# EXHIBIT "A"

# American Court Reporting
## toll-free (877) 320-1050



Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION


CIVIL ACTION NUMBER: 3:06-CV-351-MEF

G.F. KELLY TRUCKING, INC.; and GUY
KELLY, individually,
    Plaintiffs,
vs.
U.S. XPRESS ENTERPRISES, INC., et al.,
    Defendants.


DEPOSITION TESTIMONY OF
GUY F. KELLY


January 15, 2007
9:00 a.m.

COURT REPORTER:
MELANIE L. PETIX, CSR, CLR

---

Page 3

1  agreed that it shall not be necessary
2  for any objections to be made by
3  counsel as to any questions except as
4  to form or leading questions, and that
5  counsel for the parties may make
6  objections and assign grounds at the
7  time of trial, or at the time said
8  deposition is offered in evidence, or
9  prior thereto.
10        In accordance with Rule 5(d)
11  of The Alabama Rules of Civil
12  Procedure, as amended, effective
13  May 15, 1988, I, Melanie L. Petix,
14  Certified Shorthand Reporter and
15  Certified LiveNote Reporter, am hereby
16  delivering to David B. Hall, the
17  original transcript of the oral
18  testimony taken on January 15, 2007,
19  along with exhibits.
20        Please be advised that this is
21  the same and not retained by the Court
22  Reporter, nor filed with the Court.
23        --oOo--

---

Page 2

1      S T I P U L A T I O N S
2        It is hereby stipulated and
3  agreed, by and between the parties
4  through their counsel, that the
5  deposition of GUY F. KELLY may be taken
6  before Melanie L. Petix, Certified
7  Shorthand Reporter, Certified LiveNote
8  Reporter and Notary Public for the
9  State of Alabama at Large, at the
10  offices of Baker, Donelson, Bearman,
11  Caldwell & Berkowitz, Wachovia Tower,
12  420 20th Street North, Suite 1600,
13  Birmingham, Alabama 35203 on January
14  15, 2007, commencing at 9:00 a.m.
15        It is further stipulated and
16  agreed that the signature to and the
17  reading of the deposition by the
18  witness are waived, the deposition to
19  have the same force and effect as if
20  full compliance had been had with all
21  laws and rules of Court relating to the
22  taking of depositions.
23        It is further stipulated and

---

Page 4

1      A P P E A R A N C E S
2
3  FOR THE PLAINTIFF:
4      JOHN EVERETT TOMLINSON, Esq.
5      BEASLEY, ALLEN, CROW, METHVIN,
6      PORTIS & MILES, P.C.
7      P.O. BOX 4160
8      MONTGOMERY, ALABAMA 36103-4160
9
10  FOR THE DEFENDANTS:
11      DAVID B. HALL, Esq.
12      BAKER, DONELSON, BEARMAN,
13      CALDWELL & BERKOWITZ, P.C.
14      Wachovia Tower
15      420 20th Street North, Suite 1600
16      Birmingham, Alabama 35203
17
18  ALSO PRESENT:
19      Lisa Pate
20      Melissa Kell
21
22
23

## www.AmericanCourtReporting.com
## January 15, 2007

# American Court Reporting
## toll-free (877) 320-1050

Page 5

1   INDEX
2
3   EXAMINATION BY:          PAGE
4   MR. HALL                12
5
6        EXHIBITS
7
8   DEFENDANT'S              PAGE
9   No. 1 - Notice of Deposition      12
10  No. 2 - Financial Statement       55
11  No. 3 - Financial Statement       55
12  No. 4 - Balance Sheet '04         63
13  No. 5 - Financial Statement '05   63
14  No. 6 - Balance Sheet '03         63
15  No. 7 - Balance Sheet '02         63
16  No. 8 - Tax Return '05            66
17  No. 9 - Tax Return '04            67
18  No. 10 - State Tax Return '04     67
19  No. 11 - Tax Return '04           68
20  No. 12 - Request for Production
21       Responses                    68
22  No. 13 - Interrogatory Responses 101
23  No. 14 - Bank Statement          110

Page 6

1        EXHIBITS
2        (continued)
3   DEFENDANT'S              PAGE
4   No. 15 - Bank Statement          111
5   No. 16 - Tax Return '03          112
6   No. 17 - State Tax Return '03    113
7   No. 18 - Tax Return '03          113
8   No. 19 - State Tax Return '04    116
9   No. 20 - '04 Federal Depreciation
10       Schedule                    116
11  No. 21 - 1099                    118
12  No. 22 - Tax Return '05          118
13  No. 23 - State Tax Return '05    119
14  No. 24 - Georgia Tax forms       119
15  No. 25 - SC Tax Return '05       220
16  No. 26 - 1099                    121
17  No. 27 - GA Shareholder Summary  121
18  No. 28 - Shareholder's Share of
19       Income Statement            122
20  No. 29 - Kelly Trucking Out-of-
21       Pocket Expenses on
22       US Xpress Deal              123
23  No. 30 - Alan Knight Letter      150

Page 7

1        EXHIBITS
2        (continued)
3   DEFENDANT'S              PAGE
4   No. 31 - Darrell Waldon Letter   150
5   No. 32 - Driver List             153
6   No. 33 - GF Kelly Driver Roster  163
7   No. 34 - April 26 E-mail         164
8   No. 35 - Confidentiality
9       Agreement                    167
10  No. 36 - June 22 E-mail          167
11  No. 37 - June 29 Acquisition of
12       Assets Letter               170
13  No. 38 - Handwritten notes       183
14  No. 39 - October 23 E-mail       185
15  No. 40 - Asset Purchase Agreement 186
16  No. 41 - July 27, 2005 E-mail    189
17  No. 42 - July 29, 2005 E-mail    213
18  No. 43 - Summary of Agreement
19       changes since Letter of
20       Intent                      225
21  No. 44 - 8/13/05 Note            226
22  No. 45 - Asset Purchase Agreement 228
23  No. 46 - August 19, 2005 E-mail  230

Page 8

1        EXHIBITS
2        (continued)
3   DEFENDANT'S              PAGE
4   No. 47 - August 22, 2005 Letter from
5       U.S. Xpress                  237
6   No. 48 - August 23, 2005
7       "Receivable Factor"
8       E-mail                       238
9
10  No. 49 - August 23, 2005 "Final
11       Trailer List" E-mail        241
12  No. 50 - Kelly Company Vehicles
13       Road Fleet                  242
14  No. 51 - August 23, 2005
15       "Week" E-mail               245
16  No. 52 - August 23 "RE: Final
17       Trailer List" E-mail        250
18  No. 53 - G.F. Kelly Trucking
19       Out-of-Pocket Expenses      249
20  No. 54 - 8/25/05 note            252
21  No. 55 - U.S. Xpress August 25, 2005
22       Letter to Guy Kelly         260
23

**www.AmericanCourtReporting.com**
**January 15, 2007**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 9

```
1         E X H I B I T S
2          (continued)
3  DEFENDANT'S              PAGE
4  No. 56 - U.S. Xpress September 13,
5      2005 Letter to
6          Michael Cohan        263
7  No. 57 - Hill, Hill, Carter August
8      30, 2005 Letter to Ray M.
9      Martin          263
10 No. 58 - September 12, 2005 "Weekly
11     Molten Aluminum Report"
12     E-mail          268
13
14 No. 59 - Lincoln General Insurance
15     Company Forms      269
16 No. 60 - Eagle Logistics Insurance
17     Information      270
18 No. 61 - Payment History    270
19 No. 62 - January 19, 2005 U.S. DOT
20     Notice of Claim    271
21 No. 63 - Lincoln General Insurance
22     Company Forms      274
23
```

Page 10

```
1         E X H I B I T S
2          (continued)
3  DEFENDANT'S              PAGE
4  No. 64 - Avondale Mills Transportation
5      Time Sheets      275
6  No. 65 - Drivers List      276
7  No. 66 - Authorization to
8      Repossess and Hold
9      Harmless Agreement    277
10 No. 67 - Avondale Mills Work
11     Schedule        278
12         --oOo--
13
14
15
16
17
18
19
20
21
22
23
```

Page 11

```
1          I, Melanie L. Petix, a
2  Certified Shorthand Reporter, Certified
3  LiveNote Reporter and Notary Public for
4  the State of Alabama at Large, acting
5  as Commissioner, certify that on this
6  date, pursuant to the Alabama Rules of
7  Civil Procedure, and the foregoing
8  stipulations of counsel, there came
9  before me at the offices of Baker,
10 Donelson, Bearman, Caldwell &
11 Berkowitz, Wachovia Tower, 420 20th
12 Street North, Suite 1600, Birmingham,
13 Alabama 35203, on January 15, 2007,
14 commencing at or about 9:00 a.m., GUY
15 F. KELLY, witness in the above cause,
16 for oral examination, whereupon, the
17 following proceedings were had:
18
19          GUY F. KELLY,
20 having been first duly sworn
21 (affirmed), was examined and testified
22 as follows:
23
```

Page 12

```
1          COURT REPORTER:  Usual
2  stipulations?
3          MR. HALL:  That's fine.
4          MR. TOMLINSON:  Yes.
5
6  EXAMINATION BY MR. HALL:
7      Q.  Mr. Kelly, if you could,
8  please state your name.
9      A.  Guy F. Kelly.
10     Q.  How do you spell Kelly?
11     A.  K-e-l-l-y.
12     Q.  Guy is your first name?
13     A.  First name.
14     Q.  Mr. Kelly, let me show you
15 what has been marked as Defendant's
16 Exhibit 1.
17
18         (Whereupon, Defendant's Exhibit
19         Number 1 was marked for
20         identification and is attached to
21         the original transcript.)
22
23     Q.  It's a notice of deposition
```

3 (Pages 9 to 12)

**www.AmericanCourtReporting.com**
**January 15, 2007**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 13

1 for G.F. Kelly Trucking, Inc.
2    Have you seen that before
3 today?
4    A.  Not that particular copy, no.
5    Q.  Do you understand that you are
6 going to be testifying in this
7 deposition both for yourself and the
8 company?
9    A.  Correct.
10    Q.  I have a copy over here, so I
11 don't have to look over your shoulder.
12    On the second page of Exhibit
13 1, there are a list of topics.
14    Although you may not have seen
15 it in this amended notice of
16 deposition, have you seen this list
17 before?
18    A.  Yes.
19    Q.  I'm going to try to cut things
20 short.  Are you the person to speak to
21 all of these things or is somebody else
22 going to speak to any of these items?
23    A.  I won't be the only person,

Page 14

1 no, that has knowledge.
2    Q.  I'm just talking about that
3 will speak for the company?
4    A.  Yes.
5
6    (Discussion off the record.)
7
8    Q.  (BY MR. HALL:)  Mr. Kelly, if
9 you could, give me your educational
10 background.
11    A.  A BS degree, economics,
12 Auburn.  That other college.
13    Q.  I'm sorry?
14    A.  That other college.
15    Q.  Oh, that other college.
16    What year did you graduate?
17    A.  '85.
18    Q.  Have you had any postgraduate
19 study?
20    A.  That's all.
21    Q.  Where did you go to high
22 school?
23    A.  Wadley High School.

Page 15

1    Q.  And you currently live in
2 Wadley?
3    A.  I live in Roanoke.
4    Q.  Roanoke?
5    A.  Roanoke.
6    Q.  What is the street address
7 that you live at?
8    A.
9    Q.  Do you live there with anyone
10 else?
11    A.  My wife and three kids.
12    Q.  Is it Mary?
13    A.  Mary Kelly.
14    Q.  How old are your children?
15    A.  Twin girls seven, and a
16 stepdaughter 15.
17    Q.  Have you had any previous
18 marriages?
19    A.  No.
20    Q.  After graduating from -- you
21 said a BS degree in economics?
22    A.  Correct.
23    Q.  I forgot to mention something.

Page 16

1 I'm sure your attorney probably went
2 over this with you.  If I ask you any
3 questions that are confusing, which I
4 am perfectly capable of doing, please
5 ask me to rephrase it or tell me you
6 don't understand it.  Sometimes I have
7 a tendency to speak low, and if you
8 don't hear it, whatever, if there is
9 something wrong with the question,
10 please ask me and let me know and I
11 will try to rephrase it.
12    A.  Okay.
13    Q.  And you need to answer out
14 audibly.  Uh-huh and uh-uh are hard to
15 write down, so you need to say yes or
16 no.
17    A.  Right.
18    Q.  Where did you go to work after
19 you graduated from Auburn?
20    A.  Yellow Freight Systems located
21 in Mobile, Alabama.
22    Q.  What was your job there?
23    A.  Operations manager.

4  (Pages 13 to 16)

**www.AmericanCourtReporting.com**
**January 15, 2007**

# American Court Reporting
## toll-free (877) 320-1050

Page 17

1    Q.  How long did you work there?
2    A.  Two years.
3    Q.  Would that be '85 to '87?
4    A.  Correct.
5    Q.  What does a -- let me rephrase
6  this question.
7         What did you do as an
8  operations manager?
9    A.  I was responsible for all the
10  outbound shipments, transporting from
11  Mobile commercial zone to the Jackson,
12  Mississippi break bulk center.
13    Q.  B-r-e-a-k?
14    A.  Break, uh-huh.  Bulk, b-u-l-k.
15    Q.  Where did you go after you
16  left Yellow Freight?
17    A.  I worked one year, Zellner
18  Transfer Company in Atlanta, Georgia,
19  sales.
20    Q.  How do you spell that?
21    A.  Z-e-l-l-n-e-r.
22    Q.  Are they still in operation?
23    A.  They have been bought out, but

Page 18

1  they are still operating on a Zellner
2  Frontier.
3    Q.  Who owns them?
4    A.  A holding company out of
5  Indianapolis.  I think it's Frontier
6  Corporation, I believe.
7    Q.  Why did you leave Yellow
8  Freight?
9    A.  I wanted to be in sales and
10  they wanted me to be in operations, and
11  so I left.
12    Q.  You were at Zellner for one
13  year?
14    A.  About a year, yes.
15    Q.  Was that '87 to '88?
16    A.  Correct.
17    Q.  What type of sales did you do
18  there?
19    A.  Truckload, dry box,
20  transportation.
21    Q.  Where did you go after you
22  left Zellner?
23    A.  Worked for McClendon Trucking

Page 19

1  as a sales person out of Lafayette,
2  Alabama.
3    Q.  How long did you work there?
4    A.  Two years, '88 till '90.
5    Q.  What type of sales did you do
6  there?
7    A.  Truckload, dry box, regional
8  transportation.
9    Q.  I have an idea of how many
10  trucks Yellow Freight has.
11        How big was Zellner when you
12  worked there?
13    A.  A hundred trucks.
14    Q.  When you were with Yellow, do
15  you know roughly how many they had?
16    A.  It would be speculation.
17    Q.  Substantially more than
18  Zellner?
19    A.  Large amount of trucks.
20    Q.  How many did McClendon have
21  when you were there?
22    A.  Over 700.
23    Q.  Were they exclusively a

Page 20

1  truckload carrier?
2    A.  Correct.
3    Q.  Why did you go to McClendon
4  from Zellner?
5    A.  Chance to get back home.
6    Q.  Lafayette?
7    A.  It's within a 30-minute drive
8  from Wadley.
9    Q.  Were you right in Atlanta with
10  Zellner?
11    A.  Correct.  I lived in
12  Riverdale, a suburb of Atlanta.
13    Q.  Where did you go after you
14  left McClendon?
15    A.  I started my own business.
16    Q.  What year was that?
17    A.  '90.
18    Q.  Prior to 1990, had you owned
19  any other businesses?
20    A.  No.
21    Q.  Was the business you
22  started Guy --
23    A.  G.F. Kelly Trucking.

5  (Pages 17 to 20)

## www.AmericanCourtReporting.com
## January 15, 2007

**American Court Reporting**
**toll-free (877) 320-1050**

Page 21

1    Q.  G.F. Kelly Trucking.
2        Now, I have seen G.F. Kelly,
3    Inc. and G.F. Trucking, Inc.  Is that
4    the same entity?
5    A.  Correct.
6    Q.  Which one is the official
7    name?
8    A.  The legal corporate name is
9    G.F. Kelly Trucking, Incorporated.
10   Q.  Why did you start your own
11   business besides to make money?
12   A.  Opportunity to go out on my
13   own and work for myself.
14   Q.  Did you do this alone or did
15   you have any partners?
16   A.  Alone.  I started with one
17   truck, one trailer, and a cell phone.
18   Q.  When did you hire your first
19   employee?
20   A.  (No response.)
21   Q.  Year?
22   A.  '90.
23   Q.  '90?  Do you remember how

Page 22

1    quickly you grew?
2    A.  Not specifically.
3    Q.  At the end of 2004, how many
4    tractors did you have working for you,
5    either owned or owner/operator?
6    A.  I would say around 50.
7    Q.  How many of those did you own?
8    A.  I will say a third.
9    Q.  And the others were
10   owner/operators?
11   A.  Contractors, owner/operators.
12   Q.  When I say owned, I mean,
13   either leased or purchased and titled
14   in -- well, that's not the right way to
15   put it either.  That weren't
16   owner/operators?
17   A.  Correct.
18   Q.  How many trailers did you have
19   at the end of 2004?
20   A.  I would say approximately one
21   fifty.  I try to keep a three to one
22   ratio on trailers.
23   Q.  Who did you carry for?  Well,

Page 23

1    let me rephrase that question.
2        What type of trucking company
3    was G.F. Kelly when you started?
4    A.  Regional, short haul,
5    truckload, dry box.
6    Q.  Is that pretty much what G.F.
7    Kelly remained up to the present?
8    A.  Correct.  Correct.
9    Q.  Is G.F. Kelly Trucking still
10   in operation?
11   A.  No.
12   Q.  No?  When did it cease
13   operation?
14   A.  Pretty much the end of '05.
15   It operated some into '06.
16   Q.  Was it sold, did it shut down?
17   What happened to it?
18   A.  It was shut down.
19   Q.  Does G.F. Kelly Trucking still
20   have any employees?
21   A.  No.
22   Q.  G.F. Kelly Trucking, Inc., has
23   it wound up yet or is it still in

Page 24

1    existence?
2    A.  It legally still exists, but
3    no operations or no functions.
4    Q.  In 1990, you were the sole
5    shareholder in G.F. Kelly?
6    A.  Correct.
7    Q.  At some point, did you take on
8    any other investors?
9    A.  I gave some stock to an
10   employee in, I believe, '96.
11   Q.  Who was that?
12   A.  Nelson Chastain.  It was part
13   of his compensation program.
14   Q.  I saw on one of the documents
15   that he owned 20 percent in 2005; is
16   that right?
17   A.  Correct.
18   Q.  Is that what you conveyed to
19   him in '96?
20   A.  That if he would come to work
21   for me, that would be part of his
22   compensation package.
23   Q.  By the way, if for any reason,

**www.AmericanCourtReporting.com**
**January 15, 2007**

# American Court Reporting
## toll-free (877) 320-1050

Page 25

1  you need to take a break, use the
2  restroom, just let me know. This isn't
3  an endurance contest.
4     A. Okay.
5     Q. That goes for everybody in the
6  room.
7        Besides owner, what was your
8  title at G.F. Kelly?
9     A. President.
10    Q. Were you an employee?
11    A. Correct.
12    Q. Has that title ever changed?
13    A. No.
14    Q. Why did you want Mr. Chastain
15 to come to work with you in '96?
16    A. It was the growth that I was
17 having, I basically needed some help.
18    Q. What was Mr. Chastain's job to
19 be?
20    A. Vice-president, operations.
21    Q. In 1996, did you own any other
22 businesses?
23    A. Yes.

Page 26

1     Q. What were they?
2     A. K-Diesel; that's the letter K
3  dash Diesel; Riverside Diesel,
4  Riverside Truck Plaza, Kelly Spotting,
5  Kelly Leasing. I think that's all.
6     Q. While we are on that subject,
7  I asked about 1996, were there any that
8  you started between '92 and '96 that
9  you didn't own in '96?
10    A. Those were all started prior
11 to '96.
12    Q. Okay. Are there any other
13 companies since then that you have
14 started?
15    A. Eagle Logistics.
16    Q. Any others?
17    A. Riverside Timber.
18    Q. Are all these incorporated?
19    A. They are all C corps.
20    Q. Are all these entities still
21 in business?
22    A. No.
23    Q. Which ones are no longer in

Page 27

1  business?
2     A. Riverside Diesel, Riverside --
3  excuse me. Riverside Diesel is not
4  operating; Kelly Spotting, Kelly
5  Leasing, G.F. Kelly Trucking. I think
6  I got them all.
7     Q. K-Diesel, what is it?
8     A. K-Diesel actually was
9  originally a shuttle spotting company.
10 They had my spotting services.
11    Q. What did it become?
12    A. It's actually what I have
13 today operating as a holding company,
14 still spotting and trucking.
15    Q. What was Riverside Diesel?
16    A. Shop.
17    Q. Was it the shop for --
18    A. G.F. Kelly Trucking.
19    Q. Any other entities; in other
20 words, did it do work for other
21 public --
22    A. Yes, it done public work, too.
23    Q. What is Riverside Truck Plaza?

Page 28

1     A. It is a grocery store slash
2  convenience store.
3     Q. Where is it located?
4     A. Wadley.
5     Q. Are all these in or around
6  Wadley?
7     A. All in Wadley, correct.
8     Q. I assume Kelly Spotting was in
9  the spotting business?
10    A. Correct.
11    Q. Kelly Leasing, did it lease --
12    A. Trailer rental and trailer
13 leasing.
14    Q. Just trailers?
15    A. Correct. No. Excuse me. It
16 actually has real estate, rental
17 houses.
18    Q. And you said it's no longer
19 operating?
20    A. No.
21    Q. What is Eagle Logistics?
22    A. It is actually the road fleet
23 that I operate now. It's what holds

7  (Pages 25 to 28)

## www.AmericanCourtReporting.com
## January 15, 2007

**American Court Reporting**
**toll-free (877) 320-1050**

Page 29

1  the operating authority.
2  Q.  Is it a regional carrier?
3  A.  Correct.
4  Q.  Same as what -- pretty much is
5  what G.F. Kelly --
6  A.  Correct.
7  Q.  What is Riverside Timber?
8  A.  It is a timber business, buys
9  timber, sells timber, logging
10  operations.
11  Q.  Does it own land or does it
12  lease rights?
13  A.  It basically contracts to cut
14  timber.
15  Q.  Why did Riverside Diesel cease
16  operation?
17  A.  I originally rolled it into
18  the company.
19  Q.  What company?
20  A.  It was originally rolled into
21  G.F. Kelly Trucking.
22  Q.  When was that?
23  A.  I think in '03 or in '04, if

Page 30

1  I'm not correct on that date.
2  Q.  Explain spotting to me.  I
3  heard that term.
4  A.  Are you familiar with Bowater
5  Paper Company, Bowater Paper Mill in
6  Childersburg?
7  Q.  Yes.
8  A.  Well, they will have a group
9  of trailers on their lot that are
10  empty, say 150.  And they will employ
11  someone like me that has on-site
12  personnel and labor.  And they will
13  have these particular little trucks
14  that are built for off-road use.  And
15  we basically are on site as an
16  operation.
17  We take the empty trailer, we
18  carry it to the mill, to the docks and
19  they load the trailers and we bring the
20  full loaded trailer back to the trailer
21  yard.  And that is a constant
22  motion, 24 hours, seven days a week.
23  And that way, the road fleets can come

Page 31

1  through and just drop the empty
2  trailer, pick up a loaded trailer, and
3  doesn't have to go to the docks and
4  things like that.  It's basically a
5  drop and hook operation, if that helps
6  you understand it.
7  Q.  It does.  Did you own the, I
8  will call them tractors?
9  A.  Yes.  They are Ottawas,
10  O-t-t-a-w-a.  That's the brand name.
11  Q.  For a lawyer, I asked a very
12  bad question.
13  What company owned the
14  tractors?
15  A.  K-Diesel owned some and
16  G.F. Kelly, Inc. owned some.
17  Q.  Did G.F. Kelly, Inc. own any
18  in 2004?
19  A.  Yes.
20  Q.  How many?
21  A.  I couldn't give you a specific
22  number.  I had a total of 22 at one
23  point in time, and they would have been

Page 32

1  divided according to the operations.
2  Q.  I think we all are on the same
3  page with regard to the agreement and
4  the negotiations that went on in 2005.
5  Any of the, I will call them
6  Ottawas, were they part of the
7  negotiations or part of the substance
8  of the negotiations with U.S. Xpress,
9  if you recall?
10  A.  At some point in time, yes, it
11  was discussions about the spotting
12  services, yes.
13  Q.  Are the Ottawas included in
14  the 50 tractors that G.F. Kelly
15  operated?  Are the Ottawas included in
16  that number 50?
17  A.  At what point in time?
18  Q.  I think you indicated in 2004,
19  you had 50.
20  A.  I would have had some Ottawas,
21  but not included in the 50 tractors.
22  Q.  When you started talking with
23  U.S. Xpress, was that number of 50

**www.AmericanCourtReporting.com**
**January 15, 2007**

# American Court Reporting
## toll-free (877) 320-1050

Page 33

1  tractors about the same?
2      A.  No.
3      Q.  How many did you have when you
4  started talking to U.S. Xpress?
5      A.  It was over 200.
6      Q.  Tractors?
7      A.  Over-the-road units.
8      Q.  How many trailers did you have
9  when you started talking to U.S.
10  Xpress?
11      A.  It was over 500.
12      Q.  I guess, since we are talking
13  about it, we might as well finish it
14  out.  Why the increase?
15      A.  From?
16      Q.  From roughly 50 tractors in
17  2004 to over 200.
18      A.  Oh, let me back up.  In '04?
19  I was thinking you were at '94.  '94 is
20  when I had about 50 tractors.
21      Q.  Okay.
22      A.  And I had a steady progression
23  of increasing the fleet, growing the

Page 34

1  fleet from '96 forward.
2      Q.  So the 50 number is
3  referencing 1994?
4      A.  '96, yes -- '94, excuse me.
5  Yes.  I'm sorry.
6      Q.  That's all right.  Let me go
7  back to Kelly Spotting.  When did it
8  cease operation?
9      A.  In '05.
10      Q.  Why?
11      A.  I just started rolling
12  everything into K-Diesel for
13  simplification.
14      Q.  Kelly Leasing, my
15  understanding is, it ceased operation
16  as well?
17      A.  Correct.
18      Q.  Did it cease in '05 as well?
19      A.  Yes.
20      Q.  Was it rolled into K-Diesel?
21      A.  I pretty much sold everything
22  that was in it.
23      Q.  To whom?

Page 35

1      A.  Some of the trailers were sold
2  to Utility Trailer in Birmingham,
3  Alabama.  The rental property would
4  have been some individuals.  Sold one
5  house to Justin McKinney.  Dr. Mike
6  Robinson bought a nine-house rental
7  complex and took it.
8      Q.  My understanding is, G.F.
9  Kelly Trucking is no longer operating.
10      What happened to the assets of
11  G.F. Kelly Trucking?
12      A.  What was left was purchased by
13  K-Diesel.
14      Q.  When was that?
15      A.  It would have been in '06.
16      Q.  Prior to August of 2005, had
17  you removed any assets -- let me
18  rephrase this question.
19      Between August 2004 and August
20  2005, did you remove any assets of G.F.
21  Kelly Trucking, Inc.?
22      A.  No.
23      Q.  Did you transfer any of its

Page 36

1  assets to any of your other companies?
2      A.  During that time period?
3      Q.  Yes, sir.
4      A.  No.
5      Q.  What is CWC, Inc.?
6      A.  That was one of the spotting
7  services that Nelson Chastain and I
8  owned together.
9      Q.  Is it still in operation?
10      A.  I believe so.
11      Q.  Do you still own --
12      A.  I have no ownership in it.
13      Q.  Did you say that you did
14  own --
15      A.  I was part owner at one point
16  in time.
17      Q.  Okay.  When was that?
18      A.  It would have been -- I got
19  out of my part in '06.
20      Q.  Who owns it now?
21      A.  Nelson Chastain.
22      Q.  How much of it did you own?
23      A.  Fifty percent.

9 (Pages 33 to 36)

## www.AmericanCourtReporting.com
## January 15, 2007

# American Court Reporting
## toll-free (877) 320-1050

Page 37

1    Q. Did you sell out to
2  Mr. Chastain or just how did that --
3    A. We parted ways in the end of
4  '05, '06, and part of the parting of
5  the ways, he retained that business.
6    Q. Does he still own any interest
7  in G.F. Kelly Trucking?
8    A. No.
9    Q. When was that, when was his
10 ownership transferred?
11   A. At the same time, '05, early
12 '06.
13   Q. And that was transferred to
14 you?
15   A. Correct.
16   Q. Does anybody own any part of
17 Eagle Logistics with you?
18   A. Yes.
19   Q. Who?
20   A. My wife, Mary.
21   Q. How much does she own?
22   A. I think she owns 40 percent.
23 I'm not totally correct on that.

Page 38

1    Q. Less than half?
2    A. I think so.
3    Q. Do you own the rest of it?
4    A. No.
5    Q. How much do you own?
6    A. I think I own 20 percent,
7  maybe 40. I'm not totally correct on
8  this. I would have to pull the papers
9  to be positive.
10   Q. Who owns the other percentage?
11   A. Tim Heard (phonetic). I think
12 that's been changed.
13   Q. And Eagle, it's a road fleet?
14   A. It's the road fleet that we
15 operate now.
16   Q. If we can, go back to spotting
17 just a second. A driver who operates
18 one of the Ottawas in a spotting
19 operation, is he required to have a
20 CDL?
21   A. Possibly. It's according to
22 the operation.
23   Q. The K-Diesel, the K-Diesel

Page 39

1  spotters, do they have CDLs in their
2  operations?
3    A. Some of them do, yes.
4    Q. Where does Tim Heard live?
5    A. Wadley.
6    Q. Are you an employee of Eagle?
7    A. Yes.
8    Q. What is your job title?
9    A. President.
10   Q. President? Does Mr. Heard
11 work for Eagle?
12   A. No.
13   Q. Solely an investor?
14   A. Correct.
15   Q. Does Eagle have any other
16 employees?
17   A. Yes.
18   Q. Who is its CFO?
19   A. Chief financial officer?
20   Q. Yes.
21   A. As in accounting?
22   Q. Let me ask that. Does it have
23 a controller?

Page 40

1    A. We use an outside firm.
2    Q. Who is that?
3    A. Newman's Accounting in Wadley.
4    Q. Does Eagle have a
5  vice-president? Let me rephrase that.
6       Who are the officers of Eagle?
7    A. Mary Kelly is CEO and I'm the
8  president and secretary. And that's
9  it.
10   Q. Is there a safety manager?
11   A. Frank Childers.
12   Q. Is there a sales manager?
13   A. No.
14   Q. Do you have any salesmen?
15   A. Myself.
16   Q. What happened to the tractors
17 that G.F. Kelly Trucking was operating
18 in 2005 when it ceased operations?
19   A. I had to turn them in. They
20 were repo'ed.
21   Q. Was that all of them?
22   A. Not all of them.
23   Q. Those that weren't

## www.AmericanCourtReporting.com
## January 15, 2007

# American Court Reporting
## toll-free (877) 320-1050

Page 41

1  repossessed, what happened to them?
2      A.  I was able to keep a few.  I
3  don't know the exact number.  I think
4  it was about five.  And K-Diesel is
5  paying for them.
6      Q.  And you said it's about five?
7      A.  There's five, I think about
8  five that's left in actual G.F. Kelly,
9  Inc.'s name that K-Diesel is paying for
10 and another five that the bank -- I
11 borrowed the money from the bank, local
12 bank to purchase them.
13     Q.  You said you borrowed the
14 money.  What --
15     A.  K-Diesel borrowed the money.
16 K-Diesel borrowed the money.
17     Q.  How many over-the-road
18 tractors does K-Diesel operate?
19     A.  Forty-seven right now.
20     Q.  How many of those are not
21 owner/operators?
22     A.  Thirty-two.
23     Q.  Thirty-two are not?

Page 42

1      A.  Thirty-two are not.
2      Q.  So if you take out the ten
3  that came over from G.F. Kelly from the
4  32, are the other 22 originally
5  purchased or leased in K-Diesel's name?
6      A.  That would be correct.
7      Q.  How many trailers does
8  K-Diesel operate?
9      A.  Now, 120.
10     Q.  Are any of those trailers that
11 G.F. Kelly was operating?
12     A.  Yes.
13     Q.  How many?
14     A.  They were all operated by G.F.
15 Kelly at one point in time.
16     Q.  Did K-Diesel purchase them
17 from G.F. Kelly?
18     A.  They purchased a group of 40
19 that wasn't paid for.
20     Q.  Were the other 80 just
21 transferred or what?
22     A.  They were paid for and
23 transferred.

Page 43

1      Q.  When you say that K-Diesel
2  purchased 40, was there an exchange of
3  money or did K-Diesel just assume the
4  debt or something else?
5      A.  To keep from losing them, the
6  bank financed 40 for me in K-Diesel's
7  name.
8      Q.  And you said for you?
9      A.  For K-Diesel.
10     Q.  And the other 80 were
11 transferred to K-Diesel, there was no
12 exchange of money?
13     A.  Funds, no.
14     Q.  How many drivers does K-Diesel
15 have currently?
16     A.  Actual people that can drive,
17 55.
18     Q.  Fifty-five.  When you say
19 actual people that can drive, did you
20 mean CDL?
21     A.  Correct.
22     Q.  How many spotters that don't
23 have CDLs?

Page 44

1      A.  Probably about eight.
2      Q.  Of the 55 CDL drivers, how
3  many of those are spotters?
4      A.  Three, I believe.
5      Q.  Am I using that term right,
6  spotters?
7      A.  (Nods head.)  You are doing
8  good.
9      Q.  How many of the -- I'm going
10 to put them both together, the 55 and
11 the eight.
12         How many of the 63 drivers
13 worked for G.F. Kelly?
14     A.  I think all of them.
15     Q.  Did any of them work for
16 K-Diesel prior to G.F. Kelly ceasing
17 operation?
18     A.  Yes.
19     Q.  How many?
20     A.  I think about four, I think.
21     Q.  Were they employed by K-Diesel
22 prior to G.F. Kelly ceasing operation
23 or did they just work for them?

## www.AmericanCourtReporting.com
## January 15, 2007

**American Court Reporting**
**toll-free (877) 320-1050**

Page 45

1    A. Yes. K-Diesel always had
2  employees. They would have been
3  employed.
4    Q. Were they spotters?
5    A. Correct.
6    Q. Were they CDL?
7    A. Some of them.
8    Q. What is G & N Spotting
9  Service?
10   A. That is an entity, a spotting
11  service that Nelson and I owned
12  together.
13   Q. Is it still in existence?
14   A. Yes, I think.
15   Q. Do you still own any part of
16  it?
17   A. No.
18   Q. Was that part of the
19  separation?
20   A. Correct.
21   Q. When I talk about
22  separation --
23   A. Nelson and I, correct.

Page 46

1    Q. Did you ever work for, as an
2  employee, G & N Spotting Service?
3    A. No.
4    Q. The number of spotting
5  services, were those set up around
6  companies that you worked for?
7    A. Yes.
8    Q. So if you had a spotting job
9  at -- what did you call it, Bowater?
10   A. Bowater.
11   Q. Bowater Paper Mill, you would
12  form a company for that operation?
13   A. Correct.
14   Q. Where did G & N Spotting
15  Service work?
16   A. I think it was at the Nabisco
17  plant in Atlanta.
18   Q. Nabisco?
19   A. Nabisco.
20   Q. What is Golden Eagle Property,
21  LLC?
22   A. That's a company that my
23  ex-employee accountant owned or still

Page 47

1  does own.
2    Q. Did you own any interest in
3  that at any point in time?
4    A. You know, I don't know, to be
5  honest with you.
6    Q. The ex-employee, is that
7  Dennis Hamlet?
8    A. Yes.
9    Q. I don't mind showing you what
10  I'm looking at. Does that list you as
11  an incorporator?
12   A. Wow.
13   Q. Does that ring a bell?
14   A. I have seen some mail come
15  through that I have forwarded to
16  Dennis. I think that was his -- that
17  was his real estate property in
18  Opelika. He tried to get me to go in
19  with him on it. That's all I know
20  about that.
21   Q. What is K.C. Spotting, Inc.?
22   A. That was another spotting
23  service that Nelson and I had together.

Page 48

1    Q. Are you still --
2    A. No part of it now.
3    Q. Part of the separation?
4    A. Correct.
5    Q. Where did it spot at?
6    A. International Paper in
7  Augusta, Georgia.
8    Q. Does Joe Kelly own any part of
9  K-Diesel, Inc.?
10   A. He was a secretary, I think,
11  at one point in time. But no, he does
12  not own any of it now.
13   Q. I may have asked you this and
14  I apologize if I'm being redundant.
15     But does anybody else own any
16  portion of K-Diesel, Inc.?
17   A. My wife may be on it. I'm not
18  positive. I'm not positive.
19   Q. Have you ever owned a company
20  called Kelly Aluminum, Inc.?
21   A. Yes. I apologize for missing
22  that one.
23   Q. What kind of business was it

**www.AmericanCourtReporting.com**
**January 15, 2007**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 49

1  or is it?
2      A.  That was the group of trucks
3  that were dedicated to an account I had
4  with Wabash Alloys in Steele, Alabama.
5  It was a group of trucks that serviced
6  an account because of the type of
7  product.
8      Q.  So Kelly Aluminum actually
9  owned the truck or leased the trucks?
10     A.  It leased the trucks from G.F.
11  Kelly.
12     Q.  Oh, it leased them from G.F.
13  Kelly?
14     A.  G.F. Kelly owned the trucks,
15  but we had to operate the trucks under
16  Kelly Aluminum because it was a
17  hazardous material.  So I had to create
18  a company to do that exclusively
19  because of insurance purposes.
20     Q.  Okay.  Did Kelly Aluminum
21  employ its own drivers?
22     A.  I think so.
23     Q.  Did it operate out of --

Page 50

1      A.  Wadley.
2      Q.  -- Wadley?
3      A.  (Witness nods head.)
4      Q.  G.F. Kelly's site?
5      A.  Correct.
6      Q.  Did Kelly Aluminum keep
7  separate drivers' files for the drivers
8  that worked for them?
9      A.  No, I don't think so.  Frank
10  Childers would be the one to answer
11  those particulars a lot better than I
12  could.
13     Q.  Okay.  Is Kelly Aluminum still
14  in operation?
15     A.  No.
16     Q.  Did you own that by yourself?
17     A.  Yes.
18     Q.  When did it cease operation?
19     A.  I lost the account, I believe
20  in the end of '05, early 06, possibly.
21     Q.  Did Kelly Spotting do any
22  spotting anywhere other than Bowater?
23     A.  Sterilite Corporation in

Page 51

1  Birmingham, Alabama.
2      Q.  What's it called?
3      A.  Sterilite.  S-t-e-r-i-l-i-t-e.
4      Q.  What is Lufkin Trailers of
5  Alabama?
6      A.  It is a dry box, flat-bed
7  trailer dealership.
8      Q.  Do you own that?
9      A.  I own 50 percent of it.
10     Q.  Is Jerry Newsome another
11  investor?
12     A.  He is deceased.  His wife.
13     Q.  Ms. Newsome owns the other?
14     A.  Correct.
15     Q.  Is it still in operation?
16     A.  Correct.
17     Q.  Are you employed by it?
18     A.  No.
19     Q.  Where did G.F. Kelly Trucking
20  purchase its trailers from?
21     A.  Some of them came from Lufkin
22  Trailers of Alabama.
23     Q.  Did Lufkin make trailers to

Page 52

1  carry paper?
2      A.  Dry box.  They manufactured
3  dry box trailers and flat beds and dump
4  trucks.
5      Q.  Are you an officer of Lufkin
6  Trailers?
7      A.  I think so.  I think I'm
8  vice-president or president.  I don't
9  even know.  I will be honest with you.
10  I let my attorney handle all that
11  stuff.  I think I am.  I should be.
12     Q.  What is NAC Trucking, Inc.?
13     A.  That is a spotting service.
14     Q.  Go back a second.  In 2005,
15  you indicated you had over 200
16  tractors.  Did those include tractors
17  leased to Kelly Aluminum?
18     A.  Yes.
19     Q.  Did that 200 include any
20  tractors used by K.C. Spotting, Inc.?
21     A.  I don't think so.  I'm not
22  positive.  It could have used an Ottawa
23  at one point in time or a truck, if one

**www.AmericanCourtReporting.com**
**January 15, 2007**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 53

1   was broken down. I always kept some
2   spares. So I can't answer that.
3       Q. NAC Trucking, Inc., you said
4   it was a spotting --
5       A. It was a spotting service.
6       Q. Where did it spot at?
7       A. It done some work in Atlanta
8   for, I think, Advanced Distribution
9   Services over in Morrow, Georgia.
10      Q. What's the name of the town?
11      A. Morrow, M-o-r-r-o-w. That's
12  Atlanta.
13      Q. Did it work for a specific
14  company there?
15      A. Advanced Distribution.
16      Q. Okay. I'm sorry. How many
17  spotters worked for NAC Trucking, Inc.
18  in 2005?
19      A. I couldn't answer that.
20  Nelson could answer that better than I
21  could.
22      Q. Were you ever an owner in
23  that?

Page 54

1       A. I think so. I'm not positive.
2       Q. If you were, are you no longer
3   after the separation?
4       A. No longer. That was one of
5   the separations.
6       Q. Have you ever served on any
7   boards, board of directors for any
8   companies you did not own?
9       A. Not to my knowledge.
10      Q. Have you ever been on any
11  public service commissions, anything
12  like that?
13      A. Does the chamber of commerce
14  fall under that? I was part of the
15  chamber of commerce for some period of
16  time. I can't recall exactly the
17  years.
18      Q. I have something here that
19  indicates you were on the Randolph
20  County --
21      A. Oh, yeah. Randolph County
22  Industrial Board, correct, and the
23  chamber of commerce.

Page 55

1       Q. Prior to the negotiations with
2   the U.S. Xpress about the sale of G.F.
3   Kelly Trucking, Inc., had you ever sold
4   any other companies?
5       A. I don't recall any. No.
6       Q. Had you ever purchased any
7   companies?
8       A. No.
9           MR. HALL: Why don't we take a
10  quick break.
11
12          (Short recess.)
13
14      Q. (BY MR. HALL:) Let me show
15  you what has been marked as Defendant's
16  Exhibits 2 and 3 and ask if you can
17  identify those, please.
18
19          (Whereupon, Defendant's Exhibit
20          Numbers 2 and 3 were marked for
21          identification and are attached to
22          the original transcript.)
23

Page 56

1       A. Personal financial statements.
2       Q. Personally?
3       A. Personally.
4       Q. At the top, it appears
5   somebody has written then and now.
6       A. That was my handwriting.
7       Q. Then is in reference to what
8   period?
9       A. Then would have been July '05,
10  what I had a net worth of pre-U.S.
11  Xpress.
12      Q. The one marked 3 is before you
13  negotiated with U.S. Xpress?
14      A. Correct.
15      Q. And the one marked Defendant's
16  Exhibit 2 is after?
17      A. Post-U.S. Xpress.
18      Q. Who prepared those?
19      A. Myself.
20      Q. May I see those a second?
21      A. (Complies.)
22      Q. Explain to me what the
23  difference is between those two or why

**www.AmericanCourtReporting.com**
**January 15, 2007**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 57

1 there is a difference between those
2 two.
3    A.  I had to basically take my
4 personal savings and personal cash to
5 keep my business going and to pay
6 deficiencies and things of that sort.
7    Q.  I noticed a difference in the
8 valuation of Riverside Truck Stop.  Is
9 it the same?
10    A.  No.  I built onto it.
11    Q.  Okay.  Is Riverside Truck
12 Stop --
13    A.  Same thing as Riverside Truck
14 Plaza.
15    Q.  Okay.  Does G.F. Kelly
16 Trucking still have any assets or
17 liabilities?
18    A.  Yes.
19    Q.  What does it currently have?
20    A.  I would have to get the list.
21 But it still has -- it has some trucks
22 that's in G.F. Kelly's name, but
23 K-Diesel is paying for them.

Page 58

1    Q.  Okay.  You mentioned those.
2    A.  Yeah.
3    Q.  Just with regard to assets,
4 are there any other assets?
5    A.  Not to my knowledge.
6    Q.  All right.  Are there any
7 other liabilities?
8    A.  Yes.
9    Q.  You indicated that you would
10 have to look at a list.  Is there a
11 piece of paper with this information on
12 it?
13    A.  The accountant would have it.
14    Q.  Who is the accountant?
15    A.  Newman Accounting in Wadley.
16    Q.  I'm just presuming that it
17 wouldn't be a fair question to ask you
18 about all liabilities.
19    A.  I could tell you about some of
20 them.
21    Q.  Okay.  Tell me about them.
22    A.  Which ones?
23    Q.  I don't know which ones you

Page 59

1 got, so.
2    A.  Would lawsuits be considered
3 as liabilities?  I'm being sued from
4 the G.F. Kelly standpoint?
5    Q.  For debts from contracts or --
6    A.  For deficiencies on contracts.
7    Q.  Okay.  Deficiencies is what
8 I'm looking for.
9    A.  Okay.
10    Q.  I know about Volvo Commercial
11 Finance.
12    A.  You do?  Okay.  You would like
13 to have some more?
14    Q.  Do you have any others?
15    A.  Omni National Bank, Atlanta,
16 Georgia.
17    Q.  Is that in suit?
18    A.  Yes.
19    Q.  Any others?
20    A.  Navistar International.
21    Q.  Lawsuit?
22    A.  Yes, lawsuit.
23    Q.  I interrupted you.  I'm sorry.

Page 60

1    A.  And you have Volvo, right?
2    Q.  Yes, sir.  Any others?
3    A.  Those are the only three at
4 this time, I think.
5    Q.  Are there any deficiencies --
6    A.  And -- go ahead.  I'm sorry.
7    Q.  -- that there isn't any
8 lawsuit related to?
9    A.  Yes.  Daimler/Chrysler.
10 Daimler/Chrysler, I can't hardly
11 pronounce it, I'm paying $600 a month.
12 I had a deficiency with First
13 Continental Leasing.
14    Q.  Okay.
15    A.  And there are some others I
16 haven't heard from yet.
17    Q.  Do you know their names?
18    A.  GE.
19    Q.  GE Finance?
20    A.  Uh-huh.
21    Q.  Is that a yes or no?
22    A.  Yes.  GE Finance, yes.  I
23 don't know where we stand right now.

15  (Pages 57 to 60)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 61

1  And also Wells Fargo.
2     Q.  When did you enter into the
3  lease with -- let me see if I can
4  shortcut this process a little bit.
5        When did you first begin
6  negotiating with U.S. Xpress?
7     A.  I was contacted in April by
8  Ahern & Associates out of Phoenix,
9  Arizona, which is a broker representing
10  U.S. Xpress, about a possible sale or
11  them acquiring it.  That would have
12  been mid-April.
13     Q.  Let's use April.
14     A.  Okay.
15     Q.  That was '05, 2005?
16     A.  Correct.
17     Q.  After April 2005, did you
18  enter into any contracts with Volvo,
19  Omni, Navistar, Daimler/Chrysler, First
20  Continental, GE Finance, Wells Fargo?
21     A.  Not to my knowledge.
22     Q.  Did you personally
23  guarantee --

Page 62

1     A.  Everything.
2     Q.  -- on each one of these?
3     A.  (Nods head.)  Everything, yes.
4  Sorry.
5     Q.  That's all right.  You will
6  have to remind me eventually.
7        Did you do that when you
8  entered into the contracts originally
9  with these finance companies?
10     A.  Correct.
11     Q.  And you were contacted by
12  Ahern?
13     A.  A-h-e-r-n & Associates.
14     Q.  When you were first contacted
15  by Ahern & Associates in April of 2005,
16  were you current on your payments to
17  each of these finance companies, you
18  being G.F. Kelly Trucking?
19     A.  I couldn't say totally.
20     Q.  And I take it that -- I think
21  you indicated G.F. Kelly Trucking
22  hasn't gone through liquidation or
23  windup or anything like that?

Page 63

1     A.  I haven't had a liquidation
2  sale, no, of G.F. Kelly, Inc.
3     Q.  As part of the negotiations
4  with U.S. Xpress, did U.S. Xpress
5  require you to personally guarantee any
6  of these debts of the finance
7  companies?
8     A.  I was already personally
9  guaranteed.
10     Q.  Okay.  So no?
11     A.  No.
12     Q.  Let me show you what has been
13  marked as Defendant's Exhibits 4, 5, 6,
14  and 7.  And I will represent to you
15  these are things that were produced by
16  your attorney and ask if you can
17  identify those, please.
18
19        (Whereupon, Defendant's Exhibit
20        Numbers 4, 5, 6, 7 were marked for
21        identification and are attached to
22        the original transcript.)
23

Page 64

1     A.  Financial statements of G.F.
2  Kelly, Inc.
3     Q.  Were any of those financial
4  statements provided to U.S. Xpress, to
5  your knowledge?
6     A.  They asked for some financial
7  information.  I don't recall exactly
8  what they asked for or got.  They would
9  have asked the accountant.
10     Q.  Was that again Newman?
11     A.  The in-house accountant at
12  that time was -- that helped me with
13  the finances also was Randall Fant.
14     Q.  He worked for G.F. Kelly
15  Trucking?
16     A.  Correct.
17     Q.  Would he have been the one
18  that prepared the financial statement?
19  Let me rephrase that.
20        Do you know whether or not
21  G.F. Kelly Trucking gave U.S. Xpress a
22  financial statement or statements?
23     A.  I think they did, yes.

**www.AmericanCourtReporting.com**
**January 15, 2007**

Page 65

1  Q. Do you know what years?
2  A. No.
3  Q. Do you think Mr. Fant would
4  know?
5  A. Or Dennis Hamlet.
6  Q. What did Dennis Hamlet do?
7  A. He was an in-house accountant
8  prior to Fant, Randall Fant.
9  Q. I take it, you don't know if
10 any of the exhibits marked as
11 Defendant's Exhibits 4, 5, 6 or 7 were
12 the actual finance statements given to
13 U.S. Xpress?
14 A. No.
15 Q. Do you recall whether you
16 reviewed the financial statement or
17 statements that were given to U.S.
18 Xpress?
19 A. No.
20 Q. Do you know whether they were
21 accurate?
22 A. They should have been
23 accurate.

Page 66

1  Q. Let me show you what has been
2  marked as Defendant's Exhibit 8 and see
3  if you can identify that, please.
4
5     (Whereupon, Defendant's Exhibit
6     Number 8 was marked for
7     identification and is attached to
8     the original transcript.)
9
10 A. A copy of my corporate tax
11 return for G.F. Kelly, Inc.
12 Q. Who prepared that?
13 A. Newman's Accounting.
14 Q. Is that the federal or state
15 or both?
16 A. U.S. corporate. I think this
17 is just going to be federal.
18 Q. Okay.
19 A. Yeah, I think this is federal.
20 Q. I will show you what has been
21 marked as Defendant's Exhibit 9 and ask
22 you if you can identify that, please.
23

Page 67

1     (Whereupon, Defendant's Exhibit
2     Number 9 was marked for
3     identification and is attached to
4     the original transcript.)
5
6  A. G.F. Kelly's corporate tax
7  return '04.
8  Q. I will show you what has been
9  marked as Defendant's Exhibit 10 and
10 ask if you can identify that, please.
11
12    (Whereupon, Defendant's Exhibit
13    Number 10 was marked for
14    identification and is attached to
15    the original transcript.)
16
17 A. Alabama corporate tax income
18 return '04.
19 Q. Before I mark these, I'm going
20 to show you some additional pages, I'm
21 not sure what they go with, and ask if
22 you know what they go with?
23 A. I have no idea.

Page 68

1  Q. Okay.
2  A. Tax information is all I can
3  tell you.
4  Q. For?
5  A. For G.F. Kelly Trucking, Inc.
6  Q. I'm going to mark it
7  collectively as Defendant's Exhibit 11
8  just for identification purposes.
9
10    (Whereupon, Defendant's Exhibit
11    Number 11 was marked for
12    identification and is attached to
13    the original transcript.)
14
15 Q. Let me show you what has been
16 marked as Defendant's Exhibit 12.
17
18    (Whereupon, Defendant's Exhibit
19    Number 12 was marked for
20    identification and is attached to
21    the original transcript.)
22
23 Q. And I will represent that it's

17 (Pages 65 to 68)

Page 69

1 the Plaintiff's Response to U.S. Xpress
2 Enterprise, Inc.'s First Request of
3 Production of Documents.
4      Have you seen that before?
5   A.  Yes.
6   Q.  If you could, look over the --
7 well, let's see here.
8      Did you produce a copy of all
9 the written communications that you or
10 G.F. Kelly had with U.S. Xpress?
11   A.  Yes.
12   Q.  I'm just dotting i's and
13 crossing t's.
14      Did you and G.F. Kelly produce
15 a copy of all written communications
16 between yourself and anyone employed by
17 G.F. Kelly about the negotiations with
18 U.S. Xpress?
19   A.  Yes.
20   Q.  Did you consult with anyone
21 outside of G.F. Kelly about or
22 pertaining to the negotiations with
23 U.S. Xpress?

Page 70

1   A.  Yes.
2   Q.  Who?
3   A.  Wade Hartley.  Wade Hartley,
4 Montgomery, Alabama.  W-a-d-e.
5   Q.  Is he an attorney?
6   A.  Correct.
7   Q.  Is he with Hill, Hill,
8 somebody and somebody?
9   A.  Yes.  Hill, Hill, Carter.
10
11      (Discussion off the record.)
12
13   Q.  (BY MR. HALL:)  Did you
14 consult with any outside accountants
15 outside of G.F. Kelly?
16   A.  No.
17   Q.  I'm not sure how exactly I
18 asked you the question.
19      Did you consult with
20 Mr. Hartley to seek his advice and
21 counsel regarding the negotiations?
22   A.  Correct.
23   Q.  Have you produced a copy of

Page 71

1 all communications between persons
2 employed by G.F. Kelly regarding the
3 negotiations with U.S. Xpress?
4   A.  Yes.
5   Q.  Do you still have or does G.F.
6 Kelly still have the drivers' files,
7 the G.F. Kelly drivers' files for its
8 drivers in 2005?
9   A.  No.
10   Q.  What would have happened to
11 those?
12   A.  The original safety building
13 that I owned, I think it was hit -- it
14 was hit by a storm, I think in '06 at
15 some point in time.  Frank Childers
16 would know, I think.  I'm not sure.
17 Anyway, the storm hit the town of
18 Wadley.  It hit a building next to my
19 safety building, and it collapsed onto
20 my building.  And that's where we kept
21 all our files, in the basement.  We had
22 to tear the building down.  So they
23 were lost along with a lot of other

Page 72

1 material.
2   Q.  Do you remember what part of
3 the year?  Was it the beginning of '06?
4 Well, we just ended '06.
5   A.  Yeah.  I couldn't tell you an
6 exact date, to be honest with you.  We
7 can pull the paper records from the
8 local paper.
9   Q.  Have you produced a copy of
10 any documents pertaining to any clients
11 you have lost as a result of your
12 negotiations with U.S. Xpress?
13   A.  I believe we have, yes.
14   Q.  Have you produced a copy of
15 all documents pertaining to drivers
16 that you lost as a result of your
17 negotiations with U.S. Xpress?
18   A.  I believe so, yes.  Frank
19 Childers would have that.  We had 35
20 walk out and quit the week of November
21 the -- the 23rd week -- the week they
22 were in the office, I had 35 drivers to
23 walk out and quit.

18 (Pages 69 to 72)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 73

1    Q.   The week they were --
2    A.   They came down to Wadley to do
3  orientation.
4    Q.   So there were 35 drivers that
5  just up and quit --
6    A.   Yes.
7    Q.   -- I think the week of August
8  23rd?
9    A.   I believe it would have been
10  the -- let's see. Saturday was the
11  20th, 21st. The week of the 22nd, the
12  23rd week, yeah, of November.
13    Q.   Do you have any records to
14  reflect the names of those drivers?
15    A.   I think Frank would.
16    Q.   Would those records reflect
17  the exact day that they quit?
18    A.   Yes, should.
19    Q.   Will it indicate why they said
20  they quit?
21    A.   Yes.
22    Q.   Do you recall the names of the
23  drivers?

Page 74

1    A.   No.
2    Q.   Okay. Do you recall why any
3  of them said they quit?
4    A.   I talked to a few. I don't
5  recall their names. But they felt like
6  they were misled and couldn't trust me
7  anymore.
8    Q.   Oh, they felt like they were
9  misled by you?
10    A.   No. By -- well, by both
11  parties, and I was G.F. Kelly Trucking.
12    Q.   Did they indicate in what way
13  they had been misled or felt that they
14  had been misled?
15    A.   The deal on this whole
16  acquisition was to retain the offices
17  in Wadley and to maintain the company's
18  face as much as possible and
19  operations. And they were going to run
20  the company locally out of Wadley,
21  employ me for probably two years. And
22  they would continue the same operations
23  with adding more traffic patterns and

Page 75

1  lanes and guarantee the drivers would
2  continue to get home every weekend,
3  which was one of -- biggest advantages
4  I had was my company based its driver
5  force home every weekend.
6        During the orientation
7  process, the people from U.S. Xpress
8  told the drivers that they would be
9  home at best every two weeks. And
10  after that comment, they began to walk
11  out. And they felt that they were lied
12  to. And that's one of the worse things
13  a driver can ever feel, is feel like he
14  is lied to.
15    Q.   Have you produced a copy of
16  all the records reflecting clients that
17  you lost, that G.F. Kelly lost because
18  of its negotiations with U.S. Xpress?
19    A.   Yes.
20    Q.   Have I asked you that before?
21    A.   Yes.
22    Q.   Okay. Do you recall any
23  clients specifically that left because

Page 76

1  of U.S. Xpress?
2    A.   Wabash Alloys, the plant in
3  Steele, Alabama.
4    Q.   Why did they leave because of
5  U.S. Xpress?
6    A.   They were uneasy about the
7  acquisition and their account would
8  continue to be serviced the way it had
9  been by Kelly. And U.S. Xpress
10  approached my customer, when it was
11  still my customer, and talked to them
12  and informed them of the buyout. And
13  they wasn't sure if they were going to
14  keep the account or not. And I assured
15  the account that it would be taken care
16  of one way or another. And U.S. Xpress
17  had told me that I could keep the
18  account myself on the side, if that's
19  what I wanted to do. So basically,
20  Wabash got scared. I had been with
21  them two years, million dollar account,
22  dedicated. It was a specialized
23  account for the company.

19 (Pages 73 to 76)

**www.AmericanCourtReporting.com**
**January 15, 2007**

# American Court Reporting
## toll-free (877) 320-1050

Page 77

1      Do you want some more?
2      Q.  Yes.
3      A.  Bowater Paper, I lost them.
4   They never had a real good relationship
5   with U.S. Xpress.  They approached
6   Bowater Paper in Calhoun, Tennessee and
7   informed them of the buyouts, and I no
8   longer have them.
9      Q.  U.S. Xpress and Bowater had
10  a --
11     A.  They didn't have a real good
12  relationship.
13     Q.  Not a good relationship.
14  Okay.
15     A.  I don't think they actually
16  done any business at that time.  I lost
17  Rainbow Express in Gadsden, Alabama or
18  Rainbow City.
19     Q.  Is that E-X?
20     A.  Yes.
21     Q.  What city did you say it was
22  in?
23     A.  Rainbow City, Alabama,

Page 78

1   Gadsden.
2      Q.  When did Wabash Alloys cancel
3   the contract?
4      A.  In '06.
5      Q.  Who informed you that they
6   were cancelling the contract?
7      A.  Greg Fields.
8      Q.  Greg Fields?
9      A.  Uh-huh.
10     Q.  Who does he work for?
11     A.  Wabash Alloys.
12     Q.  Is he still employed there?
13     A.  I believe so.  Wabash,
14  Indiana.
15     Q.  He's located in Wabash,
16  Indiana?
17     A.  (Nods head.)  At their
18  corporate office.
19     Q.  They have a plant in Steele,
20  Alabama?
21     A.  Correct.  It supplies the
22  liquid aluminum for the Teksid plant in
23  Sylacauga, and Hyundai in Lincoln.

Page 79

1      Q.  Who serviced that account
2   after it was cancelled with G.F. Kelly?
3      A.  They give it to a local
4   carrier out of Florence, Alabama.  I
5   don't know the name.
6      Q.  Who is the G.F. Kelly salesman
7   or account person with Wabash Alloys?
8      A.  I was directly handling that.
9      Q.  Was that serviced by G.F.
10  Kelly or was that serviced by Kelly
11  Aluminum?
12     A.  It was serviced by Kelly
13  Aluminum.  The trucks were owned by
14  G.F. Kelly.
15     Q.  Did you know that U.S. Xpress
16  was going to talk to Wabash Alloys?
17     A.  No.
18     Q.  Do you know when they
19  approached them?
20     A.  No.
21     Q.  Do you know who at U.S. Xpress
22  approached them?
23     A.  I think it was Bill Farris.

Page 80

1   He was corporate sales.
2      Q.  Do you know where he
3   approached them?
4      A.  I think they went to Wabash,
5   Indiana.
6      Q.  How did you find out that U.S.
7   Xpress had talked to them?
8      A.  Greg Fields called me and told
9   me.
10     Q.  How did Greg let you know?
11     A.  Phone call.
12     Q.  And you don't remember the
13  date?
14     A.  No.
15     Q.  Was it the same time he
16  cancelled the account?
17     A.  It was before.  It would have
18  been in the -- it would have been in
19  '05 during the negotiation process.
20     Q.  And Kelly Aluminum continued
21  to service that account into '06?
22     A.  I believe so.  I'm not
23  positive.  Frank Childers could answer

## www.AmericanCourtReporting.com
## January 15, 2007

**American Court Reporting**
**toll-free (877) 320-1050**

Page 81

1   that question.
2       Q.   In '06, when Mr. Fields
3   contacted you, did he say specifically
4   why he was cancelling the contract?
5       A.   I asked him specifically, and
6   he said that the upper management got
7   nervous about the buyout and was afraid
8   they wouldn't be serviced the way we
9   had been servicing them.
10      Q.   Did you explain to him that as
11  of the end of August '05, that there
12  wasn't a buyout?
13      A.   Yes.
14      Q.   Had he expressed any concern,
15  between the time he contacted you and
16  told you that U.S. Xpress had talked to
17  them and the time that he called you
18  and cancelled the contract, had he
19  expressed any concern about the buyout?
20      A.   Yes.
21      Q.   And this was directly to you?
22      A.   Yes.
23      Q.   What, if anything, did you

Page 82

1   tell him about the negotiations?
2       A.   Nothing other than I would
3   take care of the account, you know, one
4   way or the other.  If U.S. Xpress
5   didn't want the account, that I would
6   continue to service the account.
7       Q.   Oh, he was worried that if
8   G.F. Kelly purchased Kelly, that it
9   would no longer want to service the
10  account?
11      A.   If U.S. Xpress purchased
12  Kelly, that U.S. Xpress -- they were
13  undecided if they wanted that account,
14  because of the nature of the account.
15  And they expressed that to Wabash.  And
16  that's when Greg told me that, you
17  know, he -- they were uneasy about the
18  future of their account being serviced,
19  because we were the only one that had
20  ever serviced that account.  And not
21  giving them a definite answer, that
22  killed their confidence in basically
23  what I told them or anybody told them.

Page 83

1       Q.   Around August, I think it was
2   the 25th, U.S. Xpress notified you that
3   they weren't going forward; is that
4   right?
5       A.   Al Hingst walked in my office
6   at 9:30 a.m. and said that, we totally
7   screwed up, was his exact words.  He
8   said, we have mishandled this from Day
9   One and if they had had me in here
10  prior to all this, that we would have
11  closed July 15th, like we were supposed
12  to.  He apologized and said, we have
13  botched this whole deal through
14  mismanagement.  And Frank Childers was
15  privy to part of the conversation.  And
16  he said, we are pulling out.
17      Q.   After that conversation, did
18  you ever contact Wabash Alloys and tell
19  them that you were going to continue to
20  service the account?
21      A.   Yes.
22      Q.   Did you tell them that G.F.
23  Kelly was no longer in the picture?

Page 84

1       A.   I would have told them that
2   U.S. Xpress was no longer in the
3   picture.
4       Q.   I'm sorry.  Thank you for
5   listening to what I say and not what I
6   mean.
7           You told them that U.S. Xpress
8   was no longer in the picture?
9       A.   Yes.
10      Q.   Thanks for catching me.
11          What did they say to that?
12      A.   They were still uneasy about
13  the whole situation.  They had already
14  started negotiations with another
15  carrier.  He had told me, prior to
16  that, he had to have a definite answer,
17  who was going to service the account.
18  So that account, a little background
19  and understanding, it is a -- we were
20  carrying the liquid aluminum on
21  specialized trailers from Steele,
22  Alabama down to Teksid, which makes the
23  aluminum blocks for Saturn and Hyundai

21  (Pages 81 to 84)

**www.AmericanCourtReporting.com**
**January 15, 2007**

# American Court Reporting
## toll-free (877) 320-1050

Page 85

1  and Honda. And it was very time
2  sensitive, because that liquid aluminum
3  was in a liquid form, and if it ever
4  became hardened because of late
5  deliveries or anything, you are talking
6  about major downtime of a big company.
7      Another thing is, if that ever
8  hit wet, moisture, it was a bomb. If
9  water ever hit liquid aluminum, it
10 would explode. It was a very sensitive
11 product. And we had done it two years
12 and never had a late delivery one time.
13 The drivers would be trained and wear
14 protective equipment. So U.S. Xpress
15 was very leery of that being as big --
16 I can't tell you their reasons. I
17 shouldn't say that. But it killed my
18 credibility with Wabash there in the
19 back and forth.
20     Q. Prior to U.S. Xpress talking
21 to Wabash, had you ever talked to
22 Wabash about the negotiations with U.S.
23 Xpress?

Page 86

1      A. I'm trying to recall. Not to
2  my knowledge.
3      Q. When did G.F. Kelly lose the
4  Bowater Paper account?
5      A. In '06.
6      Q. Who informed G.F. Kelly that
7  Bowater Paper was cancelling the
8  account?
9      A. Gary Cafego.
10     Q. Do you know how to spell
11 Gary's last name?
12     A. C-a-f-e-g-o.
13     Q. G-o?
14     A. Excuse me. C. C-a-f-e-g-o.
15 Yeah. A Tennessee thing.
16     Q. Who was the G.F. Kelly --
17     A. Me.
18     Q. Talking about the company --
19 contact with Bowater paper?
20     A. I am.
21     Q. Why did Gary say he was
22 cancelling the account?
23     A. They had -- they were not

Page 87

1  comfortable with U.S. Xpress at that
2  time, because of them being so large,
3  of servicing their account. Their
4  paper was very time sensitive because
5  it was a newsprint paper. It had to go
6  directly to newspaper plants. And
7  being a small company, I got directly
8  involved with operations a good bit and
9  the customers and making sure my
10 customers were taken care of. And I no
11 longer could service the account with
12 the number of trucks they required
13 after I had to turn in trucks.
14     Q. Did you know that G.F. Kelly
15 had contacted Bowater Paper?
16     A. I knew that U.S. Xpress had
17 contacted Bowater Paper.
18     Q. Did I say G.F. Kelly again?
19     A. (Nods head.) That's okay.
20     Q. How did you find out that U.S.
21 Xpress had contacted Bowater Paper?
22     A. Sam MacIntosh (phonetic)
23 called me, which is corporate traffic

Page 88

1  manager in Calhoun, Tennessee.
2      Q. When did U.S. Xpress contact
3  Bowater?
4      A. During the three-month time
5  period, I don't know the exact date,
6  June, July, August. I don't know the
7  exact date.
8      Q. Did you know that U.S. Xpress
9  was going to contact them?
10     A. No. As a matter of fact, I
11 asked Dennis.
12     Q. Farnsworth?
13     A. Yes. Until this was, you
14 know, a completed deal, that it would
15 not be a good idea to contact
16 customers.
17     Q. Had you told them that they
18 couldn't?
19     A. No, I didn't tell them they
20 couldn't. I just said, it would be a
21 good idea, I think.
22     Q. Did you ever tell them that
23 they could?

22  (Pages 85 to 88)

## www.AmericanCourtReporting.com
## January 15, 2007

**American Court Reporting**
**toll-free (877) 320-1050**

Page 89

1    A. No, I didn't tell them they
2   couldn't.
3    Q. And Bowater Paper, this was a
4   G.F. Kelly account?
5    A. Correct.
6    Q. Were they aware between August
7   of '05 and sometime in '06, when they
8   cancelled the contract, that U.S.
9   Xpress was no longer in the picture?
10    A. Yes.
11    Q. Did they say why they were
12   going to go ahead and cancel it anyway?
13    A. I couldn't service the account
14   with the proper number of trucks.
15   These big companies now require you to
16   -- they just throw it out. And
17   part of the process is that you
18   guarantee them so much trucks per week.
19   And I no longer could service that.
20    Q. Why not?
21    A. After the drivers quit, I
22   didn't have enough capacity, fleet
23   capacity to do it.

Page 90

1    Q. Did you try to hire any new
2   drivers?
3    A. Yes.
4    Q. How did you go about doing
5   that?
6    A. We have always -- I have
7   always hired by word of mouth and
8   advertisement. But you got to realize
9   my credibility was ruined with drivers.
10   Drivers are usually the best salesmen
11   when it comes to hiring other drivers.
12   And my credibility was ruined after
13   that week that they walked out.
14    Q. Did you hire any new drivers
15   after that week?
16    A. Yes, we have hired some after
17   that.
18    Q. How many?
19    A. I couldn't answer that.
20    Q. Do you have any records --
21    A. Frank could answer that.
22    Q. Does G.F. Kelly have any
23   records of the drivers that were hired

Page 91

1   afterwards?
2    A. Yes.
3      MR. HALL: I will hit this
4   next topic and then we will take about
5   25 minutes for lunch. Does that work
6   for everybody.
7      MR. TOMLINSON: Yes.
8    Q. (BY MR. HALL:) What is
9   Rainbow Express?
10    A. They are an agent that I use,
11   a sales agent.
12    Q. By the way, back to Bowater,
13   who took over that account after you?
14    A. From what standpoint, now?
15   Trucking company?
16    Q. Trucking company, yes, sir.
17    A. I don't know who all they have
18   got. I think U.S. Xpress is doing
19   business with them now. I'm not
20   positive. You got to realize now, U.S.
21   Xpress had access to all my customers
22   and customer base and pricing, the
23   whole nine yards that I disclosed to

Page 92

1   them.
2    Q. And they were not doing any
3   business with them before?
4    A. I don't believe they were in
5   that account at the time of this
6   negotiation process.
7    Q. When you say that account, you
8   are talking about that specific --
9    A. Bowater account.
10    Q. That specific --
11    A. That specific location in
12   Childersburg.
13    Q. -- location?
14    A. And they have since acquired
15   Smurfit-Stone in Stevenson, Alabama.
16    Q. Bowater has?
17    A. No. U.S. Xpress. And that
18   was one of my biggest accounts.
19    Q. Oh, you mean acquired as an
20   account?
21    A. As an account, yes. I don't
22   think they bought them out yet.
23   Probably could.

23  (Pages 89 to 92)

**www.AmericanCourtReporting.com**
**January 15, 2007**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 93

1    Q. Smurfit-Stone was one of your
2  accounts?
3    A. One of my big accounts. I
4  still do some business with them, but
5  not much.
6    Q. K-Diesel does?
7    A. Eagle Logistics.
8    Q. Eagle. You say you lost
9  Rainbow Express because of U.S. Xpress?
10   A. He does -- I do a little bit
11 of business with him right now. Very
12 little.
13   Q. Who is he?
14   A. Gary Hopper. And he was also
15 privy to some conversations with their
16 local plant on the Wabash Alloys.
17   Q. Gary Hopper is an independent
18 contractor?
19   A. Yes. He is an independent
20 sales agent.
21   Q. He doesn't operate his own
22 trucking company?
23   A. No.

Page 94

1    Q. So he --
2    A. I done a tremendous amount of
3  business with him.
4    Q. Does he work for the trucking
5  companies or does he work for the
6  shippers or do you know?
7    A. Both.
8    Q. Was he working for G.F. Kelly
9  Trucking or was he working for the
10 companies that were shipping?
11   A. He was working for G.F. Kelly
12 Trucking.
13   Q. When did he quit working for
14 G.F. Kelly Trucking?
15   A. He hasn't quit. I'm still
16 doing some business with him. He
17 substantially decreased my business.
18   Q. Have you ever asked him why?
19   A. He got real upset during the
20 negotiation process. I had actually
21 asked Farris and Wardeberg, I think is
22 his name, to contact Gary, that he
23 could help both of us as far as freight

Page 95

1  in that area. And they declined to
2  contact him and it upset Gary. And, of
3  course, after that, after all this
4  happened, he didn't have a lot of trust
5  in me at that point in time, because I
6  led him to believe that they would
7  contact him and they never did. Well,
8  actually, I think they finally did,
9  after the fact.
10   Q. After they decided not to go
11 forward?
12   A. No. Actually, you know, later
13 on in the process, I asked them to
14 contact him early on, because he was
15 such a big player involved with our
16 operation.
17   Q. I'm not sure I understand, so
18 I'm going to start at the beginning.
19   A. Okay.
20   Q. You asked U.S. Xpress to
21 contact Gary --
22   A. Hopper.
23   Q. -- Hopper, right?

Page 96

1    A. They came to my office on July
2  the 22nd. Farris and Wardeberg and
3  Dennis flew down, and some safety
4  people in there with Frank. And we
5  were discussing accounts, you know, my
6  account base and what the operation
7  entailed. And I told them that they
8  needed to contact Gary Hopper because
9  he was a big part of our sales force as
10 an agent and we done a lot of business
11 with him. And I asked them to do it
12 the next week, matter of fact. And
13 they did not do it and Gary was
14 expecting a phone call and didn't get
15 it. And I think you got into some egos
16 back and forth. So it was a sour
17 process from then on out between those
18 two.
19   Q. You said after the fact, they
20 did contact him?
21   A. They did contact him. I don't
22 know the exact date, but it was much
23 later than when I asked them to do it.

24  (Pages 93 to 96)

**www.AmericanCourtReporting.com**
**January 15, 2007**