# American Court Reporting
## toll-free (877) 320-1050

Page 97

1    Q.   But it wasn't after they said
2    they weren't going forward?
3    A.   No, it wasn't then.
4    Q.   So has he ever said to you why
5    he cut back his services for G.F.
6    Kelly?
7    A.   Yes.  I mean, he told me that
8    I couldn't service his account anymore,
9    I didn't have the capacity and that he
10   was real upset about the Wabash Alloy
11   deal, because he -- he was involved in
12   that and got commission off of it.  He
13   felt like, you know, that U.S. Xpress
14   had ruined that deal for him, too,
15   because he lost his commission off of
16   it.
17   Q.   Do you know what other
18   trucking companies Mr. Hopper or
19   Rainbow Express worked for?
20   A.   Osborne in Gadsden, Humphrey
21   Truckline.  I think he does some for
22   Floyd and Beasley.
23   Q.   You said Mr. Hopper was privy

Page 98

1    to their conversations about the local
2    plant.  What did you mean by that?
3    A.   He helped me with the
4    accounting.  He dealt with Bob Pine
5    locally, which is the plant manager at
6    Steele.  He dealt with him on a daily
7    basis.
8    Q.   Bob Pine, P-i-n-e?
9    A.   Bob pine, P-i-n-e.
10   Q.   Okay.  When you say their, is
11   it Wabash's?
12   A.   Yeah, Wabash's plant in
13   Steele, Alabama.  Gary had direct
14   dealings with Bob Pine.
15   Q.   I'm just trying to get, when
16   you said their, you are not talking
17   about U.S. Xpress' conversations with
18   Wabash; you are talking about people
19   inside Wabash's conversations?
20   A.   Right.  Right.
21   Q.   You said U.S. Xpress picked up
22   Smurfit-Stone?
23   A.   Smurfit-Stone and Paper.

Page 99

1    Q.   When did they do that?
2    A.   They have done that, I think
3    before the new year, which is '06.
4    Q.   So late '06, they picked it
5    up?
6    A.   I think, correct.  Yes.  My
7    bad.
8    Q.   And is Eagle still --
9    A.   We are still doing business
10   there.
11   Q.   Okay.
12   A.   Very little.
13   Q.   Did U.S. Xpress pick up what
14   Eagle lost?
15   A.   You would have to ask
16   Smurfit-Stone.  But I would say they
17   are probably getting a lot of the
18   freight that I was getting.
19   Q.   When did Smurfit cut back on
20   Eagle?
21   A.   Toward the end of '06.
22        (Discussion off the record.)
23

Page 100

1        (Short recess.)
2
3    Q.   (BY MR. HALL:)  You indicated
4    that you and Mr. Chastain had a parting
5    in the end of '05; is that right?
6    A.   Correct.
7    Q.   Was there a written agreement
8    with regard to that?
9    A.   Yes.
10   Q.   Do you have a copy of that?
11   Not on you, but --
12   A.   Yes.
13   Q.   Do you and Mr. Chastain have
14   any business dealings at all together
15   anymore?
16   A.   No.
17   Q.   Do you know where Mr. Chastain
18   is currently working?
19   A.   For himself.
20   Q.   For himself.  Aside from his
21   20 percent in G.F. Kelly Trucking, did
22   he obtain anything else in the --
23   excuse me -- did you obtain anything

25  (Pages 97 to 100)

## www.AmericanCourtReporting.com
## January 15, 2007

**American Court Reporting**
**toll-free (877) 320-1050**

Page 101

1  else in that separation?
2      A.  We split -- I think there were
3  about four spotting services, I'm not
4  very positive, that we owned together.
5  And when we split, we split those up.
6  He got certain ones and I got certain
7  ones.
8      Q.  I will show you what has been
9  marked as Defendant's Exhibit 13, which
10  is Plaintiff's Response to U.S. Xpress
11  Enterprise, Inc.'s First Set of
12  Interrogatories.  Have you seen that
13  before?
14
15        (Whereupon, Defendant's Exhibit
16        Number 13 was marked for
17        identification and is attached to
18        the original transcript.)
19
20      A.  You just gave it to me
21  earlier.
22      Q.  No.
23        MR. TOMLINSON:  Those are the

Page 102

1  interrogatories.
2      A.  Oh, production.  Excuse me.
3  I'm sorry.  Yes.  My bad.
4      Q.  Attached as Exhibit A, is that
5  a complete list of each bank or lending
6  institution that extended credit to
7  Kelly Trucking or yourself from January
8  1, 2003 to the present?
9      A.  Correct.
10      Q.  Looking at Exhibit A, can you
11  tell which of these companies that G.F.
12  Kelly Trucking, Inc. was indebted to in
13  April of 2005?
14      A.  I can't give you the exact
15  account by account base, no, without
16  the information I would need.
17      Q.  Okay.
18      A.  But the majority of them.
19      Q.  All right.
20      A.  You got to realize, some of
21  these have been bought out and merged
22  with other companies, too.
23      Q.  I got a lot of records.  After

Page 103

1  40 it went downhill.
2        There were a lot of records
3  like Navistar, Daimler/Chrysler that
4  were produced.
5        Are those all the records that
6  you have or G.F. Kelly Trucking has
7  regarding financing that Kelly Trucking
8  had at the time it was in negotiations
9  with U.S. Xpress?
10      A.  Correct.
11      Q.  Who is Sandy Holliday?
12      A.  He's my attorney, one of my
13  attorneys.
14      Q.  Did you seek his advice
15  regarding the negotiations with U.S.
16  Xpress?
17      A.  Yes.
18      Q.  When was that?  What part of
19  the negotiations, if not all of them?
20      A.  He was a party to it during
21  the process, he and Wade Hartley.
22      Q.  I can't remember.  Dennis
23  Hamlet, who is Dennis Hamlet?

Page 104

1      A.  Dennis was an accountant I had
2  employed until May '05.
3      Q.  And Randall Fant, he replaced
4  him?
5      A.  Fant, correct.
6      Q.  Does he go by Randy or
7  Randall?
8      A.  Randall.
9      Q.  When did Randall begin working
10  for G.F. Kelly?
11      A.  First week of June.
12      Q.  First month of June?
13      A.  First week of June '05.
14      Q.  By the way, if you could, flip
15  back to the verification page.
16      A.  (Complies.)
17      Q.  Is that your signature?
18      A.  Correct.
19      Q.  How long had Nelson Chastain
20  worked for Kelly Trucking?
21      A.  Since '96.
22      Q.  '96 to the end of '05?
23      A.  Correct.

26  (Pages 101 to 104)

# American Court Reporting
## toll-free (877) 320-1050

Page 105

1  Q.  What was his title?
2  A.  Vice-president.  And he was
3  over operations.
4  Q.  You indicated, I don't know if
5  this is the right word, but you
6  solicited him to come back or wanted
7  him to come work for you, correct?
8  A.  Correct.
9  Q.  Had he worked for you before?
10  A.  I had worked for him.
11  Q.  All right.  Where at?
12  A.  McClendon.  He was one of my
13  bosses.
14  Q.  How long did Frank Childers
15  work at Kelly Trucking?
16  A.  I think he came in '04; that
17  was the second time.  He worked for me
18  previously and left and took a state
19  job and then he came back in '04, I
20  believe.  And he left about a week ago
21  and took another state job.
22  Q.  Are you saying state as in
23  State of Alabama?

Page 106

1  A.  Yeah.  State of Alabama,
2  correct.
3  Q.  Do you remember what years he
4  worked for you the first time?
5  A.  No.  He could answer that.
6  Q.  What did he do the first time
7  he worked for you?
8  A.  Safety.
9  Q.  Did you employ somebody for
10  safety in between Mr. Childers working
11  for you?
12  A.  Correct.  My brother, Joe
13  Kelly.
14  Q.  Do you remember what years Joe
15  worked for you?
16  A.  Not correctly.  Frank could
17  answer that, I'm sure.
18  Q.  Anybody else hold that safety
19  position?
20  A.  Yes.  But I can't think of his
21  name.  Bill -- Frank could answer it.
22  Q.  If it comes to you, feel free
23  to just blurt it out.

Page 107

1  A.  I will.  The first name is
2  Bill.
3  Q.  Who was the -- for lack of a
4  better way of saying it, who was the
5  point person at Kelly that dealt with
6  the U.S. Xpress people on a day-to-day
7  basis regarding the negotiations?
8  A.  I was.
9  Q.  How did Ahern & Associates
10  first get in touch with you?
11  A.  They contacted via telephone
12  in April.
13  Q.  When?
14  A.  In April.
15  Q.  What did they say?
16  A.  They called me out of the blue
17  and wanted to know if I was interested
18  in selling the trucking operation.  And
19  I said, yes, I would entertain the
20  idea.  And they had someone that was
21  very interested and they could complete
22  the deal very quickly, within a matter
23  of a few weeks, and they would call me

Page 108

1  back.
2  Q.  Do you remember who it was you
3  spoke with at --
4  A.  Bob Schwartz.
5  Q.  Did you have any written
6  communications with Mr. Schwartz or
7  anyone else at Ahern & Associates?
8  A.  No.
9  Q.  And he specifically said that
10  they could complete the deal in a few
11  weeks?
12  A.  He said they had plenty of
13  cash on hand and it would be a matter
14  of doing due diligence, and they could
15  complete the deal within a couple of
16  weeks, if they wanted to.
17  Q.  Had you ever entertained the
18  idea of selling Kelly Trucking before?
19  A.  Yes.
20  Q.  When was that?
21  A.  I believe it was in '02, I was
22  approached by another broker and a
23  company out of Arizona.

## www.AmericanCourtReporting.com
## January 15, 2007

**American Court Reporting**
**toll-free (877) 320-1050**

Page 109

1    Q. The broker was from out of
2 Arizona or the company?
3    A. The company was out of
4 Arizona.
5    Q. Did you ever know the name of
6 it?
7    A. Ken Smith Holdings, I believe.
8 The gentleman's name was Ken Smith.
9    Q. Did you enter into any
10 negotiations with Ken Smith Holding?
11    A. Yes.
12    Q. Obviously, you didn't do the
13 deal?
14    A. Correct.
15    Q. Why were you interested in or
16 entertaining the idea of selling in
17 '02?
18    A. I'm one of those that will
19 sell anything I got for the right
20 price.
21    Q. Is that the same reason you
22 were interested in '05?
23    A. Correct.

Page 110

1    Q. Were you involved in the
2 day-to-day operations of Kelly Trucking
3 in '05?
4    A. Yes.
5    Q. What did you do? What was
6 your function?
7    A. Basically, it was what I
8 didn't do really. When you own the
9 company, you sort of try to keep your
10 hands in every facet, if you can.
11    Q. How would you describe Kelly
12 Trucking's financial condition in April
13 of '05?
14    A. Solid.
15    MR. HALL: Before I go on, I'm
16 going to knock these things out. I
17 will show you what has been marked as
18 Defendant's Exhibit 14. This was in
19 the production. It indicates it is for
20 K-Diesel.
21
22    (Whereupon, Defendant's Exhibit
23    Number 14 was marked for

Page 111

1    identification and is attached to
2    the original transcript.)
3
4    Q. (BY MR. HALL:) Does that
5 pertain to G.F. Kelly Trucking in any
6 way?
7    A. From what standpoint?
8    Q. I'm just trying to figure out
9 why I got it.
10    A. Well, it showed -- it showed
11 what I had available in liquid cash at
12 that point in time in June of '05 in
13 K-Diesel.
14    Q. What did I mark that, 14?
15    A. 14.
16    Q. I will show you what has been
17 marked Defendant's Exhibit 15.
18
19    (Whereupon, Defendant's Exhibit
20    Number 15 was marked for
21    identification and is attached to
22    the original transcript.)
23

Page 112

1    Q. And there is a note at the
2 top. Is that your handwriting?
3    A. Yes.
4    Q. What does it say?
5    A. It says, actual personal
6 money.
7    Q. What is Defendant's Exhibit
8 15?
9    A. It is a money market account
10 in a small town bank.
11    Q. Is that for you or who is --
12    A. That's for K-Diesel. I'm
13 K-Diesel, though.
14    Q. I'm going to have to ask you,
15 what do you mean by that?
16    A. Well, I mean, I own K-Diesel.
17 So, I mean, I'm responsible for
18 K-Diesel. That's me.
19    Q. I will show you what's marked
20 as Defendant's Exhibit 16 and ask if
21 you can identify that?
22
23    (Whereupon, Defendant's Exhibit

**www.AmericanCourtReporting.com**
**January 15, 2007**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 113

```
1       Number 16 was marked for
2       identification and is attached to
3       the original transcript.)
4
5    A.  My personal income tax return,
6    '03.
7
8       (Whereupon, Defendant's Exhibit
9       Number 17 was marked for
10      identification and is attached to
11      the original transcript.)
12
13   Q.  Defendant's Exhibit 17?
14   A.  My personal income tax return
15   Alabama, '03.
16
17      (Whereupon, Defendant's Exhibit
18      Number 18 was marked for
19      identification and is attached to
20      the original transcript.)
21
22   Q.  I will show you what has been
23   marked as Defendant's Exhibit 18 and
```

Page 114

```
1    ask if you can identify that, please.
2    A.  Personal income tax return,
3    '04.
4    Q.  May I see the front page
5    there?
6    A.  (Complies.)
7    Q.  What is Five Points
8    Development, Inc.?
9    A.  Oh.  That was a dry cleaners
10   that I was a part of and received some
11   compensation.
12   Q.  When you say you were a part
13   of, were you part owner?
14   A.  Correct.
15   Q.  What was it called again?
16   A.  Five Points Development,
17   Incorporated.  It was a laundromat.
18   Q.  Do you still own part of that?
19   A.  No.
20   Q.  Did you sell your interest in
21   it?
22   A.  Yes.
23   Q.  When?
```

Page 115

```
1    A.  '05, I believe.
2    Q.  Do you remember what
3    percentage you owned?
4    A.  Thirty-three percent, 33 and a
5    third.
6    Q.  Who were the other investors?
7    A.  Dennis Hamlet and Nelson
8    Chastain.
9    Q.  Was this part of -- selling
10   your interest in '05, was that part of
11   the breakup with Nelson?
12   A.  Correct.
13   Q.  What is Golf, Inc.?
14   A.  It was a golf driving range
15   that I owned part of at one point in
16   time, but no longer.
17   Q.  Was it in Auburn?
18   A.  Correct.
19   Q.  When did you sell it, sell
20   your portion of it?
21   A.  I think we closed it in '04, I
22   believe, or '05.
23   Q.  You say you closed it?
```

Page 116

```
1    A.  Closed it.  Closed it.
2    Q.  Let me show you Defendant's
3    Exhibit 19 and ask if you can identify
4    that, please.
5
6       (Whereupon, Defendant's Exhibit
7       Number 19 was marked for
8       identification and is attached to
9       the original transcript.)
10
11   A.  Income tax, personal return,
12   '04, Alabama.
13   Q.  I will show you what has been
14   marked as Defendant's Exhibit 20.
15
16      (Whereupon, Defendant's Exhibit
17      Number 20 was marked for
18      identification and is attached to
19      the original transcript.)
20
21   A.  '04, federal depreciation
22   schedule.
23   Q.  It indicates that you were
```

29 (Pages 113 to 116)

**www.AmericanCourtReporting.com**
**January 15, 2007**

# American Court Reporting
## toll-free (877) 320-1050

Page 117

1  depreciating a race car?
2      A. Correct.
3      Q. Do you own a racing team?
4      A. I owned a race car operation
5  at one point in time.
6      Q. What kind of race car?
7      A. A top alcohol dragster.
8      Q. Was there a company set up
9  around that?
10     A. No. It was set up around me
11 individually.
12     Q. The weather station and all
13 the other stuff on there, is that
14 related to the racing?
15     A. Correct. I no longer own it
16 anymore.
17     Q. You don't own the race car any
18 more?
19     A. Had to sell it.
20     Q. When did you sell it?
21     A. Last week, January '06. '07.
22 Excuse me.
23     Q. There you go.

Page 118

1      A. See if you was listening.
2      Q. Those were in your production,
3  Defendant's Exhibit 21. Do you know
4  what those are?
5
6          (Whereupon, Defendant's Exhibit
7           Number 21 was marked for
8           identification and is attached to
9           the original transcript.)
10
11     A. Those were income interest
12 statements from different banks.
13     Q. Do they just pertain to your
14 tax returns?
15     A. Correct. Tax return
16 information for '04.
17     Q. Defendant's Exhibit 22.
18
19          (Whereupon, Defendant's Exhibit
20           Number 22 was marked for
21           identification and is attached to
22           the original transcript.)
23     A. Individual tax return for Guy

Page 119

1  Kelly, '05.
2      Q. Is that --
3      A. Federal.
4      Q. -- federal? Okay.
5
6          (Whereupon, Defendant's Exhibit
7           Number 23 was marked for
8           identification and is attached to
9           the original transcript.)
10
11     Is Defendant's Exhibit 23 your
12 personal tax return for 2005?
13     A. Alabama, '05.
14     Q. What was that, 23?
15     A. 23.
16     Q. I will show you what has been
17 marked as Defendant's Exhibit 24.
18
19          (Whereupon, Defendant's Exhibit
20           Number 24 was marked for
21           identification and is attached to
22           the original transcript.)
23     A. Georgia income tax form for

Page 120

1  year '05, Guy Kelly.
2      Q. What did you earn income in
3  Georgia for?
4      A. Spotting service income.
5      Q. May I see that?
6      A. (Complies.)
7      Q. Was the spotting service in
8  Georgia?
9      A. Augusta, Georgia.
10     Q. Were you paid by the spotting
11 service that you owned?
12     A. The one that I was in partners
13 with Nelson.
14     Q. I will show you what has been
15 marked as Defendant's Exhibit 25.
16
17          (Whereupon, Defendant's Exhibit
18           Number 25 was marked for
19           identification and is attached to
20           the original transcript.)
21
22     A. Individual tax return, '05,
23 spotting service income.

## www.AmericanCourtReporting.com
## January 15, 2007

# American Court Reporting
## toll-free (877) 320-1050

Page 121

1  Q.  I think this is just tax
2  return stuff.
3  A.  Uh-huh.
4  Q.  I'm going to ask you about
5  that.  Defendant's Exhibit 26.
6
7      (Whereupon, Defendant's Exhibit
8      Number 26 was marked for
9      identification and is attached to
10     the original transcript.)
11
12  A.  That's going to be racing
13  income for the year '05.  I didn't do
14  too bad, did I?
15  Q.  No, you didn't.
16  A.  I tried to get U.S. Xpress to
17  come on board and sponsor me, but I had
18  to sell the car.
19  Q.  Defendant's Exhibit 27, I
20  think that's the last one.
21
22     (Whereupon, Defendant's Exhibit
23     Number 27 was marked for

Page 122

1      identification and is attached to
2      the original transcript.)
3
4  A.  That is spotting income, a
5  Georgia income modification for 2005,
6  income tax information.
7  Q.  Okay.  And 28, is that just
8  more of the same?
9
10     (Whereupon, Defendant's Exhibit
11     Number 28 was marked for
12     identification and is attached to
13     the original transcript.)
14
15  A.  More of the same.
16  Q.  Okay.  Defendant's Exhibit 12,
17  number five, we asked for an itemized
18  list of your damages.  I guess I need
19  to mark that.  I will show you what has
20  been marked as Defendant's Exhibit 29
21  and ask if that is your itemized list
22  of the damages that you are claiming in
23  this lawsuit.

Page 123

1      (Whereupon, Defendant's Exhibit
2      Number 29 was marked for
3      identification and is attached to
4      the original transcript.)
5
6  A.  That is a part of it.
7  Q.  Okay.  What is not included on
8  here?
9  A.  Well, there will have to be a
10  value put on ruining my credit, lost
11  earning power for the future.  I can't
12  borrow any money to amount to anything.
13  I don't have any credibility with
14  drivers anymore, as far as trying to
15  hire a fleet of drivers.  I can't
16  expand my fleet at this point in time.
17  It has pretty much ruined me for them
18  not doing what they said they were
19  going to do, as in U.S. Xpress.  It
20  ruined me financially, personally.
21  Q.  Okay.  You say it damaged your
22  credit?
23  A.  Correct.  My credit is ruined.

Page 124

1  Q.  I'm sorry.  You mentioned a
2  couple other things besides credit.
3  A.  Earning power for the future,
4  credibility with drivers and customers.
5  Q.  We will talk about these
6  things.
7      Have you put a dollar figure
8  on the amount of damage to your credit?
9  A.  We will have to let a
10  third-party determine that, be it a
11  jury or a -- or a jury.
12  Q.  Have you put a dollar figure
13  on your lost earning power?
14  A.  Well, I went from a 24 million
15  dollar company down to about a five
16  million dollar company.
17      You got to realize, David,
18  this was like a child to me.  I started
19  with a truck, trailer, and a cell phone
20  in '90.  And I grew up in a
21  single-parent home, poor as dirt, and
22  worked my way through college driving a
23  truck.  I mean, this has just been

31  (Pages 121 to 124)

## www.AmericanCourtReporting.com
## January 15, 2007

**American Court Reporting**
**toll-free (877) 320-1050**

Page 125

1  devastating. It's affected my family
2  and my health. It's affected all parts
3  of my life. I can't sleep. Imagine a
4  poor old country boy building a 24
5  million dollar company and now going
6  from be able to call a bank and say,
7  hey, I need to borrow a hundred
8  thousand dollars, I'm going to a sale.
9  And now I can't do it. I can't buy any
10 trucks. I can't buy any trailers. I
11 have had to spend every bit of my
12 savings to keep what I got going, my
13 girls' education fund. You know, I
14 could have opted to file chapter
15 whatever, but I didn't because I didn't
16 want to screw nobody. I'm not like
17 that. If I give you my word, I stick
18 to it. I'm going to pay these people
19 somehow. And, you know, the economic
20 impact to the State of Alabama in tax
21 revenue and to Randolph County in tax
22 revenue is tremendous. They lost a 24
23 million dollar company also. You know,

Page 126

1  the jobs they lost was a definite
2  impact to the area. It probably means
3  something to everybody in the State of
4  Alabama.
5  Q.  When you talk about your
6  earning power, you are talking about
7  you personally, Guy Kelly, or are you
8  talking about G.F. Kelly Trucking?
9  A.  Both.
10 Q.  Both?
11 A.  I mean, I'm one in the same.
12 I have to personally guarantee
13 everything anyway. I mean, G.F. Kelly
14 is ruined also, and it was a credible,
15 viable company and very competitive
16 with other carriers in the Southeast.
17 Q.  You mentioned your health.
18 Explain to me how it has affected you
19 health-wise?
20 A.  I developed a type arthritis
21 that I had to seek some medical help
22 on. I couldn't hardly walk in the
23 first part of '06. I don't know

Page 127

1  exactly the term they -- the term they
2  define it as, but it was caused from
3  fatigue and from stress. My hands were
4  swollen real bad. I had to go on an
5  antidepressant; been on it ever since
6  and still taking medicine for my feet.
7  Q.  These are things that
8  attribute specifically to the
9  negotiations with U.S. Xpress?
10 A.  I attribute it to the
11 misrepresentation and the misleading
12 process, because I didn't have it
13 prior. I was pretty healthy.
14 Q.  What doctors have you seen?
15 A.  Dr. Powers is the arthritic --
16 I'm trying to think of the description.
17 Dr. Runas Powers in Alexander City is
18 who I was seeing about the foot
19 condition. My local doctor was
20 Dr. Peterson in Roanoke.
21 Q.  What did you see him for?
22 A.  Having to take blood pressure
23 medicine and taking Cymbalta for

Page 128

1  depression.
2  Q.  Number three on Defendant's
3  Exhibit 13 has a Dr. Matthews.
4  A.  Dr. Matthews was also a doctor
5  I had to -- I actually thought I was
6  having a heart attack or a stroke and I
7  had to go to the hospital and be
8  hospitalized and run tests. He was the
9  heart doctor that I used in Opelika.
10 They put me through a series of tests.
11 Q.  You mentioned it affected your
12 family. How has it affected your
13 family?
14 A.  How has it not affected them?
15 I mean, I'm at home, but I'm not home.
16 I'm there physically, but mentally I'm
17 not there, because it's a constant
18 barrage every day of creditors calling
19 me wanting money and a constant barrage
20 of lawsuits, you know, I'm getting in
21 the mail.
22      When I go home, I'm mentally
23 not there for my wife or my kids. I

**www.AmericanCourtReporting.com**
**January 15, 2007**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 129

1   mean, it has affected our lifestyle.
2   Imagine the perks. I have had to sell
3   my boat. I have had to sell my lake
4   lot. I have had to sell my race car
5   operation. I have had to sell my extra
6   vehicles I had. I have had to sell
7   everything I have gotten and acquired
8   over 15 years to get money just to keep
9   this operation and keep the employees
10  there that I have.
11      I have had to cash in part of
12  my kids' bank stock to help pay the
13  bills. They had a half a million
14  dollars' worth of bank stock. I had to
15  cash in one of their CDs, which was
16  $200,000. And this is all the direct
17  result of them not completing their
18  deal. If they had just done what they
19  said they was going to do, everything
20  would have been fine.
21      Q. With regard to Kelly Trucking
22  on the lost accounts, you have got
23  Bowater and --

Page 130

1      A. Kanoff Fiberglass was another
2   one I meant to list that I lost.
3      Q. Not on here?
4      A. Is Wabash Alloys, Rainbow
5   Express.
6      Q. All right.
7      A. I lost Lozier Corporation.
8      Q. How do you spell that?
9      A. L-o-z-i-e-r.
10     Q. When did you lose Kanoff?
11     A. The minute they heard about
12  the deal and the negotiation process
13  with U.S. Xpress, which would have been
14  in '05, I don't know the exact date,
15  they cut us off.
16     Q. Who is your contact there at
17  Kanoff?
18     A. I don't know at this point in
19  time, because he's retired and I don't
20  know who replaced him. We don't do any
21  business with them anymore, so I don't
22  know who it is.
23     Q. They, you said, cut you off

Page 131

1   before or after the --
2      A. They cut us off during. When
3   they found out I was negotiating with
4   those guys and they were buying me out,
5   they discontinued doing business with
6   me.
7      Q. How did they hear about it?
8      A. I don't know. Word travels
9   real fast in the transportation
10  community. How it happens sometimes is
11  beyond me.
12     Q. Did they indicate to you what
13  it was about the negotiations that --
14     A. I think they had done some
15  business prior with U.S. Xpress and had
16  some bad results, and they opted not to
17  do any more business with them.
18     Q. Do you know if anyone from
19  U.S. Xpress spoke to Kanoff during the
20  negotiations?
21     A. I do not know.
22     Q. Is Kanoff Fiberglass like
23  Wabash Alloys, same type of fiberglass?

Page 132

1      A. No. Wabash makes liquid
2   molten aluminum.
3      Q. Aluminum. Okay.
4      A. And Kanoff Fiberglass is
5   fiberglass insulation.
6      Q. Aluminum. What does Lozier
7   do?
8      A. Lozier makes inside store
9   shelving like that goes in Wal-Marts.
10     Q. Back to Kanoff. Who is the
11  point person with Kanoff at Kelly
12  Trucking?
13     A. It would have been Nelson.
14  Don Houlk, that's Kanoff Fiberglass,
15  H-o-u-l-k. He was the rep for Kanoff
16  that we dealt with, but I think he is
17  retired now. Nelson will be able to
18  tell you something about that.
19     Q. Who dealt with Lozier?
20     A. Nelson. Lozier.
21     Q. Lozier. I messed that up in
22  here.
23      Do you know who he dealt with

33  (Pages 129 to 132)

**www.AmericanCourtReporting.com**
**January 15, 2007**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 133

1 at Lozier?
2    A. David Hale.
3    Q. H-a-l-e?
4    A. Yes.
5    Q. Who was Kanoff using? Was it
6 Kelly?
7    A. I don't know who all the
8 carriers they had, but we done a lot of
9 business with them. They had a
10 location in Lanett, Alabama, which is
11 not but about 35 miles from Wadley. So
12 it was just a great account for us.
13    Q. Over the road?
14    A. Over the road, drop box
15 freight.
16    Q. What I was asking, was this a
17 G.F. Kelly Trucking account or was it
18 one of the other --
19    A. It was G.F. Kelly Trucking.
20    Q. Is that the same thing with --
21    A. Lozier.
22    Q. -- Lozier?
23    A. Correct.

Page 134

1    Q. I take it, Lozier quit using
2 Kelly?
3    A. Correct.
4    Q. When?
5    A. In '05.
6    Q. Before or after?
7    A. Toward the -- yeah, towards
8 the end of '05, after the fact.
9    Q. Did they indicate to you why?
10    A. No, not to me directly.
11 Nelson could answer that.
12    Q. Did Nelson tell you a reason
13 why?
14    A. No. I can't recall exactly
15 other than it was because of the
16 U.S. Xpress mess. He will have to
17 explain that.
18    Q. Have you put a dollar figure
19 or can you put a dollar figure on the
20 damage that Kelly Trucking suffered as
21 a result of the loss of Lozier?
22    A. You would have access to a
23 revenue report. I don't have it.

Page 135

1    Q. Who would have that?
2    A. We could probably run one for
3 the year ending '05. All of these
4 accounts, I could get a revenue report
5 on.
6    Q. Let me ask you this: What is
7 it that Kelly -- what is it that U.S.
8 Xpress did wrong that caused all these
9 things?
10    A. They misled me and led me to
11 believe that they were buying my
12 company. And basically, I based all my
13 business decisions on what they told me
14 when I relied on them -- you know, I
15 relied on Dennis Farnsworth's word that
16 he guaranteed me that they were going
17 to buy me out, not to worry about
18 nothing. On more than one occasion,
19 he guaranteed me that.
20    Q. That's important. Okay?
21    A. That's very important because
22 I have witnesses to it.
23    Q. You said more than one

Page 136

1 occasion, he guaranteed --
2    A. That they would complete the
3 deal.
4    Q. U.S. Xpress will?
5    A. Complete the deal and acquire
6 Kelly's trucking. He was my point of
7 contact.
8    Q. What day did he tell you this?
9    A. The first time?
10    Q. Yes.
11    A. The first time is probably
12 going to be, I think, July 22nd.
13    Q. Where was he?
14    A. My office in Wadley.
15    Q. Who was present?
16    A. At that point in time, he and
17 I.
18    Q. And this is Dennis Farnsworth?
19    A. Farnsworth. The original
20 closing date was July the 15th, and he
21 continued to put it off, you know, for
22 whatever reason.
23    Q. Prior to July 22nd, 2005, had

34 (Pages 133 to 136)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 137

1  you changed the way you were operating
2  Kelly Trucking in any way?
3      A. Ask me that again.
4      Q. I will try.
5          Prior to July 22nd, 2005, had
6  you changed the way you operated Kelly
7  Trucking in any way based upon your
8  negotiations with U.S. Xpress?
9      A. Yes.
10     Q. How so?
11     A. I backed off on some equipment
12 payments and insurance payments,
13 because it was an asset purchase that
14 they were going after, so if my assets
15 were going to be paid off, so I chose
16 to back off my payments to -- so I
17 would ensure myself getting more cash
18 out of the deal.
19     Q. And this was prior to July
20 22nd, 2005?
21     A. Yes. Because he -- the
22 original closing, he told me after two
23 weeks of his first visit to the

Page 138

1  company, that he had seen all he needed
2  to see, that he wanted the company and
3  he would make it happen.
4      Q. Two weeks --
5      A. This was May the 12th.
6      Q. He will make it happen?
7      A. He will make it happen. He
8  described three different buyout
9  options to me at that time.
10     Q. Where was this? Was this a
11 conversation?
12     A. This was a meeting in my
13 office in Wadley.
14     Q. Who was present for this
15 conversation?
16     A. Nelson Chastain.
17     Q. Yourself and Mr. --
18     A. Nelson. Nelson Chastain. I'm
19 not sure he was present for the whole
20 meeting, but he was in there for a good
21 portion of it.
22     Q. Did Mr. Farnsworth tell you to
23 back off your equipment payments?

Page 139

1      A. No.
2      Q. Did he tell you to back off
3  the insurance payments?
4      A. No.
5      Q. Did you seek anyone's advice
6  in doing that?
7      A. No.
8      Q. Explain to me how backing off
9  the payments in an asset purchase works
10 to your benefit.
11     A. I had approximately about a
12 million dollars in equity in the
13 equipment at that point in time, so it
14 basically didn't matter to me at that
15 point in time if I backed off equipment
16 payments, because it was going to be
17 paid off either way. It just put more
18 immediate cash in my pocket at that
19 point in time, and that's what I
20 wanted. I didn't want to get into a
21 situation where we were haggling over
22 some issues of a piece of equipment or
23 whatever, because it was going to get

Page 140

1  paid off anyway and I would no longer
2  be in the trucking business. And I --
3  if this deal would have got completed
4  like it was promised it would have
5  been, I would have been set for life.
6  I promise you, I wouldn't have been
7  buying no more trucks and trailers.
8      Q. Were you going to use -- if
9  the deal closed, were you going to use
10 the money you got for the asset
11 purchase to pay off the debt that was
12 accumulated?
13     A. The agreement of the asset
14 purchase was, they would pay off all
15 the equipment and I would receive all
16 the remaining equity left. He
17 requested payoffs on all the equipment
18 and current payoff letters as of August
19 24th. I remember it.
20     Q. Were you going to reach an
21 agreement as to a dollar amount, and
22 then from that dollar amount they were
23 going to pay off the debt and you were

35  (Pages 137 to 140)

**www.AmericanCourtReporting.com**
**January 15, 2007**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 141

1  going to get the difference?
2      A.  We were instructed by Dennis
3  to get payoff letters from all
4  financial institutions that we owed
5  money to pertaining to asset equipment
6  through November the 24th and they were
7  to pay off all that equipment.  And
8  they had done a standard evaluation
9  that Taylor Martin does for an Asset
10  Purchase Agreement, evaluating the
11  equipment.  And they were to pay --
12  they were to pay that amount for that
13  piece of equipment, and whatever equity
14  was left when the deal was totally
15  done, I would get the difference.
16      Q.  When you said it would put
17  more immediate cash in your pocket, did
18  you mean you would get to hold on to
19  the cash that you otherwise would be
20  paying to pay off the debt or are you
21  talking about on the other side of the
22  closing, cash on the other side of the
23  closing?

Page 142

1      A.  Either way, it's the same
2  thing.  I mean, me backing off on
3  payments just put the cash in my pocket
4  right then.  And I had some other deals
5  working at the time, too, you got to
6  realize, that I had made some
7  commitments based on what they told me
8  on this deal.  And I was trying to save
9  myself interest money on some of these
10  deals.  Does that make sense?
11      Q.  No.  It might to everybody
12  else in the room, but it doesn't to me
13  yet, but that doesn't mean anything.
14      A.  All right.
15      Q.  Let's go back to May 12th.
16  Dennis tells you he has seen all he
17  needs to see and he will make it
18  happen?
19      A.  And he will offer me three
20  options.  The first option was, they
21  buy all the trailers through an asset
22  purchase and then I lease all my trucks
23  to U.S. Xpress as owner/operators.  Got

Page 143

1  it?
2      Q.  Got it.
3      A.  Second option was, they buy 49
4  percent of the company and I continue
5  to run it and then phase the rest of it
6  in over a period of time.  They would
7  complete buying the rest of the company
8  stock.  Third option was a complete
9  asset sale.  They assume no
10  liabilities, they got none of the cash
11  and the receivables coming in.
12      And he called me back the next
13  week and said that they have -- he had
14  met with whoever he met with, I don't
15  know who, but they wanted to buy the
16  whole company as a complete asset
17  purchase.  And I said, okay.  And we
18  were to close by July the 15th.
19      Q.  And then the next conversation
20  is July 22, 2000?
21      A.  Well, we would have talked
22  every week.
23      Q.  Yeah.  But I'm talking about

Page 144

1  the representations.
2      A.  Oh, yes.  They flew down from
3  Chattanooga, he did, Bill Farris and
4  Wardeberg.
5
6      (Discussion off the record.)
7
8      THE WITNESS:  Jeff Wardeberg
9  and also some safety people.  Russ
10  Moore may have come down.  I can't
11  remember.  Does that sound right?  Is
12  he still with you guys?
13      MS. PATE:  He is.
14      THE WITNESS:  And I met and
15  Dennis and Bill and Jeff, discussing
16  accounts and account base.  And Nelson
17  did.  And then Nelson met with Jeff and
18  Bill at some point in time, and then
19  Dennis and I talked about some more
20  particular things.  I don't recall.
21  But they were leaving on a corporate
22  jet for Bristol for a race.
23      MR. HALL:  A race.  I hear

36  (Pages 141 to 144)

**www.AmericanCourtReporting.com**
**January 15, 2007**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 145

1  that place is loud.
2      THE WITNESS: It is fun.
3  Great place to race. Off the record.
4
5      (Discussion off the record.)
6
7      Q.  (BY MR. HALL:)  It was just
8  you and Dennis in that July 22, 2000
9  meeting where he --
10     A.  At some point in time, yes, we
11 were together, just he and I. I think
12 they basically came down to view the
13 operation and gather information and
14 meet people. And that's the first time
15 Dennis guaranteed emphatically that
16 they were going to purchase the
17 business. That was on a Friday, July
18 22nd.
19     Q.  That's the second time. Is
20 there a third time?
21     A.  Yes.
22     Q.  When is it?
23     A.  August the 20th. I had sent

Page 146

1  Dennis an e-mail the prior week
2  basically telling him to piss or get
3  off the pot, in laymen's terms, you
4  know, either leave me alone, because
5  you are ruining my business and my
6  customers are getting nervous and my
7  drivers are getting nervous. Either
8  complete the deal or leave me alone.
9      And he called me on my cell
10 phone Saturday afternoon. And I was at
11 home. My wife answered the phone. He
12 talked to me and said, sorry for the
13 delays, the same old sorry for the
14 delay, this has been going on or
15 whatever.
16     And I said, Dennis, if you are
17 not going to buy the company, tell me
18 and just leave me alone because, I
19 said, I have to make some decisions to
20 change some stuff around. And I put it
21 on speakerphone. My wife is a witness.
22 And he said, Guy, I guarantee you and
23 promise you we are going to buy your

Page 147

1  company. He said, we are going to
2  close on August the 29th. And he said
3  Monday, there will be a team of
4  representatives coming in from the main
5  office to start the process. And
6  that's basically the gist of the
7  conversation.
8      And when he hung up, he turned
9  around and called Nelson also at home,
10 because Nelson told me the Monday that
11 he called him, too, and told him, hey,
12 we are coming in Monday, we are going
13 to complete the deal and close August
14 29th.
15     Q.  And your wife was present --
16     A.  My wife was present.
17     Q.  -- on the speakerphone
18 conversation?
19     A.  Yes. She heard it. And she
20 -- well, I won't speak for her. You
21 can talk to her tomorrow.
22     Q.  Was anybody else there besides
23 you and Mrs. Kelly?

Page 148

1      A.  My kids. You don't want them
2  here.
3      (Short recess.)
4
5      Q.  (BY MR. HALL:)  We talked
6  about the third time on the 20th on the
7  conference call. Was there a fourth?
8      A.  No.
9      Q.  Did anyone besides Dennis
10 Farnsworth make any representations to
11 you about the deal closing, definitely
12 closing?
13     A.  Other than the -- let's see.
14 The 22nd one, they came down. When
15 Farris come in and Wardeberg, I think I
16 made a comment to the effect, oh, they
17 have brought out the big guns now,
18 y'all must be real interested. And
19 Wardeberg made the comment, well, well,
20 we wouldn't be here if we wasn't
21 interested. And that was it. He was a
22 pretty arrogant guy, to say the least.
23     Q.  Wardeberg?

37  (Pages 145 to 148)

**www.AmericanCourtReporting.com**
**January 15, 2007**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 149

1    A. Wardeberg.
2    Q. Do you have any reason to
3  believe that Mr. Farnsworth, assuming
4  he said these things, do you have any
5  reason to believe that he did not mean
6  them when he said them?
7    A. I can't speak for Farnsworth.
8  I mean, basically, like I said, I
9  relied on what he represented to me as
10 their actions and I pretty much relied
11 on his word.
12   Q. Is there anything that makes
13 you think he was trying to trick you?
14   A. Now, after the fact.
15   Q. What?
16   A. I mean, I really think they
17 tried to put me out of business and
18 steel my drivers. I think it was all
19 about drivers and accounts. He even
20 made a comment to me before, when they
21 first came in, they needed drivers real
22 bad. They had 600 empty trucks sitting
23 on the lot. That's a lot of trucks.

Page 150

1    Q. Has anybody said anything to
2  you or did anybody say anything to you
3  during the negotiations or since that
4  makes you think that they were trying
5  to trick you, to put you out of
6  business so they could get your drivers
7  and your trucks besides what you have
8  already told me?
9    A. That makes me believe that
10 this was all a sham?
11   Q. Yes, sir.
12   A. They have tried to hire my
13 drivers after the fact.
14   Q. While I'm looking, I will show
15 you what has been marked Defendant's
16 Exhibits 30 and 31 which are documents
17 produced by you.
18
19   (Whereupon, Defendant's Exhibit
20    Numbers 30 and 31 were marked for
21    identification and are attached to
22    the original transcript.)
23

Page 151

1    A. By me.
2    Q. '93 and '92.
3    A. Do you know what these are?
4    Q. No. Can you tell me what they
5  are?
6    A. Did you read them?
7    Q. I did read them, yeah. What
8  are they?
9    A. It would appear to me that
10 they are invitation to hire letters.
11   Q. Who are they to?
12   A. Two of my former drivers.
13   Q. What is the date of the
14 letters?
15   A. It says November the 16th,
16 '05.
17   Q. And they are to?
18   A. Lee Knight and Darrell Waldon.
19   Q. Were they employed by you in
20 November?
21   A. Yes.
22   Q. They were not two that had
23 quit?

Page 152

1    A. No. But they were originally
2  turned down by U.S. Xpress.
3    Q. Do you know how those letters
4  came about to be sent to those men?
5    A. Do I know how they got sent to
6  the drivers?
7    Q. Yes, sir.
8    A. The driver -- I assume, if it
9  can be assumed, that U.S. Xpress sent
10 them the letters.
11   Q. How did you get copies of
12 them?
13   A. The drivers came to see me
14 after this was over and said that U.S.
15 Xpress tried to hire them and they
16 originally had been turned down when
17 they were there with me.
18   Q. Did they receive anything more
19 than those letters, do you know?
20   A. Not to my knowledge.
21   Q. Do you know if they ever spoke
22 with U.S. Xpress?
23   A. I couldn't answer that. Frank

38  (Pages 149 to 152)

**www.AmericanCourtReporting.com**
**January 15, 2007**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 153

1  could answer that probably better than
2  I could.
3      Q.  Frank?
4      A.  Frank could answer that better
5  than I could.
6      Q.  Okay.  More paper than I know
7  what to do.
8
9      (Discussion off the record.)
10
11     Q.  (BY MR. HALL:)  Do you
12  recognize what I have marked as
13  Defendant's Exhibit 32?
14
15     (Whereupon, Defendant's Exhibit
16     Number 32 was marked for
17     identification and is attached to
18     the original transcript.)
19
20     A.  It looks like a drivers' list,
21  but I'm not positive.  Frank can answer
22  that better than I can.  It looks like
23  a drivers' list.

Page 154

1      Q.  Is that a list of Kelly
2  drivers?
3      A.  Yeah.  It looks like it.  Yes.
4      MR. TOMLINSON:  David, was
5  that produced by G.F. Kelly?
6      MR. HALL:  We produced it to
7  y'all.
8      MR. TOMLINSON:  I think we got
9  it, but I wasn't sure.
10     Q.  (BY MR. HALL:)  At the top,
11  it's dated 7/23/05 at 3:22 from Kelly
12  Trucking.
13     A.  That would be on Saturday.
14     Q.  If that came from Kelly
15  Trucking, who would have --
16     A.  Safety department, Frank
17  Childers.
18     Q.  Frank Childers.  Okay.
19     How many drivers did Kelly
20  Trucking have in July of '05?
21     A.  I couldn't answer that.  Frank
22  would be better qualified to answer
23  that.

Page 155

1      Q.  You indicated you had roughly
2  200 tractors.  Did you have --
3      A.  I think we would have had
4  around 200 drivers.
5      Q.  Did any of the other drivers,
6  other than the two that are reflected
7  in Exhibits -- is that 30 and 31?
8      A.  It's 30 and 31.
9      Q.  In 30 and 31, did any other
10  drivers receive any letters from U.S.
11  Xpress, to your knowledge?
12     A.  I am told, yes, by Frank.  And
13  he could answer that.
14     Q.  Have you ever heard of
15  trucking companies buying lists of
16  truckers' names?
17     A.  I haven't.
18     Q.  No?  Were you aware that
19  trucking companies send out letters to
20  prospective drivers, trying to recruit
21  them?
22     A.  I don't.
23     Q.  Are you aware of any other

Page 156

1  trucking companies doing that?
2      A.  I mean, I'm sure it may
3  happen.  I can't -- I can't answer
4  other than what I do.
5      Q.  Do you know of any Kelly
6  Trucking drivers that were employed at
7  Kelly Trucking in July and August of
8  2005 that were subsequently hired by
9  U.S. Xpress?
10     A.  I have no knowledge, no.  But
11  they wouldn't have went.
12     Q.  Why not?
13     A.  I don't think they would have
14  went because of the debacle and the way
15  it happened.  If that would have been
16  the case, I wouldn't have had 35 to
17  walk out that week.  I had the best
18  deal going at the time for those
19  particular drivers wanting to be home
20  every weekend.
21     Q.  The drivers, you mentioned 35
22  that quit.  Were the drivers opposed to
23  working for U.S. Xpress?

39  (Pages  153 to 156)

# American Court Reporting
## toll-free (877) 320-1050

Page 157

1    A. I think they were skeptical.
2 And that situation is all in how it's
3 handled in any acquisition.
4    You got to remember now, I
5 have guaranteed these drivers that I
6 would be a part of the deal, and that's
7 what Dennis had assured me of. So I
8 was a big part of a smooth transition,
9 if it would have happened.
10    Q. Did you guarantee to Dennis or
11 anyone else at U.S. Xpress that you
12 would be able to recruit a certain
13 number of your drivers to go to work
14 for U.S. Xpress?
15    A. I guaranteed to Dennis that I
16 would do everything in my range of
17 opportunities to retain and recruit
18 future drivers. But they basically
19 held the advantage from that
20 standpoint.
21    Q. They being U.S. Xpress?
22    A. U.S. Xpress had that
23 advantage, how they treated the

Page 158

1 drivers.
2    Q. When did you decide to quit
3 paying the -- when you say back off, do
4 you mean quit paying?
5    A. Yeah.
6    Q. When did you decide to quit
7 paying the equipment payments and the
8 insurance payments?
9    A. It would have been in July.
10 And I didn't back off everything now.
11 Don't misinterpret that I backed off of
12 every payment.
13    Q. Do you remember which ones?
14    A. No, not offhand.
15    Q. You indicated that you had
16 other deals or other commitments going
17 during this negotiation.
18    What was that in reference to?
19    A. I had an opportunity to drive
20 a professional race car that fell apart
21 due to this deal. I was led to believe
22 I had an opportunity anyway.
23    Q. By whom?

Page 159

1    A. Don Shumaker Racing.
2    Q. Were there any other
3 commitments?
4    A. I was always buying and
5 selling land and buying timber. I was
6 doing a lot of lake lot buying, Wedowee
7 Lake, buying and selling lots and
8 building some houses.
9    Q. You said, with regard to
10 hiring the drivers, it's all in how you
11 handle it in any acquisition.
12    Were you involved in any way
13 in the handling of the drivers in this
14 acquisition?
15    A. Yeah. I was having constant
16 phone calls from the drivers or either
17 I would see them when they would come
18 by the office. I was constantly
19 reassuring them everything was going to
20 be fine, they were going to have better
21 opportunities and access to more
22 benefits, if the transition happened.
23 And I was guaranteeing to those drivers

Page 160

1 they would be home and they would be
2 treated the same, and I would still be
3 a part of the operation and they could
4 come to me if they had a problem. And
5 Dennis assured me and I represented to
6 them him representing to me, you know,
7 that I would keep them pretty much at
8 status quo.
9    Q. When did somebody from U.S.
10 Xpress tell you that the drivers would
11 definitely be home every weekend?
12    A. Dennis told me that.
13    Q. When was that?
14    A. That was in the original
15 talking process. I mean, that would
16 happen first thing. When he asked me
17 what type of operation we had, that
18 probably would have happened on May the
19 22nd -- excuse me -- May the 12th. I
20 had to describe the operation I had,
21 which was regional truckload and
22 getting the guys home every weekend.
23    Q. How were you able to do that?

40 (Pages 157 to 160)

## American Court Reporting
## toll-free (877) 320-1050

Page 161

1  How were you able to get the guys home
2  every weekend?
3      A.  Recruiting drivers in a given
4  area where you had a high concentration
5  of freight and you -- for instance, I'm
6  based in Alabama and I pull all the way
7  primary into the Virginia area.  So you
8  try to recruit drivers in the middle,
9  because you are doing this constantly
10 back and forth (demonstrating) from one
11 end to the other.  So you recruit.
12 There's a big misconception in
13 recruiting in a way unless you just got
14 to hire every driver that comes through
15 the door.  But you recruit in your
16 traffic patterns, if you want to get
17 them home every weekend.  And that's
18 what I did, I guaranteed my drivers
19 home every weekend no matter what.
20     Q.  Did Kelly drivers ever work
21 for any other companies?
22     A.  We pretty much got them out of
23 the cradle.  I'm sorry, I had to throw

Page 162

1  that in there.
2      Q.  While they were employed by
3  Kelly Trucking, did they work for any
4  other affiliated companies of yours?
5      A.  No.  They were full-time
6  employees.
7      Q.  So they never drove for --
8  what was the aluminum company?
9      A.  Kelly Aluminum Group was a
10 specific group of drivers that that's
11 all they did, if that answers that.
12 There was not any crisscrossing.
13     Q.  That's what I'm asking.
14     A.  Yeah.
15     Q.  Did Kelly drivers ever drive
16 for an affiliated company?
17     A.  No.
18     Q.  Were Kelly trucks governed?
19     A.  Yes.
20     Q.  At what speed?
21     A.  Seventy miles per hour.  With
22 the exception of owner/operators, I
23 couldn't.

Page 163

1      Q.  I will show you what has been
2  marked as Defendant's Exhibit 33.  Does
3  that appear to be a list of G.F. Kelly
4  drivers?
5
6         (Whereupon, Defendant's Exhibit
7          Number 33 was marked for
8          identification and is attached to
9          the original transcript.)
10
11     A.  It appears to be a list of
12 Kelly Trucking drivers.
13     Q.  Do you know whose notes these
14 are on here?
15     A.  Some of them is Frank's.  It
16 looks like Frank, most of Frank's.
17     Q.  Can you describe -- there is
18 different types of -- it looks like
19 different pens.  One appears to be
20 dark.
21     A.  That's mine right there,
22 Patrick Echols is timber, that means he
23 can pull timber; he has had experience

Page 164

1  pulling timber.  Does that make sense?
2      Q.  Okay.
3      A.  And there's mine again.  Some
4  of it is Frank's.  It looks like the
5  dark is going to be Frank's.
6      Q.  Okay.
7      A.  I don't know who the other one
8  is.  Frank was constantly updating
9  drivers' list to make sure who was
10 active and wasn't active, who was going
11 to be out for medical leave.
12     Q.  The list of drivers that was
13 provided by Kelly Trucking to U.S.
14 Xpress, did it include spotters as
15 well?
16     A.  You will have to ask Frank
17 about that.
18     Q.  Frank is the guy--
19     A.  Safety, he is safety and
20 personnel.
21     Q.  He knows the most about the
22 drivers' files?
23     A.  He will be able to tell you

41 (Pages 161 to 164)

## www.AmericanCourtReporting.com
## January 15, 2007

**American Court Reporting**
**toll-free (877) 320-1050**

Page 165

1 the most about drivers' history and
2 drivers' files.
3     Q.  I will show you what has been
4 marked as Defendant's Exhibit 34 and
5 see if you recognize that.
6
7         (Whereupon, Defendant's Exhibit
8         Number 34 was marked for
9         identification and is attached to
10        the original transcript.)
11
12    A.  It is an e-mail from myself to
13 Dennis.
14    Q.  Okay.  The April 26th e-mail
15 from you to Dennis, sent package back
16 today.
17        What package was that?
18    A.  It would have been the back
19 page information that he was
20 requesting.
21    Q.  Did you ever receive anything
22 in writing from U.S. Xpress or anyone
23 employed by U.S. Xpress guaranteeing

Page 166

1 that they would close the deal?
2    A.  On paper?
3    Q.  Yes, sir.
4    A.  I think there should be an
5 e-mail somewhere stating the closing
6 date.
7    Q.  Okay.
8    A.  And in my mind, that's telling
9 me that they are going to buy the
10 company.
11    Q.  On this one, on the first page
12 of Exhibit 34, Mr. Farnsworth's e-mail
13 to you, the last sentence says, we are
14 interested in a potential transaction.
15        At that time, it was your
16 understanding that there was no deal
17 certain; is that correct?
18    A.  On April 22nd, yeah.  Or was
19 it -- yeah, April 22nd is when it was
20 sent.
21    Q.  Do you see where I'm talking
22 about?
23    A.  Yeah, right there.  And it was

Page 167

1 sent on April 22nd, on Friday.
2    Q.  I will show you what has been
3 marked as Defendant's Exhibit 35 and
4 ask if you can identify that, please.
5
6         (Whereupon, Defendant's Exhibit
7         Number 35 was marked for
8         identification and is attached to
9         the original transcript.)
10
11    A.  That's the CA agreement.
12    Q.  CA meaning confidentiality?
13    A.  Confidential, yeah, between
14 myself and Dennis Farnsworth and U.S.
15 Xpress dated April 18th, '05.
16    Q.  Okay.
17
18        (Whereupon, Defendant's Exhibit
19        Number 36 was marked for
20        identification and is attached to
21        the original transcript.)
22
23    Q.  36?

Page 168

1    A.  36.
2    Q.  I will show you what has been
3 marked as Defendant's Exhibit 36.
4        MR. HALL:  And I apologize, I
5 don't have an extra copy for you.
6        MR. TOMLINSON:  Sure.  That's
7 fine.
8        MR. HALL:  I got more copies
9 of stuff than I know what to do with.
10    Q.  (BY MR. HALL:)  Do you
11 recognize Defendant's Exhibit 36?
12    A.  Yes.
13    Q.  Monday, June 20th, 2005, 12:49
14 p.m. from Dennis Farnsworth to you.  Do
15 you remember receiving that e-mail?
16    A.  Yes.
17    Q.  Do you know what
18 Mr. Farnsworth was referring to when he
19 said, I received approval to move
20 forward?
21    A.  That was an approval to
22 acquire Kelly Trucking.
23    Q.  Do you know who he had to get

42 (Pages 165 to 168)

**www.AmericanCourtReporting.com**
**January 15, 2007**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 169

1  approval from?
2     A.  The big chief above.  I have
3  no idea.
4     Q.  All right.  You understood
5  that he had to get somebody else's
6  approval before he could commit to
7  anything?
8     A.  No, I don't know that that's
9  really what he had to do.  But it
10  appears that he is trying to portray it
11  that way.
12     Q.  And the next sentence, do you
13  see where he says, I will be putting
14  together an outline of a potential
15  transaction for your consideration?
16     A.  Yes.
17     Q.  Does that indicate to you that
18  there is no certainty that there will
19  be a transaction?
20     A.  The fact that he put potential
21  in there, is that what you are asking
22  me?
23     Q.  Yes.

Page 170

1     A.  That is sort of misleading,
2  according to what context -- he says, I
3  have received approval to move forward.
4  And then the sentence says, I will be
5  putting together an outline for a
6  potential transaction, meaning that he
7  has already agreed that he is going to
8  move forward with the purchase and he
9  is putting together a potential
10  transaction that may be changed.
11     Q.  That's the way you take that?
12     A.  That's the way I take that.
13     Q.  I will show you what has been
14  marked as Defendant's Exhibit 37.
15
16        (Whereupon, Defendant's Exhibit
17        Number 37 was marked for
18        identification and is attached to
19        the original transcript.)
20
21     Q.  Do you recognize this letter?
22     A.  Yes.
23     Q.  On the last page, is that your

Page 171

1  signature?
2     A.  Yes.
3     Q.  And below it, it's dated
4  6/30/05?
5     A.  Correct.
6     Q.  The letter, the first sentence
7  says, U.S. Xpress has an interest in
8  acquiring certain assets of G.F. Kelly
9  Trucking.
10        Did I read that correctly?
11     A.  Correct.
12     Q.  Skip the next sentence.  Upon
13  execution of this letter, USX will
14  continue its due diligence
15  investigation, and thereafter USX and
16  GFK would enter into negotiations for a
17  definitive agreement.
18        Did I read that correctly?
19     A.  Yes.
20     Q.  Does that indicate to you that
21  there isn't a definitive agreement?
22     A.  Does that say this agreement,
23  or they are going to present me with an

Page 172

1  agreement?
2     Q.  I'm asking you.
3     A.  It means to me that this is
4  basically a rough draft of a final
5  agreement to come.
6     Q.  Okay.  But there isn't a final
7  agreement now?
8     A.  Well, it couldn't be if he
9  said negotiations for a definitive
10  agreement.
11     Q.  If you drop down to paragraph
12  1, subparagraph A, it says, USX would
13  purchase the business and certain
14  tangible and intangible assets of GFK
15  free and clear of all liens, claims,
16  encumbrance, security interest and
17  impairments of title of any kind or
18  nature, indicating that this is what
19  they would propose to do if you go
20  forward?
21     A.  Correct.
22     Q.  This has to do with the
23  assets, certain assets of Kelly that

43  (Pages 169 to 172)

## American Court Reporting
## toll-free (877) 320-1050

Page 173

1  they are looking at purchasing?
2      A.  Asset purchase, correct.
3      Q.  And according to the last
4  sentence, that only occurs after an
5  appraisal and inspection of the
6  equipment by U.S. Xpress; is that
7  right?  Did I read that right?
8      A.  Correct.  Which they done.
9      Q.  Subparagraph B says, at the
10  closing of the definitive agreement,
11  USX would assume specified liabilities,
12  correct?
13      A.  Correct.
14      Q.  What does the word "would"
15  mean to you in this context?
16      A.  What the word "would" would
17  mean, in this context, means if they
18  completed the transaction, that they
19  would pay off all my debt of assets.
20      Q.  Okay.  Subparagraph E
21  indicates, at closing, USX would
22  determine whether to offer employment
23  to each of the drivers, including

Page 174

1  independent contractors of GFK existing
2  as of the closing.  The decision as to
3  whether to hire each eligible GFK
4  driver would be made by USX in its sole
5  discretion, again indicating that if it
6  closed, they would hire certain drivers
7  of Kelly Trucking.
8      Is that how you read that?
9      A.  At close, USX would determine
10  whether or not... that's the way that
11  sounds, but then this whole thing makes
12  it sound like they never intended to
13  buy the company.
14      Q.  Paragraph or subparagraph E,
15  the last sentence, the decision as to
16  whether to hire each eligible GFK
17  driver would be made by USX in its sold
18  discretion.
19      You understood that it was
20  going to qualify the drivers under its
21  standards and determine which it could
22  hire?
23      A.  Yes.  Correct.  I never -- we

Page 175

1  never received any prequalifications
2  for the drivers.
3      Q.  What do you mean by that,
4  prequalifications for the drivers?
5      A.  Well, I mean, they were
6  determined based on their hiring
7  qualifications.  So for this to really
8  go further, they never supplied us with
9  any qualifications, so this appeared,
10  to me, what you are disclosing here,
11  that did they ever intend to buy me
12  out?
13      Q.  When you signed this letter,
14  did you read it?
15      A.  Yeah.  I actually let my
16  attorney read it.
17      Q.  Which one?
18      A.  Hartley.
19      Q.  Did he tell you or did anybody
20  ever give you any indication on June
21  30th, 2005 that you had a contract for
22  the sale of your business to U.S.
23  Xpress?

Page 176

1      A.  Yes.  Dennis Farnsworth, he
2  guaranteed me that they would buy the
3  company and close the deal, not to
4  worry about the driver situation, that
5  that was something safety and personnel
6  would handle.
7      Q.  On page 3 of the letter, the
8  bottom paragraph number 3, could you
9  read that paragraph, please?
10      A.  Covenants and conditions?
11      Q.  Representations, covenants and
12  conditions, yes.
13      A.  (Complies.)  I have read it.
14      Q.  All right.  Do you see on the
15  first full sentence on page 4, closing
16  of the definitive agreement will be
17  subject to a reasonable and customary
18  conditions?
19      Did I read that correctly?
20      A.  Correct.
21      Q.  What does will be subject to
22  mean to you in that sentence?
23      A.  I don't know exactly what it

44  (Pages 173 to 176)

## www.AmericanCourtReporting.com
## January 15, 2007

# American Court Reporting
## toll-free (877) 320-1050

Page 177

1  means in that context.
2      Q.  All right.  Do you take that
3  to mean that closing will depend upon
4  the following, the things that follow
5  in that sentence?
6      A.  Yes.
7      Q.  Roughly in the middle of that
8  -- let me see if I can find it for you.
9  It could be hard to follow this.
10      Do you see where it says,
11  satisfaction?
12      A.  Uh-huh.
13      Q.  One of the conditions is
14  satisfaction with the results of our
15  due diligence examination, meaning
16  USX's due diligence examination,
17  correct?
18      A.  That's what that says.
19      Q.  And approval by USX Board of
20  Directors?
21      A.  Correct.
22      Q.  Based upon paragraph 3
23  beginning on page 3 going to page 4, as

Page 178

1  put out in this letter of intent, did
2  you have a guaranteed contract for the
3  purchase of the assets of Kelly
4  Trucking?
5      A.  I didn't need a guaranteed
6  contract.  I had Dennis Farnsworth's
7  word.  He kept guaranteeing to me that
8  it was going to close and they were
9  going to buy the company.
10      Q.  Did you understand, in
11  paragraph 3, that only the USX Board of
12  Directors could approve the closing on
13  behalf of U.S. Xpress?
14      A.  He had got prior approval to
15  move forward in a prior document.
16      Q.  To move forward with
17  negotiations and due diligence?
18      A.  Is that what it said?  You
19  said a potential transaction.  I
20  received approval to move forward, I
21  will be putting together an outline of
22  potential transactions, which means to
23  me I will be putting together the terms

Page 179

1  of the agreement for buying the assets
2  and the values of the assets and the
3  conditions on moneys to be paid and
4  also my compensation.  We had already
5  agreed that the deal was done.
6      Q.  What was your compensation on
7  the date of that e-mail?
8      A.  There wasn't any compensation
9  on that.  He said, I will be putting
10  together an outline for your potential
11  compensation, is the way I took it,
12  which he disclosed in this agreement.
13      Q.  Had you reached an agreement
14  on the purchase price?
15      A.  He had already told me how it
16  would work as far as an amount of money
17  that I should end up with over the time
18  period.
19      Q.  Is that in writing anywhere?
20      A.  It's not in this agreement, I
21  don't think.  But if you do the -- if
22  you apply the computations of what we
23  had agreed to and applied, I think you

Page 180

1  can come up with a reasonable number
2  that we had talked about.
3      Q.  Do you remember what that
4  number was that you talked about?
5      A.  It was four and a half million
6  dollars over the time period.
7      Q.  On page 4, paragraph 5 --
8      A.  Yes.
9      Q.  -- it states, from the date
10  hereof through closing, unless
11  negotiations are terminated, GFK would
12  operate the acquired business in the
13  ordinary course of business and refrain
14  from any extraordinary transactions.
15      Do you take that if
16  negotiations terminated, from that
17  language, that there was a definitive
18  contract?
19      A.  I don't understand exactly
20  what you are asking me now.
21      Q.  Doesn't that indicate that
22  there's going to be negotiations and
23  that they can be terminated?

## www.AmericanCourtReporting.com
## January 15, 2007

**American Court Reporting**
**toll-free (877) 320-1050**

Page 181

1    A.  Read number 5, the conduct of
2  business?
3    Q.  Yes, sir.
4    A.  I mean, I operated my business
5  in a normal business fashion.  Is that
6  what you are asking me?
7    Q.  I'm asking if the language of
8  paragraph 5 indicates to you that there
9  is an agreement?
10    A.  We have an agreement.  They
11  had an agreement to buy the company.
12  Now, we are negotiating the terms of
13  the agreement.
14    Q.  Okay.  Flip back to the first
15  paragraph of the letter.  USX writes,
16  we wish to affirm our interest by
17  setting forth the basic terms of a
18  proposed transaction.  Upon execution
19  of this letter, USX would continue its
20  due diligence investigation, and
21  thereafter USX and JFK --
22    A.  GFK.
23    Q.  JFK is not with us anymore.

Page 182

1    -- GFK would enter into
2  negotiations for a definitive
3  agreement.
4    Does that indicate to you that
5  there is no definitive agreement?
6    A.  No.  We already said we had an
7  agreement; we just didn't have a final
8  agreement.
9    Q.  You had an agreement that both
10  were interested, and USX was going to
11  begin its due diligence, correct?
12    A.  Yes.  I mean, you are telling
13  me that as of June 29th and then he
14  come back and -- Dennis come back and
15  guaranteed me they would close by July
16  the 15th.
17    Q.  The next sentence says, as set
18  forth in paragraph 11 below, this
19  letter is not binding on any of the
20  parties until completion of
21  negotiations and execution of a
22  definitive agreement.
23    Was there ever a closing?

Page 183

1    A.  Are you saying they never
2  intended to buy me out; is that what
3  this is saying?
4    MR. TOMLINSON:  He can't
5  answer your questions.
6    THE WITNESS:  Oh, he can't
7  answer my questions.  All right.  There
8  was never a closing, no.  I gave Dennis
9  an opportunity to leave me alone and
10  bow out, and he continued to pursue me,
11  so, and continued to tell me that they
12  were going to purchase the company.
13    Q.  (BY MR. HALL:)  I will show
14  you what has been marked as Defendant's
15  Exhibit 38 and ask if you can identify
16  that, please.  This is from your
17  production, Kelly Number 16 and 17.
18
19    (Whereupon, Defendant's Exhibit
20    Number 38 was marked for
21    identification and is attached to
22    the original transcript.)
23

Page 184

1    A.  One of the original
2  conversations I had would have been in
3  April '05.  That probably would have
4  been April the 12th when he was in my
5  office, because I had written it down,
6  and he had told me what I would expect
7  to receive, which is goodwill between
8  700 and 740,000, another 400,000 for
9  driver base.
10    Q.  And so these are notes from
11  when?
12    A.  These were the notes from the
13  meeting I had with Dennis on -- it
14  would have been a meeting we had in
15  April.  I put down April '05.  And he
16  was describing to me what an agreement
17  would look like as far as compensation,
18  because that's what I see writing down.
19    Q.  Where do you see April '05?
20    A.  Right there (indicating).
21    Q.  I looked over it.  Sure
22  enough.  Okay.
23    A.  And those were the questions I

46  (Pages 181 to 184)

**www.AmericanCourtReporting.com**
**January 15, 2007**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 185

1  was asking him, you know, what I would
2  have expected to receive.
3      Q.  Okay.  I will show you what
4  has been marked as Defendant's Exhibit
5  39 and ask if you recognize that.
6
7          (Whereupon, Defendant's Exhibit
8          Number 39 was marked for
9          identification and is attached to
10         the original transcript.)
11
12     A.  That is an e-mail from Dennis
13  to Randall.  It looks like it's going
14  to be the -- because there was an
15  addendum to the first Asset Purchase
16  Agreement for finalizing terms.  And I
17  think that's in reference to that.
18     Q.  Okay.
19     A.  That is the tractor value and
20  trailer value that Taylor Martin done.
21     Q.  I will show you what has been
22  marked as Defendant's Exhibit 40 which,
23  I believe, is the attachment.  It's

Page 186

1  dated July 26th, 2005.
2
3          (Whereupon, Defendant's Exhibit
4          Number 40 was marked for
5          identification and is attached to
6          the original transcript.)
7
8      Q.  Same date as the Tuesday
9  e-mail from Dennis to you?
10     A.  Right.  Uh-huh.
11     Q.  Does that appear -- on the
12  first page, there's a 1 and an ST
13  circled.  Is that your handwriting?
14     A.  Yes, I think.
15     Q.  Meaning that this was the
16  first version of the Asset Purchase
17  Agreement; is that what that means, the
18  handwritten note?
19     A.  I don't know if that's what
20  that meant.  I could have been taking a
21  note on something.  I mean, if you will
22  notice, I write all over everything.
23  But it may be.

Page 187

1      Q.  Sure.  Looking back at Dennis'
2  e-mail, it indicates he has attached
3  the Asset Purchase Agreement, the
4  tractor OLV.
5          What does OLV mean?  Is that
6  orderly liquidation value?
7      A.  Yes, orderly liquidation
8  value.  I had to think a minute.  Yes.
9
10         (Discussion off the record.)
11
12     Q.  (BY MR. HALL:)  And trailer
13  OLV for your review?
14     A.  Correct.
15     Q.  The next sentence says, please
16  forward to your legal representative
17  for review.
18         Did you do that?
19     A.  Yes.  It went to Wade.
20     Q.  Did you have a meeting on July
21  22nd with Dennis Farnsworth?
22     A.  Yes.
23     Q.  This is after that meeting.

Page 188

1  And it says, per our discussion
2  yesterday, I am forwarding this to you
3  so that we can head start on the review
4  process.  This is not an executed
5  agreement and this e-mail is not
6  official notice of USX's approval to
7  close the deal.
8          Did I read that correctly?
9      A.  Correct.
10     Q.  Per our discussions, you are
11  to have another conversation today with
12  Gary Hopper.  Following that
13  conversation, we will have a conference
14  call with Jeff Wardeberg, at which time
15  we will mutually decide what our next
16  steps are.
17         Did I read that correctly?
18     A.  Correct.
19     Q.  Based upon that e-mail, was it
20  your opinion that you had a definitive
21  agreement?
22     A.  No.  Based on that information
23  right there (indicating).

47 (Pages 185 to 188)

**www.AmericanCourtReporting.com**
**January 15, 2007**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 189

1    Q.  Did you review the Asset
2    Purchase Agreement?
3    A.  I would have looked at it.
4    Q.  Did you go over it with your
5    attorney?
6    A.  I don't recall exactly.
7    Q.  I will show you what has been
8    marked as Defendant's Exhibit 41.
9
10       (Whereupon, Defendant's Exhibit
11       Number 41 was marked for
12       identification and is attached to
13       the original transcript.)
14
15    Q.  Do you recognize that e-mail?
16    A.  Correct.
17    Q.  Why are you sending this
18    e-mail to Mr. Farnsworth?
19    A.  Because during -- I mean,
20    after we -- after I got that e-mail, I
21    asked Dennis again, you know, if they
22    wasn't going to do the deal, let's part
23    ways.

Page 190

1        You got to realize, now, we
2    are talking in between these e-mails,
3    too, and having conversations about the
4    deal.  And he would have told me that
5    -- and I'm trying to put the pressure
6    on them to either do something or
7    forget it so I can base my decisions on
8    other avenues to go in.
9    Q.  What other avenues did you
10   have available?
11   A.  From what standpoint?
12   Q.  Well, if they are not going to
13   do the deal, what other avenues did you
14   have available?
15   A.  Well, I mean, I basically
16   needed to make some payments.  And my
17   insurance renewal was coming up and I
18   needed to start telling my insurance
19   company to go forward with that, to
20   shop the insurance, like we do every
21   year.  Basically, just decisions.  Did
22   we want to try to increase the fleet
23   some more or did I want to -- you know,

Page 191

1    basically, which direction I wanted the
2    company going in.
3    Q.  Was anybody else interested in
4    purchasing USX -- I'm sure somebody
5    was.
6        Was anybody else interested in
7    purchasing Kelly Trucking at this time?
8    A.  I get phone calls all the
9    time.  I had gotten phone calls regular
10   from people wanting to buy, some
11   brokers, but nothing concrete.
12   Q.  Were you in negotiations with
13   anyone?
14   A.  No.  I couldn't be.
15
16       (Discussion off the record.)
17
18   Q.  (BY MR. HALL:)  On page 6 of
19   that agreement, Article 4, Closing,
20   they have indicated a date of August 8,
21   2005; is that correct?
22   A.  The closing shall be
23   consummated August 8, 2005.

Page 192

1    Q.  Were there conditions that had
2    to be met before there could be a
3    closing, do you remember?
4    A.  I don't remember offhand.
5    Q.  If you will, look back at page
6    5.  It says, the obligations of the
7    buyer, which would be U.S. Xpress,
8    hereunder are subject to the following
9    conditions having been fulfilled on or
10   before the closing date.
11       Did I read that correctly?  I
12   left off the parenthetical.
13   A.  Obligations of the buyer
14   hereunder are subject to the following
15   conditions.  Okay.
16   Q.  All right.  Section 3.2,
17   Inspections, buyer shall have completed
18   its inspection of the transferred
19   equipment and leased equipment and
20   shall be satisfied with results of such
21   inspection in its sole discretion.
22       Did I read that correctly?
23   A.  Correct.

48  (Pages 189 to 192)

## American Court Reporting
## toll-free (877) 320-1050

Page 193

1    Q.  And you understood that USX
2  was going to make the final decision on
3  the equipment in its own discretion?
4    A.  Yes.  They had sent people
5  already down.
6    Q.  Had they inspected all of the
7  equipment?
8    A.  They had sent two gentlemen
9  down to Wadley to get a good bit of it
10 on site, and then they had also sent
11 them to some other locations where I
12 had dropped equipment.
13   Q.  Do you know whether they had
14 had a chance to inspect all of it?
15   A.  I couldn't attest to that.
16   Q.  Section 3.6, Closing Date
17 Drivers, buyer shall be satisfied in
18 its sole discretion that there will be
19 at least 145 closing date drivers that
20 will meet buyer's qualifications for
21 hiring.
22       Did I read that correctly?
23   A.  Correct.

Page 194

1    Q.  At that time, had USX had a
2  chance to qualify Kelly drivers?
3    A.  I don't know at what point in
4  time, but they had all my driver files.
5  We delivered them to Chattanooga.
6  Frank could answer that better than I
7  could.
8    Q.  Okay.  Section 3.8, Factoring
9  Payoff Letter.  At any time, did you
10 ever present to USX a payoff letter,
11 factoring payoff letter?
12   A.  Not to my knowledge.  That was
13 if they were going to pay off the
14 factoring company.
15   Q.  Section 3.9, Sales Agent, Gary
16 Hopper and seller shall have terminated
17 all contractual arrangements under
18 which Mr. Hopper has provided services
19 to seller and its affiliates, and
20 Mr. Hopper shall have entered into a
21 Sales Agent Agreement with buyer in
22 form and substance reasonably
23 acceptable to buyer.

Page 195

1       Did Mr. Hopper ever enter into
2  a Sales Agent Agreement with USX?
3    A.  Not to my knowledge.
4    Q.  Do you know if Mr. Hopper ever
5  would have entered into a Sales Agent
6  Agreement with USX?
7    A.  I think he would have.
8    Q.  Okay.  Did you ever talk to
9  him about that?
10   A.  Yes.
11   Q.  Have we talked about that
12 already?
13   A.  Yes.
14   Q.  Okay.  Looking back at
15 Defendant's Exhibit 41, was there a
16 response from Mr. Farnsworth about the
17 cost that you would incur if you don't
18 close by August 1st?
19   A.  I don't recall exactly what
20 was said on that.
21   Q.  Did you ever ask U.S. Xpress
22 to pay these things?
23   A.  No.

Page 196

1    Q.  Was there ever an agreement
2  that USX would pay these things?
3    A.  No.
4    Q.  Did you pay these things?
5    A.  Yes.
6       MR. HALL:  We have been going
7  a little over an hour.  I need to take
8  a break.
9
10      (Short recess.)
11
12   Q.  (BY MR. HALL:)  When did --
13 you may have said this at the beginning
14 of this long day.
15      When did Kelly Trucking
16 actually cease operations?
17   A.  I don't know the exact date.
18 It would have been '06.
19   Q.  Do you remember, the beginning
20 of '06, end of '06?
21   A.  It was probably the first
22 quarter of '06.
23   Q.  You mentioned some companies

## www.AmericanCourtReporting.com
## January 15, 2007

Page 197

1  that left because of the transaction
2  with U.S. Xpress.
3      Did you retain all the other
4  customers, all the other clients?
5      A. No.
6      Q. What happened to them?
7      A. I wasn't able to service the
8  majority of my customers because of my
9  fleet capacity.
10     Q. Are any of those customers
11 customers of K-Diesel now?
12     A. Yes.
13     Q. Are any of those customers
14 customers of Eagle Logistics now?
15     A. Yes.
16     Q. Do you know what percentage
17 are -- take out the ones that you said
18 left. Those that are left over, what
19 percentage of those are with either
20 K-Diesel or Eagle?
21     A. Maybe ten percent.
22     Q. What customers are still with
23 K-Diesel?

Page 198

1      A. I'm still doing some business
2  with Smurfit-Stone-Paper, International
3  Paper.
4      Q. All right.
5      A. Master Brand Cabinets,
6  Spectrum Brands. Do you want me to
7  name several?
8      Q. As many as you can think of.
9      A. Ralston Purina, Food Lion,
10 Rainbow Express, Frontier Spinning.
11 That's the main ones I think I have
12 left.
13     Q. What about with Eagle?
14     A. That's the same thing.
15     Q. Of the drivers that were
16 working for Kelly Trucking in August of
17 '05, how many of them work for either
18 K-Diesel or Eagle now?
19     A. Probably 25. That's a
20 guesstimation.
21     Q. Would Frank know more?
22     A. Yeah. He would have a better,
23 accurate account.

Page 199

1      Q. How did the deal with USX
2  cause your deal with the racing -- I
3  don't know -- Shoemater or Shumaker?
4      A. Shumaker. I had to bring a
5  half a million dollars to the table.
6  And in return, they were going to
7  guarantee me first choice at all of the
8  Army enlisted men that didn't re-up. I
9  had first dibs at them, to hire them as
10 drivers.
11     Q. Say that again now. I'm not
12 sure I understand.
13     A. Shumaker Racing has a big deal
14 with the Army as a sponsor. So the
15 enlisted men that didn't reenlist, he
16 was going to give me first dibs on
17 them, for hiring them as a driver and
18 guaranteeing them a job so. I had a
19 direct link to a steady flow of
20 drivers.
21     Q. At --
22     A. And in return, see, that was
23 going to -- I was going to be able to

Page 200

1  bring that to U.S. Xpress and that
2  would entice my compensation package.
3      Q. Did you talk about that at all
4  with anybody from U.S. Xpress?
5      A. Yeah. I talked with Dennis.
6  And I even talked to Wardeberg and
7  Farris about it the day they were in
8  Wadley. They seemed very interested at
9  the time or led me to believe that.
10     Q. And you were going to be able
11 to drive for Shumaker?
12     A. Shumaker, yeah.
13     Q. After the U.S. Xpress deal
14 fell apart in August '05, did any
15 brokers call you after that about
16 anyone interested in purchasing Kelly
17 Trucking?
18     A. Yes.
19     Q. Do you remember the names of
20 any of the brokers?
21     A. Not right offhand. The usual
22 ones. I think Chapman & Associates is
23 one that called me over a time period.

50   (Pages 197 to 200)

Page 201

1  I had nothing to offer them at this
2  point in time.
3      Q.  Is this in September, October?
4      A.  I couldn't give you the exact
5  date. I get these calls about once a
6  quarter, these canvass calls.
7      Q.  Did you enter into any letters
8  of intent with anybody about
9  negotiating a deal after August '05?
10     A.  Yes.
11     Q.  Who?
12     A.  There's one at the present
13  time with a broker, and it's Riverside
14  Transport out of Kansas.
15     Q.  Is that for G.F. Kelly or is
16  that with --
17     A.  That's just basically what's
18  left.
19     Q.  Everything else?
20     A.  Yeah. They want what's left.
21  It's about 25 trucks, I believe.
22  Over-the-road freight.
23     Q.  Drivers?

Page 202

1      A.  Drivers, tractors and
2  trailers. Asset purchase.
3      Q.  Of the 35 drivers that quit
4  that week of August 22nd, 2005, had any
5  of them been given notice from U.S.
6  Xpress that they didn't qualify under
7  U.S. Xpress' standards?
8      A.  You will have to talk to Frank
9  about all that. U.S. Xpress had all
10  our information at some time prior of
11  all this, so they had access to all the
12  information on the drivers. And Dennis
13  represented to me that that was not an
14  issue of mine and his completing the
15  deal.
16     Q.  What do you mean, not an
17  issue?
18     A.  He said -- he made a comment
19  to me that was something that safety
20  would work out.
21     Q.  Did you understand that
22  because they would be going to work for
23  a different company, because it wasn't

Page 203

1  a stock purchase, they would be going
2  to a different company, that U.S.
3  Xpress would have to go through the
4  driver qualification process?
5      A.  Yes. But they had all that
6  information prior. They had all the
7  information prior to the week they came
8  down, the week of the 22nd.
9      Q.  Would Frank know exactly what
10  U.S. Xpress had?
11     A.  Yeah. When they came in on
12  the 22nd, all that was supposed to be
13  was basically a one-day affair, and the
14  driver gets out the next day and goes
15  back to work. And it turned into a
16  three-day fiasco. They were supposed
17  to be assigned trucks and fuel cards
18  and go to work. As a matter of fact,
19  they had already sent about a hundred
20  Qualcomms to my shop to be installed in
21  the trucks and tractors that followed.
22     Q.  Why is it that -- and I
23  understand, maybe it's simpler than I'm

Page 204

1  trying to make it.
2      Why is it USX's fault that
3  Kelly did not pay its creditors or fell
4  behind with its creditors?
5      A.  Well, I mean, Dennis stated to
6  me, don't worry about making the
7  payments. You know, for instance,
8  going back to this e-mail to them,
9  Dennis told me, he said, well, don't
10  worry about it, we are going to close
11  just in a few days, don't worry about
12  it, you can settle all of that with
13  them and we will pay everything off.
14     Q.  That e-mail, you are referring
15  to Defendant's Exhibit 41?
16     A.  The 22nd. Yes. That's an
17  example.
18     Q.  He told you don't worry
19  about --
20     A.  He said, that's a minor issue.
21  He said, the details will be worked
22  out, we will be closing in a few days
23  anyway.

# American Court Reporting
## toll-free (877) 320-1050

Page 205

1    Q.  Your advisors, did any of them
2   tell you, don't worry about it, don't
3   worry about paying the bills?
4    A.  I don't have any advisors.
5    Q.  That's comforting to your
6   lawyer.  I thought you were excluding
7   that.
8    A.  I was excluding lawyers.
9    Q.  I didn't ask you what he said.
10      Did you talk to --
11   A.  What was the last question you
12  asked me?
13
14   (Discussion off the record.)
15
16   (Record read.)
17
18   THE WITNESS:  I mean, after
19  this situation, you are asking me why
20  is it USX's fault of what has happened
21  now; is that what you are asking?
22   MR. TOMLINSON:  You can ask
23  him to rephrase it.

Page 206

1    MR. HALL:  Yes.
2    THE WITNESS:  Yeah, I guess.
3    Q.  (BY MR. HALL:)  What I'm
4   asking is, why do you think it's USX's
5   fault that you fell behind with your
6   creditors?
7    A.  Well, after the week of the --
8   when they came in, which is the week of
9   the 22nd of August, and the 35 drivers
10  walked out because we had told them one
11  thing, be it myself and U.S. Xpress
12  people.  And when I lost 35 drivers and
13  you multiply that time our average
14  revenue of $3,000 per driver, I lost
15  $100,000 in revenue per week at the
16  flick of a finger.  So I couldn't, I
17  didn't have the ability to pay them
18  from the revenue lost.  I thought
19  that's what you asked me and I was just
20  making sure.
21   Q.  Did you contact any of those
22  35 drivers and say, we are not doing
23  the deal with U.S. Xpress, come back?

Page 207

1    A.  I tried everything.  Yes.
2    Q.  Did any of them come back?
3    A.  I know of one personally.  But
4   now Frank can answer that better than I
5   can.  I do know of one.
6    Q.  Do you remember which one?
7    A.  V.J. Adams.
8    Q.  You said you and U.S. Xpress
9   told these guys that or made
10  representations to them and then things
11  were different.  I assume you are
12  talking about being home on the
13  weekends?
14   A.  Yes.  I led them to believe,
15  based on what I was led to believe and
16  relied on from Dennis, that they would
17  continue to be home every weekend, just
18  as we had recruited them originally.  I
19  mean, that's a big deal to a driver.
20  Gaining a driver's trust is very hard.
21  But once you get it, it is pretty
22  solid.  If you ever lose it, it is
23  extremely hard to get back in a small

Page 208

1   company like that anyway.
2    Q.  Is there any written
3   communication from Dennis or anyone
4   from U.S. Xpress committing to have the
5   drivers home every weekend?
6    A.  Dennis' word to me in
7   meetings.  And I think Nelson will be
8   able to backup my testimony right
9   there, that our operation would
10  continue like it had been, the Kelly
11  operation.
12   Q.  I just want to make sure I'm
13  clear on this.  Is it that he said your
14  operation will continue as it has been
15  or did he say specifically your drivers
16  will be home on the weekends?
17   A.  I take that as both meaning
18  the same.
19   Q.  I know.  But I want to know
20  what he said.
21   A.  He said, we will be continue
22  your operation as it has been
23  operating.  And I think I distinctly

## www.AmericanCourtReporting.com
## January 15, 2007

**American Court Reporting**
**toll-free (877) 320-1050**

Page 209

1  asked him, will my drivers -- make sure
2  that my drivers will still be getting
3  home on the weekend, and he said yes.
4      Q.  You think you remember him
5  saying that?
6      A.  Yes, he said that.  Yes.
7      Q.  Prior to August 22nd, 2005,
8  had you told any vendors, finance
9  companies, et cetera, anyone outside of
10  Kelly that you were in negotiations
11  with U.S. Xpress?
12      A.  Yes.
13      Q.  Who?
14      A.  My home bank, which would have
15  been First Bank in Wadley, a small town
16  bank in Roanoke, Alabama.  I would have
17  told -- I think I disclosed it to GE.
18  I know I told some truck salesmen.
19  They are constantly trying to sell you
20  trucks, so it was disclosed to them.
21      Q.  Did you tell any other
22  trucking companies?
23      A.  Yes.

Page 210

1      Q.  Who?
2      A.  J-Par Trucking.
3      Q.  Who?
4      A.  J dash P-A-R Trucking.  They
5  are in Roanoke Alabama.  Good friend of
6  mine.  Like I say, word travels real
7  quickly in the transportation
8  community.
9      Q.  Did you tell any customers?
10      A.  Yes.
11      Q.  Which ones?
12      A.  We have talked about this
13  before now.
14      Q.  Have we?
15      A.  Yeah.
16      Q.  All the ones that you have
17  told me about?
18      A.  Yeah.  Like the Bowaters.
19      Q.  No.  I'm talking about before
20  August 22nd, 2005.
21      A.  Yes.  I talked to several
22  customers to inform them of the buyout
23  and the transition.  I would still

Page 211

1  continue to be there and help them and
2  be a point of contact to assure them
3  that their business would be taken care
4  of.
5      Q.  Are there some in addition to
6  those that you are claiming that you
7  lost?  We are talking about the ones --
8      A.  We lost.
9      Q.  -- you lost.
10      A.  Yeah, I talked to some ones
11  that I still have, too.
12      Q.  Do you remember the names?
13      A.  Smurfit-Stone, International
14  Paper.
15      Q.  The ones we talked about that
16  are still with Eagle and K-Diesel?
17      A.  Yes.  Correct.
18      Q.  That will shortcut it a little
19  bit.
20          Any in addition to those?
21      A.  Not that I can recall.
22      Q.  Okay.  Did you tell anyone at
23  Daimler/Chrysler?

Page 212

1      A.  No.
2      Q.  Volvo Finance?
3      A.  Yes.
4      Q.  Why did you tell the finance
5  companies?
6      A.  I told them that I had been
7  approached by U.S. Xpress for an asset
8  purchase and the closing date was
9  originally told to me by Dennis of July
10  the 15th and they would be requesting
11  payoff letters to pay them off.  As a
12  matter of fact, we would have had to
13  contact all of them.  Yeah, we had to
14  contact all of them, as a matter of
15  fact, requesting the payoff letters for
16  the 24th.
17      Q.  What number is that?  40?
18      A.  40.
19      Q.  After you got Defendant's
20  Exhibit 40 and you sent Defendant's
21  Exhibit 41, did you have any other
22  communications with Dennis Farnsworth
23  about the purchase, Asset Purchase

**www.AmericanCourtReporting.com**
**January 15, 2007**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 213

1 Agreement?
2    A.  From what standpoint,
3 generally or specifics?
4    Q.  Yes, specifically.
5    A.  I mean, we talked almost every
6 day.
7    Q.  I will show you what has been
8 marked as Defendant's Exhibit 42.  Do
9 you recognize that e-mail?
10
11       (Whereupon, Defendant's Exhibit
12       Number 42 was marked for
13       identification and is attached to
14       the original transcript.)
15
16    A.  Yes.  Yep.  I sent it.  This
17 was the opportunity for them to
18 basically leave me alone.
19    Q.  Okay.  The first sentence
20 indicates that you are rejecting that
21 Purchase Agreement.  Is that safe to
22 say?
23    A.  Correct.

Page 214

1    Q.  The second sentence -- well, I
2 guess it's the second paragraph.  What
3 do you mean, I have basically -- I'm
4 quoting.
5       I have basically sucked the
6 cash out of the company and backed off
7 my payments anticipating a sale, so I
8 am not dead, end of quote.
9       What did you mean by that?
10    A.  Well, I basically was moving
11 cash around in my company, and also had
12 backed off the payments, because Dennis
13 told me, don't worry about it, we are
14 going to close in just a matter of
15 days.  He kept changing the -- I mean,
16 week to week, he kept closing the
17 closing date.  You know, it was July
18 15th and, no, we will close the
19 following week and we will close the
20 following week.  And Nelson can attest
21 to that.
22       And basically, you know, he
23 kept telling me, well, don't worry

Page 215

1 about the payments, we are fixing to
2 pay everything off and you are going to
3 get all your money back anyway.  So
4 that's basically what I anticipated.
5       You know, I sucked all the
6 cash out of it, moving it around.  And
7 when you start doing that in a big
8 company, you got to be able to track it
9 and be able to keep a paper trail or
10 you are going to get in trouble
11 tax-wise.
12    Q.  Do you have the paperwork, the
13 accounting papers that show what funds
14 you sucked out of the company?
15    A.  I think I have a copy of a
16 K-Diesel money market that had 600 and
17 some thousand dollars in it that you
18 showed me in an exhibit that I put on
19 there somewhere, Nelson, when it got
20 moved around.
21    Q.  When you say cash out of the
22 company, are you talking about --
23    A.  -- operating cash.

Page 216

1    Q.  -- Kelly Trucking?
2    A.  Kelly Trucking.
3    Q.  And you moved that money over
4 to K-Diesel; is that what you mean?
5    A.  Well, that and what I didn't
6 have in pure cash.
7    Q.  What I'm asking is, you took
8 money out of Kelly Trucking and put it
9 into K-Diesel; is that what you are
10 saying?
11    A.  I would have moved some over
12 there, yeah.
13    Q.  Do you know how much you
14 pulled out of Kelly Trucking?
15    A.  Not at the moment.  I had a
16 million dollars cold liquid cash at
17 this time, probably in August.
18    Q.  Where did it go?
19    A.  Do I disclose that?
20
21       (Short recess.)
22
23       MR. HALL:  Are y'all ready?

54  (Pages 213 to 216)

**www.AmericanCourtReporting.com**
**January 15, 2007**

# American Court Reporting
## toll-free (877) 320-1050

Page 217

```
 1      THE WITNESS: Yes.
 2      MR. HALL:  What was my
 3   question?
 4
 5      (Record read.)
 6
 7      THE WITNESS: K-Diesel.
 8      Q.  (BY MR. HALL:)  I take it from
 9   the second paragraph, you say you
10   haven't showed your hand, prior to this
11   time, had you disclosed to Dennis
12   Farnsworth that you had not -- that you
13   had backed off payments?
14      A.  Ask me that again.
15      Q.  All right.  Prior to ~~June~~ July
16   29th, 2005 at 2:27 p.m. in this
17   e-mail --
18      A.  Right.
19      Q.  -- had you told Dennis
20   Farnsworth that you had backed off,
21   quote, backed off my payments?
22      A.  Yes.
23      Q.  All right.  When?
```

Page 218

```
 1      A.  Well, I had my e-mail right
 2   here on the 27th.
 3      Q.  That's what I'm talking about.
 4   Prior to this.
 5      A.  Yeah, I had had conversations
 6   with him, that basically, I told him, I
 7   said -- and I told him up front.  I
 8   said, I'm going to ride my creditors
 9   some right now, I said, because I'm
10   going to pull some cash out of the
11   company; I said, but I'm going to get
12   it back, the loans are going to get
13   paid off anyway.  I wasn't planning on
14   borrowing no more money from none of
15   these people.  So I really didn't care.
16      Q.  What were you trying to convey
17   to Dennis in this second paragraph,
18   that you weren't in dire straits, that
19   you had a position of strength?
20      A.  I was trying to, you know, get
21   him to quit misleading me with this
22   whole process, and the date he tells me
23   we are going to close, let's close.
```

Page 219

```
 1   Because you got to realize, David, it
 2   affected my whole operation.  It
 3   affected my driver, it affected my
 4   personnel in the office, they were
 5   scared to death.  It affected my
 6   customer base.  And you can tell a
 7   customer all day long that everything
 8   is going to be okay if somebody is, you
 9   know, leading you to believe they are
10   going to buy you out.
11      But I had a great reputation,
12   a great company and a great service
13   record with these people and they
14   depended on what I told them.  So I
15   mean, basically I was trying to get him
16   to, you know, move forward, you know,
17   sort of give him an ultimatum; either
18   buy the company or leave me alone.
19   They were continuing the process, I
20   guess, for lack of better words.
21      Q.  When did you first find out
22   that U.S. Xpress couldn't guarantee the
23   drivers that they would be home every
```

Page 220

```
 1   weekend?
 2      A.  It would be the 22nd.
 3      Q.  August?
 4      A.  August 22nd.
 5      Q.  The proposal in Defendant's
 6   Exhibit --
 7      A.  40?
 8      Q.  -- 40, how did it differ from
 9   -- at the bottom you say, this is
10   basically what I want, then you list
11   out eight things.
12      A.  What are you asking me now?
13      Q.  You are saying you can't
14   accept the terms of Defendant's Exhibit
15   40.
16      A.  Right.  Okay.
17      Q.  And then you counter --
18      A.  Right.  Okay.
19      Q.  I want to know how your
20   counter differs from the agreement,
21   Defendant's Exhibit 40.
22      A.  I think the only difference
23   was going to be that $740,000, I think,
```

## www.AmericanCourtReporting.com
## January 15, 2007

# American Court Reporting
## toll-free (877) 320-1050

Page 221

1 and also the driver base up front.
2    Q. It went from --
3    A. The agreement, I think the
4 first agreement, the driver base money
5 would have been paid over a period of
6 time, which I would have had no control
7 over, of retaining the drivers. And I
8 wanted that money up front and the
9 goodwill money that he had told me in
10 the original meeting.
11    Q. You indicate that -- one, two,
12 three, four, five, six paragraphs down,
13 you said that red flags start flying.
14      What did you mean by that?
15    A. Because he changed his -- from
16 the original meeting, where I had
17 written on this piece of paper, Exhibit
18 38, he had already changed the way I
19 would be paid twice. In the original
20 meeting, he told me the $740,000 up
21 front and he told me $400,000 for
22 driver base. And then if you look at
23 Exhibit 40, it goes to a progression

Page 222

1 about the drivers somewhere. There it
2 is. Compensation on the driver
3 retention pool payments as paid with
4 the Asset Agreement.
5    Q. Did you talk to Dennis
6 Farnsworth after you sent this e-mail?
7    A. On the 29th?
8    Q. Yes.
9    A. Yes.
10    Q. What did you talk about?
11    A. We talked about the e-mail
12 itself. And he basically told me,
13 don't worry, these are minor, minor
14 conditions that will be worked out,
15 that we will be closing -- he actually
16 told me we would close by the week of
17 the 4th that next time. I think I put
18 it in my e-mail. Correct.
19    Q. Number 7, we will close by the
20 4th; is that what means?
21    A. Right there.
22    Q. What does number 5 mean, all
23 trucks and trailers zero balance owed?

Page 223

1    A. I wanted them to pay the total
2 trucks and trailers off, and then any
3 equity left, they would just write me a
4 check for.
5    Q. So you --
6    A. I didn't want them to get into
7 the -- go ahead. I'm sorry.
8    Q. You wanted them to pay off the
9 creditors?
10    A. Yeah. And then any difference
11 between orderly liquidation value and
12 the payoff, then just take it out of
13 equity so we could go ahead and just
14 get them paid off and not accrue any
15 more interest.
16    Q. Did they agree to that?
17    A. Dennis agreed to me that he
18 would take care of everything. And I
19 think he put most of it in there.
20    Q. Did you tell Mr. Farnsworth
21 during that conversation that you had
22 another buyer?
23    A. I don't recall. I may have.

Page 224

1 I don't recall it.
2    Q. Did you have an offer from
3 James A. Smith out of Cullman at that
4 time?
5    A. Not at that time. I got one
6 later on. James R. Smith in Cullman.
7    Q. Were you in negotiations with
8 James R. Smith in Cullman at the same
9 time?
10    A. No.
11    Q. When did you receive an offer
12 from James R. Smith?
13    A. In '06.
14    Q. Why didn't you take it?
15    A. Well, it wasn't a worthy
16 offer, a worthy offer to me.
17    Q. Who did you deal with at
18 James R. Smith?
19    A. Carson. I can't think of
20 Carson's last name. I will think of it
21 shortly. And actually James R. Smith
22 himself. I had a meeting with those
23 guys in Cullman in '06.

56 (Pages 221 to 224)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 225

1    Q.  What is it?  James?
2    A.  James R. Smith.
3    Q.  No.  What was the name of the
4  guy you dealt with?
5    A.  Carson.  That's his right-hand
6  man.  I can't think of his last name
7  right offhand.
8    Q.  Mr. Smith's right-hand man?
9    A.  Yeah.  For lack of a better
10  term.
11    Q.  I will show you what has been
12  marked as Defendant's Exhibit 43.  I'm
13  sorry, I have to take it back from you.
14  You produced it.  It's your number 74.
15  And ask if you can identify that.
16
17      (Whereupon, Defendant's Exhibit
18      Number 43 was marked for
19      identification and is attached to
20      the original transcript.)
21    A.  That is -- that is Dennis'
22  revived -- excuse me -- Dennis
23  Farnsworth's revised compensation

Page 226

1  package.
2    Q.  Do you know what date that
3  this was --
4    A.  August 1st, '05.
5    Q.  That's what the handwritten
6  note says?
7    A.  Yeah.  I would have wrote it
8  in there because it didn't print it off
9  on the e-mail.
10    Q.  I will show you what has been
11  marked as Defendant's Exhibit 44, your
12  production number 75.
13
14      (Whereupon, Defendant's Exhibit
15      Number 44 was marked for
16      identification and is attached to
17      the original transcript.)
18
19    A.  Oh, yeah.  That's a
20  conversation with Greg Fields.  That's
21  when he give me notice.
22    Q.  Is this your note?
23    A.  This is my note the day he

Page 227

1  called me, it looks like, yes, when he
2  was giving me notice that we will be
3  gone in 120 days.  They didn't give me
4  120 days.
5    Q.  And Greg Fields was with
6  Wabash?
7    A.  Wabash Alloys.
8    Q.  Did he go into any more detail
9  than the U.S. Xpress situation had a
10  big influence on their decision?
11    A.  I'm trying to think of exactly
12  what he said.  I remember him saying
13  that because U.S. Xpress hadn't given
14  them a definite yes or no answer, that
15  they would continue the contractual
16  obligations that I had with them and
17  with them buying me out, that they were
18  changing carriers.
19    Q.  I will show you what has been
20  marked as Defendant's Exhibit 45.  Is
21  that the August 4, 2005 Asset Purchase
22  Agreement referenced in the Complaint?
23

Page 228

1      (Whereupon, Defendant's Exhibit
2      Number 45 was marked for
3      identification and is attached to
4      the original transcript.)
5
6    A.  That appears to be it.
7    Q.  I think you indicated before
8  that there was no closing on any
9  agreement with U.S. Xpress; is that
10  correct?
11    A.  Written.  Written.  Written.
12  I don't believe there is a written.
13  There is a verbal.
14    Q.  A verbal closing?
15    A.  There is a verbal closing from
16  Dennis Farnsworth, that we would have
17  closed August the 29th.  And he
18  requested payoff letters through the
19  24th that the assets were to be paid
20  off.  He had instructed me to go ahead
21  and call Wade and for Wade to be there
22  the 29th; I do remember that, Wade
23  Hartley of Hill, Hill & Carter.

**www.AmericanCourtReporting.com**
**January 15, 2007**