# DEFENDANT'S EXHIBIT "34"

**Guy Kelly**

**From:** Guy Kelly [g.kelly@kellytrucking.com]
**Sent:** Tuesday, April 26, 2005 2:57 PM
**To:** 'Dennis Farnsworth'
**Subject:** RE: CA Agreement

Sent package today

guy

Guy F. Kelly
Kelly Trucking.com

**Please note that my new email address is g.kelly@kellytrucking.com. Please update your records. Thanks**

-----Original Message-----
**From:** Dennis Farnsworth [mailto:dfarnswort@usxpress.com]
**Sent:** Friday, April 22, 2005 9:20 AM
**To:** Guy Kelly
**Subject:** RE: CA Agreement

Thank you for promptly sending back the signature page to the CA agreement. Attached is an info request list. Please email back what you can and mail or fax the rest.

Contact info:
2630 Leafield Terrace
Midlothian, VA  23113

804-423-7353 Office
804-314-9113 Cell
804-423-7379 Fax

We are interested in a potential transaction and look forward to receiving the requested information. Thanks.

---

**From:** Guy Kelly [mailto:g.kelly@kellytrucking.com]
**Sent:** Wednesday, April 20, 2005 12:10 PM
**To:** Dennis Farnsworth
**Subject:** RE: CA Agreement

Dennis:

Faxed back agreement yesterday

guy

Guy F. Kelly
Kelly Trucking.com


DEFENDANT'S EXHIBIT 34

**Please note that my new email address is g.kelly@kellytrucking.com. Please update your records. Thanks**

-----Original Message-----
**From:** Dennis Farnsworth [mailto:dfarnswort@usxpress.com]
**Sent:** Monday, April 18, 2005 4:38 PM

9/16/2005

Kelly-000001

Please provide the following information:

A. Equipment list with detail –
   Tractors - year, make, type, engine, mileage, purchased new or used, transmission, rear ends, tire sizes, tread.
   Trailers – year, make, model, length purchased new or used, tire sizes and tread.
B. Driver Data – name, date of birth, date of hire, current pay rate, address, SS number, copy of most current MVR
C. Financials – balance sheet and P & L for 2002, 2003 and 2004
D. Provide a copy of tax returns for 2002, 2003 and 2004 if applicable.
E. Provide a copy of 940 and 941 returns for 2004. Provide a copy of 4th qtr bank statements.
F. What type of trucking software do you use? List your computer equipment.
G. Are any of your customers using load tendering software or EDI?
H. Most recent receivable aging report.
I. Most recent payables aging report.
J. Customer listing by percentage of business (last 12 month) – copies of rate schedules and date of last increase. (include FSC charts)
K. Current W/C carrier, rate and renewal date – copy any pending lawsuits or open files.
L. Current general liability, physical damage and cargo carriers, rates and renewal dates – copy any open files or lawsuits pending.
M. Briefly describe company's core business and strengths.
N. When was your last DOT audit, provide copy of current rating.
O. Do you manage hours of service manually or scan?
P. What is your safe stat score?
Q.
R. List all non-driving positions with brief job descriptions, length of time with company, salaries and benefit packages. Denote any person you consider key to your operation.
S. Do you have any type of retirement in place?
T. What would you say is your average length of haul, revenue per loaded mile, revenue per total miles and dead head percentage?
U. List all properties owned by the company. Has there ever been any underground fuel storage, if so has the clean up been completed?

Kelly-000002

# DEFENDANT'S EXHIBIT "35"

## CONFIDENTIALITY AGREEMENT

This Confidentiality Agreement (the "Agreement") executed this 18th day of April 2005, by and between U.S. Xpress Enterprises, Inc. (and affiliated companies), a Nevada corporation whose address is <u>4080 Jenkins Road, Chattanooga, Tennessee 37421</u> ("Recipient"), and Kelly Trucking, whose address is Wadley, AL, ("KELLY").

### RECITALS

**WHEREAS**, KELLY will make available to Recipient certain information described in Paragraph 1 below; and

**WHEREAS**, Recipient and KELLY desire to set forth their agreement herein with respect to the disclosure and use of such documents and information;

**NOW, THEREFORE**, in consideration of the above recitals and the terms, conditions and obligations hereinafter set forth, and intending to be legally bound hereby, the parties do covenant and mutually agree as follows:

1. KELLY may disclose, reveal or make available for inspection and use by Recipient certain information relating directly or indirectly to the business, financial condition, operations, assets and liabilities of KELLY and its subsidiaries and affiliates, including but not limited to, tax information, sales data, customers, prospective customers, vendors, suppliers, products carried, marketing programs or concepts, new products, training programs, personnel information and files, benefits information, payroll information and files, processes and internal procedures, papers, reports, analyses and summaries in written, oral, electronic or other form (hereinafter collectively referred to as the "Information"). In addition, the term Information shall also include all notes, analyses, compilations, studies or other documents prepared by or on behalf of Recipient which contain, reflect or are based upon, in whole or in part, any information described in this Paragraph 1.

2. KELLY retains all right, title and interest in and to the Information. Recipient agrees that all Information of any nature disclosed, revealed or made available by KELLY under this Agreement, whether or not the Information, or any part thereof, was prepared by KELLY or a third party, is proprietary and confidential and subject to the terms of this Agreement. KELLY makes no representation or warranty, express or implied, as to the accuracy or completeness of any Information and shall have no liability to Recipient or others relating to or resulting from the use of the Information.

3. Recipient shall use the Information provided hereunder only for the purpose of a possible transaction between KELLY (or one of its subsidiaries or affiliates) and Recipient and shall not use the Information for any other purpose. Recipient will not sell, license or provide the use of such Information to any person or entity without the express written consent of KELLY.

4. A. Subject to Paragraph 7, Recipient shall take all measures necessary to safeguard

143345.V3



DEFENDANT'S EXHIBIT 35

and protect the Information against disclosure beyond that disclosure permitted herein. Recipient shall not divulge the Information, or any part thereof, to any person or entity unless specifically authorized by a duly authorized representative of KELLY, except that Recipient may disclose the Information exclusively for the purpose stated in Paragraph 3 to its authorized directors, officers, employees, agents or advisors (collectively sometimes referred to in this Agreement as "Representatives") who need to know such Information and who agree to keep such Information confidential and agree to be bound by the terms of this Agreement. Recipient shall cause its Representatives to comply with this and all other provisions of this Agreement.

  B.  Recipient acknowledges and agrees that, without the prior written consent of KELLY, Recipient will not disclose to any other person or entity, and Recipient will cause its Representatives not to disclose to any other person or entity, the fact that the Information has been made available to Recipient, that discussions or negotiations are taking place concerning a possible transaction between Recipient and KELLY (or one of its subsidiaries or affiliates) or any of the terms, conditions or other facts with respect thereto (including the status thereof); provided however, that Recipient may make such disclosures if Recipient has received the written opinion of counsel, a copy of which shall be provided to KELLY, that such disclosure is required by applicable law.

  C.  Nothing in this Agreement shall be deemed to prohibit (a) any general solicitation for employment not specifically directed at employees of the Company, including but not limited to, advertisements and searches conducted by a headhunter agency in which the Recipient did not pre-approve the contact list, (b) the employment by the Recipient of any individual who initiated contact with the Recipient or any portfolio company of U.S. Xpress Enterprises, Inc. regarding such employment or (c) the employment by the Recipient of any employee of the Company with whom the Recipient or its Representatives had no contact during the Transaction.

  D.  Recipient acknowledges and agrees that it is aware, and that Recipient will advise such of its Representatives who are informed as to the matters which are the subject of this Agreement, that the United States securities laws prohibit any person who has received from KELLY material, non-public information concerning the matters which are the subject of this Agreement from purchasing or selling the securities of KELLY or from communicating such information to any other person under circumstances in which it is reasonably foreseeable that such person is likely to purchase or sell securities of KELLY in reliance of such information.

5.  Recipient may make copies, excerpts or reproductions of the Information only for its own use, or the use of its authorized Representatives; however, all such copies, excerpts or reproductions may be used only for the purpose stated in Paragraph 3.

6.  At the sole and exclusive discretion and upon the request of KELLY, or upon termination of this Agreement, or upon election of Recipient to return the Information, whichever occurs first, Recipient and all authorized third persons or entities in possession of any originals, copies, or excerpts of the Information shall promptly destroy the Information and all originals, copies, or excerpts thereof unless KELLY requests the return of the Information. In the event KELLY requests the return of the Information, the persons or entities having possession of the

143345.V3

2

Kelly-000006

Information or any part thereof, at the sole cost and expense of Recipient, shall promptly return to KELLY all such originals, copies, or excerpts.

7.   Nothing in this Agreement shall affect the right of Recipient to use or disclose the Information or any part thereof which (a) is or may hereafter be in the public domain through no breach of this Agreement or any other agreement contemplated herein; (b) is disclosed to Recipient or the general public by some third party or entity in rightful possession of the Information and such disclosure violates no confidentiality obligations to KELLY or any of its subsidiaries or affiliates in such disclosure; or (c) is subsequently disclosed to the general public by KELLY.

8.   This Agreement shall become effective as of the date hereof and shall terminate upon the return or destruction by Recipient of all the Information and all originals or copies, or excerpts thereof at its own election or at the request of KELLY pursuant to Paragraph 6.

9.   Notwithstanding the above Paragraph 8, the obligations of Recipient herein shall survive the termination of this Agreement and shall not expire until five years after the termination of this Agreement, except for the obligations of Recipient contained in Paragraph 4.C., which shall survive the termination of this Agreement and shall not expire until two years after the termination of this Agreement.

10.  Recipient agrees that its breach of any of the foregoing obligations with regard to the Information may cause irreparable injury to KELLY, and there can be no adequate remedy at law for any breach of the Recipient's obligations hereunder. Recipient, therefore, agrees that, upon any such breach or any threat thereof, KELLY shall be entitled to seek appropriate equitable relief in addition to whatever remedies it might have at law, including, but not limited to, injunctive relief which may be brought to enforce any provision of this Agreement, without the necessity of proof that KELLY's remedy at law is inadequate. If KELLY is compelled to bring an action to enforce any provision of this Agreement and a court of competent jurisdiction determines that Recipient breached any such provision, Recipient agrees to pay KELLY's court costs and attorneys' fees.

11.  This Agreement is not assignable by Recipient to any person or entity whatsoever without the prior written consent of KELLY. Any attempted assignment without such written consent shall render the assignment null and void. Subject to the preceding sentence, this Agreement shall be binding upon the successors and assigns of the parties hereto.

12.  This Agreement contains the entire agreement and understanding between the parties as to the subject matter hereof. It merges with and supersedes all prior and contemporaneous agreements, commitments, representations, writings and discussions, whether oral or written. This Agreement may not be superseded, amended or modified except by written agreement signed by the parties hereto.

13.  This Agreement shall be governed by and construed in accordance with the laws of the

143345.V3                                         3

Kelly-000007

State of Tennessee.

14. The signatory of this Agreement for Recipient warrants and represents that he has full authority to bind Recipient; and further, that he has sufficient control and authority over all others in whose possession the Information may be placed to assure that the terms, conditions and obligations herein shall be fully complied with and enforced.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their duly authorized representatives as of the day first above written.

Kelly Trucking

By: _[signature]_
Print Name: Guy Kelly
Title: President

U.S. Xpress Enterprises, Inc.

By: _[signature]_
Print Name: Dennis Farnsworth
Title: VP Business Development

143345.V3                                    4

# DEFENDANT'S EXHIBIT "36"

## Guy Kelly

**From:** Guy Kelly [g.kelly@kellytrucking.com]
**Sent:** Wednesday, June 22, 2005 7:45 AM
**To:** 'Dennis Farnsworth'
**Subject:** RE: update

Great, if possible wish you could have ready by Thursday nelson has to be out Friday but if can't Friday
Will be ok

guy

Guy F. Kelly
Kelly Trucking.com

**Please note that my new email address is g.kelly@kellytrucking.com. Please update your records. Thanks**

-----Original Message-----
**From:** Dennis Farnsworth [mailto:dfarnswort@usxpress.com]
**Sent:** Monday, June 20, 2005 12:49 PM
**To:** Guy Kelly
**Subject:** update

I have received approval to move forward. I will be putting together an outline of a potential transaction for your consideration. I should have this completed by Friday, June 24.



DEFENDANT'S EXHIBIT 36

9/16/2005

Kelly-000003

# DEFENDANT'S EXHIBIT "37"

June 29, 2005

**PRIVILEGED & CONFIDENTIAL**

Mr. Guy F. Kelly
G. F. Kelly Trucking, Inc.
242 Main Street
P.O. Box 29
Wadley, AL 36276

Re:   Acquisition of Assets of G. F. Kelly Trucking, Inc.

Dear Guy:

U. S. Xpress Enterprises, Inc., a Nevada corporation (together with its subsidiaries and affiliates, "USX"), has an interest in acquiring certain assets of G. F. Kelly Trucking, Inc., an Alabama corporation (together with its subsidiaries and affiliates, "GFK"). We wish to affirm our interest by setting forth the basic terms of a proposed transaction. Upon execution of this letter, USX would continue its due diligence investigation and, thereafter, USX and GFK would enter into negotiations for a definitive agreement. As set forth in Paragraph 11 below, this letter is not binding on any of the parties until completion of negotiations and execution of a definitive agreement.

Based upon the information currently known to us, the definitive agreement would include the following terms:

1.   Basic Transaction.

(a)   USX would purchase the business (the "Acquired Business") and certain tangible and intangible assets of GFK free and clear of all liens, claims, encumbrances, security interests, and impairments of title of any kind or nature (the "Purchased Assets"). Except as provided in the following sentence, the Purchased Assets would include substantially all of the assets and properties used in the Acquired Business, and would be substantially the same as the present assets and properties of GFK, except for any agreed upon changes established by the definitive agreement. The Purchased Assets would not include (i) any real property owned by GFK, (ii) cash, cash equivalents, and accounts receivable of GFK existing immediately prior to closing of the transaction, except to the extent GFK and USX otherwise agree, or (iii) any tractors, trailers, or other equipment excluded from the transaction by USX, in its sole discretion, after an appraisal and inspection of such equipment.


DEFENDANT'S EXHIBIT 37

Mr. Guy F. Kelly
G. F. Kelly Trucking, Inc.
June 29, 2005
Page 2

(b)    At closing of the definitive agreement ("Closing"), USX would (i) assume specified liabilities and obligations of GFK (the "Assumed Liabilities"), and (ii) deliver to GFK, in cash, an amount equal to the orderly liquidation value of all tractors and trailers included in the Purchased Assets, as determined prior to Closing through an appraisal by Taylor & Martin and an inspection by USX. The Assumed Liabilities would include only those liabilities identified or scheduled in the Agreement, would not include accounts payable, except to the extent GFK and USX otherwise agree, and would generally be limited to those liabilities related to the Acquired Business and Purchased Assets arising on or after the date of Closing.

(c)    At Closing, USX and GFK would enter into one or more lease agreements (the "Leases") with respect to real property owned by GFK and used in the Acquired Business. Monthly amounts due to GFK under the Leases would be based upon the fair market value of the facilities leased and a capitalization rate of six percent (6.0%).

(d)    Before and after Closing, GFK and its owner and president, Guy F. Kelly ("Kelly"), would cooperate with USX in negotiating the assignment or termination of equipment leases, as directed by USX.

(e)    At Closing, USX would determine whether to offer employment to each of the drivers, including independent contractors, of GFK existing as of the Closing (the "Eligible GFK Drivers"). The decision as to whether to hire each Eligible GFK Driver would be made by USX in its sole discretion.

(f)    At Closing, USX would determine whether to offer employment to each of the other non-driver employees of GFK existing as of the Closing. The decision as to whether to hire each non-driver employee would be made by USX in its sole discretion.

(g)    At Closing, USX would enter into an independent contractor agreement with Kelly (the "Contractor Agreement"), pursuant to which Kelly would provide assistance to USX on such matters and at such times as USX reasonably requests on an independent contractor basis. Services to be provided by Kelly under the Contractor Agreement would include assistance in the hiring and retention of drivers, the transfer or termination of equipment leases, the conversion of customer accounts to USX, and other similar matters. Compensation would be paid under the Contractor Agreement for up to twenty-four (24) months after Closing based upon the following:

(i)    *Driver Retention Payments.* In the first six (6) months after Closing, Kelly would be eligible to receive payments based on the hiring and retention of Eligible GFK Drivers by USX. Kelly would be paid $1,000 for each Eligible GFK Driver that is offered and accepts employment by USX (each, a "Retained Driver"). If a Retained Driver does not remain employed by USX for a period of at least one (1) month after

Mr. Guy F. Kelly
G. F. Kelly Trucking, Inc.
June 29, 2005
Page 3

hiring, USX would be entitled to deduct the full $1,000 paid with respect to such Retained Driver from future payments to Kelly under the Contractor Agreement. If a Retained Driver remains employed by USX for more than one (1) month but less than two (2) months, USX would be entitled to deduct $500 from future payments to Kelly under the Contractor Agreement. If a Retained Driver remains employed by USX for three (3) or more months, Kelly would be entitled to receive an additional $250 per month for each such Retained Driver, up to a maximum of four months and $1,000 per Retained Driver.

(ii)    *Driver Pool Payments*. In the first twenty-four (24) months after Closing, Kelly would be eligible to receive payments based on the overall size of the driver pool serving the Acquired Business (the "Driver Pool"). The Driver Pool would include both Retained Drivers employed by USX and additional or replacement drivers recruited by Kelly (or his employees or agents) and hired by USX after Closing. After the end of each month, Kelly would be entitled to receive the following payments based on the weighted average size of the Driver Pool during the month then ended:

| Weighted Average Size of Driver Pool | Additional Payment to Kelly (per month) |
|---|---|
| 0 to 44 drivers | $0 |
| 45 to 89 drivers | $4,166.67 |
| 90 to 129 drivers | $8,333.33 |
| 130 to 169 drivers | $12,500.00 |
| 170 to 175 drivers | $16,666.67 |
| More than 175 drivers | $16,666.67 plus $150.00 per driver above 175 |

Settlement and payment of amounts due to Kelly under the Contractor Agreement, after giving effect to any applicable deductions, would occur on a monthly basis. The Contractor Agreement would provide that all decisions with respect to the hiring and retention of drivers following Closing would be made by USX in its sole discretion.

2.    Noncompetition Agreements. Each of GFK and Kelly would agree as part of the transaction to refrain from competition during the twenty-four (24) month period in which payments are to be made by USX under the Contractor Agreement and for an additional twelve (12) months thereafter. No additional compensation, other than compensation under the definitive agreement and the Contractor Agreement, would be paid by USX for these noncompetition agreements.

3.    Representations, Warranties, Covenants, and Conditions. GFK and Kelly would both agree to make representations, warranties, and covenants customary in these types of

Kelly-000011

Mr. Guy F. Kelly
G. F. Kelly Trucking, Inc.
June 29, 2005
Page 4

transactions. Closing of the definitive agreement would be subject to reasonable and customary conditions, including, but not limited to, absence of a materially adverse change in the Acquired Business or Purchased Assets, absence of material litigation relating to the transaction, the Acquired Business, or the Purchased Assets, accuracy of representations and warranties as if made at Closing, satisfaction with the results of our due diligence examination, approval by the USX board of directors, and absence of a materially adverse change in any applicable law, rule, or regulation, which applies to, and materially affects, GFK, the Acquired Business, or the Purchased Assets at or prior to Closing. The representations and warranties would survive Closing, and GFK and Kelly would jointly and severally indemnify USX against the full amount of any losses and costs it would suffer due to breach of any representation, warranty, or covenant.

   4.   Access. From the date of this letter until Closing, unless negotiations are terminated, GFK would afford USX and its representatives full and free access to GFK, its personnel, accountants, lawyers, properties, contracts, books and records, and all other documents and data. The parties would work diligently towards the preparation and execution of the definitive agreement.

   5.   Conduct of Business. From the date hereof through Closing, unless negotiations are terminated, GFK would operate the Acquired Business in the ordinary course of business and refrain from any extraordinary transactions. Among other things, you would not approve any wage increase, employment agreement, severance package, or similar measure related to the Acquired Business and would not dispose of any GFK assets except scheduled equipment trades of which we are informed.

   6.   Confidentiality. Except to the extent required by law, USX will not disclose or use, and will direct its representatives not to disclose or use, any Confidential Information (as defined below) with respect to GFK that it receives from GFK except in connection with our evaluation of the transaction proposed in this letter. For purposes of this Paragraph 6, "Confidential Information" means any information about GFK received by us from you or your representatives in connection with the proposed transaction, unless (i) such information is already known to us or our representatives or to others not bound by a duty of confidentiality; (ii) such information becomes publicly available through no fault of ours or our representatives; (iii) the use of such information is necessary or appropriate in making any filing or obtaining any consent or approval required for the consummation of the transaction proposed in this letter; or (iv) the furnishing or use of such information is required by or necessary or appropriate in connection with legal proceedings. Upon written request, we will promptly return or destroy any Confidential Information in our possession and certify in writing that we have done so.

   7.   Disclosure. Except to the extent required by law, NASDAQ or stock exchange rules, or upon written advice of securities counsel, without the prior consent of the other parties, no party will directly or indirectly, make any public comment, statement, or communication with

Mr. Guy F. Kelly
G. F. Kelly Trucking, Inc.
June 29, 2005
Page 5

respect to, or otherwise disclose or permit the disclosure of, the existence of discussions regarding the possible transaction or any of the terms, conditions, or other aspects of the transaction proposed in this letter. If a party is required to make any such disclosure, it must first provide to the other party the content of the proposed disclosure, the reasons such disclosure is required, and the time and place the disclosure will be made.

    8.    Costs. USX will be responsible for all of its costs and expenses, and GFK and Kelly will be responsible for all of their own costs and expenses (including in each case any broker's, finder's, or investment banker's fees and the expenses of attorneys, accountants, and any other representatives) incurred in connection with pursuing or consummating the proposed transaction.

    9.    Standstill. Except for the proposed transaction, from the date of this letter until July 15, 2005, neither GFK, Kelly, nor any representative of GFK or Kelly will solicit, respond to, consider, or engage in any discussions, negotiations, or contacts regarding a potential merger, acquisition, sale of assets, or other transaction involving all or any part of the assets, stock, or business of GFK, and such parties will cease any such discussions, contacts, or negotiations that have commenced prior to the date hereof.

    10.    Termination. Any party hereto may terminate this letter upon written notice to the other parties if a definitive agreement is not signed on or before July 15, 2005. Upon such termination, this letter shall have no force or effect and no party shall have any further obligations hereunder; provided, however, that the binding provisions of this letter shall indefinitely survive the termination of this letter.

    11.    Nature of Agreement. This letter sets forth some of the terms of a proposed transaction. Except for the provisions of Paragraphs 6, 7, 8, 9, 10 and 11 hereof, which are binding, this letter is not binding on the parties and may not be relied upon as the basis for a contract estoppel or be the basis for a claim based on detrimental reliance or any other theory. This letter is not intended as a substitute for the definitive agreement, which will contain all of the elements necessary for a transaction of this type. Other than the binding provisions hereof, a binding commitment with respect to the transaction would result only from the execution of the definitive agreement and any other necessary documentation, subject to the conditions expressed therein. This letter will be of no further force and effect unless it is signed on behalf of GFK and returned to USX by July 5, 2005.

*  *  *  *  *

Kelly-000013

Mr. Guy F. Kelly
G. F. Kelly Trucking, Inc.
June 29, 2005
Page 6

     If you agree with this letter, please sign and return one copy and we will promptly begin work on our due diligence and a definitive agreement.

Very truly yours,

U. S. XPRESS ENTERPRISES, INC.,
a Nevada corporation

By: *[signature]*
Name: RAY M HARLIN
Title: Executive V.P & CFO

Duly executed on July ___, 2005

G. F. KELLY TRUCKING, INC.
an Alabama corporation

By: *[signature] 6-30-5*
Name: Guy F. Kelly
Title: President

Kelly-000014

# DEFENDANT'S EXHIBIT "39"

## Frank Childers

**From:** Randall Fant [r.fant@kellytrucking.com]
**Sent:** Monday, October 23, 2006 2:05 PM
**To:** f.childers@kellytrucking.com
**Subject:** FW: Asset Purchase Agreement & OLV

---

**From:** Guy Kelly [mailto:g.kelly@kellytrucking.com]
**Sent:** Tuesday, July 26, 2005 8:23 AM
**To:** r.fant@kellytrucking.com
**Subject:** FW: Asset Purchase Agreement & OLV


Guy F. Kelly
Kelly Trucking.com

**Please note that my new email address is g.kelly@kellytrucking.com. Please update your records. Thanks**
-----Original Message-----
**From:** Dennis Farnsworth [mailto:dfarnswort@usxpress.com]
**Sent:** Tuesday, July 26, 2005 7:38 AM
**To:** Guy Kelly
**Subject:** Asset Purchase Agreement & OLV

Attached are the Asset Purchase Agreement, Tractor OLV, and Trailer OLV for your review. Please forward to your legal representative for review. Per our discussion yesterday, I am forwarding this to you so that we can get a head start on the review process. This is not an executed agreement and this email is not official notice of USX approval to close the deal. Per our discussion, you are to have another conversation today with Gary Hopper. Following that conversation, we will have a conference call with Jeff Wardeberg at which time we will mutually decide what our next steps are. Following your review of the agreement, give me a call. Thanks.


DEFENDANT'S EXHIBIT 39