# DEFENDANT'S EXHIBIT "40"

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "<u>Agreement</u>") is made as of July 26, 2005, by and among U. S. Xpress Leasing, Inc., a Tennessee corporation ("<u>Buyer</u>"), G. F. Kelly Trucking, Inc., an Alabama corporation ("<u>Seller</u>"), and Guy F. Kelly ("<u>Stockholder</u>").

### RECITALS

Seller is a trucking company and the owner of certain assets. Stockholder owns all of the issued and outstanding capital stock of Seller. Seller proposes to sell and Buyer proposes to purchase such assets. The parties desire to reduce their agreement to writing and make certain other agreements as set forth herein.

### AGREEMENT

NOW, THEREFORE, in consideration of the foregoing recitals and the mutual covenants herein contained, and other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

### ARTICLE I
### PURCHASE AND SALE OF ASSETS

Section 1.1.    <u>Purchase and Sale of Assets</u>. At Closing, Seller shall sell to Buyer, and Buyer shall purchase from Seller, for the consideration specified in Section 1.4 below, the following assets of Seller, free and clear of all liens, claims, encumbrances, security interests, and impairments of title of any kind or nature ("<u>Liens</u>"):

(a)    Subject to the provisions of Section 1.4, all of the equipment listed on Schedule 1.1(a) hereto (collectively, the "<u>Transferred Equipment</u>");

(b)    Subject to the provisions of Section 1.4, the contract rights to all of the leased equipment listed on <u>Schedule 1.1(b)</u> hereto (collectively, the "<u>Leased Equipment</u>");

(c)    Subject to the provisions of Section 1.4, all satellite communication units servicing Transferred Equipment and Leased Equipment;

(d)    All of Seller's inventories of spare tires, wheels, and related equipment;

(e)    All vehicle licenses and registrations and plates issued by any governmental authority (the "<u>Plates and Permits</u>") for the tractors and trailers owned by Seller and included in the Transferred Equipment or Leased Equipment, to the extent such Plates and Permits are freely transferable under the terms thereof and applicable law, including the right to receive any refunds with respect to amounts prepaid for such Plates and Permits;



DEFENDANT'S EXHIBIT

40

(f)     All of Seller's business, including its customer list, customer files, rate tariffs, contracts (including shipper contracts and owner-operator contracts, to the extent such contracts are assignable), current driver files (except to the extent Seller is required to keep them pursuant to applicable law), telephone and fax numbers, and post office boxes (the "Business");

(g)     The office furniture and fixtures that Buyer by written notice delivered not less than three (3) days prior to the Closing Date deems necessary for the continued operation of the Business;

(h)     All of Seller's accounts receivable from customers and others, including driver advance receivables, and all rights to payment for goods sold or leased or services provided in relation to the Business as the same exist as of the Effective Time (the "Accounts Receivable");

(i)     All other or additional privileges, rights, interests, properties and assets of Seller, of every kind and description and wherever located, that are used or intended for use in connection with, or that are necessary or advisable to the continued conduct of the Business as presently being conducted.

All of such assets and rights are collectively referred to in this Agreement as the "Purchased Assets."

Section 1.2.     Excluded Assets. Notwithstanding Section 1.1 hereof, the Purchased Assets shall not include the following (the "Excluded Assets"):

(a)     Seller's rights under or pursuant to this Agreement and the other agreements with Buyer contemplated hereby;

(b)     Real property owned by Seller at Closing;

(c)     Cash, including bank balances and bank accounts, monies in possession of any banks, savings and loans, or trust companies, and similar cash items on hand at Closing;

(d)     Investment securities and other short- and medium-term investments of the Business;

(e)     The corporate seals, certificates of incorporation, minute books, stock books, tax returns, books of account or other records having to do with the corporate organization of Seller;

(f)     Any item of Transferred Equipment, or contract rights with respect to any item of Leased Equipment, excluded from the transaction by Buyer pursuant to Section 1.5 below; and

(g)     Any other asset of Seller specifically set forth on Schedule 1.2(g) hereto.

Section 1.3.     Condition of Transferred and Leased Equipment. Prior to Closing, Buyer shall have the opportunity to inspect the Transferred Equipment and Leased Equipment. Seller represents and warrants the following as to the condition and title of the Transferred Equipment and

2

Kelly-000019

Leased Equipment: (a) each of the Transferred Equipment and Leased Equipment is in good repair and condition and acceptable for use as intended in the interstate transportation of truckloads of freight; (b) each of the Transferred Equipment and Leased Equipment has been maintained in accordance with the manufacturer's specifications and warranties; (c) each of the Transferred Equipment and Leased Equipment meets all U.S. Department of Transportation ("DOT") requirements, has less than $350 of damage, does not require engine or drive train repair, has no seat tears or broken or cracked glass (if a tractor), has all major systems functioning properly (if a tractor), and has all required safety equipment; (d) each of the Transferred Equipment and Leased Equipment has at least 50% tread depth on all tires and at least 30% wear remaining on all brakes; and (e) each of the Transferred Equipment is owned by Seller free and clear of all Liens, other than Liens represented by Payoff Letters (as hereinafter defined).

        Section 1.4.     Purchase Price.

        (a)      Subject to the provisions of Section 1.5, the purchase price for the Purchased Assets (the "Purchase Price") shall equal (i) the orderly liquidation value of all Transferred Equipment, as determined prior to Closing through an appraisal by Taylor & Martin and an inspection by Buyer (the "Equipment OLV"), plus (ii) One Hundred Sixty-One Thousand Nine Hundred Twelve and No/100 Dollars ($161,912.00), representing the value of the Plates and Permits as of the Closing Date, plus (iii) an amount equal to eighty-five percent (85%) of all Accounts Receivable included in the Purchased Assets as of the Closing Date.

        (b)      Buyer shall deliver the Purchase Price, by company check or wire transfer of immediately available funds, as follows: (i) the amount required to retire all obligations and remove all Liens relating to the Transferred Equipment, if any, shall be paid to the respective Lien holders, as set forth in the Lien Payoff Letters, as defined in Section 3.7; (ii) all amounts and fees required to terminate that certain agreement dated May 2, 2005, by and between Seller and Interstate Capital Corp. (the "Factoring Agreement"), shall be paid to Interstate Capital Corp., as set forth in the Factoring Payoff Letter, as defined in Section 3.8, (iii) at Buyer's election, any of Seller's trade payables existing as of the Closing Date may be paid by Buyer to the creditor thereof, and (iv) the balance of the Purchase Price, if any, after payment of amounts specified in items (i) through (iii) shall be delivered to Seller at Closing.

        (c)      In addition to delivering the Purchase Price in accordance with Section 1.4(b), at Closing, Buyer shall assume Seller's obligations with respect to (i) leases of Leased Equipment included in the Purchased Assets, and (ii) obligations owed by Seller for driver and owner-operator escrow amounts.

        Section 1.5.     Adjustment to Purchase Price. The Purchase Price shall be reduced by the amount, if any, equal to (a) the value of any Transferred Equipment that is missing, destroyed, or damaged beyond ordinary repair (any such assets being excluded from the transaction and retained by Seller) plus (b) the amount required to bring the Transferred Equipment and Leased Equipment into the condition required under Section 1.2 hereof. As an alternative to adjusting the Purchase Price under clause (b) of the preceding sentence, Buyer may elect to exclude an item of Transferred Equipment or Leased Equipment from the transaction. In such event, Seller shall retain the asset and

Kelly-000020

the Purchase Price shall be reduced accordingly. To the extent any deficiency in the condition of Transferred Equipment or Leased Equipment is discovered after Closing, Seller shall indemnify the Buyer for such amount under Section 10.2 hereof.

Section 1.6.    No Assumed Liabilities. Buyer shall not assume any liabilities or obligations of Seller, Stockholder or any affiliate of Seller of any kind or nature whatsoever other than any liability expressly provided in this Agreement or any contract or agreements assigned to or entered into by Buyer pursuant to this Agreement. Without limiting the generality of the foregoing, it is hereby agreed that Buyer is not assuming, and shall not be deemed to have assumed, any liability and shall not have any obligation for or with respect to any liability or obligation of or relating to Seller or Stockholder (i) for any prepayment penalty, late fee, interest, or other amount owing on the Transferred Equipment or Leased Equipment; (ii) for wages, bonuses, accrued vacation or sick leave, or other payments due for any reason to Sellers' employees for periods during which they were employees of Seller; (iii) for any sales, use, excise, income, franchise, or other taxes, or any legal, accounting, brokerage, finders fees, or other expenses of whatsoever kind or nature incurred by Seller, Stockholder or any affiliate of Seller; or (iv) arising out of any action, suit, claim, or proceeding based upon any event occurring prior to the Closing. Buyer is not purchasing, assuming sponsorship of, or otherwise assuming responsibility or liability for or under any employee benefit plan of Seller. Seller and Stockholder, jointly and severally, shall indemnify Buyer pursuant to Section 6.2 hereof against all liabilities that are not expressly assumed. However, Buyer does expressly assume any and all liability arising out of or related to the Purchased Assets which accrues or occurs after the Closing.

Section 1.7.    Risk of Loss. Seller shall bear the risk of loss and repair to the Transferred Equipment and Leased Equipment prior to the Effective Time, including the cost of repair for material damage or restoration to operating condition where such damage to or cessation of operation of any of the Transferred Equipment and Leased Equipment occurs prior to the Effective Time. Buyer shall bear risk of loss to the Transferred Equipment after the Effective Time.

## ARTICLE II
## DRIVERS AND OTHER EMPLOYEES

Section 2.1.    Drivers. Seller grants Buyer the exclusive opportunity to hire all of Seller's employee drivers and to contract with its owner-operators as of the Closing. In connection therewith, Seller shall transfer all driver files and safety records to Buyer. For all such records transferred to Buyer, Buyer hereby agrees to maintain those records for a period of six (6) years from the Closing Date for the benefit of Seller, and shall permit Seller to have access to such records upon reasonable notice and at reasonable times. However, Buyer shall be obligated to maintain DOT records only for the time required by applicable DOT regulations. At the Closing, Seller shall provide a list of its employee drivers and owner-operators as of such date ("Closing Date Drivers"). Seller and Stockholder shall provide all reasonable cooperation and assistance in Buyer's attempt to hire and contract with the Closing Date Drivers it desires and shall not provide a list or any information concerning the Closing Date Drivers to any other person or entity except as required by law. The decision as to whether Buyer will hire each Closing Date Driver shall be made by Buyer in its sole discretion.

4

Section 2.2.    Other Employees of Seller.  Buyer, in its sole discretion, will have the right but not the obligation to offer employment to as few or as many former non-driver employees of Seller following the Closing as it shall decide. Seller shall assist Buyer in recruiting the employees identified by Buyer. Seller shall have the right to continue to employ the shop employees listed on Schedule 2.2 hereto (the "Shop Employees").

## ARTICLE III
## CONDITIONS TO CLOSING

The obligations of Buyer hereunder are subject to the following conditions (all or any of which may be waived in whole or in part by Buyer) having been fulfilled on or before the Closing Date:

Section 3.1.    Representations and Warranties True; Compliance with Covenants.  The representations and warranties of Seller shall be true and correct in all material respects at and as of the Closing Date with the same force and effect as though such representations and warranties had been made at and as of the Closing Date. Seller shall in all material respects have complied with and performed all covenants, obligations, and conditions required by this Agreement to be complied with or performed prior to Closing.

Section 3.2.    Inspections.  Buyer shall have completed its inspection of the Transferred Equipment and Leased Equipment and shall be satisfied with the results of such inspection in its sole discretion.

Section 3.3.    Due Diligence.  Buyer shall have completed its due diligence investigation of Seller, confirming that the Business, assets, and financial and legal condition of Seller are satisfactory to Buyer in Buyer's sole discretion.

Section 3.4.    Background Check.  Buyer shall have conducted a background check concerning Stockholder, and the results of such background check shall be satisfactory to Buyer in Buyer's sole discretion.

Section 3.5.    No Damage or Destruction.  The Transferred Equipment and Leased Equipment, as adjusted under Section 1.5, shall not have suffered any destruction or damage by fire, accident, or other casualty or Act of God, whether or not covered by insurance, which affects such Transferred Equipment in a material and adverse way.

Section 3.6.    Closing Date Drivers.  Buyer shall be satisfied, in its sole discretion, that there will be at least one hundred forty-five (145) Closing Date Drivers that will meet Buyer's qualifications for hiring.

Section 3.7.    Lien Payoff Letters.  If any Transferred Equipment is subject to a Lien, prior to Closing, Seller shall present to Buyer one or more payoff letters, with all prepayment penalties, late fees, administrative fees, and other amounts due included (the "Lien Payoff Letters"). The Lien Payoff Letters shall be executed by the lenders providing financing on each of the Transferred

5

Equipment, and the amount of all prepayment penalties, late fees, administrative fees, and other amounts indicated as due in the Lien Payoff Letters shall not, on an aggregate basis, exceed the total Equipment OLV for Transferred Equipment not excluded from the transaction pursuant to Section Section 1.5.

Section 3.8.    Factoring Payoff Letter.  Seller shall present to Buyer a payoff letter, with all prepayment penalties, late fees, administrative fees, and other amounts due under the Factoring Agreement included (the "Factoring Payoff Letter" and, together with the Lien Payoff Letters, the "Payoff Letters"). The Factoring Payoff Letter shall be executed by Interstate Capital Corp., and the amount of all prepayment penalties, late fees, administrative fees, and other amounts indicated as due in the Factoring Payoff Letter shall not exceed eighty-five percent (85%) of all Accounts Receivable included in the Purchased Assets as of the Closing Date.

Section 3.9.    Sales Agent.  Gary Hopper and Seller shall have terminated all contractual arrangements under which Mr. Hopper has provided services to Seller and its affiliates, and Mr. Hopper shall have entered into a sales agent agreement with Buyer in form and substance reasonably acceptable to Buyer.

## ARTICLE IV
## CLOSING

Section 4.1.    Time.  The transactions contemplated by this Agreement shall be consummated at a closing (the "Closing") to be held on August 8, 2005, or such other time as the parties may agree (the "Closing Date"). The Closing shall be effective as of 11:59 p.m. Eastern time on the Closing Date (the "Effective Time").

Section 4.2.    Seller and Stockholder Deliveries.  At Closing, Seller shall deliver to Buyer the following:

(a)    Possession of all of the Transferred Equipment and Leased Equipment;

(b)    Original titles to all of the Transferred Equipment, duly endorsed for transfer and without any Lien noted thereon (or Payoff Letters covering any Transferred Equipment for which Buyer shall remit a portion of the Purchase Price to a lienholder under Section 1.4(b));

(c)    A duly executed Bill of Sale for the Purchased Assets (other than the Leased Equipment) in substantially the form attached as Exhibit A;

(d)    A duly executed counterpart to an Assignment and Assumption for the Leased Equipment in substantially the form Attached as Exhibit B (the "Assignment");

(e)    A duly executed counterpart to a Lease Agreement with respect to all real property owned by Seller and used in the Business, providing for the lease by Buyer of such property at a monthly rental rate based upon the fair market value of the facilities leased and

6

a capitalization rate of six percent (6.0%), in a form that is mutually agreeable to Buyer and Seller (the "Lease Agreement"); and

(f)    A duly executed counterpart to an Independent Contractor Agreement, pursuant to which Stockholder would provide assistance to Buyer on such matters and at such times as Buyer reasonably requests on an independent contractor basis, and providing for compensation to Stockholder substantially as provided on Exhibit C, in a form that is mutually agreeable to Buyer and Stockholder (the "Contractor Agreement").

Section 4.3.    Buyer Deliveries.  At Closing, Buyer shall deliver to Seller and Stockholder the following:

(a)    The Purchase Price in the manner set forth in Section 1.4(b);

(b)    A duly executed counterpart to the Assignment;

(c)    A duly executed counterpart to the Lease Agreement; and

(d)    A duly executed counterpart to the Contractor Agreement.

## ARTICLE V
## NONCOMPETITION

Section 5.1.    Covenant Not to Compete.  As an inducement for Buyer to consummate the transactions contemplated by this Agreement, each of Seller and Stockholder agrees that, during the period specified in Section 5.2, he or it will not, directly or indirectly, anywhere within the United States of America:

(a)    Engage or invest in, own, manage, operate, finance, control, or participate in the ownership, management, operation, financing, or control of, be employed by, associated with, or in any manner connected with, or render services or advice or other aid to, or guarantee any obligation of, any person engaged in or planning to become engaged in the contract carrier, common carrier, or freight distribution industries or any other business whose products or activities compete in whole or in part with the business of Seller; provided, however, that the foregoing shall not apply to (i) the provision of contract or common carrier services solely involving the transportation of timber, or (ii) the provision of spotting services by K-Diesel, Inc., an Alabama corporation, and K.C. Spotting, Inc., an Alabama corporation, to the extent and in the manner that such services are conducted on the date hereof; provided, further, that Selling Stockholder may purchase or otherwise acquire up to (but not more than) three percent (3%) of any class of securities of any enterprise (but without otherwise participating in the activities of such enterprise) if such securities are listed on any national or regional securities exchange or have been registered under Section 12(g) of the Securities Exchange Act of 1934;

(b)    (i) Induce or attempt to induce any employee of Buyer or its subsidiaries or affiliates to terminate his or her employment with Buyer or its subsidiaries or affiliates; (ii) induce or attempt to induce any independent contractor of Buyer or its subsidiaries or affiliates to terminate his

7

or her relationship with Buyer or its subsidiaries or affiliates, (iii) in any way interfere with the relationship between Buyer or its subsidiaries or affiliates and any such employee or independent contractor of Buyer or its subsidiaries or affiliates; or (v) induce or attempt to induce any customer, supplier, licensee, or other person to cease doing business with Buyer or its subsidiaries or affiliates or in any way interfere with the relationship between any such customer, supplier, licensee, or other business entity and Buyer and its subsidiaries or affiliates; or

        (c)     Solicit, divert, or take away, or attempt to divert or to take away, the business or patronage of any of the clients, customers, or accounts, or prospective clients, customers, or accounts, of Buyer or its subsidiaries or affiliates.

        Section 5.2.    <u>Duration of Covenant Not to Compete</u>. The restrictions contained in Section 5.1 shall apply to Seller and Stockholder from the Closing Date until the third anniversary of the Closing Date.

        Section 5.3.    <u>Enforceability</u>. If any restriction set forth in this Article V is found by any court of competent jurisdiction to be unenforceable because it extends for too long a period of time, over too great a range of activities, or in too broad a geographic area, it shall be interpreted to extend only over the maximum period of time, range of activities, or geographic area as to which it may be enforceable.

        Section 5.4.    <u>Specific Performance</u>. The restrictions contained in this Article V are necessary for the protection of the business and goodwill of the Business and are considered by Seller and Stockholder to be reasonable for such purpose. Each of Seller and Stockholder agrees that any breach of this Article V will cause Buyer substantial and irrevocable damage and therefore, in the event of any such breach, in addition to such other remedies which may be available, Buyer shall have the right to seek specific performance and injunctive relief, and if Buyer shall prevail in a legal proceeding to remedy a breach under this Article V, Buyer shall be entitled to receive its reasonable attorneys' fees, expert witness frees, and out-of-pocket costs incurred in connection with such proceeding, in addition to any other relief it may be granted.

**ARTICLE VI**
**TREATMENT OF CONFIDENTIAL INFORMATION**

        Section 6.1.    <u>Definition of Confidential Information</u>. For purposes of this Agreement, "Confidential Information" means (a) any and all information concerning the Business, however documented, that is a trade secret within the meaning of applicable law; (b) any and all information concerning the Business that consists of historical financial statements, financial projections and budgets, historical and projected sales, capital spending budgets and plans, the names and backgrounds of key personnel, contractors, agents, customers, drivers, suppliers and potential suppliers, personnel training and techniques and materials, and purchasing methods and techniques, however documented; and (c) any and all notes, analysis, compilations, studies, summaries and other material prepared by or for Seller or its subsidiaries or affiliates containing or based, in whole or in part, upon any information included in the foregoing.

8

Kelly-000025

Section 6.2.    Nondisclosure of Confidential Information.  Each of Seller and Stockholder acknowledges and agrees that the protection of the Confidential Information is necessary to protect and preserve the value of the Business and the benefit to Buyer of the transactions contemplated by this Agreement.  Therefore, each of Seller and Stockholder agrees not to disclose to any unauthorized persons or use for the benefit of any third party any Confidential Information, whether or not such information is embodied in writing or other physical form or is retained in the memory of such person, without Buyer's written consent, unless and to the extent that the Confidential Information is or becomes generally known to and available for use by the public other than as a result of the fault of Seller or Stockholder, or the fault of any other person bound by a duty of confidentiality to Seller or Stockholder or their subsidiaries or affiliates.  Each of Seller and Stockholder agrees to deliver to Buyer on the date hereof, and at any other time Buyer may request, all documents, memoranda, notes, plans, records, reports, and other documentation (and all copies of all of the foregoing), that contain Confidential Information and any other Confidential Information that Seller or Stockholder may then possess or have under its or his control.

## ARTICLE VII
## OTHER COVENANTS AND AGREEMENTS

Section 7.1.    Conduct of Business.  Prior to the Effective Time, Seller shall operate the Business only in the ordinary course of business consistent with past practice and will not introduce any new method of management, operation, or accounting.  Seller shall use its commercially reasonable efforts to preserve the Business intact, to retain Seller's present employees, customers, and suppliers so that they will be available to Buyer after the Closing, and to cause consummation of the transactions contemplated by this Agreement in accordance with its terms and conditions.  Seller shall maintain all books and Records of Seller relating to the Business in the ordinary course of business.  Seller shall continue in full force and effect the insurance coverage under policies existing as of the date hereof or substantially equivalent policies.  Seller shall not knowingly take any action that might impair the Business or Purchased Assets without the prior written consent of Buyer or take or fail to take any action that would cause or permit the representations and warranties made in Article VIII hereof to be inaccurate at the time of the Closing.  Seller shall maintain the Purchased Assets in a state of repair and condition that complies with legal requirements and is consistent with the requirements and normal conduct of Seller's business.   Seller shall comply in all material respects with all applicable laws, rules, regulations, ordinances, and contractual requirements that are applicable to the Business.

Section 7.2.    Access and Investigation.  Between the date of this Agreement and Closing, Seller and Stockholder will, and will cause their respective employees, agents, and other representatives to, (a) afford Buyer and its employees, agents, and other representatives full and free access to the personnel, properties, contracts, books and records, and other documents and data of Seller, (b) furnish Buyer and its employees, agents, and other representatives with copies of all such contracts, books and records, and other existing documents and data as Buyer may reasonably request, and (c) furnish Buyer and its employees, agents, and other representatives with such additional financial, operating, and other data and information as Buyer may reasonably request; provided, that such activities shall be conducted in a manner that does not interfere unreasonably with the Business.

9

Kelly-000026

Section 7.3.    Consents; Customer Contracts.

(a)    Buyer, Seller, and Stockholder shall cooperate with each other and proceed, as promptly as is reasonably practical, to obtain the consents, if any, required by regulatory authorities and parties to contracts and obtain all required consents. Seller and Stockholder will cooperate with each other to negotiate the assignment or termination of leases with respect to Leased Equipment, as directed by Buyer.

(b)    In connection with the transfer of the Business, Seller and Stockholder shall cooperate with Buyer in transitioning all customer contracts and relationships of the Business, whether or not the contracts are assignable, from Seller to Buyer. To the extent Buyer assumes any contract assigned by Seller, Buyer shall pay, perform, and discharge all obligations under such contracts that arise from events, duties, obligations, circumstances, or acts or omissions by Buyer that arise, or are performed after, the Effective Time.

Section 7.4.    Plates and Permits. Seller and Stockholder shall cooperate with Buyer to achieve acceptable licensing arrangements for the duration of the Plates and Permits being purchased for the tractors and trailers included in the Transferred Equipment and Leased Equipment and any owner-operator-owed equipment utilizing the Plates and Permits of Seller, which cooperation shall include, without limitation and at Buyer's request, entering into mutually acceptable back-to-back equipment leasing arrangements pursuant to which Seller shall lease such Plates and Permits to Buyer or owner-operators, as applicable, for no additional consideration. Seller and Stockholder shall execute and deliver all documents reasonably necessary to effectuate such acceptable licensing arrangements.

Section 7.5.    Completion of Loads. Seller shall be responsible for costs, expenses, liabilities, risk of loss, and claims in connection with all shipments dispatched prior to the Effective Time (and until such shipment has been delivered in the case of shipments being completed after the Effective Time). Buyer shall be responsible for dispatching, and shall be responsible for all expenses associated with, all loads dispatched after the Effective Time. For assigning risk of loss, Seller shall be responsible for any liability arising from loads dispatched prior to the Effective Time and Buyer shall be responsible for any liability arising from loads dispatched after the Effective Time.

Section 7.6.    Use of Name. Seller consents to the use of its name by Buyer on the Transferred Equipment and Leased Equipment until ninety (90) days following Closing; provided, however, that Buyer shall use its best efforts to remove the Seller's name, or any derivative thereof, from the Transferred Equipment and Leased Equipment as soon as practicable. Subject to the foregoing, Buyer agrees to indemnify, defend, and hold harmless Seller against all liabilities arising out of Buyer's use of Seller's name pursuant to this Section 7.6.

Section 7.7.    Payment of Liabilities. Seller shall pay or otherwise satisfy in the ordinary course of business all of the liabilities and obligations related to the Business and the Purchased Assets that become due or owing prior to the Effective Time. If Seller shall fail to comply with this Section 7.7, Buyer shall be entitled to pay such liabilities and obligations on behalf of Seller and to

10

Kelly-000027

deduct the amount of such payment from amounts due to Stockholder under the Contractor Agreement.

Section 7.8.    Accounts Receivable.  Seller and Stockholder shall cooperate with Buyer in the collection of Accounts Receivable.  If any Account Receivable remains unpaid more than one hundred twenty (120) days after the stated due date thereof, Seller shall repurchase such Account Receivable from Buyer in exchange for one hundred percent (100%) of the unpaid amount of such Account Receivable.  If Seller shall fail to comply with this Section 7.8, Buyer shall be entitled to deduct the amount owed by Seller hereunder from amounts due to Stockholder under the Contractor Agreement.

Section 7.9.    Driver Escrow.  Notwithstanding Buyer's assumption of obligations owed by Seller for driver and owner-operator escrow amounts pursuant to Section 1.4(c), Seller shall reimburse Buyer for all net amounts actually paid to drivers with respect to those escrow amounts on or prior to the first anniversary of the Closing Date.  If Seller shall fail to comply with this Section 7.9, Buyer shall be entitled to deduct the amount owed by Seller hereunder from amounts due to Stockholder under the Contractor Agreement.

Section 7.10.    Shop Services.  Seller and Stockholder shall cause the Shop Employees, or other comparable employees of Seller, to continue to provide services to Buyer in connection with the Business for a period of at least one (1) year after the Closing; provided, however, that such services shall not be provided by Seller without the delivery by Buyer of a work order properly approved through Buyer's maintenance process.  Labor performed by employees of Seller in rendering services to Buyer shall be billed to Buyer at the rate of Forty-Five Dollars ($45) per hour worked.  Parts used in connection with services rendered to Buyer shall be billed to Buyer at one hundred ten percent (110%) of Seller's cost of such parts.

Section 7.11.    Disclosure.  From the date hereof until the Closing, except to the extent required by law, NASDAQ rules, or upon written advice of securities counsel, without the prior written consent of the other party, neither Buyer nor Seller shall, and each shall direct its representatives not to, directly or indirectly, make any public comment, statement, or communication with respect to, or otherwise to disclose or to permit the disclosure of the existence of discussions regarding this transaction. If a party is required to make any such disclosure, it must first provide to the other parties the content of the proposed disclosure, the reasons such disclosure is required, and the time and place the disclosure will be made.

## ARTICLE VIII
## REPRESENTATIONS OF SELLER AND STOCKHOLDER

Seller and Stockholder hereby jointly and severally represent, warrant, and guarantee, as of the date hereof and as of the Effective Time, the following:

Section 8.1.    Corporate Approvals.  Seller is a duly formed, validly existing corporation, with full power and authority to enter into this Agreement by and through the officer executing his name hereto, and any corporate approvals required will have been obtained at or prior to Closing.

11

Kelly-000028

Section 8.2.    Authorizations.  All corporate action, to the extent necessary, has been duly taken to approve and authorize Seller's execution and delivery of this Agreement, the sale of the Purchased Assets as provided for herein, the performance of the transactions contemplated herein, and the execution of the documents required hereunder and incidental hereto.  Seller has obtained all consents of third parties required to transfer the Purchased Assets and take the other actions required of Seller under this Agreement.  The execution, delivery, and performance of this Agreement by Seller will not result in violation of, or a default under, any agreement, charter document, or other obligation to which it is a party or by which it may be bound.  This Agreement constitutes the valid and binding obligation of Seller and is enforceable in accordance with its terms.

Section 8.3.    Ability to Perform Agreement.  At Closing, Seller will possess the unrestricted ability to consummate the transaction contemplated hereby.

Section 8.4.    Financial Statements.  Seller has delivered to Buyer (a) copies of the unaudited balance sheets of Seller as of December 31, 2004, and the related statements of income, retained earnings, and cash flows for the year then ended, (b) the unaudited balance sheets of Seller as of June 30, 2005, and the related statements of income, retained earnings, and cash flows for the year-to-date period then ended, and (c) a representation letter signed by both the President and the chief financial or accounting officer of Seller stating that all such financial statements present fairly, in all material respects, the financial position of Seller as of the dates thereof, and the results of operations, changes in stockholders' equity, and cash flows of the Company for the years then ended, in conformity with generally accepted accounting principles ("GAAP") consistently applied, except for (i) the absence of footnotes and other disclosures required in audited financial statements by GAAP and (ii) with respect to clause (b) normal year end adjustments and reclassifications the aggregate effect of which is immaterial.

Section 8.5.    Financial and Operating Information.  Seller has delivered to Buyer operating information, including customer lists, operating information depicted on the income statement, rates charged customers, miles per tractor, empty miles, and other information related to the Business underlying the financial statements provided to Buyer.  All of such information is accurate and fairly depicts the operations represented by such information.

Section 8.6.    No Changes.  Since December 31, 2004, Seller has not experienced any materially adverse event, including but not limited to a notification of termination of or reduction in customer traffic or revenues or efforts to organize employees in a collective bargaining unit.

Section 8.7.    Litigation.  There is no action, suit, proceeding, demand, claim, assessment, judgment, litigation, lien, claim, or governmental investigation against Seller or otherwise outstanding, or to the knowledge of Seller or Stockholder, pending, or threatened relating to or affecting Seller with respect to the Business or any of the Purchased Assets which (a) questions or might question the validity or legality of the transactions contemplated hereby, (b) seeks or might seek to enjoin any transaction contemplated hereby, (c) seeks or might seek damages on account of the consummation of any transaction contemplated hereby, (d) seeks or might seek to impair or place a Lien on the Purchased Assets, or (e) seeks damages from Seller (other than claims for which Seller

Kelly-000029

is fully insured). Neither Seller nor Stockholder has received notice that it is subject to any claim involving any employment, tax, or environmental matter related to the Business, nor is either Seller or Stockholder aware of any factual basis for such a claim, nor to the knowledge of Seller or Stockholder is any such claim threatened.

Section 8.8.    No Default.    Seller is not in default under any contract, agreement, license, franchise, lease, permit, or other document which would affect Buyer's rights thereunder if assigned to Buyer, the condition of the Purchased Assets, or the performance by Seller of any obligation hereunder.

Section 8.8.    No Restriction.    Seller is not a party to, or subject to or bound by, any judgment, injunction, or decree of any court or governmental authority that restricts or prohibits the performance by Seller of the terms and conditions of this Agreement.

Section 8.9.    Taxes.    All federal, state, provincial, local, and other governmental income, payroll, excise, sales, personal property, franchise, and other taxes or assessments assessed by jurisdictions governing Seller have been paid when due and all tax returns lawfully due prior to the Closing have been prepared and filed, and Seller has not granted any waiver currently in effect of the statute of limitations with respect to any such taxes or assessments. Seller has complied in all respects with all applicable laws, rules, and regulations relating to the payment and withholding of taxes and have, within the time and in the manner prescribed by law, withheld from employee wages and paid over to the proper governmental authorities all amounts required to be so withheld and paid over under all applicable laws.

Section 8.10.    Compliance With Laws.    Seller has owned, leased, and used all of the Purchased Assets and has conducted its business, in compliance in all respects with all applicable laws. Except as disclosed, Seller has not received notice of any investigation or alleged violation of law. No material judgment is unsatisfied against Seller, and Seller is not subject to any material stipulation, order, consent, or decree arising from an action before any governmental authority affecting the assets, Business or employees of Seller.

Section 8.11.    Claims.    Seller does not have any claims related to the Business against Seller made by its customers for cargo damage, overcharges, or other matters, except for claims relating to actions of Seller prior to the Closing which shall remain the sole responsibility of Seller.

Section 8.12.    Drivers; Employees.

(a)    Seller is not a party to any collective bargaining agreement relating to its employees employed in connection with the Business, nor does any such agreement determine the terms and conditions of employment of any such employee. In the past five (5) years, there has not been any labor unrest or union organizing activity involving the Business.

(b)    There are no agreements, plans, or policies that would give rise to any severance, termination, change-in-control, accrued vacation, or other similar payment obligation by Buyer to employees or independent contractors of Seller as a result of the consummation of this Agreement.

13

Kelly-000030

(c)    Schedule 8.12 identifies each of Seller's employee benefit plans affecting or relating to employees of Seller employed in connection with the Business, including all retirement, profit sharing, defined contribution, and defined benefit plans as well as any severance vacation pay, health and welfare, employment, or other agreements (oral or written) relating to employees of Seller (collectively, "Plans"). No Plan is a multi-employer or a defined benefit plan, and neither the Company nor any predecessor or affiliate of the Company or a predecessor has ever been a party to or sponsored a multi-employer or defined benefit plan. The Company is not a member of a group of businesses under common control or businesses constituting a single employer (a "Group"), except any Group in which no member has been a party to a defined benefit plan.

(d)    Seller maintains files on all employee drivers and individual contractors, and each employee driver, independent contractor, and file meets all DOT requirements.

Section 8.13.    Environment, Health, and Safety.

(a)    Seller and any predecessors have complied with all laws concerning pollution or protection of the environment, all laws concerning public health and safety, and all laws concerning employee health and safety, including laws relating to emissions, discharges, releases, or threatened release of pollutants, contaminants, or chemical, industrial, hazardous, or toxic materials or wastes (including petroleum and any fraction or derivative thereof) into ambient air, surface water, ground water, or lands, or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport, or hauling of such substances (collectively, "Environmental Laws"), and no action, suit, proceeding, hearing, investigation, charge, complaint, claim, demand, or notice is pending against any of them alleging any failure so to comply. Seller and any predecessors have obtained and been in compliance with all of the terms and conditions of all permits that are required under all Environmental Laws.

(b)    Seller does not have any liability (and neither Seller nor any predecessor has handled or disposed of any substance, arranged for the disposal of any substance, exposed any employee or other individual to any substance or condition, or owned or operated any property or facility in any manner that could form the basis for any present or future action, suit, proceeding, hearing, investigation, charge, complaint, claim, or demand against Seller giving rise to any liability) for damage to any site, location, or body of water (surface or subsurface), for any illness of or personal injury to any employee or other individual, or for any reason under any Environmental Law.

Section 8.14.    Bulk Sales.  Laws applicable to bulk sales do not apply to the transaction contemplated by this Agreement.

Section 8.15.    Solvency.  Prior to and after giving effect to the transactions contemplated by this Agreement:  (a) the fair value of Seller's assets is greater than the amount of its liabilities (including disputed, contingent, and unliquidated liabilities) as such value is established and liabilities evaluated in accordance with GAAP; (b) the present fair saleable value of Seller's assets is not less than the amount that will be required to pay the probable liability on its debts as they become

14

absolute and matured; (c) Seller is able to realize upon its assets and pay its debts and other liabilities (including disputed, contingent, and unliquidated liabilities) as they mature in the normal course of business, (d) Seller does not intend to, and does not believe that it will, incur debts or liabilities beyond its ability to pay as such debts and liabilities mature; (e) Seller is not engaged in business or a transaction, and is not about to engage in business or a transaction, for which its property would constitute unreasonably small capital; and (f) Seller is otherwise solvent.

**ARTICLE IX**
**REPRESENTATIONS OF BUYER**

Buyer hereby represents, warrants, and guarantees, as of the date hereof and as of the Effective Time, the following:

Section 9.1.    Corporate Approvals.    Buyer is a duly formed, validly existing Tennessee corporation, with full power and authority to enter into this Agreement by and through the officer executing his name hereto, and any corporate approvals required will have been obtained at or prior to Closing.

Section 9.2.    Authorization.    All corporate action, to the extent necessary, has been duly taken to approve and authorize Buyer's execution and delivery of this Agreement, the purchase of the Transferred Equipment as provided for herein, the performance of the transactions contemplated herein, and the execution of the documents required hereunder and incidental hereto. The execution, delivery, and performance of this Agreement by Buyer will not result in violation of, or a default under, any agreement, charter document, or other obligation to which it is a party or by which it may be bound. This Agreement constitutes the valid and binding obligation of Buyer and is enforceable in accordance with its terms.

Section 9.3.    Ability to Perform Agreement.    At Closing, Buyer will possess the unrestricted ability to consummate the transaction contemplated hereby.

**ARTICLE X**
**SURVIVAL OF REPRESENTATIONS, WARRANTIES, AND COVENANTS;**
**INDEMNIFICATION**

Section 10.1.    Survival of Representations, Warranties, and Covenants.    All representations, warranties, and agreements made by Seller, Stockholder, and Buyer, respectively, in this Agreement or pursuant hereto, shall survive Closing and the consummation of the transactions contemplated by this Agreement until expiration of the applicable statute of limitations and shall thereupon expire together with the associated right to indemnification (except to the extent a written notice asserting a claim shall have been delivered prior to such expiration, then such right shall extend to the resolution of such claim).

Section 10.2.    Indemnification by Seller and Stockholder. Each of Seller and Stockholder, jointly and severally, shall indemnify, defend, and hold harmless Buyer, its officers, directors, employees, agents, and affiliates from and against any and all claims, causes of action, suits,

15

judgments, taxes, losses, damages, deficiencies, obligations, costs, and expenses (including, without limitation, interest, penalties, and reasonable fees and costs of attorneys and other experts) arising out of or otherwise in respect of : (a) any misrepresentation, inaccuracy in, or breach of any representation, warranty, covenant, or agreement of Seller or Stockholder contained in this Agreement or any document executed in connection herewith; (b) any third-party claims relating to the operation of the Transferred Equipment and Leased Equipment, the factual basis of which transaction or claim arose prior to the Effective Time; and (c) any liability of Seller or Stockholder whatsoever not expressly assumed by Buyer hereunder, including any third-party claims arising from the act or omission of Seller, either prior to or after Closing.

Section 10.3.  Indemnification by Buyer.  Buyer shall indemnify, defend, and hold harmless Seller, its officers, directors, employees, agents, and affiliates from and against any and all claims, causes of action, suits, judgments, taxes, losses, damages, deficiencies, obligations, costs, and expenses (including, without limitation, interest, penalties, and reasonable fees and costs of attorneys and other experts) arising out of or otherwise in respect of:  (a) any misrepresentation, inaccuracy in, or breach of any representation, warranty, covenant, or agreement of Buyer contained in this Agreement or any contract executed in connection herewith; and (b) any third-party claims relating to the operation of the Transferred Equipment and Leased Equipment by Buyer, the factual basis of which transaction or claim arose subsequent to the Effective Time.

## ARTICLE XI
## MISCELLANEOUS

Section 11.1.  Termination.

(a)    Any of the parties may terminate this Agreement as provided below:

(i)    The parties may terminate this Agreement by mutual written consent at any time prior to the Closing Date;

(ii)    This Agreement may be terminated by written notice given by Buyer to Seller or by Seller to Buyer (A) if the transactions contemplated by this Agreement shall violate any non-appealable final order, decree, or judgment of any court or governmental authority having competent jurisdiction, or (B) there shall be a statute, judgment, law, ordinance, rule, or regulation promulgated by any governmental authority that makes the transactions contemplated by this Agreement illegal or otherwise prohibited;

(iii)    Buyer may terminate this Agreement by giving written notice to Seller at any time prior to the Closing Date (A) in the event Seller or Stockholder has breached any representation, warranty, or covenant contained in this Agreement, Buyer has notified Seller or Stockholder of the breach, and the breach has continued without cure for a period of five (5) days after the notice of breach, or (B) if the Closing shall not have occurred on or before August 8, 2005 (unless the failure results primarily from Buyer breaching any representation, warranty, or covenant contained in this Agreement); or

(iv)    Seller may terminate this Agreement by giving written notice to Buyer at any time prior to the Closing Date (A) in the event Buyer has breached any representation, warranty, or covenant contained in this Agreement, Seller has notified Buyer of the breach, and the

16

breach has continued without cure for a period of five (5) days after the notice of breach or (B) if the Closing shall not have occurred on or before August 8, 2005 (unless the failure results primarily from Seller or Stockholder breaching any representation, warranty, or covenant contained in this Agreement).

        (b)    If any Party terminates this Agreement pursuant to Section 11.1(a) above, all rights and obligations of the parties hereunder shall terminate without any liability of any party to any other party, except for any liability of any party then in willful breach; provided, however, that the provisions of Sections 7.11, 11.1, 11.4 and 11.8, and Article X solely in the event of a willful breach, shall remain in full force and effect.

Section 11.2.  Notices. All notices and other communications hereunder shall be in writing and shall be deemed given (a) on the date of delivery if delivered personally; (b) on the date of transmission if sent via facsimile transmission to the facsimile number given below, and telephonic confirmation of receipt is obtained promptly after completion of transmission; (c) on the date after delivery to a reputable nationally recognized overnight courier service or (d) three days after being mailed by registered or certified mail (return receipt requested) to the parties at the following addresses (or at such other address for a party as shall be specified by like notice):

        (a)    If to Buyer:

> c/o U.S. Xpress Enterprises, Inc.
> 4080 Jenkins Road
> Chattanooga, TN 37421
> Attention: _____
> Facsimile: _____

        (b)    If to Seller or Stockholder:

> G. F. Kelly Trucking, Inc.
> ~~2210 Highway 225 North~~   242 MAIN St
> ~~Chatsworth, GA 30705~~   WAdley AL 36276
> Attention: _____
> Facsimile: _____

Section 11.3.  Entire Agreement. This Agreement, the attached Exhibits, and the Closing deliveries identified herein contain the entire agreement between the parties hereto with respect to the transactions contemplated herein.

Section 11.4.  Expenses. Except as otherwise herein expressly provided, each party shall bear its own expenses (including without limitation fees of their respective attorneys and consultants and experts) incurred by such party in connection with this Agreement or the consummation of the transactions contemplated herein.

Section 11.5.  Further Assurances. Following Closing, upon reasonable request by Buyer, each of Seller and Stockholder shall execute, or cause to be executed, and shall deliver to Buyer such other and further documents of assignment, transfer, and conveyance as may be necessary or

Kelly-000034

advisable, in the reasonable opinion of Buyer's counsel, to effectively assign, transfer, and convey to Buyer all of the Purchased Assets being sold hereunder.

Section 11.6.   Amendments.   This Agreement shall not be changed or terminated orally and no waiver of compliance with any provision or condition hereof and no consent provided for herein shall be effective unless evidenced by a written instrument duly executed by the party to be charged therewith.

Section 11.7.   Assignment.   This Agreement shall be binding upon and inure to the benefit of the parties and their respective heirs, successors, legal representatives, and permitted assigns. This Agreement may not be assigned by any party without the prior written consent of the other party; provided that Buyer may assign its rights to another member of its corporate group without consent.

Section 11.8.   Governing Law.   This Agreement shall be construed and enforced in accordance with the laws of the State of Tennessee, without regard to the conflicts of law principles thereof.

Section 11.9.   Headings.   Paragraph headings herein are for convenience only and shall not affect the interpretation of any provision.

Section 11.10.   Counterparts.   This Agreement may be executed, by facsimile or otherwise, in one or more counterparts, all of which together shall constitute one instrument.

* * * * * * * * * * * * * * * * * * * *

Signature Page Follows

18

Kelly-000035

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Signature Page to the Asset Purchase Agreement
Between U. S. Xpress Leasing, Inc. and
G. F. Kelly Trucking, Inc.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

IN WITNESS WHEREOF, the parties have executed this Agreement of the day, month, and year first written above.

**SELLER:**                        **BUYER:**

**G. F. KELLY TRUCKING, INC.**       **U. S. XPRESS LEASING, INC.**

By: _____       By: _____
Name: _____      Name: _____
Title: _____       Title: _____

**STOCKHOLDER:**

_____
Guy F. Kelly

19

Kelly-000036

Exhibit A to Asset Purchase Agreement
Between U. S. Xpress Leasing, Inc. and
G. F. Kelly Trucking, Inc.

## BILL OF SALE

FOR VALUABLE CONSIDERATION, receipt of which is hereby acknowledged, G. F. Kelly Trucking, Inc., an Alabama corporation ("Seller"), does hereby grant, bargain, sell, and deliver to U. S. Xpress Leasing, Inc., a Tennessee corporation ("Buyer"), all of Seller's right, title and interest in and to all of the Purchased Assets, as such term is defined in the Asset Purchase Agreement by and among Seller, Buyer, and Guy F. Kelly, dated July 25, 2005 (the "Agreement"), including but not limited to those assets listed on Exhibit A attached to this Bill of Sale and incorporated herein by this reference as if fully set forth, to have and to hold the same unto Buyer, its successors and assigns, forever.

Seller represents and warrants (i) that it is the lawful owner of the Purchased Assets, free and clear of all Liens of any nature whatsoever, (ii) that it has been duly authorized and has good right to sell the Purchased Assets, and (iii) that it will warrant and defend the same against the claims and demands of all persons, firms, and corporations whatsoever.

Seller covenants and agrees to take such further actions as may be necessary to convey good title to the Purchased Assets to Buyer, free and clear of all Liens, including but not limited to delivering motor vehicle titles, duly endorsed for transfer, in accordance with the Agreement.

Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed in the Agreement.

DATED: _____, 2005

**SELLER:**

**G. F. KELLY TRUCKING, INC.**

By: _____
Name: _____
Title: _____

Exhibit B to Asset Purchase Agreement
Between U. S. Xpress Leasing, Inc. and
G. F. Kelly Trucking, Inc.

## LEASED EQUIPMENT ASSIGNMENT AND ASSUMPTION AGREEMENT AND CONSENT

THIS LEASED EQUIPMENT ASSIGNMENT AND ASSUMPTION AGREEMENT AND CONSENT (this "Agreement"), dated as of _____, 2005, is made and entered into by and among U. S. Xpress Leasing, Inc., a Tennessee corporation ("Assignee"), G. F. Kelly Trucking, Inc., an Alabama corporation ("Assignor"), and _____ (the "Lessor"). Assignee, Assignor, and Lessor are sometimes individually referred to herein as a "Party" and together as the "Parties."

### WITNESSETH

WHEREAS, Assignor is the lessee under certain equipment lease agreements, attached hereto as Exhibit A, and with respect to the equipment set forth on Exhibit B (the equipment set forth on Exhibit B and included in the equipment lease agreements shall be referred to as the "Assumed Equipment Leases");

WHEREAS, Assignor, Assignee, and Guy F. Kelly are parties to that certain Asset Purchase Agreement dated July 25, 2005 (the "Asset Purchase Agreement");

WHEREAS, pursuant to the Asset Purchase Agreement, Assignor desires to assign, as of the Effective Time (as defined in the Asset Purchase Agreement), the Assumed Equipment Leases to Assignee, and Assignee desires to assume, pay, perform, and discharge all of the obligations of Assignor arising at or after the Effective Time under the Assumed Equipment Leases; and

WHEREAS, Lessor and Assignee desire to provide for Assignee's assumption of the Assumed Equipment Leases hereunder.

NOW, THEREFORE, in consideration of the mutual representations, warranties, and covenants contained herein and in the Asset Purchase Agreement, and on the terms and subject to the conditions herein set forth, the Parties hereto, intending to be legally bound, hereby covenant and agree as follows:

Section 1.    Assignment.  Assignor hereby (a) sells, transfers, assigns, and conveys all of its right, title, and interest in and to the Assumed Equipment Leases to Assignee and its assigns forever; such sale, transfer, assignment, and conveyance to be effective as of the Effective Time, and (b) agrees to indemnify and hold Assignee, and its stockholders, directors, employees, representatives, and agents harmless from and against any and all claims, causes of action, suits,

judgments, taxes, losses, damages, deficiencies, obligations, costs, and expenses (including, without limitation, interest, penalties, and reasonable fees, and costs of attorneys and other experts) resulting from any breach or nonperformance of the Assumed Equipment Leases arising prior to the Effective Time. Assignor represents that it has full right to execute and perform this Agreement and that it is not in breach of or in default under any of the terms relating to the Assumed Equipment Leases.

Section 2.    Assumption.    Assignee hereby (a) assumes and agrees to pay, perform, and discharge when due all of Assignor's liabilities, obligations, duties, and responsibilities arising under the Assumed Equipment Leases from and after the Effective Time and (b) agrees to indemnify and hold Assignor and its stockholders, directors, employees, representatives, and agents harmless from and against any and all claims, causes of action, suits, judgments, taxes, losses, damages, deficiencies, obligations, costs, and expenses (including, without limitation, interest, penalties, and reasonable fees, and costs of attorneys and other experts) resulting from any breach or nonperformance of the Assumed Equipment Leases arising from and after the Effective Time.

Section 3.    Consent to Assignment.    Lessor hereby consents to the assignment of the Assumed Equipment Leases to Assignee and waives any claim against Assignee for penalties, late fees, interest, or other amounts accruing or arising under the Assumed Equipment Leases prior to the Effective Time. Lessor represents that the Assumed Equipment Leases are in full force and effect and that the Assumed Equipment Leases together with this Agreement will constitute the entire agreement between Lessor and Assignee as to the rolling stock subject to the Assumed Equipment Leases. Notwithstanding anything in the Assumed Equipment Leases to the contrary, Lessor agrees to look solely to Assignee for performance of all obligations under the Assumed Equipment Leases and then only with respect to obligations arising from and after the Effective Time

Section 4.    Contingency.    This Agreement and the transactions contemplated hereunder are contingent upon the closing of the Asset Purchase Agreement.

IN WITNESS WHEREOF, the Parties hereto, intending to be legally bound, have caused this Agreement to be executed by their duly authorized representatives as of the date first above written.

**ASSIGNOR:**                                    **ASSIGNEE:**

**G. F. KELLY TRUCKING, INC.**         **U. S. XPRESS LEASING, INC.**


By: _____          By: _____
Name: _____          Name: _____
Title: _____          Title: _____


**LESSOR:**

[                              ]


By: _____
Name: _____
Title: _____

Kelly-000040

Exhibit C to Asset Purchase Agreement
Between U. S. Xpress Leasing, Inc. and
G. F. Kelly Trucking, Inc.

Compensation would be paid to Stockholder under the Contractor Agreement for up to twenty-four (24) months after Closing based upon the following:

(i)     *Driver Retention Payments.*  In the first six (6) months after Closing, Stockholder would be eligible to receive payments based on the hiring, leasing of owner operators and retention of Closing Date Drivers by Buyer. Stockholder would be paid $1,500 for each Closing Date Driver that is offered and accepts employment by Buyer or enters a lease agreement with Buyer (each, a "Retained Driver"). If a Retained Driver does not remain employed by or leased to Buyer for a period of at least one (1) month after hiring, Buyer would be entitled to deduct the full $1,500 paid with respect to such Retained Driver from future payments to Stockholder under the Contractor Agreement. If a Retained Driver remains employed by or leased to Buyer for more than one (1) month but less than two (2) months, Buyer would be entitled to deduct $1,000 from future payments to Stockholder under the Contractor Agreement. If a Retained Driver remains employed by or leased to Buyer for three (3) or more months, Stockholder would be entitled to receive an additional $125 per month for each such Retained Driver, up to a maximum of four months and $500 per Retained Driver.

(ii)    *Driver Pool Payments.*  In the first twenty-four (24) months after Closing, Stockholder would be eligible to receive payments based on the overall size of the driver pool serving the Business (the "Driver Pool"). The Driver Pool would include both Retained Drivers employed by or leased to Buyer and additional or replacement drivers recruited by Stockholder (or his employees or agents) and hired by Buyer after Closing. After the end of each month, Stockholder would be entitled to receive the following payments based on the weighted average size of the Driver Pool during the month then ended:

| Weighted Average Size of Driver Pool | Additional Payment to Stockholder (per month) |
|---|---|
| 0 to 44 drivers | $0 |
| 45 to 89 drivers | $4,166.67 |
| 90 to 129 drivers | $8,333.33 |
| 130 to 169 drivers | $12,500.00 |
| 170 to 175 drivers | $16,666.67 |
| More than 175 drivers | $16,666.67 plus $150.00 per driver above 175 |

Settlement and payment of amounts due to Stockholder under the Contractor Agreement, after giving effect to any applicable deductions, would occur on a monthly basis. The Contractor Agreement would provide that all decisions with respect to the hiring and retention of drivers following Closing would be made by Buyer in its sole discretion.

# DEFENDANT'S EXHIBIT "42"

## Guy Kelly

**From:**    Guy Kelly [g.kelly@kellytrucking.com]
**Sent:**    Friday, July 29, 2005 2:27 PM
**To:**      'Dennis Farnsworth'
**Subject:** sale

Dennis:

After careful consideration and reviewing the agreement for the last two days
I cannot agree to terms that are stated.

I know you guys think I am in dire straits but I have learned from the past don't
Always show your hand the way it is. I have basically sucked the cash out of the
Company and backed off my payments anticipating a sale so I am not dead.

I also have a line of credit at my bank but I have chosen not to use unless needed.

Basically you guys want my driver base and maybe some of my accounts that
Can fit your operation in which I understand.

The problem is I have no control who you hire and how they will be treated
And retained which affects my payout on drivers When they become usx.

Unfortunately I am the kind of guy when you tell me something I take it a face
Value and when it changes red flags start flying and nothing in my opinion
Has stayed consistent.

1.The closing date has changed 3 times

2. I was told good will money paid $740,000

3. Driver base $400,000

4. equity in equipment

5. difference of receivable money minus the factored payoff or I collect my rec.

6. I can't pay for a shop and employees at $45 per hour the going rate
   is $85 per hour and I would be at your mercy for work to pay bills

7. Under this arrangement I couldn' t agree to a  2 year non-compete

The way the agreement is structured I will be lucky to break even. And I am
Not giving my company away I worked for 15 years building.The company
Good will, and account base is worth something.

I have to have a good feeling and attitude that I have been treated fairly
To project that to the driver base or that will hurt us both.

This is basically what I want:


  1.  $740,000 good will or whatever you guys want to call it
  2.  $600,000 driver base ( this is based on industry standards of recruitment and retaining drivers @5,000 per
      driver)

7/29/2005

DEFENDANT'S
EXHIBIT
42

3. $161,912 tags permits
4. $76,401 insurance cost incurred from not closing
5. all trucks and trailers -0- balance owed
6. I will collect my receivables
7. We close by the 4th
8. 2 year non-compete

Sincerely;

Guy Kelly

Guy F. Kelly
Kelly Trucking.com

**Please note that my new email address is g.kelly@kellytrucking.com. Please update your records. Thanks**

7/29/2005

Kelly-000073

DEFENDANT'S EXHIBIT

"43"

*August 1 06   addendum to Agreement*

Summary of Agreement changes since "Letter of Intent"

1) Same as "letter of intent": USX to purchase tractors and trailers at Orderly Liquidation Value (OLV) based on Taylor & Martin appraisal.
   a. Added that equipment must have less than $350 of damage, 50% tread depth, and 30% brake wear remaining
2) Added that USX will pay you up front $161,912 for the unused portion of the "plates and permits" (11 months)
3) Added that USX would pay you 85% of the value of 100% of the trade receivables with recourse after any item goes beyond 120 days (this should generate you up front cash of approximately $780,000 ($2.8 million x 85% less factored receivable payoff of $1.6 million)
4) Changed the timing on the initial driver earn-out to $1,500 upfront instead of $1,000 (same total of $2,000 per driver but a quicker payout to you)
5) Put in a requirement that at least 145 drivers qualified and signed on by USX
6) Added a contingency based on the results of a background check on GF Kelly Trucking and Guy Kelly
7) We need to discuss the shop today.

Summary of potential earn-out:
1) Driver sign on of $2,000 per driver would generate you $255,000 upfront if we sign 170 drivers with the remaining $85,000 paid out over 6 months if all 170 stay on for a total driver sign on payment of $340,000
2) Driver pool earn-out of 24 months will generate you $400,000 if we maintain a pool of 170 drivers
3) You will receive up front $161,912 for the "plates & permits"
4) Receivable purchase if 100% collected would net you approximately $780,000
5) Tractor & trailer equity to you ????????? Waiting on payoff letters.

*Wholesale no Ls. L*



DEFENDANT'S EXHIBIT 43