# EXHIBIT "B"

**American Court Reporting**
**toll-free (877) 320-1050**

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

CIVIL ACTION NUMBER: 3:06-CV-351-MEF

G.F. KELLY TRUCKING, INC.; and GUY
KELLY, individually,
    Plaintiffs,
vs.
U.S. XPRESS ENTERPRISES, INC., et al.,
    Defendants.

DEPOSITION TESTIMONY OF
NELSON CHASTAIN

January 19, 2007
11:00 a.m.

COURT REPORTER:
MELANIE L. PETIX, CSR, CLR

Page 2

1   STIPULATIONS
2       It is hereby stipulated and
3   agreed, by and between the parties
4   through their counsel, that the
5   deposition of NELSON CHASTAIN may be
6   taken before Melanie L. Petix,
7   Certified Shorthand Reporter, Certified
8   LiveNote Reporter and Notary Public for
9   the State of Alabama at Large, at the
10  offices of Baker, Donelson, Bearman,
11  Caldwell & Berkowitz, Wachovia Tower,
12  420 20th Street North, Suite 1600,
13  Birmingham, Alabama 35203 on January
14  19, 2007, commencing at 11:00 a.m.
15      It is further stipulated and
16  agreed that the signature to and the
17  reading of the deposition by the
18  witness are waived, the deposition to
19  have the same force and effect as if
20  full compliance had been had with all
21  laws and rules of Court relating to the
22  taking of depositions.
23      It is further stipulated and

Page 3

1   agreed that it shall not be necessary
2   for any objections to be made by
3   counsel as to any questions except as
4   to form or leading questions, and that
5   counsel for the parties may make
6   objections and assign grounds at the
7   time of trial, or at the time said
8   deposition is offered in evidence, or
9   prior thereto.
10      In accordance with Rule 5(d)
11  of The Alabama Rules of Civil
12  Procedure, as amended, effective
13  May 15, 1988, I, Melanie L. Petix,
14  Certified Shorthand Reporter and
15  Certified LiveNote Reporter, am hereby
16  delivering to David B. Hall the
17  original transcript of the oral
18  testimony taken on January 19, 2007.
19      Please be advised that this is
20  the same and not retained by the Court
21  Reporter, nor filed with the Court.
22      --oOo--
23

Page 4

1       APPEARANCES
2
3   FOR THE PLAINTIFF:
4       JOHN EVERETT TOMLINSON, Esq.
5       BEASLEY, ALLEN, CROW, METHVIN,
6       PORTIS & MILES, P.C.
7       P.O. BOX 4160
8       MONTGOMERY, ALABAMA 36103-4160
9
10  FOR THE DEFENDANTS:
11      DAVID B. HALL, Esq.
12      BAKER, DONELSON, BEARMAN,
13      CALDWELL & BERKOWITZ, P.C.
14      Wachovia Tower
15      420 20th Street North, Suite 1600
16      Birmingham, Alabama 35203
17
18  ALSO PRESENT (via teleconference):
19      Lisa Pate
20      Melissa Kell
21
22
23

1 (Pages 1 to 4)

**www.AmericanCourtReporting.com**
**January 19, 2007**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 5

1  INDEX
2
3  EXAMINATION BY:            PAGE
4  MR. HALL                   7
5
6
7      EXHIBITS
8
9  (There were no exhibits
10 marked for identification.)
11
12         --oOo--
13
14
15
16
17
18
19
20
21
22
23

Page 6

1      I, Melanie L. Petix, a
2  Certified Shorthand Reporter, Certified
3  LiveNote Reporter and Notary Public for
4  the State of Alabama at Large, acting
5  as Commissioner, certify that on this
6  date, pursuant to the Alabama Rules of
7  Civil Procedure, and the foregoing
8  stipulations of counsel, there came
9  before me at the offices of Baker,
10 Donelson, Bearman, Caldwell &
11 Berkowitz, Wachovia Tower, 420 20th
12 Street North, Suite 1600, Birmingham,
13 Alabama 35203, on January 19, 2007,
14 commencing at or about 11:00 a.m.,
15 NELSON CHASTAIN, witness in the above
16 cause, for oral examination, whereupon,
17 the following proceedings were had:
18
19      NELSON CHASTAIN,
20 having been first duly sworn
21 (affirmed), was examined and testified
22 as follows:
23

Page 7

1       COURT REPORTER: Usual
2  stipulations?
3       MR. HALL: Please, ma'am.
4       MR. TOMLINSON: Sure.
5
6  EXAMINATION BY MR. HALL:
7   Q. Mr. Chastain, if you could,
8  please state your full name?
9   A. Nelson Chastain.
10  Q. C-h-a-s-t-a-i-n?
11  A. That's correct.
12  Q. Where do you live, Mr.
13 Chastain?
14  A. Opelika, Alabama.
15  Q. What's the address there?
16  A. ████████████████
17  Q. How long have you lived at
18 that address?
19  A. Seven and a half years.
20  Q. What do you currently do for a
21 living?
22  A. I have a specialized trucking
23 operation.

Page 8

1   Q. What does that mean?
2   A. It's a spotting service at
3  paper mills.
4   Q. What is the name of that
5  company?
6   A. K.C. Spotting.
7   Q. Do you own that by yourself?
8   A. Yes.
9   Q. Have you always owned that by
10 yourself?
11  A. No.
12
13     (Discussion off the record.)
14
15  A. The answer was no.
16  Q. (BY MR. HALL:) No. Okay.
17     How long have you owned that
18 by yourself?
19  A. Approximately two years.
20  Q. Do you currently own any other
21 companies?
22  A. No.
23  Q. Have you ever owned any other

2 (Pages 5 to 8)

**www.AmericanCourtReporting.com**
**January 19, 2007**

American Court Reporting
toll-free (877) 320-1050

Page 9

1  companies?
2      A.  Partially.
3      Q.  I guess a better way to put
4  that, have you been an investor in any
5  closely held companies?
6      A.  Not financially.
7      Q.  We will go back to the first
8  way I asked.
9          At one point in time, you
10 owned part of Kelly Trucking?
11     A.  That's correct.
12     Q.  When I say Kelly Trucking, you
13 know we are on the same page?
14     A.  Right.
15     Q.  You know, which company I'm
16 talking about?
17     A.  Right.
18     Q.  Have you owned any part of any
19 other companies?
20     A.  Yes.
21     Q.  All right.  What are those
22 companies, the names of those
23 companies?

Page 10

1      A.  G & N Spotting.
2      Q.  All right.
3      A.  NAC Trucking.
4      Q.  N-A-T?
5      A.  C.
6      Q.  Oh, okay.
7      A.  CWC Trucking.
8      Q.  All right.
9      A.  And Zellner Transfer.
10     Q.  What is a spotting service?
11     A.  We take empty trailers at a
12 paper mill, take them to the dock.
13 They load them and we bring them back.
14 A road driver will bring a trailer in,
15 drop his empty, and then he will pick
16 up a load and leave.  And my guys just
17 shuttle them back and forth from the
18 yard to the dock and handle the
19 check-in and computer work.
20     Q.  Is that the only thing that
21 K.C. Spotting does?
22     A.  A little maintenance, but it's
23 related to that.

Page 11

1      Q.  Who was the other owner of
2  K.C. Spotting or owners?
3      A.  Was?
4      Q.  Yes.  Was.
5      A.  Guy Kelly.  Guy Kelly.
6      Q.  I assume that G & N Spotting
7  is in the spotting business as well or
8  was?
9      A.  Yes.
10     Q.  Did you own that by yourself?
11     A.  No.
12     Q.  Did you own that with
13 Mr. Kelly?
14     A.  Yes.
15     Q.  Anybody else?
16     A.  No.
17     Q.  Was that a corporation?
18     A.  Yes.
19     Q.  Is it still in existence?
20     A.  No.
21     Q.  It dissolved?
22     A.  Yes.
23     Q.  When did it dissolve?

Page 12

1      A.  About a year ago, a little
2  over a year ago.
3      Q.  What is -- is it N-A -- is it
4  NAC?
5      A.  NAC.
6      Q.  What is NAC?
7      A.  That was a spotting service
8  also.
9      Q.  What about CWC Trucking?
10     A.  Same thing.
11     Q.  Zellner?
12     A.  It was a trucking company.
13     Q.  The spotting companies, were
14 they set up around a specific location?
15     A.  Yes.
16     Q.  K.C. Spotting did spotting at
17 a paper company; is that what you said?
18     A.  Yes.
19     Q.  Which one was that?
20     A.  International Paper.
21     Q.  Was that in Alabama?
22     A.  Augusta.
23     Q.  Augusta.  What about G & N

3 (Pages 9 to 12)

www.AmericanCourtReporting.com
January 19, 2007

**American Court Reporting**
toll-free (877) 320-1050

Page 13

1  Spotting, where was it?
2     A. MeadWestvaco in Mahrt,
3  Alabama. M-a-h-r-t. And Smurfit-Stone
4  in Stevenson, Alabama.
5     Q. What about NAC?
6     A. International Paper in
7  Prattville.
8     Q. And CWC?
9     A. Nabisco in Atlanta.
10    Q. Did you own NAC and CWC with
11 Mr. Kelly?
12    A. I believe NAC was. I can't
13 remember if CWC was or not.
14    Q. What is the current status of
15 NAC?
16    A. It's closed.
17    Q. Closed? Did it cease
18 operation and still exist or was it
19 dissolved?
20    A. It was dissolved.
21    Q. Did you own it by yourself
22 when it dissolved?
23    A. Yes, I believe. Yes.

Page 14

1     Q. When did Mr. Kelly get out of
2  it?
3     A. Probably about two years ago.
4        MR. HALL: Melissa, can you
5  hear okay?
6        MS. KELL: Oh, yeah. I can
7  hear fine.
8     Q. (BY MR. HALL:) What is the
9  status of CWC Trucking?
10    A. It's dissolved.
11    Q. Were each of these Alabama
12 companies?
13    A. Yes.
14    Q. Was Mr. Kelly an investor or
15 owner in Zellner Transfer?
16    A. Yes.
17    Q. Is it still in operation?
18    A. No. It's been bought out
19 several times.
20    Q. Were you and Mr. Kelly owners
21 of Zellner when it was purchased from
22 you?
23    A. Try that again. Because this

Page 15

1  goes back to the early '90s. We were
2  small partners compared to the other
3  ones in the firm.
4     Q. I was going to ask, maybe we
5  can start back to when it was
6  purchased.
7     A. Yeah. '88.
8     Q. '88. Was it a stock purchase?
9  Do you know what kind of purchase it
10 was?
11    A. Asset.
12    Q. Asset. And there were other
13 owners of the company besides yourself
14 and Mr. Kelly?
15    A. Correct.
16    Q. What type of trucking company
17 was it?
18    A. General commodity, truckload.
19    Q. Regional?
20    A. Yes.
21    Q. How many tractors do they have
22 or operate?
23    A. About 80.

Page 16

1     Q. Is that owner/operators?
2     A. Company.
3     Q. Did it have any
4  owner/operators?
5     A. A few.
6     Q. Were you involved at all in
7  the sale of the assets of Zellner?
8     A. No.
9     Q. Was that handled by someone
10 other than you and Mr. Kelly?
11    A. Yes.
12    Q. Have you ever sold a company
13 that you owned?
14    A. No.
15    Q. Have you ever purchased a
16 company?
17    A. No.
18    Q. I'm going to ask you about
19 your education background and your work
20 history.
21    A. Okay.
22    Q. Just for simplicity's sake,
23 I'm going to start with education and

4 (Pages 13 to 16)

www.AmericanCourtReporting.com
**January 19, 2007**

Page 17

1  just go chronologically forward, if
2  that's all right.
3     A. Okay.
4     Q. Where did you finish high
5  school?
6     A. I finished in Atlanta in '66.
7     Q. Did you have any education
8  after high school?
9     A. Yes.
10    Q. Where at?
11    A. University of Georgia.
12    Q. Did you graduate?
13    A. Yes.
14    Q. What type of degree did you
15 obtain?
16    A. DBA in finance.
17    Q. Any postgraduate?
18    A. No.
19    Q. Where did you go to work after
20 college?
21    A. Overnite Transportation
22 Company.
23    Q. What year was that?

Page 18

1     A. Well, I was there part time
2  for five years and started full time in
3  '71.
4     Q. Did you work there part time
5  in college?
6     A. Yes.
7     Q. What did you do?
8     A. Dock work.
9     Q. What did you do when you went
10 to work for them full time?
11    A. Really, I was in their
12 management training program. So I did
13 everything.
14    Q. Learned the ropes in the
15 trucking industry?
16    A. Yes.
17    Q. Is Overnite less than load?
18    A. Yes, less than truckload.
19    Q. Didn't FedEx or somebody just
20 buy them?
21    A. UPS.
22    Q. UPS. How long did you work
23 with Overnite?

Page 19

1     A. Nine years full time.
2     Q. Until roughly 1980?
3     A. Yes, approximately.
4     Q. You mentioned a management
5  training program. I assume that at
6  some point in time, you finished that;
7  is that right?
8     A. Yes.
9     Q. After you finished the
10 management training program, what was
11 your job title?
12    A. I don't know if I had a title.
13    Q. What did you do? Maybe that
14 would be a better way.
15    A. I ended up as assistant
16 manager.
17    Q. Of a terminal?
18    A. Yes. In Baltimore.
19    Q. What other things did you do
20 with Overnite?
21    A. Everything except drive and
22 mechanic.
23    Q. Sales?

Page 20

1     A. Safety personnel, operations,
2  dispatch, rating, collections.
3     Q. Where did you go after you
4  left Overnite?
5     A. I came back home to Atlanta
6  with a company called National Freight.
7     Q. How long were you with
8  National Freight?
9     A. About six months.
10    Q. What did you do for National
11 Freight?
12    A. Terminal manager.
13    Q. Where did you go after --
14    A. McClendon Trucking.
15    Q. Was that still in 1980?
16    A. '81, I believe.
17    Q. '81?
18    A. Somewhere right around there.
19    Q. How long did you stay with
20 McClendon?
21    A. About eight years.
22    Q. What did you do at McClendon?
23    A. I was VP of operations, and

5 (Pages 17 to 20)

American Court Reporting
toll-free (877) 320-1050

Page 21

1  was in sales initially.
2      Q. Where were you located?
3      A. La Fayette, Alabama.
4      Q. Did Mr. Kelly work for you
5  there?
6      A. Yes.
7      Q. What did he do there?
8      A. Sales.
9      Q. How long did he work for you
10 there?
11     A. I would say about two years.
12     Q. Were you his boss?
13     A. Not directly.
14     Q. Is that where met Mr. Kelly?
15     A. Yes.
16     Q. Did you do anything besides VP
17 of operations and sales while you were
18 with McClendon?
19     A. That's it.
20     Q. That's enough?
21     A. That was enough.
22     Q. After McClendon, what did you
23 do?

Page 22

1      A. Zellner Transfer.
2      Q. How long were you with
3  Zellner?
4      A. About two and a half years.
5      Q. Was that roughly --
6      A. '90, '91, somewhere.
7      Q. Until '90, '91?
8      A. Yeah.
9      Q. What did you do with Zellner?
10     A. VP-operations, and sales.
11     Q. Did Mr. Kelly work at Zellner?
12     A. Yes.
13     Q. Did he work for you there?
14     A. Yes.
15     Q. What was his job there?
16     A. Sales.
17     Q. Anything besides sales?
18     A. Whatever we needed done. He
19 drove a truck. He -- whatever.
20     Q. When you went to Zellner, did
21 you buy in or were you given some
22 ownership?
23     A. I was given ownership.

Page 23

1      Q. Was that the same thing with
2  Mr. Kelly?
3      A. Yes.
4      Q. I may have misunderstood you.
5  My notes reflect that Zellner was --
6  the asset purchase was in '88?
7      A. Uh-huh.
8      Q. Did you go to work after the
9  asset purchase?
10     A. The same time. September of
11 '88 is when the deal went down.
12     Q. You worked at Zellner until
13 '90, '91?
14     A. Yes.
15     Q. Were you an owner in Zellner
16 in '88?
17     A. When Zellner was bought out, I
18 was given some ownership in the
19 company.
20     Q. Okay. It was bought out in
21 '88?
22     A. Yes.
23     Q. And you were given ownership

Page 24

1  at that time?
2      A. At that time.
3      Q. I'm sorry. I thought we were
4  talking about when you got out of
5  Zellner.
6      A. No. No. I gave back the
7  ownership at that time.
8      Q. When you left, you gave your
9  ownership --
10     A. Yes.
11     Q. To your knowledge, was
12 Mr. Kelly in the same ownership plan?
13     A. Yes.
14     Q. So when he left, he gave back
15 his ownership as well?
16     A. (Nods head.)
17     Q. You have to say yes or no,
18 please.
19     A. Yes.
20     Q. After Zellner, what did you
21 do?
22     A. Sunbelt Transfer.
23     Q. Where is that?

6 (Pages 21 to 24)

www.AmericanCourtReporting.com
January 19, 2007

Page 25

1  A. Waco, Georgia.
2  Q. What did you do at Waco?
3  A. I started off in sales.
4  Q. I assumed something, that you
5  were in Waco, Georgia; is that right?
6  A. That's where the office was,
7  yes.
8  Q. You were in sales. Anything
9  else?
10  A. And ended up as VP-operations
11  and sales.
12  Q. What does a VP of operations
13  do?
14  A. Runs the place.
15  Q. How long were you with
16  Sunbelt?
17  A. A year.
18  Q. So you left in roughly '92?
19  A. Yeah.
20  Q. Where did you go then?
21  A. Builders Transport, Camden,
22  South Carolina.
23  Q. Are all these carriers

Page 26

1  truckload carriers?
2  A. Yes. Except Overnite.
3  Q. Except Overnite?
4  A. Uh-huh.
5
6     (Discussion off the record.)
7
8  Q. (BY MR. HALL:)
9  O-v-e-r-n-i-t-e; is that right?
10  A. Yes.
11  Q. How long were you with
12  Builders Transport?
13  A. Three and a half years,
14  approximately.
15  Q. Again, what did you do with
16  Builders Transport?
17  A. I was director of customer
18  service and planning.
19  Q. You said Builders Transport
20  was in South Carolina?
21  A. Camden, South Carolina.
22  Q. Was your job title pretty much
23  the same the entire time you were

Page 27

1  there?
2  A. The whole time.
3  Q. Where did you go after
4  Builders Transport?
5  A. Kelly Trucking.
6  Q. Do you remember what year you
7  started?
8  A. '95.
9  Q. How did you get from Builders
10  to Kelly Trucking?
11  A. Guy Kelly.
12  Q. Did Mr. Kelly work with you at
13  Sunbelt or Builders Transport?
14  A. No.
15  Q. So y'all were separated
16  roughly between '91 and '95?
17  A. Right.
18  Q. Did he recruit you to come
19  back?
20  A. Yes.
21  Q. Why did he want you to come
22  back?
23  A. He needed help.

Page 28

1  Q. What kind of help did he need?
2  A. Basically, somebody to run --
3  Q. The company?
4  A. -- run the company.
5  Q. Were you given ownership in
6  Kelly Trucking when you came back?
7  That's not right. When you came to
8  work with --
9  A. Shortly thereafter.
10  Q. What condition was Kelly
11  Trucking in when you went to work there
12  in '95?
13  A. Small.
14  Q. How many tractors?
15  A. I think there were five
16  company and 20 owner/operators.
17  Q. Was there a plan to grow the
18  company?
19  A. No, no written plan or formal
20  plan.
21  Q. Was that something that -- you
22  coming back, was that part of your job,
23  was to grow it?

7 (Pages 25 to 28)

American Court Reporting
toll-free (877) 320-1050

Page 29

1  A. Yes. The game plan was to
2  grow as long as we enjoyed what we were
3  doing.
4  Q. What was the financial
5  condition of the company when you came
6  back in '95?
7  A. I couldn't tell you.
8  Q. Did you have anything to do
9  with the finances?
10 A. No.
11    MR. HALL: Off the record.
12
13    (Discussion off the record.)
14
15 Q. (BY MR. HALL:) Did that stay
16 that way until the time -- until the
17 end of '95?
18 A. Yes.
19 Q. You stayed out of the
20 finances?
21 A. Yes.
22 Q. What was your title?
23 A. VP-operations.

Page 30

1  Q. I'm talking about Kelly
2  Trucking specifically. What things did
3  you do?
4  A. I oversaw sales, oversaw
5  dispatch.
6  Q. Okay.
7  A. That's specifically. And
8  being a vice-president, was involved in
9  AR, billing.
10 Q. Did you have anything to do
11 with drivers or safety?
12 A. Initially, yes. But as we
13 grew out, I got out of it.
14 Q. But 1994 -- 2004, excuse me.
15 A. Okay.
16 Q. By 2004, were you involved
17 with drivers or safety at all?
18 A. No.
19 Q. Who was in charge of that?
20 A. Frank Childers.
21 Q. How long had Mr. Childers been
22 with -- how long was Mr. Childers with
23 Kelly Trucking?

Page 31

1  A. He was there two different
2  times, and I couldn't give you an exact
3  time frame or the length on either.
4  Q. He was there in 2004 and 2005,
5  though?
6  A. I believe so. 2005, yes.
7  2004, I can't -- I'm not sure what the
8  time frame was.
9  Q. You said Mr. Childers was
10 there two times?
11 A. Yes.
12 Q. Who was Mr. Childers'
13 predecessor the second time he came or
14 the second time he worked for Kelly?
15 A. Bill Callahan, I believe, was
16 his name.
17 Q. I take it, you haven't kept up
18 with Mr. Callahan?
19 A. No.
20 Q. Do you have any idea where
21 he's working today?
22 A. No.
23 Q. Why did Mr. Callahan leave?

Page 32

1  A. He was terminated.
2  Q. Why?
3  A. We had a conditional safety
4  rating. Mr. Callahan's position -- job
5  was to get us out from under it, which
6  he failed to do.
7  Q. What does a conditional safety
8  rating mean?
9  A. The Department of
10 Transportation will evaluate your
11 compliance with their rules. There's
12 three degrees: There's satisfactory,
13 conditional and closure. Conditional
14 gives you an opportunity to get your
15 programs in place to come up to
16 standard.
17 Q. What things did the DOT
18 indicate that Kelly Trucking had to
19 bring up to standard?
20 A. Logs.
21 Q. Anything else?
22 A. I believe that was the major
23 issue.

8 (Pages 29 to 32)

Page 33

1   Q. There was some testimony about
2 drug testing. Was that any part of it?
3   A. There may have been. I don't
4 recall.
5   Q. Okay. What was the issue with
6 the logs?
7   A. Falsification.
8   Q. Falsification?
9   A. (Nods head.)
10   Q. Sorry. You have to say yes or
11 no.
12   A. Yes.
13   Q. Was that by the drivers?
14   A. Yes.
15   Q. So was this a matter of Kelly
16 Trucking auditing those or making sure
17 that they were accurate?
18   A. Yes.
19   Q. Why was Mr. Childers brought
20 back?
21   A. To resolve the issue of the
22 rating.
23        MR. HALL: By the way, this is

Page 34

1 off the record.
2
3   (Discussion off the record.)
4
5   Q. (BY MR. HALL:) Do you
6 remember roughly how long Mr. Childers
7 had been back when U.S. Xpress and
8 Kelly started talking?
9   A. A year or so.
10   Q. During that time, did Kelly
11 Trucking's safety rating change --
12   A. Yes.
13   Q. -- to satisfactory?
14   A. Yes.
15   Q. If you know, what were Kelly
16 Trucking's hiring criteria for drivers
17 in 2004 and 2005?
18   A. Specifically, I couldn't tell
19 you.
20   Q. Okay. Would Mr. Childers know
21 that?
22   A. He should know, yes.
23   Q. Were they written down

Page 35

1 anywhere?
2   A. I don't know.
3   Q. Driver's issue, Mr. Childers?
4   A. What?
5   Q. It's a driver's issue, so that
6 would be for Mr. Childers?
7   A. Yes. Yes.
8   Q. Did you have anything to do
9 with accounts payable?
10   A. No.
11   Q. Did you have anything to do
12 with the purchase of equipment or --
13   A. No.
14   Q. -- leasing equipment?
15      That's no for both?
16   A. Right.
17   Q. Did you have any conversations
18 with any of Kelly Trucking's debtors
19 such as Volvo Finance?
20   A. No.
21   Q. Did you have anything to do
22 with -- I understand there was a
23 factoring agreement on the accounts

Page 36

1 receivable?
2   A. Yes.
3   Q. Were you involved with that?
4   A. Very little.
5   Q. Who handled that?
6   A. Dennis Hamlet.
7   Q. What was his title at Kelly
8 Trucking?
9   A. He was the controller.
10   Q. And I understand, in 2005,
11 that Randall Fant replaced him?
12   A. That's correct.
13   Q. Why did Mr. Hamlet leave?
14   A. Really, I don't know. He
15 found another job, but I don't know if
16 it --
17   Q. He wasn't terminated?
18   A. No.
19   Q. Who terminated Mr. Callahan?
20   A. Frank Childers.
21   Q. What was Frank's job when
22 Mr. Callahan was terminated?
23   A. I think he was the director of

9 (Pages 33 to 36)

Page 37

1  safety and personnel at that time.
2  Q. So Mr. Callahan was still
3  there when Mr. Childers was brought
4  back?
5  A. Yes.
6  Q. You were over sales. Who were
7  the salespeople.
8  A. We had a guy named Don Johnson
9  and Gary Profitt.
10
11  (Discussion off the record.)
12
13  Q. (BY MR. HALL:) What did Gary
14  Hopper do?
15  A. He was an agent.
16  Q. Did you have any other agents
17  besides Gary Hopper?
18  A. Yes.
19  Q. I'm sorry. I'm talking about
20  in the 2004-2005 time frame.
21  A. Yes.
22  Q. Who was that?
23  A. John Kennedy.

Page 38

1  Q. When you say agent, you mean
2  they are independent contractors?
3  A. Yes.
4  Q. Was Mr. Hopper's -- was his
5  company Rainbow Logistics?
6  A. That's correct.
7  Q. What was Mr. Kennedy's
8  company?
9  A. I don't know if he had a name.
10  Q. What is the current status of
11  Kelly Trucking, if you know?
12  A. I don't.
13  Q. When did you leave Kelly
14  Trucking?
15  A. November of '05.
16  Q. Why did you leave?
17  A. We were going in different
18  directions.
19  Q. You say we, is that in
20  reference to Mr. Kelly?
21  A. Yes.
22  Q. Were you the sole owners of
23  Kelly Trucking?

Page 39

1  A. Yes. Yes, I believe so.
2  Q. Okay.
3  A. At one time, there was
4  somebody else, but --
5  Q. On the Purchase Agreement with
6  U.S. Xpress, it has Mr. Kelly as 80
7  percent and you as 20 percent. Is that
8  the way you recall it?
9  A. Yes.
10  Q. When you say, we were going in
11  different directions, is that
12  directions with the company or
13  directions -- maybe a better way, what
14  do you mean by that?
15  A. Guy was involved in some other
16  things.
17  Q. All right. And you didn't
18  want to be involved in those?
19  A. No.
20  Q. What was Mr. Kelly involved
21  in?
22  A. Logging was a big part of it.
23  Q. Was there anything else?

Page 40

1  A. He had some other interests.
2  Q. You mean business interests?
3  A. Yes.
4  Q. Were those -- I'm going to try
5  to understand this. And if I, in my
6  feeble way of understanding it, get it
7  wrong, you clear it up. Okay?
8  A. Okay.
9  Q. Did Kelly Trucking own these
10  companies?
11  A. No.
12  Q. Was it that he was devoting
13  more time to these other companies than
14  to Kelly Trucking?
15  A. Yes.
16  Q. What I'm trying to get to is,
17  how did these other interests affect
18  Kelly Trucking and your decision to
19  split up?
20  A. The growth of Kelly Trucking
21  stopped, and Guy's direction was to get
22  more heavily involved in logging, the
23  grocery store.

10 (Pages 37 to 40)

Page 41

1  Q. When did the growth begin to
2  stop?
3  A. Probably about 2004. Sometime
4  that year, I would imagine.
5  Q. What were Mr. Kelly's -- what
6  was his title at Kelly Trucking?
7  A. President.
8  Q. President. What did he do for
9  Kelly Trucking?
10 A. He handled the -- equipment
11 purchasing was Guy's. The finance was
12 his to a degree with Dennis, and I'm
13 not sure how they broke that up.
14 Q. Okay. Anything else?
15 A. For the most part, that was
16 his.
17 Q. That's it? Beginning, say,
18 from January 2004, how involved was
19 Mr. Kelly with Kelly Trucking?
20 A. I couldn't give you a
21 percentage-wise.
22 Q. Was he there enough, in your
23 opinion?

Page 42

1  A. He was there enough to do what
2  he needed to do.
3  Q. Do you know whether he made a
4  conscious decision to stop the growth
5  of Kelly Trucking?
6  A. I couldn't tell you.
7  Q. The other interests, were they
8  pulling him away from Kelly Trucking?
9  A. Yes. Yes, they would.
10 Q. Who made the decision to hire
11 Mr. Fant?
12 A. I did.
13 Q. You did? Was Mr. Hamlet still
14 there?
15 A. No -- yes, he was.
16 Q. What was the purpose of hiring
17 Mr. Fant?
18 A. Mr. Hamlet had given us a
19 notice, two-week notice.
20 Q. Mr. Fant wasn't brought back
21 for any specific project?
22 A. No. No. Just as a
23 replacement.

Page 43

1  Q. I may have asked you this.
2  You don't know what the
3  financial condition of Kelly Trucking
4  was beginning in 2005 or do you know?
5  A. I couldn't tell you exactly,
6  no. I mean, I have seen some
7  financials, but I really couldn't say.
8  Q. At that time, what was your
9  opinion as to the health of Kelly
10 Trucking?
11 A. Since we ended up factoring,
12 I'm going to say it wasn't the best.
13 Q. When did Kelly Trucking enter
14 into the Factoring Agreement?
15 A. It was probably sometime in
16 2004. I'm not exactly sure.
17 Q. Was that to help with cash
18 flow?
19 A. Yes.
20 Q. If you know, how did U.S.
21 Xpress and Kelly Trucking get together?
22 A. Specifically, I don't know.
23 Q. Was Kelly Trucking looking to

Page 44

1  sell?
2  A. I would say yes.
3  Q. Had there been discussions
4  prior to 2005 about selling?
5  A. Yes.
6  Q. I assume discussions between
7  yourself and Mr. Kelly?
8  A. Yes.
9  Q. When did those discussions
10 first start, if you remember?
11 A. Probably around sometime in
12 2004.
13 Q. Why?
14 A. I think Guy wanted to get out,
15 pursue some other interests.
16 Q. Were you involved in the
17 negotiations with U.S. Xpress?
18 A. No.
19 Q. Prior to April of 2005, had
20 Kelly Trucking entered into any
21 discussions with any other potential
22 purchaser?
23 A. Yes. Yes.

11 (Pages 41 to 44)

Page 45

1  Q. Who?
2  A. Ken Smith.
3  Q. Do you know if he had a
4  trucking company or was it an
5  individual?
6  A. It was an individual.
7  Q. Where is Mr. Smith from?
8  A. Scottsdale, Arizona.
9  Q. When were these discussions?
10 A. 2004, I believe.
11 Q. Do you know how far they got?
12 A. Pretty far.
13 Q. Obviously, it didn't close?
14 A. Did not close.
15 Q. Do you know when the
16 discussions ended?
17 A. A guess would be the winter of
18 2005.
19 Q. Was Kelly Trucking negotiating
20 with Mr. Smith throughout 2005?
21 A. No.
22 Q. When did --
23 A. Latter part of 2004.

Page 46

1  Q. Okay.
2  A. It ended in 2005, first of the
3  year.
4  Q. First of the year. Okay. I'm
5  sorry.
6  A. Winter.
7  Q. I got you. Early 2005?
8  A. Right.
9  Q. Were you involved at all in
10 those negotiations?
11 A. Limited.
12 Q. Do you know what type of
13 purchase was contemplated?
14 A. It was an asset purchase, I
15 believe.
16 Q. Was it similar to the
17 negotiations with U.S. Xpress? I'm
18 talking about an asset purchase. Same
19 type of --
20 A. I believe so.
21 Q. Do you know why those
22 negotiations with Mr. Smith terminated?
23 A. Yes.

Page 47

1  Q. Why?
2  A. He failed to come up with the
3  funds.
4  Q. Did Kelly Trucking have any
5  negotiations with any other potential
6  or interested buyer?
7  A. What time frame?
8  Q. 2004, 2005.
9  A. There was discussion with
10 Floyd & Beasley. There was discussion
11 with, I think it's H.O. Smith. And I
12 believe those are the only two that I
13 can recall.
14 Q. Where is Floyd & Beasley from?
15 A. Sycamore, Alabama.
16 Q. What about H.O. Smith?
17 A. Cullman.
18 Q. Floyd & Beasley is a trucking
19 company. H.O. Smith, is that a
20 trucking company?
21 A. Trucking company.
22 Q. Is that James R.
23 A. James R. I don't know where I

Page 48

1  got H.O.
2  Q. I got you.
3  A. Okay.
4  Q. When did Kelly Trucking talk
5  with Floyd & Beasley?
6  A. I'm going to say spring of
7  2005.
8  Q. Before U.S. Xpress?
9  A. I believe it was.
10 Q. Did Floyd & Beasley and Kelly
11 Trucking reach the point where they
12 entered into a letter of intent?
13 A. No. I think it was just
14 discussions.
15 Q. What about with James R.
16 Smith?
17 A. It was fall of 2005.
18 Q. Do you know whether Kelly
19 Trucking and James R. Smith entered
20 into any kind of letter of intent?
21 A. I don't believe so. I don't
22 think so, no.
23 Q. When do you first recall U.S.

12 (Pages 45 to 48)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 49

1  Xpress -- learning of U.S. Xpress'
2  interest in purchasing Kelly Trucking?
3      A.  I believe it was the first of
4  June of '05.
5      Q.  How did you learn about it?
6      A.  Guy told me.
7      Q.  What did he say?
8      A.  He said he was thinking about
9  selling out to U.S. Xpress and they
10 were coming in for a meeting.
11         MR. HALL:  Let me take a break
12 for just a second.
13
14         (Discussion off the record.)
15
16     Q.  (BY MR. HALL:)  What was your
17 first contact with anyone from U.S.
18 Xpress?
19     A.  It was Dennis Farnsworth in
20 June.  I believe it was June.
21     Q.  Was that in person, over the
22 phone?
23     A.  In person.

Page 50

1      Q.  What was that about?
2      A.  Acquiring the company.
3      Q.  Do you remember the
4  discussion?
5      A.  They had basically three plans
6  that they used in acquiring other firms
7  and went over each one of them, and
8  wanted to go back and decide which
9  would be best for U.S. Xpress.
10     Q.  Prior to that discussion, had
11 you had any discussions with Mr. Kelly
12 about the sale?  I know you said, on
13 June 1st, Mr. Kelly said he was
14 thinking about selling or something to
15 that effect.
16     A.  Yeah.
17     Q.  Did you have any meetings or
18 anything with Mr. Kelly prior to your
19 meeting with Mr. Farnsworth?
20     A.  Not a meeting.  Just he
21 mentioned that he was coming in, to be
22 available.
23     Q.  Y'all didn't discuss details?

Page 51

1      A.  No.
2      Q.  And as best you recall, that
3  was the substance of your conversation
4  with Mr. Farnsworth on that first
5  occasion?
6      A.  Yeah, initially.  Yes.
7      Q.  When was your next discussion
8  with anyone from U.S. Xpress?
9      A.  A few weeks later, they came
10 back in with a proposal, I believe it
11 was.
12     Q.  Was that in the form of a
13 letter of intent?
14     A.  I don't recall.
15     Q.  Okay.  Do you recall whether
16 it was in written form?
17     A.  I don't recall.
18     Q.  Did you have a conversation
19 with anybody with U.S. Xpress?
20     A.  No.
21     Q.  Were you at a meeting with
22 folks from Kelly Trucking and U.S.
23 Xpress?

Page 52

1      A.  No.
2      Q.  Do you remember what the
3  proposal was?
4      A.  No.
5      Q.  How did you learn about the
6  proposal?
7      A.  Guy told me later.
8      Q.  Do you recall what Guy told
9  you?
10     A.  They had a proposal in, and
11 they wanted to acquire the company and
12 they wanted to move fairly rapidly and
13 needed some information from each of
14 us.  And I had to get some stuff
15 together to send to them.
16     Q.  Was this July?
17     A.  Probably.
18     Q.  Do you recall whether it was
19 before or after the holiday, the
20 Fourth?
21     A.  I couldn't recall.
22     Q.  Do you remember what
23 information that you needed to gather?

13 (Pages 49 to 52)

**www.AmericanCourtReporting.com**
**January 19, 2007**

Page 53

1  A. I got information on sales,
2  customers, revenue per truck by month,
3  turnover ratios, I think some age --
4  employment ages, length of service, and
5  a few other operational statistics.
6     Q. You said turnover ratios, is
7  that --
8     A. Drivers.
9     Q. -- drivers?
10    A. Yes.
11    Q. How long did it take you to
12 gather that information?
13    A. Half a day, day.
14    Q. When was the next discussion
15 with anyone about the purchase -- for
16 purposes of this deposition, I'm going
17 to call it the purchase negotiations,
18 something along those lines. You will
19 know what I'm talking about?
20    A. Yes.
21    Q. When was the next discussion
22 with anyone about the negotiations?
23    A. Probably with Dennis, as far

Page 54

1  as I remember.
2     Q. Dennis Farnsworth?
3     A. Farnsworth.
4     Q. Dennis Hamlet is gone by this
5  time?
6     A. Yes.
7     Q. Do you remember what time
8  frame?
9     A. No. I would say late July,
10 but I couldn't say specifically.
11    Q. Do you remember what it was
12 about?
13    A. That they were going to go
14 ahead and move forward. They wanted me
15 to -- they were going to retain me as
16 general manager in charge of the
17 operation. They were going to leave it
18 there in Wadley.
19    Q. Was there any discussion about
20 a closing date?
21    A. Soon.
22    Q. By that, do you mean they were
23 going to try to close soon?

Page 55

1     A. As soon as they could, yes.
2     Q. Did you have any discussions
3  about the terms of the purchase?
4     A. No, not really.
5     Q. Anything about conditions to
6  closing?
7     A. The main thing was, they were
8  wanting to be able to secure as many
9  drivers as possible.
10    Q. Do you remember a specific
11 number that they needed?
12    A. No. Well, no, I can't
13 remember. I mean, I have some numbers
14 in my mind, but I can't honestly say I
15 can remember the exact number they were
16 looking for.
17    Q. Okay. How many drivers did
18 Kelly Trucking have in July of '05?
19    A. Let's see, 160, 170, somewhere
20 in that range.
21    Q. And were these drivers
22 actually driving under Kelly Trucking's
23 authority?

Page 56

1     A. Company and owner/operators,
2  yes.
3     Q. Did any of these drivers --
4  I'm going to put owner/operators and
5  employee drivers under the same
6  heading, and I'm going to call them the
7  Kelly drivers.
8        Did any of the Kelly drivers
9  drive for any of Mr. Kelly's other
10 businesses?
11    A. On a part-time basis.
12    Q. Which entities?
13    A. The logging, chip business.
14    Q. Did any of them drive for any
15 of the spotting companies?
16    A. No.
17    Q. Were any of these spotting
18 drivers included in --
19    A. No.
20    Q. Let me finish my question.
21    A. Sorry.
22    Q. That's all right.
23       Were they included in the

14 (Pages 53 to 56)

American Court Reporting
toll-free (877) 320-1050

## Page 57

1. total number of drivers with Kelly
2. Trucking?
3.    A. No.
4.    Q. So this estimate, and I
5. understand it is an estimate, of 160 to
6. 170 is just Kelly employees and/or
7. Kelly owner/operators?
8.    A. That's what I believe.
9.    Q. Okay. Mr. Childers would be
10. probably the right person to talk to
11. about that?
12.    A. That's correct.
13.    Q. Did you ever review any of the
14. Purchase Agreements between Kelly
15. Trucking and/or between -- who was it
16. between?
17.    U.S. Xpress and -- between
18. U.S. Xpress and Kelly Trucking, Guy
19. Kelly or yourself?
20.    A. Yes.
21.    Q. When is the first time you saw
22. a copy of the Asset Purchase Agreement?
23.    A. Probably July, I guess.

## Page 58

1.    Q. Was it before your discussion
2. with Mr. Farnsworth in late July?
3.    A. I couldn't say. I don't
4. remember.
5. 
6.    (Discussion off the record.)
7. 
8.    Q. (BY MR. HALL:) I will show
9. you what was previously marked as
10. Defendant's Exhibit 35. Do you recall
11. seeing that before?
12.    A. I don't. I have seen
13. something, but I can't honestly say
14. that was it. It's been so long.
15.    Q. Okay. I will show you what's
16. been marked as Defendant's Exhibit 37,
17. which is a letter to Mr. Kelly.
18.    A. Okay.
19.    Q. Do you recall if you ever saw
20. that?
21.    A. Yes.
22.    Q. I'm going to show you two
23. additional documents; one is marked

## Page 59

1. Defendant's Exhibit 40 and the other is
2. marked Defendant's Exhibit 45, and ask
3. if you remember seeing those two copies
4. of the Asset Purchase Agreement?
5.    A. There is some information in
6. here that I remember. Whether it's the
7. exact document or not, I couldn't
8. answer that.
9.    Q. Okay. I understand the one
10. marked 40 --
11.    A. Okay.
12.    Q. -- was a version sent to
13. Mr. Kelly in July, and the one marked
14. 45 was sent the first week of August
15. with some changes in it.
16.    Do you recall there being two
17. versions?
18.    A. No.
19.    Q. On the last page of Exhibit
20. 45, there is a signature line, and
21. above it there is a signature where
22. it's typewritten Nelson Chastain. Is
23. that your signature?

## Page 60

1.    A. That's it.
2.    Q. Did you have a meeting with
3. Mr. Kelly about the Purchase Agreement
4. before you signed it?
5.    A. Yes.
6.    Q. Was anybody else at that
7. meeting?
8.    A. I don't recall.
9.    Q. I shouldn't have assumed that.
10.    Was there more than one
11. discussion about the Purchase Agreement
12. before you signed it?
13.    A. I don't remember that.
14.    Q. Do you remember your
15. discussions with Mr. Kelly or otherwise
16. about the Purchase Agreement?
17.    A. No.
18.    Q. Did you seek any type of legal
19. counsel with regard to the Purchase
20. Agreement?
21.    A. No.
22.    Q. Do you know if Mr. Kelly did?
23.    A. I would say yes, but I can't

15 (Pages 57 to 60)