# EXHIBIT "C"

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

G.F. KELLY TRUCKING, INC., and
GUY KELLY, individually,

Plaintiffs,
Civil Action No.
v. C:06cv00351-MEF

U.S. XPRESS ENTERPRISES, INC.,
et al.,

Defendants.

February 5, 2007
Richmond, Virginia

The deposition of DENNIS FARNSWORTH, a Witness, taken at the instance of the Plaintiffs, before Kimberly A. Heiser, RPR, CCR, a Notary Public for the State of Virginia at Large, beginning at 2:30 p.m., at Williams Mullen, 1021 East Cary Street, Richmond, Virginia.

COOK & WILEY, INC.
Registered Professional Reporters
3751 Westerre Parkway, Suite D-1
Richmond, Virginia 23233
(804) 359-1984



APPEARANCES:

Clinton G. Carter, Esquire
John E. Tomlinson, Esquire
BEASLEY, ALLEN, CROW, METHVIN, PORTIS & MILES, PC
272 Commerce Street
Montgomery, Alabama 36103
(334) 269-2343
Counsel for the Plaintiffs

David B. Hall, Esquire
BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, PC
420 20th Street North
Birmingham, Alabama 35203
(205) 244-3831
Counsel for the Defendants

ALSO PRESENT:
Al Hingst

E X H I B I T S

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Deposition notice | 40 |
| 2 | Deposition notice | 40 |
| 3 | Bates Nos. 208-221 | 118 |
| 4 | Bates No. 303 | 118 |
| 5 | Bates No. 285 | 118 |
| 6 | Bates No. 035 | 118 |

CERTIFIED COPY





DENNIS FARNSWORTH, a Witness, called by the Plaintiffs, first being duly sworn, testified as follows:

EXAMINATION BY MR. CARTER:

Q State your full name please, sir.
A Dennis Ray Farnsworth.
Q Mr. Farnsworth, my name is Clint Carter, and I think you know that I along with John Tomlinson and the law firm of Beasley Allen represent G.F. Kelly Trucking, Inc., and Guy Kelly in a lawsuit pending down in Alabama against U.S. Xpress Enterprises, Inc. Are you aware of that?
A Yes, I am.
Q Have you ever given a deposition before?
A One time before.
Q You understand that you just took an oath to tell the truth just like we're in front of the jury?
A Yes.
Q I'm going to be asking you a series of questions today. Do your best to give me a verbal answer instead of a gesture or a head shake so Kimberly can get everything down. Okay?
A Yes.





Q I don't know Kimberly, but I've seen court reporters get really mad if you don't do that. Let me finish my question before you start your answer. Okay?
A Okay.
Q You're getting her mad already. I'll let you finish your answer before I ask you another question. All right?
A Okay.
Q Your lawyer is here next to you. If at any time you need an opportunity to stop and talk with him or to take a restroom break or whatever, I'll be glad to accommodate you as long as there is not a question pending. Is that fair?
A Yes.
Q Before we get into the facts that gave rise to this case, I want to find out a little bit about your background. Tell me, sir, where you were born and raised.
A McPherson, Kansas.
Q Did you go to high school there?
A Yes, I did.
Q Where did you go to high school?
A McPherson High School.
Q What year did you graduate?
A 1970.

Q What did you do when you graduated high school?
A Went to college.
Q Where did you go?
A Went to McPherson College for two years and then Wichita State University for my final two years.
Q Did you get a degree from Wichita State?
A Yes, I did.
Q What was it?
A Bachelor's degree in business.
Q What year was that?
A 1974.
Q What did you do after you graduated?
A I went to work for Champlin Petroleum Company, a subsidiary of Union Pacific Corporation.
Q How long were you employed there?
A Seventeen years.
Q What did you do for them?
A Various financial roles up to assistant controller.
Q What year did you leave there?
A 1990.
Q Why did you leave?
A I left to take a position as a controller, slash, CFO for a start-up used car business.
Q What's the name of the business?





A Pacific Auto Mart.
Q How long did you work with Pacific Auto Mart?
A One year.
Q Why did you leave Pacific Auto Mart?
A I saw that the business wasn't doing that well, and I had made contact back with Union Pacific Corporation, and they offered me a position as controller with USPCI.
Q How long did you hold that position?
A I was with USPCI from 1991 through 1995, and they -- Union Pacific elected to dispose of that subsidiary, so I left at that time.
Q Where did you go?
A I went to work to be a personal business manager for Tommy Taylor in Fort Worth, Texas.
Q Who is Tommy Taylor?
A Tommy Taylor is the investment -- was the investment banker for the Bass family of Texas.
Q Is that like Bass Pro Shops?
A No. The Bass family holds various oil and gas interests and real estate across the nation. A very wealthy family.
Q How long did you have that position?
A 1995 to 1996.
Q What did you do in '96?





A In 1996, I was contacted by Union Pacific Corporation again and asked to come to Richmond, Virginia, to become their controller in overnight transportation.
Q How long did you hold that job?
A 1996 to 1999, the end of '99.
Q What happened in 1999?
A In 1999, I was approached by a headhunter and went to work for Union Pacific -- U.S. Xpress Enterprises as their corporate controller in Chattanooga.
Q Are you still employed by U.S. Xpress today?
A No, I'm not.
Q How long did you work at U.S. Xpress?
A I worked at U.S. Xpress for the year 2000, one year.
Q What were your duties and responsibilities when you worked at U.S. Xpress?
A I was the corporate controller responsible for the financials, SCC reporting, accounts payable, accounts receivable, asset management, billing, receivables.
Q And why did you leave U.S. Xpress?
A Approached by a headhunter and had an opportunity to go become chief financial officer for





Quality Distribution out of Tampa, Florida.
Q How long were you with Quality Distribution?
A I was there three years.
Q What were your duties and responsibilities there?
A I was chief financial officer responsible for treasury functions, planning and analysis, tax, all of the general controller type duties, financial reporting, SCC reporting, investment relations, accounts payable, billing, fixed assets.
Q How come you left that job?
A I left that job to get married to a woman here in Richmond, Virginia.
Q She wasn't going to let you work?
A No. She could not move to Florida due to her child custody issue that she had at the time.
Q All right. How were you next employed?
A I was next employed here in Richmond, Virginia, to a company called CPOR, C-P-O-R-E -- no, C-P-O-R. Excuse me.
Q How long did you work for CPOR?
A I worked for CPOR about a year and a half.
Q What did you do there?
A I was chief financial officer responsible for all of the financial duties, the investor relations,

pretty much the same thing I was doing at my other jobs.

Q What kind of business was CPOR?

A CPOR was a poultry packaging solution company. They integrated packaging equipment on the back end of the line, so it's basically an engineering firm.

Q How big was it?

A Very small. Total revenues were about 6 million annually.

Q Why did you leave there?

A I left there mainly because that was an interim job for me. I was looking for other things to do. I decided to go out and sell the program of agent, slash, affiliate relationships in the transportation industry, so I went to various carriers with the idea of my working -- for me to work for them as an independent contractor, put together the program for them.

I went to U.S. Xpress. I'd worked with them before. They were one of the carriers I talked to, and they were very interested in doing that, but they didn't want to hire me as an independent contractor. They'd rather hire me as an employee, and I accepted.

Q When was that?

A That was in 2004.

Q Who is the person at U.S. Xpress that hired you in 2004?





A Ray Harlin.

Q What was his title at that time?

A Executive vice president, chief financial officer.

Q What title were you given?

A Vice president of business development.

Q How long were you a vice president of business development for U.S. Xpress?

A 2004 until 2006, the latter part of 2006.

Q Why did you leave in 2006?

A I was approached by a headhunter with an opportunity to join a start-up 3PL -- third-party logistics firm -- in Dallas, Texas, as the chief financial officer. And that appealed to me, so I took that position.

Q How long did you have that job?

A I'm still in it today.

Q How much money have you paid that headhunter?

A I haven't paid that headhunter. It's not the same headhunter.

Q Well, obviously I want to focus on the time that you were at U.S. Xpress, between 2004 and 2006. You've given me your title, but explain to me your job responsibilities and your duties there.

A My job responsibility was to facilitate the





growth of the capacity in the business through either agent relationships or acquisition approach. My job was to search for companies, work with brokers who search for companies, research the companies, negotiate some of the terms of the deals, present those to the decision-makers, and then facilitate the conversion if the deal was consummated.

Q Between 2004 and 2006, how many deals did you actually convert for U.S. Xpress?

A Three.

Q So that means you found three smaller trucking companies and entered into this process you've been describing to me, and eventually U.S. Xpress bought them out or merged with them?

A Of those three, two -- number one, they were all brought to us by brokers except for one. The first one was Arnold Transportation, and Arnold Transportation was brought to us by a previous employee of U.S. Xpress who was working at Arnold, Mike Walters.

Q Arnold Transportation was based where?

A They're based out of Jacksonville, Florida.

Q I didn't mean to interrupt you. Go ahead.

A They're a regional carrier based out of Jacksonville, Florida. And then Total Transportation of Mississippi was brought to us by a broker.





Q Who was that?

A Ahern & Associates. And then Abilene Motor Express, based out of Richmond, Virginia, was brought to us by Davenport & Company.

Q All right. What is Davenport & Company?

A They're a local firm who represents sellers in disposing of their businesses.

Q And tell me about Ahern & Associates.

A Ahern is based out of Scottsdale, Arizona, and they will either work for the seller or for the buyer. We had a relationship that had started prior to my joining U.S. Xpress with Ahern & Associates to represent the buyer. They would search for firms.

Q Who is the person or the persons you worked with at Ahern & Associates on --

A I worked directly with Andy Ahern.

Q How big of a business is Ahern & Associates?

A I don't know.

Q Ahern & Associates is also the broker that was involved in the G.F. Kelly Trucking deal, correct?

A Yes.

Q And how does it work? Just brokers know that U.S. Xpress might be looking to buy or merge other carriers and if a -- does a broker get a client and then come to you? Just explain to me a little bit in your own

words how it works.

A We had basically an open relationship with Ahern & Associates. Ahern & Associates is out in the marketplace looking for carriers to represent or to sell, depending on which end of the deal they're looking at getting involved in. They know U.S. Xpress and kind of understand the company, so if they see something that looks like it would be a fit for U.S. Xpress, they would contact me.

Q Did you or to your knowledge did anyone else at U.S. Xpress tip off Ahern & Associates during this time frame and say, Hey, we're looking to buy other companies?

A We had a working relationship with Ahern & Associates to look in the marketplace to acquire companies.

Q Do you know of other companies that Ahern & Associates has been involved in that U.S. Xpress acquired?

A No.

Q When you got there, you were just told, We've got a working relationship with Ahern & Associates, and that's essentially how you dealt with them, correct?

A Yes.

Q All right. Let's back up a little bit. Can you tell me what you know about U.S. Xpress as far as





when the company was founded and those things?

A Not directly, no.

Q When is the first time you ever heard of it?

A When I was contacted by a headhunter back in 2000.

Q That's located in Chattanooga, correct?

A Correct.

Q Did you live in Chattanooga when you worked there?

A No.

Q Where did you live?

A Let's back up. Which job?

Q Both of them. In 2000.

A Okay. In 2000, I resided in an apartment in Chattanooga during that time frame, and that apartment was paid for by the company.

Q Okay. And then from '04 to '06, where did you reside?

A I resided here in Richmond, Virginia.

Q During the '04-'06 time frame, could you estimate how many employees U.S. Xpress had?

A I don't know. It would only be speculation, the number of employees.

Q In the business -- I mean, based on your experience and what you do, is U.S. Xpress considered a





big outfit or a small outfit or a mid-level outfit? How would you explain it?

A They're a large truckload carrier.

Q And what's your basis for having that opinion?

A Well, they're a public company and they know the size of the organizations that are out there, and they're one of the largest truckload carriers.

Q From '04 to '06, who did you report to?

A Ray Harlin.

Q And who did Mr. Harlin report to?

A Max Fuller and Pat Quinn.

Q Would you spell Max's last name for me?

A F-u-l-l-e-r.

Q What was his title?

A Cochairman, I believe.

Q And what was the other name?

A Pat Quinn, Q-u-i-n-n.

Q Is that a man or a woman?

A Man.

Q What was his title?

A Cochairman.

Q Did you work directly with Mr. Fuller and Mr. Quinn?

A No.

Q In the three conversions that you mentioned to





me a second ago, who did you work with at U.S. Xpress to effectuate those conversions?

A I worked with Ray Harlin, Jeff Wardeberg, Russ Moore, John Martin, I think -- who else? Lori Boneau, Jerry Elkins, Mike Murphy, and for some reason I can't think of their tax guy at this point.

Q These are all employees at U.S. Xpress?

A Yes.

Q Out of the three that you mentioned to me, which one was the largest conversion?

A Arnold Transportation.

Q How many trucks did Arnold have?

A I think they had over a thousand.

Q So you were approached by Mike Walters about the possibility of U.S. Xpress --

A I was not approached. Ray Harlin and Jeff Wardeberg were approached.

Q And they got you involved?

A Yes.

Q What did you do when you got involved?

A My job on Arnold primarily was due diligence.

Q When you say due diligence, what do you mean?

A Due diligence would be to review -- be involved in reviewing all their historic financial information, all of their account reconciliations.

From -- my due diligence was primarily all financial oriented.

Q And when you're doing a financial due diligence of a potential company out there, what is your goal? What are you trying to do?

A It depends on the type of acquisition that is occurring. In the case of Arnold, which was a stock purchase, it's a very thorough due diligence. Since you will be basically assuming the balance sheet of the company, you do a very thorough -- from the standpoint of looking at all of the accounts, like an auditor.

A financial auditor would look at the accounts verifying receivables, verifying -- looking at payables, verifying of -- support for physical assets, financial type work.

Q Do you recall when you first began working on the Arnold conversion?

A It was in the fall of '04.

Q Can you estimate how much time between when you started working on it and the time when the conversion was completed?

A I could only estimate, but I believe it was 60 to probably 90 days.

Q And during these 60 to 90 days, is this something you're doing every day? Working on Arnold, is





it your main focus?

A It was probably at that time about 40 percent of my focus.

Q Did you visit Arnold?

A Yes, I did.

Q How many times?

A One time. That was at their Harrisburg office, Pennsylvania.

Q What did you do when you visited Arnold?

A Basically spent the entire time locked in a room similar to this conference room going through books and records.

Q How long were you there?

A I was there one week.

Q At what phase in the conversion process did that take place?

A Probably middle of the phase.

Q What did you find out as a result of this week-long review of the Arnold records?

A Basically assured ourselves that the financial records were -- were reasonable as far as their accuracy goes, that their internal controls were in decent shape, and that there was minimal risk from our point of view of proceeding on with other due diligence activities.

Q Those things you just listed, those are goals





you were trying to accomplish while you were there during the review, correct?

A Correct.

Q After you finished your review and came to these conclusions, to whom did you report those to?

A Ray Harlin.

Q Are you just giving Ray like a thumbs-up and saying, It looks good down there, I think we need to go forward?

A I present pretty much the facts to Ray Harlin as far as what I find. Ray Harlin, Jeff Wardeberg, Max, and Ray -- Max and Pat are the decision-makers on the deals.

Q After you finished your week-long review at Arnold and made your conclusions as you just described, did you have any other involvement in the conversion?

A No.

Q All right. Let's go ahead and talk a little bit about the other ones. You mentioned Abilene?

A Abilene's the most recent one that was completed.

Q When was it completed?

A That was completed in I think summer '06, late summer '06.

Q Was it a stock purchase as well?





A Yes, it was.

Q How many trucks did Abilene have?

A Abilene has about probably around 250.

Q Who got you involved in the Abilene conversion?

A Davenport & Company represented their client. They represented the seller to U.S. Xpress through Ray Harlin to me.

Q Davenport goes to Ray, Ray goes to you?

A Yes.

Q Did you go to Abilene?

A Yes, I did.

Q How many times?

A Probably around six to seven times.

Q Why did you go to Abilene six to seven times whereas you just went to Arnold one time?

A Because they're located locally here and I live here in Richmond.

Q It's more convenient?

A More convenient.

Q What I'd like to do is go through each time you remember going to Abilene, and tell me as best you can when it was and what you did there.

A Okay. The first meeting with Abilene was downtown Richmond with their selling broker to discuss just general concept of -- similar to in all the deals

that we look at, there's a initial phase where you're either on the phone or face to face, you sit down with the sellers and just say, you know, Describe your business.

They describe their business, I describe U.S. Xpress's business and see if there's any reason to go beyond just having that afternoon discussion. That was the first meeting with them. So that was with Davenport, Abilene, and myself.

Q Okay. Next meeting?

A Next meeting would have been -- I believe it was Ray Harlin and Jeff Wardeberg came to Richmond, and we had another sit-down with them here in an office downtown to again basically go over the exact same thing I did in my first meeting.

Q All right.

A The third meeting was when Max Fuller came, so it was Max Fuller and Ray Harlin and myself and I believe Russ Moore, and it may -- I'm not certain, but Ray -- Jerry Elkins or Mike Murphy. We met at Abilene's off-site facility. They own a little house off the premises, and we met there and had general discussions again about the business, why this might -- may or may not make sense.

Q These conversations, you all are discussing the





fact that U.S. Xpress wants to convert Abilene through a stock purchase, correct?

A Has an interest in potentially converting them, taking an ownership in them through a stock purchase.

Q And these meetings that you're describing are part of your due diligence process, correct?

A No. These are part of the initial get-to-know-you to see if it's worth going and having further discussions and working out potential outlines of a potential transaction.

Q And that's what going on in these first three meetings?

A Yes.

Q All right. Let me ask you, who is Russ Moore?

A Vice president of safety.

Q And Jerry Elkins?

A Vice president of I believe equipment. I don't know his exact title.

Q Okay. What's the purpose of having Russ Moore at this meeting?

A To discuss the driver base, description of their safety program, what issues that they might encounter as far as their safety program versus our safety program.





Q When you say driver base, what are you talking about?

A Company and independent contractors.

Q How many trucks did Abilene have?

A 250 approximately.

Q Does that correspond with 250 drivers or --

A That's 250 trucks in service. Some of that's company drivers, some of that's independent contractors.

Q So, I mean, I don't know a lot about this, but if you tell me 250 trucks, am I correct or incorrect to assume that means they had 250 drivers?

A They had control of 250 drivers. Some of those were employees, some of those were independent contractors.

Q And during these conversations that you've been describing for me, what, if anything, was said about what would happen to those drivers if Abilene was converted?

A Why don't you rephrase the question.

Q Well, you're saying that you had this third meeting and that Russ Moore was there and he's the vice president of safety and one of his goals was to find out about the driver base, correct?

A Mm-hmm.

Q And you said -- and you said that -- don't make her mad.





And you've said that they had 250 trucks or 250 drivers, correct?

A Correct.

Q And my question is, did you all contemplate what was going to happen with those 250 trucks and drivers? Were they going to be converted to U.S. Xpress?

A On a stock purchase transaction, we were contemplating with Abilene owning 49 percent of the company, so therefore those drivers and their contractual relationship would continue with Abilene and they were Abilene's employees.

Q They would not become U.S. Xpress employees?

A That's correct.

Q Anything else you remember about the third meeting?

A No.

Q Okay. Tell me about the next one.

A The next one would have been a lot further down the road due to -- well, in this particular situation, Davenport represented the seller. Davenport had put Abilene out for bid with other carriers, so we were just one of the many carriers in the bid process.

Q Do you know who some of the other carriers in the bid process were?

A No. They would not divulge that.

Q Okay. So what happened at the fourth meeting?
A Well, by the fourth meeting, we would have -- you had to submit your bid, which is a bid outline saying these would be potential terms and conditions of a transaction. So we had submitted our bid, they went through their review process and came back to us with, you know, their counteroffers, and we would have completed some negotiation to put together a letter of intent that was acceptable to Abilene and U.S. Xpress.
Following the execution of the letter of intent, then I would -- then I was at Abilene to perform due diligence at that point.
Q Okay. What's the purpose of a letter of intent?
A The letter of intent sets out nonbinding understanding of what potentially would be put together in a definitive agreement.
Q Kind of like a framework for the conversion?
A Yes.
Q Who actually drafts the letter of intent?
A The letter of intent is drafted by counsel that is retained by U.S. Xpress, then reviewed by various parties in U.S. Xpress before it is executed by a U.S. Xpress representative.
Q Typically, who would execute a letter of intent



on behalf of U.S. Xpress during this '04 to '06 time frame?
A It would be one or four individuals: Ray Harlin, Jeff Wardeberg, Max Fuller, or Pat Quinn.
Q What determines who does it?
A It would be determined based on really availability of who might be in the office at that point in time when the letter of intent needed to be executed.
Q Who did the one for Abilene?
A Ray Harlin.
Q Who did the one for Arnold?
A Ray Harlin.
Q Okay. Explain to me the due diligence you went through for the conversion of Abilene.
A Okay. Abilene was a similar structure as Arnold, therefore I did a complete financial due diligence review, since U.S. Xpress was acquiring 49 percent of the stock of Abilene. So a very thorough due diligence financial review.
Q How long did it take?
A About two weeks.
Q Is that every day?
A Yes.
Q Where did it take place?
A Took place at Abilene's facility, in addition





to working in my office.
Q Did you do it by yourself?
A Did probably 95 percent of it by myself.
Q At the completion of your due diligence, this two-week process you've explained to me, what did you do?
A I reported to Ray Harlin the findings of my due diligence.
Q What were your findings?
A That Abilene had a excellent financial reconciliation system, financial records were in excellent condition, the balance sheet and PNL and cash flow represented what they said it did, and very positive signs they were a very solid company.
Q At what phase of the Abilene conversion did you conduct your due diligence?
A Probably the final 25 percent.
Q After you completed your due diligence and submitted your findings, did you have any other involvement in the Abilene conversion?
A A little.
Q What did you do?
A I was -- I sat in on the closing when all the documents were signed, I worked with the controller on putting together -- you know, setting up the type of financials he was expected to provide to U.S. Xpress,





and I introduced the individuals to their working counterparts at U.S. Xpress that they would be dealing with on a daily, weekly, monthly basis.
Let me get some water.
Q Sure.
Tell me about working with the controller. Are you talking about the controller for Abilene?
A Yes.
Q What did you do there?
A Worked with the controller with Abilene to introduce him to the controller at U.S. Xpress, go over, you know, the financial reporting that he would have to try to put together at the end of each month and quarter to provide to U.S. Xpress.
Q Is it fair to say that after you've completed your due diligence and made a positive recommendation, that your subsequent involvement -- your goal is really to make sure the conversion gets completed, correct?
A I'm one of the players in the conversion process.
Q You're --
A Not 100 percent. I'm not 100 percent responsible for all the pieces.
Q I understand. I'm just really trying to focus on what you're doing. I mean, you're working with the

controller because you want to help him do the necessary financials that will ensure that U.S. Xpress converts Abilene, correct?

A Yes.

Q You mentioned that you introduced counterparts. Tell me what you mean.

A For example, on the independent contractor side, our independent contract representative is John Martin, and so I would invite John Martin to come to Abilene to meet some of the people, let him meet with them and do his -- whatever he does with them on an independent contractor side.

(Mr. Tomlinson left the room.)

A Have, you know, the safety individuals meet with the safety people to get to know each other a little more and have the contacts that they need to have so if they have a problem or they have questions, they know who to call and talk to.

Q And all this work is done with an eye towards a successful conversion, correct?

A That was done after conversion, after closing.

Q Anything else you can remember doing before the closing with Abilene that you haven't told me about?





A No.

Q You mentioned a third one.

A Yeah. Total Transportation, Mississippi. That was closed I believe in springtime of '05.

Q Stock purchase?

A Stock purchase. 49 percent stock purchase.

Q What was your first involvement in that one?

A Phone call from Ahern & Associates saying he's got a carrier in Mississippi that looks like it would be a good fit for U.S. Xpress.

Q What did you do in response to that phone call?

A What I did in response to that phone call is we set up a phone call with the owners and have a general discussion over the phone to get to know you, find out more about their company, what the owners might be thinking, just see if there is, you know, potential for further discussion.

Based on that -- I didn't mention earlier before, but based on those conversations, we execute a confidentiality agreement before we do anything else.

Q What's the purpose of the confidentiality agreement?

A The purpose of the confidentiality agreement is to clear the path for further discussions and analysis so that U.S. Xpress -- myself, primarily -- can





have access to information that it normally would not have access to under the protection of a nondisclosure agreement.

Q The nondisclosure agreement means that U.S. Xpress cannot disclose the target of the conversion's financials with the outside world?

A That's correct.

Q Does it work the other way? Does U.S. Xpress share its financials with the target of the conversion?

A U.S. Xpress's financials are public information. They're a public company.

Q Don't need a confidentiality agreement for that.

A No.

Q Who's the person you dealt with the most for the Mississippi conversion?

A I dealt with John Stomps and Rick Kale and Hugh Statum. Those were the three owners. The transaction was basically purchasing. Hugh Statum owned 51 percent of the company, and we purchased -- buy him out at 49 percent interest. Those are the three owners.

Q Okay. And let me back up, because I may not have asked this question. Who was the person you dealt with the most during the Arnold conversion?

A Eric San Martino.





Q Same question for Abilene.

A Abilene, it was Keith Jones and Colin Jones. Those were the two owners.

Q Okay. Very good. For the -- I apologize, I've forgotten the name of the Mississippi outfit.

A Total Transportation.

Q Total Transportation. Did you go to Total Transportation?

A Yes, I did.

Q How many times?

A I would say four or five.

Q And tell me what you remember about those meetings.

A Well, the first meeting was a follow-up after the confidentiality agreement, a follow-up to have a direct discussion of more detail of their company and whether or not -- may or may not be a fit to do a transaction. That was held at their facility in Jackson, Mississippi.

Q Who was there?

A The three owners, Hugh Statum, John Stomps, Rick Kale; and from U.S. Xpress, myself and Bill Farris.

Q Who is Bill Farris?

A Bill Farris is the vice president of dedicated.

Q What is that?

A They have a business unit at U.S. Xpress that focuses on dedicated contracts. A dedicated contract means that you supply the services specifically for routes for a customer, and you have the outbound and the inbound or the back haul. Everything's rolled into the contract.

Q What was the relevance or the purpose of having him at this meeting?

A I had Bill Farris there due to his background and experience at U.S. Xpress and Jeff Wardeberg was not available to attend.

Q All right. Anything else you remember about that meeting?

A No.

Q Tell me about the next one.

A The next meeting was with Ray Harlin, Dennis Farnsworth, Rick Kale, John Stomps, Hugh Statum. Purpose of that meeting was to attempt to work out a letter of intent.

Q Had you presented them with a draft letter of intent or were you just talking about the details?

A We were going through the details from an outline perspective.

Q All right. Next meeting?





A The next meeting would have been myself alone beginning the due diligence after a letter of intent was executed by both parties.

Q Kind of the process there is typically a notification from a broker to U.S. Xpress, there is an initial conversation -- let me back up.

Does the confidentiality agreement take place before you really start talking about the conversion?

A Absolutely.

Q That's kind of the first thing?

A The confidentiality agreement is executed before any documents are shared.

Q After the confidentiality agreement is executed, discussions are had, documents are shared with the goal of entering into a letter of intent, correct?

A The goal of the discussions and the review of the documents is to determine whether or not there is an interest on both parties as well as U.S. Xpress to put together a letter of intent between the parties to move to the -- to really move to the next step, which is a real due diligence step. Up to that point, it's just reviewing documents and having discussions.

Q The real due diligence work takes place after the letter of intent, correct?

A Correct.





Q All right. Tell me about your due diligence with Total Transportation.

A Total Transportation again was a 49 percent stock purchase. It's a very thorough financial due diligence review that I performed and -- because the balance sheet -- you'd be owning 49 percent of the balance sheet and the stock. So whatever you take on that day, you're taking on history and everything else that goes with it.

Q How long did your due diligence take for Total?

A About two weeks of financial due diligence.

Q Where did it take place?

A At Jackson, Mississippi, as well as in my office in Richmond.

Q Did you do the same thing in Total Transportation's due diligence that you've described to me for the other two?

A Yes.

Q Did you make a recommendation at the end of your due diligence?

A Yes, I did.

Q What was it?

A My recommendation was that their financial internal controls and their financials were in very solid condition.





Q Then what happened?

A Then after that, we moved forward with some due diligence in other areas and safety review, driver review. And with Total Transportation, it was continued to negotiate terms and conditions for a definitive agreement.

Q I may have asked you this: How many trucks for Total Transportation?

A Total Transportation has about 450 trucks.

Q How much time lapse between the completion of your due diligence and the closing?

(Mr. Tomlinson entered the room.)

A Total Transportation was about 45 to 60 days.

Q Is that about the average time frame?

A It's -- in U.S. Xpress, it's typically 45, 60 days from the letter of intent.

Q Typically, who decides what the closing date is?

A The closing date is decided by both parties.

Q What has to take place between the completion of the due diligence before the closing can be conducted?

A Whatever the terms and conditions are of the contract dictate what has to take place following the

due diligence period.

Q And as with Abilene, did you work after your due diligence but before the closing to try and facilitate the conversion?

A Yes.

Q What are some things you did?

A Well, with Arnold, there was very little in the fact that you're buying the stock. Arnold and Total Transportation and Abilene is you're buying the stock of the company, so after the due diligence takes place, it's really meeting the terms and conditions of the contract, arranging the funding and the financing to purchase the stock, and the closing is transparent from the standpoint that it's nothing more than a change in ownership of a portion of the company.

Q Okay. I know obviously about the G.F. Kelly Trucking situation, and I know about these three companies that you converted between 2004 and 2006. My question is, did you attempt to convert or investigate any other companies for the potential of conversion on behalf of U.S. Xpress during that time frame?

A Yes. I looked at probably over a hundred companies.

Q How does it work that you can put the time into the three conversions you just discussed to me and then





be involved in the G.F. Kelly Trucking situation and still look at a hundred additional companies for a potential conversion?

A Over the two and a half years, I normally had anywhere from eight to fifteen companies on my pipeline at any point in time that I was working.

Q How does a company get on your pipeline?

A Through -- either through the brokerage process, through whatever contact was made to bring that company into discussions.

Q The broker typically goes to Ray first. Is that right?

A No, not necessarily.

Q Could go to you?

A It could go to me directly. If they knew that I existed, they would contact me directly. So over time, some of the brokers knew to come directly to me. But brokers typically when they're out looking will -- they'll approach all the large carriers directly to the chief financial officer with a letter of introduction.

Q If you have eight to fifteen companies in your pipeline at a given time and you looked at over a hundred companies in the span of two and a half years, how do you decide which companies to target for a conversion?

A What they do -- the process, again, is all





those hundred companies at least have a telephone conversation talking about their company, talking about U.S. Xpress, does it make any sense, that type of thing. Around probably 90 percent of that hundred, you go to at least a confidentiality level agreement, at which time they provide information that is asked for.

That process takes -- can take easily 90 days where you're gathering information, having this general decisions with those individuals, and a lot changes in 90 days. They may -- some of the companies withdraw, we may withdraw based on, Well, it's not really the type of business we want to proceed into. So that 90 days weeds a lot the majority of those out during the initial discussions.

Q So let me make sure I've got this right. You're saying that in that two and a half years, you believe that you actually entered into a confidentiality agreement with 90 percent of a hundred companies, or 90 companies?

A Yes.

Q What's the process for entering into a confidentiality agreement? Do you have like a standard one that you use and if you have a conversation with someone, you just send it to them?

A Yes.





Q Can you do that on your own accord or do you have to get permission or get that recommended by somebody else?

A To generate a confidentiality statement, I had the authority to generate a confidentiality statement.

Q And after the confidentiality statement has been generated and sent to a potential conversion, you say it's about 90 days?

A 90 days of gathering information and having discussions.

Q And when you say eight to fifteen companies in your pipeline, is what you mean like during any given 90-day period, you may be investigating eight to fifteen companies?

A Yes.

Q During this 90 days, you're trying to determine whether or not the conversion would be practical to decide whether or not to get a letter of intent, correct?

A Yes.

MR. CARTER: All right. Let's take a break.

(Recess taken.)

(Exhibits 1 and 2 are marked.)

Q All right. Sir, I want to show you a couple of exhibits. The first I have marked as Exhibit No. 1. This is your deposition notice. Have you seen that before, sir?
A Yes, I have.
Q Did you undertake to determine whether or not you had any documents in your possession that were responsive to 1, 2, 3, 4, 5, and 6?
A Yes, I did.
Q And I believe what your lawyer is saying is that if you had any documents that were responsive to those requests, that you gave them to him and he gave them to me?
A Well, what I said -- what I say associated with these documents is when I left U.S. Xpress, all documents in my possession relating to my position were left in the possession of U.S. Xpress. I have no documents.
Q You didn't take none home with you?
A No.
Q All right. The second exhibit I'm going to show you is what's called a 30(b)(5) and (6) deposition notice. Have you seen that before, sir?
A This is referencing Al Hingst.
Q Well, it is, but I think what your lawyer is





saying is that you're the person that's here to speak on behalf of U.S. Xpress for Topics No. 1 and No. 2.
A Okay. Yes, I have seen this.
Q Is it your understanding that you are the person that's here to speak on behalf of U.S. Xpress for Topics 1 and 2?
A Yes.
Q Topic No. 1 is U.S. Xpress's dealings with G.F. Kelly Trucking and Guy Kelly, correct?
A Correct.
Q Topic No. 2 is the asset purchase agreement which is the subject of the complaint, correct?
A Yes.
Q What is an asset purchase agreement?
A An asset purchase agreement is a contractual agreement related to purchasing the assets of a company and not the stock or ownership interest in the company.
Q The three conversions we talked about earlier were stock purchases, correct?
A Correct.
Q And those are different than asset purchases, correct?
A Correct.
Q What's the strategy or the thought process behind whether or not U.S. Xpress wants to do a stock





conversion a stock purchase or an asset purchase?
A The first criteria or decision is made based upon the size of the entity that we were dealing with. To do a stock purchase, you need to be looking at probably 30 million to $35 million a year revenue company to consider a stock purchase. Stock purchase carries with it the risk of prior ownership issues that may exist.
Asset purchase is you're purchasing the physical selected assets of a company. You're not buying that company's stock ownership or legal structure.
Q Did you ever consider converting G.F. Kelly Trucking on a stock purchase basis?
A Every company when we initially had discussions, that was always a potential option of the options we have to look at. G.F. Kelly early on in the discussions was ruled out as an option to do a 49 percent purchase.
Q Why?
A Mainly due to the size of the organization.
Q What was the size?
A I believe it was about 175 trucks or about $24 million or so in revenue.
Q Is it your testimony that G.F. Kelly Trucking was ruled out as a stock purchase because they didn't





meet this revenue threshold of 30 to 35 million?
A Correct.
Q Any other reason?
A No.
Q Are you the person that made that determination?
A No.
Q Who made it?
A That determination is made by Ray Harlin.
Q Do you know whether or not U.S. Xpress has ever done a stock purchase for a company that actually had revenues less than 30 million?
A No, I don't.
Q It's your testimony that the three companies we talked about previously all had revenues in excess of 30 to 35 million?
A Yes.
Q What is the first time, sir, that G.F. Kelly Trucking appeared on your radar screen?
A I recollect that it was in the spring of '05, contacted by Ahern & Associates.
Q Were you the person contacted by Ahern?
A Yes.
Q Do you have a recollection of that contact?
A Yes.

Q Tell me what you remember about it.
A The typical contact with Ahern was an initial e-mail directly to me describing a potential candidate that he may have, describing the number of trucks, little bit of the history, the background. And then that would have been followed up by a phone call to Ahern if I was interested in that particular one.
Q Were you?
A Yes.
Q Why? Let me ask that better. What was it that Ahern said to you that made you interested in G.F. Kelly Trucking?
A When I had discussions with Ahern -- and I don't remember that particular discussion. The discussions with Ahern that would get us interested would be transportation companies that had -- you know, were larger than 15 million revenue, had a solid base of drivers and customers. And from his point of view, he would present those to me.
We'd have our discussion, and based on whatever information he gathered he would share and if it sounded like something that was a -- you know, met a truck load carrier -- in other words, U.S. Xpress was not interested in a chemical carrier, an ocean carrier, less than truckload carrier. Those types of things would get ruled





out at that point.
Q And it's your recollection based on your conversations with Ahern that G.F. Kelly Trucking met that criteria, correct?
A Yes.
Q What did you do next?
A I would have requested Andy Ahern to set up an initial phone discussion.
Q Did that take place?
A Yes, it did.
Q Do you have a recollection of the initial phone conversation with G.F. Kelly Trucking?
A Just general recollection like I have with all the other carriers that I talk to.
Q Who else --
A No specifics.
Q You remember who was on the phone?
A Guy Kelly.
Q Who else?
A That's it.
Q You?
A Myself and Guy Kelly would have been the only parties on the telephone conversation. If he had someone else, you know, there with him, I was not aware.
Q And is it your testimony that you just simply





can't remember what was said during that conversation?
A Specifics, yes.
Q Generally, what do you think was said during that conversation?
A Generally, that conversation was the same conversation I had with all the other owners. I had -- I would have had Guy Kelly basically walk through the nature of his business, I would have walked through a general overview of U.S. Xpress's business, I would have finished the conversation with, you know, Are you an interested seller in some capacity at this point.
And based on their response, if he said yes, then I would have sent him a confidentiality agreement. So therefore I sent him a confidentiality agreement, so he would have said yes at that point.
Q So I think what you're telling me is you don't have a specific recollection of the conversation, but based on what happened afterwards, he said yes to your inquiry and you sent him some information, right?
A Correct.
Q Did you e-mail that information to him?
A Yes.
Q During the process with G.F. Kelly, was it your habit to communicate with Guy Kelly through e-mail?
A A combination of e-mail and direct





conversation.
Q So you believe you sent him the confidentiality agreement?
A Yes.
Q You believe he signed it?
A Yes.
Q And what happened next?
A The next step, I would have put together a list of items that I would like for him to provide for our review. So I would have e-mailed him that list for him to begin putting together that information to provide to me.
Q And this is the step in the process we talked about earlier between the confidentiality agreement and the letter of intent, correct?
A Correct.
Q Tell me everything you remember doing with respect to the potential conversion of G.F. Kelly Trucking to U.S. Xpress after the execution of the confidentiality agreement until the letter of intent.
A That's a -- that's a, you know, pretty long period of time for me to try to go through all the steps. You know, when I ask questions specifically along those steps or do we have 30 minutes for me to sit here and just start walking through it?

Q Well, really what I'm trying to figure out, if you can sit here right now and tell me and walk me through it, I'd love for you to do that. If you feel like you can't do that -- I mean, we've got documents and all that stuff, but I'm trying to get a feel or a sense of what you remember.

So I'm not asking -- I mean, you recollect that generally there are things you do between the confidentiality agreement and the letter of intent. What I'm asking you is specifically.

A Okay. Specifically.

Q Specifically for G.F. Kelly Trucking, Inc., what do you remember doing between the execution of the confidentiality agreement and the letter of intent?

A Okay. All right. From a specific point of view, I recall sending him a request of documents. I recall receiving various documents over a period of time. I recall reviewing those documents and determining based on those documents -- let's back up.

Well, I would have reviewed those documents. During that time frame, I would have had various conversations about pieces of those documents. I don't specifically remember those conversations. Based on the review of those documents and, you know, conversations that I would have had with Guy Kelly, I would put





together a recommendation -- which I remember doing -- a recommendation to Ray Harlin and Jeff Wardeberg of -- the recommendation is really just to move to the next step, which is discussions to talk about potential terms and conditions.

Q The recommendation that you're describing, is it a written recommendation?

A Yes, it is.

Q Do you believe there is a document somewhere in this case, a written recommendation from you along those lines regarding G.F. Kelly Trucking?

A Yes.

Q Do you recall whether or not you reviewed that written recommendation in preparation of your deposition today?

A No.

Q Do you have a feel for a sense of how long between your initial telephone conversation with Guy Kelly and when you made the written recommendation was?

A I could only speculate.

Q What happened after you made your written recommendation?

A I had a visit with Guy Kelly, and I don't know whether that was before the written recommendation or after the written recommendation, but I made a road





trip -- as a part of a road trip, I visited five other carriers. I made a road trip and stopped by and saw Guy Kelly to discuss the various potential options that we might entertain and to get some of his feedback to see whether or not I could put together some type of a transaction that might work for the parties.

Q Do you recall who the other companies were that you visited on that road trip?

A I recall three of those.

Q Tell me who you recall.

A I'm not in a position to do that, since I signed a confidentiality agreement with those companies.

Q How did you like Wadley?

A It was a -- well, I actually missed it the first time I drove through it. That's the truth.

MR. HALL: I think that answered the question.

Q Where did you all meet?

A In Guy Kelly's office.

Q Do you have a specific recollection of that meeting?

A Yes, I do.

Q Tell me everything that you recall about that meeting in Guy Kelly's office.

A I remember meeting Guy Kelly, and Nelson Chastain was in the meeting as well.





Q What did you all talk about?

A Well, we spent probably 20 to 30 minutes talking about car racing first, because he has everything on his wall --

Q He showed you all his trophies and all his pictures?

A Couldn't help to talk about it. Right. So to break the ice, we chatted about that a little while. Then we again kind of rehashed or talked over the things we'd talked about over the phone as far as, you know, tell me again about your company, what it does, how it does it, what does U.S. Xpress do.

We talked about, you know, three ways of kind of looking at his company depending on, you know, how the information came about. Looking at it, one of them was a potential agency relationship to where Guy Kelly would keep his company as is, you know, basically lease his drivers to U.S. Xpress and he would receive a commission to do that. That was one option we threw out on the table just to talk about.

We chatted briefly about the 49 percent. I explained to him at that point in time that he was on the bubble as far as that even being an opportunity, but I would have to have that discussion. And then we talked about a straight asset purchase of purchasing his

equipment and his drivers, and that was the third option we talked about. We left the meeting with an agreement that we would continue discussions, and then I went on with my road trip to meet other carriers.

Q During this first meeting with Guy Kelly, did you make a recommendation to him as to which of the three ways -- well, let me start over.

You and Guy Kelly discussed three ways that U.S. Xpress could potentially convert or work with G.F. Kelly Trucking, correct?

A Correct.

Q When you do an agency, do you still call that a conversion?

A Yes.

Q So you and Guy Kelly discussed three ways that U.S. Xpress could convert G.F. Kelly Trucking, correct?

A Yes.

Q I mean, that's the only thing you all are there talking about, right?

A That's it.

Q Your goal in going to see him -- your announced goal in going to see him was to discuss the conversion of G.F. Kelly Trucking by U.S. Xpress, correct?

A Discuss whether or not there could be a potential conversion that made sense for both parties.





Q You are there holding yourself out as a representative of U.S. Xpress, correct?

A I'm holding myself as a representative of U.S. Xpress in discussing these options. During every conversation I have with all owners, I make it very clear that my job as VP of business development is to facilitate the discussions and that all agreements or anything has to be handled by the executives of the company.

Q During this first meeting with Guy Kelly and subsequent meetings with Guy Kelly, you have U.S. Xpress's permission to speak on behalf of the company, correct?

A To speak on behalf of the company as far as what potential options we may have in front of us, what things we may need, what activities we may need to have taking place, that is correct. As far as committing the company to any type of a discussion or commitment decision, I have no authority to do that. I made that very clear.

Q Who has the authority to do that?

A Four individuals: Ray Harlin, Jeff Wardeberg, Pat Quinn, and Max Fuller.

Q Does the confidentiality agreement state that you cannot make ultimate decisions on behalf of U.S.





Xpress?

A No. The confidentiality agreement makes no reference to my role in the process.

Q During this first meeting with Guy Kelly, did he sign anything acknowledging that you didn't have the ability to make decisions on behalf of the company?

A There was -- there was no document of that nature.

Q You're just saying that's what you told him?

A Yes.

Q But you do agree that you're there on behalf of U.S. Xpress, correct?

A I was an employee of U.S. Xpress, correct.

Q You're talking about U.S. Xpress's business to Guy Kelly for potential conversion with the permission of U.S. Xpress, correct?

A Permission of U.S. Xpress and Guy Kelly.

Q Well, you're not at that meeting representing Guy Kelly, correct?

A That's correct.

Q You're representing U.S. Xpress, correct?

A Correct.

Q What do you remember happening next after you left Guy -- after this first meeting with respect to the conversion of G.F. Kelly Trucking?





A What I remember is I think a couple weeks -- several weeks went by before we kicked back up conversations.

Q What do you remember about those conversations kicking back up?

A Conversations were, you know, providing the documentation that I'd requested.

Q Did he provide you with everything you requested?

A Yes, he did.

Q Do you remember how long between the confidentiality agreement and the letter of intent?

A I believe it was probably around 60 days, approximately in that neighborhood.

Q And during this time frame, you're requesting documents from Guy, correct?

A Correct.

Q And Guy is providing you with documents, correct?

A Correct.

Q Is it fair to say that G.F. Kelly Trucking provided you with sufficient information during this process such that U.S. Xpress had enough documentation to in fact enter a letter of intent? Is that correct?

A I think we need to go backwards a little ways.

When you ask the question did he provide me with all the documentation and everything that was requested, he provided that but a lot of that was incomplete, especially in the order that the driver information was incomplete. The supporting documentation associated with the loans on the tractors and the trailers was seriously incomplete.

As a part of that, during that period of time before the letter of intent, there were other individuals that met with Guy Kelly and his staff from our -- from U.S. Xpress in the area of the safety side of it had spent I believe a couple meetings at Wadley to -- what we do during due diligence is kind of a cursory review of the safety files and the driver files.

Back to your question is that to move to a letter of intent, yes, we have to satisfy ourselves that the information, whether it's whole or partial, is enough for us to enter negotiations from a letter of intent point of view.

Q So what you're saying is U.S. Xpress was satisfied enough with the documentation that G.F. Kelly Trucking had provided such that it could enter into a letter of intent, correct?

A Yes.

Q So you're saying after the confidentiality





agreement and before the letter of intent, there were others with U.S. Xpress that met with Guy Kelly and other officials at G.F. Kelly Trucking, correct?

A Correct.

Q You mentioned safety, so I'm guessing Russ Moore was involved?

A Yes.

Q What did he do to your knowledge before the letter of intent?

A To my knowledge, before the letter of intent, he spent one day there reviewing driver files that were available there on the location.

Q Okay. So it's your testimony that before the letter of intent was entered into, that Russ Moore on behalf of U.S. Xpress was given access to and did review the driver files for G.F. Kelly Trucking, correct?

A That is my recollection.

Q Did you speak to Russ Moore after he reviewed these driver files?

A Yes, I did.

Q What did he say to you?

A Russ Moore said that the driver files were somewhat incomplete. When Frank Childers was asked where are the files, he said that they were destroyed in a tornado that occurred in 2004, and you could





physically see a building that had been destroyed. Had no verification whether that was true or not.

But that, you know, there was issues in the driver files due to missing data that would have to be either completed to, you know, his satisfaction or an explanation of whatever that had to support what that driver was about before we could really do any type of a due diligence.

Q So before the letter of intent, Russ Moore went to Wadley to physically review the driver files, correct?

A That's my recollection.

Q And I think what I hear you saying is that some driver files were available and some were not, correct?

A Correct.

Q And it's your understanding from Russ Moore that some driver files were not available because they were destroyed in a tornado, correct?

A Per Frank Childers and Guy Kelly.

Q Did you ever discuss with Frank Childers this problem with driver files being destroyed in a tornado?

A Yes.

Q Was that before the letter of intent or after?

A I'm not certain.

Q Tell me what you what are you certain of. What do you remember about that conversation?





A I just remember having conversation with Frank Childers about his driver files were missing and that -- you know, where were the files and what was going on with the files. It was his response that they were destroyed by the tornado, that those files were not available.

Q Do you feel like U.S. Xpress understood that for whatever reason there were a certain number of driver files that were not going to be available? Did U.S. Xpress understand that before the letter of intent was entered into?

A I really don't -- I really don't know.

Q So the question is --

A I can only speculate, you know, and -- like I say, I really don't know the timing.

Q Right. And I'm just getting there because you said you think this meeting with Russ Moore --

A I believe it was before the letter of intent.

Q And certainly Russ --

A Based on my recall, but I'm not certain.

Q All I want to know is what you remember.

A Right. That's all I -- I remember there was a meeting, I remember -- and I'm not certain whether it was before or after the letter of intent.

Q But it was at that meeting that Russ Moore

learned that there were some driver files that could not be accessed, correct?

A Yes. Yes.

Q Do you remember other U.S. Xpress employees going to Wadley to meet with G.F. Kelly Trucking officials before the letter of intent was entered into?

A There was a meeting -- I don't know whether it was before the letter of intent or after. I don't recall. There was a meeting right around that time frame when -- that was when Russ Moore came. It was Russ Moore, myself, Jeff Wardeberg, I think Bill Farris came to that meeting, I think Mike Murphy -- might have been Mike Murphy or Jerry Elkins. I don't know which one.

Q Who is Mike Murphy?

A He works for Jerry Elkins in the equipment side. That's what I recall. I don't know specifically all the people there. We had a plane full we took down there, a company plane.

Q And you all were down there for one day?

A One day.

Q Didn't want to spend the night in Wadley?

A No.

Q And, again, you think this was before the letter of intent, correct?





A It was right around that time frame. It could have been just before or just after, but I really don't recall. I just know it was right around that time frame.

Q But regardless, we know that a letter of intent was entered into between U.S. Xpress and G.F. Kelly Trucking, correct?

A Correct.

Q And if it proceeded like you told me these other conversions did, after the letter of intent was executed, you began your due diligence, correct?

A Correct.

Q How many times did you visit Wadley in the process of your due diligence?

A What I recall is I think three times.

Q Tell me what you recall about the first time.

A First time, I spent -- the first time, I believe I spent an entire week there primarily looking at financials and receivables, but really this is different. Since it's an asset purchase, I really didn't focus on financials in general because I'm buying the assets. You know, the financials are his.

I focused primarily on trying to look at the debt instruments associated with the equipment, since there would be a payout associated with that to pay off





the liens. So I worked with Randall Fant I believe during that time frame, looked at that, and I also focused on looking at their accounts receivable to get a handle on the type of customer, since we were also looking at purchasing the accounts receivable as part of the asset purchase.

Q This week that you spent as part of your due diligence, do you remember what month that was?

A I believe it was toward the end of July.

Q What was your understanding of Randall Fant's title?

A Randall Fant was -- was new on board and was a financial person for the company. He really didn't have a title that was really presented to me, but he was responsible for the financial reports, accounts payable, accounts receivable activities.

Q You did this review on-site?

A Yes.

Q Like in a conference room?

A No. They didn't have a conference room. They were an old department store. I did it in one -- I think their salesman's office I think is what I used. He was out of town.

Q Was Guy Kelly there this week?

A 50 percent of the time.





Q Would he come check in on you and say Hey and all that stuff?

A No.

Q Would you all talk to each other while you were doing your review?

A Usually if I needed -- had a question or something, I would go chat with him or Nelson. Those were my two individuals that I discussed to clarify.

Q Would Guy ask you things like, How's your review coming, how is everything looking during this process?

A No, not -- no.

Q What about Nelson?

A No.

Q After you finished this -- during your first visit for your due diligence, after you completed this week, did you talk to Guy or Nelson and say, I'm finished and this is what I've found or --

A Yes.

Q -- or give them any conclusion?

A Yes.

Q Tell me what you remember saying to them after you concluded your week-long due diligence there in Wadley.

A What I recall is I was having significant

trouble getting the leases and the debt instruments on the assets, and I conveyed that. I recall conveying that to Nelson Chastain, who told me that he's sorry for that but that the previous controller was basically a dud and they had to terminate him.

Q Who was that, do you know?

A Dennis Hamlet. And that the records were out of -- well, the records were in poor shape and Randall had been hired to get everything back into shape. And I recall telling Guy that, you know, we couldn't even consider moving forward at all unless he gets me all of the loan documentation, because each loan documentation has different covenants or issues that deal with what you can or cannot do as far as early payoff goes.

Q And when you told Guy that, what did he say?

A He said pretty much the same thing Nelson did, that it was a mess, said he had every title in his drawer to every piece of equipment, he could tell me about that piece of equipment and, you know, who was on the loan; but as far as a loan documents go, I would have to work with Randall, and Randall -- he said he would tell Randall to give it his all to try to gather all that information.

Q What did you say to Guy after he told you that?

A I said, Fine, you need to pull together all





that information. Before we can consider going further on any other steps, you need to gather that information.

Q Anything else you remember saying to Guy or Nelson before you left?

A No.

Q What's the next thing you did -- well, let me ask you this: After you completed this week review of documents and whatnot in Wadley as part of your due diligence, did you make a recommendation to anyone at U.S. Xpress?

A Yes.

Q What did you do?

A Basically recapped the -- reviewed the structure again and how the deal might work and put together a -- you know, I put together a summary that said here are, you know, the facts as I know them and based on the facts, we should continue on with the process.

Q Was that a written summary?

A Yes.

Q When you would write stuff, would you type it or e-mail it or how did it work?

A I usually would type it in Word and attach it via e-mail and send it. I was not in Chattanooga that often, so I would deliver things typically by e-mail.





Q So after your week-long review in Wadley, you did a summary of G.F. Kelly for U.S. Xpress and recommended that they move forward with the conversion process, correct?

A Move forward with the continued negotiation process and the steps leading up to the definitive agreement.

Q Well, all that's part of the conversion process, isn't it?

A Right. But it's not -- I did not make any recommendation to say, you know, based on these facts, we have enough information to say close. All I have is enough facts to say based on these facts, it still looks like a worthy transaction and let's proceed with further due diligence and negotiations on the terms and conditions.

Q And you did that in a written document, correct?

A Yes.

Q And you think that was towards the end of July?

A I believe so.

Q What happened next in the conversion process?

A I'd like to request a restroom break.

Q Granted.





(Recess taken.)

Q What happened next in the conversion process?

A I'm trying to remember. I would like to back up just a little bit. You keep using the term conversion process. Conversion process -- you know, in defining how that works, you don't have a conversion process until you have a closing, as explained in the other three contracts that we did.

You asked what I did after the closing as far as the conversion goes to continue on. There is no conversion happening at this point in time. I'd like to make that on the record as far as Guy Kelly and G.F. Kelly Trucking goes.

Q So in your nomenclature, the conversion process starts after the closing?

A Correct.

Q All right. And what name or phrase do you use to describe the process that we're going through right now?

A Due diligence, defining due diligence as you have a letter of intent, which is a document that outlines the understanding of the parties but is not a contractual agreement that is binding upon those parties.

Q Okay.

A Okay? And then you have a contract that will set out terms and conditions of a contract to go to actual closing. Just like if you bought a home, to where you sit down and sign the closing documents and then you have conversion at the time you sign the closing documents, then you physically move your household goods into the house.

So I would like to put that definition in there, because that term was used many times during this process. Okay?

Q Gotcha. I appreciate that.

We've talked about the week you spent in Wadley for your due diligence, and we've talked about your conversation with Guy and Nelson.

A Right.

Q At the completion of that, we've talked about the written summary that you gave to say go forward, and then I think I asked you what happened next --

A Right. Right.

Q -- in your due diligence process.

A Correct. During -- after that recommendation, then there was negotiation between Guy Kelly and U.S. Xpress -- U.S. Xpress being myself -- as far as to potential terms and conditions of an agreement. So that





was going on at the same time as other due diligence activities which would have concentrated around equipment review and driver file review.

Q Who's doing the due diligence on the equipment review and the driver file review?

A The driver file review was performed by our safety department, which was headed up by Russ Moore. At that time, as part of the due diligence, Guy Kelly had provided all the driver files with all the information that he had available, had been provided to U.S. Xpress, and was in U.S. Xpress's possession in Chattanooga.

Q Okay.

A Okay?

Q What about with respect to the due diligence on the equipment, who handled that?

A Jerry Elkins, Mike Murphy. And part of that due diligence, they reviewed equipment on-site as well as at several locations where Guy Kelly had equipment.

Q And is the purpose of that just to check out the condition of the equipment to help you all determine what it's worth?

A Yes, what it's worth or whether the equipment could actually be used based on our specs.

Q And while that due diligence is going on,





you're negotiating with Guy on behalf of U.S. Xpress, correct?

A Negotiating potential terms and conditions on behalf of U.S. Xpress.

Q Give me some examples of potential terms and conditions that you and Guy were negotiating during that time frame.

A During that time frame, we negotiated the initial number of drivers. The way we approached the contract was an asset purchase, and Guy Kelly wanted -- additionally wanted goodwill in his terms, what he defined as goodwill; goodwill being moneys that are associated with the general valuation of the company or what it's all about. There's really no specific assets you can put the value on.

So we looked at -- I looked at and talked with Guy Kelly about the concept of how many drivers that he would get signed on, in addition to a continuing relationship to maintain that driver base. In that concept, I explained to him that really the drivers and the continuing relationship to continue to keep drivers or grow drivers is what I would term goodwill. The physical asset purchase had to do with the physical pieces of equipment, the tractors and the trailers and the accounts receivable.





So we had discussions along those lines of how many drivers could he potentially -- out of his 175 to 200 drivers, how many could he believe based on discussion that he had had with safety people at U.S. Xpress on how many drivers he thought he could really qualify within U.S. Xpress's guidelines.

Q In the context of the stock purchase, earlier I think you told me that the drivers would remain employed by whoever they were with before the stock purchase, correct?

A Correct.

Q But what I hear you saying is with an asset purchase, it's different?

A It's different.

Q How is it different?

A It's different in that the drivers have to become employed by U.S. Xpress or independent -- sign on as independent contractors under U.S. Xpress operating authority. So they have to meet standards of U.S. Xpress.

Q Is that always the situation with an asset purchase?

A Yes.

Q Did you understand early on in the due diligence process that if there was a conversion, the

drivers would go to work for U.S. Xpress?

A They would go to work for -- if U.S. Xpress would own the assets, they would have become employed within the U.S. Xpress umbrella, yes.

Q Did you explain that to Guy Kelly?

A Yes.

Q Did you and Guy Kelly negotiate a figure with respect to how many drivers would be at issue?

A Based on the initial conversations that we had and discussions based on his overall total and what he thought, we -- on the initial asset purchase agreement, I believe we -- somewhere between 145, 150. I don't remember the number exactly, but it was somewhere -- because typically if they had 200 drivers, we would look at having around 75 -- we would need at least 75 percent, so that's where we get to the number of about 150 drivers.

Q So it was your belief based on your investigation during due diligence that G.F. Kelly Trucking had about 200 drivers?

A He represented that he had approximately 200 drivers, counting spotting drivers, independent contractor drivers. Guy Kelly seemed to come up with drivers where we didn't know there was drivers.

Q And initially it was your belief that you all





were going to need 140 to 150 of those drivers?

A 145 to 150 range.

Q Initially, did you do anything to verify this number of 200 drivers?

A Just through the driver list that he would provide, just a listing of driver names. Part of the initial gathering of the information he would provide, you know, kind of how many drivers he had that were three years, four years, two years, one. Just kind of a global in the initial information request I always looked for.

It just give me kind of a summary of the number of drivers that you represent, and he had provided that. So based on initial conversations, just initial raw data, he was saying he had somewhere in the neighborhood of 190, 200 drivers under his control.

Q And at this stage, did you undertake to determine whether or not any of those 200 drivers would be able to work for U.S. Xpress or contract --

A I did not, but U.S. Xpress did through the safety department.

Q Russ Moore?

A Yes, through the initial general review of the driver file.

MR. HALL: Let him finish his question before





you --

THE WITNESS: What was that?

MR. HALL: I said, let him finish his question before you answer.

THE WITNESS: Okay.

Q Okay. So you've finished your week-long due diligence in Wadley, you've made a recommendation to go forward, and Russ Moore and his crowd are undertaking to determine how many of these 200 drivers could get qualified to drive for U.S. Xpress if there was a conversion, correct?

A The recommendation was to move forward with the due diligence process.

Q I gotcha.

A Okay. Russ Moore's review is an initial review to determine on paper approximately how many are -- would be absolute yeses, how many were absolute noes based on the documentation in the file, and what the population of undetermined amount was to see if you were in the ballpark of having the opportunity to qualify that many drivers.

Q And during the due diligence process, did Russ Moore on behalf of U.S. Xpress determine that G.F. Kelly was in the ballpark such that the due diligence could go forward?





A The -- between -- after the first draft of the asset agreement which was provided to Guy Kelly based on negotiations and based on Russ Moore's review, there was a carved down number of drivers due to the fact that there were some issues with his driver base. So by the second asset agreement, we had lowered that requirement.

Q At what point during the due diligence for G.F. Kelly was the asset purchase agreement entered into? Had you completed your due diligence before that agreement was entered into?

A No.

Q That agreement was entered into while the due diligence process was still ongoing. Is that correct?

A Yes.

Q When did you finish the due diligence process?

A I finished the due diligence process on the day that we terminated the agreement.

Q Is that standard operation for the due diligence process?

A Yes.

Q Once your due diligence has determined that the conversion cannot go forward, U.S. Xpress terminates the process, correct?

A Yes.

Q Okay. So during the due diligence process, an

asset purchase agreement is entered into, correct?
A Yes.
Q Among other things, that asset purchase agreement contemplates that G.F. Kelly Trucking will have 145 to 150 drivers who are qualified to drive for U.S. Xpress if the conversion takes place, correct?
A The conditions of the contract were twofold: That that many drivers could qualify and -- and that they had accepted to come to work within the contract provisions that you had to meet the 145 drivers. And the decision to bring a driver on under the terms and conditions of the contract were at the sole discretion of U.S. Xpress.
Q Subsequent to the original asset purchase agreement based on Russ Moore's due diligence with respect to the drivers, the number of 145 is reduced, correct?
A Correct.
Q And that's because -- well, let me ask you. Why was the number reduced?
A Well, the number was reduced because the number of driver files and issues involved, it appeared that 145 was not an attainable number. And through negotiations and discussions with Guy Kelly, we were willing to move forward with a lower number and Guy





Kelly was willing to move forward with a lower number, as Guy Kelly's earnout or his goodwill was determined by the number of drivers. So it was a joint decision to move forward with a lower number.
Q How specifically was his earnout or his goodwill determined by the number of drivers?
A The agreement was written with two -- two sections on it. One section dealt with the initial number of drivers, so if 135 or the number that would meet the criteria signed on, he got an up-front payment. I don't recall exactly how much, but he would get an up-front payment.
Then there was -- it was important that those drivers stay for at least six months, so there was a detriment against that initial payout and an earnout against that initial payout. So there was some number -- $2,500 or $2,000 or something -- up front.
Then if that driver left in the first month, that money was to be recovered out of the entire pot, so he would have to refund that $2,000. If it went another month past there, then he would have to refund less. And then the final -- there was a final payout if it went the entire six months, he would get an additional $500 or $1,000. I don't know what the number was.
So that was the front -- I said there was two





pieces. That was the front piece, how he would get paid. Then there was a back piece that we agreed to, because typically on an asset purchase you would do something based on the revenue or an earnout. You'd say as an owner you would receive X percent of the revenue.
Guy Kelly's position was, I really want someone to do the transaction, I don't have that much control over the revenue. Therefore I agreed that he probably doesn't have that much control over the revenue, but what he does have control over is helping to build the driver base.
So therefore we set up a matrix that would just -- the number of drivers at the end of each month that were in the pot that was associated with Guy Kelly, he would receive an earnout for the next two years and that would be his earnout of his goodwill and he received no salary.
Q What's the importance to U.S. Xpress of retaining the G.F. Kelly drivers?
A The importance of whether it's G.F. Kelly or any potential company that we would do a transaction with is that drivers are very expensive to replace. I think it costs in the neighborhood of 2,000 upwards to $5,000 to replace a driver. So we were not going to enter into a contract to where -- again, you can't





physically own a human being like you can a tractor. These are individuals who can resign at any point in time.
So if we're going to make the investment for those drivers, it's very important that you get some earnings or some earnout out of that driver if I'm going to pay you for a driver. So there's an incentive for there for -- I get some money up front but you have to help retain that driver for us to get our earnout out of that driver.
Q Okay. So we have our initial purchase -- asset purchase agreement with 145 drivers, and the amended asset purchase agreement requires how many?
A When we say the initial purchase agreement, there was no executed initial purchase agreement. It was only a purchase agreement for consideration.
Q Okay.
A The final purchase agreement was somewhere around, you know, 135, 140. I don't know the number, but it was a lower amount of drivers from the initial draft we discussed.
Q But only slightly lower?
A Only slightly lower.
Q All right. Tell me about your -- and we may have already talked about this a little bit, but tell me

about your second visit to Wadley during the due diligence process.

A My second visit to Wadley during the due diligence process was -- and I believe Guy wasn't even there present when I went. I went to continue to follow up on the supporting documentation for the loans, to see where we were at, and also to have discussions with Nelson Chastain as far as the potential role of Nelson going forward as being a part of the organization.

Q What did those discussions with Nelson entail?

A Basically entailed, you know, where Nelson thought he might fit in going forward, how he felt about the transaction, what he thought of it. Also, I asked him questions about what he thought of some of the individuals in the company like Frank Childers, Randall Fant.

So -- and also we discussed some of the customer base and, you know, whether he had any concerns or not as far as, you know, keeping customers going forward, they had to get a better handle on -- really what Nelson thought about everything.

Q What did he tell you?

A He told me he was excited about, you know, the potential opportunity of working directly with U.S. Xpress and, you know, he saw it as an opportunity for





their business to grow in the future and that he would be willing to stay on board.

Q Would Nelson ask you to comment on whether or not this is going to happen? I mean, would he say, Do you think that this is really going to go down, am I really going to get a job with you at U.S. Xpress? Would he ask you questions like that?

A He asked me questions like that. My response to him is that each step of the due diligence process, we have to make it through every step. They've got to qualify the drivers and we have to meet all the requirements in order for us to close.

Q During your second trip to Wadley, based on everything you knew at the time of the second trip after talking to Nelson, did you form an opinion as to whether or not you thought the conversion was going to go through?

A My job as facilitator is to execute all the steps. We were going through that process, so as a second visit, you know, the steps were still moving forward and we had to accomplish each individual task to move to a closing date.

Q Your goal was to get to a closing date, correct?

A That's my goal as facilitator.





Q You were there talking to Nelson in part to get to a closing date, correct?

A Correct.

Q You're doing your due diligence in your week-long review to try to get to a closing date, correct?

A Correct.

Q Certainly you never indicated during that second meeting to anyone that there would not be a closing date, correct?

A During the due diligence process, you're not at a point where you can say whether there's going to be or not going to be a closing date. My job as facilitator it is to do the due diligence and make all the steps happen. That's what I do -- did.

Q You explained the due diligence process to Guy Kelly, correct?

A Yes, I did.

Q And you explained the due diligence process to Nelson Chastain, correct?

A Yes, I did.

Q You were the representative on behalf of U.S. Xpress who explained the due diligence process to G.F. Kelly Trucking, correct?

A Yes.





Q And you wanted them to listen to what you said about the due diligence process and rely on what you said about the due diligence process, correct?

A The answer to that is yes. I -- very clear -- I am extremely clear -- as a part of my job as VP of business development, I'm extremely clear under the steps and the risks of the things that have to happen that must take place in order for me to close.

Q Based on your representations to Guy and Nelson, they understood that the culmination of this process was the closing, correct?

MR. HALL: Object to the form.

Q You can still answer unless he tells you not to.

MR. HALL: You can answer.

A The objective of the process as I described is that there are conditions within the contract that have to take place that are presented to the seller that specifically outline the events that have to occur. If those events occur, there will be a closing because that is the conditions of the contract. That is made extremely clear each and every step of the way.

Q You made that extremely clear --

A Yes, I did.

Q -- to Guy and Nelson. That's your testimony?

A Yes.
Q Anything else you remember about this second visit to Wadley?
A No.
Q What do you recall about your next visit to Wadley?
A My third visit to Wadley was just prior to the driver process, the direct review of the driver and paperwork. It was just before that. The purpose of that was again to lay down in front of Guy and Nelson the things that must take place. Also, we had general discussions on how we were going to try to accomplish that as far as where the driver was going to have to be in order for the driver to be reviewed by our safety department.
Q And at the occurrence of your third trip to Wadley, is it fair to say that the other aspects but for this driver issue -- that the other aspects of the due diligence were complete?
A No.
Q What else was still hanging out there besides the drivers on this third meeting?
A We still did not have all the documentation to support the loan agreements on the assets. We still did not have payoff letters -- all the final payoff letters





from those companies. We had not received anything from the factoring company that would have provided a payoff and a release of the factoring agreement.
Q What's -- I didn't mean to interrupt you, but what's a factoring agreement?
A A factoring agreement is an agreement between a company and a factoring company that basically says that they will loan money against those receivables or those billings as they occur so that they take possession -- you know, the factoring company can be with recourse or without recourse depending on how they're written, and I can't remember how that one was written, but they're very specific for a period of time. Every one year, two years, three years they sign a contract that says this is the term.
And as the invoices are created, they are funded -- either 85 percent or 90 percent or some number -- by the factoring company. Then those collections are still handled by the original party, and it may or may not be that way, but they handle it. The moneys then flow through an account which pay off that note, and the only way the company gets future funds is from future billings.
And they have penalties in there for early payout, you know, and releases and things that have to





occur in order before they close out that agreement.
Q Was there just one factoring agreement at issue?
A Yes.
Q Who was it with?
A I think it was International something. I don't recall.
Q So is it your testimony that during this third meeting, you were still asking Guy to provide more information about the factoring agreement?
A Yes.
Q Did you deal with International at all in obtaining the information?
A No.
Q Why?
A Because that's their company. I have no relationship with that company.
Q Is it your testimony that you told Guy and Nelson you still needed this information during this third meeting?
A Yes.
Q What did they say in response?
A They said that they were working on getting that information to me. I made it very clear to them that we cannot close on that -- on the asset purchase





without having that information.
Q During this third meeting, were you all actually kicking around dates for the closing?
A We were kicking around potential dates based on the amount of time it would take to complete the condition -- the items of the condition.
Q Was there a discussion of some August closing dates?
A I don't remember exactly how the contract was written, but it was -- the discussion was centered around the contractual arrangements.
Q I think you told me earlier that the closing was scheduled mutually by both parties, correct?
A That's correct.
Q In other words, to have a closing, U.S. Xpress has got to agree on a date and G.F. Kelly Trucking's got to agree on a date, correct?
A That's correct.
Q And what you're saying is during this third meeting during the due diligence process, you all are kicking around potential closing dates, correct?
A That would be correct.
Q Anything else that you remember that happened during this -- your third meeting to Wadley -- your third trip to Wadley?

A No.
Q All right. You said it was right before something.
A It was right before -- the third meeting at Wadley was to jointly agree on a process on how to basically qualify -- the final qualification and sign-up of the drivers.
Q All right. I want to talk about that, but I want to ask you about something first. We talked about three conversions that you did during this '04 to '06 time frame with U.S. Xpress, correct?
A Correct.
Q All of those were stock purchases, correct?
A Correct.
Q Now, we've been talking about an asset purchase with G.F. Kelly Trucking, correct?
A Correct.
Q So this is the first process that we've talked about where you actually had to qualify drivers, correct?
A Correct.
Q My question is, during this '04 to '06 time frame, was there any other company that got as far along as G.F. Kelly did in the process to where you were dealing with the qualification of drivers?
A No, not in an acquisition of assets, not in an





asset purchase.
Q Well, if I'm hearing you right, that's the only time you qualify drivers is in an asset purchase.
A The other time is when you do an agent agreement.
Q Between '04 and '06, did you facilitate an agent agreement on behalf of U.S. Xpress that involved the qualification of drivers?
A Yes.
Q How many companies?
A I was personally -- I was personally involved with one, and there was three other agents that had been acquired -- negotiated contracts with during that time frame that I was not involved in.
Q Who were you personally involved with?
A Bryant Transportation.
Q Where is that?
A In -- trying to think of the town in Georgia. It's near Dalton.
Q Did you conduct the due diligence process for Bryant?
A Yes.
Q Is it similar to the due diligence processes that you've described for me already today?
A Yes.





Q Did the Bryant deal go to a closing?
A Yes.
Q It was converted?
A Yes.
Q Was the Bryant driver qualification before or after the G.F. Kelly driver qualification?
A I don't recall.
Q Now, I'm trying to find out --
A I don't recall.
Q I'm trying to find out if you had actually gone through the process of conducting a driver qualification on behalf of U.S. Xpress before you did this one at G.F. Kelly.
A I don't recall. They were right around the same time frame, so I can't say one finished before the other.
Q You only did two, correct?
A Correct.
Q And they were right around the same time frame?
A Correct.
Q Did you set them up the same way?
A No. An agency's different.
Q Tell me how.
A An agency is the company's ownership remains totally intact. All the employees are the employees of





the agent. The drivers are employees of the agent. The agent leases their trucks to U.S. Xpress. The agent has total 100 percent control of their business.

In an asset purchase, the control of those assets and those drivers become -- the buyer has total control over those assets and drivers.
Q And the first -- the one and only driver qualification you did for an asset purchase with U.S. Xpress was the one for G.F. Kelly, correct?
A That I was involved in.
Q That you were involved in?
A Right.
Q All right. Well, tell me how the driver qualification process worked at G.F. Kelly.
A In my role as due diligence as primarily the finance side, I was not in charge or directly participating in that process, so I can't really tell you how that went.
Q Who was in charge of that process on behalf of U.S. Xpress?
A It would be Russ Moore and Al Hingst.
Q What's the purpose of the driver qualification process?
A From my perspective -- and, again, it's my perspective -- the purpose of the driver qualification