# EXHIBIT "D"

# American Court Reporting
## toll-free (877) 320-1050

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

CIVIL ACTION NUMBER: 3:06-CV-351-MEF

G.F. KELLY TRUCKING, INC.; and GUY
KELLY, individually,
    Plaintiffs,
vs.
U.S. XPRESS ENTERPRISES, INC., et al.,
    Defendants.

DEPOSITION TESTIMONY OF
WILLIS FRANKLIN CHILDERS

January 25, 2007
10:00 a.m.

COURT REPORTER:
MELANIE L. PETIX, CSR, CLR

Page 2

1    S T I P U L A T I O N S
2        It is hereby stipulated and
3    agreed, by and between the parties
4    through their counsel, that the
5    deposition of WILLIS FRANKLIN CHILDERS
6    may be taken  before Melanie L. Petix,
7    Certified Shorthand Reporter, Certified
8    LiveNote Reporter and Notary Public for
9    the State of Alabama at Large, at the
10   offices of Baker, Donelson, Bearman,
11   Caldwell & Berkowitz, Wachovia Tower,
12   420 20th Street North, Suite 1600,
13   Birmingham, Alabama 35203 on January
14   25, 2007, commencing at 10:00 a.m.
15       It is further stipulated and
16   agreed that the signature to and the
17   reading of the deposition by the
18   witness are waived, the deposition to
19   have the same force and effect as if
20   full compliance had been had with all
21   laws and rules of Court relating to the
22   taking of depositions.
23       It is further stipulated and

Page 3

1    agreed that it shall not be necessary
2    for any objections to be made by
3    counsel as to any questions except as
4    to form or leading questions, and that
5    counsel for the parties may make
6    objections and assign grounds at the
7    time of trial, or at the time said
8    deposition is offered in evidence, or
9    prior thereto.
10       In accordance with Rule 5(d)
11   of The Alabama Rules of Civil
12   Procedure, as amended, effective
13   May 15, 1988, I, Melanie L. Petix,
14   Certified Shorthand Reporter and
15   Certified LiveNote Reporter, am hereby
16   delivering to David B. Hall the
17   original transcript of the oral
18   testimony taken on January 25, 2007.
19       Please be advised that this is
20   the same and not retained by the Court
21   Reporter, nor filed with the Court.
22           --oOo--
23

Page 4

1    A P P E A R A N C E S
2
3    FOR THE PLAINTIFF:
4        JOHN EVERETT TOMLINSON, Esq.
5        BEASLEY, ALLEN, CROW, METHVIN,
6        PORTIS & MILES, P.C.
7        P.O. BOX 4160
8        MONTGOMERY, ALABAMA 36103-4160
9
10   FOR THE DEFENDANTS:
11       DAVID B. HALL, Esq.
12       BAKER, DONELSON, BEARMAN,
13       CALDWELL & BERKOWITZ, P.C.
14       Wachovia Tower
15       420 20th Street North, Suite 1600
16       Birmingham, Alabama 35203
17
18   ALSO PRESENT (via teleconference):
19       Lisa Pate
20       Melissa Kell
21
22
23

1  (Pages 1 to 4)

## www.AmericanCourtReporting.com
## January 25, 2007

**American Court Reporting**
**toll-free (877) 320-1050**

Page 5

1      I N D E X
2
3   EXAMINATION BY:        PAGE
4   MR. HALL          7
5
6
7      E X H I B I T S
8
9   DEFENDANT'S         PAGE
10   No. 88        117
11
12      --oOo--
13
14
15
16
17
18
19
20
21
22
23

Page 6

1      I, Melanie L. Petix, a
2   Certified Shorthand Reporter, Certified
3   LiveNote Reporter and Notary Public for
4   the State of Alabama at Large, acting
5   as Commissioner, certify that on this
6   date, pursuant to the Alabama Rules of
7   Civil Procedure, and the foregoing
8   stipulations of counsel, there came
9   before me at the offices of Baker,
10   Donelson, Bearman, Caldwell &
11   Berkowitz, Wachovia Tower, 420 20th
12   Street North, Suite 1600, Birmingham,
13   Alabama 35203, on January 25, 2007,
14   commencing at or about 10:00 a.m.,
15   WILLIS FRANKLIN CHILDERS, witness in
16   the above cause, for oral examination,
17   whereupon, the following proceedings
18   were had:
19
20      WILLIS FRANKLIN CHILDERS,
21   having been first duly sworn
22   (affirmed), was examined and testified
23   as follows:

Page 7

1      COURT REPORTER: Usual
2   stipulations?
3      MR. HALL: Sure.
4      MR. TOMLINSON: Yes.
5
6   EXAMINATION BY MR. HALL:
7      Q. Mr. Childers, if you could,
8   please state your full name.
9      A. Willis Franklin Childers.
10      Q. Could you spell your last
11   name, please?
12      A. C-h-i-l-d-e-r-s.
13      Q. Mr. Childers, I represent U.S.
14   Xpress in a case that was filed by G.F.
15   Kelly Trucking, Inc. and Guy Kelly.
16   I'm going to be asking you some
17   questions today. If I ask you any
18   questions that you don't understand, I
19   don't speak loud enough or I ask a
20   confusing question, please let me know,
21   ask me to restate it or speak up and I
22   will try to do it so that you
23   understand what I'm trying to ask you.

Page 8

1   If I do ask you a question and you
2   answer it, I will presume that you
3   understand the question. Is that fair?
4      A. Yes, sir.
5      Q. And also, for purposes of the
6   court reporter taking down what you
7   say, she can't write down nods or
8   uh-huhs or uh-uhs. So you need to
9   answer audibly. Okay?
10      A. Okay.
11      Q. Mr. Childers, where do you
12   reside?
13      A. Dadeville, Alabama.
14      Q. What is your address there?
15      A.
16
17      Q. How long have you lived at
18   that location?
19      A. Four years in June.
20      Q. I'm going to ask you about
21   your educational background starting
22   with high school.
23      Where did you graduate from

2   (Pages 5 to 8)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 9

1  high school?
2      A.  Auburn High School.
3      Q.  What year was that?
4      A.  1960.
5      Q.  Did you go to college after
6  that?
7      A.  Went in the military.
8      Q.  Military.  Okay.  Have you had
9  any education --
10     A.  I'm sorry.  I'm sorry.  One
11  quarter at Auburn and then in the
12  military.
13     Q.  Have you attended any -- other
14  than that quarter at Auburn, have you
15  attended any other universities or
16  colleges?
17     A.  One more quarter after that in
18  '62, I believe it was, 1962.
19     Q.  Okay.  What branch of the
20  service were you in?
21     A.  Air Force.
22     Q.  When did you get out?
23     A.  Same year I went in, '61.

Page 10

1      Q.  '61?  When you got back, is
2  that when you went to the second
3  quarter at Auburn?
4      A.  No, sir.  I got back in '61.
5  I didn't go the second quarter until
6  '62.
7      Q.  Okay.  Have you had any other
8  education, formal education, since that
9  second quarter at Auburn?
10     A.  No, sir.
11     Q.  I'm going to ask you about
12  your job history up to the present.
13  Simplest way to do it is start at the
14  beginning and work our way forward.
15         What was the first job you had
16  after high school besides the military?
17     A.  Working for my father.  He had
18  a grocery business.
19     Q.  All right.  Where was that?
20     A.  Auburn, Alabama.
21     Q.  Auburn.  How long did you work
22  there?
23     A.  Worked there really from the

Page 11

1  time I was about 12 years old up until
2  about 25 or 26.
3      Q.  What did you do after that?
4      A.  I worked with Colonial Baking
5  Company for four years out of
6  Montgomery, Alabama.
7      Q.  How many years?  I'm sorry.
8      A.  About four.
9      Q.  Four years?
10     A.  Yes.
11     Q.  What years were they?
12     A.  Let's see.  Had to be
13  somewhere around '65 to about '69.
14     Q.  What did you do for Colonial
15  Baking?
16     A.  I was a salesperson.
17     Q.  Were you on call 24 hours a
18  day?
19     A.  Yes, sir.
20     Q.  You lasted a long time.  What
21  did you do after Colonial Baking?
22     A.  Uniroyal, at the time that was
23  the name of it, Uniroyal, and, you

Page 12

1  know, Uniroyal and Goodrich, Michelin
2  bought them out.  But it was -- I went
3  there in -- I believe it was December
4  of '69 is when I went to work there and
5  I worked there until 1993, September of
6  '93.
7      Q.  I imagine you held more than
8  one position there?
9      A.  Yes, sir.
10     Q.  If you could, just run me
11  through it, as best you can recall?
12     A.  Well, I went in just to work
13  in the factory to start with.  I was a
14  steward, which is just a departmental
15  job in the union.  I was a supervisor
16  in the plant.
17     Q.  Okay.
18     A.  Then I was chairman of the
19  union, which is over a division of the
20  plant, and then I was president of the
21  union.  And I was with the corporate
22  office for a very short period of time
23  in Detroit, Michigan.  And then I came

3  (Pages 9 to 12)

# American Court Reporting
## toll-free (877) 320-1050

Page 13

1　back and worked in the plant for a
2　while and then I was president of the
3　union until I retired.
4　　Q.　And you did that up until '93?
5　　A.　Yes, sir.
6　　Q.　After you left, I'm going to
7　call it Uniroyal, Goodrich, after you
8　left there in '93, where did you go?
9　　A.　I didn't do anything, really.
10　I bought a place on Lake Martin and
11　remodelled it for several months. And
12　I went to a truck driving school. I
13　got my license. I wanted to drive a
14　truck and I did that. And I bought
15　several trucks, leased them all to Guy
16　Kelly. And that's how I met him.
17　　Q.　What truck driving school did
18　you go to?
19　　A.　It's the same one they have at
20　Southern Union in Opelika now. It's
21　changed names, but it's --
22　　Q.　It's in Opelika?
23　　A.　Yes, sir. It was in Cusseta

Page 14

1　at the time just up the interstate from
2　Opelika, Exit 70. Opelika is exit
3　what, 64. So it's six miles from the
4　last exit in Opelika.
5　　Q.　Did you drive for anybody?
6　　A.　Yes.
7　　Q.　Who?
8　　A.　Kelly.
9　　Q.　Oh, okay.
10　　A.　And I drove for Salem
11　Carriers. I believe it was three trips
12　for them, from Alexander City southeast
13　of here to Eagle Pass, Texas. And I
14　did that on weekends while I was
15　working for the State.
16　　Q.　Did you work for Salem
17　Carriers before you went to work for
18　Kelly?
19　　A.　No, sir. I think it was two
20　or three trips, I think that's all I
21　made out there for them.
22　　Q.　For Salem?
23　　A.　Yes, sir.

Page 15

1　　Q.　Were you an owner/operator?
2　　A.　No. I was driving one of
3　their trucks. They were just behind on
4　what they had to pull out of Russell
5　Mills in Alex City.
6　　Q.　After you got your CDL, you
7　indicated you bought several or bought
8　some trucks; is that right?
9　　A.　Yeah.
10　　Q.　Is that what you did right
11　after you got your CDL; did you
12　immediately buy a truck?
13　　A.　Yes. Uh-huh. Yes.
14　　Q.　That won't be the last time.
15　　　And you became a contractor
16　for Mr. Kelly?
17　　A.　Yes. Yes.
18　　Q.　What year was that?
19　　A.　'94.
20　　Q.　Did you start out with just
21　one truck?
22　　A.　Yes, sir.
23　　Q.　You indicated you were working

Page 16

1　for the State during the week?
2　　A.　I was with Kelly, I drove for
3　him '94 up until late spring of '95,
4　and I still had trucks leased on up
5　there, other trucks. I worked at the
6　lake house for about three months that
7　year, working on, you know -- in the
8　yard, outside. And Guy called me and
9　asked me to come drive one of his
10　trucks until he could find somebody to
11　drive it, to help him out. And that
12　was sometime in August of '95, and I
13　did that until about the first of 1996.
14　That's when I went with the State.
15　　Q.　Did you have drivers that
16　worked for you?
17　　A.　Yes, sir.
18　　Q.　How many -- I will call them
19　employees. How many employees did you
20　have '94 to '95?
21　　A.　Four. At one time, four.
22　　Q.　And four tractors?
23　　A.　Yes, sir. Well, really I had

4　(Pages 13 to 16)

## www.AmericanCourtReporting.com
## January 25, 2007

**American Court Reporting**
**toll-free (877) 320-1050**

Page 17

1  five tractors, but four drivers.
2      Q.  And you leased all of them to
3  Mr. Kelly?
4      A.  Most of the time.  A couple of
5  times, I had one leased to a company in
6  Tuscaloosa, one leased to a company
7  here in Birmingham.  But then I pulled
8  them back in and put them back with
9  Kelly.
10     Q.  What did you do for the State
11  in '96?
12     A.  I was a truck driving
13  instructor.
14     Q.  Was that at Southern Union?
15     A.  No, not at that time.  It's
16  where it is now.  At that time, it was
17  at Cusseta, Alabama.
18     Q.  How do you spell Cusseta?
19     A.  C-u-s-s-e-t-a.
20     Q.  I wouldn't even come close.
21     A.  It was there in the office
22  until '98 and we moved to Opelika.  But
23  not at Southern Union.

Page 18

1      Q.  But it's the same school?
2      A.  No.  Not at that time, no.
3  It's the same group that's at Southern
4  Union today, but it was Central Alabama
5  Skills Center when I was there.
6      Q.  What aspect of -- I assume
7  this is commercial driver's training?
8      A.  Yes.
9      Q.  What aspect did you teach?
10     A.  All of it.
11     Q.  That's a simple answer.
12         How long did you work for the
13  State?
14     A.  From the first of 1996 to July
15  of 2000.
16     Q.  During this time period, were
17  you leasing tractors to Kelly Trucking?
18     A.  Yes.
19     Q.  And you had one occasion or a
20  few times you leased to Salem Carriers?
21     A.  No.  No.  I said I drove a
22  company truck for Salem Carriers.
23     Q.  I'm sorry.  I misunderstood

Page 19

1  you.
2      A.  To help a friend out.
3      Q.  All right.  '96 to July of
4  2000, you maintained the same number of
5  trucks, roughly, the same number of
6  employees?
7      A.  Not until 2000, no.  '99 is
8  when I sold all my trucks.  Latter part
9  of '99 is when I sold the last one.
10     Q.  At that point in time, were
11  you out of the trucking business, other
12  than teaching?
13     A.  Yes.
14     Q.  Why did you get out?
15     A.  Why did I sell my trucks?
16     Q.  Yes, sir.
17     A.  Phone calls at 2:00 or 3:00 in
18  the morning and just keeping drivers.
19  Sometimes, hard to keep drivers.
20     Q.  In July of 2000, what did you
21  do then?
22     A.  Went to work with Guy Kelly.
23     Q.  What did you go to work with

Page 20

1  Mr. Kelly as?  What was your title?
2      A.  I was the safety director.
3      Q.  Did you work continuously
4  with -- was that with Kelly Trucking?
5      A.  Yes.
6      Q.  Did you work continuously with
7  Kelly Trucking from that point to, I
8  guess, August of 2005?
9      A.  No.
10     Q.  How long did you work with
11  Kelly Trucking?
12     A.  I left in October of that same
13  year.
14     Q.  Okay.
15     A.  I believe it was -- yeah, that
16  was in 2000.
17     Q.  Somewhere in the fall?
18     A.  Yeah.  October.  I think it
19  was October.  About ten weeks.
20     Q.  Why did you leave?
21     A.  I guess I didn't have the
22  control that I thought I needed to run
23  my job.

5  (Pages 17 to 20)

**www.AmericanCourtReporting.com**
**January 25, 2007**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 21

1  Q. What did you do after you
2  left?
3  A. Went back with the State.
4  Q. Same position?
5  A. Yes.
6  Q. What was your title?
7  Instructor?
8  A. Truck driving instructor.
9  Q. Okay. I assume this is fall
10 of 2000 that you went back?
11 A. Yes.
12 Q. How long did you stay with the
13 State the second time?
14 A. July of 2001.
15 Q. You know what the next
16 question is.
17    Where did you go next?
18 A. Kelly.
19 Q. How long did you stay at Kelly
20 Trucking the second time?
21 A. Until -- with the group -- you
22 know, it's one of these now. He's
23 changed the name. But I was there

Page 22

1  until the latter part of -- until
2  December of last year. I started to
3  work where I am now January the 1st.
4  Well, January the 2nd.
5  Q. I'm not sure I understand.
6  A. You are saying Kelly on one
7  hand, but it's Eagle. When I left, the
8  name of the company was Eagle.
9  Q. When did it switch from Kelly
10 Trucking to Eagle?
11 A. In '05. No. No. What's
12 this?
13 Q. '06.
14 A. '06.
15 Q. So you worked with Kelly
16 Trucking from roughly July '01 until it
17 changed its name to Eagle?
18 A. I was still with them then.
19 Yeah. I just left Wadley, Alabama. I
20 just left G.F. Kelly or Guy.
21 Q. In December of '06?
22 A. '06. My last day was the 31st
23 of December.

Page 23

1  Q. But from July 2001 up until
2  the end of '05, you were an employee of
3  Kelly Trucking?
4  A. Yes.
5  Q. Were you safety director that
6  entire time?
7  A. Yes. Safety and personnel,
8  HR.
9  Q. At Kelly Trucking, what did
10 you do? Describe your job. She has
11 got plenty of pages, if it takes a long
12 time.
13 A. Well, I guess the long story
14 short would be, applications,
15 applications that came through were
16 approved in my department. MVRs were
17 run in my department. Any advertising
18 for it came out of my department. Any
19 discipline that took place came out of
20 my department. I guess that would be,
21 basically, the hiring and firing came
22 through my department.
23    I dealt with all the claims

Page 24

1  that came in from the, you know,
2  different customers that we had. I
3  dealt with that on a daily basis.
4  Tickets, citations, things of that
5  nature had to be recorded and kept up
6  with. Kept up with all drug and
7  alcohol preemployment, random,
8  suspicion, postaccident, things of that
9  nature.
10 Q. Logbooks?
11 A. Yes, sir. Logbooks, yes. I
12 handled all the Lease Agreements.
13 Q. With the drivers?
14 A. Yes, sir.
15 Q. I just wanted to make sure, as
16 opposed to finance companies that would
17 lease tractors to Kelly, did you deal
18 with those as well?
19 A. I dealt with them after Guy.
20 You know, Guy would have to sign off
21 and sign the lease and then the
22 paperwork came to me, yes. Because I
23 had to plate the trucks and register

**www.AmericanCourtReporting.com**
**January 25, 2007**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 25

```
 1  the trucks. If they just sent an MSO
 2  and a bill, I would have to take that
 3  paperwork to the county courthouse to
 4  get them titled in the State. I
 5  handled insurance, physical damage
 6  cargo, liability, general liability.
 7     Q. No sales?
 8     A. I made a couple of calls, but
 9  nothing -- no, sir, not in the respect
10  that you would think of sales, no. No.
11     Q. Okay.
12     A. And this is the end of '05,
13  right?
14     Q. Yes, sir. Or '05.
15     A. Right.
16     Q. Let me go back a second. You
17  mentioned that you did not have the
18  control that you thought you would have
19  when you worked with Kelly Trucking in
20  2000.
21        What kind of control did you
22  expect to have that you didn't have?
23     A. His brother worked for me.
```

Page 26

```
 1  Family. If I need to go further, I
 2  will, but I don't think I should.
 3     Q. Did his brother previously
 4  hold that position?
 5     A. Yes.
 6     Q. Did his brother eventually go
 7  into his own trucking business?
 8     A. His brother always had one or
 9  two trucks that he owned himself. And
10  he drove. When I first went up there,
11  he drove, the brother did. And he went
12  into the office, but he still had a few
13  trucks that, you know, he would get
14  drivers for.
15     Q. Was he leasing them to Kelly
16  Trucking?
17     A. Yes. He still -- I think one
18  truck is all he had when I went to work
19  there in 2000. I believe it was just
20  one truck that he had at that time.
21     Q. When you went to work for
22  Kelly Trucking in 2000, did it have any
23  hiring criteria?
```

Page 27

```
 1     A. Talking about as far as --
 2     Q. Drivers.
 3     A. -- moving violations and --
 4     Q. Correct. I mean, what --
 5     A. Your basic, no more than three
 6  moving violations and accidents or a
 7  combination thereof for a three-year
 8  period. Which it has changed now. And
 9  as far as me sitting here spitting it
10  out word for word, I can't. And I say
11  it's changed from the standpoint, the
12  insurance company, one time per year
13  they will shoot you a sheet and say,
14  this is the requirements for you to be
15  able to hire somebody.
16     Q. Did you have any -- when I say
17  you, I'm talking about Kelly Trucking
18  -- have any written hiring instructions
19  or standards?
20     A. Were there --
21     Q. Yes, sir.
22     A. -- at the time that I went to
23  work there?
```

Page 28

```
 1     Q. Yes, sir.
 2     A. Yes.
 3     Q. Did those still exist when you
 4  left or had they changed by then?
 5     A. And you are speaking of when,
 6  now, what year?
 7     Q. 2005.
 8     A. If they changed any at all,
 9  the three moving violations, which was
10  the main part of it, it was still there
11  and the accident or the combination
12  thereof. That was mainly the meat of
13  what the insurance company wanted to
14  get to.
15     Q. While you were there, was
16  there a policy -- and I'm talking about
17  2000 to 2005 -- was there a policy on
18  -- I'm talking about for hiring now --
19  prior positive drug testing or prior
20  positive drug tests?
21     A. What we used -- you know, if
22  they told you, that's the key to it.
23     Q. Right.
```

7 (Pages 25 to 28)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 29

1    A.  You had two years, if we tried
2  to hire one and he tested positive, he
3  had to wait six months and he would
4  have to go to an approved --
5    Q.  SAP?
6    A.  Yes.  And get his certificate
7  and then we would we test him basically
8  like we wanted to for the next 12
9  months.  Or if he came there and
10  applied for a job, tested positive and
11  would not go to rehab, then we couldn't
12  hire him back for two years.  That's
13  basically what the federal guidelines
14  are.  That's what they are.
15    Q.  Okay.  Did he have any
16  criteria for experience?
17    A.  I wouldn't say solid because
18  there had been some student drivers
19  that had been hired there in the past,
20  exceptional students.  They were
21  approved through the insurance agent,
22  though, before they were hired and they
23  had to do more training than somebody,

Page 30

1  say, like you that had been driving ten
2  years.
3    Q.  Who was the insurance company
4  or which insurance company set the
5  standards that you have referred to?
6    A.  Lincoln General.  Liberty
7  Mutual at one time.  When I went there,
8  they had -- they were just coming off a
9  -- a yearly contract is what they had
10  with Liberty Mutual.  I think it's out
11  of Birmingham.  I never did deal with
12  them that much, but we went with
13  Lincoln General.
14    Q.  Is that who you were with from
15  the second time you came back?
16    A.  The entire time, yes.
17    Q.  Was there any particular agent
18  that you dealt with at Lincoln General?
19    A.  Bill Hamrick.  He's not with
20  Lincoln General.  He is just an agency
21  that sells.  You know, he's an
22  insurance --
23    Q.  He is like a broker or --

Page 31

1    A.  Out of Troy.
2    Q.  -- a private agent?
3    A.  Yes.
4    Q.  Was there a written standard
5  regarding prior accidents?  I guess the
6  MVR?
7    A.  Yes.  It's like the three and
8  one or two and two.  You had to have a
9  combination thereof.  You couldn't have
10  four speeding tickets.
11    Q.  Okay.
12    A.  You couldn't have two speeding
13  tickets and two accidents or something
14  of that nature.  It could vary.  They
15  might let one go that had three
16  speeding tickets and two fender
17  benders that would show up on an MVR
18  that wasn't their fault.  Or one could
19  be at fault, one could not be at fault
20  and they would still approve those
21  people.
22    Q.  If you got an application from
23  a driver and you had done a background

Page 32

1  check on him, would you send that
2  information to Mr. Hamrick and get his
3  approval to hire each driver?
4    A.  When we added a driver, any
5  driver, whether it be an owner/operator
6  or a company driver, we would send that
7  driver's name in with his license
8  number and the State.  And we would
9  send it in to them and they would --
10  they would run it.  They would let us
11  know whether or not they would accept
12  that person.
13    Q.  And if they accepted them, was
14  that sufficient for Kelly Trucking
15  hiring practices?  In other words, if
16  the insurance company or the insurance
17  agent says, he's approved by the
18  insurance company, did that mean that
19  Kelly could then hire him?
20    A.  Yes.
21    Q.  Did that make sense?
22    A.  I understood what you are
23  saying.

8  (Pages 29 to 32)

**www.AmericanCourtReporting.com**
**January 25, 2007**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 33

1    Q.   Okay.  You indicated that you
2  handled advertising; is that right?
3    A.   Yes.
4    Q.   That's for recruitment of
5  drivers --
6    A.   Yes.
7    Q.   -- that type of advertising?
8    A.   Yes.
9    Q.   Did Kelly Trucking have
10  anything written down anywhere, either
11  in advertising or in any of its manuals
12  or anywhere else setting out the
13  specific criteria to hire a driver?
14    A.   In advertising?
15    Q.   Yes, sir.
16    A.   No.
17    Q.   What about anywhere else?
18    A.   The only thing we would put in
19  our advertising would be a clean MVR.
20  Like most trucking companies, they put
21  that, but they don't live by it.
22    Q.   Okay.  Did Kelly live by it?
23    A.   We lived by what the insurance

Page 34

1  company told us we had to live by.
2    Q.   Okay.  Once a driver is hired,
3  were there any written policies
4  regarding what it took to be retained?
5  In other words -- let me ask it another
6  way.
7        What would a driver have to do
8  to be terminated as a driver?
9    A.   What would a driver have to do
10  to be terminated as a driver?
11    Q.   Right.  In other words, he can
12  no longer drive for Kelly Trucking.
13    A.   Well, he could come into my
14  office and cuss me out and I would fire
15  him.
16    Q.   I'm talking about with regard
17  to driving.
18    A.   One serious at fault accident,
19  a very good possibility of being
20  terminated.  Points.  You get three
21  serious violations, which they will
22  take care of themselves, because State
23  will pull their license anyway for 60

Page 35

1  days on points.
2    Q.   That's three serious
3  violations in a 36-month period?
4    A.   Well, if you get two serious
5  back to back, and that's 15 over or
6  more, following too close, improper
7  lane change or using the wrong lane,
8  those are serious, and if you get two
9  of those in a short period of time,
10  they will pull it for 60 days.
11    Q.   What about, you said one
12  serious at fault accident?
13    A.   As I said, it's a very good
14  possibility, I believe, is the wording
15  I used.
16    Q.   You are right.  How do you
17  define serious?
18    A.   Rollover, at fault, you know,
19  the driver being at fault.
20    Q.   In 2005, did Kelly Trucking
21  have a printed driver's manual?
22    A.   Like a policy and procedure
23  manual?

Page 36

1    Q.   Yes.
2    A.   Yes.
3    Q.   When it changed names from
4  Kelly Trucking to, did you say Eagle?
5    A.   Yes.
6    Q.   Did a policy manual still
7  exist?
8    A.   Yes.
9    Q.   Do you know where -- was a
10  copy of the Kelly Trucking -- I'm going
11  to call it a driver's manual, policy
12  and procedure manual.
13        Do you know if a copy of that
14  still exists today?
15    A.   I haven't been there to look.
16  As far as me sitting here saying that I
17  know one is there, I can't sit here and
18  say that.  I couldn't do it.  I don't
19  know what they have done since I left
20  there.
21    Q.   When you left, do you know if
22  there was one?
23    A.   There was one in my desk

9  (Pages 33 to 36)

**www.AmericanCourtReporting.com**
**January 25, 2007**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 37

1  drawer when I left.
2      Q. Did Eagle have a separate
3  driver's policy and procedure manual?
4      A. It was basically the same one
5  that Kelly had.
6      Q. Was there a separate safety
7  manual?
8      A. No, sir.
9      Q. Was there a separate employee
10  manual?
11     A. No, sir.
12     Q. Did Kelly Trucking maintain --
13  I'm talking about 2004-2005 time
14  period. Did it maintain an accident
15  log?
16     A. Yes, sir.
17     Q. I'm talking about the kind
18  where you put down preventable or not
19  preventable.
20     A. Yes.
21     Q. Did Kelly Trucking have any
22  kind of standard for determining what
23  was preventable, what was defined as

Page 38

1  preventable and what was defined as not
2  preventable?
3      A. Any type standard?
4      Q. Yes, sir. This is our
5  definition of preventable and this is
6  our definition of not preventable.
7      A. No. We just took a look at
8  the facts that were there at the time
9  the accident took place and made the
10  determination from that as to whether
11  we thought it was preventable or
12  nonpreventable.
13     Q. Who was involved in those
14  decisions?
15     A. My son part of the time.
16     Q. Your son?
17     A. My son. David Battle
18  (phonetic). Tucker McKinney, I think
19  he's sort of -- well, no. No. No.
20  Let me back up. We are talking about
21  2005. Back it up.
22     Q. Yeah. 2004 and 2005.
23     A. I'm running together on that.

Page 39

1  David Battle would be. Tucker McKinney
2  would not be. But Eddie Adams, I don't
3  think he ever worked a wreck, so.
4      Q. What is your son's name?
5      A. Marcus Childers.
6      Q. Did he work at Kelly Trucking?
7      A. Yes.
8      Q. What did he do for Kelly?
9      A. He was safety, over safety. I
10  brought him in safety director, and
11  I was just over the department, as far
12  as human resources, personnel and
13  safety.
14     Q. What did David Battle do?
15     A. When my son left, David came
16  to work for me.
17     Q. I see. Was David Battle there
18  in 2005?
19     A. Yes. Now, the dates on David
20  are going to be a little bit iffy for
21  me, I mean, as far as coming and going.
22  I mean, I can find out, but I cannot
23  sit here and tell you the exact dates.

Page 40

1      Q. I wasn't going to ask you.
2          What year did Marcus leave?
3      A. If I'm not badly mistaken,
4  it's going to be sometimes in late
5  spring of '05.
6      Q. Do you know why he left?
7      A. He went in business for
8  himself.
9      Q. Trucking?
10     A. Yes, sir.
11     Q. What was the name of his
12  company?
13     A. Eagle Landscaping and
14  Materials, I think is the name of it.
15  He hauls pine straw by the trailer load
16  and sells it by the trailer load.
17  That's it.
18     Q. He is not working with any of
19  Mr. Kelly's companies?
20     A. No, sir. No, sir.
21     Q. What was Kelly Trucking's
22  policy regarding drugs or alcohol for a
23  driver, not hiring, but somebody who

10  (Pages 37 to 40)

**www.AmericanCourtReporting.com**
**January 25, 2007**

## American Court Reporting
## toll-free (877) 320-1050

Page 41

1  has already been hired that tested
2  positive for drugs or alcohol?
3      A. Terminated. We would
4  terminate them.
5      Q. Did it matter whether it was a
6  random test or related to an accident?
7      A. It didn't matter.
8      Q. By the way, if you need to
9  take a break, let me know.
10     A. Okay.
11     Q. When you went to work for
12 Kelly Trucking the second time, in your
13 opinion, what was the condition of the
14 drivers' files that Kelly Trucking
15 maintained on its drivers?
16     A. Second time, so it would be
17 2001; is that what you are saying?
18     Q. Yes, sir.
19     A. What was the condition of the
20 files?
21     Q. Yes, sir. Was there a file
22 for every driver?
23     A. Yes.

Page 42

1      Q. Were they up to date?
2      A. To the best of my knowledge,
3  yes.
4      Q. Did Kelly Trucking have a file
5  on every driver working for it in 2005
6  when the negotiations with U.S. Xpress
7  began?
8      A. I cannot say that there was
9  one on every driver, because we were in
10 the hiring process at that time and we
11 were still continuing to run it like a
12 business. So to say that somebody that
13 had been brought in in the last week or
14 two, that their file would be in there
15 that was completed, I will say no, they
16 wouldn't be in there, you know. So
17 every file, I would have to say, no,
18 not every file.
19     Q. In the summer of 2005, do you
20 recall how many drivers, either
21 owner/operator or employee, were
22 working for Kelly Trucking?
23     A. I want to say approximately

Page 43

1  155. That will be close.
2      Q. Did any of those drivers also
3  work for any of Mr. Kelly's other
4  companies?
5      A. What other companies did he
6  have?
7      Q. I understand that there were
8  some spotting companies; there was a
9  company called K-Diesel and then there
10 was an Eagle, which I understood is a
11 logging operation.
12     A. You are going to have to clear
13 up which drivers. Were any of those
14 drivers -- you are talking about out of
15 the 155 now; is that's what you are
16 saying.
17     Q. Yes, sir. I'm talking about
18 the ones that were driving under Kelly
19 Trucking's authority. Did any of those
20 also work for any of Mr. Kelly's other
21 companies?
22     A. Have you got that list?
23     Q. I do.

Page 44

1          MR. HALL: I tell you what,
2  why don't we take a break and grab
3  something to drink and I will find that
4  list.
5
6          (Short recess.)
7
8      Q. (BY MR. HALL:) I'm showing
9  you what has been marked as Defendant's
10 Exhibits 32, 33 and 65. And those are
11 all lists, appear to be drivers' lists.
12         Do you recognize those?
13     A. This one, I do. And this one,
14 I -- do you want me to say what exhibit
15 it is?
16     Q. Yes.
17     A. Sixty-five, I recognize it;
18 Exhibit 33, I recognize it; 32, I do
19 not.
20     Q. Thirty-two, you do not?
21     A. No, sir.
22     Q. Because it's easier for me to
23 read, and life is all about me, what is

11 (Pages 41 to 44)

## www.AmericanCourtReporting.com
## January 25, 2007

**American Court Reporting**
**toll-free (877) 320-1050**

Page 45

1    Defendant's Exhibit 33?
2        A.  U.S. Xpress sent this to me,
3    me being Frank Childers, to look at.
4        Q.  All right.
5        A.  And then they called me, the
6    gentleman that is the vice-president of
7    safety -- I cannot remember his name.
8    I'm sorry, but I cannot remember.  It's
9    in my office, though.  I have his card
10   in my office, but I don't have it with
11   me.  He called me and wanted to talk
12   about some of the drivers on this list.
13       Q.  Okay.
14       A.  But this was generated at U.S.
15   Xpress.
16       Q.  Does that contain all of Kelly
17   Trucking's drivers at that time?
18       A.  I would say probably not.
19   Like I told you earlier, there were
20   some still being processed and their
21   files would not have been in the two
22   filing cabinets that we sent to U.S.
23   Xpress for them to look at, no, sir.

Page 46

1        Q.  Defendant's Exhibit 65, what
2    is it?
3        A.  It's a printout of drivers,
4    date of birth, license number, State,
5    hire date.
6        Q.  Is this a Kelly Trucking
7    document?
8        A.  Yes, it is.  Yes, sir.
9        Q.  Does this contain -- it looks
10   like at the top it says -- well, it
11   says, run 8/9/05 at 13:34, which is
12   military time.
13           Does this contain all of Kelly
14   Trucking's drivers?
15       A.  Again, probably not.  From
16   this standpoint, some that were in the
17   process, we hired say five or six
18   people, their names and their files
19   would not go in the cabinets that we
20   had that we sent up there.  They would
21   not be in that filing cabinet nor would
22   they be entered here until everything
23   was complete on the file.  So, yeah, we

Page 47

1    might have had -- there might have been
2    a handful, just a few that might not be
3    entered here or that might not have
4    been in those filing cabinets.
5        Q.  Looking at Defendant's Exhibit
6    33, can you tell from this list whether
7    or not any of these drivers drove for
8    companies other than Kelly Trucking or
9    in addition to Kelly Trucking?
10       MR. HALL:  While you are
11   looking at that, go off the record just
12   a second.
13
14       (Discussion off the record.)
15
16       THE WITNESS:  I see about five
17   that might have pulled --
18       Q.  (BY MR. HALL:)  You see about
19   five?
20       A.  I see about five that probably
21   pulled wood and it's listed out here as
22   timber.
23       Q.  A handwritten note?

Page 48

1        A.  Yes.
2        Q.  Do you remember the drivers
3    that worked for Kelly Trucking by name?
4        A.  Not the total list, no, sir.
5    No, sir.
6        Q.  Okay.  If they pulled timber,
7    would they have been working for Eagle?
8        A.  Yes, sir.  More than likely,
9    they would have worked for Eagle.  But
10   if they pulled some of the product that
11   we had in the van division, then they
12   would have been on this list also.
13       Q.  When you say the van division,
14   is that Kelly Trucking?
15       A.  Yes, sir.
16       Q.  On this list in the biggest
17   column, there are some typewritten
18   notations, no file, next to a lot of
19   the names or several of the names.
20           Do you know what that is
21   regarding?
22       A.  What?  The no file?
23       Q.  Yes, sir.

12  (Pages 45 to 48)

Page 49

1  A. U.S. Xpress did that. This
2  document, other than the handwritten
3  part that's in here, was generated by
4  U.S. Xpress, not by Kelly Trucking.
5  Q. Okay. Were there ever
6  occasions where a driver would take a
7  load for Kelly Trucking and then not
8  have a load for his trip back, and
9  consequently he would pull a load for
10  one of Mr. Kelly's other companies?
11  A. I can't think of anything. I
12  can't think of it, you know, because if
13  he was up in Virginia, Kelly didn't do
14  anything -- I mean, one of his other
15  companies didn't do anything in
16  Virginia, North Carolina, South
17  Carolina, anything like that.
18  Q. Okay.
19  A. Can I say something about this
20  document?
21  Q. Sure.
22  A. I didn't generate this
23  document. When I got it, it came --

Page 50

1  Q. It came from U.S. Xpress?
2  A. Yeah. You know, I don't know
3  if anybody in Kelly generated it and
4  then it came back to me. But I did not
5  -- this I generated, but this one I
6  didn't.
7  Q. This one being Defendant's
8  Exhibit 65, the one marked 65 is the
9  one you created?
10  A. Yes, sir. My fax cover sheet
11  is on it.
12  Q. Okay. Can you tell from your
13  list, Defendant's Exhibit 65, whether
14  these are all drivers that worked for
15  Kelly Trucking or whether any of them
16  worked for any spotting companies or
17  Eagle or K-Diesel?
18  A. Now, Patrick Ackles -- I don't
19  know what page this is.
20  Q. In the right-hand corner,
21  there's a D and a couple of numbers
22  after it.
23  A. Okay. 1128, top of the page,

Page 51

1  now he pulled both. He would pull
2  logs, he would pull chips, and
3  sometimes he would pull van freight.
4  Again, the van freight being G.F. Kelly
5  freight. You know, there might be one
6  before that. But that's the first one
7  that jumped out and hit me.
8      1129, Marvin Catrett.
9  Q. I got it.
10  A. Okay.
11  Q. He did the same thing?
12  A. He did the same thing, yes,
13  sir. Now, these there at the bottom --
14  Q. You are on 1139, the
15  handwritten?
16  A. Yes. Yeah. These were South
17  Carolina drivers as you so have up
18  there. Now, the Christopher Bell, I
19  just do not remember that name. I
20  remember Lewis Boisey, James Griffin,
21  Sorrells and Walter Voorhees, now those
22  I do remember that they ran that
23  shuttle up there, which was about --

Page 52

1  the furthest point from point A to
2  point B was about 16 miles one way. It
3  was pulling -- it was van freight. The
4  rest of -- the remainder of it, to my
5  knowledge, was about a mile and a half
6  to two miles from A to B and then go
7  back to A and then back to B, just back
8  and forth. Now, that's what this -- I
9  know the ones, the names that I called
10  out, that's what they did. But they
11  were part of the van division of G.F.
12  Kelly Trucking.
13  Q. On that same page, 1139, just
14  above the handwriting, drivers on this
15  report 104, do you see that?
16  A. Okay. Uh-huh.
17  Q. I assume that doesn't include
18  the handwritten names?
19  A. It doesn't include the 54
20  that's back over here either, I don't
21  think. I don't think it does. I saw
22  it somewhere in here when I was going
23  through it, 54 on this other page, 127.

# American Court Reporting
## toll-free (877) 320-1050

Page 53

```
1    Q.  Page 127.
2    A.  It's like 158 and then this,
3  what, ten, eight, whatever it is, 160
4  something.
5    Q.  I think there's nine listed
6  there, so it will be --
7    A.  Yeah, 167.
8    Q.  -- 167?
9    A.  Well, let's see, 58 and nine.
10  Yeah, 167.
11    Q.  Where are you getting 58 from?
12    A.  Fifty-four from over here and
13  104 here.
14    Q.  Oh, 158 plus nine?
15    A.  Yes.  I mean, that's the way I
16  ran it up in my head.
17    Q.  Okay.  Do you remember why you
18  ran this report on August 9th, 2005?
19    A.  They called me and asked me
20  for it, some lady did.
21    Q.  At U.S. Xpress?
22    A.  Yes.
23    Q.  Mary?
```

Page 54

```
1    A.  You can check that number and
2  find out who it is.  I don't remember
3  the lady's name.  But that's where it
4  was faxed to.
5    Q.  Okay.  All the names listed on
6  here, were they all active employees or
7  drivers for Kelly Trucking?
8    A.  For me to sit here and tell
9  you that everybody that's between 1122
10  and 1139, that everybody was there that
11  day, I don't think I could sit here and
12  tell you that.  What I can tell you is
13  this is what the computer showed as an
14  active list at that time.
15    Q.  I just noticed on 1128 that
16  there is a Richard Bowie, and below it
17  there's a message, working a week
18  notice, last day will be the 19th of
19  August.
20    A.  Okay.
21    Q.  I think there was another one
22  I saw in here.
23    A.  So then answering your
```

Page 55

```
1  question, yes, he would have been there
2  at the time that this was faxed to
3  them.  But, I mean, the computer --
4  until this man is actually gone, our
5  computer system has an A and it will
6  pull up.  If you put an I on it, it
7  won't pull it up because that puts them
8  inactive.  Gut if you go in there and
9  just plug the A in on the drivers A to
10  Z, that's what it will pull up.  And
11  until he left, this would not actually
12  kick him out.
13    Q.  The way the program was set
14  up, you could pull up active and
15  inactive drivers?
16    A.  Not on the same listing, no,
17  sir.  No, sir.
18    Q.  You had to pull up two
19  different listings?
20    A.  Yes, sir.  You would have to
21  go to a different list.
22    Q.  On 1134 --
23    A.  Okay.
```

Page 56

```
1    Q.  And I don't know if this is
2  Niki Peters.  Do you see where I'm
3  referring to?
4    A.  The termination.
5    Q.  Yeah.  Termination date '03.
6  Do you know what that means?
7    A.  No, sir, I don't.  Not the way
8  -- not with it sitting in there like
9  that, because that's normally just a
10  message system for the people in
11  operations.  That's the reason those
12  messages are put at the bottom, like
13  the Tommy Norad at the top, death in
14  the family, that's letting operations
15  know that this man has got a death in
16  the family and he will be gone for a
17  few days; he won't -- you know, will
18  not be at work.  But the termination,
19  no, sir, I have no earthly idea.
20    Q.  Yeah.  I noticed there is one
21  on 1135 for Reginald Stone also.
22    A.  1135, you said?
23    Q.  Yes, sir.
```

14  (Pages 53 to 56)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 57

1    A. Okay. No, sir. I can't sit
2  here and say. I mean, as far as me
3  telling you that I know why that's
4  there, I cannot do it. No, sir.
5    Q. On 1128 with Richard Bowie and
6  1137 for James Watts, it indicates that
7  they are both working.
8    A. Richard Bowie.
9    Q. That's on 1128.
10   A. What's the other one?
11   Q. The other one is on 1137.
12 It's James Watts. Do you see the two
13 I'm talking about?
14   A. Yes, sir.
15   Q. Both of them indicate they
16 have given notice.
17     Do you know why they had given
18 notice, do you remember?
19   A. We had -- we had a few
20 drivers, I cannot sit here and tell you
21 how many -- I would possibly have to
22 try to take another day off or go at
23 night back to the office and see if the

Page 58

1  paperwork is still there.
2     We had a few drivers that left
3  because they didn't want to work with
4  U.S. Xpress. Can I sit here and tell
5  you, without looking at other
6  paperwork, that these were two of the
7  people, no, sir, I cannot.
8    Q. Sure.
9    A. James Watts is still with the
10 company to this day, the company that's
11 there now.
12   Q. He's driving for Eagle?
13   A. Yes, sir. I'm 99 percent sure
14 he's there, 99.
15   Q. Can you look at this list in
16 Defendant's Exhibit 65 and tell which
17 of these drivers are still driving for
18 Eagle or that were when you left?
19   A. I don't know if I will have it
20 100 percent right. I can try.
21   Q. Sure.
22   A. I can try. On page 11 or
23 document number 1122.

Page 59

1    Q. Yes, sir.
2    A. V.J. -- well, Victory Jack
3  Adams is still there. Baker is gone,
4  Jerry Baker.
5    Q. Do you know when he left?
6    A. At the time that most of this
7  took place.
8    Q. Do you know if it was before
9  or after the negotiations with U.S.
10 Xpress broke down?
11   A. No, sir. I wouldn't sit here
12 and tell you that I knew if it was
13 before the 25th or after the 25th.
14 Honestly, I can't sit here and do that.
15 I can't.
16   Q. Okay.
17   A. Melvin Cleveland is gone.
18 This is still on document 1122. Monroe
19 Cooper is not there anymore.
20   Q. Let me stop you. The ones in
21 between Jerry Baker and Melvin
22 Cleveland --
23   A. I think Vence Eddie Bell.

Page 60

1  Faite Brantley, I know Faite is still
2  there. Eugene Burwell -- I'm 99
3  percent Eugene is still there and Keith
4  Byrd. I'm sure that -- if you want me
5  to tell you the ones that are still there
6  and the ones that are gone or just the
7  ones that are gone that I think --
8    Q. I tell you what, just to make
9  it clear, why don't we go through which
10 ones that are still there and just say
11 they are still there, and those that
12 are not, are not. And if you don't
13 know --
14   A. Okay. Randall Curby, then, to
15 my knowledge, he's still there.
16   Q. When we talk about still
17 there, I'm talking about they were with
18 Eagle when you left.
19   A. Yes, sir. Yes, sir. Yes,
20 sir.
21   Q. Did you say with regard to
22 Mr. Corbett?
23   A. Corbett gone.

15  (Pages 57 to 60)

# American Court Reporting
## toll-free (877) 320-1050

Page 61

1   Q. All right. On page 1123?
2   A. Charles Dean is there, but he
3   is not driving. He is still with the
4   company. Ronald Dewberry, still there.
5   Greg Dudley, gone. I'm going to have
6   to say gone on John English. I'm not
7   100 percent sure, but I believe he is
8   gone.
9   Q. Okay.
10  A. Fred Gordon is gone. Pretty
11  sure Cedric is still there. Jimmy
12  Griffin is gone. John C. Hall is
13  there. Tommy Allen Hall is there.
14  Hamby, he is gone, I'm pretty sure.
15  David Hester.
16  Q. Yes, sir.
17  A. On 1124, David Hester is gone.
18  Homer Hudson is gone. Charles Kerry
19  Jackson is gone. Dale Johnson is still
20  there. Kenneth Johnson, I will say
21  gone. Carl Jones, gone. Roger Keener,
22  still there, I believe. Joe Kelly,
23  he's there but not driving. McClung,

Page 62

1   Douglas McClung, I'm pretty sure he is
2   gone. Ronald Tory Mezick is gone.
3   1125. Doris Mosley is still
4   there. Jerry Mosley is still there.
5   These next two, they are brothers, I
6   think both Luther Norwood and
7   Roosevelt, I think both of them are
8   gone. Kenneth Payne is gone. He left
9   because of what happened. Raymond Paul
10  Phillips is gone, and he is part of
11  that same problem. Jeffrey Quick, to
12  my knowledge, is still there. John
13  Richardson is still there. Charles
14  Robinson is gone. Wayne Slaton is
15  gone.
16  1126, Meven Stringer, Meven is
17  still there. Keith Taft was there when
18  I left. I cannot speak, you know.
19  Cameron Tharpe. George Cameron, is
20  that Tharpe? I will say he's gone. I
21  haven't heard the name in a good while.
22  James Todd, gone. Jason Walker is
23  gone. Darrell Waldon is there.

Page 63

1   Anthony Walker, I will be honest with
2   you, I am not 100 percent sure. I
3   honestly cannot sit here and say either
4   way.
5   Q. Okay.
6   A. James Watkins is gone. Teresa
7   Watkins is gone. Roderick Williams is
8   gone.
9   1127, Walter Williams, I'm
10  pretty sure he is gone. Ronnie Woods,
11  gone. George Wright, I'm not 100
12  percent sure on him either way, so I
13  would rather not say. John Wyatt, I'm
14  pretty sure he's gone.
15  1128, Patrick Ackles is there.
16  Ronnie Allen is gone. Iteago Banks is
17  gone. Mack Battle is still there.
18  Drew Bernard is gone. Richard Bowie,
19  Richard Bowie, I'm pretty sure he is
20  gone.
21  Q. He is the one that indicates
22  he was working his week notice?
23  A. Yeah. The week prior. And I

Page 64

1   can't speak to him, whether it was -- I
2   don't know about the rest of it on that
3   one.
4   Q. Okay.
5   A. Walter Bryant, I'm sure is
6   gone. Lynn Bryant, I'm sure he is
7   gone. Edward Buchanan, I'm sure -- I
8   believe he is gone. Gerald Huff, Buff,
9   Buff, gone.
10  1129, Larry Burns, gone.
11  Melvin Buster, gone. Wesley Byrd,
12  Wesley Byrd, I'm not 100 percent sure
13  on Wesley Byrd. I think he's gone, but
14  I'm not 100 percent sure.
15  Marvin Catrett is still there.
16  Monroe Cooper is gone. Johnny Wayne
17  Cox, I don't think he is there. I'm
18  pretty sure he is gone. Everett
19  Crowder, I think Everett is still
20  there. He is. Everett is still there.
21  Taylor Crowe, I think he's gone. Jerry
22  Cunningham, I think, is gone. Bobby
23  Ray Daniel, I'm pretty sure he is gone.

16 (Pages 61 to 64)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 65

1 Todd Daugherty, gone, Thomas Davis is
2 still there. Gordon Denney, gone, Andy
3 Devine, gone. Jimmy Dobbs, Jimmy
4 Dobbs, I don't know. I don't know. I
5 can't guess either way.
6      Ronald Durden, Ronald Durden,
7 I think Ronald is gone. Roger Eaton is
8 gone. Joe Ebiling, Anniston, is gone.
9 Jason Ellis, gone. Dennis Fowler,
10 gone.
11      1131, Demetrius Fuller, gone.
12 James Fuller, I'm pretty sure he is
13 gone. I'm pretty sure. Pedro Garcia
14 is gone. Keith Gentry is gone.
15 Kenneth Gibson is gone. Randall
16 Gleaton, gone. Ricky Gleaton, gone.
17 Philip Goodwin, gone. Jack Gorham,
18 gone. Willard Gregory, I'm pretty sure
19 Willard is still there. Suwadu Harris,
20 gone. Darrel Hart. Darrel Hart.
21 Gosh, it was brothers. One of them is
22 still there and one of them is gone on,
23 the Hart brothers. And I don't know

Page 66

1 where the other one is. Let me see. I
2 cannot remember. But there were two
3 brothers, Darryl and something else. I
4 do not know, but one of the Hart
5 brothers is still working there.
6      Q. Okay.
7      A. Toby Hilyer, gone. Douglas
8 Holston, gone. Charles W. Jackson,
9 gone. Charles Jackson, gone. Thomas
10 Johnson, gone. Sam Jones, gone. James
11 Jones, gone. Avora Kelly, I'm going to
12 say he is gone. Patrick Kite, I'm not
13 a -- I don't know. I just don't know.
14 Alan Knight is gone. Walter Lancaster,
15 gosh. I'm not 100 percent sure on
16 Walter either way. I just cannot
17 remember. Eddie Lawrence, gone. James
18 Maness, gone. Jeff Mastin. I don't
19 know on Jeff. Jeffrey Mastin, I do not
20 know.
21      Q. Okay.
22      A. Macon Mauldin, gone. Mark
23 McDaniel, gone. Rodney McClain, still

Page 67

1 working. Philip Stanley Miranda, I'm
2 going to say gone. The name has not
3 jumped up.
4      1134, Johnny Newell, gone.
5 Tommy Norred, I don't know on Tommy.
6 Tommy, I don't know. George Norton,
7 gone. Steven Nunn, I would say gone.
8 Ronnie Owens, gone. Tommy Peters is
9 still working. Niki Peters is gone.
10 Tony Poole is gone. Les Rogers is
11 gone. William Roth, I don't know about
12 William Roth, I don't remember.
13      Q. Okay.
14      A. Louie, Louie, Louie. Let's
15 see. I'm going to say gone.
16      Q. All right.
17      A. Jimmy Screws is gone. Gone on
18 Nathan Simons. Billy Sims, gone.
19 Curtis Sims, gone. Charles Smith,
20 gone. Curtis Smith, gone. Joel Mack
21 Stewart, gone. Steven Stephenson,
22 gone. Reginald Stone, gone.
23      Reginald Stone again -- 1136,

Page 68

1 Reginald Stone again is gone. M.C.
2 Talton, gone. Yeah. I'm going to say
3 gone. Jesse Taylor, gone. Harold
4 Thomas, gone. Andrew Thorpe is still
5 there. Willie Thompson, gone. James
6 Vann, I'm 99 percent sure he's gone.
7 Barbara Vickers, gone. Dennis Wadley,
8 gone. Jimmy Walters, gone. David
9 Washburn, I'm pretty sure he is gone.
10 This is on 1137. I'm sorry. David
11 Washburn, gone. James Watts, I think
12 James is still there, I think. Arthur
13 Wearing, I'm going to say gone. Robert
14 Weaver, still working. Chris Welcher,
15 gone. Michael Welles, gone. Milton
16 David Whatley, I think he's gone.
17 Steven Wilkins, I'm not sure. I cannot
18 say on that one. I don't know.
19      Q. Okay.
20      A. Arthur Wimberly is still
21 there. He was when I left. William
22 Woods, I'm 99 percent sure he's gone.
23 Ronnie Woods, I think Ronnie is gone.

17 (Pages 65 to 68)

**www.AmericanCourtReporting.com**
**January 25, 2007**

Page 69

1 Anthony Wright, I'm not sure. Robert
2 Wright is gone. Yamashito Yowe is
3 gone. Ronnie Woods, gone. Anthony
4 Wright, that's a reprint.
5    Q. Yeah. I guess we are down to
6 the --
7    A. Yeah, that's the same sheet.
8    Q. -- down to the written names.
9    A. Yes. I'm going to have to say
10 all of this group is gone. A couple of
11 them, I don't know. But the ones that
12 I do know on here, if they were working
13 in there, they are all gone. That's on
14 1139, the handwritten.
15    Q. How many drivers did Kelly
16 Trucking have in January of 2006 or the
17 beginning of 2006, roughly?
18    A. It will have to be rough.
19 Sixty-five, 70. It could be off five
20 to ten. But I believe it would be
21 below 70.
22    Q. When Kelly Trucking, as you
23 indicated, switched over to Eagle, was

Page 70

1 it called -- is it Eagle Logistics?
2    A. Yes, sir.
3    Q. How many drivers did Eagle
4 Logistics wind up with?
5    A. Probably around 65 or 70, give
6 or take one or two.
7    Q. You indicated that -- let me
8 see if I can find it -- Kenneth Payne
9 and Raymond Phillips left because of
10 what happened.
11        What do you mean? What was it
12 that happened that caused them to
13 leave?
14    A. The company that they were
15 pulling freight for, which -- and I'm
16 saying a company. One of our
17 customers.
18    Q. Okay.
19    A. They were working out of
20 Rainbow Logistics' drop yard in
21 Gadsden, Alabama or Rainbow City,
22 whichever one you want to call it. But
23 the name of the company was Rainbow

Page 71

1 Logistics. They were leased on to us,
2 pulling freight for Rainbow Logistics,
3 which they acquired the freight and
4 they were pulling Overnite freight.
5 And when all this came about, the
6 gentleman that owned Rainbow Logistics
7 was not 100 percent sure -- well, as a
8 matter of fact, U.S. Xpress never would
9 even talk with him. So we lost those
10 accounts. And when we lost them, we
11 lost five trucks that went with them
12 and we lost the business. We have been
13 able to get two trucks back in there,
14 but we lost several trucks and some
15 good revenue when we lost that account.
16    Q. You said Mr. Payne and
17 Mr. Phillips were owner/operators?
18    A. Yes, sir.
19    Q. And they were working for
20 Rainbow Logistics?
21    A. No, sir. No, sir. They were
22 leased on to Kelly Trucking. Rainbow
23 Logistics is like a brokerage company.

Page 72

1 They used to be a trucking company, but
2 now he brokers freight. And he let us
3 pull the freight. He had the account
4 with Overnite. He was not in the
5 trucking business. So the men leased
6 on to us, but they went up and pulled
7 the Overnite freight, which came
8 through him. Well, him sitting in the
9 middle not knowing what was going to
10 happen and nobody from U.S. Xpress
11 would ever talk to him, and at that
12 point he said, to heck with you, I'm
13 pulling it. So he did. He snatched
14 them from under us, you know, and the
15 operators went with him. We lost the
16 trucks, we lost the account.
17    Q. I see. He moved it to another
18 client?
19    A. Yes.
20    Q. And then the drivers went --
21    A. Yes, sir.
22    Q. -- with the account?
23    A. And Baker, Jerry Baker is

18 (Pages 69 to 72)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 73

1 another one that went with them.
2    Q. Of those on this list that you
3 indicated they left, do you know how
4 many of them quit voluntarily and how
5 many were terminated?
6    A. I can't sit here and tell you,
7 no, sir.
8    Q. Okay.
9    A. Terminated in what fashion?
10 What are you speaking of, terminated?
11    Q. Either there was a reduction
12 in force or something happened and you
13 made the decision to let them go.
14    A. Okay. As far as sitting here
15 and telling you specific names, no,
16 sir, I cannot do that today. I can't.
17    Q. Prior to August 25th, 2005, we
18 are talking about the U.S. Xpress
19 negotiations, prior to that time, do
20 you know how many Kelly Trucking
21 drivers quit? And I'm talking about
22 the June, July, August time period.
23    A. Because of the buyout that was

Page 74

1 going on?
2    Q. Yes.
3    A. I would have to have a halfway
4 educated guess. Below 20.
5    Q. I know you are guessing at the
6 number, approximate number below 20.
7    Do you know why those drivers
8 chose to quit?
9    A. Some of them didn't want to
10 work for U.S. Xpress.
11    Q. Okay.
12    A. Some of them.
13    Q. Right.
14    A. I can't sit here and call out
15 individual names. Some, we could pick
16 up and going back possibly in the
17 archives on the computer system, let's
18 say, and possibly pulling it out of
19 that. But as far as me -- which the
20 man is still there, V.J. Adams, he was
21 not going with U.S. Xpress. But
22 everything worked out like it did. A
23 lot of them wanted to leave. But when

Page 75

1 they found out I was going to work for
2 U.S. Xpress -- I started to wear my
3 shirt today -- some of them decided to
4 stay.
5    Q. So there were a number that
6 were going to quit until they found out
7 that you were going to be part of the
8 USX operation; is that what you are
9 saying?
10    A. Yeah. In the trucking
11 business, you have people quitting
12 every day. You have people coming on
13 every day. As far as me sitting here
14 and telling you an actual number that
15 quit because of U.S. Xpress --
16    Q. Right.
17    A. -- I cannot give you a dead
18 number. I cannot do it. I can't pull
19 it out.
20    Q. Sure. I think Mr. Kelly
21 estimated that there were 35 drivers
22 that quit the week of August 21st,
23 22nd, 2005.

Page 76

1    Does that number -- do you
2 have an opinion about the number that
3 quit that week?
4    A. I really don't want to give an
5 opinion on that number. If it's any
6 way to pull it out of the system,
7 because it's normally -- normally, I
8 won't say always, normally notated in
9 the system why that person left,
10 normally.
11    Q. Was that information
12 maintained in the system when you left
13 Eagle?
14    A. I cannot -- I cannot sit here
15 and say that it was or wasn't, because
16 I didn't go into the archives. If that
17 had to be done, somebody else in the
18 company would do that. I didn't want
19 to fool with it.
20    Q. I understand. Was the Eagle
21 system the same system that was
22 operated by Kelly Trucking?
23    A. Yes, sir. You are speaking of

19 (Pages 73 to 76)

**www.AmericanCourtReporting.com**
**January 25, 2007**

## American Court Reporting
## toll-free (877) 320-1050

Page 77

1 computers?
2   Q.  Yes, sir.
3   A.  Okay.
4   Q.  How do you measure turnover
5 rates in -- or how did you measure
6 turnover rates in drivers?
7   A.  On a percentage basis of what
8 we hired in a year.  Basically, we do
9 it on the year, 12-month period,
10 beginning of year with what we had at
11 the end of the year and what we hired
12 in between and get your percentage of
13 it.
14   Q.  What was the turnover rate in
15 drivers for Kelly Trucking 2003, 2004,
16 2005?
17   A.  I honestly couldn't sit here
18 and tell you exactly what it was.  I
19 cannot do it.  Not -- and you come back
20 and say, well, this is what you said.
21 Because I honestly don't know what the
22 percentage was.
23   Q.  Sure.  Is that maintained?

Page 78

1 Are there records that would reflect
2 that?
3   A.  The only way you could pull it
4 up now is see how many people were
5 hired in that year off the system that
6 they have, if it's still working.  And
7 pull that up as to how many drivers
8 they had, active drivers they had for
9 the entire year is the only way I would
10 know to do it.
11   Q.  What was the -- and I'm not
12 sure when Kelly and Eagle switched.
13     What was the turnover rate for
14 2006 for Kelly Trucking?
15   A.  It was very low; I remember
16 that.  We didn't hire many people last
17 year.  And I'm speaking of company
18 trucks now.  Owner/operators, we lost a
19 few and we gained a few.  I would say
20 that was pretty close to an even break
21 on owner/operators.  Company trucks,
22 very, very few trucks we had to fill.
23 The people that were there just really

Page 79

1 aren't leaving; they are staying.
2     MR. HALL:  Let's take a real
3 break.
4
5     (Short recess.)
6
7   Q.  (BY MR. HALL:)  Mr. Childers,
8 why did you leave Kelly Trucking or
9 Eagle?
10   A.  Which time?
11   Q.  This last time.
12   A.  This last time?  I guess
13 probably two or three reasons combined.
14 I had taken a pay cut, and the job that
15 came available in Dadeville -- I guess,
16 bottom line, you take the gross and you
17 don't care too much about the gross;
18 it's what you have left at the bottom.
19 And I make more money now than I did
20 with Kelly, as far as actual money in
21 my hand, and it's 15 minutes from my
22 house, where the other one was 45
23 minutes from my house.

Page 80

1   Q.  Where do you currently work?
2   A.  Tallapoosa County Board of
3 Education, transportation supervisor.
4   Q.  Did the drivers say what it
5 was about USX or the reasons why they
6 did not want to work for USX?
7   A.  I didn't have anyone -- I
8 can't remember personally.  V.J. Adams,
9 like I said, he's still there.  But
10 V.J., I don't know if he had worked for
11 them in the past or knew people that
12 had worked for them.  Normally, that's
13 was what you were getting from the
14 people.  Somebody else told them what
15 kind of company it was, and that's the
16 reason they said they just didn't want
17 to go.  But again, I guess V.J. is the
18 only one that came up and said -- I
19 think it was V.J., that he -- I think
20 he had been there.  I don't know.  But
21 he just said he couldn't go.
22   Q.  After August 25th, 2005, did
23 the -- let me back up a second.

## www.AmericanCourtReporting.com
## January 25, 2007

**American Court Reporting**
**toll-free (877) 320-1050**

Page 81

1    Did Kelly Trucking -- this is
2  a new question. Did Kelly Trucking get
3  unsolicited applications from drivers,
4  just as part of the business?
5    A.  Unsolicited?
6    Q.  Yeah. Somebody would show up
7  and say, I'm here to apply.
8    A.  Yes. We have had a few
9  walk-ins, yes. Yes.
10    Q.  How did you recruit drivers
11  normally?
12    A.  Word of mouth from our current
13  drivers, the drivers we had on the
14  road, plus we advertised, you know, had
15  an 800 number on the back of -- not all
16  the trailers, but the majority of our
17  trailers, we had an 800 number on the
18  back of it. We had two billboards, one
19  on 95, one on Interstate 20 and one in
20  South Carolina, one in North Carolina.
21  Magazines.
22    Q.  Was there an average number of
23  applicants that you would get per year

Page 82

1  or per month?
2    A.  I wouldn't say an average. I
3  mean, you are going to get so many per
4  month just by word of mouth from the
5  drivers.
6    Q.  Right. Do you have an
7  estimate of what an average month would
8  be like?
9    A.  Applications or phone calls?
10    Q.  Applications.
11    A.  Maybe 20, 25 a month, maybe.
12  I mean, that might be an average.
13    Q.  During your time at Kelly
14  Trucking, did that ever change up or
15  down?
16    A.  I would say probably -- we cut
17  back on our advertising. So before we
18  switched over, yeah, the calls we had
19  dropped off and the applications, we
20  didn't get the applications that we had
21  been getting, because we had to cut all
22  advertising.
23    Q.  When did you cut back on

Page 83

1  advertising?
2    A.  I started cutting back on that
3  in about June.
4    Q.  2005?
5    A.  2005.
6    Q.  Was the need for drivers less
7  or was that just a cash flow?
8    A.  It wasn't that. We were
9  selling the company and I was not going
10  to get hung out there and continue to
11  run that because that came out of my
12  budget and continue to run it. And, I
13  guess, Kelly would have had to have
14  paid it a month or so down the road.
15  So it was a consensus, that we felt
16  like we needed to cut back. And that's
17  what I did. We cut back to one
18  magazine.
19    Q.  So in roughly June 2005, you
20  cut back on the recruiting?
21    A.  No. Started cutting back on
22  just the magazines. Just because you
23  are in a magazine doesn't necessarily

Page 84

1  mean you are going to get an
2  application out of it. The majority of
3  our applications came from our drivers
4  referring somebody to us.
5    Q.  So the applicants, you know,
6  the average applicants didn't change
7  much even though you cut back on the
8  advertising?
9    A.  It changed some. It cut it
10  down some, yes. But, you know, it
11  didn't cut it down 100 percent, no,
12  sir.
13    Q.  After August 25th, 2005, did
14  you start advertising again? When I
15  say you, I'm talking about Kelly
16  Trucking.
17    A.  Yeah, I understand. I
18  understand. No, sir. We cut the last
19  -- I think we got it down to one
20  magazine and then we cut that magazine
21  out and we didn't do anything for
22  several months just trying to have
23  money to operate on. And it was

21  (Pages 81 to 84)

**www.AmericanCourtReporting.com**
**January 25, 2007**