**American Court Reporting**
**toll-free (877) 320-1050**

Page 85

1  sometime in '06, three or four months
2  maybe that I advertised, maybe five
3  months, with one magazine to try to
4  pick up a couple of drivers. Or mainly
5  owner/operators is what I was trying to
6  pick up at the time.
7      Q. Did Kelly Trucking's need for
8  drivers change between 2004 and 2005?
9  I'm talking about quantity.
10     A. You mean did we have a lot
11 more empty trucks sitting than we
12 needed to hire somebody to put in
13 them --
14     Q. Yes, sir.
15     A. -- from '04 through 05?
16     Q. Yes, sir.
17     A. I probably -- I would have to
18 say the empty trucks ran about the
19 same. We were very fortunate on being
20 able to keep our trucks filled.
21     Q. When did you first learn that
22 Kelly Trucking was -- excuse me --
23 yeah, Kelly Trucking and U.S. Xpress

Page 86

1  were in discussions?
2      A. May or June, maybe. I don't
3  remember the exact month, but I'm going
4  to say it's somewhere in there. Maybe
5  sometime in June. I've got a calendar
6  of events once I got involved with it
7  that's at my old office. When I say
8  events, I guess, when I first became
9  aware of it.
10     Q. Is this like an appointment
11 book or something?
12     A. Well, I did everything the old
13 fashion way. I just copied a calendar
14 sheet, a small one, and then I would
15 just write in there. I didn't have an
16 appointment book. It was just sheets
17 out of a calendar that I copied and
18 used.
19     Q. This wasn't something you kept
20 specifically for U.S. Xpress; it's what
21 you did regularly?
22     A. Yeah. I always keep dates on
23 everything. Tried to, anyway.

Page 87

1      Q. And that was at your old
2  office --
3      A. Yes, sir.
4      Q. -- at Kelly Trucking --
5      A. Yes, sir.
6      Q. -- when you left in December
7  of '06?
8      A. '06, that's when I left.
9      Q. That calendar of events was
10 still there when you left?
11     A. To my knowledge, it was, yes,
12 sir.
13     Q. Were you aware of Kelly
14 Trucking having entered into any
15 discussions with any other companies
16 about the sale of Kelly Trucking to
17 some other entity?
18     A. It was just mentioned to me
19 about a company, Floyd & Beasley, had
20 talked with Guy and Nelson, and I
21 believe Dennis was there at the time.
22     Q. Dennis?
23     A. Hamlet.

Page 88

1      Q. Hamlet. Okay. How did you
2  first hear about U.S. Xpress?
3      A. Guy called me in his office
4  and informed me as to what he was
5  doing.
6      Q. What did he tell you?
7      A. He told me he had entered into
8  an agreement with U.S. Xpress for them
9  to buy the company. And he said,
10 Frank, I don't think you are going to
11 have to worry about your job. I said,
12 okay.
13     Q. At any point in time, did you
14 ever see any agreements between Kelly
15 Trucking and U.S. Xpress?
16     A. At any point during any time
17 period?
18     Q. Yes, sir.
19     A. Yes.
20     Q. When?
21     A. Probably the latter part of
22 August after the deal went sour.
23     Q. So after August 25th, 2005?

**www.AmericanCourtReporting.com**
**January 25, 2007**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 89

1    A.  I'm going to say that's
2  probably the first time that I sat down
3  and really went through the agreement,
4  yes, sir.  I don't remember going
5  through it before.  I'm trying to
6  remember.
7    Q.  Did you ever have any contact
8  with anybody from U.S. Xpress?
9    A.  Yes, sir.
10    Q.  When was that and if more than
11  one occasion?
12    A.  Many occasions.  And every one
13  of them's name I can't -- Dennis
14  Farnsworth, I talked to him a number of
15  times.  Al, I think he was the man from
16  Nebraska --
17    Q.  Al Hingst.
18    A.  -- that had sold his company
19  to U.S. Xpress.  He had a small
20  company.  And John, a man from Utah, I
21  believe that was his name, John.  Yeah.
22  Was it John?
23        The lady that came in with a

Page 90

1  crew that came to the office building
2  that I was in at the time, because I
3  was the only one down there, I cannot
4  remember that lady's name.  I've got it
5  in some of my paperwork at the office,
6  but again I don't have it with me.
7  Vice-president of -- over safety, he
8  came to my office.  I met the CFO, the
9  vice -- I believe it was the
10  vice-president of the company when they
11  flew in.  Six of them flew in on their
12  little jet.
13    Q.  Did you say six of them?
14    A.  I believe it was six.  I
15  believe it was five or six.  I had
16  lunch with them.  The exact number, I
17  don't know.  But it was several of them
18  that flew in to Alexander City, to the
19  airport there and then they came over.
20  You know, I met that group, and they
21  all gave me their card, but it's stuck
22  at the office.
23    Q.  When you say the office, are

Page 91

1  you referring to Eagle?
2    A.  Yes.  Yes.  Not where I work
3  now.  There was a lady and a gentleman,
4  and I'm going to have to -- my days are
5  close and I'm going to be under more so
6  than over as far as a date, I believe.
7        Between a two- and three-week
8  period prior to the disaster date,
9  there was a gentleman I got a call
10  from, I think it was Tunnel Hill in
11  Georgia, asking me if I would let them
12  have my files on our drivers.  I said,
13  let me talk with Guy Kelly.
14        I talked with Guy and he said,
15  go ahead and let them have them.  And
16  the reason that I remember the -- I do
17  not remember their names, but I know
18  both of them were single; they were
19  single.  I think both had been
20  divorced.  It just stands out in my
21  head.  One lived in Georgia, one lived
22  in Alabama, but they both worked there.
23  They came down together and we chatted

Page 92

1  a little bit.  They told me they were
2  going together.  We, you know, just
3  carried on generally.  They picked up
4  our filing cabinets, two complete top
5  to bottom stuffed with drivers.  They
6  took those back with them and kept them
7  for a long period of time.  I'm going
8  to say a good two weeks.  Again, I
9  could be off a day or two, but I'm sure
10  it was a good two weeks.  And those two
11  people I met.  Their names, I do not
12  remember.  They did not give me a card.
13        There were about five or six
14  ladies that came down the 22nd, I
15  believe it was, the week of the 25th.
16  Was Monday the 22nd?  Yeah, Monday
17  would be the 22nd is when they came
18  down.  A lot of the ladies that came
19  down then, I had conversation with
20  them.  But names, I don't remember.
21  They were at the office.  I'm just
22  trying to think of anybody else.  I'm
23  probably the world's worst with names

**www.AmericanCourtReporting.com**
**January 25, 2007**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 93

1    than anybody you ever met. But I think
2    that's all that I met with the company.
3        Q. You said they kept the filing
4    cabinets with the drivers' stuff in it
5    for a while?
6        A. It was everything. Had
7    everything in it. Had their personnel
8    file and their DQ files.
9        Q. Okay.
10       A. They had both files. They
11   went to Tunnel Hill. After the deal
12   went sour, they did not bring them back
13   personally. They wanted us to send
14   somebody. They didn't give them back
15   till after the deal went bad. And we
16   had one of our trucks to pick it up,
17   had an empty trailer, truck and trailer
18   coming. I've got a receipt at the
19   office again where our driver had to
20   sign for the filing cabinets. The
21   exact date on it, I cannot tell you.
22   But the best I remember, the date is on
23   there. He signed for them. They put

Page 94

1    them up in the back of the trailer and
2    he brought them back to the office and
3    we unloaded them and put them in the
4    office.
5        Q. Were you involved at all in
6    the negotiations regarding what went in
7    the Purchase Agreement?
8        A. As to what went in the
9    Purchase Agreement?
10       Q. Yes.
11       A. No, sir.
12       Q. What, if any, involvement did
13   you have in, I guess, the due diligence
14   or the negotiations?
15       A. Well, one part, to get it out
16   of the way, is when Dennis came down --
17   and this will not be in any order.
18   Dennis came down to my office and asked
19   me about working for U.S. Xpress. I
20   told him yeah. They even brought me
21   some nice shirts to wear. We had a
22   number of small meetings. And I say
23   small. Quick, 15, 20 minutes,

Page 95

1    sometimes less, that Guy and Nelson
2    would be in one of the two offices with
3    Dennis where they might be on a
4    conference call with somebody out of
5    Tunnel Hill, I'm assuming that's where
6    they were from, talking about what was
7    coming up or when they were going to
8    try to get this thing together, I guess
9    you would say, and get it completed.
10       But also, Dennis got me to
11   come up one day because of a phone call
12   from -- and I'm still -- I'm going to
13   use Tunnel Hill, and if some of them
14   were in corporate or somewhere else,
15   that's what I'm speaking of when I say
16   Tunnel Hill.
17       Q. Okay.
18       A. They needed a number of items
19   from me. They needed like a sample of
20   our drivers. That was what they
21   wanted. And this was several weeks
22   prior to August 25th. I didn't pull
23   them. I had -- I believe Dennis came

Page 96

1    to my office, when they were asked for,
2    and I told him just to go in there and
3    pull whatever he wanted. And that way,
4    it would be a true sampling. But
5    somebody else pulled them, and I'm
6    thinking it was Dennis that pulled them
7    and we sent them to Tunnel Hill, and
8    they sent those back. And then that's
9    when they asked me if it was a true
10   sampling of our drivers and I said,
11   yes, it was. I could not sit here and
12   tell you the eight or ten that were
13   pulled, the names.
14       And then that was when they
15   asked me -- Dennis called me again and
16   asked me if I could -- or Nelson did
17   and asked me to come up to his office.
18   Dennis was there and Guy was there. I
19   believe it was Dennis and Guy. I know
20   Dennis was there and Nelson was there.
21   I don't know if Guy was there this
22   particular time or not. But that was
23   when we got on the squawk box and that

24 (Pages 93 to 96)

**www.AmericanCourtReporting.com**
**January 25, 2007**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 97

1   was when they wanted to send the lady
2   and the gentleman down to pick up the
3   files. And I told them, you know, at
4   that point, I had already talked to Guy
5   and, yes, they sent them down.
6       One conversation, and again I
7   can't remember if it was Guy's office
8   or Nelson's, because we had a few in
9   there, and Guy, which you would just
10  have to know Guy. We are sitting here
11  talking, well, you got to do something,
12  I can't lose money. And basically when
13  he said that, it was during the
14  conversation as to when they wanted to
15  start to pull these drivers in on the
16  22nd. And he said, I can't lose money.
17  And they said, well, we will take care
18  of your expenses for that week
19  basically on getting the drivers in.
20      My understanding from talking
21  to the vice-president, which is over
22  safety, was that we were going to have
23  the people come in to hit a short form

Page 98

1   application, is what we call it, and
2   especially these large companies, like
3   U.S. Xpress, they have what they call a
4   short or express application.
5   Basically, you are just giving the
6   company the right to check everything.
7   That's what they did at Tunnel Hill
8   with a handful of drivers that went
9   through there. But the ones that they
10  brought into my office, they kept them
11  and they kept them and they kept them.
12  They had no earnings for the week, to
13  my knowledge. They were so hacked,
14  when they got through on Thursday, that
15  I think most of them went home. They
16  were there Monday and Tuesday, and they
17  told them not to come back Wednesday
18  because they had some more people
19  coming in. They told them to come back
20  Thursday. So they did. And then
21  early, before lunchtime is when Al and
22  John and the lady that was over the
23  group that came in from Tunnel Hill, I

Page 99

1   called them into my office that morning
2   and had a good chitchat with them, then
3   after that is when everything broke
4   loose.
5       Q. Let me go back. Is that all
6   you could remember?
7       A. No. What I remember -- what I
8   don't understand in remembering, I
9   don't know if you want this or not, you
10  might not, but they had every file that
11  we had, maybe one or two or three,
12  something, you know, like I told you
13  earlier, I wouldn't bet my life that
14  every file was sent on every driver we
15  had. I wouldn't bet my life on it.
16  But the ones that we could find, we
17  sent. But they had those files for so
18  long, they could have -- they knew
19  exactly what kind of drivers they were
20  before they sent all these people in
21  there on the 22nd to my office to start
22  the recruiting process or whatever you
23  want to call it, signing them up for

Page 100

1   hire. But they had everything. They
2   had it for a couple of weeks, a good
3   couple of weeks that they had it.
4       Q. Did U.S. Xpress ever ask or
5   ever send down any applications for the
6   drivers to fill out and send back to
7   U.S. Xpress before that August 22nd
8   week?
9       A. You know, I honestly don't
10  remember. I know we had a bunch of --
11  I say a bunch. We had a stack of
12  applications in the office. They could
13  have. They could have. I honestly
14  can't -- I think at one point in time,
15  I don't know if it was before the 22nd
16  or after, I know there were several
17  applications there in our building down
18  there, yes. So it had to be somewhere
19  around that time. It could have been
20  -- it could have been a day or two
21  before.
22      Q. I take it, you weren't
23  involved in handing those out or

**www.AmericanCourtReporting.com**
**January 25, 2007**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 101

1  sending those back to U.S. Xpress after
2  they were filled out?
3      A.  That would have been Eddie
4  Adams or either David Battle that would
5  have handled that.
6      Q.  What did Mr. Farnsworth say to
7  you about coming to work for U.S.
8  Xpress?
9      A.  He asked me -- their intent
10  was -- their intent was to leave a
11  satellite office in Wadley. I think it
12  was to make the transition. He didn't
13  say that. But in my mind, I felt like
14  that's what it was. He asked me what I
15  was making and I told him. He asked me
16  what benefits I had and I told him.
17  And he told me that I would have the
18  same thing with them when this took
19  place.
20      Q.  Do you remember when this
21  conversation took place?
22      A.  June, July, maybe. When I'm
23  speaking of July, it would be around

Page 102

1  the very first part of July, and I'm
2  thinking probably closer to the latter
3  part of June is when we discussed it.
4      Q.  Did you have any conversations
5  with anyone from U.S. Xpress about the
6  closing date?
7      A.  It was discussed in one or two
8  of the meetings that we had. And the
9  reason I'm saying one or two, because
10  it changed. Again, I cannot sit here
11  -- more than likely, it was in Nelson's
12  office. Dennis was there. I don't
13  know if Randall Fant was in there or
14  not, I cannot say. It was three people
15  in that room or four people in that
16  room that day. It was either Randall
17  or Guy in the room with Dennis when it
18  was discussed on one occasion. Another
19  occasion, I think it was just me and
20  Guy and Dennis in Guy's office. But to
21  my knowledge, I think that's the only
22  two times I heard of closing dates for
23  the exception now -- excuse me -- for

Page 103

1  the exception of when they were coming
2  down.
3      Q.  That week in August?
4      A.  Yes, sir. That it was
5  supposed to close that following
6  Monday, I believe it was, the 29th is
7  what they -- is the reason they had to
8  get everything done that week.
9      Q.  All right. The first meeting
10  that you mentioned, not necessarily the
11  first in order, but the first meeting
12  that you mentioned where there were
13  several people, four or five people in
14  the conference, do you remember what
15  was said about the closing date?
16      A.  No. The only thing I can
17  remember basically out of it is just
18  Dennis would say that we've got to do
19  this, that's the reason we are going to
20  move the closing date to this date.
21  But as far as any particulars, I
22  honestly don't know of any.
23      Q.  Is that the same thing with

Page 104

1  the second meeting or second
2  conference?
3      A.  Pretty much. I think the last
4  one was the one -- the middle one --
5  the last one was right before they came
6  in there. So that was not really --
7  that was just an FYI, I believe, for me
8  being up there. But the one prior to
9  that was when they were letting me know
10  that the people were coming in.
11      And I was getting a little
12  disgusted, I believe, because of the
13  calls I was getting from the drivers,
14  you know, and the date getting put off.
15  But they did call me. As far as
16  covering anything else in that meeting,
17  I cannot sit here and tell you we went
18  through a great deal of anything other
19  than maybe just close to an FYI again.
20      Q.  Okay. You mentioned that
21  there was a conference where Mr. Kelly
22  was worried about his expenses of
23  bringing the drivers in.

26 (Pages 101 to 104)

# American Court Reporting
## toll-free (877) 320-1050

Page 105

1    A. Yes, sir.
2    Q. Do you remember when that
3  conference was?
4    A. Golly. Golly. I'm going to
5  say maybe sometime maybe the first
6  week, second week in August, I'm
7  thinking. You know, it was one of the
8  deals where -- when we were told to
9  call -- I say we. From Guy and
10  Nelson's standpoint, they had a code
11  that they had to call this number and
12  enter it and it would be four, five,
13  six people on the phone at one time.
14  You know, I didn't know everybody that
15  was on the phone calls; I didn't know
16  everybody.
17    Q. This was a conference call?
18    A. Yes. One of them, yes.
19    Q. You said one of them?
20    A. Dennis Farnsworth was in the
21  room with us.
22    Q. Was there a second conference
23  call regarding this?

Page 106

1    A. Not that specifically, no, not
2  the money, if that's what you are
3  talking about.
4    Q. Right.
5    A. No, sir. No, sir. There was
6  another one about the drivers' DQ files
7  and personnel files, one about that.
8    Q. So Dennis was in the room with
9  yourself, Mr. Chastain and Mr. Kelly
10  when the discussion came up about Kelly
11  Trucking's expense to bring the
12  driver's in the week of --
13    A. I'm just about 100 percent
14  sure on that one, yes. Yes.
15    Q. You indicated that they said,
16  we will take care of the expenses; is
17  that right?
18    A. Yes.
19    Q. Who said that?
20    A. I don't know. It was four or
21  five on the phone. I know one person
22  -- and again, I hate that I don't
23  remember his name, but you know who I'm

Page 107

1  talking about, the vice-president over
2  safety. You will know him. Should.
3  Because I got several -- had several
4  calls with him. I've got his card at
5  the office again. You know, they are
6  card people. I don't know if it was
7  the CFO. I don't know if it was him.
8  I don't know. I can go through the
9  cards and maybe tell you who it was.
10  But as far as --
11    Q. There is a Mr. Wardeberg.
12    A. Who?
13    Q. Wardeberg.
14    A. Yeah. Now, I remember him.
15    Q. Russ Moore?
16    A. When I say remember him, I
17  remember the name.
18    Q. Mr. Moore, Russ Moore?
19    A. Russ Moore was over safety.
20  He was vice-president of safety, wasn't
21  he?
22    Q. Is that who --
23    A. No, he is not the one that

Page 108

1  said that. No, not Russ. It wasn't
2  Russ.
3    Q. Did you know what kind of a
4  purchase this was, whether it was an
5  asset purchase or a stock purchase?
6    A. I did know that, yes, sir.
7    Q. What was your understanding?
8    A. It was an asset purchase.
9    Q. And were you aware that the
10  drivers were no longer going to work
11  for Kelly Trucking, they were going to
12  have to apply with a new employer, U.S.
13  Xpress?
14    A. Well, going to work, you had
15  -- the law says they have to do that if
16  they changed over and go for U.S.
17  Xpress.
18    Q. Right.
19    A. I mean, they couldn't just
20  roll them over.
21    Q. Right. You understand that's
22  why they had to come in and have them
23  fill out applications and go through

27 (Pages 105 to 108)

## www.AmericanCourtReporting.com
## January 25, 2007

Page 109

1    the driver's qualification process?
2        A.  Well, yeah, I understand what
3    you are saying, but -- yeah, I
4    understand what you are saying.
5        Q.  But what?  There is something
6    that you were thinking there.
7        A.  Well, that's something I know.
8    They had their files, they knew what
9    their driving record was.  They had the
10   files for a couple of weeks.  They knew
11   it -- before they came into my office
12   on the 22nd, they knew what every
13   driver that they've got on that piece
14   of paper had on their record up until
15   the last annual review.  You have to do
16   an annual review on every driver.  And
17   it varies.  So the worst, the latest
18   one it could have been was 11 months
19   and 29 days or 11 months and 30 days.
20   And then it would drop down to ten,
21   nine, eight, seven, six, five, four,
22   three current is the way you have to do
23   them.  So they knew what their record

Page 110

1    was before they ever walked through the
2    doors to sign them up.
3        Q.  Were there ever any
4    conversations between yourself and
5    anyone from U.S. Xpress about the Kelly
6    driver files, what was contained in the
7    Kelly driver files?
8        A.  Did I have a conversation?
9        Q.  Yes, sir.
10       A.  The only conversation I had is
11   the one I told you a few minutes ago
12   when we pulled some at random, when
13   some were pulled at random and sent,
14   are these representative of the files,
15   and, you know, my answer to them was
16   yes, because I just reached in there
17   like you pulling them out blind.  I
18   didn't want to pull them.  I wanted
19   somebody else to do it.
20       Q.  Right.
21       A.  And they were sent, so they
22   should have known what was in those
23   files.

Page 111

1        Q.  Do you know if anyone from
2    U.S. Xpress had any conversations with
3    anyone else at Kelly Trucking about
4    specific drivers and things in their
5    driver's file prior to the week of
6    August 21st, 2005?
7        A.  I had a conversation -- can I
8    see this?
9        Q.  Yes.  They are there for your
10   reference.
11       A.  I'm looking at Defendant's
12   Exhibit 33.  There are a couple of
13   notations on here that I put on here
14   myself when I got a call from Russ
15   Moore.
16       Q.  Which ones are your notations?
17       A.  The real ugly ones.
18       Q.  The which ones?
19       A.  This one.
20       Q.  The heavy ones?
21       A.  Yes.  Like this rollover.
22       Q.  On page 97?
23       A.  Yes, 97.

Page 112

1        Q.  There is a 12 dash --
2        A.  12.
3        Q.  -- R period over?
4        A.  Yes.  Yes.  Now, these are the
5    reasons that U.S. gave that they
6    wouldn't hire these people and I
7    scribbled it in and that's what it's in
8    there for.
9        Q.  On that same page, there's a
10   couple of heavy notations.  The word
11   no?
12       A.  Yes.
13       Q.  What does that mean?
14       A.  No, they would not be hired.
15   They are numbered.
16       Q.  I see.
17       A.  The number, it should start
18   with one, wherever one is.
19       Q.  And this is what U.S. Xpress
20   told you?
21       A.  Yes.  Over the phone.
22       Q.  Do you remember when this
23   conversation was?

28  (Pages 109 to 112)

# American Court Reporting
## toll-free (877) 320-1050

Page 113

1    A.  I had two.  The second one --
2  the first one, it's going to be hard.
3  I'm drawing a blank on it.  But the
4  second one I know was on August 25th,
5  the morning of August 25th.
6    Q.  Do you remember when the first
7  one was?
8    A.  It had to be the week prior to
9  the 25th.  It had to be in this mix.
10  Well, it could have been before that,
11  because when they sent me this, they
12  said, we didn't have these files, we
13  don't have these files, where are they.
14  And that's when we went down and looked
15  at the files.  And you can see on some
16  of them here, here, here, we sent those
17  in.  Some of them they said they didn't
18  have.  When we got the files back, they
19  were in there.
20    So I'm going to say on the
21  nine -- I mean, I believe it was ten, I
22  think it was the week prior to on the
23  first ten that's on here.  Either nine

Page 114

1  or ten, he called me the week prior to.
2    Now, the ones after that, you
3  know, like either ten, 11, 12, 13, 14,
4  15, 16, that was the morning of the
5  25th.  That was when John and Al and
6  the lady that was handling the office
7  people that came down, that's when they
8  came into the office and told me that
9  Russ wanted me to call him.  And, boom.
10  He wanted to talk.  And I asked them
11  what it was about, and they said, Russ
12  wants to discuss these drivers that he
13  had said that he couldn't use.  I think
14  it's the first -- anyway, nine or ten
15  that's on here.  He said, you could
16  take it to somebody else, personnel, to
17  see if they can get some of them
18  changed.  I said, okay.  So when I
19  called him that morning with these
20  people present in the office --
21    Q.  This is the morning of the
22  25th?
23    A.  The 25th.  He decides or

Page 115

1  either they knew it and didn't tell me
2  the truth, one or the two, they give me
3  other names to add to the list instead
4  of me being able to discuss him pulling
5  some of these people off the list that
6  they wouldn't accept.  And that's when
7  I sort of got upset.
8    Q.  So you had a conversation
9  around the 9th or 10th of August?
10    A.  I won't say the 9th or 10th.
11    Q.  What was the nine or ten in
12  reference to?
13    A.  These numbers here.
14    Q.  Oh, okay.
15    A.  These numbers like -- see
16  nine, when he -- to get it clear, when
17  he called me the first time about
18  these --
19    Q.  Right.
20    A.  -- when he would call one out,
21  I would just stick a number down there.
22  And it was either nine or ten drivers
23  the first time he called that he could

Page 116

1  not accept.  He said, we can't take
2  these drivers.  So when they told me
3  about it on that Thursday morning that
4  he wanted to discuss the drivers again
5  and possibly send them through
6  personnel again to see if we could
7  change over to get some of them
8  approved, when I called him, it was
9  just reverse, he wanted to add some
10  more to the list.
11    Q.  I see.
12    A.  We had two conversations about
13  the handwritten part here, on my part,
14  we had two different conversations
15  about that.
16
17    (Discussion off the record.)
18
19    (Whereupon, Defendant's Exhibit
20    Number 88 was marked for
21    identification and is attached to
22    the original transcript.)
23    Q.  (BY MR. HALL:)  I will show

## www.AmericanCourtReporting.com
## January 25, 2007

**American Court Reporting**
**toll-free (877) 320-1050**

Page 117

1  you what has been marked as Defendant's
2  Exhibit 88 and ask if you had a copy,
3  a color copy like that.
4      A.  Do I have a color copy?
5      Q.  Did you get a color copy like
6  that?
7      A.  No.
8      Q.  You were working from a copy
9  like --
10     A.  I worked from this right here.
11     Q.  Defendant's 33?
12     A.  Yes, sir, 33.
13     Q.  On the last page of
14 Defendant's Exhibit 33, there is a
15 notation at the top, 50 orange.
16         Do you know whose handwriting
17 that is?
18     A.  That is definitely not mine.
19 You can see my scribbling over here and
20 how fat I write with my pen.  What does
21 that mean to you?  Oh, you are talking
22 about on this?
23     Q.  I was just wondering if that

Page 118

1  was your handwriting.
2      A.  No, sir.
3      Q.  The -- I lost my train of
4  thought.
5      A.  The E looks like mine.  I make
6  E's that way.  But I haven't had
7  anything in color.  There's nothing in
8  my office in color.  I worked off this
9  copy since I have had it.
10     Q.  For the next two, these that
11 have no file, I'm on Defendant's
12 Exhibit 33, those that have no file
13 typed in in the right-hand column, next
14 to it when it says here, that means
15 that you actually still had the file at
16 Kelly Trucking?
17     A.  Yes.
18     Q.  Were there any drivers'
19 qualification files missing because of
20 a weather related mishap in Wadley?
21     A.  Weather related?
22     Q.  Either a tornado or something
23 destroyed a building and drivers' files

Page 119

1  were lost.
2      A.  We had a tornado that hit our
3  safety building.  That's the reason I
4  was down in the other building.
5      Q.  This is before --
6      A.  It happened April the 31st,
7  April the 30th.  Let's see.  April the
8  30th, last day of April.  That's the
9  reason, 30 days.
10     Q.  Were there any drivers' files
11 lost in that?
12     A.  Yes, there were some in that.
13 As far as sitting here telling you
14 there was 30 or 40 or 50, I wouldn't
15 tell you that.
16     Q.  The drivers' files you had to
17 give to U.S. Xpress, were they
18 complete?
19     A.  Yes, to my knowledge, they
20 were, now.
21     Q.  Was there anything that
22 existed before the tornado that wasn't
23 in the drivers' files after the tornado

Page 120

1  that you sent to U.S. Xpress?
2      A.  Shoot that one to me again.
3      Q.  What I'm trying to get at is,
4  if some of the drivers' files were lost
5  because of this tornado, were these
6  drivers files completely reconstructed
7  afterwards?
8      A.  Yeah.  What was sent, what was
9  in those filing cabinets?
10     Q.  Right.
11     A.  Yes, they were correct.  They
12 were correct.
13     Q.  And complete?
14     A.  Yes.
15     Q.  They had everything that
16 existed before the tornado?
17     A.  Yes.  Yes.  It might have been
18 four or five that might not have been
19 sent that weren't even on the list,
20 period, that wouldn't have anything to
21 do with U.S. Xpress that would have to
22 be in there that we had.  You know,
23 everything -- everything that they

30  (Pages 117 to 120)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 121

1  received was a complete DQ file and
2  personnel file.
3      Q.  Who was it you called the
4  morning of the 25th?
5      A.  I didn't call anybody.  They
6  came in and -- well, they came in and
7  told me to call him.  I didn't call him
8  up and say, hey, let's talk about this.
9  Al and John and the lady that was over
10 the group of the ladies that came in
11 there said that Russ Moore wanted me to
12 talk to him that morning about the nine
13 or ten drivers he had said he couldn't
14 accept.  And he said, if I would call
15 him, that he would try to go through
16 personnel with it again and see if he
17 could get some of them corrected.  I
18 said, okay.  So I talked to him and he
19 added some more to it.
20     Q.  This was the morning of the
21 25th?
22     A.  Of the 25th.
23     Q.  What did he say about the

Page 122

1  additional drivers?
2      A.  The ones he added to the list?
3      Q.  Yes, sir.
4      A.  He gave me -- starting at
5  either ten or 11 and going up to the
6  end.  See on these numbered ones,
7  that's the ones that he added to it,
8  saying he could not take those.  All of
9  these were not done on the same list.
10 And that's what I couldn't understand,
11 why with the files that he couldn't
12 say, I can't take the 20, but he has to
13 do it in two different sessions.  But I
14 wrote out there what he said.
15     Q.  What does it mean when it has
16 timber written next to it on
17 Defendant's Exhibit 33?
18     A.  That was one that I told you
19 pulled timber mainly, but they would
20 pull road freight also.
21     Q.  Both.  Okay.  Next to Malcomb
22 Maulden --
23     A.  Which --

Page 123

1      Q.  On page 98, Defendant's
2  Exhibit 33, it's got four accidents --
3      A.  Okay.  Macon Maulden.
4      Q.  Correct.
5      A.  Yes.
6      Q.  What does no; accidents, four
7  accidents mean?
8      A.  No, they won't accept him
9  because of accidents.
10     Q.  Okay.  I got you.  All right.
11 The one below that, Rodney McClain.
12     A.  Rodney McClain.  Okay.
13     Q.  Is it rear end, R period end?
14     A.  Yes.  Yes.
15     Q.  So three tickets plus three
16 tickets?
17     A.  Yeah.  That, I don't know what
18 that stuff got there for.  But he had
19 three tickets and I think one of them
20 was an accident and had a rear end.
21 And that's the reason.  We can go back.
22 That won't be hard to find out what he
23 had on there anyway.

Page 124

1      Q.  Page 99, Harold Thomas.
2      A.  Page 99, Harold Thomas.
3      Q.  It says homicide?
4      A.  That's what it says, which we
5  don't run a -- we don't do a criminal
6  background.  Undoubtedly USX does.
7      Q.  Willy Thompson?
8      A.  He was SAP.
9      Q.  He had tested positive and had
10 not been --
11     A.  Not for us.  With another
12 company.
13     Q.  All right.
14     A.  But he came in and brought his
15 forms like he was supposed to do, and
16 we followed up on it from there.
17     Q.  He had tested positive for
18 another company and then was hired by
19 Kelly Trucking?
20     A.  Yes.  Which that's legal.
21     Q.  You can test positive at
22 another employer and then go to work
23 for another employer?

31  (Pages 121 to 124)

# American Court Reporting
## toll-free (877) 320-1050

Page 125

1    A.  After you have gone through
2  your rehab in the SAP program.
3    Q.  Okay.  It's not no SAP, but
4  no --
5    A.  No.  They will not hire him
6  because they won't hire anybody that's
7  in a SAP.
8    Q.  He went to a SAP?
9    A.  Yeah.
10   Q.  I got you.  I thought it
11  meant, no, he had not been to a SAP.
12   A.  No.  He had.  He brought his
13  paperwork with him.
14   Q.  All right.  I'm with you.
15  Jimmy Walters, do you know what that
16  note says?
17   A.  Stop sign, it looks like.
18  S-t-o-p s-i-g-n.
19   Q.  Were you aware of U.S. Xpress'
20  hiring requirements?
21   A.  No.  No, sir, I was not, not
22  until they came in there with their
23  applications, notebooks and everything

Page 126

1  that they brought in on the 22nd.  I
2  think I still have some of it at the
3  office.
4    Q.  Do you know how many drivers
5  USX set as a minimum number of drivers
6  that they had to qualify and hire, be
7  able to hire on the closing date for
8  the Purchase Agreement to go through?
9    A.  I didn't know until after the
10  fact.
11   Q.  So before the fact, you
12  weren't involved in deciding how many
13  drivers they needed?
14   A.  No, sir.  No, sir.  No, sir.
15   Q.  Were you aware that they
16  reduced it from 145 to 130 at one
17  point?
18   A.  I was aware that it was 130.
19  That's what I was aware of.
20   Q.  And you learned that
21  afterwards?
22   A.  After the 25th, yes, sir,
23  because the conversation that I had

Page 127

1  about it with the gentleman from
2  Nebraska, he didn't say anything about
3  it when I was in the room with him,
4  with Guy and Al, Nebraska.
5    Q.  Mr. Hingst, Al?
6    A.  Yeah, he is the one that's
7  over that department that sort of gets
8  small companies and throws them in, you
9  know, hooks them up and tries to help
10  get in the fold for USX.
11   Q.  So you call Mr. Moore and he
12  adds names to the list that they can't
13  hire?
14   A.  Yes, sir.
15   Q.  What, if anything, happens
16  then?
17   A.  I sort of threw my pen up in
18  the air at my desk with Al and John and
19  the lady.  Again, you will have to find
20  out who she is or I can look it up at
21  the old office.  And I told them, I
22  said, you know, you group of people are
23  the most unprofessional people I have

Page 128

1  ever dealt with in my life, to be a
2  company of your size and to have the
3  people that you have in here.
4    I went on -- like I said, I
5  was upset at that point.  I said, I
6  think your main point in coming in here
7  was to shut this company down and break
8  us.  That's what I said to these people
9  that were in my office.
10   Al, he said, Frank, is Guy
11  here today; and I said, yes, sir, he
12  is.  I said, let me call.  So I called
13  up on the hill.  We were down at the
14  office down at the bottom of the hill.
15  I called up on the hill, Guy was there.
16  I said, Guy, Al wants to come up and
17  talk to you; he said, fine.  Al goes up
18  there.
19   In the meantime, three of the
20  people that were on this list that USX
21  would not hire but they were making
22  them fill out paperwork anyway, they
23  had already given me their names, that

32 (Pages 125 to 128)

## www.AmericanCourtReporting.com
## January 25, 2007

**American Court Reporting**
**toll-free (877) 320-1050**

Page 129

1  they would not hire them, but they were
2  sitting out there making them go
3  through all this paperwork. I went out
4  there and got three of them and brought
5  them in my office, I said, let me tell
6  you, if this things goes through, they
7  are not going to hire you. What do you
8  mean; I said, they already told me they
9  are not going to hire you. I said, I
10  will find you a job, sit down, I will
11  find you a job before you leave here
12  today.
13      I looked for a man that owns
14  J-Par Trucking, I looked for his
15  number. I could not find his number.
16  I called Guy Kelly. I said, Guy, I
17  need Craig Elliott's number. He said,
18  for what; I said, because there's three
19  people they are not going to hire, I've
20  got to get these people a job, I cannot
21  leave them hung out like that.
22      He said, well, Frank don't do
23  anything and I will call you back in

Page 130

1  three or four or five minutes. I said,
2  okay. Less than a minute later the
3  phone rang, it was Guy. He said, get
4  up here as quick as you can. So I told
5  those guys that were sitting there, the
6  drivers, I said, don't go anywhere,
7  hang around the building, I will be
8  back.
9      I get on the hill. The door
10  to Guy's office -- I went in. Well, Al
11  was sitting there and Guy was behind
12  his desk. I went in, what is
13  it. He looked at me and he said, the
14  deal is off. I said, excuse me. He
15  said, they are pulling the plug on it.
16      I turned around to go to the
17  door. I closed the door and I locked
18  it. And I started at Al, to discuss it
19  with him. Guy thought I was going over
20  there, I guess, to mix it up with him.
21  And Guy jumps up and hollers, no,
22  Frank, no, Frank. Don't. Don't.
23  Don't.

Page 131

1      Well, Al jumps up then, and I
2  said, Guy, all I wanted to do was keep
3  somebody from walking in here and
4  hearing the conversation we are having
5  is the reason I locked your door.
6      He stood up, shook my hand, he
7  said, I'm sorry; he said, had I been
8  here when this started, we could have
9  completed this deal, he said, but we
10  are pulling out.
11      I said, for what reason; he
12  said, we are just going to pull out,
13  Frank. And I guess that was close to
14  the last conversation I had with him,
15  because I told Guy I had to leave the
16  room, I was ill, but I had a right to
17  be ill.
18      Q. When you spoke with the people
19  in your office and they told you that
20  there were a number of drivers that
21  they are not going to hire, did they
22  ask you questions, solicit any kind of
23  information that might change their

Page 132

1  mind?
2      A. And you are speaking of the
3  call from Tunnel Hill when we were
4  talking on the --
5      Q. I'm talking about the morning
6  of the 25th.
7      A. Yes, sir. Well, now, I say
8  yes, sir. I understand what you are
9  saying. But go ahead. I want to know
10  what you are saying.
11      Q. You said you had a call with
12  them to talk about a number of drivers
13  that weren't going to qualify?
14      A. Yes, sir. Yes, sir. Okay.
15      Q. Did they solicit any
16  information from you that might cause
17  them to change their mind? Did they
18  say, tell us where we are wrong here,
19  ask for any additional information from
20  you?
21      A. No, sir, they didn't. And
22  that's the reason I got upset. Because
23  when I was told, it was either by Al,

33 (Pages 129 to 132)

**www.AmericanCourtReporting.com**
**January 25, 2007**

# American Court Reporting
## toll-free (877) 320-1050

Page 133

1  John or the lady, and I have to keep
2  referring to them in that fashion,
3  because at that point, they are the
4  ones that were doing the talking to me
5  on the local level there. And Al had
6  just come in that morning, by the way.
7      They wanted me to call Tunnel
8  Hill because they wanted to discuss
9  maybe some of the ones that they had
10  told me prior to the 25th, that they
11  might accept some of them if they ran
12  them back through personnel. They
13  didn't ask me anything more about the
14  drivers. They had everything on the
15  drivers. They didn't need to ask me
16  anything about them. Instead of
17  discussing the ones, possibly taking
18  some of them off the list, they added
19  more to the list.
20     Q.  When you talked with Russ
21  Moore, did you offer -- did you say,
22  you need to hire this particular guy,
23  you have got that wrong? Were there

Page 134

1  any discussions like that?
2     A.  He just told me he wasn't
3  going to hire them.
4     Q.  What made you think that their
5  main point was to shut the company down
6  or break it?
7     A.  Because they had, prior to
8  this -- and I think -- after thinking
9  about it, I think Guy Kelly might have
10  had this. And I'm going to tell you.
11  Well, you can tell her what it is, I
12  won't. But I think Guy might have had
13  a copy of this, might have, now.
14     Q.  Defendant's Exhibit 88?
15     A.  Yes. Guy could have had a
16  copy of that. I'm not 100 percent
17  sure, but I think he might have. Why
18  do I think he wanted to shut it down?
19     Q.  Right.
20     A.  Because when I got this, they
21  had their --
22     Q.  33.
23     A.  33. They had their mind made

Page 135

1  up what they were going to do with
2  these drivers. They knew what they
3  were going to do. They had had all of
4  their DQ files and their personnel
5  files at their facility in Tunnel Hill,
6  so they knew what was here. Them
7  knowing what was there, why did they
8  put us through that entire week that
9  they put us through or four days,
10  Monday through Thursday, when they knew
11  they weren't going to take these
12  drivers in the first place. They were
13  not going to take them. But yet they
14  come in there, they have all these
15  drivers come in on Monday. Our
16  customers couldn't be serviced, our
17  drivers were disgruntled because they
18  weren't making any money and we
19  couldn't pay them. That was when,
20  through a phone conversation, they were
21  supposed to have been paid, taken care
22  of, compensated for, but they haven't
23  been. You know, looking at it from my

Page 136

1  standpoint, it's the only way you could
2  look at it. There's no other way to
3  look at it.
4     Q.  What did they have to gain
5  from doing that?
6     A.  What did they have to gain?
7  Drivers. Since they had every name of
8  every driver that we had and they had
9  the listing of our customers. And they
10  had already called on some of our
11  customers. And they had no -- I can't
12  think of any other reason. They told
13  me, when they came in -- and I say
14  they. It was Dennis. Said that they
15  had 600 trucks sitting on the fence.
16  That means they had 600 trucks that
17  didn't have drivers. They needed
18  drivers.
19     Q.  Do you know of a Kelly driver
20  employed by Kelly in August of 2005 who
21  has been hired by U.S. Xpress?
22     A.  I cannot sit here and tell you
23  that they have been hired. I know

34  (Pages 133 to 136)

## www.AmericanCourtReporting.com
## January 25, 2007

**American Court Reporting**
**toll-free (877) 320-1050**

Page 137

1    there have been some letters sent out.
2        Q.  Do you know of any Kelly
3    Trucking client that U.S. Xpress picked
4    up after August 25th, 2005?
5        A.  I can't say that they picked
6    it up or added it to their list. But
7    we have an account in north Alabama,
8    it's in Stevenson Alabama. It's a
9    paper mill up there. I believe it's
10   Smurfit-Stone. I think U.S. Xpress
11   might have picked up a load or two.
12   And I'm talking about just minuscule.
13   But you pull what they have done in
14   there for the last few months and tell
15   me if it's minuscule. Who is it
16   hurting? It's hurting them as they are
17   today. That's a real good account, you
18   know, a good paying customer. And I
19   know they have gone in there. But as
20   far as me actually getting up here,
21   other than that one, and saying, yeah,
22   I know they hurt us on the Overnite
23   deal, that hurt us bad. That was a

Page 138

1    good account.
2        Q.  The Rainbow?
3        A.  Yes, sir. Yes, sir.
4        Q.  And you are not aware of any
5    drivers who quit the week of August
6    21st, 22nd?
7        A.  We lost a few. The only way
8    you could track that, I mean, to be
9    dead on is archives. Like I told you
10   earlier, go back and get one of those
11   computer experts we got there at the
12   office to check it to see when the --
13   they can check the code to see the last
14   load he pulled and they can tell you,
15   if it's still in the system. I don't
16   know how much they purged when it was
17   rolled over.
18       Q.  Did you have any discussions
19   with anyone with U.S. Xpress about
20   Kelly Trucking's equipment?
21       A.  I talked to -- again, I'm very
22   poor with names -- a gentleman that
23   came in and -- the day that these guys

Page 139

1    came in, something like Mark and Mark
2    or Jerry and Jerry. You know, that
3    might not have been their names, but
4    the two guys that came in, their first
5    names were the same. They wanted to
6    check our trailers. They came in to
7    look at them. And I heard them comment
8    -- we told them where they were. They
9    went up, they looked at them.
10       When they came back, I was not
11   trying to eavesdrop on them, but the
12   statement was made like from here to
13   that chair right there, you know, those
14   trailers are awful. And I stuck my
15   nose in this conversation. I said, let
16   me tell you, I said, all those trailers
17   up there, that's the reason they are up
18   there to be repaired. I said, those
19   are not our road trailers.
20       And that guy told him, I heard
21   him tell him, you know, look, he said,
22   we can't do anything with those. And I
23   had to tell him again, those are

Page 140

1    trailers to be repaired. And they
2    were. We just had a lot of trailers at
3    that time to be repaired. Probably 45,
4    maybe. That's a close guess. I don't
5    know if that upset them, I honestly
6    don't know, but they were.
7        Q.  When you went up to the office
8    and you had the conversation where you
9    locked the door --
10       A.  Yes, sir.
11       Q.  -- it was just you, Guy and
12   Al?
13       A.  Yes, sir.
14       Q.  And you asked Al why they were
15   pulling out?
16       A.  Yes, sir.
17       Q.  And he said, we are just
18   pulling out?
19       A.  I said, what's going on, is
20   what I asked him. When he stood up, I
21   said, what's going on. He said, we
22   just got to pull out. And I said, why.
23   He never did give me a reason. Which

35  (Pages 137 to 140)

**www.AmericanCourtReporting.com**
**January 25, 2007**

# American Court Reporting
## toll-free (877) 320-1050

Page 141

1  he didn't have to give me a reason. I
2  mean, I just work there. But he never
3  gave me a reason.
4        He said it was handled wrong
5  from the start. He said, had I been
6  here to handle this from the start, he
7  said, I could have made this work. He
8  said, I should have been in here
9  earlier. That was his very words.
10  That's the only thing he said to me
11  about it, period.
12    Q. Did Guy ever tell you what Al
13  had told him about why they were
14  pulling out?
15    A. He could have in conversations
16  later, but I don't even -- I might have
17  talked to him one more time about that
18  that day. But I had to go back down
19  and take care of the problem with all
20  those drivers that were down there at
21  the time. And the other ladies that
22  were from U.S. Xpress, they were --
23  everybody was still in the building

Page 142

1  when I got back down there. And once
2  the ladies cleared the building, I
3  called all the drivers from outside
4  inside. I had some at the shop, at the
5  truck stop. I called all them down so
6  I could talk to them at one time and I
7  explained to them what had just
8  happened.
9    Q. What was their reaction?
10    A. To be honest with you, they
11  cheered. They wanted to hug my neck.
12  But I told them it wasn't me.
13    Q. They didn't want the deal to
14  go through?
15    A. No, sir.
16    Q. I take it, then nobody quit
17  the next week, because U.S. Xpress
18  wasn't coming in?
19    A. Again, I would have to hit the
20  archives and get somebody to go in
21  there with me.
22    Q. Not that you recall sitting
23  here?

Page 143

1    A. Well, not sitting here, no. I
2  had my hands full trying to get drivers
3  out then.
4    Q. What I'm trying to get an idea
5  of is, there wasn't like a mass exodus,
6  U.S. Xpress is not come in, we are
7  leaving?
8    A. (Shakes head.)
9    Q. Is that a no?
10    A. Yeah. I hear what you are
11  saying. I can't sit and just say, you
12  know, we lost 50 people or we lost 10
13  or none. I know a few left. I cannot
14  tell you how many. I told you that
15  earlier. The exact number, I cannot
16  tell you.
17    Q. What I'm trying to do is get
18  an idea of how many left because U.S.
19  Express was coming in and then when
20  U.S. Xpress was not coming in, how many
21  left?
22    A. The ones that we lost, you
23  should check between the period of 22

Page 144

1  and 25 or either the week prior to.
2    Q. August 22 to 25?
3    A. That's when you would have a
4  big exit, if you had a big exit.
5    Q. I see.
6    A. And then maybe minuscule
7  thereafter, I mean, just little bitty.
8  And the combination of all of it, like
9  I said, I still think it's going to be
10  under 20. That's me. And I would have
11  to get in the system or somebody get in
12  the system to give me a correct number.
13  But I think it can be done.
14    Q. I'm going to try to run
15  through this real quick. I think I
16  know the answers to a lot of these
17  questions. Let me set these aside.
18        I'm going to show you what has
19  been marked as Defendant's Exhibits 4
20  through 7, and ask if you had anything
21  to do with their preparation.
22    A. Is basically all this
23  financial, about every bit of it?

36 (Pages 141 to 144)

## www.AmericanCourtReporting.com
## January 25, 2007

# American Court Reporting
## toll-free (877) 320-1050

Page 145

1    Q.  Right.
2    A.  I didn't prepare any of that,
3  no, sir.  If it's all financial, I
4  didn't, no, sir.
5    Q.  Is that the same thing with
6  the tax returns?
7    A.  Tax returns, yes, sir.  No.
8  No.  No, sir, I didn't fool with that.
9    Q.  Defendant's Exhibit 13, I've
10  got a copy over here.  Did you have any
11  part in preparing the answers to those
12  for Kelly Trucking?
13    A.  I see my name on page 2.  I
14  don't think so.  Off of this, I
15  honestly don't think so.  I didn't see
16  anything in there that jumped out at
17  me.  That's not to say that I might not
18  have been asked, but I just thumbed it
19  real quick, because this is dealing
20  with the leasing and banks and the same
21  thing on the next page.
22    Q.  Okay.  If you could, look --
23    A.  Same thing on the next page.

Page 146

1  All the pages, it looks like, are
2  dealing with financial institutions.
3  And I didn't get involved in any of
4  that.
5    Q.  Question number four, on page
6  2 --
7    A.  Okay.
8    Q.  -- we asked Kelly Trucking to
9  identify the name of every employee of
10  Kelly Trucking who was involved in any
11  way with the negotiations and to
12  describe the nature of their
13  involvement, and your name is there
14  listed.
15       Have you described for me all
16  of your involvement in the
17  negotiations?
18    A.  Yes, sir.  Yes, sir.  I was
19  not involved with drawing that up and
20  saying it was -- you know, money-wise,
21  numbers and all that, no, sir, I was
22  not.
23    Q.  Have you described all the

Page 147

1  discussions that you had with anyone
2  from U.S. Xpress, as best you can
3  remember today?
4    A.  Yes, sir.  Yes, sir.
5    Q.  Before we end, if you think of
6  anything else, just tell me.
7    A.  I will call him.  I mean, if I
8  go down the road -- you know, when you
9  get my age, things happen.  If I'm
10  going down the road and something comes
11  up, I will call this gentleman and have
12  him call you and I will come back and
13  tell you or however we can handle it.
14    Q.  But the best you can remember,
15  you have covered everything today?
16    A.  Yes, sir.
17    Q.  I will show you what has been
18  marked as Defendant's Exhibit 29 and
19  ask if you recognize that.
20    A.  The document, I have not seen.
21  I have heard conversation about it in
22  the office from Guy.  But as far as me
23  seeing this document prior to today,

Page 148

1  no, sir.
2    Q.  You didn't help prepare any
3  kind of damage claim?
4    A.  No, sir.  No, sir.
5    Q.  I will show you what has been
6  marked Defendant's Exhibits 30 and 31
7  and ask if you have seen those before.
8    A.  Yes, sir, I have seen these.
9    Q.  All right.
10    A.  Are you looking for this?
11    Q.  Yeah.  I was looking to see if
12  there are -- is that Mr. Knight?
13    A.  Yeah.  They are on this list.
14  Allen Knight and Darrell Waldon.
15  Darrell is still there.
16    Q.  Mr. Knight is gone?
17    A.  Yes, sir.  Knight is on 98.
18  Waldon is on 101.  That positive drug
19  screen you are seeing on there was not
20  with us.  That was with another company
21  on Waldon.
22    Q.  On Defendant's Exhibit 33?
23    A.  Yes, sir.

37  (Pages 145 to 148)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 149

1    Q.   What page did you say he was
2  on?
3    A.   101.
4    Q.   Was he a no?
5    A.   Yes, sir.  About a third of
6  the way down from the top, Darrell
7  Waldon.
8    Q.   Okay.  I see it.  They are
9  both owner/operators?
10   A.   Darrell Waldon is an
11 owner/operator, Allen Knight is a
12 company driver.
13   Q.   On Defendant's Exhibit 33,
14 page 98, Mr. Knight is listed, your
15 handwriting has no beside it?
16   A.   Yes, sir.
17   Q.   Do you know why he was not
18 eligible for hire?
19   A.   No, sir.  The ones that they
20 were real adamant about, I put it in
21 real heavy, as you can see, I tried to
22 use a heavy pen.  But I did not write
23 anything beside it.  They just said

Page 150

1  they would not hire him.
2    Q.   And Mr. Waldon was the one
3  with a positive drug test --
4    A.   Yes, sir.
5    Q.   -- from a prior employer?
6    A.   Yes, sir.
7    Q.   Did you have any conversations
8  with Mr. Kelly about a James A. or a
9  James R. Smith's interest in purchasing
10 Kelly Trucking?
11   A.   Yes.
12   Q.   When was that?
13   A.   Which time?
14   Q.   How about the first time.
15   A.   That was after U.S. pulled
16 out.
17   Q.   How soon after?
18       MR. HALL:  You want to go off
19 the record a second?
20       THE WITNESS:  Yes.
21       MR. HALL:  Go off the record
22 for a second.
23

Page 151

1       (Discussion off the record.)
2
3    Q.   (BY MR. HALL:)  You were
4  telling me about the first time you had
5  a conversation with Mr. Kelly about --
6  was it James R. or James A. Smith?
7    A.   James R.
8    Q.   James R. Smith's interest in
9  purchasing Kelly Trucking, and I think
10 you indicated that the first
11 conversation with Mr. Kelly was after
12 August 25th, 2005?
13   A.   It was, I'm going to say, a
14 few weeks, I don't know how many, is
15 when it came -- we got a letter or he
16 -- I don't know if Guy called him or he
17 called Guy.  I don't know how it got
18 started.
19   Q.   What happened with those
20 discussions?
21   A.   Maybe October, I think, they
22 had pretty much reached an agreement.
23 And this was in the late fall, the best

Page 152

1  I can remember.  There was so much
2  going on that year.  The purchase did
3  not go through because of some
4  equipment being cross-collateralled at
5  one of the lending institutions, and
6  they would not release what he wanted
7  to buy, what Mr. Smith wanted to buy.
8  So there was no way to complete the
9  deal.
10   Q.   Did Mr. Kelly ever indicate to
11 you that he had had conversations with
12 James R. Smith as early as July 2005?
13   A.   I can't answer that either
14 way.  I will be honest with you.
15   Q.   You don't recall that?
16   A.   No, I don't.  No, sir.
17   Q.   Do you ever recall having any
18 conversations with Mr. Kelly, when
19 Mr. Kelly felt like he wasn't bound by
20 the Purchase Agreement?
21   A.   You are speaking of the USX
22 Purchase Agreement?
23   Q.   Yes, sir.  I'm sorry.

38  (Pages 149 to 152)

Page 153

1  A.  I cannot sit here and think of
2  any time that he might have told me
3  that he was not bound by it.  I don't
4  remember if he did.  I honestly don't
5  remember.
6  Q.  Was there a second
7  conversation or second negotiations
8  between James R. Smith and Kelly
9  Trucking?
10  A.  They -- and I say they.  They
11  wanted to purchase a few of the trucks
12  that you would be able to get off --
13  that were not cross-collateralled, they
14  wanted to purchase some trucks and a
15  few trailers.  And they did purchase
16  some trucks.  But this was -- I think
17  on into '06 is when that was finalized.
18  Q.  Was any of Kelly Trucking's
19  equipment repossessed during 2005?
20  A.  Yes, sir.
21  Q.  Was any of it repossessed
22  prior to August 25th, 2005?
23  A.  Not to my knowledge, it

Page 154

1  wasn't.  Not to my knowledge.
2  Q.  Were you aware of any default
3  proceedings or repossession efforts
4  prior to August 25th, 2005?
5  A.  Repossessions or defaults?
6  Repossessions, no, sir, I know nothing
7  there.
8  Q.  Do you know whether or not
9  Kelly Trucking was behind on its
10  payments to its creditors in 2005?
11  A.  In 2005?
12  Q.  Yes, sir.
13  A.  Yes, sir.  There was some
14  discussion on that.  As far as the
15  amount, that I cannot speak to, because
16  I was not in that circle.
17  Q.  Okay.  Do you know who Danny
18  Frankel is, Frankel?  Oh, never mind.
19  I'm going to show you what is marked as
20  Defendant's Exhibit 81.  I see his name
21  up above, so.
22  Do you recognize that exhibit?
23  A.  I have not seen this.

Page 155

1  Q.  Okay.  The e-mail at the
2  bottom is dated August 31, 2005 and
3  it's from Mr. Kelly to Danny Frankel,
4  Vice-President, Omni National Bank.
5  And Mr. Kelly indicates that he will be
6  in Cullman, Alabama with James R. Smith
7  completing the buyout.
8  Were you aware that Mr. Kelly
9  was in negotiations in August with
10  James R. Smith?
11  A.  I worked with Guy, and I made
12  one trip to Cullman.  The exact time, I
13  cannot say.  I told you I thought it
14  was sometime after the USX deal.  If he
15  talked to him before, I might have
16  talked to him before, I can't say.  But
17  I know it was sometime in the fall
18  before anything was done because of the
19  cross-collateral deal.  The date that
20  we went to Cullman, I cannot tell you.
21  I've got some notes, again, on that.
22  But if they kept them in my office and
23  they didn't scramble everything after I

Page 156

1  left, then I could possibly find them.
2  And whatever I've got there, you can
3  definitely look at.  Yeah, I was
4  involved with that.
5  Q.  Okay.
6  MR. HALL: I apologize.  I'm
7  going to go off the record real quick.
8
9  (Discussion off the record.)
10
11  Q.  Let me show you what has been
12  marked as Defendant's Exhibit 67 and
13  ask if you recognize that, please.
14  A.  I haven't seen it.  I mean, I
15  know some of these people that are on
16  here.  This is the South Carolina group
17  from Graniteville.  I mean, what are
18  you asking me about?
19  Q.  I didn't know -- I don't know
20  who prepared it.
21  A.  I didn't.
22  Q.  Do you know what company those
23  people work for?

39  (Pages 153 to 156)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 157

1    A.  They were paid, I know, by
2  Kelly.
3    Q.  What's the name of the
4  operation in South Carolina?
5    A.  Are you talking about the
6  company's name or who these people
7  worked for or the name of the company
8  where they were moving and pulling
9  freight out of?
10    Q.  What was the name of the
11  company that they were pulling trailers
12  for?
13    A.  Avondale.
14    Q.  Was Avondale -- let me
15  rephrase the question.
16       It's your understanding that
17  those people were paid by Kelly
18  Trucking?
19    A.  Yes, that's my understanding.
20    Q.  All right.  And were they
21  driving -- are they CDL drivers?
22    A.  Yes.
23    Q.  Were they driving Kelly

Page 158

1  tractors with Kelly's -- I guess
2  there's no ICC anymore -- DOT number,
3  operating authority?
4    A.  I would say yes.  Now, a
5  couple of these, like I told you
6  earlier, like this Joseph Campbell and
7  maybe one more, two more, Randall
8  Tucker, the name is familiar, Walter
9  Bryant is familiar.  Kenny Gibson is
10  not familiar.  Keith Thomas is not
11  familiar.  Randall Sorrells, I think he
12  -- I don't know.  He was on that other
13  list you had.  But that's the majority
14  of the group that was in Graniteville.
15    Q.  Let me show you what has been
16  marked as Defendant's Exhibit 64 and
17  ask if you can identify that, please.
18    A.  Okay.  Now, this looks like
19  Randy's signature on the bottom,
20  Sorrells.  The Keith Thomas, you know,
21  I just got through saying I didn't
22  recognize that name.  James Griffin, I
23  recognize that name.  Walter Voorhees,

Page 159

1  like I told you earlier, yeah.  This
2  Kenny Gibson, that does not really ring
3  a bell right off.  Randall Tucker, yes,
4  I remember him being there.  Walter
5  Bryant, I remember him being there.
6  James Abney, that's one of those I
7  cannot, or Joseph Campbell.  Boisey
8  Lewis, I remember him.
9    Q.  What is Avondale
10  Transportation?
11    A.  It's just a little corner or a
12  room that they let these people use to
13  put -- I say these people.  These
14  drivers, they had a little desk.  They
15  would sit there, and they would keep
16  spare walkie-talkies in the desk
17  drawer.  They had a fax machine that
18  they would let them use out of that
19  office.  That's the reason this is on
20  here.  And they would fax these
21  timecards to a girl named Melanie
22  Wilkins so that she could do their pay.
23  You know, she was the lady in the

Page 160

1  payroll that did their pay.  That's the
2  reason that they faxed them in.  They
3  faxed them all from that same place to
4  G.F. Kelly for pay.
5    Q.  Is Avondale Transportation a
6  company owned by Mr. Chastain or
7  Mr. Kelly?
8    A.  No, sir.  Hey, I mean, if it
9  is, it would be -- I should know about
10  it.  But, no, sir.  No, sir.  It was
11  the same one as -- it's the same one to
12  do with Sylacauga down here, Avondale,
13  same group.
14    Q.  Let me look over my notes real
15  quick and we may be done.
16       Mr. Kelly, what were his
17  responsibilities at Kelly Trucking?
18    A.  What were Guy Kelly's
19  responsibilities?
20    Q.  Yes, sir.
21    A.  He was the owner, principal
22  owner.
23    Q.  What did he actually do?

40  (Pages 157 to 160)

**www.AmericanCourtReporting.com**
**January 25, 2007**