IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | |
|---|---|
| G.F. KELLY TRUCKING, INC.; and<br>GUY KELLEY, individually,<br><br>    Plaintiffs,<br><br>v.<br><br>U.S. XPRESS ENTERPRISES, INC.,<br><br>    Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)   CIVIL ACTION NO:<br>)   3:06-CV-351-MEF<br>)<br>)<br>) |

## NARRATIVE STATEMENT OF UNDISPUTED PERTINENT FACTS

COMES NOW Defendant U.S. Xpress Enterprises, Inc. ("USX") and submits the following narrative statement of undisputed pertinent facts in support of its Motion for Summary Judgment, filed contemporaneously herewith.

**I.   Introduction**

Plaintiffs filed suit against USX on March 14, 2006, asserting claims that arise out of failed negotiations regarding the purchase of certain assets of Plaintiff G. F. Kelly Trucking, Inc. ("GFK") by USX. Plaintiffs plead causes of action for breach of contract, fraud and suppression. They seek an unspecified amount of compensatory and punitive damages. [Complaint, generally].

For their breach of contract claim, Plaintiffs contend that USX "was under a duty to pay the purchase price to Plaintiffs pursuant to the [Asset Purchase] Agreement" but "breached the contractual obligations of the Agreement by failing and refusing to properly pay the purchase price due thereunder." [Complaint at p. 3-4, para. 17-18].

For their fraud and suppression claims, Plaintiffs contend that "[o]n August 4, 2005, Defendant USX represented to Kelly that it would pay the monies owed to him pursuant to the Agreement" but that "representation was false and Defendant USX knew it was false." [Complaint at p. 4, para. 21-21]. Further, Plaintiffs allege that:

> USX failed to disclose to Plaintiff Kelly that he would not be paid the monies owed him pursuant to the purchase agreement [and] … failed to disclose to Kelly that the negotiation process, Agreement and closing period was nothing more than a fraudulent tactic employed by USX to freeze GFK's operations under the guise of consummating a buyout. In reality, USX sought to suspend GFK's operations for a long enough period of time that its business function was paralyzed and, thus, recovery was impossible.

[Complaint at p. 5, para. 26]. Plaintiffs maintain that USX "innocently, recklessly, negligently or wantonly made the aforementioned representations and/or concealed the material facts relating to the terms of the agreement." [Complaint at p. 6, para. 30].

USX denies all allegations of the Complaint and says that it is entitled to summary judgment on all counts.

## II.    Undisputed Facts Pertinent to Breach of Contract Claim

On August 8, 2005, GFK, Guy Kelly and Nelson Chastain entered into an Asset Purchase Agreement ("APA") with USX whereby GFK agreed to sell certain of its assets to USX subject to completion of USX's due diligence and the satisfaction of certain express conditions to closing. [Kelly Depo. at p. 227, line 19 to p. 228, line 6 and Def. Exh. 45, generally]. In return, USX agreed to pay certain amounts to GFK. [Id. at Def. Exh. 45, pp. 3-4, Sec. 1.4]. Kelly individually agreed to a non-compete clause and made certain representations and warranties. Kelly also agreed to a Contractor Agreement whereby he would assist USX in the hiring and retention of GFK drivers. USX agreed to compensate Kelly in return. [Id. at Def. Exh. 45, pp. 8-9, Art. V and Exhibit C].

B DBH 739549 v1
2016317-000055 2/23/2007

USX's obligation to pay the purchase price was expressly subject to certain express Conditions to Closing.

## ARTICLE III
## CONDITIONS TO CLOSING

The obligations of Buyer hereunder are subject to the following conditions (all or any of which may be waived in whole or in part by Buyer) having been fulfilled on or before the Closing Date.

[Kelly Depo. at p. 227, line 19 to p. 228, line 6 and Def. Exh. 45, p. 5, Art. III]. Included in those Conditions was the requirement that USX complete "its due diligence investigation of [GFK], confirming that the Business, assets, and financial and legal condition of [GFK] are satisfactory to [USX] in [USX's] sole discretion." [Id. at p. 6, Sec. 3.3]. Another Condition was that USX would be able to qualify and hire 130 "Closing Date Drivers" (i.e. drivers working for GFK on the day of closing who met USX's hiring qualifications and who agreed to work for USX). [Id. at p. 5, Sec. 2.1 and p. 6, Sec. 3.6]. Whether USX was satisfied that a driver met its qualifications for hiring was a matter expressly reserved to USX's "sole discretion." [Id. at p. 6, Sec. 3.6].

USX's primary purpose for entering into the APA was to acquire GFK's drivers. [Chastain Dep. at p. 55, lines 2-16]. USX had no interest in acquiring the equipment of GFK. USX agreed to acquire the equipment only to the extent it could be sold for more than the indebtedness owed thereon. [Kelly Depo. at p. 227, line 19 to p. 228, line 6 and Def. Exh. 45, p. 6, Art. III, Sec. 3.7]. The APA included a Condition to Closing that required the orderly liquidation value of the equipment to exceed GFK's indebtedness. [Id.].

Additionally, USX reserved the right to inspect all of GFK's equipment that USX proposed to purchase and to be "satisfied with the result of the inspection in its sole discretion." [Kelly Depo. at p. 227, line 19 to p. 228, line 6 and Def. Exh. 45, p. 6, Art. III, Sec. 3.2]. Other

3

Conditions to Closing required GFK to provide USX payoff letters for all liens on the equipment USX proposed to purchase, to provide a payoff letter for GFK's Factoring Agreement and for USX to have entered into a contract with GFK's sales agent that was "reasonably acceptable to [USX]." [Id. at p. 6, Sec. 3.7, Sec. 3.8 and p. 7, Sec. 3.9].

Following the execution of the APA, due diligence efforts began in earnest. [Farnsworth Depo. at p. 61, line 4 to p. 63, line 9; p. 70, lines 4-24; p. 76, lines 7-20; p. 80, line 24 to p. 82, line 12; p. 85, line 5 to p. 89, line 7; p. 92, line 22 to p. 94, line 14; p. 100, line 19 to p. 101, line 10; p. 124, lines 11-20, Def. Exh. 48; Kelly Depo. at p. 143, line 19 to p. 145, line 18]. Although previously representing that GFK had 200 drivers, GFK sent USX a list of its drivers that contained the names of only 158 individuals[1]. [Kelly Depo. at p. 155, lines 1-4; p. 276, lines 6-23; Farnsworth Depo. at p. 73, line 18 to p. 74, line 24; Childers Depo. at p. 46, line 1 to p. 47, line 4 and p. 50, lines 7-11, Def. Exh. 65]. GFK also forwarded its files on each driver. [Childers Depo. at p. 89, line 7 to p. 93, line 8; Moore Decl. at ¶ 5]. A careful review of the GFK drivers list and the driver files indicated that several of the drivers did not have a driver's file. [Moore Decl. at ¶ 5]. Many of the files that were received were incomplete. [Id. at ¶ 5]. USX contacted GFK to determine why certain drivers did not have files and why certain files were incomplete. [Id. at ¶ 5]. GFK Safety Director, Frank Childers, and Kelly told USX's Safety Director, Russ Moore, that many files were lost when a tornado hit and destroyed the GFK safety building in April of 2005. [Id. at ¶ 5]. Some time shortly thereafter, GFK provided the names of 9 previously undisclosed additional drivers. [Id. at ¶¶ 4, 10; Def. Exh. 88 and 90; Childers Depo. at p. 50, lines 7-11; Def. Exh. 65]. The newly disclosed drivers apparently worked for an

---

[1] Prior to the execution of the APA, GFK had provided USX with a list containing the names of only 116 drivers. [Kelly Depo. At p. 153, lines 11-17, Def. Exh. 32; Moore Decl. at ¶ 4].

affiliate of GFK, and GFK proposed to put them in the pool for consideration. This raised the total number of known potential drivers to 167. [Moore Decl. at ¶ 4; Childers Depo. at p. 50, line 7 to p. 54, line 14, Def. Exh. 65; Kelly Depo. at p. 276, lines 6-23].

By August 19, 2005, USX had determined that there were a sufficient number of drivers who potentially could be qualified to justify the expense to USX to proceed with its due diligence efforts on site at GFK. [Hingst Depo. at p. 21, line 3 to p. 24, line 22; Moore Decl. at ¶ 10, Def. Exh. 88]. USX had determined that more than 130 of the drivers were either likely to be qualified or it lacked sufficient information to make a determination. [Id.]. It was also understood that there were likely additional GFK or GFK affiliated drivers who had not appeared on the initial list or for whom USX had not received a GFK file. [Id.].

During the week of August 22, USX sent its employees to GFK's home office in Wadley to complete its final, detailed due diligence, including meeting with GFK's drivers to determine whether they met USX's hiring criteria. [Hingst Depo. at p. 25, line 15 to p. 26, line 17; p. 28, line 3 to p. 29, line 15]. Because the proposed transaction contemplated an asset purchase, each of the GFK drivers would have to be hired by USX and submit to its driver qualification and hiring process ("Drivers Qualification Process"). USX's Drivers Qualification Process included the completion of a USX application, a drug test, a road test, a medical examination and an orientation regarding USX's policies and procedures. [Farnsworth Depo. at p. 72, lines 7 to p. 73, line 6; p. 92, line 22 to p. 93, line 8; p. 107, line 17 to p. 108, line 6; Moore Decl. at ¶ 6]. GFK determined which drivers were routed through Wadley so that they could participate in the Drivers Qualification Process. [Moore Decl. at ¶ 6].

The number of drivers that appeared for Drivers Qualification between August 22 and August 25 was less than expected. [Hingst Depo. at p. 25, lines 15-25; p. 33, line 10 to p. 35,

5

line 12; Moore Decl. at ¶ 8]. Also, it became apparent that, of the 60 to 80 drivers that were participating in the Drivers Qualification Process, there was a general reluctance to conform to USX's policies and procedures. [Hingst Depo. at p. 28, line 9 to p. 29, line 15; Hingst Decl. at ¶ 5; Kelly Depo. at p. 72, line 14 to p. 75, line 14 and p. 233, line 14 to p. 234, line 15; Moore Decl. at ¶ 8]. Many GFK drivers objected to USX's policies that required its drivers to log fuel and scale stops. Several GFK drivers announced that it was not their practice to stop at scales and that they did not like the idea of having to do so. [Hingst Depo. at p. 28, line 9 to p. 29, line 15; Hingst Decl. at ¶ 5]. Moreover, USX trucks are governed at 67 mph, and many of GFK's drivers stated that they had no intention of driving for a company that required its drivers to drive that slowly. [Hingst Decl. at ¶ 5]. It was apparent that GFK's drivers were comfortable with a more permissive, less safety conscious culture than that of USX. [Hingst Decl. at ¶ 5]. It also became apparent that many of the drivers would not agree to work for USX. [Hingst Decl. at ¶ 5; Hingst Depo. at p. 28, line 9 to p. 29, line 15]. There was an over-riding sense of objection and outright hostility toward the proposed transaction. [Childers Depo. at p. 141, line 12 to p. 142, line 15; Kelly Depo. at p. 72, line 14 to p. 75, line 14 and p. 233, line 14 to p. 234, line 15; Hingst Decl. at ¶ 5; Hingst Depo. at p. 28, line 9 to p. 29, line 15; Moore Decl. at ¶ 8]. It was apparent that GFK's drivers did not support the proposed transaction and did not want to be USX drivers. [Id.]. In fact, Kelly testified that 15 drivers quit the week of August 15 and that 35 additional drivers quit the week of August 22. [Kelly Depo. at p. 72, line 14 to p. 75, line 14 and p. 233, line 14 to p. 234, line 15].

On the morning of August 25, 2005, USX determined that of the 60 drivers processed, almost half -- 29 -- were not qualified. [Hingst Depo. at p. 32, lines 4 - 21; Moore Decl. at ¶ 9]. USX also determined that, at most, it would be able to qualify 100 drivers and, of those, only

about 70 would agree to work for USX (or USX would want working for it given the views expressed during qualification). [Hingst Depo. at p. 28, line 9 to p. 29, line 15; Moore Decl. at ¶ 9]. It was obvious that it would be impossible to qualify 130 GFK drivers and that there was no way this Condition to Closing could be satisfied. [Kelly Depo. at p. 72, line 14 to p. 75, line 14 and p. 233, line 14 to p. 234, line 15; Hingst Depo. at p. 28, line 9 to p. 29, line 15; Hingst Decl. at ¶ 5; Farnsworth Depo. at p. 94, line 15 to p. 97, line 12; Moore Decl. at ¶ 9].

In addition to the inability to qualify the requisite number of drivers, USX's inspection of the GFK equipment revealed that it was in much worse shape than represented. [Farnsworth Depo. at p. 100, lines 12-18; Hingst Depo. at p. 26, line 15 to p. 28, line 2]. Although Kelly had represented that he had one million dollars in equity in his equipment, USX discovered on or about August 10, 2005, that was not the case. [Kelly Depo. at p. 139, line 8 to p. 140, line 7, Def. Exh. 50; Farnsworth Depo. at p. 100, line 12 to p. 103, line 6; p. 118, line 22 to p. 120, line 12, Pl. Exh. 3; Hingst Depo. at p. 26, line 15 to p. 28, line 2; Fant Depo. at p. 38, lines 10-19]. A comparison of the book value of the equipment to the debt owed on the equipment showed that GFK's equipment was not worth more than what was owed on it. [Farnsworth Depo. at p. 100, line 12 to p. 103, line 6; p. 118, line 22 to p. 120, line 12, Pl. Exh. 3]. GFK owed over a million dollars more than his tractors were worth (book value) and had less than a million dollars of equity (book value) in his trailers. [Id.]. Further, upon a physical inspection of a sampling of roughly 50 to 60 trailers during the week of August 22, USX discovered that the book value was greater than the actual value of the GFK trailers. [Hingst Depo. at p. 26, line 15 to p. 28, line 2]. The GFK trailers were in "serious disarray." [Farnsworth Depo. at p. 100, lines 12-18]. Inspection of the majority of GFK's equipment revealed that it did not meet the Department of Transportation standards or the Trade Standards required by the APA. [Hingst Depo. at p. 26,

line 15 to p. 28, line 2; Kelly Depo. at p. 227, line 19 to p. 228, line 6, Def. Exh. 45, pp. 2-3, Sec. 1.3 and p. 6, Sec. 3.2.]

Furthermore, USX was finding it difficult to obtain, and had not obtained as of August 25, the equipment Lien Payoff Letters, the Factoring Payoff Letter and the Sales Agent Agreement, which were Conditions to Closing.[2] [Farnsworth Depo. at p. 81, lines 3-9; p. 85, line 5 to p. 88, line 1; p. 93, line 22 to p. 94, line 14; p. 124, lines 11-20, Def. Exh. 48; Kelly Depo. at p. 227, line 19 to p. 228, line 6, Def. Exh. 45 at p. 6, Sec. 3.7 and Sec. 3.8]. Consequently, on August 25, based primarily upon the inability to qualify a sufficient number of GFK drivers, USX made the decision that it did not intend to pursue its due diligence because the Conditions to Closing could not be met. [Farnsworth Depo. at p. 94, line 15 to p. 97, line 12; Hingst Depo. at p. 41, lines 5-15]. USX communicated this to GFK, Kelly and Childers on August 25, 2005, both verbally and in writing. [Chastain Depo. at p. 78, line 21 to p. 80, line 5; Farnsworth Depo. at p. 94, line 15 to p. 97, line 12; Kelly Depo. at p. 260, lines 6-19, Def. Exh. 55; Hingst Depo. at p. 41, line 5 to p. 42, line 19]. At no time prior to filing suit did GFK or Kelly contend that USX breached a contract owed to them.

Despite the express terms of the APA that it is "the entire agreement between the parties hereto with respect to the transactions contemplated herein" and that it "shall not be changed or terminated orally and no waiver of compliance with any provision or condition hereof and no consent provided for herein shall be effective unless evidenced by a written instrument duly executed by the party to be charged therewith," Plaintiffs contend that USX breached the

---

[2] When Fant began working for GFK, he found that the company's records "were not well-maintained." [Fant Depo. at p. 15, lines 1-5]. Who owned what equipment at GFK was "vague." [Chastain Depo. at p. 99, lines 16-23].

agreement because it did not close on August 29, 2005, pursuant to an "oral" agreement. [Kelly Depo. at p. 227, line 19 to p. 228, line 6, Def. Exh. 45 at p. 19, Sec. 11.3 and Sec. 11.6].

Kelly admits that he intended to be bound by the language of the merger clause when he signed it. [Kelly Depo. at p. 265, line 21 to p. 266, line 9]. He nevertheless contends that he had an "oral" contract with Dennis Farnsworth, then Vice President of Business Development for USX. [Kelly Depo. at p. 135, line 6 to p. 136, line 22; p. 137, line 21 to p. 139, line 7; p. 145, line 7 to p. 148, line 8]. Kelly claims this oral contract, which was never reduced to writing, not even in a note to himself, was made over the phone on Saturday, August 20, 2005.[3] Kelly understood as early as the Letter of Intent that only USX's Board of Directors had the authority to approve compliance with all Conditions to Closing and to authorize a closing. [Kelly Depo. at p. 167, line 18 to p. 171, line 11; Def. Exh. 36 and 37]. Notwithstanding this knowledge, Kelly contends that Farnsworth promised, prior to the onsite due diligence planned to begin the next Monday morning, that USX would buy GFK and close on August 29, 2005 (interestingly, the APA does not even contemplate a purchase of GFK). [Kelly Depo. at p. 145, line 19 to p. 147, line 14].

Mr. Farnsworth denies he made such a statement. Mr. Farnsworth testified that he told Kelly that he would do his best to get the due diligence complete in time to close by August 29. [Farnsworth Depo. at p. 124, lines 11-20]. It was understood by other employees of USX that August 29, 2005, was the target closing date. [Hingst Depo. at p. 25, lines 1-5]. To support his claim, Kelly testified that Farnsworth made the same representation to Nelson Chastain, Kelly's lone fellow stockholder in GFK, a signatory to the APA and the Vice President of Operations of

---

[3] Kelly never makes reference to this oral contract in his complaint nor did he raise it as a point of contention when USX announced that it was not going to close.

9

GFK. [Kelly at p. 147, lines 8-14]. Mr. Chastain, however, testified that he only had one conversation with Mr. Farnsworth regarding a closing:

> Q. At any time, did anyone from U.S. Xpress guarantee to you that there would be a closing no matter what?
> A. I received a call one Saturday night from Dennis saying, we were going to close on Tuesday. The statement, no matter what, was not involved.
> Q. It was just, we are going to close on Tuesday?
> A. Yes. I feel confident we are going to close on Tuesday.
> Q. Do you remember what month?
> A. August.
> Q. And that call was on a Sunday night?
> A. Yes.

[Chastain Depo. at p. 62, lines 2-17]. Chastain testified he was aware that there were conditions that had to be met before there could be a closing. [Chastain Depo. at p. 61, line 7 to p. 62, line 1].

Interestingly, Kelly also testified that when he met with one of Farnsworth's superiors, Jeff Wardeberg, the following Monday, August 22, Wardeberg did not tell Kelly that there was a guaranteed deal. Rather, Wardeberg explained to Kelly that his presence on site was indicative of USX's "interest" in completing the transaction. [Kelly Depo. at p. 148, lines 9-22]. Of course, Kelly's contention that he entered into an oral contract upon which he relied, is undermined by the obvious: USX sent its team to Wadley that Monday to complete its due diligence regarding the Conditions to Closing in accordance with the express terms of the APA. [Hingst Depo. at p. 25, line 15 to p. 26, line 17; p. 28, line 3 to p. 29, line 15; Def. Exh. 47].

### III. Undisputed Facts Pertinent to Fraud and Suppression Claims

In addition to his breach of contract claim, Kelly alleges that "[o]n August 4, 2005, Defendant USX represented to Kelly that it would pay the monies owed to him pursuant to the Agreement." [Complaint at p. 4, ¶ 21]. However, there is no evidence that USX made any representations to Kelly on August 4, 2005, about monies it owed *him*, let alone to GFK.

10

Contrary to the Complaint, Plaintiffs alleged in written discovery, and Kelly testified in his deposition, that Kelly's claim for fraud is based upon the same alleged phone conversation with Farnsworth on August 20, 2005, as is the basis for his breach of contract claim. [Kelly Depo. at p. 145, line 23 to p. 147, line 14, Def. Exh. 13, Int. 8].[4]

Kelly is not an uneducated, unsophisticated consumer. Nor is he just the President and an Owner of G. F. Kelly Trucking, Inc. ("GFK"). [Complaint at p. 1, para. 1 and p. 2, para. 5; Kelly Depo. at p. 20, line 21 to p.21, line 9 and p. 23, lines 2-8]. Rather, he is an educated, sophisticated, experienced businessman. Kelly has a bachelor's degree in economics from Auburn University. [Kelly Depo. at p. 14, lines 8-12]. After working his way up with various trucking companies and gaining experience, Kelly started his own trucking business, GFK in 1990. [Kelly Depo. at p. 16, line 18 to p. 20, line 23]. In addition to GFK, Kelly also owned several other trucking companies -- K-Diesel, Eagle Logistics, Zellner Transfer, Kelly Spotting, G & N Spotting Service, K.C. Spotting, Kelly Aluminum, NAC Trucking; a logging company -- Riverside Timber; two truck stops -- Riverside Diesel, Riverside Truck Plaza; a trailer rental and leasing company -- Kelly Leasing; a trailer dealership -- Lufkin Trailers; a laundromat -- Five Points Development, Inc.; and a golf driving range -- Golf, Inc. [Kelly Depo. at p. 25, line 21 to p. 30, line 1; p. 34, line 6 to p. 36, line 23; p. 45, lines 8-17; p. 47, lines 21-23; p. 48, line 19 to p. 49, line 19; p. 51, lines 4-9; p. 52, lines 12-13; p. 53, line 3 to p. 54, line 1; p. 114, line 7 to p. 115, line 22; p. 159, lines 2-8; Chastain Depo. at p. 12, lines 11-12; p. 14, lines 14-15; p. 22, line 11 to p. 23, line 1]. In addition, Kelly owned his own race car operation. [Kelly Depo. at p. 117,

---

[4] In answer to interrogatory number 8, Kelly writes that "Dennis Farnsworth ... guaranteed he would buy the business, close the deal by August 29, 2005." [Kelly Depo. at p. 101, lines 8-18, Def. Exh. 13, Int. 8].

lines 3-11]. He also engaged in the businesses of buying timber, of buying and selling land and lake lots and of building and selling houses. [Kelly Depo. at p. 158, line 15 to p. 159, line 8].

Throughout his negotiations with USX, Kelly sought and received the advice of not one, but two attorneys as well as GFK's accountants, Randall Fant and Dennis Hamlet.[5] [Kelly Depo. at p. 69, line 20 to p. 70, line 22; p. 101, line 8 to p. 102, line 3; Def. Exh. 13, pp. 1-2; p. 103, line 11 to p. 104, line 13]. Moreover, he and GFK sought and received the counsel of Mr. Chastain, whose business experience is substantially similar to Kelly's. [Chastain Depo. at p. 7, line 20 to p. 27, line 23]. In fact, Fant and Chastain counseled Kelly regarding the terms and conditions of the APA and specifically the driver qualification condition to closing before Kelly signed it. [Fant Depo. at p. 24, line 1 to p. 25, line 5; Chastain Depo. at p. 59, line 19 to p. 662, line 1].

When the negotiations with USX first began in the spring of 2005, Kelly claims that GFK's financial position was "solid" though he admits that GFK was behind on payments to some creditors. [Kelly Depo. at p. 61, lines 5-16; p. 62, lines 14-19]. Of course, Kelly also claims that GFK was financially ruined because USX did not purchase his assets. [Kelly Depo. at p. 122, line 16 to p. 123, line 20; p. 126, lines 5-16]. GFK's accountant, Randall Fant, however, contradicts Kelly's assertion and testified that when he joined GFK in May of 2005, GFK's financial position was, in fact, "bad." [Fant Depo. at p. 26, lines 5-11]. Fant was admittedly hired to turn GFK around. [Fant Depo. at p. 26, line 5 to p. 28, line 5]. He stated that in May of 2005 GFK was at least thirty to ninety days behind on payments to nearly all of its creditors. [Fant Depo. at p. 14, lines 21-23; p. 22, lines 1-8]. Fant explained that "[o]ne of the

---

[5]   Dennis Hamlet resigned from GFK at the end of May 2005. He was replaced by Randall Fant during the first week of June. [Kelly Depo. at p. 103, line 11 to p. 104, line 13].

12

biggest problems" was the "factoring agreement ... [T]hat arrangement had cost them about just short of half a million dollars." [Fant Depo. at p. 28, lines 6-15]. Fant advised GFK's stockholders in June of 2005 that GFK needed to either be sold or undergo serious restructuring. [Fant Depo. at p. 26, line 12 to p. 30, line 12]. Fant explained that GFK was in for some pretty tough times. [Fant Depo. at p. 27, lines 1-19]. Fant, however, never disclosed his opinions to USX. [Id.].

According to Fant, Kelly was not as involved with GFK as he once was. [Fant Depo. at p. 29, line 22 to p. 30, line 12]. Kelly was devoting more time to the other companies he owned. [Id.]. Kelly's fellow owner and business partner, Chastain, agrees. [Chastain Depo. at p. 40, lines 12-15]. According to Chastain, GFK ceased growing in 2004. [Chastain Depo. at p. 40, line 16 to p. 41, line 4]. Kelly was devoting more time to his other companies, mainly logging and his grocery store. [Id.]. The financial condition of GFK began to decline in 2004. [Chastain Depo. at p. 43, lines 2-19]. GFK ran into a cash flow problem, which forced it to seek help by factoring its receivables. [Id.].

According to Chastain, Kelly was seeking to pursue other interests in 2004 and began to look for a way out of GFK. [Chastain Depo. at p. 43, line 2 to p. 44, line 9]. GFK entered into discussions with another buyer in 2004, which led to the parties entering into an asset purchase agreement similar to the APA. [Id. at p. 44, line 19 to p. 46, line 3]. The potential buyer, however, backed out in the early part of 2005, just before USX and GFK first came into contact. [Id.]. During the same period of time, Kelly engaged in separate discussions with Floyd & Beasley Trucking and James R. Smith Trucking.[6] [Id. at p. 47, line 4 to p. 48, line 22].

---

[6] Interestingly, Kelly was engaged in negotiations with James R. Smith Trucking during his negotiations with USX. [Kelly Depo. at p. 232, lines 13-23; Farnsworth Depo. at p. 118, line 22, Pl. Exh. 6; p. 123, line 13 to p. 124, line 8; Fant Depo. at p. 58, line 1 to p. 59, line 15, Def.

13

After failing to reach a deal with any of the prior potential buyers, Kelly was introduced to USX through a broker in April 2005. [Kelly Depo. at p. 61, lines 5-16]. After an initial phone conversation between Kelly and Dennis Farnsworth, GFK and USX entered into a Confidentiality Agreement by which USX could use information pertaining to GFK "for the purpose of a possible transaction" between GFK and USX. [Farnsworth Depo. at pg. 46, line 2 to p. 47, line 22; Kelly Depo. at p. 167, lines 2-16 and Defendant's Exhibit 35, p. 1, para. 3]. Kelly sent documents and information to Farnsworth for him to review and determine whether he would recommend to USX that it consider GFK for a potential transaction. [Farnsworth Depo. at p. 48, line 17 to p. 50, line 5; Kelly Depo. at p. 165, lines 3-20 and Def. Exh. 34]. On May 12, 2005, Farnsworth came to Wadley and presented Kelly with three potential options he was contemplating for a potential transaction: (1) USX could buy GFK's trailers and GFK lease them back under an agency arrangement; (2) USX could buy 49% of GFK's stock and Kelly continue to run GFK; or (3) an asset purchase. [Farnsworth Depo. at p. 51, line 19 to p. 53, line 20; Kelly Depo. at p. 142, line 15 to p. 143, line 18].

On June 20, 2005, Farnsworth sent Kelly an email and advised, "I have received approval to move forward. I will put together an outline of a potential transaction…." [Kelly Depo. at p. 167, line 18 to p. 170, line 12; Def. Exh. 36]. Of course, Kelly testified that Farnsworth's email was a commitment to purchase the company and that his reference to receiving approval was not credible. [Kelly p. 168, line 10 to p. 170, line 12]. USX and Kelly agreed that the best option to pursue was an asset purchase, and they entered into a Letter of Intent setting forth "the basic terms of a proposed transaction." [Kelly Depo. at p. 143, lines 3-18; p. 167, line 18 to p. 171, line 5; Def. Exh. 36 and Def. Exh. 37, p. 1, intro. para.]. The Letter further reads:

---

Exh. 81].

14

> Upon execution of this letter, USX would continue its due diligence investigation and, thereafter, USX and GFK would enter into negotiations for a definitive agreement. As set forth in Paragraph 11 below, this letter is not binding on any of the parties until completion of negotiations and execution of a definitive agreement.

[Kelly Depo. at p. 170, line 13, through p. 171, line 5; Def. Exh. 37 at p. 1, intro. para.]. The Letter then sets forth the terms of what a definitive agreement might include. Paragraph 11 of the Letter, however, expressly provides:

> This letter sets forth some of the terms of a proposed transaction. Except for the provisions of Paragraphs 6, 7, 8, 9, 10 and 11 hereof, which are binding, this letter is not binding on the parties and may not be relied upon as the basis for a contract estoppel or be the basis for a claim based on detrimental reliance or any other theory. This letter is not intended as a substitute for the definitive agreement, which will contain all of the elements necessary for a transaction of this type. Other than the binding provisions hereof, a binding commitment with respect to the transaction would result only from the execution of the definitive agreement and any other necessary documentation, subject to the conditions expressed therein. This letter will be of no further force and effect unless it is signed on behalf of GFK and returned to USX by July 5, 2005.

[Kelly Depo. at p. 170, line 13, through p. 171, line 5; Def. Exh. 37 at p. 5, para. 11].[7] Kelly read the Letter of Intent and showed it to his attorney. [Kelly Depo. at p. 170, line 13 to p. 175, line 18]. He signed the Letter of Intent on June 30, 2005. [Id. at p. 170, line 13 to p. 171, line 5].

After execution of the Letter of Intent, USX commenced its initial due diligence investigation. [Kelly Depo. at p. 143, line 19 to p. 145, line 18; Farnsworth Depo. at p. 61, line 4 to p. 63, line 9; p. 70, lines 4-24; p. 80, line 24 to p. 82, line 12; p. 85, line 5 to p. 89, line 7]. Simultaneous with the due diligence, USX and GFK negotiated the terms of a more definitive agreement for the purchase of GFK. [Farnsworth Depo. at p. 69, line 17 to p. 72, line 6]. On July 26, 2005, Farnsworth sent Kelly a draft of an asset purchase agreement. [Farnsworth Depo.

---

[7] The only binding provisions of the Letter of Intent pertain to Confidentiality (paragraph 6), Disclosure (paragraph 7), Costs (paragraph 8), Standstill (paragraph 9), Termination (paragraph 10) and Nature of Agreement (paragraph 11 set forth above in full). [Kelly Depo. at p. 170, line 13, through p. 171, line 5; Def. Exh. 37 at pp. 4-5, para. 6-11].

15

at p. 76, lines 7-14; Kelly Depo. at p. 185, line 3 to p. 188, line 23 and Def. Exhs. 39 and 40].

Farnsworth wrote:

> Attached are the Asset Purchase Agreement, Tractor OLV, and Trailer OLV for your review. Please forward to your legal representative for review. Per our discussion yesterday, I am forwarding this to you so that we can get a head start on the review process. This is not an executed agreement and this email is not official notice of USX approval to close the deal. Per our discussion, you are to have another conversation today with Gary Hopper. Following that conversation, we will have a conference call with Jeff Wardeberg at which time we will mutually decide what our next steps are. Following your review of the agreement, give me a call. Thanks.

[Kelly Depo. at p. 185, lines 3-20, Def. Exh. 39].

The draft agreement included certain conditions that had to be met before the purchase would close. Among others, at least 145 GFK drivers had to be found qualified under USX's driver standards as determined at USX's sole discretion. Also, USX had to be satisfied with its physical inspection of GFK's equipment. [Kelly Depo. at p. 185, line 3 to p. 186, line 23, Def. Exh. 39 and Def. Exh. 40, pp. 5-6, Art. III].

Kelly forwarded the draft of the asset purchase agreement to his attorney. [Kelly Depo. at p. 187, lines 15-22]. He then wrote Farnsworth: "After careful consideration and reviewing the agreement for the last two days I cannot agree to terms that are stated." [Kelly Depo. at p. 213, lines 7-23; Def. Exh. 42]. Kelly gave Farnsworth a list of desired changes. [Farnsworth Depo. at p. 124, line 21 to p. 126, line 20; Kelly Depo. at p. 213, lines 7-23, Def. Exh. 42; p. 220, line 5 to p. 223, line 19]. In addition to rejecting the draft asset purchase agreement, Kelly also disclosed that he had completely ceased making any payments to GFK's creditors and that he had "sucked the cash out of the company." [Kelly Depo. at p. 213, line 7 to p. 217, line 7; Def. Exh. 42]. Kelly disclosed that he took $1,000,000 out of GFK and moved it to one of his other companies, K-Diesel. [Id.]. Neither Chastain, Kelly's partner, nor Fant, GFK's accountant were

16

aware of Kelly's actions. [Chastain Depo. at 85, line 13 to p. 87, line 14; Fant Depo. at 34, lines 13-19].

On August 8, 2005, USX and GFK entered into the Asset Purchase Agreement ("APA"). [Kelly Depo. at p. 227, line 19 to p. 228, line 6 and Def. Exh. 45]. Prior to signing on behalf of GFK and himself, Kelly sent the APA to his attorney who advised him throughout the negotiations between GFK and USX. [Kelly Depo. at p. 69, line 20 to p. 70, line 22, and p. 235, lines 3-9]. The APA incorporated several revisions from the earlier draft but despite the negotiations, retained all of the Conditions to Closing, though reducing the number of Qualified Drivers from 145 to 130. [Farnsworth Depo. at p. 77, line 3 to p. 80, line 23; Kelly Depo. at p. 227, line 19 to p. 228, line 6 and Def. Exh. 45, p. 6, Sec. 3.6].

Additionally, the APA's language as to the closing date became less specific. [Farnsworth Depo. at p. 109, line 16 to p. 110, line 3]. The proposed closing date was set at "August 8, 2005, or such other time as the parties may agree." [Kelly Depo. at p. 185, line 21 to p. 186, line 23, Def. Exh. 40, p. 6, Sec. 4.1]. However, Article IV of the APA states: "Time. Subject to Article III [(Conditions to Closing)], the transaction contemplated by this agreement shall be consummated at a closing (the "Closing") to be held two (2) business days after the satisfaction of the condition specified in Section 3.6 [(Closing Date Drivers)], or such other time as the parties may agree." [Def. Exh. 45, p. 17, Sec. 11.1]. Moreover, the APA provides that the agreement may be terminated by either party by giving written notice to seller at anytime prior to the Closing Date… (b) if the Closing shall not have occurred on or before August 31, 2005. [Def. Exh 45, p. 18, Sec. 11.1(a)(iii)]. USX made the determination that there were insufficient GFK drivers who were qualified in order to comply with Condition to Closing 3.6 and that the condition could not be met by August 31 or any reasonable date there after. [Pate Decl. at ¶ 3].

17

To avoid unnecessary expense and complication, USX gave written notice of termination on August 25, 2005. [Hingst Decl. at ¶ 5; Farnsworth Depo. at 94, line 15 to p. 96, line 18; p. 106, lines 1-9 and Def. Exh. at 55; Pate Decl. at ¶ 3].

Respectfully submitted this 23rd day of February, 2007.

/s/ Elizabeth R. Floyd
Lawrence B. Clark
David B. Hall
Elizabeth R. Floyd
Attorneys for Defendant
U.S. Xpress Enterprises, Inc.

Of Counsel:
BAKER DONELSON BEARMAN CALDWELL & BERKOWITZ, P.C.
420 20th Street North, Suite 1600
Birmingham, Alabama 35203
(205) 328-0480

## Certificate of Service

I hereby certify that I have filed this document through the Court's CM/ECF electronic filing system and that the following persons will be served with notice of the filing on this the 23rd day of February, 2007.

Jere L. Beasley
W. Daniel Miles
Clinton C. Carter
John Everett Tomlinson
BEASLEY, ALLEN, CROW, METHVIN, PORTIS & MILES, P.C.
P. O. Box 4160
Montgomery, Alabama 36103-4160

/s/ Elizabeth R. Floyd
Of Counsel