IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| G.F. KELLY TRUCKING, INC. and | * | |
| GUY KELLY, individually, | * | |
| | * | |
| **Plaintiffs,** | * | |
| | * | |
| vs. | * | **Civil Action No. 3:06cv00351-MEF** |
| | * | |
| U.S. XPRESS ENTERPRISES, INC., | * | |
| et al., | * | |
| | * | |
| **Defendants.** | * | |

## PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiffs G.F. Kelly Trucking, Inc. and Guy Kelly ("Kelly Trucking") request the Court **DENY** Defendant U.S. Xpress Enterprises, Inc.'s ("USX") Motion for Summary Judgment. Plaintiffs oppose all grounds stated in Defendant USX's Motion for Summary Judgment and Brief in Support Thereof. Plaintiffs state that USX's Motion for Summary Judgment is due to be **DENIED** because there exist genuine issues of material fact to be determined by the jury in this case. Furthermore, USX is not entitled to judgment as a matter of law.

## INTRODUCTION

Plaintiffs commenced this action on or about March 14, 2006, in the Circuit Court of Randolph County, Alabama. The Plaintiffs' complaint alleges breach of contract, fraud and suppression.[1] On April 18, 2006, this matter was removed to the United States

---

[1] See Exhibit 14, Plaintiffs Complaint

District Court for the Middle District of Alabama, Eastern Division. On February 23, 2007, USX filed its Motion for Summary Judgment on all counts of Plaintiffs' Complaint. This case arises from the alleged breach by USX of an Asset Ppurchase Agreement ("APA" and/or "Agreement") entered into by Kelly Trucking and USX, as well as alleged fraud and suppression committed by USX against Plaintiffs throughout the negotiation and due diligence process involving the Asset Purchase Agreement.

## STATEMENT OF FACTS

In Mid April of 2005, Plaintiff Guy Kelly was contacted by a USX broker about a possible sale or acquisition of G.F. Kelly Trucking by USX.[2] On or about April 18, 2005, G.F. Kelly Trucking entered into a confidentiality agreement with USX.[3] After the execution of the confidentiality agreement, USX's Dennis Farnsworth of requested various documents from G.F. Kelly Trucking. Farnsworth received these documents from Kelly Trucking and reviewed these documents. Mr. Kelly provided Farnsworth with everything he requested. [4] On May 12, 2005, Farnsworth told Kelly that USX had seen all it needed to see, that USX wanted the company, and he (Farnsworth) would make it happen.[5]   Subsequently, USX became satisfied enough with the Kelly Trucking documentation that USX induced Kelly Trucking to enter into a letter of intent [6] The Letter of Intent was executed on June 30, 2005.[7] After the execution of the letter of

---

[2] See Exhibit 1, Deposition Guy Kelly page 61, lines 5-12; 107, lines 11-14
[3] See Exhibit 2, Confidentiality Agreement.
[4] See Exhibit 3, Deposition of Dennis Farnsworth page 49, lines 5-25; page 56, lines 8-10
[5] Exhibit 1, Deposition of Guy Kelly, page 137, lines 21-23; page 138, lines 1-7
[6] Exhibit 3, page 57, lines 20-24
[7] See Exhibit 4, Letter of Intent

intent, USX began its due diligence.[8] Towards the end of July, after a week long review at Kelly Trucking, Farnsworth made a written summary and recommendation to USX to move forward with the negotiation and due diligence process.[9] Subsequently, the due diligence activities regarding the equipment review and the driver file review proceeded. The driver file review was performed by the safety department of USX, which was headed up by Russ Moore. At that time, as part of the due diligence, all of the driver files with all the information available had been provided by Guy Kelly to USX in Chattanooga.[10] This initial review was to determine how many Kelly Trucking drivers would be accepted as USX drivers based on the documentation in the file. Additionally USX was required to determine if Kelly Trucking could provide enough qualified drivers.[11] Farnsworth testified that there were G.F. Kelly drivers disqualified as a result of that review in Chattanooga.[12] With respect to the due diligence on the equipment, USX reviewed equipment on site as well as at several locations where Guy Kelly had equipment.[13]

Guy Kelly testified in his deposition that in a meeting on July 22, 2005, Dennis Farnsworth guaranteed emphatically that USX was going to purchase Kelly Trucking.[14] On August 8, 2005, USX and G.F. Kelly Trucking entered into the Asset Purchase Agreement.[15] Guy Kelly further testified that on August 20, 2005, Farnsworth guaranteed

---

[8] Exhibit 3, page 62, lines 9-12
[9] Exhibit 3, Deposition of Dennis Farnsworth, page 67, lines 1-21
[10] Id (Depo of Dennis Farnsworth, page 70, lines 4-14)
[11] Id (Depo of Dennis Farnsworth pg 75, lines 15-21)
[12] Id (Depo of Dennis Farnsworth, page 123, lines 1-3)
[13] Id at page 70, lines 15-19
[14] Exhibit 1, Deposition of Guy Kelly, page 145, lines 7-18
[15] See Exhibit 5, Asset Purchase Agreement

and promised him that USX would purchase Kelly Trucking and that the deal would close on August 29, 2005.[16]

On August 22, 2005, representatives of USX came to Wadley, Alabama, to continue the qualification process of Kelly Trucking drivers. All of the drivers were required to be physically present at Kelly Trucking or an alternate location for the qualification process.[17] Al Hingst, a representative USX, testified that he thought the driver qualification process should have been completed in seven (7) days.[18] According to business records produced by Defendant USX consisting of USX driver applications, drug tests, driving tests, and other employee records there were at least ninety-five (95) drivers that participated in the on-site driver qualification held in Wadley as of Thursday August 25, 2005. [19]

Al Hingst testified that it was not feasible for Kelly Trucking to have one hundred and fifty (150) drivers or one hundred and fifty (150) trucks present at one time for the qualification. Further, Hingst agreed to the disruptiveness to Kelly Trucking to cease business for the qualification process.[20] Al Hingst testified that even though there were fewer drivers than expected who had shown up, he understood based on what he knew that the actual universe of Kelly Trucking drivers could have been larger.[21] Mr. Hingst testified that he was expecting to see another sixty (60) or seventy (70), or a hundred (100) drivers by Saturday or Sunday and expected that someway they were going to get

---

[16] Exhibit 1, Deposition of Guy Kelly, page 146, lines 22-23; page 147, lines 1-2
[17] Exhibit 3, Deposition of Dennis Farnsworth, page 93, lines 1-8
[18] See Exhibit 6, Deposition of Al Hingst, page 25, lines 6-14
[19] See Exhibits 15-117, Drivers names and exhibit numbers are referenced on Plaintiffs' Evidentiary Submission.
[20] Exhibit 6, (Depo of Al Hingst, page 35, lines 13-21
[21] Id, page 35, lines 8-12

the rest of the drivers in through that week or that weekend.[22] According to Hingst

testimony, USX made no attempt to qualify drivers at alternate locations as promised.

Hingst testified that USX "pulled the plug on the deal before it could happen."[23] On

August 25, 2005, USX informed Kelly Trucking that it was terminating the agreement.

Hingst admitted that there were Kelly drivers who could have been qualified but were not

given the opportunity.[24] Hingst further testified that on the day USX pulled out of the

deal there were still USX staff on site doing work to complete the conversion, that drivers

were being tested, and that drivers were still filling out applications.[25] Farnsworth also

testified that the qualification process had not been completed when the determination

was made by the USX senior management group to 'pull the plug."[26]

Hingst testified that he informed Mr. Kelly that USX was calling off the buyout.[27]

In fact, Hingst admitted to Guy Kelly and Frank Childers that the process had not been

handled correctly.[28] Kelly and Childers testified regarding statements made to them by Al

Hingst. Specifically Childers testified as follows:

**(Frank Childers)**

A.    He stood up, shook my hand, he said, I'm sorry; **he said, had I been here when
      this started, we could have completed this deal,** he said, but we are pulling out.
      I said, for what reason; he said, we are just going to pull out, Frank.

      (Exhibit 7, Deposition of Frank Childers, page 131, lines 6-13)

---

[22] Exhibit 6, Deposition of Al Hingst, page 40, lines 15-20

[23] Id, page 36, lines 6-25

[24] Id, page 37, lines 1-5

[25] Id, page 43, lines 9-16

[26] Exhibit 3, Deposition of Dennis Farnsworth, page 94, lines 15-18

[27] Exhibit 6, Deposition of Al Hingst, page 61, lines 17-22

[28] Id, page 61, lines 23-25; page 62, line 1

Q.      When you went up to the office and you had the conversation where you
        locked the door --

A.      Yes, sir.

Q.      -- it was just you, Guy and Al?

A.      Yes, sir.

Q.      And you asked Al why they were pulling out?

A.      Yes, sir.

Q.      And he said, we are just pulling out?

A.      I said, what's going on, is what I asked him.  When he stood up, I said, what's
        going on.  He said, we just got to pull out.  And I said, why.  He never did give
        me a reason.  Which he didn't have to give me a reason.  I mean, I just work there.
        But he never gave me a reason. **He said it was handled wrong from the start.
        He said, had I been here to handle this from the start, he said, I could have
        made this work.  He said, I should have been in here earlier.**  That was his
        very words.  That's the only thing he said to me about it, period.

        (Exhibit 7, page 140, lines 7-23; page 141, lines 1-11)


Kelly echoed this testimony regarding the Hingst admission:

**(Guy Kelly)**


Q.      Around August, I think it was the 25th, U.S. Xpress notified you that
        they weren't going forward; is that right?

A.      Al Hingst walked in my office at 9:30 a.m. and said that, **we totally screwed up,
        was his exact words**.  He said, **we have mishandled this from Day One and if
        they had had me in here prior to all this, that we would have closed July
        15th, like we were supposed to.  He apologized and said, we have botched this
        whole deal through mismanagement.**  And Frank Childers was privy to part of
        the conversation.  And he said, we are pulling out.

(Exhibit 1, page 83, lines 1-16)

## STANDARD OF REVIEW

Summary judgment can be granted only if it is shown "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). On a motion for summary judgment, the court is to construe the evidence and factual inferences arising therefrom in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158, 26 L. Ed. 2d 142, 90 S. Ct. 1598 (1970); *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996). *Hendricks v. Baptist Health Servs.*, 278 F.Supp. 2d 1276, 1284 (D. Ala. 2003). When a court considers a motion for summary judgment, it is to refrain from deciding any material factual issues. All evidence and inferences drawn from the underlying facts must be viewed in the light most favorable to the nonmovant. *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1080 (11th Cir. 1990). The movant bears "the exacting burden of demonstrating that there is no dispute as to any material fact in the case." *Warrior Tombigbee Transp. Co. v. M/V Nan Fung*, 695 F.2d 1294, 1296 (11th Cir. 1983); see also *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 26 L. Ed. 2d 142, 90 S. Ct. 1598 (1970). *Hendricks*, 278 F. Supp. 2d 1276, 1285 (D. Ala. 2003). An issue of fact is "genuine" if the record as a whole could lead a reasonable trier of fact to find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). An issue is "material" if it might affect the outcome of the case under the governing law. *Redwing Carriers v. Saraland Apts.*, 94 F.3d 1489, 1495-1496 (11th Cir. 1996).

## ARGUMENT

## I. **PLAINTIFFS' BREACH OF CONTRACT CLAIM DOES NOT FAIL AS A MATTER OF LAW.**

Kelly Trucking alleges in the Complaint that Defendant USX was under a duty to pay the purchase price to Plaintiffs pursuant to the Agreement and that Defendant USX breached the contractual obligations of the agreement by failing and refusing to properly pay the purchase price due thereunder. In support of Plaintiffs' allegations, Plaintiffs asserts the following:

### A. **Defendant USX breached the contractual obligations of the Agreement**

Defendant USX erroneously contends that Kelly Trucking did not meet one or more of the conditions set forth in the APA. The APA included certain conditions to closing. The primary condition for which USX contends Plaintiffs did not meet is *Section 3.6* of the APA. This particular section states as follows:

> Section 3.6. <u>Closing Date Drivers</u>  Buyer shall be satisfied, in its sole discretion, that there would be at least one hundred and thirty (130) Closing Date Drivers that will meet Buyer's qualifications for hiring.[29]

An important covenant of the APA that relates to Section 3.6 and that is pertinent to Plaintiffs' argument that USX breached the agreement with Plaintiffs is *Section 7.12*. This section states as follows:

> Section 7.12. <u>Cooperation in respect to closing date drivers</u>. From the date hereof to the closing date, the parties hereto shall cooperate and use their reasonable best efforts to evaluate as promptly as practicable all sellers employee drivers and owner-operators for the purposes of the condition specified in Section 3.6 above.[30]

---

[29] Exhibit 5, page 6, Section 3.6
[30] Id, page 12, Section 7.12

Therefore, for the purposes *Section 3.6*, and to fulfill their contractual obligations under the APA, Defendant USX had a duty to cooperate and use there reasonable best efforts to evaluate as promptly and practical all of Plaintiffs' employed drivers for the purposes of accomplishing the condition set forth in *Section 3.6* above.

Every contract imposes upon the parties a duty of good faith and fair dealing in the performance and interpretation of the contract. *Wallace v. National Bank of Commerce,* 938 S.W.2d 684, 686 (Tenn. 1996):  RESTATEMENT (SECOND) OF CONTRACTS § 205 (1979): 2 JOSEPH M. PERILLO & HELEN HADJIYAUUAKIS BENDER, CORBIN ON CONTRACTS § 5.27, at 139 (rev.ed.1995).  This **duty requires a contracting party to do nothing that will have the effect impairing or destroying the rights of the other party to receive the benefits of the contract.** *Winfree v. Educators Credit Union,* 900 S.W.2d 285, 289 (Tenn.Ct.App.1995).(emphasis added)

The evidence in this case shows that USX did not comply with *Section 7.12* of the APA in failing to cooperate, and use reasonable best efforts in the evaluation of Kelly Trucking drivers or owner/operators.  Futhermore, USX did not act in good faith in dealings with Kelly Trucking and impaired the rights of Kelly Trucking to receive the benefits under the Agreement. Specifically, USX did not fully cooperate or use their reasonable best efforts in promptly evaluating all of Kelly Trucking's drivers for the purposes of finalizing the Asset Purchase Agreement and paying the amount owed to Plaintiffs under the agreement.

As previously discussed, USX requested and received all of Kelly Trucking's driver files. G.F. Kelly Trucking provided all of the files in their possession. In fact,

Farnsworth, testified that all of Kelly Trucking driver files had been gathered and were in Chattanooga as of August 9, 2005.[31] These driver files provided USX with an opportunity to review the files, review the driver information and determine whether Kelly Trucking drivers would meet USX's qualifications for hiring. This initial review was determine on paper approximately how many drivers would be available to qualify.[32] Farnsworth testified that some Kelly drivers were disqualified as a result of that review in Chattanooga.[33] In fact, prior to the August 22, 2005 on-site driver qualification process, USX compiled and updated, as of August 17, 2005, a color coded list setting forth what drivers were qualified and what drivers were not qualified. The color coded list contains the names of 167 Kelly Trucking drivers.[34] Hingst testified that based on his experience with USX, Russ Moore or somebody in safety had determined that the twenty seven (27) people marked in yellow on Exhibit 9 were not qualified to drive for USX.[35]

On August 22, 2005, representatives of USX came to Wadley, Alabama, to continue the qualification process of Kelly Trucking drivers. During the driver qualification process all the drivers are required to be physically present at Kelly Trucking or another location.[36] As previously referenced, Hingst testified that it was not feasible to qualify all one hundred and fifty (150) drivers at one time. Hingst agreed that the qualification process was disruptive to Kelly Trucking's operations.[37] Hingst further testified that he thought the driver qualification process could have been accomplished in

---

[31] Exhibit 3, Deposition of Dennis Farnsworth, page 122, lines16-19
[32] Id, page 75, lines 6-21
[33] Id, page123, lines 1-3
[34] See Exhibit 9, bates No. D 002552 – D 002556
[35] Exhibit 6, Deposition of Al Hingst, page 56, lines 19-23
[36] Exhibit 3, Deposition of Dennis Farnsworth, page 93, lines 5-8
[37] Exhibit 6, Deposition of Al Hingst, page 35, lines 13-21

seven (7) days.[38] Despite the difficulty involved with routing drivers, Nelson Chastain of G.F. Kelly Trucking, testified that Plaintiffs had approximately forty percent (40%) of drivers routed into Wadley on the first day of the process. Additionally Chastain testified that the drivers were supposed to be in and out the same day. With regard to the routing of drivers, Chastain testified as follows:

Q.    Do you remember how many you were able to route into Wadley?

A.    Specific number, no.  The first day, we probably had 40 percent.

Q.    Did you know what U.S. Xpress was doing?

A.    **They were going to do a review of the drivers and an orientation and they would have them in and out the same day.**

Q.    **Did they?**

A.    **No.**

(Exhibit 8, Deposition of Nelson Chastain, page 72, lines 4-15)

USX erroneously asserts that only sixty (60) to eighty (80) drivers participated in the on-site driver qualification process in Wadley, AL. As referenced above, according to business records produced by Defendant USX (consisting of USX Driver applications, drug tests, and driving tests) there were at least ninety-five (95) Kelly drivers that participated in the on-site driver qualification held in Wadley as of Thursday August 25, 2005.[39] In comparing the names of the drivers who participated in the process with Plaintiffs Exhibit 9 , there were seventeen (17) drivers out of the ninety-five (95) who had already been deemed disqualified by USX as of August 17, 2005, prior to the on-site

---

[38] Exhibit 6, page 25, lines 6-14

[39] Exhibits 15-117, Drivers names and exhibit numbers are referenced on Plaintiffs' Evidentiary Submission

11

qualification process.[40] Unexplainably, during the critical qualification week of August 22, 2005, before the proposed closing date of August 29, USX spent valuable time taking applications, conducting driving tests and drug tests, on drivers for which it had already deemed disqualified. Farnsworth testified that it made no sense for previously disqualified drivers to have been requested by USX to come physically to the actual driver qualification.[41]

Based on Plaintiffs' Exhibits 15-117 and Exhibit 9, out of the ninety-five (95) drivers who participated in the qualification process in Wadley, Alabama, seventy-eight (78) of these drivers were drivers already designated as a "Yes", or were drivers who HAD NOT been designated as a "No" by USX.[42]  USX has provided no evidence that any of these seventy-eight (78) drivers were disqualified as of August 25, 2005, when it breached the agreement. In fact, out of the twenty-nine (29) drivers that USX claims were disqualified as of August 25, 2007, twenty-seven (27) of them were the same drivers that were disqualified before USX even came for the on-site visit August 22, 2005 (Exhibit 9, Bates No. D 002552 – D 002556). Apparently, USX wanted to hire these drivers, but did not want to count them for the purposes of completing the conversion of  Kelly Trucking.

USX wasted four (4) days of Plaintiffs' time processing drivers that USX already knew would be disqualified, when there were several more drivers who USX could have qualified for the purposes of conversion.  These actions of USX violate the reasonable and good faith effort as requirements of the APA. Unexplainably, with at least three (3) days left out of a seven-day (7) planned driver qualification process, USX pulled the plug

---

[40] See Exhibit 9, Bates No D 002552 – D 002556; Exhibits 23-39
[41] Exhibit 3, Deposition of Dennis Farnsworth, page 123, lines 8-12
[42] Exhibits 15-117; Exhibit 9, Bates No D 002552 – D 002556

on the deal. Hingst admitted that more drivers could have been qualified.[43] Hingst testified he was expecting to see another sixty (60) or seventy (70), or a hundred (100) drivers by Saturday or Sunday and **expected that someway they were going to get the rest of the drivers in through that week or that weekend.**[44]

Hingst also testified that there was some talk about making it easier for Kelly Trucking by going to another location for the weekend to do qualifying for drivers who had not shown up because they were hauling freight in other places. However, Hingst testified that USX did not make an attempt to go to another location in order to qualify drivers who could not make it to Wadley.[45] Hingst testified that USX pulled the plug on the deal before it could happen.[46] **Furthermore, Hingst admitted that there were drivers out there who could have been qualified but were not given the opportunity to be qualified.**[47] Hingst testified that on the day that they pulled the plug on the deal there was still USX staff on site doing work to complete the conversion, that drivers were being tested, and that drivers were still filling out applications.[48] Dennis Farnsworth testified that in the case of the G.F. Kelly driver qualification process that the qualification process had not been completed when the determination was made by the senior management group that there would not be enough drivers qualified to meet the requirements.[49]

---

[43] Exhibit 6, Deposition of Al Hingst, page 34, lines 3-5; page 35, lines 8-12
[44] Id, page 40, lines 17-20
[45] Id, page 36, lines 6-22
[46] Exhibit 6, Deposition of Al Hingst, page 36, lines 23-25
[47] Id, page 37, lines 1-5
[48] Id, page 43, lines 9-16
[49] Exhibit 3, Deposition of Dennis Farnsworth, page 94, lines 15-18

USX makes a feeble attempt to argue through the declarations of Russ Moore and Al Hingst that it became clear that of the drivers who participated in the driver qualification process there was a general reluctance to conform to USX's policies and procedures, or that many of the drivers would not go to work for USX. Moore discusses "conversations" "comments", and "observing the actions of Kelly Trucking drivers". Interestingly, neither USX, Moore nor Hingst have anything to support their assertions. The record is devoid of any documentation demonstrating, which particular drivers they are discussing, who made the comments, or which drivers they allegedly had conversations with in making their assessment. Even if there were comments made by certain drivers, there is no evidence to show that these drivers were not the same drivers who had already been disqualified by USX prior to coming to Wadley. In fact, Russ Moore was not even in Wadley during the on-site qualification process. Furthermore, Hingst did not show up in Wadley for the qualification process until Wednesday, August 24, 2005.[50]

Furthermore, USX presents no evidence that it was aware at the time of the qualification process that any of Kelly's drivers allegedly quit. However, USX conveniently make these assertions now without support. Again, USX provides no evidence as to which particular drivers they are speaking of, if any of these drivers were not available for the qualification process before or during the week of August 22, if any of these drivers had already been disqualified prior to August 22, or if this was, at the time, a factor in USX's decision to terminate the agreement.

---

[50] Exhibit 6, Deposition of Al Hingst, page 25, lines 15-17

Moore's statement in his declaration that it was his impression that at best only about seventy (70) would go to work for USX is irrelevant to whether or not the drivers met the qualifications for hiring. As indicated previously, pursuant to condition set forth in *Section 3.6* of the APA, whether or not any of Kelly's drivers were hired by USX or decided to go to work for USX was not part of the stated condition. The condition clearly states only that "one hundred and thirty (130) Closing Date Drivers would meet buyers' qualifications for hiring."[51] Based on the APA, Moore's testimony regarding what Kelly drivers intended to do provides no basis for USX's position that Plaintiffs did not comply with *Section 3.6* of the APA.

In his declaration, Hingst alleges a number of laundry list items that he alleges he overhead Kelly Trucking drivers' make. However, as discussed above, Hingst has yet to identify which drivers he is specifically talking about and/or whether these drivers were already disqualified by USX prior to coming to Wadley the week of August the 22, 2005 for the driver qualification process. Hingst further declares that he advised USX decision makers that either by record or bad attitude U.S. Xpress would be unable to qualify enough drivers that were acceptable. Surprisingly, Hingst makes this declaration even though he admitted in his deposition that there were still drivers available that had not been given the opportunity to qualify.[52] It is also apparent that as of August 25, 2005, there were at least three (3) to four (4) days left before the proposed closing date of August 29, 2007 to give additional drivers an opportunity to qualify. This is based on the seven (7) day time period in which Hingst testified that he thought that the qualification

---

[51] Exhibit 5, page 6, Section 3.6
[52] Id, page 137, lines 1-5

process could be completed.[53] Nevertheless, USX pulled out of the deal, thereby breaking the Agreement after fraudulently inducing Kelly Trucking to enter it.

Hingst testified that he informed Mr. Kelly that U.S. Xpress was calling off the buyout.[54] In fact, Hingst informed Guy Kelly and Frank Childers that the process had not been handled correctly.[55] Kelly and Childers specifically testified as to Hingst's statements that "**it was handled wrong from the start**" and "**we have botched this whole deal through mismanagement.**"[56]   In fact, when asked if he had any explanation for why it took three, four months before anybody realized that there were going to be issues with the driver qualifications, Hingst testified that he did not.[57]

It is clear from the evidence that USX completely mismanaged the entire process involving the APA, including the due diligence process for the qualification of drivers pursuant to *Sections 3.6* and *7.12* of the APA. Plaintiffs have provided substantial evidence that USX did not comply with *Section 7.12* of the APA in failing to cooperate, and use their reasonable best efforts in their evaluation of Plaintiffs' employed drivers or owner/operators, and did not act in good faith in their dealings with Plaintiffs and impaired the rights of Plaintiffs to receive the amount owed under the agreement.

Even when considering USX's arguments, there is clearly a **genuine issue of material fact** with respect to whether USX acted in good faith and cooperated and used reasonable best efforts to evaluate as promptly and as practicable all of Kelly Trucking's employed drivers owner/operators for the purposes of the condition specified in Section

---

[53] Exhibit 6, Deposition of Al Hingst, page 25, lines 6-14

[54] Id, page 61, lines 19-22

[55] Id, pages 61, lines 23-25; page 62, line 1

[56] Exhibit 1, page 83, lines 1-16; Exhibit 7, pages 140, lines 7-23; page 141, lines 1-11

[57] Exhibit 6, Deposition of Al Hingst page 31, lines 6-10

3.6 of the APA. In addition, as a general rule, **"the question of reasonableness is a factual question** to be determined by the trier of fact and, if there is a dispute, summary judgment would not be proper." *Educational Serv. Placement, Inc. v. Watts*, 789 S.W.2d 902, 904-05 (Tenn. Ct. App. 1989) (deciding whether buyer made reasonable efforts to obtain financing).

### B.     Defendant USX'S decision to terminate the agreement was not based on other Non- Driver conditions

Despite USX's assertions that the decision to terminate the Agreement involved other reasons besides the qualification of drivers, it is clear from the evidence that the driver qualification issue is the only excuse given by USX for breaking the Agreement. Farnsworth testified that not having the proper number of drivers is what really killed the deal.[58] Hingst agreed that two of the big reasons to acquire G.F. Kelly involved getting the drivers and getting the book of business.[59] In fact, Hingst agreed that the driver qualification is what "pulled the plug on the deal."[60] In addition, regarding the missing documents, Dennis Farnsworth testified that he was in charge of getting those documents for USX and that Guy Kelly continued to say that he could provide those documents.[61]

Also, Farnsworth testified that the value of the Kelly Trucking assets was determined by an outside company, Taylor & Martin, which USX uses on a regular basis. Taylor & Martin works auctions of equipment across the country and creates valuations

---

[58] Exhibit 3, Deposition of Dennis Farnsworth, page 97, lines 16-19; pg 103, lines 22-24
[59] Exhibit 6, Deposition of Al Hingst, page 30, lines 22-25; page 31, line 1
[60] Id, page 31, lines 11-13
[61] Exhibit 3, Deposition of Dennis Farnsworth page 96, lines 19-25; page 97, lines 1-6

based on those auctions.[62]  Farnsworth testified that the third party evaluation of Taylor & Martin determined that based on the due diligence review resulted in approximately a "break even" scenario for USX, and that this situation it was not a "deal killer" by itself. Farnsworth testified that that the qualification of the driver was a deal killer by itself.[63] In fact, there were inspections done by USX of Kelly Trucking's equipment prior to the week of August 22, 2005. Although USX asserts differently now, as illustrated above, the results of those inspections did not terminate the deal prior to August 22, or deter USX from coming to Wadley for driver qualifications during that week.


In his deposition, Guy Kelly testified to his conversations with representatives of USX regarding the equipment inspection. Specifically Mr. Kelly testified as follows:

Q.    Did he tell you why they were pulling out?

A.    No.  He just basically said, we mishandled this and it's a fiasco and I'm sorry and it wasn't handled properly.

Q.    **He didn't say anything to you about the results of their inspection of the Kelly equipment?**

A.    **No.**

(Exhibit 1, page 252, line 23; page 253, lines 1-9)


Q.    And it's your testimony that they did not convey to you anything about U.S. Xpress equipment not meeting -- excuse me -- Kelly equipment not meeting U.S. Xpress standards and not being able to qualify enough Kelly drivers?

A.    That had no bearing on the buyout, as far as equipment.  It was an asset sale.  And I was only going to get the equity of what was left.  So it had no bearing on the sale being completed.  And Dennis said that wouldn't matter anyway.

---

[62] Exhibit 3, page 100, lines 21-25
[63] Exhibit 3, Deposition of Dennis Farnsworth, page 103, lines 1-25; page 105, lines 1-2

Q.    What wouldn't?

A.    The condition of my equipment had no bearing.  The drivers were not going to drive Kelly trucks or use Kelly trailers anymore.  It had no bearing on the actual completing of the deal.

(Exhibit 1, page 254, lines 13-23; page 255, lines 1-10)

In addition, USX has failed to prove that these other conditions could not have been met by closing, had USX not terminated the Agreement. There is clearly a genuine issue of material fact as to whether Kelly Trucking could have met these conditions.

**C.    Defendant USX has not met its burden of proof that Plaintiffs failed to meet the conditions of the Asset Purchase Agreement and USX' own Defense demonstrates the existence of a genuine issue of material fact**

In Tennessee contract actions, if a plaintiff claims that a defendant breached a contract, the defendant may assert the affirmative defense that the plaintiff failed to comply with a condition precedent to the defendant's duty to perform; **if the defendant asserts this defense, Defendant bears the burden of proof.** *Safeco Insurance Co. v. City of White House Tenn.*, 191 F.3d 675 (6th Cir. 1999)(emphasis added)

Given the evidence presented above, USX has not met the burden of proof that Kelly Trucking did not fulfill the conditions set forth in the APA. As referenced above, the closing date for the APA was planned for August 29, 2007.[64] Even if the issue of the closing date is undecided the APA designates that the Buyer may terminate the agreement by written notice if closing shall not have occurred on or before August 31, 2005. Specifically, the APA states as follows:

---

[64] Exhibit 3, Deposition of Dennis Farnsworth, page 24, lines 11-20

Article XI, Section 11.1(a)(iii) of the agreement, "Buyer may terminate this agreement by giving written notice to Buyer at any time prior to the Closing Date (A) in the event Buyer has breached any representation, warranty, or covenant contained in this Agreement, Buyer has notified Seller or any Stockholder of the breach, and the breach has continued without cure for a period of five (5) days after the notice of the breach or **(B) if the closing shall not have occurred on or before August 31, 2005 (unless the failure results primarily from Buyer breaching any representation, warranty, or covenant contained in this Agreement).[65]**

The evidence shows that USX terminated the agreement with anywhere from four (4) to six (6) days left before the closing date or the deadline for closing. On the date USX terminated the agreement, it was acknowledged by representatives of USX that the driver qualification was still being conducted and that there were still drivers out there that had yet to be given an opportunity to be qualified. Furthermore, as evidenced above, USX breached covenant 7.12 of the agreement, which according to Article XI, Section 11.1(a)(iii) referenced above, precludes USX from making the argument that the conditions of the APA could not be met by August 31, 2005.

In addition, as also evidenced above, the other conditions related to the equipment inspection and the missing equipment lien paperwork were not the reasons for USX pulling out of the agreement. Furthermore, prior to the closing, USX did not provide Plaintiffs with written notice of any breach of representation, warranty, or covenant, contained in the agreement, or allow a period of five (5) days in which to cure any alleged breach. The evidence shows that USX sent a letter to Plaintiffs on August 25, 2005, merely stating "that it was not in the parties' best interest to move forward with the proposed business arrangement."[66]  Not until September 13, 2005, did USX in writing notify Plaintiffs that they had breached any covenants, warranties, or representation

---

[65] Exhibit 5, page 18, Article XI, Section 11.1(a)(iii)
[66] See Exhibit 12, letter from Ray Harlin of USX to Guy Kelly

regarding the APA.[67]  In short, USX has not met its burden of proof that Plaintiffs could not have complied with the conditions for closing set forth in the APA.

Based on the foregoing, USX's arguments must fail regarding Plaintiffs' breach of contract claim.  Kelly Trucking has shown genuine issues of material fact regarding the issues of good faith, cooperation and reasonableness with regard to USX's due diligence under the APA. In addition, **it is a clear FACT QUESTION** as to whether Plaintiffs could have met the conditions set forth in the APA by the closing date of August 2, 2005, or August 31, 2005. Kelly Trucking has also shown that USX has failed to meet its burden in proving that Plaintiffs failed to meet the conditions set forth in the APA. Therefore summary judgment should be denied.

## II.    PLAINTIFFS' FRAUD AND SUPPRESSION CLAIMS DO NOT FAIL AS A MATTER OF LAW

### A.    Plaintiffs Reasonably Relied on the representations of Defendant

USX erroneously contends that Plaintiffs fraud claims fail as a matter of law because Kelly Trucking could not reasonably rely on any alleged  representations outside the Asset Purchase Agreement. In Alabama, the standard of review applicable to fraud cases is reasonable reliance. *Foremost Ins. Co. v. Parham*, 693 So.2d 409 (Ala. 1997).  In *Foremost*, the Alabama Supreme Court revived reasonable reliance as an element of fraud. The Court stated that returning to "the reasonable reliance standard" provided "a more practical standard that [allows] the fact finder greater flexibility in determining the issue of reliance based on all the circumstances surrounding a transaction, including the mental

---

[67] See Exhibit 13, letter from Lisa Pate of USX to Guy Kelly

capacity, educational background, relative sophistication, and bargaining power of the parties." *Id*. at 41.

Additionally, the Supreme Court emphasized that "a return to the reasonable reliance standard will once again provide a mechanism . . . whereby the trial court can enter a judgment as a matter of law in a fraud case where the **undisputed evidence** indicates that the party or parties claiming fraud in a particular transaction were fully capable of reading and understanding their documents, **but nonetheless made a deliberate decision to ignore written contract terms**." *Id*. at 421 (Emphasis Added).

Defendants incorrectly assert that the Plaintiffs' fraud claims fail "as a matter of law for lack of reasonable reliance." In doing so, the Defendants stretch the principles of *Foremost Ins. Co. v. Parham*, *supra* too far. Plaintiffs do not contend in any way that they ignored any written terms regarding the Asset Purchase Agreement at issue. It is clear that Kelly Trucking realized there were conditions in the APA that had to be met before closing. Plaintiffs do not argue the existence of these conditions, but rather, that the representations and actions of USX gave Kelly Trucking a reasonable belief that these conditions were being met or would be met at closing, and Kelly relied on these representations in proceeding with the agreement and due diligence process.

In fact, inspections and valuations of Kelly Trucking's equipment had previously been done as early as August 11, 2007. Kelly Trucking had also sent USX lists indicating the number of drivers it had, as well as driver files for which USX could review and make decisions regarding which drivers would qualify for closing. USX had this information available to them weeks prior to August 22, 2007. Based on Plaintiffs' knowledge that USX had all this information in its possession, and given the fact USX

was still representing that the deal was going through and raised no questions that any of the conditions could be met, it was reasonable for Plaintiffs to believe that these conditions were a non-issue and that the closing would happen as scheduled.

In addition, the fact that USX had not pulled the plug prior to USX visiting Wadley the week of August 22, 2007, only solidified Plaintiffs' reasonable belief that the deal was going through as represented. Guy Kelly, Frank Childers, and Nelson Chastain testified in their depositions regarding the above-referenced representations and their reliance on them. Specifically, Guy Kelly testifies as follows:

**(Guy Kelly)**

Q.    Let me ask you this: What is it that Kelly -- what is it that U.S. Xpress did wrong that caused all these things?

A.    They misled me and led me to believe that they were buying my company. And basically, **I based all my business decisions on what they told me when I relied on them -- you know, I relied on Dennis Farnsworth's word that he guaranteed me that they were going to buy me out, not to worry about nothing. On more than one occasion, he guaranteed me that.**

(Exhibit 1, page 135, lines 6-19)

Q.    Defendant's Exhibit 45, page 6, Section 3.6 requires there to be at least 130 closing day drivers that will meet buyer's qualifications for hiring; is that correct?

A.    That's what the document states. **But Dennis continued to tell me not to worry about the detail of the agreement, that they would work out the deal with the drivers through safety.**

(Exhibit 1, page 234, lines 16-23; page 235, lines 1-2)

Q.    Did you understand that because they would be going to work for a different company, because it wasn't a stock purchase, they would be going to a different

company, that U.S. Xpress would have to go through the driver qualification process?

A.    **Yes. But they had all that information prior. They had all the information prior to the week they came down, the week of the 22nd.**

(Exhibit 1, page 202, lines 21-23; page 203, lines 1-8)

Q.    Did he tell you or did anybody ever give you any indication on June 30th, 2005 that you had a contract for the sale of your business to U.S. Xpress?

A.    Yes. Dennis Farnsworth, he guaranteed me that they would buy the company and **close the deal, not to worry about the driver situation, that that was something safety and personnel would handle.**

(Exhibit 1, page 175, lines 19-23; page 176, lines 1-6)

Childers testified to the fraud as follows:

Q.    Right. You understand that's why they had to come in and have them fill out applications and go through the driver's qualification process?

A.    Well, yeah, I understand what you are saying, but -- yeah, I understand what you are saying.

Q.    But what? There is something that you were thinking there.

A.    Well, that's something I know. **They had their files, they knew what their driving record was. They had the files for a couple of weeks. They knew it -- before they came into my office on the 22nd, they knew what every driver that they've got on that piece of paper had on their record up until the last annual review.**

(Exhibit 7, page 108, lines 21-23; page 109, lines 1-15)

Finally, Chastain gave the following testimony related to USX's fraud:

A.    I don't know what it would be called. Misrepresentation.

Q.    How so?

A.    We provided all the information that they required.  They had a chance to look at it.  And it was drug on and on.  And something -- every time, it was something more each time, especially with the driver files.  **We had given them every single one of them, and they have made a determination at that time, after reviewing them, what they could do and what they couldn't do.  We are talking a month and a half later deciding we didn't have enough drivers.**  And the files were DOT certified being correct  and accurate and up to date.  **So there shouldn't have been any problems whatsoever in reviewing them.**

(Exhibit 8, page 93, lines 4-23)


There is no evidence before this Court that the Plaintiffs made a deliberate decision to ignore a written contract or terms. As discussed above, the fact that there were conditions in the language of the agreement, and that USX gave no indications that the conditions were not being, or would not be met, only gives credence to Plaintiffs' reasonable reliance on USX's representations that the deal was moving forward and would close.  Under the current facts, it cannot be said that the Plaintiffs "blindly" trusted Dennis Farnsworth and USX where they should not have. Based on the evidence, testimony and case law referenced above, the Plaintiffs reasonably relied on USX'S representations regarding the APA closing. Accordingly, the Defendants' argument of Plaintiffs' "lack of reasonable reliance" fails.

Furthermore, for the reasons stated above, USX's argument that the Plaintiffs' suppression claim is deficient due to an alleged lack of reasonable reliance must also fail.


**B.**    **Plaintiffs Have Presented Substantial Evidence of USX's Intent to Deceive Plaintiffs**

USX erroneously asserts that because Plaintiffs' claims for fraud are promissory in nature, that Kelly cannot prove that USX did not intend to go through with the closing at the time the parties entered into the agreement.

Fraud" is defined as (1) a false representation (2) of a material existing fact (3) relied upon by the plaintiff (4) who was damaged as a proximate result of the misrepresentation. *Earnest v. Pritchett-Moore, Inc.*, 401 So.2d 752 (Ala. 1981).

If fraud is based upon a promise to perform or abstain from performing in the future, two additional elements must be proved: (1) the defendant's intention, at the time of the alleged misrepresentation, not to do the act promised, coupled with (2) an intent to deceive. *Coastal Concrete Co. v. Patterson*, 503 So. 2d 824, 826 (Ala. 1987)(citing *Clanton v. Bains Oil Co.*, 417 So.2d 149 (Ala. 1982)).

A defendant's failure to perform promise to act is not itself evidence of intent to deceive at time promise was made, such as might support fraud claim; however, fact finder **may consider that failure, together with other circumstances, in deciding whether, at time promise was made, defendant had requisite fraudulent intent.** *Murphy v. Droke*, 668 So. 2d 513, 514 (Ala. 1995)(emphasis added). In addition, a defendant's intent to deceive can be established through **circumstantial evidence that relates to events that occurred after the alleged misrepresentations were made.** Byrd v. Lamar, at 343 (citing *Vance v. Huff*, 568 So. 2d 745, 750 (Ala. 1990))(emphasis added).

Further, **"ordinarily, intent is a matter peculiarly within the province of the trier of facts."** *Hillcrest Ctr., Inc. v. Rone*, at 906 (citing *Purcell Co. v. Spriggs Enterprises, Inc.*, 431 So. 2d 515, 519 (Ala. 1983))(emphasis assed).When plaintiff

presents substantial evidence that defendant had intent to deceive, it is for jury to decide whether defendant actually had such intent for purposes of plaintiff's fraud claim. *Murphy,* 668 So.2d at 514.

It is clear from the evidence that USX never intended to honor the agreement with Plaintiffs for closing, including the completion of the driver qualification process the week of August 22, 2005. Rather, USX put on an elaborate ruse under the guise of consummating a buyout in order to suspend Plaintiffs' operations, and have an opportunity to take applications on Kelly's drivers and have access to its information in order to hire these drivers from Kelly Trucking after breaching the Agreement. Furthermore, it is obvious from USX's actions that it was attempting to obtain information regarding Kelly Trucking customers in order to take them from Plaintiffs after the fallout of the termination of the agreement.

With respect to USX's intentions to defraud, Guy Kelly testified as follows:

Q.    Is there anything that makes you think he was trying to trick you?

A.    Now, after the fact.

Q.    What?

A.    I mean, I really think **tried to put me out of business and steal my drivers**. I think it was all about drivers and accounts. He even made a comment to me before, when they first came in, they needed drivers real bad. They had 600 empty trucks sitting on the lot. That's a lot of trucks.

(Exhibit 1, page 149, lines 12-23)


Additionally, Frank Childers testified:

Q.    What made you think that their main point was to shut the company down or

        break it?

\*          \*          \*          \*          \*          \*

A.      ……. They had their mind made up what they were going to do with these drivers. They knew what they were going to do. **They had had all of their DQ files and their personnel files at their facility in Tunnel Hill, so they knew what was here. Them knowing what was there, why did they put us through that entire week that they put us through or four days, Monday through Thursday, when they knew they weren't going to take these drivers in the first place.** They were not going to take them. But yet they come in there, they have all these drivers come in on Monday. Our customers couldn't be serviced, our drivers were disgruntled because they weren't making any money and we couldn't pay them. That was when, through a phone conversation, they were supposed to have been paid, taken care of, compensated for, but they haven't been. You know, looking at it from my standpoint, it's the only way you could look at it. There's no other way to look at it.

Q.      What did they have to gain from doing that?

A.      **What did they have to gain? Drivers. Since they had every name of every driver that we had and they had the listing of our customers. And they had already called on some of our customers.**

(Exhibit 7, page 134, lines 4-6; page 135, lines 3-23; page 136, lines 1-3)


        USX's intent is further evidenced by the fact that after USX pulled the plug on the deal, USX actively solicited Kelly Trucking drivers that they had previously listed as disqualified on the USX driver list. As noted previously, U.S. Xpress did take the opportunity to have drivers go through the qualification process during the week of August 22, 2005 even though they had previously been listed as disqualified by USX. In this manner USX would have all the information on Kelly Trucking drivers without having to expend any money on completing the sale of the equipment and other assets of Kelly Trucking.

        Guy Kelly discussed the issue of USX soliciting Kelly Trucking drivers that had been previously disqualified. Kelly testified as follows:

28

Q.    Has anybody said anything to you or did anybody say anything to you during the negotiations or since that makes you think that they were trying to trick you, to put you out of business so they could get your drivers and your trucks besides what you have already told me?

A.    That makes me believe that this was all a sham?

Q.    Yes, sir.

A.    **They have tried to hire my drivers after the fact**.

Q.    While I'm looking, I will show you what has been marked Defendant's Exhibits 30 and 31 which are documents produced by you. (Whereupon, Defendant's Exhibit Numbers 30 and 31 were marked for identification and are attached to the original transcript.)

A.    By me.

Q.    '93 and '92.

A.    Do you know what these are?

Q.    No.  Can you tell me what they are?

A.    Did you read them?

Q.    I did read them, yeah.  What are they?

A.    It would appear to me that they are invitation to hire letters.

Q.    Who are they to?

A.    Two of my former drivers.

Q.    What is the date of the letters?

A.    It says November the 16th, '05.

Q.    And they are to?

A.    **Lee Knight and Darrell Waldon**.

Q.    Were they employed by you in November?

A.    Yes.

29

Q.    They were not two that had quit?

A.    **No.  But they were originally turned down by U.S. Xpress**.

Q.    Do you know how those letters came about to be sent to those men?

A.    Do I know how they got sent to the drivers?

Q.    Yes, sir.

A.    The driver -- I assume, if it can be assumed, that U.S. Xpress sent them the letters.

Q.    How did you get copies of them?

A.    **The drivers came to see me after this was over and said that U.S. Xpress tried to hire them and they originally had been turned down when they were there with me.**

(Exhibit 1, Page 150, lines 1-22; page151, lines 1-23; page 152, lines 1-17)


Additionally, Childers testified as follows:

Q.    So you call Mr. Moore and he adds names to the list that they can't hire?

A.    Yes, sir.

Q.    What, if anything, happens then?

A.    I sort of threw my pen up in the air at my desk with Al and John and the lady. Again, you will have to find out who she is or I can look it up at the old office. And I told them, I said, you know, you group of people are the most unprofessional people I have ever dealt with in my life, to be a company of your size and to have the people that you have in here. I went on -- like I said, I was upset at that point. **I said, I think your main point in coming in here was to shut this company down and break us**.  That's what I said to these people that were in my office.

\*            \*            \*            \*            \*            \*

**In the meantime, three of the people that were on this list that USX would not hire but they were making them fill out paperwork anyway, they had already given me their names, that they would not hire them, but they were sitting out there making them go through all this paperwork.**

30

(Exhibit 7, page 127, lines 11-23; page 128, lines 1-9 and 19-23; page 129, lines 1-3)

Although USX had previously designated Allen "Lee" Knight and Darrell Waldon as disqualified in Plaintiffs' Exhibit 9, the documents produced by USX shows that both Mr. Knight and Mr. Waldon, during the week of August 22, 2005, took drug tests, road tests, and filled out several payroll, and other employment forms, in preparation for hiring by USX.[68] As indicated above in Kelly's testimony, shortly after the termination of the agreement, these two particular drivers were solicited by USX for employment by mail.[69] Based on his review of Plaintiffs' Exhibits 9, 10, and 11, Hingst testified that drivers Alan Knight and Darrell Walden were disqualified for the purposes of the conversion, but yet were later directly solicited by USX.[70] In fact, Hingst testified that as part of the conversion that he had assured Mr. Kelly that USX would not solicit any of his drivers.[71]

As further evidence of USX's fraudulent intent, USX contacted Kelly's customers prior to the closing date without written or express permission of G.F. Kelly Trucking. In fact, Section 4.B of the Confidentiality Agreement executed by USX and Plaintiffs states in part that: ".....Recipient will not, without disclose to any other person or entity, and Recipient will cause its Representatives not to **disclose to any other person or entity, the fact that the information has been made available to Recipient, that discussions**

---

[68] See Exhibit 30, Alan Knight; Exhibit 39, Darrell Waldon; Exhibit 9, bates No.002553 and 002556

[69] See Exhibits 10 and 11, Solicitation letters from USX to Darrell Waldon and Alan Knight

[70] Exhibit 6, Deposition of Al Hingst, pages 58, lines 15-20; page 59, lines 11-15

[71] Id at page 57, lines 9-12

or negotiations are taking place concerning a possible transaction between recipient and Kelly."[72]

  In their depositions, both Guy Kelly and Nelson Chastain testified as to the unauthorized contact of Kelly Trucking customers by USX. Specifically, Chastain testified as follows:

Q. To your knowledge, did U.S. Xpress have any **unauthorized contact with Kelly Trucking clients?**

A. **Yes.**

Q. When?

A. After I provided the list.

Q. Which clients?

A. The main one I can recall was Wabash Alloys and Delphi.

Q. Do you know who had the contact with them?

A. Some of their sales reps.

Q. Do you remember what time period this was?

A. No.

Q. Do you know whether it was after August of '05?

A. **No. It was prior to the sale, prior to the -- mid-August, I would say.**

Q. How did you know they had had contact with them?

A. Customers told us.

Q. What did they say?

A. That U.S. Xpress had been in to talk to them.

---

[72] Exhibit 2, page 2, Section 4.B

(Exhibit 8, page 67, lines 7-23; page 68, lines 1-9)

Guy Kelly testified as follows:

Q.    Did you know that U.S. Xpress was going to talk to Wabash Alloys?

A.    No.

Q.    Do you know when they approached them?

A.    No.

Q.    Do you know who at U.S. Xpress approached them?

A.    I think it was Bill Farris. He was corporate sales.

Q.    Do you know where he approached them?

A.    I think they went to Wabash, Indiana.

Q.    How did you find out that U.S. Xpress had talked to them?

A.    Greg Fields called me and told me.

(Exhibit 1, page 79, lines 15-23; page 80, lines 1-9)


Q.    Did you know that G.F. Kelly had contacted Bowater Paper?

A.    I knew that U.S. Xpress had contacted Bowater Paper.

Q.    Did I say G.F. Kelly again?

A.    (Nods head.)  That's okay.

Q.    How did you find out that U.S. Xpress had contacted Bowater Paper?

A.    Sam MacIntosh (phonetic)called me, which is corporate traffic manager in
      Calhoun, Tennessee.

Q.    When did U.S. Xpress contact Bowater?

A.    During the three-month time period, I don't know the exact date, June, July,
      August.  I don't know the exact date.

Q.    **Did you know that U.S. Xpress was going to contact them?**

33

A.    **No.** As a matter of fact, I asked Dennis.

Q.    Farnsworth?

A.    **Yes. Until this was, you know, a completed deal, that it would not be a good idea to contact customers.**

(Exhibit 1, page 87, lines 14-23; page 88, lines 1-16)

Further, Hingst testified that it would have been improper for anybody at USX to contact one of Kelly Trucking's customers without permission.[73] Also, Dennis Farnsworth testified that it would have not been appropriate for USX to contact Kelly Trucking customers during the due diligence process without the permission of Guy Kelly.[74]

C.    **Plaintiffs' fraudulent suppression claim does NOT fail as a matter of law**

Defendant USX erroneously argues that Plaintiffs' fraudulent suppression claim fails because Plaintiffs have presented no evidence that USX intended not to close on the APA assuming the conditions were met. As discussed previously in Section II.B above, Plaintiffs have produced substantial evidence that USX never intended to follow through with the purchase and closing and that the negotiation process, APA and closing period was nothing more than a fraudulent tactic to steal his drivers and customers from Kelly Trucking without having to consummate the agreement and pay money for the drivers and pay off the other assets.

Any actions taken by USX to put forth the perception that it were going to follow through with the closing were done so fraudulently in an attempt to disguise USX's true intentions to paralyze Kelly Trucking's operations in order to make it easier to obtain

---

[73] Exhibit 6, Deposition of Al Hingst, page 47, lines 17-21
[74] Exhibit 3, Deposition of Dennis Farnsworth, page 128, lines 6-10

their drivers and customers. USX suppressed these material facts, which it had a duty to communicate to Plaintiffs. Plaintiffs were injured as a result of USX's suppression.

Kelly Trucking has produced sufficient evidence to support the fact that USX never intended to follow through on the representations that USX would close on the asset purchase agreement, and USX suppressed these material facts from Plaintiffs. Therefore USX's argument that Plaintiffs cannot prove the requisite intent must fail.

## CONCLUSION

Kelly Trucking has established claims for breach of contract, fraudulent misrepresentation and suppression, relating to the Asset Purchase Agreement entered into with USX. Plaintiffs have established facts necessary to prove that: USX breached the contract with Plaintiffs; Plaintiffs reasonably relied upon the representations made by USX regarding the asset purchase agreement; USX never intended to close on the asset purchase agreement with Plaintiffs; and all of Plaintiffs' claims are factually sufficient. Accordingly, genuine issues of material fact exist and USX is not entitled to judgment as a matter of law. USX's Motion for Summary Judgment is due to be **DENIED**.


Respectfully submitted this the 21st day of March, 2007.

JOHN E. TOMLINSON (TOM014)
Attorney for Plaintiffs


OF COUNSEL:

**BEASLEY, ALLEN, CROW,**
**METHVIN, PORTIS & MILES, P.C.**
Post Office Box 4160
Montgomery, Alabama 36103-4160

35

(334) 269-2343
(334) 954-7555 – Fax

## CERTIFICATE OF SERVICE

I hereby certify that the following persons will be served with this notice by U.S. Mail, postage prepaid, on this 21st day of March, 2007.

**ATTORNEYS FOR DEFENDANT**
Mr. David B. Hall
Elizabeth R. Floyd
Lawrence B. Clark
BAKER DONELSON BEARMAN
CALDWELL & BERKOWITZ, P.C.
420 20th Street North, Suite 1600
Birmingham, Alabama 35203

Of Counsel