**American Court Reporting**
**toll-free (877) 320-1050**

Page 97

1    Q.  But it wasn't after they said
2  they weren't going forward?
3    A.  No, it wasn't then.
4    Q.  So has he ever said to you why
5  he cut back his services for G.F.
6  Kelly?
7    A.  Yes.  I mean, he told me that
8  I couldn't service his account anymore,
9  I didn't have the capacity and that he
10  was real upset about the Wabash Alloy
11  deal, because he -- he was involved in
12  that and got commission off of it.  He
13  felt like, you know, that U.S. Xpress
14  had ruined that deal for him, too,
15  because he lost his commission off of
16  it.
17    Q.  Do you know what other
18  trucking companies Mr. Hopper or
19  Rainbow Express worked for?
20    A.  Osborne in Gadsden, Humphrey
21  Truckline.  I think he does some for
22  Floyd and Beasley.
23    Q.  You said Mr. Hopper was privy

Page 98

1  to their conversations about the local
2  plant.  What did you mean by that?
3    A.  He helped me with the
4  accounting.  He dealt with Bob Pine
5  locally, which is the plant manager at
6  Steele.  He dealt with him on a daily
7  basis.
8    Q.  Bob Pine, P-i-n-e?
9    A.  Bob pine, P-i-n-e.
10    Q.  Okay.  When you say their, is
11  it Wabash's?
12    A.  Yeah, Wabash's plant in
13  Steele, Alabama.  Gary had direct
14  dealings with Bob Pine.
15    Q.  I'm just trying to get, when
16  you said their, you are not talking
17  about U.S. Xpress' conversations with
18  Wabash; you are talking about people
19  inside Wabash's conversations?
20    A.  Right.  Right.
21    Q.  You said U.S. Xpress picked up
22  Smurfit-Stone?
23    A.  Smurfit-Stone and Paper.

Page 99

1    Q.  When did they do that?
2    A.  They have done that, I think
3  before the new year, which is '06.
4    Q.  So late '06, they picked it
5  up?
6    A.  I think, correct.  Yes.  My
7  bad.
8    Q.  And is Eagle still --
9    A.  We are still doing business
10  there.
11    Q.  Okay.
12    A.  Very little.
13    Q.  Did U.S. Xpress pick up what
14  Eagle lost?
15    A.  You would have to ask
16  Smurfit-Stone.  But I would say they
17  are probably getting a lot of the
18  freight that I was getting.
19    Q.  When did Smurfit cut back on
20  Eagle?
21    A.  Toward the end of '06.
22    (Discussion off the record.)
23

Page 100

1    (Short recess.)
2
3    Q.  (BY MR. HALL:)  You indicated
4  that you and Mr. Chastain had a parting
5  in the end of '05; is that right?
6    A.  Correct.
7    Q.  Was there a written agreement
8  with regard to that?
9    A.  Yes.
10    Q.  Do you have a copy of that?
11  Not on you, but --
12    A.  Yes.
13    Q.  Do you and Mr. Chastain have
14  any business dealings at all together
15  anymore?
16    A.  No.
17    Q.  Do you know where Mr. Chastain
18  is currently working?
19    A.  For himself.
20    Q.  For himself.  Aside from his
21  20 percent in G.F. Kelly Trucking, did
22  he obtain anything else in the --
23  excuse me -- did you obtain anything

25 (Pages 97 to 100)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 101

1  else in that separation?
2    A.  We split -- I think there were
3  about four spotting services, I'm not
4  very positive, that we owned together.
5  And when we split, we split those up.
6  He got certain ones and I got certain
7  ones.
8    Q.  I will show you what has been
9  marked as Defendant's Exhibit 13, which
10  is Plaintiff's Response to U.S. Xpress
11  Enterprise, Inc.'s First Set of
12  Interrogatories.  Have you seen that
13  before?
14
15      (Whereupon, Defendant's Exhibit
16      Number 13 was marked for
17      identification and is attached to
18      the original transcript.)
19
20    A.  You just gave it to me
21  earlier.
22    Q.  No.
23      MR. TOMLINSON:  Those are the

Page 102

1  interrogatories.
2    A.  Oh, production.  Excuse me.
3  I'm sorry.  Yes.  My bad.
4    Q.  Attached as Exhibit A, is that
5  a complete list of each bank or lending
6  institution that extended credit to
7  Kelly Trucking or yourself from January
8  1, 2003 to the present?
9    A.  Correct.
10    Q.  Looking at Exhibit A, can you
11  tell which of these companies that G.F.
12  Kelly Trucking, Inc. was indebted to in
13  April of 2005?
14    A.  I can't give you the exact
15  account base by account base, no, without
16  the information I would need.
17    Q.  Okay.
18    A.  But the majority of them.
19    Q.  All right.
20    A.  You got to realize, some of
21  these have been bought out and merged
22  with other companies, too.
23    Q.  I got a lot of records.  After

Page 103

1  40 it went downhill.
2      There were a lot of records
3  like Navistar, Daimler/Chrysler that
4  were produced.
5      Are those all the records that
6  you have or G.F. Kelly Trucking has
7  regarding financing that Kelly Trucking
8  had at the time it was in negotiations
9  with U.S. Xpress?
10    A.  Correct.
11    Q.  Who is Sandy Holliday?
12    A.  He's my attorney, one of my
13  attorneys.
14    Q.  Did you seek his advice
15  regarding the negotiations with U.S.
16  Xpress?
17    A.  Yes.
18    Q.  When was that?  What part of
19  the negotiations, if not all of them?
20    A.  He was a party to it during
21  the process, he and Wade Hartley.
22    Q.  I can't remember.  Dennis
23  Hamlet, who is Dennis Hamlet?

Page 104

1    A.  Dennis was an accountant I had
2  employed until May '05.
3    Q.  And Randall Fant, he replaced
4  him?
5    A.  Fant, correct.
6    Q.  Does he go by Randy or
7  Randall?
8    A.  Randall.
9    Q.  When did Randall begin working
10  for G.F. Kelly?
11    A.  First week of June.
12    Q.  First month of June?
13    A.  First week of June '05.
14    Q.  By the way, if you could, flip
15  back to the verification page.
16    A.  (Complies.)
17    Q.  Is that your signature?
18    A.  Correct.
19    Q.  How long had Nelson Chastain
20  worked for Kelly Trucking?
21    A.  Since '96.
22    Q.  '96 to the end of '05?
23    A.  Correct.

26  (Pages 101 to 104)

**www.AmericanCourtReporting.com**
**January 15, 2007**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 105

1    Q.  What was his title?
2    A.  Vice-president.  And he was
3  over operations.
4    Q.  You indicated, I don't know if
5  this is the right word, but you
6  solicited him to come back or wanted
7  him to come work for you, correct?
8    A.  Correct.
9    Q.  Had he worked for you before?
10   A.  I had worked for him.
11   Q.  All right.  Where at?
12   A.  McClendon.  He was one of my
13  bosses.
14   Q.  How long did Frank Childers
15  work at Kelly Trucking?
16   A.  I think he came in '04; that
17  was the second time.  He worked for me
18  previously and left and took a state
19  job and then he came back in '04, I
20  believe.  And he left about a week ago
21  and took another state job.
22   Q.  Are you saying state as in
23  State of Alabama?

Page 106

1    A.  Yeah.  State of Alabama,
2  correct.
3    Q.  Do you remember what years he
4  worked for you the first time?
5    A.  No.  He could answer that.
6    Q.  What did he do the first time
7  he worked for you?
8    A.  Safety.
9    Q.  Did you employ somebody for
10  safety in between Mr. Childers working
11  for you?
12   A.  Correct.  My brother, Joe
13  Kelly.
14   Q.  Do you remember what years Joe
15  worked for you?
16   A.  Not correctly.  Frank could
17  answer that, I'm sure.
18   Q.  Anybody else hold that safety
19  position?
20   A.  Yes.  But I can't think of his
21  name.  Bill -- Frank could answer it.
22   Q.  If it comes to you, feel free
23  to just blurt it out.

Page 107

1    A.  I will.  The first name is
2  Bill.
3    Q.  Who was the -- for lack of a
4  better way of saying it, who was the
5  point person at Kelly that dealt with
6  the U.S. Xpress people on a day-to-day
7  basis regarding the negotiations?
8    A.  I was.
9    Q.  How did Ahern & Associates
10  first get in touch with you?
11   A.  They contacted via telephone
12  in April.
13   Q.  When?
14   A.  In April.
15   Q.  What did they say?
16   A.  They called me out of the blue
17  and wanted to know if I was interested
18  in selling the trucking operation.  And
19  I said, yes, I would entertain the
20  idea.  And they had someone that was
21  very interested and they could complete
22  the deal very quickly, within a matter
23  of a few weeks, and they would call me

Page 108

1  back.
2    Q.  Do you remember who it was you
3  spoke with at --
4    A.  Bob Schwartz.
5    Q.  Did you have any written
6  communications with Mr. Schwartz or
7  anyone else at Ahern & Associates?
8    A.  No.
9    Q.  And he specifically said that
10  they could complete the deal in a few
11  weeks?
12   A.  He said they had plenty of
13  cash on hand and it would be a matter
14  of doing due diligence, and they could
15  complete the deal within a couple of
16  weeks, if they wanted to.
17   Q.  Had you ever entertained the
18  idea of selling Kelly Trucking before?
19   A.  Yes.
20   Q.  When was that?
21   A.  I believe it was in '02, I was
22  approached by another broker and a
23  company out of Arizona.

27 (Pages 105 to 108)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 109

1    Q.  The broker was from out of
2  Arizona or the company?
3    A.  The company was out of
4  Arizona.
5    Q.  Did you ever know the name of
6  it?
7    A.  Ken Smith Holdings, I believe.
8  The gentleman's name was Ken Smith.
9    Q.  Did you enter into any
10 negotiations with Ken Smith Holding?
11   A.  Yes.
12   Q.  Obviously, you didn't do the
13 deal?
14   A.  Correct.
15   Q.  Why were you interested in or
16 entertaining the idea of selling in
17 '02?
18   A.  I'm one of those that will
19 sell anything I got for the right
20 price.
21   Q.  Is that the same reason you
22 were interested in '05?
23   A.  Correct.

Page 110

1    Q.  Were you involved in the
2  day-to-day operations of Kelly Trucking
3  in '05?
4    A.  Yes.
5    Q.  What did you do?  What was
6  your function?
7    A.  Basically, it was what I
8  didn't do really.  When you own the
9  company, you sort of try to keep your
10 hands in every facet, if you can.
11   Q.  How would you describe Kelly
12 Trucking's financial condition in April
13 of '05?
14   A.  Solid.
15   MR. HALL:  Before I go on, I'm
16 going to knock these things out.  I
17 will show you what has been marked as
18 Defendant's Exhibit 14.  This was in
19 the production.  It indicates it is for
20 K-Diesel.
21
22   (Whereupon, Defendant's Exhibit
23     Number 14 was marked for

Page 111

1    identification and is attached to
2    the original transcript.)
3
4    Q.  (BY MR. HALL:)  Does that
5  pertain to G.F. Kelly Trucking in any
6  way?
7    A.  From what standpoint?
8    Q.  I'm just trying to figure out
9  why I got it.
10   A.  Well, it showed -- it showed
11 what I had available in liquid cash at
12 that point in time in June of '05 in
13 K-Diesel.
14   Q.  What did you mark that, 14?
15   A.  14.
16   Q.  I will show you what has been
17 marked Defendant's Exhibit 15.
18
19   (Whereupon, Defendant's Exhibit
20     Number 15 was marked for
21     identification and is attached to
22     the original transcript.)
23

Page 112

1    Q.  And there is a note at the
2  top.  Is that your handwriting?
3    A.  Yes.
4    Q.  What does it say?
5    A.  It says, actual personal
6  money.
7    Q.  What is Defendant's Exhibit
8  15?
9    A.  It is a money market account
10 in a small town bank.
11   Q.  Is that for you or who is --
12   A.  That's for K-Diesel.  I'm
13 K-Diesel, though.
14   Q.  I'm going to have to ask you,
15 what do you mean by that?
16   A.  Well, I mean, I own K-Diesel.
17 So, I mean, I'm responsible for
18 K-Diesel.  That's me.
19   Q.  I will show you what's marked
20 as Defendant's Exhibit 16 and ask if
21 you can identify that?
22
23   (Whereupon, Defendant's Exhibit

28  (Pages 109 to 112)

**www.AmericanCourtReporting.com**
**January 15, 2007**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 113

1  Number 16 was marked for
2  identification and is attached to
3  the original transcript.)
4
5      A.  My personal income tax return,
6  '03.
7
8          (Whereupon, Defendant's Exhibit
9  Number 17 was marked for
10  identification and is attached to
11  the original transcript.)
12
13      Q.  Defendant's Exhibit 17?
14      A.  My personal income tax return
15  Alabama, '03.
16
17          (Whereupon, Defendant's Exhibit
18  Number 18 was marked for
19  identification and is attached to
20  the original transcript.)
21
22      Q.  I will show you what has been
23  marked as Defendant's Exhibit 18 and

Page 114

1  ask if you can identify that, please.
2      A.  Personal income tax return,
3  '04.
4      Q.  May I see the front page
5  there?
6      A.  (Complies.)
7      Q.  What is Five Points
8  Development, Inc.?
9      A.  Oh.  That was a dry cleaners
10  that I was a part of and received some
11  compensation.
12      Q.  When you say you were a part
13  of, were you part owner?
14      A.  Correct.
15      Q.  What was it called again?
16      A.  Five Points Development,
17  Incorporated.  It was a laundromat.
18      Q.  Do you still own part of that?
19      A.  No.
20      Q.  Did you sell your interest in
21  it?
22      A.  Yes.
23      Q.  When?

Page 115

1      A.  '05, I believe.
2      Q.  Do you remember what
3  percentage you owned?
4      A.  Thirty-three percent, 33 and a
5  third.
6      Q.  Who were the other investors?
7      A.  Dennis Hamlet and Nelson
8  Chastain.
9      Q.  Was this part of -- selling
10  your interest in '05, was that part of
11  the breakup with Nelson?
12      A.  Correct.
13      Q.  What is Golf, Inc.?
14      A.  It was a golf driving range
15  that I owned part of at one point in
16  time, but no longer.
17      Q.  Was it in Auburn?
18      A.  Correct.
19      Q.  When did you sell it, sell
20  your portion of it?
21      A.  I think we closed it in '04, I
22  believe, or '05.
23      Q.  You say you closed it?

Page 116

1      A.  Closed it.  Closed it.
2      Q.  Let me show you Defendant's
3  Exhibit 19 and ask if you can identify
4  that, please.
5
6          (Whereupon, Defendant's Exhibit
7  Number 19 was marked for
8  identification and is attached to
9  the original transcript.)
10
11      A.  Income tax, personal return,
12  '04, Alabama.
13      Q.  I will show you what has been
14  marked as Defendant's Exhibit 20.
15
16          (Whereupon, Defendant's Exhibit
17  Number 20 was marked for
18  identification and is attached to
19  the original transcript.)
20
21      A.  '04, federal depreciation
22  schedule.
23      Q.  It indicates that you were

29  (Pages 113 to 116)

**www.AmericanCourtReporting.com**
**January 15, 2007**

# American Court Reporting
## toll-free (877) 320-1050

Page 117

```
 1   depreciating a race car?
 2     A.  Correct.
 3     Q.  Do you own a racing team?
 4     A.  I owned a race car operation
 5   at one point in time.
 6     Q.  What kind of race car?
 7     A.  A top alcohol dragster.
 8     Q.  Was there a company set up
 9   around that?
10     A.  No.  It was set up around me
11   individually.
12     Q.  The weather station and all
13   the other stuff on there, is that
14   related to the racing?
15     A.  Correct.  I no longer own it
16   anymore.
17     Q.  You don't own the race car any
18   more?
19     A.  Had to sell it.
20     Q.  When did you sell it?
21     A.  Last week, January '06.  '07.
22   Excuse me.
23     Q.  There you go.
```

Page 118

```
 1     A.  See if you was listening.
 2     Q.  Those were in your production,
 3   Defendant's Exhibit 21.  Do you know
 4   what those are?
 5
 6     (Whereupon, Defendant's Exhibit
 7      Number 21 was marked for
 8      identification and is attached to
 9      the original transcript.)
10
11     A.  Those were income interest
12   statements from different banks.
13     Q.  Do they just pertain to your
14   tax returns?
15     A.  Correct.  Tax return
16   information for '04.
17     Q.  Defendant's Exhibit 22.
18
19     (Whereupon, Defendant's Exhibit
20      Number 22 was marked for
21      identification and is attached to
22      the original transcript.)
23     A.  Individual tax return for Guy
```

Page 119

```
 1   Kelly, '05.
 2     Q.  Is that --
 3     A.  Federal.
 4     Q.  -- federal?  Okay.
 5
 6     (Whereupon, Defendant's Exhibit
 7      Number 23 was marked for
 8      identification and is attached to
 9      the original transcript.)
10
11     Is Defendant's Exhibit 23 your
12   personal tax return for 2005?
13     A.  Alabama, '05.
14     Q.  What was that, 23?
15     A.  23.
16     Q.  I will show you what has been
17   marked as Defendant's Exhibit 24.
18
19     (Whereupon, Defendant's Exhibit
20      Number 24 was marked for
21      identification and is attached to
22      the original transcript.)
23     A.  Georgia income tax form for
```

Page 120

```
 1   year '05, Guy Kelly.
 2     Q.  What did you earn income in
 3   Georgia for?
 4     A.  Spotting service income.
 5     Q.  May I see that?
 6     A.  (Complies.)
 7     Q.  Was the spotting service in
 8   Georgia?
 9     A.  Augusta, Georgia.
10     Q.  Were you paid by the spotting
11   service that you owned?
12     A.  The one that I was in partners
13   with Nelson.
14     Q.  I will show you what has been
15   marked as Defendant's Exhibit 25.
16
17     (Whereupon, Defendant's Exhibit
18      Number 25 was marked for
19      identification and is attached to
20      the original transcript.)
21
22     A.  Individual tax return, '05,
23   spotting service income.
```

30  (Pages 117 to 120)

## www.AmericanCourtReporting.com
## January 15, 2007

# American Court Reporting
## toll-free (877) 320-1050

Page 121

1    Q.  I think this is just tax
2  return stuff.
3    A.  Uh-huh.
4    Q.  I'm going to ask you about
5  that.  Defendant's Exhibit 26.
6
7        (Whereupon, Defendant's Exhibit
8        Number 26 was marked for
9        identification and is attached to
10       the original transcript.)
11
12   A.  That's going to be racing
13  income for the year '05.  I didn't do
14  too bad, did I?
15   Q.  No, you didn't.
16   A.  I tried to get U.S. Xpress to
17  come on board and sponsor me, but I had
18  to sell the car.
19   Q.  Defendant's Exhibit 27, I
20  think that's the last one.
21
22       (Whereupon, Defendant's Exhibit
23       Number 27 was marked for

Page 122

1        identification and is attached to
2        the original transcript.)
3
4    A.  That is spotting income, a
5  Georgia income modification for 2005,
6  income tax information.
7    Q.  Okay.  And 28, is that just
8  more of the same?
9
10       (Whereupon, Defendant's Exhibit
11       Number 28 was marked for
12       identification and is attached to
13       the original transcript.)
14
15   A.  More of the same.
16   Q.  Okay.  Defendant's Exhibit 12,
17  number five, we asked for an itemized
18  list of your damages.  I guess I need
19  to mark that.  I will show you what has
20  been marked as Defendant's Exhibit 29
21  and ask if that is your itemized list
22  of the damages that you are claiming in
23  this lawsuit.

Page 123

1        (Whereupon, Defendant's Exhibit
2        Number 29 was marked for
3        identification and is attached to
4        the original transcript.)
5
6    A.  That is a part of it.
7    Q.  Okay.  What is not included on
8  here?
9    A.  Well, there will have to be a
10  value put on ruining my credit, lost
11  earning power for the future.  I can't
12  borrow any money to amount to anything.
13  I don't have any credibility with
14  drivers anymore, as far as trying to
15  hire a fleet of drivers.  I can't
16  expand my fleet at this point in time.
17  It has pretty much ruined me for them
18  not doing what they said they were
19  going to do, as in U.S. Xpress.  It
20  ruined me financially, personally.
21   Q.  Okay.  You say it damaged your
22  credit?
23   A.  Correct.  My credit is ruined.

Page 124

1    Q.  I'm sorry.  You mentioned a
2  couple other things besides credit.
3    A.  Earning power for the future,
4  credibility with drivers and customers.
5    Q.  We will talk about these
6  things.
7        Have you put a dollar figure
8  on the amount of damage to your credit?
9    A.  We will have to let a
10  third-party determine that, be it a
11  jury or a -- or a jury.
12   Q.  Have you put a dollar figure
13  on your lost earning power?
14   A.  Well, I went from a 24 million
15  dollar company down to about a five
16  million dollar company.
17       You got to realize, David,
18  this was like a child to me.  I started
19  with a truck, trailer, and a cell phone
20  in '90.  And I grew up in a
21  single-parent home, poor as dirt, and
22  worked my way through college driving a
23  truck.  I mean, this has just been

31 (Pages 121 to 124)

## www.AmericanCourtReporting.com
## January 15, 2007

**American Court Reporting**
**toll-free (877) 320-1050**

Page 125

1  devastating. It's affected my family
2  and my health. It's affected all parts
3  of my life. I can't sleep. Imagine a
4  poor old country boy building a 24
5  million dollar company and now going
6  from be able to call a bank and say,
7  hey, I need to borrow a hundred
8  thousand dollars, I'm going to a sale.
9  And now I can't do it. I can't buy any
10  trucks. I can't buy any trailers. I
11  have had to spend every bit of my
12  savings to keep what I got going, my
13  girls' education fund. You know, I
14  could have opted to file chapter
15  whatever, but I didn't because I didn't
16  want to screw nobody. I'm not like
17  that. If I give you my word, I stick
18  to it. I'm going to pay these people
19  somehow. And, you know, the economic
20  impact to the State of Alabama in tax
21  revenue and to Randolph County in tax
22  revenue is tremendous. They lost a 24
23  million dollar company also. You know,

Page 126

1  the jobs they lost was a definite
2  impact to the area. It probably means
3  something to everybody in the State of
4  Alabama.
5      Q. When you talk about your
6  earning power, you are talking about
7  you personally, Guy Kelly, or are you
8  talking about G.F. Kelly Trucking?
9      A. Both.
10      Q. Both?
11      A. I mean, I'm one in the same.
12  I have to personally guarantee
13  everything anyway. I mean, G.F. Kelly
14  is ruined also, and it was a credible,
15  viable company and very competitive
16  with other carriers in the Southeast.
17      Q. You mentioned your health.
18  Explain to me how it has affected you
19  health-wise?
20      A. I developed a type arthritis
21  that I had to seek some medical help
22  on. I couldn't hardly walk in the
23  first part of '06. I don't know

Page 127

1  exactly the term they -- the term they
2  define it as, but it was caused from
3  fatigue and from stress. My hands were
4  swollen real bad. I had to go on an
5  antidepressant; been on it ever since
6  and still taking medicine for my feet.
7      Q. These are things that
8  attribute specifically to the
9  negotiations with U.S. Xpress?
10      A. I attribute it to the
11  misrepresentation and the misleading
12  process, because I didn't have it
13  prior. I was pretty healthy.
14      Q. What doctors have you seen?
15      A. Dr. Powers is the arthritic --
16  I'm trying to think of the description.
17  Dr. Runas Powers in Alexander City is
18  who I was seeing about the foot
19  condition. My local doctor was
20  Dr. Peterson in Roanoke.
21      Q. What did you see him for?
22      A. Having to take blood pressure
23  medicine and taking Cymbalta for

Page 128

1  depression.
2      Q. Number three on Defendant's
3  Exhibit 13 has a Dr. Matthews.
4      A. Dr. Matthews was also a doctor
5  I had to -- I actually thought I was
6  having a heart attack or a stroke and I
7  had to go to the hospital and be
8  hospitalized and run tests. He was the
9  heart doctor that I used in Opelika.
10  They put me through a series of tests.
11      Q. You mentioned it affected your
12  family. How has it affected your
13  family?
14      A. How has it not affected them?
15  I mean, I'm at home, but I'm not home.
16  I'm there physically, but mentally I'm
17  not there, because it's a constant
18  barrage every day of creditors calling
19  me wanting money and a constant barrage
20  of lawsuits, you know, I'm getting in
21  the mail.
22      When I go home, I'm mentally
23  not there for my wife or my kids. I

32 (Pages 125 to 128)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 129

1  mean, it has affected our lifestyle.
2  Imagine the perks. I have had to sell
3  my boat. I have had to sell my lake
4  lot. I have had to sell my race car
5  operation. I have had to sell my extra
6  vehicles I had. I have had to sell
7  everything I have gotten and acquired
8  over 15 years to get money just to keep
9  this operation and keep the employees
10 there that I have.
11        I have had to cash in part of
12 my kids' bank stock to help pay the
13 bills. They had a half a million
14 dollars' worth of bank stock. I had to
15 cash in one of their CDs, which was
16 $200,000. And this is all the direct
17 result of them not completing their
18 deal. If they had just done what they
19 said they was going to do, everything
20 would have been fine.
21     Q.  With regard to Kelly Trucking
22 on the lost accounts, you have got
23 Bowater and --

Page 130

1     A.  Kanoff Fiberglass was another
2  one I meant to list that I lost.
3     Q.  Not on here?
4     A.  Is Wabash Alloys, Rainbow
5  Express.
6     Q.  All right.
7     A.  I lost Lozier Corporation.
8     Q.  How do you spell that?
9     A.  L-o-z-i-e-r.
10    Q.  When did you lose Kanoff?
11    A.  The minute they heard about
12 the deal and the negotiation process
13 with U.S. Xpress, which would have been
14 in '05, I don't know the exact date,
15 they cut us off.
16    Q.  Who is your contact there at
17 Kanoff?
18    A.  I don't know at this point in
19 time, because he's retired and I don't
20 know who replaced him. We don't do any
21 business with them anymore, so I don't
22 know who it is.
23    Q.  They, you said, cut you off

Page 131

1  before or after the --
2     A.  They cut us off during. When
3  they found out I was negotiating with
4  those guys and they were buying me out,
5  they discontinued doing business with
6  me.
7     Q.  How did they hear about it?
8     A.  I don't know. Word travels
9  real fast in the transportation
10 community. How it happens sometimes is
11 beyond me.
12    Q.  Did they indicate to you what
13 it was about the negotiations that --
14    A.  I think they had done some
15 business prior with U.S. Xpress and had
16 some bad results, and they opted not to
17 do any more business with them.
18    Q.  Do you know if anyone from
19 U.S. Xpress spoke to Kanoff during the
20 negotiations?
21    A.  I do not know.
22    Q.  Is Kanoff Fiberglass like
23 Wabash Alloys, same type of fiberglass?

Page 132

1     A.  No. Wabash makes liquid
2  molten aluminum.
3     Q.  Aluminum. Okay.
4     A.  And Kanoff Fiberglass is
5  fiberglass insulation.
6     Q.  Aluminum. What does Lozier
7  do?
8     A.  Lozier makes inside store
9  shelving like that goes in Wal-Marts.
10    Q.  Back to Kanoff. Who is the
11 point person with Kanoff at Kelly
12 Trucking?
13    A.  It would have been Nelson.
14 Don Houlk, that's Kanoff Fiberglass,
15 H-o-u-l-k. He was the rep for Kanoff
16 that we dealt with, but I think he is
17 retired now. Nelson will be able to
18 tell you something about that.
19    Q.  Who dealt with Lozier?
20    A.  Nelson. Lozier.
21    Q.  Lozier. I messed that up in
22 here.
23        Do you know who he dealt with

33 (Pages 129 to 132)

**www.AmericanCourtReporting.com**
**January 15, 2007**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 133

1  at Lozier?
2      A.  David Hale.
3      Q.  H-a-l-e?
4      A.  Yes.
5      Q.  Who was Kanoff using?  Was it
6  Kelly?
7      A.  I don't know who all the
8  carriers they had, but we done a lot of
9  business with them.  They had a
10  location in Lanett, Alabama, which is
11  not but about 35 miles from Wadley.  So
12  it was just a great account for us.
13      Q.  Over the road?
14      A.  Over the road, drop box
15  freight.
16      Q.  What I was asking, was this a
17  G.F. Kelly Trucking account or was it
18  one of the other --
19      A.  It was G.F. Kelly Trucking.
20      Q.  Is that the same thing with --
21      A.  Lozier.
22      Q.  -- Lozier?
23      A.  Correct.

Page 134

1      Q.  I take it, Lozier quit using
2  Kelly?
3      A.  Correct.
4      Q.  When?
5      A.  In '05.
6      Q.  Before or after?
7      A.  Toward the -- yeah, towards
8  the end of '05, after the fact.
9      Q.  Did they indicate to you why?
10      A.  No, not to me directly.
11  Nelson could answer that.
12      Q.  Did Nelson tell you a reason
13  why?
14      A.  No.  I can't recall exactly
15  other than it was because of the
16  U.S. Xpress mess.  He will have to
17  explain that.
18      Q.  Have you put a dollar figure
19  or can you put a dollar figure on the
20  damage that Kelly Trucking suffered as
21  a result of the loss of Lozier?
22      A.  You would have access to a
23  revenue report.  I don't have it.

Page 135

1      Q.  Who would have that?
2      A.  We could probably run one for
3  the year ending '05.  All of these
4  accounts, I could get a revenue report
5  on.
6      Q.  Let me ask you this:  What is
7  it that Kelly -- what is it that U.S.
8  Xpress did wrong that caused all these
9  things?
10      A.  They misled me and led me to
11  believe that they were buying my
12  company.  And basically, I based all my
13  business decisions on what they told me
14  when I relied on them -- you know, I
15  relied on Dennis Farnsworth's word that
16  he guaranteed me that they were going
17  to buy me out, not to worry about
18  nothing.  On more than one occasion,
19  he guaranteed me that.
20      Q.  That's important.  Okay?
21      A.  That's very important because
22  I have witnesses to it.
23      Q.  You said more than one

Page 136

1  occasion, he guaranteed --
2      A.  That they would complete the
3  deal.
4      Q.  U.S. Xpress will?
5      A.  Complete the deal and acquire
6  Kelly's trucking.  He was my point of
7  contact.
8      Q.  What day did he tell you this?
9      A.  The first time?
10      Q.  Yes.
11      A.  The first time is probably
12  going to be, I think, July 22nd.
13      Q.  Where was he?
14      A.  My office in Wadley.
15      Q.  Who was present?
16      A.  At that point in time, he and
17  I.
18      Q.  And this is Dennis Farnsworth?
19      A.  Farnsworth.  The original
20  closing date was July the 15th, and he
21  continued to put it off, you know, for
22  whatever reason.
23      Q.  Prior to July 22nd, 2005, had

34 (Pages 133 to 136)

**www.AmericanCourtReporting.com**
**January 15, 2007**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 137

1  you changed the way you were operating
2  Kelly Trucking in any way?
3      A.  Ask me that again.
4      Q.  I will try.
5          Prior to July 22nd, 2005, had
6  you changed the way you operated Kelly
7  Trucking in any way based upon your
8  negotiations with U.S. Xpress?
9      A.  Yes.
10     Q.  How so?
11     A.  I backed off on some equipment
12 payments and insurance payments,
13 because it was an asset purchase that
14 they were going after, so if my assets
15 were going to be paid off, so I chose
16 to back off my payments to -- so I
17 would ensure myself getting more cash
18 out of the deal.
19     Q.  And this was prior to July
20 22nd, 2005?
21     A.  Yes.  Because he -- the
22 original closing, he told me after two
23 weeks of his first visit to the

Page 138

1  company, that he had seen all he needed
2  to see, that he wanted the company and
3  he would make it happen.
4      Q.  Two weeks --
5      A.  This was May the 12th.
6      Q.  He will make it happen?
7      A.  He will make it happen.  He
8  described three different buyout
9  options to me at that time.
10     Q.  Where was this?  Was this a
11 conversation?
12     A.  This was a meeting in my
13 office in Wadley.
14     Q.  Who was present for this
15 conversation?
16     A.  Nelson Chastain.
17     Q.  Yourself and Mr. --
18     A.  Nelson.  Nelson Chastain.  I'm
19 not sure he was present for the whole
20 meeting, but he was in there for a good
21 portion of it.
22     Q.  Did Mr. Farnsworth tell you to
23 back off your equipment payments?

Page 139

1      A.  No.
2      Q.  Did he tell you to back off
3  the insurance payments?
4      A.  No.
5      Q.  Did you seek anyone's advice
6  in doing that?
7      A.  No.
8      Q.  Explain to me how backing off
9  the payments in an asset purchase works
10 to your benefit.
11     A.  I had approximately about a
12 million dollars in equity in the
13 equipment at that point in time, so it
14 basically didn't matter to me at that
15 point in time if I backed off equipment
16 payments, because I was going to be
17 paid off either way.  It just put more
18 immediate cash in my pocket at that
19 point in time, and that's what I
20 wanted.  I didn't want to get into a
21 situation where we were haggling over
22 some issues of a piece of equipment or
23 whatever, because it was going to get

Page 140

1  paid off anyway and I would no longer
2  be in the trucking business.  And I --
3  if this deal would have got completed
4  like it was promised it would have
5  been, I would have been set for life.
6  I promise you, I wouldn't have been
7  buying no more trucks and trailers.
8      Q.  Were you going to use -- if
9  the deal closed, were you going to use
10 the money you got for the asset
11 purchase to pay off the debt that was
12 accumulated?
13     A.  The agreement of the asset
14 purchase was, they would pay off all
15 the equipment and I would receive all
16 the remaining equity left.  He
17 requested payoffs on all the equipment
18 and current payoff letters as of August
19 24th.  I remember it.
20     Q.  Were you going to reach an
21 agreement as to a dollar amount, and
22 then from that dollar amount they were
23 going to pay off the debt and you were

35 (Pages 137 to 140)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 141

1  going to get the difference?
2      A.  We were instructed by Dennis
3  to get payoff letters from all
4  financial institutions that we owed
5  money to pertaining to asset equipment
6  through November the 24th and they were
7  to pay off all that equipment.  And
8  they had done a standard evaluation
9  that Taylor Martin does for an Asset
10  Purchase Agreement, evaluating the
11  equipment.  And they were to pay --
12  they were to pay that amount for that
13  piece of equipment, and whatever equity
14  was left when the deal was totally
15  done, I would get the difference.
16      Q.  When you said it would put
17  more immediate cash in your pocket, did
18  you mean you would get to hold on to
19  the cash that you otherwise would be
20  paying to pay off the debt or are you
21  talking about on the other side of the
22  closing, cash on the other side of the
23  closing?

Page 142

1      A.  Either way, it's the same
2  thing.  I mean, me backing off on
3  payments just put the cash in my pocket
4  right then.  And I had some other deals
5  working at the time, too, you got to
6  realize, that I had made some
7  commitments based on what they told me
8  on this deal.  And I was trying to save
9  myself interest money on some of these
10  deals.  Does that make sense?
11      Q.  No.  It might to everybody
12  else in the room, but it doesn't to me
13  yet, but that doesn't mean anything.
14      A.  All right.
15      Q.  Let's go back to May 12th.
16  Dennis tells you he has seen all he
17  needs to see and he will make it
18  happen?
19      A.  And he will offer me three
20  options.  The first option was, they
21  buy all the trailers through an asset
22  purchase and then I lease all my trucks
23  to U.S. Xpress as owner/operators.  Got

Page 143

1  it?
2      Q.  Got it.
3      A.  Second option was, they buy 49
4  percent of the company and I continue
5  to run it and then phase the rest of it
6  in over a period of time.  They would
7  complete buying the rest of the company
8  stock.  Third option was a complete
9  asset sale.  They assume no
10  liabilities, they got none of the cash
11  and the receivables coming in.
12      And he called me back the next
13  week and said that they have -- he had
14  met with whoever he met with, I don't
15  know who, but they wanted to buy the
16  whole company as a complete asset
17  purchase.  And I said, okay.  And we
18  were to close by July the 15th.
19      Q.  And then the next conversation
20  is July 22, 2000?
21      A.  Well, we would have talked
22  every week.
23      Q.  Yeah.  But I'm talking about

Page 144

1  the representations.
2      A.  Oh, yes.  They flew down from
3  Chattanooga, he did, Bill Farris and
4  Wardeberg.
5
6      (Discussion off the record.)
7
8      THE WITNESS:  Jeff Wardeberg
9  and also some safety people.  Russ
10  Moore may have come down.  I can't
11  remember.  Does that sound right?  Is
12  he still with you guys?
13      MS. PATE:  He is.
14      THE WITNESS:  And I met and
15  Dennis and Bill and Jeff, discussing
16  accounts and account base.  And Nelson
17  did.  And then Nelson met with Jeff and
18  Bill at some point in time, and then
19  Dennis and I talked about some more
20  particular things.  I don't recall.
21  But they were leaving on a corporate
22  jet for Bristol for a race.
23      MR. HALL:  A race.  I hear

36  (Pages 141 to 144)

**www.AmericanCourtReporting.com**
**January 15, 2007**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 145

1  that place is loud.
2       THE WITNESS: It is fun.
3  Great place to race. Off the record.
4
5       (Discussion off the record.)
6
7       Q. (BY MR. HALL:) It was just
8  you and Dennis in that July 22, 2000
9  meeting where he --
10      A. At some point in time, yes, we
11 were together, just he and I. I think
12 they basically came down to view the
13 operation and gather information and
14 meet people. And that's the first time
15 Dennis guaranteed emphatically that
16 they were going to purchase the
17 business. That was on a Friday, July
18 22nd.
19      Q. That's the second time. Is
20 there a third time?
21      A. Yes.
22      Q. When is it?
23      A. August the 20th. I had sent

Page 146

1  Dennis an e-mail the prior week
2  basically telling him to piss or get
3  off the pot, in laymen's terms, you
4  know, either leave me alone, because
5  you are ruining my business and my
6  customers are getting nervous and my
7  drivers are getting nervous. Either
8  complete the deal or leave me alone.
9       And he called me on my cell
10 phone Saturday afternoon. And I was at
11 home. My wife answered the phone. He
12 talked to me and said, sorry for the
13 delays, the same old sorry for the
14 delay, this has been going on or
15 whatever.
16      And I said, Dennis, if you are
17 not going to buy the company, tell me
18 and just leave me alone because, I
19 said, I have to make some decisions to
20 change some stuff around. And I put it
21 on speakerphone. My wife is a witness.
22 And he said, Guy, I guarantee you and
23 promise you we are going to buy your

Page 147

1  company. He said, we are going to
2  close on August the 29th. And he said
3  Monday, there will be a team of
4  representatives coming in from the main
5  office to start the process. And
6  that's basically the gist of the
7  conversation.
8       And when he hung up, he turned
9  around and called Nelson also at home,
10 because Nelson told me the Monday that
11 he called him, too, and told him, hey,
12 we are coming in Monday, we are going
13 to complete the deal and close August
14 29th.
15      Q. And your wife was present --
16      A. My wife was present.
17      Q. -- on the speakerphone
18 conversation?
19      A. Yes. She heard it. And she
20 -- well, I won't speak for her. You
21 can talk to her tomorrow.
22      Q. Was anybody else there besides
23 you and Mrs. Kelly?

Page 148

1       A. My kids. You don't want them
2  here.
3       (Short recess.)
4
5       Q. (BY MR. HALL:) We talked
6  about the third time on the 20th on the
7  conference call. Was there a fourth?
8       A. No.
9       Q. Did anyone besides Dennis
10 Farnsworth make any representations to
11 you about the deal closing, definitely
12 closing?
13      A. Other than the -- let's see.
14 The 22nd one, they came down. When
15 Farris come in and Wardeberg, I think I
16 made a comment to the effect, oh, they
17 have brought out the big guns now,
18 y'all must be real interested. And
19 Wardeberg made the comment, well, well,
20 we wouldn't be here if we wasn't
21 interested. And that was it. He was a
22 pretty arrogant guy, to say the least.
23      Q. Wardeberg?

37  (Pages 145 to 148)

**www.AmericanCourtReporting.com**
**January 15, 2007**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 149

1    A.  Wardeberg.
2    Q.  Do you have any reason to
3  believe that Mr. Farnsworth, assuming
4  he said these things, do you have any
5  reason to believe that he did not mean
6  them when he said them?
7    A.  I can't speak for Farnsworth.
8  I mean, basically, like I said, I
9  relied on what he represented to me as
10  their actions and I pretty much relied
11  on his word.
12    Q.  Is there anything that makes
13  you think he was trying to trick you?
14    A.  Now, after the fact.
15    Q.  What?
16    A.  I mean, I really think they
17  tried to put me out of business and
18  steel my drivers.  I think it was all
19  about drivers and accounts.  He even
20  made a comment to me before, when they
21  first came in, they needed drivers real
22  bad.  They had 600 empty trucks sitting
23  on the lot.  That's a lot of trucks.

Page 150

1    Q.  Has anybody said anything to
2  you or did anybody say anything to you
3  during the negotiations or since that
4  makes you think that they were trying
5  to trick you, to put you out of
6  business so they could get your drivers
7  and your trucks besides what you have
8  already told me?
9    A.  That makes me believe that
10  this was all a sham?
11    Q.  Yes, sir.
12    A.  They have tried to hire my
13  drivers after the fact.
14    Q.  While I'm looking, I will show
15  you what has been marked Defendant's
16  Exhibits 30 and 31 which are documents
17  produced by you.
18
19      (Whereupon, Defendant's Exhibit
20      Numbers 30 and 31 were marked for
21      identification and are attached to
22      the original transcript.)
23

Page 151

1    A.  By me.
2    Q.  '93 and '92.
3    A.  Do you know what these are?
4    Q.  No.  Can you tell me what they
5  are?
6    A.  Did you read them?
7    Q.  I did read them, yeah.  What
8  are they?
9    A.  It would appear to me that
10  they are invitation to hire letters.
11    Q.  Who are they to?
12    A.  Two of my former drivers.
13    Q.  What is the date of the
14  letters?
15    A.  It says November the 16th,
16  '05.
17    Q.  And they are to?
18    A.  Lee Knight and Darrell Waldon.
19    Q.  Were they employed by you in
20  November?
21    A.  Yes.
22    Q.  They were not two that had
23  quit?

Page 152

1    A.  No.  But they were originally
2  turned down by U.S. Xpress.
3    Q.  Do you know how those letters
4  came about to be sent to those men?
5    A.  Do I know how they got sent to
6  the drivers?
7    Q.  Yes, sir.
8    A.  The driver -- I assume, if it
9  can be assumed, that U.S. Xpress sent
10  them the letters.
11    Q.  How did you get copies of
12  them?
13    A.  The drivers came to see me
14  after this was over and said that U.S.
15  Xpress tried to hire them and they
16  originally had been turned down when
17  they were there with me.
18    Q.  Did they receive anything more
19  than those letters, do you know?
20    A.  Not to my knowledge.
21    Q.  Do you know if they ever spoke
22  with U.S. Xpress?
23    A.  I couldn't answer that.  Frank

38  (Pages 149 to 152)

**www.AmericanCourtReporting.com**
**January 15, 2007**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 153

1  could answer that probably better than
2  I could.
3      Q.  Frank?
4      A.  Frank could answer that better
5  than I could.
6      Q.  Okay.  More paper than I know
7  what to do.
8
9      (Discussion off the record.)
10
11     Q.  (BY MR. HALL:)  Do you
12  recognize what I have marked as
13  Defendant's Exhibit 32?
14
15         (Whereupon, Defendant's Exhibit
16         Number 32 was marked for
17         identification and is attached to
18         the original transcript.)
19
20     A.  It looks like a drivers' list,
21  but I'm not positive.  Frank can answer
22  that better than I can.  It looks like
23  a drivers' list.

Page 154

1      Q.  Is that a list of Kelly
2  drivers?
3      A.  Yeah.  It looks like it.  Yes.
4      MR. TOMLINSON:  David, was
5  that produced by G.F. Kelly?
6      MR. HALL:  We produced it to
7  y'all.
8      MR. TOMLINSON:  I think we got
9  it, but I wasn't sure.
10     Q.  (BY MR. HALL:)  At the top,
11  it's dated 7/23/05 at 3:22 from Kelly
12  Trucking.
13     A.  That would be on Saturday.
14     Q.  If that came from Kelly
15  Trucking, who would have --
16     A.  Safety department, Frank
17  Childers.
18     Q.  Frank Childers.  Okay.
19         How many drivers did Kelly
20  Trucking have in July of '05?
21     A.  I couldn't answer that.  Frank
22  would be better qualified to answer
23  that.

Page 155

1      Q.  You indicated you had roughly
2  200 tractors.  Did you have --
3      A.  I think we would have had
4  around 200 drivers.
5      Q.  Did any of the other drivers,
6  other than the two that are reflected
7  in Exhibits -- is that 30 and 31?
8      A.  It's 30 and 31.
9      Q.  In 30 and 31, did any other
10  drivers receive any letters from U.S.
11  Xpress, to your knowledge?
12     A.  I am told, yes, by Frank.  And
13  he could answer that.
14     Q.  Have you ever heard of
15  trucking companies buying lists of
16  truckers' names?
17     A.  I haven't.
18     Q.  No?  Were you aware that
19  trucking companies send out letters to
20  prospective drivers, trying to recruit
21  them?
22     A.  I don't.
23     Q.  Are you aware of any other

Page 156

1  trucking companies doing that?
2      A.  I mean, I'm sure it may
3  happen.  I can't -- I can't answer
4  other than what I do.
5      Q.  Do you know of any Kelly
6  Trucking drivers that were employed at
7  Kelly Trucking in July and August of
8  2005 that were subsequently hired by
9  U.S. Xpress?
10     A.  I have no knowledge, no.  But
11  they wouldn't have went.
12     Q.  Why not?
13     A.  I don't think they would have
14  went because of the debacle and the way
15  it happened.  If that would have been
16  the case, I wouldn't have had 35 to
17  walk out that week.  I had the best
18  deal going at the time for those
19  particular drivers wanting to be home
20  every weekend.
21     Q.  The drivers, you mentioned 35
22  that quit.  Were the drivers opposed to
23  working for U.S. Xpress?

39 (Pages 153 to 156)

**www.AmericanCourtReporting.com**
**January 15, 2007**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 157

1     A.  I think they were skeptical.
2  And that situation is all in how it's
3  handled in any acquisition.
4        You got to remember now, I
5  have guaranteed these drivers that I
6  would be a part of the deal, and that's
7  what Dennis had assured me of.  So I
8  was a big part of a smooth transition,
9  if it would have happened.
10     Q.  Did you guarantee to Dennis or
11  anyone else at U.S. Xpress that you
12  would be able to recruit a certain
13  number of your drivers to go to work
14  for U.S. Xpress?
15     A.  I guaranteed to Dennis that I
16  would do everything in my range of
17  opportunities to retain and recruit
18  future drivers.  But they basically
19  held the advantage from that
20  standpoint.
21     Q.  They being U.S. Xpress?
22     A.  U.S. Xpress had that
23  advantage, how they treated the

Page 158

1  drivers.
2     Q.  When did you decide to quit
3  paying the -- when you say back off, do
4  you mean quit paying?
5     A.  Yeah.
6     Q.  When did you decide to quit
7  paying the equipment payments and the
8  insurance payments?
9     A.  It would have been in July.
10  And I didn't back off everything now.
11  Don't misinterpret that I backed off of
12  every payment.
13     Q.  Do you remember which ones?
14     A.  No, not offhand.
15     Q.  You indicated that you had
16  other deals or other commitments going
17  during this negotiation.
18        What was that in reference to?
19     A.  I had an opportunity to drive
20  a professional race car that fell apart
21  due to this deal.  I was led to believe
22  I had an opportunity anyway.
23     Q.  By whom?

Page 159

1     A.  Don Shumaker Racing.
2     Q.  Were there any other
3  commitments?
4     A.  I was always buying and
5  selling land and buying timber.  I was
6  doing a lot of lake lot buying, Wedowee
7  Lake, buying and selling lots and
8  building some houses.
9     Q.  You said, with regard to
10  hiring the drivers, it's all in how you
11  handle it in any acquisition.
12        Were you involved in any way
13  in the handling of the drivers in this
14  acquisition?
15     A.  Yeah.  I was having constant
16  phone calls from the drivers or either
17  I would see them when they would come
18  by the office.  I was constantly
19  reassuring them everything was going to
20  be fine, they were going to have better
21  opportunities and access to more
22  benefits, if the transition happened.
23  And I was guaranteeing to those drivers

Page 160

1  they would be home and they would be
2  treated the same, and I would still be
3  a part of the operation and they could
4  come to me if they had a problem.  And
5  Dennis assured me and I represented to
6  them him representing to me, you know,
7  that I would keep them pretty much at
8  status quo.
9     Q.  When did somebody from U.S.
10  Xpress tell you that the drivers would
11  definitely be home every weekend?
12     A.  Dennis told me that.
13     Q.  When was that?
14     A.  That was in the original
15  talking process.  I mean, that would
16  happen first thing.  When he asked me
17  what type of operation we had, that
18  probably would have happened on May the
19  22nd -- excuse me -- May the 12th.  I
20  had to describe the operation I had,
21  which was regional truckload and
22  getting the guys home every weekend.
23     Q.  How were you able to do that?

40  (Pages 157 to 160)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 161

1  How were you able to get the guys home
2  every weekend?
3      A.  Recruiting drivers in a given
4  area where you had a high concentration
5  of freight and you -- for instance, I'm
6  based in Alabama and I pull all the way
7  primary into the Virginia area.  So you
8  try to recruit drivers in the middle,
9  because you are doing this constantly
10  back and forth (demonstrating) from one
11  end to the other.  So you recruit.
12  There's a big misconception in
13  recruiting in a way unless you just got
14  to hire every driver that comes through
15  the door.  But you recruit in your
16  traffic patterns, if you want to get
17  them home every weekend.  And that's
18  what I did, I guaranteed my drivers
19  home every weekend no matter what.
20      Q.  Did Kelly drivers ever work
21  for any other companies?
22      A.  We pretty much got them out of
23  the cradle.  I'm sorry, I had to throw

Page 162

1  that in there.
2      Q.  While they were employed by
3  Kelly Trucking, did they work for any
4  other affiliated companies of yours?
5      A.  No.  They were full-time
6  employees.
7      Q.  So they never drove for --
8  what was the aluminum company?
9      A.  Kelly Aluminum Group was a
10  specific group of drivers that that's
11  all they did, if that answers that.
12  There was not any crisscrossing.
13      Q.  That's what I'm asking.
14      A.  Yeah.
15      Q.  Did Kelly drivers ever drive
16  for an affiliated company?
17      A.  No.
18      Q.  Were Kelly trucks governed?
19      A.  Yes.
20      Q.  At what speed?
21      A.  Seventy miles per hour.  With
22  the exception of owner/operators, I
23  couldn't.

Page 163

1      Q.  I will show you what has been
2  marked as Defendant's Exhibit 33.  Does
3  that appear to be a list of G.F. Kelly
4  drivers?
5
6          (Whereupon, Defendant's Exhibit
7          Number 33 was marked for
8          identification and is attached to
9          the original transcript.)
10
11      A.  It appears to be a list of
12  Kelly Trucking drivers.
13      Q.  Do you know whose notes these
14  are on here?
15      A.  Some of them is Frank's.  It
16  looks like Frank, most of Frank's.
17      Q.  Can you describe -- there is
18  different types of -- it looks like
19  different pens.  One appears to be
20  dark.
21      A.  That's mine right there,
22  Patrick Echols is timber, that means he
23  can pull timber; he has had experience

Page 164

1  pulling timber.  Does that make sense?
2      Q.  Okay.
3      A.  And there's mine again.  Some
4  of it is Frank's.  It looks like the
5  dark is going to be Frank's.
6      Q.  Okay.
7      A.  I don't know who the other one
8  is.  Frank was constantly updating
9  drivers' list to make sure who was
10  active and wasn't active, who was going
11  to be out for medical leave.
12      Q.  The list of drivers that was
13  provided by Kelly Trucking to U.S.
14  Xpress, did it include spotters as
15  well?
16      A.  You will have to ask Frank
17  about that.
18      Q.  Frank is the guy--
19      A.  Safety, he is safety and
20  personnel.
21      Q.  He knows the most about the
22  drivers' files?
23      A.  He will be able to tell you

41  (Pages 161 to 164)

**www.AmericanCourtReporting.com**
**January 15, 2007**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 165

1  the most about drivers' history and
2  drivers' files.
3      Q.  I will show you what has been
4  marked as Defendant's Exhibit 34 and
5  see if you recognize that.
6
7          (Whereupon, Defendant's Exhibit
8          Number 34 was marked for
9          identification and is attached to
10         the original transcript.)
11
12     A.  It is an e-mail from myself to
13 Dennis.
14     Q.  Okay.  The April 26th e-mail
15 from you to Dennis, sent package back
16 today.
17         What package was that?
18     A.  It would have been the back
19 page information that he was
20 requesting.
21     Q.  Did you ever receive anything
22 in writing from U.S. Xpress or anyone
23 employed by U.S. Xpress guaranteeing

Page 166

1  that they would close the deal?
2      A.  On paper?
3      Q.  Yes, sir.
4      A.  I think there should be an
5  e-mail somewhere stating the closing
6  date.
7      Q.  Okay.
8      A.  And in my mind, that's telling
9  me that they are going to buy the
10 company.
11     Q.  On this one, on the first page
12 of Exhibit 34, Mr. Farnsworth's e-mail
13 to you, the last sentence says, we are
14 interested in a potential transaction.
15         At that time, it was your
16 understanding that there was no deal
17 certain; is that correct?
18     A.  On April 22nd, yeah.  Or was
19 it -- yeah, April 22nd is when it was
20 sent.
21     Q.  Do you see where I'm talking
22 about?
23     A.  Yeah, right there.  And it was

Page 167

1  sent on April 22nd, on Friday.
2      Q.  I will show you what has been
3  marked as Defendant's Exhibit 35 and
4  ask if you can identify that, please.
5
6          (Whereupon, Defendant's Exhibit
7          Number 35 was marked for
8          identification and is attached to
9          the original transcript.)
10
11     A.  That's the CA agreement.
12     Q.  CA meaning confidentiality?
13     A.  Confidential, yeah, between
14 myself and Dennis Farnsworth and U.S.
15 Xpress dated April 18th, '05.
16     Q.  Okay.
17
18         (Whereupon, Defendant's Exhibit
19         Number 36 was marked for
20         identification and is attached to
21         the original transcript.)
22
23     Q.  36?

Page 168

1      A.  36.
2      Q.  I will show you what has been
3  marked as Defendant's Exhibit 36.
4          MR. HALL:  And I apologize, I
5  don't have an extra copy for you.
6          MR. TOMLINSON:  Sure.  That's
7  fine.
8          MR. HALL:  I got more copies
9  of stuff than I know what to do with.
10     Q.  (BY MR. HALL:)  Do you
11 recognize Defendant's Exhibit 36?
12     A.  Yes.
13     Q.  Monday, June 20th, 2005, 12:49
14 p.m. from Dennis Farnsworth to you.  Do
15 you remember receiving that e-mail?
16     A.  Yes.
17     Q.  Do you know what
18 Mr. Farnsworth was referring to when he
19 said, I received approval to move
20 forward?
21     A.  That was an approval to
22 acquire Kelly Trucking.
23     Q.  Do you know who he had to get

42  (Pages 165 to 168)

**www.AmericanCourtReporting.com**
**January 15, 2007**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 169

1  approval from?
2      A.  The big chief above.  I have
3  no idea.
4      Q.  All right.  You understood
5  that he had to get somebody else's
6  approval before he could commit to
7  anything?
8      A.  No, I don't know that that's
9  really what he had to do.  But it
10  appears that he is trying to portray it
11  that way.
12      Q.  And the next sentence, do you
13  see where he says, I will be putting
14  together an outline of a potential
15  transaction for your consideration?
16      A.  Yes.
17      Q.  Does that indicate to you that
18  there is no certainty that there will
19  be a transaction?
20      A.  The fact that he put potential
21  in there, is that what you are asking
22  me?
23      Q.  Yes.

Page 170

1      A.  That is sort of misleading,
2  according to what context -- he says, I
3  have received approval to move forward.
4  And then the sentence says, I will be
5  putting together an outline for a
6  potential transaction, meaning that he
7  has already agreed that he is going to
8  move forward with the purchase and he
9  is putting together a potential
10  transaction that may be changed.
11      Q.  That's the way you take that?
12      A.  That's the way I take that.
13      Q.  I will show you what has been
14  marked as Defendant's Exhibit 37.
15
16          (Whereupon, Defendant's Exhibit
17          Number 37 was marked for
18          identification and is attached to
19          the original transcript.)
20
21      Q.  Do you recognize this letter?
22      A.  Yes.
23      Q.  On the last page, is that your

Page 171

1  signature?
2      A.  Yes.
3      Q.  And below it, it's dated
4  6/30/05?
5      A.  Correct.
6      Q.  The letter, the first sentence
7  says, U.S. Xpress has an interest in
8  acquiring certain assets of G.F. Kelly
9  Trucking.
10          Did I read that correctly?
11      A.  Correct.
12      Q.  Skip the next sentence.  Upon
13  execution of this letter, USX will
14  continue its due diligence
15  investigation, and thereafter USX and
16  GFK would enter into negotiations for a
17  definitive agreement.
18          Did I read that correctly?
19      A.  Yes.
20      Q.  Does that indicate to you that
21  there isn't a definitive agreement?
22      A.  Does that say this agreement,
23  or they are going to present me with an

Page 172

1  agreement?
2      Q.  I'm asking you.
3      A.  It means to me that this is
4  basically a rough draft of a final
5  agreement to come.
6      Q.  Okay.  But there isn't a final
7  agreement now?
8      A.  Well, it couldn't be if he
9  said negotiations for a definitive
10  agreement.
11      Q.  If you drop down to paragraph
12  1, subparagraph A, it says, USX would
13  purchase the business and certain
14  tangible and intangible assets of GFK
15  free and clear of all liens, claims,
16  encumbrance, security interest and
17  impairments of title of any kind or
18  nature, indicating that this is what
19  they would propose to do if you go
20  forward?
21      A.  Correct.
22      Q.  This has to do with the
23  assets, certain assets of Kelly that

43  (Pages 169 to 172)

**www.AmericanCourtReporting.com**
**January 15, 2007**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 173

1 they are looking at purchasing?
2    A.  Asset purchase, correct.
3    Q.  And according to the last
4 sentence, that only occurs after an
5 appraisal and inspection of the
6 equipment by U.S. Xpress; is that
7 right?  Did I read that right?
8    A.  Correct.  Which they done.
9    Q.  Subparagraph B says, at the
10 closing of the definitive agreement,
11 USX would assume specified liabilities,
12 correct?
13    A.  Correct.
14    Q.  What does the word "would"
15 mean to you in this context?
16    A.  What the word "would" would
17 mean, in this context, means if they
18 completed the transaction, that they
19 would pay off all my debt of assets.
20    Q.  Okay.  Subparagraph E
21 indicates, at closing, USX would
22 determine whether to offer employment
23 to each of the drivers, including

Page 174

1 independent contractors of GFK existing
2 as of the closing.  The decision as to
3 whether to hire each eligible GFK
4 driver would be made by USX in its sole
5 discretion, again indicating that if it
6 closed, they would hire certain drivers
7 of Kelly Trucking.
8    Is that how you read that?
9    A.  At close, USX would determine
10 whether or not... that's the way that
11 sounds, but then this whole thing makes
12 it sound like they never intended to
13 buy the company.
14    Q.  Paragraph or subparagraph E,
15 the last sentence, the decision as to
16 whether to hire each eligible GFK
17 driver would be made by USX in its sold
18 discretion.
19    You understood that it was
20 going to qualify the drivers under its
21 standards and determine which it could
22 hire?
23    A.  Yes.  Correct.  I never -- we

Page 175

1 never received any prequalifications
2 for the drivers.
3    Q.  What do you mean by that,
4 prequalifications for the drivers?
5    A.  Well, I mean, they were
6 determined based on their hiring
7 qualifications.  So for this to really
8 go further, they never supplied us with
9 any qualifications, so this appeared,
10 to me, what you are disclosing here,
11 that did they ever intend to buy me
12 out?
13    Q.  When you signed this letter,
14 did you read it?
15    A.  Yeah.  I actually let my
16 attorney read it.
17    Q.  Which one?
18    A.  Hartley.
19    Q.  Did he tell you or did anybody
20 ever give you any indication on June
21 30th, 2005 that you had a contract for
22 the sale of your business to U.S.
23 Xpress?

Page 176

1    A.  Yes.  Dennis Farnsworth, he
2 guaranteed me that they would buy the
3 company and close the deal, not to
4 worry about the driver situation, that
5 that was something safety and personnel
6 would handle.
7    Q.  On page 3 of the letter, the
8 bottom paragraph number 3, could you
9 read that paragraph, please?
10    A.  Covenants and conditions?
11    Q.  Representations, covenants and
12 conditions, yes.
13    A.  (Complies.)  I have read it.
14    Q.  All right.  Do you see on the
15 first full sentence on page 4, closing
16 of the definitive agreement will be
17 subject to a reasonable and customary
18 conditions?
19    Did I read that correctly?
20    A.  Correct.
21    Q.  What does will be subject to
22 mean to you in this sentence?
23    A.  I don't know exactly what it

44  (Pages 173 to 176)

**www.AmericanCourtReporting.com**
**January 15, 2007**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 177

1  means in that context.
2      Q.  All right.  Do you take that
3  to mean that closing will depend upon
4  the following, the things that follow
5  in that sentence?
6      A.  Yes.
7      Q.  Roughly in the middle of that
8  -- let me see if I can find it for you.
9  It could be hard to follow this.
10         Do you see where it says,
11  satisfaction?
12      A.  Uh-huh.
13      Q.  One of the conditions is
14  satisfaction with the results of our
15  due diligence examination, meaning
16  USX's due diligence examination,
17  correct?
18      A.  That's what that says.
19      Q.  And approval by USX Board of
20  Directors?
21      A.  Correct.
22      Q.  Based upon paragraph 3
23  beginning on page 3 going to page 4, as

Page 178

1  put out in this letter of intent, did
2  you have a guaranteed contract for the
3  purchase of the assets of Kelly
4  Trucking?
5      A.  I didn't need a guaranteed
6  contract.  I had Dennis Farnsworth's
7  word.  He kept guaranteeing to me that
8  it was going to close and they were
9  going to buy the company.
10      Q.  Did you understand, in
11  paragraph 3, that only the USX Board of
12  Directors could approve the closing on
13  behalf of U.S. Xpress?
14      A.  He had got prior approval to
15  move forward in a prior document.
16      Q.  To move forward with
17  negotiations and due diligence?
18      A.  Is that what it said?  You
19  said a potential transaction.  I
20  received approval to move forward, I
21  will be putting together an outline of
22  potential transactions, which means to
23  me I will be putting together the terms

Page 179

1  of the agreement for buying the assets
2  and the values of the assets and the
3  conditions on moneys to be paid and
4  also my compensation.  We had already
5  agreed that the deal was done.
6      Q.  What was your compensation on
7  the date of that e-mail?
8      A.  There wasn't any compensation
9  on that.  He said, I will be putting
10  together an outline for your potential
11  compensation, is the way I took it,
12  which he disclosed in this agreement.
13      Q.  Had you reached an agreement
14  on the purchase price?
15      A.  He had already told me how it
16  would work as far as an amount of money
17  that I should end up with over the time
18  period.
19      Q.  Is that in writing anywhere?
20      A.  It's not in this agreement, I
21  don't think.  But if you do the -- if
22  you apply the computations of what we
23  had agreed to and applied, I think you

Page 180

1  can come up with a reasonable number
2  that we had talked about.
3      Q.  Do you remember what that
4  number was that you talked about?
5      A.  It was four and a half million
6  dollars over the time period.
7      Q.  On page 4, paragraph 5 --
8      A.  Yes.
9      Q.  -- it states, from the date
10  hereof through closing, unless
11  negotiations are terminated, GFK would
12  operate the acquired business and refrain
13  from any extraordinary transactions.
14         Do you take that if
15  negotiations terminated, from that
16  language, that there was a definitive
17  contract?
18      A.  I don't understand exactly
19  what you are asking me now.
20      Q.  Doesn't that indicate that
21  there's going to be negotiations and
22  that they can be terminated?
23      A.  I don't understand exactly

45 (Pages 177 to 180)

**www.AmericanCourtReporting.com**
**January 15, 2007**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 181

1  A. Read number 5, the conduct of
2 business?
3  Q. Yes, sir.
4  A. I mean, I operated my business
5 in a normal business fashion. Is that
6 what you are asking me?
7  Q. I'm asking if the language of
8 paragraph 5 indicates to you that there
9 is an agreement?
10  A. We have an agreement. They
11 had an agreement to buy the company.
12 Now, we are negotiating the terms of
13 the agreement.
14  Q. Okay. Flip back to the first
15 paragraph of the letter. USX writes,
16 we wish to affirm our interest in
17 setting forth the basic terms of a
18 proposed transaction. Upon execution
19 of this letter, USX would continue its
20 due diligence investigation, and
21 thereafter USX and JFK --
22  A. GFK.
23  Q. JFK is not with us anymore.

Page 182

1  -- GFK would enter into
2 negotiations for a definitive
3 agreement.
4  Does that indicate to you that
5 there is no definitive agreement?
6  A. No. We already said we had an
7 agreement; we just didn't have a final
8 agreement.
9  Q. You had an agreement that both
10 were interested, and USX was going to
11 begin its due diligence, correct?
12  A. Yes. I mean, you are telling
13 me that as of June 29th and then he
14 come back and -- Dennis come back and
15 guaranteed me they would close by July
16 the 15th.
17  Q. The next sentence says, as set
18 forth in paragraph 11 below, this
19 letter is not binding on any of the
20 parties until completion of
21 negotiations and execution of a
22 definitive agreement.
23  Was there ever a closing?

Page 183

1  A. Are you saying they never
2 intended to buy me out; is that what
3 this is saying?
4  MR. TOMLINSON: He can't
5 answer your questions.
6  THE WITNESS: Oh, he can't
7 answer my questions. All right. There
8 was never a closing, no. I gave Dennis
9 an opportunity to leave me alone and
10 bow out, and he continued to pursue me,
11 so, and continued to tell me that they
12 were going to purchase the company.
13  Q. (BY MR. HALL:) I will show
14 you what has been marked as Defendant's
15 Exhibit 38 and ask if you can identify
16 that, please. This is from your
17 production, Kelly Number 16 and 17.
18
19  (Whereupon, Defendant's Exhibit
20  Number 38 was marked for
21  identification and is attached to
22  the original transcript.)
23

Page 184

1  A. One of the original
2 conversations I had would have been in
3 April '05. That probably would have
4 been April the 12th when he was in my
5 office, because I had written it down,
6 and he had told me what I would expect
7 to receive, which is goodwill between
8 700 and 740,000, another 400,000 for
9 driver base.
10  Q. And so these are notes from
11 when?
12  A. These were the notes from the
13 meeting I had with Dennis on -- it
14 would have been a meeting we had in
15 April. I put down April '05. And he
16 was describing to me what an agreement
17 would look like as far as compensation,
18 because that's what I was writing down.
19  Q. Where do you see April '05?
20  A. Right there (indicating).
21  Q. I looked over it. Sure
22 enough. Okay.
23  A. And those were the questions I

46 (Pages 181 to 184)

**www.AmericanCourtReporting.com**
**January 15, 2007**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 185

1  was asking him, you know, what I would
2  have expected to receive.
3      Q.  Okay.  I will show you what
4  has been marked as Defendant's Exhibit
5  39 and ask if you recognize that.
6
7      (Whereupon, Defendant's Exhibit
8      Number 39 was marked for
9      identification and is attached to
10     the original transcript.)
11
12     A.  That is an e-mail from Dennis
13  to Randall.  It looks like it's going
14  to be the -- because there was an
15  addendum to the first Asset Purchase
16  Agreement for finalizing terms.  And I
17  think that's in reference to that.
18     Q.  Okay.
19     A.  That is the tractor value and
20  trailer value that Taylor Martin done.
21     Q.  I will show you what has been
22  marked as Defendant's Exhibit 40 which,
23  I believe, is the attachment.  It's

Page 186

1  dated July 26th, 2005.
2
3      (Whereupon, Defendant's Exhibit
4      Number 40 was marked for
5      identification and is attached to
6      the original transcript.)
7
8      Q.  Same date as the Tuesday
9  e-mail from Dennis to you?
10     A.  Right.  Uh-huh.
11     Q.  Does that appear -- on the
12  first page, there's a 1 and an ST
13  circled.  Is that your handwriting?
14     A.  Yes, I think.
15     Q.  Meaning that this was the
16  first version of the Asset Purchase
17  Agreement; is that what that means, the
18  handwritten note?
19     A.  I don't know if that's what
20  that meant.  I could have been taking a
21  note on something.  I mean, if you will
22  notice, I write all over everything.
23  But it may be.

Page 187

1      Q.  Sure.  Looking back at Dennis'
2  e-mail, it indicates he has attached
3  the Asset Purchase Agreement, the
4  tractor OLV.
5      What does OLV mean?  Is that
6  orderly liquidation value?
7      A.  Yes, orderly liquidation
8  value.  I had to think a minute.  Yes.
9
10     (Discussion off the record.)
11
12     Q.  (BY MR. HALL:)  And trailer
13  OLV for your review?
14     A.  Correct.
15     Q.  The next sentence says, please
16  forward to your legal representative
17  for review.
18      Did you do that?
19     A.  Yes.  It went to Wade.
20     Q.  Did you have a meeting on July
21  22nd with Dennis Farnsworth?
22     A.  Yes.
23     Q.  This is after that meeting.

Page 188

1  And it says, per our discussion
2  yesterday, I am forwarding this to you
3  so that we can head start on the review
4  process.  This is not an executed
5  agreement and this e-mail is not
6  official notice of USX's approval to
7  close the deal.
8      Did I read that correctly?
9      A.  Correct.
10     Q.  Per our discussions, you are
11  to have another conversation today with
12  Gary Hopper.  Following that
13  conversation, we will have a conference
14  call with Jeff Wardeberg, at which time
15  we will mutually decide what our next
16  steps are.
17      Did I read that correctly?
18     A.  Correct.
19     Q.  Based upon that e-mail, was it
20  your opinion that you had a definitive
21  agreement?
22     A.  No.  Based on that information
23  right there (indicating).

47  (Pages 185 to 188)

**www.AmericanCourtReporting.com**
**January 15, 2007**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 189

1    Q.  Did you review the Asset
2  Purchase Agreement?
3    A.  I would have looked at it.
4    Q.  Did you go over it with your
5  attorney?
6    A.  I don't recall exactly.
7    Q.  I will show you what has been
8  marked as Defendant's Exhibit 41.
9
10    (Whereupon, Defendant's Exhibit
11    Number 41 was marked for
12    identification and is attached to
13    the original transcript.)
14
15    Q.  Do you recognize that e-mail?
16    A.  Correct.
17    Q.  Why are you sending this
18  e-mail to Mr. Farnsworth?
19    A.  Because during -- I mean,
20  after we -- after I got that e-mail, I
21  asked Dennis again, you know, if they
22  wasn't going to do the deal, let's part
23  ways.

Page 190

1    You got to realize, now, we
2  are talking in between these e-mails,
3  too, and having conversations about the
4  deal.  And he would have told me that
5  -- and I'm trying to put the pressure
6  on them to either do something or
7  forget it so I can base my decisions on
8  other avenues to go in.
9    Q.  What other avenues did you
10  have available?
11    A.  From what standpoint?
12    Q.  Well, if they are not going to
13  do the deal, what other avenues did you
14  have available?
15    A.  Well, I mean, I basically
16  needed to make some payments.  And my
17  insurance renewal was coming up and I
18  needed to start telling my insurance
19  company to go forward with that, to
20  shop the insurance, like we do every
21  year.  Basically, just decisions.  Did
22  we want to try to increase the fleet
23  some more or did I want to -- you know,

Page 191

1  basically, which direction I wanted the
2  company going in.
3    Q.  Was anybody else interested in
4  purchasing USX -- I'm sure somebody
5  was.
6    Was anybody else interested in
7  purchasing Kelly Trucking at this time?
8    A.  I get phone calls all the
9  time.  I had gotten phone calls regular
10  from people wanting to buy, some
11  brokers, but nothing concrete.
12    Q.  Were you in negotiations with
13  anyone?
14    A.  No.  I couldn't be.
15
16    (Discussion off the record.)
17
18    Q.  (BY MR. HALL:)  On page 6 of
19  that agreement, Article 4, Closing,
20  they have indicated a date of August 8,
21  2005; is that correct?
22    A.  The closing shall be
23  consummated August 8, 2005.

Page 192

1    Q.  Were there conditions that had
2  to be met before there could be a
3  closing, do you remember?
4    A.  I don't remember offhand.
5    Q.  If you will, look back at page
6  5.  It says, the obligations of the
7  buyer, which would be U.S. Xpress,
8  hereunder are subject to the following
9  conditions having been fulfilled on or
10  before the closing date.
11    Did I read that correctly?  I
12  left off the parenthetical.
13    A.  Obligations of the buyer
14  hereunder are subject to the following
15  conditions.  Okay.
16    Q.  All right.  Section 3.2,
17  Inspections, buyer shall have completed
18  its inspection of the transferred
19  equipment and leased equipment and
20  shall be satisfied with results of such
21  inspection in its sole discretion.
22    Did I read that correctly?
23    A.  Correct.

48 (Pages 189 to 192)

**www.AmericanCourtReporting.com**
**January 15, 2007**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 193

1  Q. And you understood that USX
2  was going to make the final decision on
3  the equipment in its own discretion?
4  A. Yes. They had sent people
5  already down.
6  Q. Had they inspected all of the
7  equipment?
8  A. They had sent two gentlemen
9  down to Wadley to get a good bit of it
10  on site, and then they had also sent
11  them to some other locations where I
12  had dropped equipment.
13  Q. Do you know whether they had
14  had a chance to inspect all of it?
15  A. I couldn't attest to that.
16  Q. Section 3.6, Closing Date
17  Drivers, buyer shall be satisfied in
18  its sole discretion that there will be
19  at least 145 closing date drivers that
20  will meet buyer's qualifications for
21  hiring.
22  Did I read that correctly?
23  A. Correct.

Page 194

1  Q. At that time, had USX had a
2  chance to qualify Kelly drivers?
3  A. I don't know at what point in
4  time, but they had all my driver files.
5  We delivered them to Chattanooga.
6  Frank could answer that better than I
7  could.
8  Q. Okay. Section 3.8, Factoring
9  Payoff Letter. At any time, did you
10  ever present to USX a payoff letter,
11  factoring payoff letter?
12  A. Not to my knowledge. That was
13  if they were going to pay off the
14  factoring company.
15  Q. Section 3.9, Sales Agent, Gary
16  Hopper and seller shall have terminated
17  all contractual arrangements under
18  which Mr. Hopper has provided services
19  to seller and its affiliates, and
20  Mr. Hopper shall have entered into a
21  Sales Agent Agreement with buyer in
22  form and substance reasonably
23  acceptable to buyer.

Page 195

1  Did Mr. Hopper ever enter into
2  a Sales Agent Agreement with USX?
3  A. Not to my knowledge.
4  Q. Do you know if Mr. Hopper ever
5  would have entered into a Sales Agent
6  Agreement with USX?
7  A. I think he would have.
8  Q. Okay. Did you ever talk to
9  him about that?
10  A. Yes.
11  Q. Have we talked about that
12  already?
13  A. Yes.
14  Q. Okay. Looking back at
15  Defendant's Exhibit 41, was there a
16  response from Mr. Farnsworth about the
17  cost that you would incur if you don't
18  close by August 1st?
19  A. I don't recall exactly what
20  was said on that.
21  Q. Did you ever ask U.S. Xpress
22  to pay these things?
23  A. No.

Page 196

1  Q. Was there ever an agreement
2  that USX would pay these things?
3  A. No.
4  Q. Did you pay these things?
5  A. Yes.
6  MR. HALL: We have been going
7  a little over an hour. I need to take
8  a break.
9
10  (Short recess.)
11
12  Q. (BY MR. HALL:) When did --
13  you may have said this at the beginning
14  of this long day.
15  When did Kelly Trucking
16  actually cease operations?
17  A. I don't know the exact date.
18  It would have been '06.
19  Q. Do you remember, the beginning
20  of '06, end of '06?
21  A. It was probably the first
22  quarter of '06.
23  Q. You mentioned some companies

49 (Pages 193 to 196)

**www.AmericanCourtReporting.com**
**January 15, 2007**