# EXHIBIT 3

**Page 1**

```
1              IN THE UNITED STATES DISTRICT COURT
              FOR THE MIDDLE DISTRICT OF ALABAMA
2                      EASTERN DIVISION

3
   G.F. KELLY TRUCKING, INC., and
4  GUY KELLY, individually,

5              Plaintiffs,
                              Civil Action No.
6  v.                        C:06cv0351-MEF

7  U.S. XPRESS ENTERPRISES, INC.,
   et al.,
8
              Defendants.
9

10                    February 5, 2007

11                   Richmond, Virginia

12

13         The deposition of DENNIS FARNSWORTH, a Witness,

14  taken at the instance of the Plaintiffs, before Kimberly

15  A. Heiser, RPR, CCR, a Notary Public for the State of

16  Virginia at Large, beginning at 2:30 p.m., at Williams

17  Mullen, 1021 East Cary Street, Richmond, Virginia.

18

19

20                    COOK & WILEY, INC.
                Registered Professional Reporters
21              3751 Westerre Parkway, Suite D-1
                    Richmond, Virginia 23233
22                       (804) 359-1984

23

24

25

                    COOK & WILEY, INC.
```

**Page 2**

```
1
   APPEARANCES:
2
   Clinton G. Carter, Esquire
3  John E. Tomlinson, Esquire
   BEASLEY, ALLEN, CROW, METHVIN, PORTIS & MILES, PC
4  272 Commerce Street
   Montgomery, Alabama 36103
5  (334) 269-2343
   Counsel for the Plaintiffs
6
   David B. Hall, Esquire
7  BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, PC
   420 20th Street North
8  Birmingham, Alabama 35203
   (205) 244-3831
9  Counsel for the Defendants

10

11  ALSO PRESENT:
   Al Hingst
12
```

```
13
14
15                    E X H I B I T S
16  NUMBER  DESCRIPTION                          PAGE
17  1        Deposition notice                    40
18  2        Deposition notice                    40
19  3        Bates Nos. 208-221                  118
20  4        Bates No. 303                       118
21  5        Bates No. 285                       118
22  6        Bates No. 035                       118
23
24
25
```

COOK & WILEY, INC.  ORIGINAL COPY

**Page 3**

```
1

2         DENNIS FARNSWORTH, a Witness, called by the

3  Plaintiffs, first being duly sworn, testified as follows:

4

5         EXAMINATION BY MR. CARTER:

6

7  Q    State your full name please, sir.

8  A    Dennis Ray Farnsworth.

9  Q    Mr. Farnsworth, my name is Clint Carter, and I

10  think you know that I along with John Tomlinson and the

11  law firm of Beasley Allen represent G.F. Kelly Trucking,

12  Inc., and Guy Kelly in a lawsuit pending down in Alabama

13  against U.S. Xpress Enterprises, Inc.  Are you aware of

14  that?

15  A    Yes, I am.

16  Q    Have you ever given a deposition before?

17  A    One time before.

18  Q    You understand that you just took an oath to

19  tell the truth just like we're in front of the jury?

20  A    Yes.

21  Q    I'm going to be asking you a series of

22  questions today.  Do your best to give me a verbal answer

23  instead of a gesture or a head shake so Kimberly can get

24  everything down.  Okay?

25  A    Yes.

                    COOK & WILEY, INC.
```

**Page 4**

```
1  Q    I don't know Kimberly, but I've seen court

2  reporters get really mad if you don't do that.  Let me

3  finish my question before you start your answer.  Okay?

4  A    Okay.

5  Q    You're getting her mad already.  I'll let you

6  finish your answer before I ask you another question.

7  All right?

8  A    Okay.

9  Q    Your lawyer is here next to you.  If at any

10  time you need an opportunity to stop and talk with him or

11  to take a restroom break or whatever, I'll be glad to

12  accommodate you as long as there is not a question

13  pending.  Is that fair?

14  A    Yes.

15  Q    Before we get into the facts that gave rise to

16  this case, I want to find out a little bit about your

17  background.  Tell me, sir, where you were born and

18  raised.

19  A    McPherson, Kansas.

20  Q    Did you go to high school there?

21  A    Yes, I did.

22  Q    Where did you go to high school?

23  A    McPherson High School.

24  Q    What year did you graduate?

25  A    1970.

                    COOK & WILEY, INC.
```

1    Q    What did you do when you graduated high school?
2    A    Went to college.
3    Q    Where did you go?
4    A    Went to McPherson College for two years and
5    then Wichita State University for my final two years.
6    Q    Did you get a degree from Wichita State?
7    A    Yes, I did.
8    Q    What was it?
9    A    Bachelor's degree in business.
10   Q    What year was that?
11   A    1974.
12   Q    What did you do after you graduated?
13   A    I went to work for Champlin Petroleum Company,
14   a subsidiary of Union Pacific Corporation.
15   Q    How long were you employed there?
16   A    Seventeen years.
17   Q    What did you do for them?
18   A    Various financial roles up to assistant
19   controller.
20   Q    What year did you leave there?
21   A    1990.
22   Q    Why did you leave?
23   A    I left to take a position as a controller,
24   slash, CFO for a start-up used car business.
25   Q    What's the name of the business?

1    A    Pacific Auto Mart.
2    Q    How long did you work with Pacific Auto Mart?
3    A    One year.
4    Q    Why did you leave Pacific Auto Mart?
5    A    I saw that the business wasn't doing that
6    well, and I had made contact back with Union Pacific
7    Corporation, and they offered me a position as
8    controller with USPCI.
9    Q    How long did you hold that position?
10   A    I was with USPCI from 1991 through 1995, and
11   they -- Union Pacific elected to dispose of that
12   subsidiary, so I left at that time.
13   Q    Where did you go?
14   A    I went to work to be a personal business
15   manager for Tommy Taylor in Fort Worth, Texas.
16   Q    Who is Tommy Taylor?
17   A    Tommy Taylor is the investment -- was the
18   investment banker for the Bass family of Texas.
19   Q    Is that like Bass Pro Shops?
20   A    No.  The Bass family holds various oil and gas
21   interests and real estate across the nation.  A very
22   wealthy family.
23   Q    How long did you have that position?
24   A    1995 to 1996.
25   Q    What did you do in '96?

1    A    In 1996, I was contacted by Union Pacific
2    Corporation again and asked to come to Richmond,
3    Virginia, to become their controller in overnight
4    transportation.
5    Q    How long did you hold that job?
6    A    1996 to 1999, the end of '99.
7    Q    What happened in 1999?
8    A    In 1999, I was approached by a headhunter and
9    went to work for Union Pacific -- U.S. Xpress
10   Enterprises as their corporate controller in
11   Chattanooga.
12   Q    Are you still employed by U.S. Xpress today?
13   A    No, I'm not.
14   Q    How long did you work at U.S. Xpress?
15   A    I worked at U.S. Xpress for the year 2000, one
16   year.
17   Q    What were your duties and responsibilities when
18   you worked at U.S. Xpress?
19   A    I was the corporate controller responsible for
20   the financials, SCC reporting, accounts payable,
21   accounts receivable, asset management, billing,
22   receivables.
23   Q    And why did you leave U.S. Xpress?
24   A    Approached by a headhunter and had an
25   opportunity to go become chief financial officer for

1    Quality Distribution out of Tampa, Florida.
2    Q    How long were you with Quality Distribution?
3    A    I was there three years.
4    Q    What were your duties and responsibilities
5    there?
6    A    I was chief financial officer responsible for
7    treasury functions, planning and analysis, tax, all of
8    the general controller type duties, financial reporting,
9    SCC reporting, investment relations, accounts payable,
10   billing, fixed assets.
11   Q    How come you left that job?
12   A    I left that job to get married to a woman here
13   in Richmond, Virginia.
14   Q    She wasn't going to let you work?
15   A    No.  She could not move to Florida due to her
16   child custody issue that she had at the time.
17   Q    All right.  How were you next employed?
18   A    I was next employed here in Richmond,
19   Virginia, to a company called CPOR, C-P-O-R-E -- no,
20   C-P-O-R.  Excuse me.
21   Q    How long did you work for CPOR?
22   A    I worked for CPOR about a year and a half.
23   Q    What did you do there?
24   A    I was chief financial officer responsible for
25   all of the financial duties, the investor relations,

1  pretty much the same thing I was doing at my other jobs.
2      Q.    What kind of business was CPOR?
3      A.    CPOR was a poultry packaging solution company.
4  They integrated packaging equipment on the back end of
5  the line, so it's basically an engineering firm.
6      Q.    How big was it?
7      A.    Very small.  Total revenues were about
8  6 million annually.
9      Q.    Why did you leave there?
10     A.    I left there mainly because that was an
11 interim job for me.  I was looking for other things to
12 do.  I decided to go out and sell the program of agent,
13 slash, affiliate relationships in the transportation
14 industry, so I went to various carriers with the idea of
15 my working -- for me to work for them as an independent
16 contractor, put together the program for them.
17            I went to U.S. Xpress.  I'd worked with them
18 before.  They were one of the carriers I talked to, and
19 they were very interested in doing that, but they didn't
20 want to hire me as an independent contractor.  They'd
21 rather hire me as an employee, and I accepted.
22     Q.    When was that?
23     A.    That was in 2004.
24     Q.    Who is the person at U.S. Xpress that hired you
25 in 2004?

1      A.    Ray Harlin.
2      Q.    What was his title at that time?
3      A.    Executive vice president, chief financial
4  officer.
5      Q.    What title were you given?
6      A.    Vice president of business development.
7      Q.    How long were you a vice president of business
8  development for U.S. Xpress?
9      A.    2004 until 2006, the latter part of 2006.
10     Q.    Why did you leave in 2006?
11     A.    I was approached by a headhunter with an
12 opportunity to join a start-up 3PL -- third-party
13 logistics firm -- in Dallas, Texas, as the chief
14 financial officer.  And that appealed to me, so I took
15 that position.
16     Q.    How long did you have that job?
17     A.    I'm still in it today.
18     Q.    How much money have you paid that headhunter?
19     A.    I haven't paid that headhunter.  It's not the
20 same headhunter.
21     Q.    Well, obviously I want to focus on the time
22 that you were at U.S. Xpress, between 2004 and 2006.
23 You've given me your title, but explain to me your job
24 responsibilities and your duties there.
25     A.    My job responsibility was to facilitate the

11

1  growth of the capacity in the business through either
2  agent relationships or acquisition approach.  My job was
3  to search for companies, work with brokers who search
4  for companies, research the companies, negotiate some of
5  the terms of the deals, present those to the
6  decision-makers, and then facilitate the conversion if
7  the deal was consummated.
8      Q.    Between 2004 and 2006, how many deals did you
9  actually convert for U.S. Xpress?
10     A.    Three.
11     Q.    So that means you found three smaller trucking
12 companies and entered into this process you've been
13 describing to me, and eventually U.S. Xpress bought them
14 out or merged with them?
15     A.    Of those three, two -- number one, they were
16 all brought to us by brokers except for one.  The first
17 one was Arnold Transportation, and Arnold Transportation
18 was brought to us by a previous employee of U.S. Xpress
19 who was working at Arnold, Mike Walters.
20     Q.    Arnold Transportation was based where?
21     A.    They're based out of Jacksonville, Florida.
22     Q.    I didn't mean to interrupt you.  Go ahead.
23     A.    They're a regional carrier based out of
24 Jacksonville, Florida.  And then Total Transportation of
25 Mississippi was brought to us by a broker.

12

1      Q.    Who was that?
2      A.    Ahern & Associates.  And then Abilene Motor
3  Express, based out of Richmond, Virginia, was brought to
4  us by Davenport & Company.
5      Q.    All right.  What is Davenport & Company?
6      A.    They're a local firm who represents sellers in
7  disposing of their businesses.
8      Q.    And tell me about Ahern & Associates.
9      A.    Ahern is based out of Scottsdale, Arizona, and
10 they will either work for the seller or for the buyer.
11 We had a relationship that had started prior to my
12 joining U.S. Xpress with Ahern & Associates to represent
13 the buyer.  They would search for firms.
14     Q.    Who is the person or the persons you worked
15 with at Ahern & Associates on --
16     A.    I worked directly with Andy Ahern.
17     Q.    How big of a business is Ahern & Associates?
18     A.    I don't know.
19     Q.    Ahern & Associates is also the broker that was
20 involved in the G.F. Kelly Trucking deal, correct?
21     A.    Yes.
22     Q.    And how does it work?  Just brokers know that
23 U.S. Xpress might be looking to buy or merge other
24 carriers and if a -- does a broker get a client and then
25 come to you?  Just explain to me a little bit in your own

14

1  words how it works.
2      A    We had basically an open relationship with
3  Ahern & Associates. Ahern & Associates is out in the
4  marketplace looking for carriers to represent or to
5  sell, depending on which end of the deal they're looking
6  at getting involved in. They know U.S. Xpress and kind
7  of understand the company, so if they see something that
8  looks like it would be a fit for U.S. Xpress, they would
9  contact me.
10      Q    Did you or to your knowledge did anyone else at
11  U.S. Xpress tip off Ahern & Associates during this time
12  frame and say, Hey, we're looking to buy other companies?
13      A    We had a working relationship with Ahern &
14  Associates to look in the marketplace to acquire
15  companies.
16      Q    Do you know of other companies that Ahern &
17  Associates has been involved in that U.S. Xpress
18  acquired?
19      A    No.
20      Q    When you got there, you were just told, We've
21  got a working relationship with Ahern & Associates, and
22  that's essentially how you dealt with them, correct?
23      A    Yes.
24      Q    All right. Let's back up a little bit. Can
25  you tell me what you know about U.S. Xpress as far as

1  when the company was founded and those things?
2      A    Not directly, no.
3      Q    When is the first time you ever heard of it?
4      A    When I was contacted by a headhunter back in
5  2000.
6      Q    That's located in Chattanooga, correct?
7      A    Correct.
8      Q    Did you live in Chattanooga when you worked
9  there?
10      A    No.
11      Q    Where did you live?
12      A    Let's back up. Which job?
13      Q    Both of them. In 2000.
14      A    Okay. In 2000, I resided in an apartment in
15  Chattanooga during that time frame, and that apartment
16  was paid for by the company.
17      Q    Okay. And then from '04 to '06, where did you
18  reside?
19      A    I resided here in Richmond, Virginia.
20      Q    During the '04-'06 time frame, could you
21  estimate how many employees U.S. Xpress had?
22      A    I don't know. It would only be speculation,
23  the number of employees.
24      Q    In the business -- I mean, based on your
25  experience and what you do, is U.S. Xpress considered a

15

1  big outfit or a small outfit or a mid-level outfit? How
2  would you explain it?
3      A    They're a large truckload carrier.
4      Q    And what's your basis for having that opinion?
5      A    Well, they're a public company and they know
6  the size of the organizations that are out there, and
7  they're one of the largest truckload carriers.
8      Q    From '04 to '06, who did you report to?
9      A    Ray Harlin.
10      Q    And who did Mr. Harlin report to?
11      A    Max Fuller and Pat Quinn.
12      Q    Would you spell Max's last name for me?
13      A    F-u-l-l-e-r.
14      Q    What was his title?
15      A    Cochairman, I believe.
16      Q    And what was the other name?
17      A    Pat Quinn, Q-u-i-n-n.
18      Q    Is that a man or a woman?
19      A    Man.
20      Q    What was his title?
21      A    Cochairman.
22      Q    Did you work directly with Mr. Fuller and
23  Mr. Quinn?
24      A    No.
25      Q    In the three conversions that you mentioned to

16

1  me a second ago, who did you work with at U.S. Xpress to
2  effectuate those conversions?
3      A    I worked with Ray Harlin, Jeff Wardeberg, Russ
4  Moore, John Martin, I think -- who else? Lori Boneau,
5  Jerry Elkins, Mike Murphy, and for some reason I can't
6  think of their tax guy at this point.
7      Q    These are all employees at U.S. Xpress?
8      A    Yes.
9      Q    Out of the three that you mentioned to me,
10  which one was the largest conversion?
11      A    Arnold Transportation.
12      Q    How many trucks did Arnold have?
13      A    I think they had over a thousand.
14      Q    So you were approached by Mike Walters about
15  the possibility of U.S. Xpress --
16      A    I was not approached. Ray Harlin and Jeff
17  Wardeberg were approached.
18      Q    And they got you involved?
19      A    Yes.
20      Q    What did you do when you got involved?
21      A    My job on Arnold primarily was due diligence.
22      Q    When you say due diligence, what do you mean?
23      A    Due diligence would be to review -- be
24  involved in reviewing all their historic financial
25  information, all of their account reconciliations.

1    From -- my due diligence was primarily all financial

2    oriented.

3        Q    And when you're doing a financial due diligence

4    of a potential company out there, what is your goal?

5    What are you trying to do?

6        A    It depends on the type of acquisition that is

7    occurring. In the case of Arnold, which was a stock

8    purchase, it's a very thorough due diligence. Since you

9    will be basically assuming the balance sheet of the

10    company, you do a very thorough -- from the standpoint

11    of looking at all of the accounts, like an auditor.

12        A financial auditor would look at the accounts

13    verifying receivables, verifying -- looking at payables,

14    verifying of -- support for physical assets, financial

15    type work.

16        Q    Do you recall when you first began working on

17    the Arnold conversion?

18        A    It was in the fall of '04.

19        Q    Can you estimate how much time between when you

20    started working on it and the time when the conversion

21    was completed?

22        A    I could only estimate, but I believe it was 60

23    to probably 90 days.

24        Q    And during these 60 to 90 days, is this

25    something you're doing every day? Working on Arnold, is

1    it your main focus?

2        A    It was probably at that time about 40 percent

3    of my focus.

4        Q    Did you visit Arnold?

5        A    Yes, I did.

6        Q    How many times?

7        A    One time. That was at their Harrisburg

8    office, Pennsylvania.

9        Q    What did you do when you visited Arnold?

10        A    Basically spent the entire time locked in a

11    room similar to this conference room going through books

12    and records.

13        Q    How long were you there?

14        A    I was there one week.

15        Q    At what phase in the conversion process did

16    that take place?

17        A    Probably middle of the phase.

18        Q    What did you find out as a result of this

19    week-long review of the Arnold records?

20        A    Basically assured ourselves that the financial

21    records were -- were reasonable as far as their accuracy

22    goes, that their internal controls were in decent shape,

23    and that there was minimal risk from our point of view

24    of proceeding on with other due diligence activities.

25        Q    Those things you just listed, those are goals

19

1    you were trying to accomplish while you were there during

2    the review, correct?

3        A    Correct.

4        Q    After you finished your review and came to

5    these conclusions, to whom did you report those to?

6        A    Ray Harlin.

7        Q    Are you just giving Ray like a thumbs-up and

8    saying, It looks good down there, I think we need to go

9    forward?

10        A    I present pretty much the facts to Ray Harlin

11    as far as what I find. Ray Harlin, Jeff Wardeberg, Max,

12    and Ray -- Max and Pat are the decision-makers on the

13    deals.

14        Q    After you finished your week-long review at

15    Arnold and made your conclusions as you just described,

16    did you have any other involvement in the conversion?

17        A    No.

18        Q    All right. Let's go ahead and talk a little

19    bit about the other ones. You mentioned Abilene?

20        A    Abilene's the most recent one that was

21    completed.

22        Q    When was it completed?

23        A    That was completed in I think summer '06, late

24    summer '06.

25        Q    Was it a stock purchase as well?

20

1        A    Yes, it was.

2        Q    How many trucks did Abilene have?

3        A    Abilene has about probably around 250.

4        Q    Who got you involved in the Abilene conversion?

5        A    Davenport & Company represented their client.

6    They represented the seller to U.S. Xpress through Ray

7    Harlin to me.

8        Q    Davenport goes to Ray, Ray goes to you?

9        A    Yes.

10        Q    Did you go to Abilene?

11        A    Yes, I did.

12        Q    How many times?

13        A    Probably around six to seven times.

14        Q    Why did you go to Abilene six to seven times

15    whereas you just went to Arnold one time?

16        A    Because they're located locally here and I

17    live here in Richmond.

18        Q    It's more convenient?

19        A    More convenient.

20        Q    What I'd like to do is go through each time you

21    remember going to Abilene, and tell me as best you can

22    when it was and what you did there.

23        A    Okay. The first meeting with Abilene was

24    downtown Richmond with their selling broker to discuss

25    just general concept of -- similar to in all the deals

1  that we look at, there's an initial phase where you're
2  either on the phone or face to face, you sit down with
3  the sellers and just say, you know, Describe your
4  business.
5         They describe their business, I describe U.S.
6  Xpress's business and see if there's any reason to go
7  beyond just having that afternoon discussion.  That was
8  the first meeting with them.  So that was with Davenport,
9  Abilene, and myself.
10      Q   Okay.  Next meeting?
11      A   Next meeting would have been -- I believe it
12  was Ray Harlin and Jeff Wardeberg came to Richmond, and
13  we had another sit-down with them here in an office
14  downtown to again basically go over the exact same thing
15  I did in my first meeting.
16      Q   All right.
17      A   The third meeting was when Max Fuller came, so
18  it was Max Fuller and Ray Harlin and myself and I
19  believe Russ Moore, and it may -- I'm not certain, but
20  Ray -- Jerry Elkins or Mike Murphy.  We met at Abilene's
21  off-site facility.  They own a little house off the
22  premises, and we met there and had general discussions
23  again about the business, why this might -- may or may
24  not make sense.
25      Q   These conversations, you all are discussing the

---

1  fact that U.S. Xpress wants to convert Abilene through a
2  stock purchase, correct?
3      A   Has an interest in potentially converting
4  them, taking an ownership in them through a stock
5  purchase.
6      Q   And these meetings that you're describing are
7  part of your due diligence process, correct?
8      A   No.  These are part of the initial
9  get-to-know-you to see if it's worth going and having
10  further discussions and working out potential outlines
11  of a potential transaction.
12      Q   And that's what going on in these first three
13  meetings?
14      A   Yes.
15      Q   All right.  Let me ask you, who is Russ Moore?
16      Vice president of safety.
17      Q   And Jerry Elkins?
18      A   Vice president of I believe equipment.  I
19  don't know his exact title.
20      Q   Okay.  What's the purpose of having Russ Moore
21  at this meeting?
22      A   To discuss the driver base, description of
23  their safety program, what issues that they might
24  encounter as far as their safety program versus our
25  safety program.

---

23

1      Q   When you say driver base, what are you talking
2  about?
3      A   Company and independent contractors.
4      Q   How many trucks did Abilene have?
5      A   250 approximately.
6      Q   Does that correspond with 250 drivers or --
7      A   That's 250 trucks in service.  Some of that's
8  company drivers, some of that's independent contractors.
9      Q   So, I mean, I don't know a lot about this, but
10  if you tell me 250 trucks, am I correct or incorrect to
11  assume that means they had 250 drivers?
12      A   They had control of 250 drivers.  Some of
13  those were employees, some of those were independent
14  contractors.
15      Q   And during these conversations that you've been
16  describing for me, what, if anything, was said about what
17  would happen to those drivers if Abilene was converted?
18      A   Why don't you rephrase the question.
19      Q   Well, you're saying that you had this third
20  meeting and that Russ Moore was there and he's the vice
21  president of safety and one of his goals was to find out
22  about the driver base, correct?
23      A   Mm-hmm.
24      Q   And you said -- and you said that -- don't make
25  her mad.

---

24

1      And you've said that they had 250 trucks or 250
2  drivers, correct?
3      A   Correct.
4      Q   And my question is, did you all contemplate
5  what was going to happen with those 250 trucks and
6  drivers?  Were they going to be converted to U.S. Xpress?
7      A   On a stock purchase transaction, we were
8  contemplating with Abilene owning 49 percent of the
9  company, so therefore those drivers and their
10  contractual relationship would continue with Abilene and
11  they were Abilene's employees.
12      Q   They would not become U.S. Xpress employees?
13      A   That's correct.
14      Q   Anything else you remember about the third
15  meeting?
16      A   No.
17      Q   Okay.  Tell me about the next one.
18      A   The next one would have been a lot further
19  down the road due to -- well, in this particular
20  situation, Davenport represented the seller.  Davenport
21  had put Abilene out for bid with other carriers, so we
22  were just one of the many carriers in the bid process.
23      Q   Do you know who some of the other carriers in
24  the bid process were?
25      A   No.  They would not divulge that.

1    Q   Okay. So what happened at the fourth meeting?
2    A   Well, by the fourth meeting, we would have --
3  you had to submit your bid, which is a bid outline
4  saying these would be potential terms and conditions of
5  a transaction. So we had submitted our bid, they went
6  through their review process and came back to us with,
7  you know, their counteroffers, and we would have
8  completed some negotiation to put together a letter of
9  intent that was acceptable to Abilene and U.S. Xpress.
10       Following the execution of the letter of
11  intent, then I would -- then I was at Abilene to perform
12  due diligence at that point.
13   Q   Okay. What's the purpose of a letter of
14  intent?
15   A   The letter of intent sets out nonbinding
16  understanding of what potentially would be put together
17  in a definitive agreement.
18   Q   Kind of like a framework for the conversion?
19   A   Yes.
20   Q   Who actually drafts the letter of intent?
21   A   The letter of intent is drafted by counsel
22  that is retained by U.S. Xpress, then reviewed by
23  various parties in U.S. Xpress before it is executed by
24  a U.S. Xpress representative.
25   Q   Typically, who would execute a letter of intent

COOK & WILEY, INC.

1  on behalf of U.S. Xpress during this '04 to '06 time
2  frame?
3    A   It would be one of four individuals: Ray
4  Harlin, Jeff Wardeberg, Max Fuller, or Pat Quinn.
5    Q   What determines who does it?
6    A   It would be determined based on really
7  availability of who might be in the office at that point
8  in time when the letter of intent needed to be executed.
9    Q   Who did the one for Abilene?
10   A   Ray Harlin.
11   Q   Who did the one for Arnold?
12   A   Ray Harlin.
13   Q   Okay. Explain to me the due diligence you went
14  through for the conversion of Abilene.
15   A   Okay. Abilene was a similar structure as
16  Arnold, therefore I did a complete financial due
17  diligence review, since U.S. Xpress was acquiring
18  49 percent of the stock of Abilene. So a very thorough
19  due diligence financial review.
20   Q   How long did it take?
21   A   About two weeks.
22   Q   Is that every day?
23   A   Yes.
24   Q   Where did it take place?
25   A   Took place at Abilene's facility, in addition

COOK & WILEY, INC.

27

1  to working in my office.
2    Q   Did you do it by yourself?
3    A   Did probably 95 percent of it by myself.
4    Q   At the completion of your due diligence, this
5  two-week process you've explained to me, what did you do?
6    A   I reported to Ray Harlin the findings of my
7  due diligence.
8    Q   What were your findings?
9    A   That Abilene had a excellent financial
10  reconciliation system, financial records were in
11  excellent condition, the balance sheet and PNL and cash
12  flow represented what they said it did, and very
13  positive signs they were a very solid company.
14   Q   At what phase of the Abilene conversion did you
15  conduct your due diligence?
16   A   Probably the final 25 percent.
17   Q   After you completed your due diligence and
18  submitted your findings, did you have any other
19  involvement in the Abilene conversion?
20   A   A little.
21   Q   What did you do?
22   A   I was -- I sat in on the closing when all the
23  documents were signed, I worked with the controller on
24  putting together -- you know, setting up the type of
25  financials he was expected to provide to U.S. Xpress,

COOK & WILEY, INC.

28

1  and I introduced the individuals to their working
2  counterparts at U.S. Xpress that they would be dealing
3  with on a daily, weekly, monthly basis.
4        Let me get some water.
5    Q   Sure.
6        Tell me about working with the controller. Are
7  you talking about the controller for Abilene?
8    A   Yes.
9    Q   What did you do there?
10   A   Worked with the controller with Abilene to
11  introduce him to the controller at U.S. Xpress, go over,
12  you know, the financial reporting that he would have to
13  try to put together at the end of each month and quarter
14  to provide to U.S. Xpress.
15   Q   Is it fair to say that after you've completed
16  your due diligence and made a positive recommendation,
17  that your subsequent involvement -- your goal is really
18  to make sure the conversion gets completed, correct?
19   A   I'm one of the players in the conversion
20  process.
21   Q   You're --
22   A   Not 100 percent. I'm not 100 percent
23  responsible for all the pieces.
24   Q   I understand. I'm just really trying to focus
25  on what you're doing. I mean, you're working with the

COOK & WILEY, INC.

1  controller because you want to help him do the necessary
2  financials that will ensure that U.S. Xpress converts
3  Abilene, correct?
4      A    Yes.
5      Q    You mentioned that you introduced counterparts.
6  Tell me what you mean.
7      A    For example, on the independent contractor
8  side, our independent contract representative is John
9  Martin, and so I would invite John Martin to come to
10 Abilene to meet some of the people, let him meet with
11 them and do his -- whatever he does with them on an
12 independent-contractor side.
13
14           (Mr. Tomlinson left the room.)
15
16     A    Have, you know, the safety individuals meet
17 with the safety people to get to know each other a
18 little more and have the contacts that they need to have
19 so if they have a problem or they have questions, they
20 know who to call and talk to.
21     Q    And all this work is done with an eye towards a
22 successful conversion, correct?
23     A    That was done after conversion, after closing.
24     Q    Anything else you can remember doing before the
25 closing with Abilene that you haven't told me about?

COOK & WILEY, INC.

1      A    No.
2      Q    You mentioned a third one.
3      A    Yeah.  Total Transportation, Mississippi.
4  That was closed I believe in springtime of '05.
5      Q    Stock purchase?
6      A    Stock purchase.  49 percent stock purchase.
7      Q    What was your first involvement in that one?
8      A    Phone call from Ahern & Associates saying he's
9  got a carrier in Mississippi that looks like it would be
10 a good fit for U.S. Xpress.
11     Q    What did you do in response to that phone call?
12     A    What I did in response to that phone call is
13 we set up a phone call with the owners and have a
14 general discussion over the phone to get to know you,
15 find out more about their company, what the owners might
16 be thinking, just see if there is, you know, potential
17 for further discussion.
18           Based on that -- I didn't mention earlier
19 before, but based on those conversations, we execute a
20 confidentiality agreement before we do anything else.
21     Q    What's the purpose of the confidentiality
22 agreement?
23     A    The purpose of the confidentiality agreement
24 is to clear the path for further discussions and
25 analysis so that U.S. Xpress -- myself, primarily -- can

COOK & WILEY, INC.

31

1  have access to information that it normally would not
2  have access to under the protection of a nondisclosure
3  agreement.
4      Q    The nondisclosure agreement means that U.S.
5  Xpress cannot disclose the target of the conversion's
6  financials with the outside world?
7      A    That's correct.
8      Q    Does it work the other way?  Does U.S. Xpress
9  share its financials with the target of the conversion?
10     A    U.S. Xpress's financials are public
11 information.  They're a public company.
12     Q    Don't need a confidentiality agreement for
13 that.
14     A    No.
15     Q    Who's the person you dealt with the most for
16 the Mississippi conversion?
17     A    I dealt with John Stomps and Rick Kale and
18 Hugh Statum.  Those were the three owners.  The
19 transaction was basically purchasing.  Hugh Statum owned
20 51 percent of the company, and we purchased -- buy him
21 out at 49 percent interest.  Those are the three owners.
22     Q    Okay.  And let me back up, because I may not
23 have asked this question.  Who was the person you dealt
24 with the most during the Arnold conversion?
25     A    Eric San Martino.

COOK & WILEY, INC.

32

1      Q    Same question for Abilene.
2      A    Abilene, it was Keith Jones and Colin Jones.
3  Those were the two owners.
4      Q    Okay.  Very good.  For the -- I apologize, I've
5  forgotten the name of the Mississippi outfit.
6      A    Total Transportation.
7      Q    Total Transportation.  Did you go to Total
8  Transportation?
9      A    Yes, I did.
10     Q    How many times?
11     A    I would say four or five.
12     Q    And tell me what you remember about those
13 meetings.
14     A    Well, the first meeting was a follow-up after
15 the confidentiality agreement, a follow-up to have a
16 direct discussion of more detail of their company and
17 whether or not -- may or may not be a fit to do a
18 transaction.  That was held at their facility in
19 Jackson, Mississippi.
20     Q    Who was there?
21     A    The three owners, Hugh Statum, John Stomps,
22 Rick Kale; and from U.S. Xpress, myself and Bill Farris.
23     Q    Who is Bill Farris?
24     A    Bill Farris is the vice president of
25 dedicated.

COOK & WILEY, INC.

**Page 33**

Q   What is that?

A   They have a business unit at U.S. Xpress that focuses on dedicated contracts. A dedicated contract means that you supply the services specifically for routes for a customer, and you have the outbound and the inbound or the back haul. Everything's rolled into the contract.

Q   What was the relevance or the purpose of having him at this meeting?

A   I had Bill Farris there due to his background and experience at U.S. Xpress and Jeff Wardeberg was not available to attend.

Q   All right. Anything else you remember about that meeting?

A   No.

Q   Tell me about the next one.

A   The next meeting was with Ray Harlin, Dennis Farnsworth, Rick Kale, John Stomps, Hugh Statum. Purpose of that meeting was to attempt to work out a letter of intent.

Q   Had you presented them with a draft letter of intent or were you just talking about the details?

A   We were going through the details from an outline perspective.

Q   All right. Next meeting?

COOK & WILEY, INC.

**Page 34**

Q   The next meeting would have been myself alone beginning the due diligence after a letter of intent was executed by both parties.

Q   Kind of the process there is typically a notification from a broker to U.S. Xpress, there is an initial conversation -- let me back up.

Does the confidentiality agreement take place before you really start talking about the conversion?

A   Absolutely.

Q   That's kind of the first thing?

A   The confidentiality agreement is executed before any documents are shared.

Q   After the confidentiality agreement is executed, discussions are had, documents are shared with the goal of entering into a letter of intent, correct?

A   The goal of the discussions and the review of the documents is to determine whether or not there is an interest on both parties as well as U.S. Xpress to put together a letter of intent between the parties to move to the -- to really move to the next step, which is a real due diligence step. Up to that point, it's just reviewing documents and having discussions.

Q   The real due diligence work takes place after the letter of intent, correct?

A   Correct.

COOK & WILEY, INC.

**Page 35**

Q   All right. Tell me about your due diligence with Total Transportation.

A   Total Transportation again was a 49 percent stock purchase. It's a very thorough financial due diligence review that I performed and -- because the balance sheet -- you'd be owning 49 percent of the balance sheet and the stock. So whatever you take on that day, you're taking on history and everything else that goes with it.

Q   How long did your due diligence take for Total?

A   About two weeks of financial due diligence.

Q   Where did it take place?

A   At Jackson, Mississippi, as well as in my office in Richmond.

Q   Did you do the same thing in Total Transportation's due diligence that you've described to me for the other two?

A   Yes.

Q   Did you make a recommendation at the end of your due diligence?

A   Yes, I did.

Q   What was it?

A   My recommendation was that their financial internal controls and their financials were in very solid condition.

COOK & WILEY, INC.

**Page 36**

Q   Then what happened?

A   Then after that, we moved forward with some due diligence in other areas and safety review, driver review. And with Total Transportation, it was continued to negotiate terms and conditions for a definitive agreement.

Q   I may have asked you this: How many trucks for Total Transportation?

A   Total Transportation has about 450 trucks.

Q   How much time lapse between the completion of your due diligence and the closing?

(Mr. Tomlinson entered the room.)

A   Total Transportation was about 45 to 60 days.

Q   Is that about the average time frame?

A   It's -- in U.S. Xpress, it's typically 45, 60 days from the letter of intent.

Q   Typically, who decides what the closing date is?

A   The closing date is decided by both parties.

Q   What has to take place between the completion of the due diligence before the closing can be conducted?

A   Whatever the terms and conditions are of the contract dictate what has to take place following the

COOK & WILEY, INC.

1  due diligence period.
2      Q    And as with Abilene, did you work after your
3  due diligence but before the closing to try and
4  facilitate the conversion?
5      A    Yes.
6      Q    What are some things you did?
7      A    Well, with Arnold, there was very little in
8  the fact that you're buying the stock.  Arnold and Total
9  Transportation and Abilene is you're buying the stock of
10 the company, so after the due diligence takes place,
11 it's really meeting the terms and conditions of the
12 contract, arranging the funding and the financing to
13 purchase the stock, and the closing is transparent from
14 the standpoint that it's nothing more than a change in
15 ownership of a portion of the company.
16     Q    Okay.  I know obviously about the G.F. Kelly
17 Trucking situation, and I know about these three
18 companies that you converted between 2004 and 2006.  My
19 question is, did you attempt to convert or investigate
20 any other companies for the potential of conversion on
21 behalf of U.S. Xpress during that time frame?
22     A    Yes.  I looked at probably over a hundred
23 companies.
24     Q    How does it work that you can put the time into
25 the three conversions you just discussed to me and then

COOK & WILEY, INC.

1  be involved in the G.F. Kelly Trucking situation and
2  still look at a hundred additional companies for a
3  potential conversion?
4      A    Over the two and a half years, I normally had
5  anywhere from eight to fifteen companies on my pipeline
6  at any point in time that I was working.
7      Q    How does a company get on your pipeline?
8      A    Through -- either through the brokerage
9  process, through whatever contact was made to bring that
10 company into discussions.
11     Q    The broker typically goes to Ray first.  Is
12 that right?
13     A    No, not necessarily.
14     Q    Could go to you?
15     A    It could go to me directly.  If they knew that
16 I existed, they would contact me directly.  So over
17 time, some of the brokers knew to come directly to me.
18 But brokers typically when they're out looking will --
19 they'll approach all the large carriers directly to the
20 chief financial officer with a letter of introduction.
21     Q    If you have eight to fifteen companies in your
22 pipeline at a given time and you looked at over a hundred
23 companies in the span of two and a half years, how do you
24 decide which companies to target for a conversion?
25     A    What they do -- the process, again, is all

COOK & WILEY, INC.

1  those hundred companies at least have a telephone
2  conversation talking about their company, talking about
3  U.S. Xpress, does it make any sense, that type of thing.
4  Around probably 90 percent of that hundred, you go to at
5  least a confidentiality level agreement, at which time
6  they provide information that is asked for.
7           That process takes -- can take easily 90 days
8  where you're gathering information, having this general
9  decisions with those individuals, and a lot changes in 90
10 days.  They may -- some of the companies withdraw, we may
11 withdraw based on, Well, it's not really the type of
12 business we want to proceed into.  So that 90 days weeds
13 a lot the majority of those out during the initial
14 discussions.
15     Q    So let me make sure I've got this right.
16 You're saying that in that two and a half years, you
17 believe that you actually entered into a confidentiality
18 agreement with 90 percent of a hundred companies, or 90
19 companies?
20     A    Yes.
21     Q    What's the process for entering into a
22 confidentiality agreement?  Do you have like a standard
23 one that you use and if you have a conversation with
24 someone, you just send it to them?
25     A    Yes.

COOK & WILEY, INC.

1      Q    Can you do that on your own accord or do you
2  have to get permission or get that recommended by
3  somebody else?
4      A    To generate a confidentiality statement, I had
5  the authority to generate a confidentiality statement.
6      Q    And after the confidentiality statement has
7  been generated and sent to a potential conversion, you
8  say it's about 90 days?
9      A    90 days of gathering information and having
10 discussions.
11     Q    And when you say eight to fifteen companies in
12 your pipeline, is what you mean like during any given
13 90-day period, you may be investigating eight to fifteen
14 companies?
15     A    Yes.
16     Q    During this 90 days, you're trying to determine
17 whether or not the conversion would be practical to
18 decide whether or not to get a letter of intent, correct?
19     A    Yes.
20          MR. CARTER:  All right.  Let's take a break.
21
22          (Recess taken.)
23
24          (Exhibits 1 and 2 are marked.)
25

COOK & WILEY, INC.

1    Q    All right.  Sir, I want to show you a couple of
2    exhibits.  The first I have marked as Exhibit No. 1.
3    This is your deposition notice.  Have you seen that
4    before, sir?
5    A    Yes, I have.
6    Q    Did you undertake to determine whether or not
7    you had any documents in your possession that were
8    responsive to 1, 2, 3, 4, 5, and 6?
9    A    Yes, I did.
10    Q    And I believe what your lawyer is saying is
11    that if you had any documents that were responsive to
12    those requests, that you gave them to him and he gave
13    them to me?
14    A    Well, what I said -- what I say associated
15    with these documents is when I left U.S. Xpress, all
16    documents in my possession relating to my position were
17    left in the possession of U.S. Xpress.  I have no
18    documents.
19    Q    You didn't take none home with you?
20    A    No.
21    Q    All right.  The second exhibit I'm going to
22    show you is what's called a 30(b)(5) and (6) deposition
23    notice.  Have you seen that before, sir?
24    A    This is referencing Al Hingst.
25    Q    Well, it is, but I think what your lawyer is

COOK & WILEY, INC.

1    saying is that you're the person that's here to speak on
2    behalf of U.S. Xpress for Topics No. 1 and No. 2.
3    A    Okay.  Yes, I have seen this.
4    Q    Is it your understanding that you are the
5    person that's here to speak on behalf of U.S. Xpress for
6    Topics 1 and 2?
7    A    Yes.
8    Q    Topic No. 1 is U.S. Xpress's dealings with G.F.
9    Kelly Trucking and Guy Kelly, correct?
10    A    Correct.
11    Q    Topic No. 2 is the asset purchase agreement
12    which is the subject of the complaint, correct?
13    A    Yes.
14    Q    What is an asset purchase agreement?
15    A    An asset purchase agreement is a contractual
16    agreement related to purchasing the assets of a company
17    and not the stock or ownership interest in the company.
18    Q    The three conversions we talked about earlier
19    were stock purchases, correct?
20    A    Correct.
21    Q    And those are different than asset purchases,
22    correct?
23    A    Correct.
24    Q    What's the strategy or the thought process
25    behind whether or not U.S. Xpress wants to do a stock

COOK & WILEY, INC.

43

1    conversion a stock purchase or an asset purchase?
2    A    The first criteria or decision is made based
3    upon the size of the entity that we were dealing with.
4    To do a stock purchase, you need to be looking at
5    probably 30 million to $35 million a year revenue
6    company to consider a stock purchase.  Stock purchase
7    carries with it the risk of prior ownership issues that
8    may exist.
9    Asset purchase is you're purchasing the
10    physical selected assets of a company.  You're not buying
11    that company's stock ownership or legal structure.
12    Q    Did you ever consider converting G.F. Kelly
13    Trucking on a stock purchase basis?
14    A    Every company when we initially had
15    discussions, that was always a potential option of the
16    options we have to look at.  G.F. Kelly early on in the
17    discussions was ruled out as an option to do a
18    49 percent purchase.
19    Q    Why?
20    A    Mainly due to the size of the organization.
21    Q    What was the size?
22    A    I believe it was about 175 trucks or about
23    $24 million or so in revenue.
24    Q    Is it your testimony that G.F. Kelly Trucking
25    was ruled out as a stock purchase because they didn't

COOK & WILEY, INC.

44

1    meet this revenue threshold of 30 to 35 million?
2    A    Correct.
3    Q    Any other reason?
4    A    No.
5    Q    Are you the person that made that
6    determination?
7    A    No.
8    Q    Who made it?
9    A    That determination is made by Ray Harlin.
10    Q    Do you know whether or not U.S. Xpress has ever
11    done a stock purchase for a company that actually had
12    revenues less than 30 million?
13    A    No, I don't.
14    Q    It's your testimony that the three companies we
15    talked about previously all had revenues in excess of 30
16    to 35 million?
17    A    Yes.
18    Q    What is the first time, sir, that G.F. Kelly
19    Trucking appeared on your radar screen?
20    A    I recollect that it was in the spring of '05,
21    contacted by Ahern & Associates.
22    Q    Were you the person contacted by Ahern?
23    A    Yes.
24    Q    Do you have a recollection of that contact?
25    A    Yes.

COOK & WILEY, INC.

1    Q   Tell me what you remember about it.

2    A   The typical contact with Ahern was an initial

3   e-mail directly to me describing a potential candidate

4   that he may have, describing the number of trucks,

5   little bit of the history, the background. And then

6   that would have been followed up by a phone call to

7   Ahern if I was interested in that particular one.

8    Q   Were you?

9    A   Yes.

10    Q   Why? Let me ask that better. What was it that

11  Ahern said to you that made you interested in G.F. Kelly

12  Trucking?

13    A   When I had discussions with Ahern -- and I

14  don't remember that particular discussion. The

15  discussions with Ahern that would get us interested

16  would be transportation companies that had -- you know,

17  were larger than 15 million revenue, had a solid base of

18  drivers and customers. And from his point of view, he

19  would present those to me.

20       We'd have our discussion, and based on whatever

21  information he gathered he would share and if it seemed

22  like something that was a -- you know, met a truck load

23  carrier -- in other words, U.S. Xpress was not interested

24  in a chemical carrier, an ocean carrier, less than

25  truckload carrier. Those types of things would get ruled

---

1  out at that point.

2    Q   And it's your recollection based on your

3  conversations with Ahern that G.F. Kelly Trucking met

4  that criteria, correct?

5    A   Yes.

6    Q   What did you do next?

7    A   I would have requested Andy Ahern to set up an

8  initial phone discussion.

9    Q   Did that take place?

10    A   Yes, it did.

11    Q   Do you have a recollection of the initial phone

12  conversation with G.F. Kelly Trucking?

13    A   Just general recollection like I have with all

14  the other carriers that I talk to.

15    Q   Who else --

16    A   No specifics.

17    Q   You remember who was on the phone?

18    A   Guy Kelly.

19    Q   Who else?

20    A   That's it.

21    Q   You?

22    A   Myself and Guy Kelly would have been the only

23  parties on the telephone conversation. If he had

24  someone else, you know, there with him, I was not aware.

25    Q   And is it your testimony that you just simply

---

47

1  can't remember what was said during that conversation?

2    A   Specifics, yes.

3    Q   Generally, what do you think was said during

4  that conversation?

5    A   Generally, that conversation was the same

6  conversation I had with all the other owners. I had --

7  I would have had Guy Kelly basically walk through the

8  nature of his business, I would have walked through a

9  general overview of U.S. Xpress's business, I would have

10  finished the conversation with, you know, Are you an

11  interested seller in some capacity at this point.

12       And based on their response, if he said yes,

13  then I would have sent him a confidentiality agreement.

14  So therefore I sent him a confidentiality agreement, so

15  he would have said yes at that point.

16    Q   So I think what you're telling me is you don't

17  have a specific recollection of the conversation, but

18  based on what happened afterwards, he said yes to your

19  inquiry and you sent him some information, right?

20    A   Correct.

21    Q   Did you e-mail that information to him?

22    A   Yes.

23    Q   During the process with G.F. Kelly, was it your

24  habit to communicate with Guy Kelly through e-mail?

25    A   A combination of e-mail and direct

---

48

1  conversation.

2    Q   So you believe you sent him the confidentiality

3  agreement?

4    A   Yes.

5    Q   You believe he signed it?

6    A   Yes.

7    Q   And what happened next?

8    A   The next step, I would have put together a

9  list of items that I would like for him to provide for

10  our review. So I would have e-mailed him that list for

11  him to begin putting together that information to

12  provide to me.

13    Q   And this is the step in the process we talked

14  about earlier between the confidentiality agreement and

15  the letter of intent, correct?

16    A   Correct.

17    Q   Tell me everything you remember doing with

18  respect to the potential conversion of G.F. Kelly

19  Trucking to U.S. Xpress after the execution of the

20  confidentiality agreement until the letter of intent.

21    A   That's a -- that's a, you know, pretty long

22  period of time for me to try to go through all the

23  steps. You know, when I ask questions specifically

24  along those steps or do we have 30 minutes for me to sit

25  here and just start walking through it?

1  Q    Well, really what I'm trying to figure out, if
2  you can sit here right now and tell me and walk me
3  through it, I'd love for you to do that.  If you feel
4  like you can't do that -- I mean, we've got documents and
5  all that stuff, but I'm trying to get a feel or a sense
6  of what you remember.
7          So I'm not asking -- I mean, you recollect that
8  generally there are things you do between the
9  confidentiality agreement and the letter of intent.  What
10 I'm asking you is specifically.
11     A    Okay.  Specifically.
12     Q    Specifically for G.F. Kelly Trucking, Inc.,
13 what do you remember doing between the execution of the
14 confidentiality agreement and the letter of intent?
15     A    Okay.  All right.  From a specific point of
16 view, I recall sending him a request of documents.  I
17 recall receiving various documents over a period of
18 time.  I recall reviewing those documents and
19 determining based on those documents -- let's back up.
20     Well, I would have reviewed those documents.
21 During that time frame, I would have had various
22 conversations about pieces of those documents.  I don't
23 specifically remember those conversations.  Based on the
24 review of those documents and, you know, conversations
25 that I would have had with Guy Kelly, I would put

1  together a recommendation -- which I remember doing -- a
2  recommendation to Ray Harlin and Jeff Wardeberg of -- the
3  recommendation is really just to move to the next step,
4  which is discussions to talk about potential terms and
5  conditions.
6      Q    The recommendation that you're describing, is
7  it a written recommendation?
8      A    Yes, it is.
9      Q    Do you believe there is a document somewhere in
10 this case, a written recommendation from you along those
11 lines regarding G.F. Kelly Trucking?
12     A    Yes.
13     Q    Do you recall whether or not you reviewed that
14 written recommendation in preparation of your deposition
15 today?
16     A    No.
17     Q    Do you have a feel for a sense of how long
18 between your initial telephone conversation with Guy
19 Kelly and when you made the written recommendation was?
20     A    I could only speculate.
21     Q    What happened after you made your written
22 recommendation?
23     A    I had a visit with Guy Kelly, and I don't know
24 whether that was before the written recommendation or
25 after the written recommendation, but I made a road

50

1  trip -- as part of a road trip, I visited five other
2  carriers.  I made a road trip and stopped by and saw Guy
3  Kelly to discuss the various potential options that we
4  might entertain and to get some of his feedback to see
5  whether or not I could put together some type of a
6  transaction that might work for the parties.
7      Q    Do you recall who the other companies were that
8  you visited on that road trip?
9      A    I recall three of those.
10     Q    Tell me who you recall.
11     A    I'm not in a position to do that, since I
12 signed a confidentiality agreement with those companies.
13     Q    How did you like Wadley?
14     A    It was a -- well, I actually missed it the
15 first time I drove through it.  That's the truth.
16         MR. HALL:   I think that answered the question.
17     Q    Where did you all meet?
18     A    In Guy Kelly's office.
19     Q    Do you have a specific recollection of that
20 meeting?
21     A    Yes, I do.
22     Q    Tell me everything that you recall about that
23 meeting in Guy Kelly's office.
24     A    I remember meeting Guy Kelly, and Nelson
25 Chastain was in the meeting as well.

51

1  Q    What did you all talk about?
2      A    Well, we spent probably 20 to 30 minutes
3  talking about car racing first, because he has
4  everything on his wall --
5      Q    He showed you all his trophies and all his
6  pictures?
7      A    Couldn't help to talk about it.  Right.  So to
8  break the ice, we chatted about that a little while.
9  Then we again kind of rehashed or talked over the things
10 we'd talked about over the phone as far as, you know,
11 tell me again about your company, what it does, how it
12 does it, what does U.S. Xpress do.
13         We talked about, you know, three ways of kind
14 of looking at his company depending on, you know, how the
15 information came about.  Looking at it, one of them was a
16 potential agency relationship to where Guy Kelly would
17 keep his company as is, you know, basically lease his
18 drivers to U.S. Xpress and he would receive a commission
19 to do that.  That was one option we threw out on the
20 table just to talk about.
21         We chatted briefly about the 49 percent.  I
22 explained to him at that point in time that he was on the
23 bubble as far as that even being an opportunity, but I
24 would have to have that discussion.  And then we talked
25 about a straight asset purchase of purchasing his

52

1  equipment and his drivers, and that was the third option
2  we talked about. We left the meeting with an agreement
3  that we would continue discussions, and then I went on
4  with my road trip to meet other carriers.
5  Q During this first meeting with Guy Kelly, did
6  you make a recommendation to him as to which of the three
7  ways -- well, let me start over.
8  You and Guy Kelly discussed three ways that
9  U.S. Xpress could potentially convert or work with G.F.
10  Kelly Trucking, correct?
11  A Correct.
12  Q When you do an agency, do you still call that a
13  conversion?
14  A Yes.
15  Q So you and Guy Kelly discussed three ways that
16  U.S. Xpress could convert G.F. Kelly Trucking, correct?
17  A Yes.
18  Q I mean, that's the only thing you all are there
19  talking about, right?
20  A That's it.
21  Q Your goal in going to see him -- your announced
22  goal in going to see him was to discuss the conversion of
23  G.F. Kelly Trucking by U.S. Xpress, correct?
24  A Discuss whether or not there could be a
25  potential conversion that made sense for both parties.

COOK & WILEY, INC.

1  Q You are there holding yourself out as a
2  representative of U.S. Xpress, correct?
3  A I'm holding myself as a representative of U.S.
4  Xpress in discussing these options. During every
5  conversation I have with all owners, I make it very
6  clear that my job as VP of business development is to
7  facilitate the discussions and that all agreements or
8  anything has to be handled by the executives of the
9  company.
10  Q During this first meeting with Guy Kelly and
11  subsequent meetings with Guy Kelly, you have U.S.
12  Xpress's permission to speak on behalf of the company,
13  correct?
14  A To speak on behalf of the company as far as
15  what potential options we may have in front of us, what
16  things we may need, what activities we may need to have
17  taking place, that is correct. As far as committing the
18  company to any type of a discussion or commitment
19  decision, I have no authority to do that. I made that
20  very clear.
21  Q Who has the authority to do that?
22  A Four individuals: Ray Harlin, Jeff Wardeberg,
23  Pat Quinn, and Max Fuller.
24  Q Does the confidentiality agreement state that
25  you cannot make ultimate decisions on behalf of U.S.

COOK & WILEY, INC.

55

1  Xpress?
2  A No. The confidentiality agreement makes no
3  reference to my role in the process.
4  Q During this first meeting with Guy Kelly, did
5  he sign anything acknowledging that you didn't have the
6  ability to make decisions on behalf of the company?
7  A There was -- there was no document of that
8  nature.
9  Q You're just saying that's what you told him?
10  A Yes.
11  Q But you do agree that you're there on behalf of
12  U.S. Xpress, correct?
13  A I was an employee of U.S. Xpress, correct.
14  Q You're talking about U.S. Xpress's business to
15  Guy Kelly for potential conversion with the permission of
16  U.S. Xpress, correct?
17  A Permission of U.S. Xpress and Guy Kelly.
18  Q Well, you're not at that meeting representing
19  Guy Kelly, correct?
20  A That's correct.
21  Q You're representing U.S. Xpress, correct?
22  A Correct.
23  Q What do you remember happening next after you
24  left Guy -- after this first meeting with respect to the
25  conversion of G.F. Kelly Trucking?

COOK & WILEY, INC.

56

1  A What I remember is I think a couple weeks --
2  several weeks went by before we kicked back up
3  conversations.
4  Q What do you remember about those conversations
5  kicking back up?
6  A Conversations were, you know, providing the
7  documentation that I'd requested.
8  Q Did he provide you with everything you
9  requested?
10  A Yes, he did.
11  Q Do you remember how long between the
12  confidentiality agreement and the letter of intent?
13  A I believe it was probably around 60 days,
14  approximately in that neighborhood.
15  Q And during this time frame, you're requesting
16  documents from Guy, correct?
17  A Correct.
18  Q And Guy is providing you with documents,
19  correct?
20  A Correct.
21  Q Is it fair to say that G.F. Kelly Trucking
22  provided you with sufficient information during this
23  process such that U.S. Xpress had enough documentation to
24  in fact enter a letter of intent? Is that correct?
25  A I think we need to go backwards a little ways.

COOK & WILEY, INC.

57

1   When you ask the question did he provide me with all the
2   documentation and everything that was requested, he
3   provided that but a lot of that was incomplete,
4   especially in the order that the driver information was
5   incomplete. The supporting documentation associated
6   with the loans on the tractors and the trailers was
7   seriously incomplete.
8           As a part of that, during that period of time
9   before the letter of intent, there were other individuals
10  that met with Guy Kelly and his staff from our -- from
11  U.S. Xpress in the area of the safety side of it had
12  spent I believe a couple meetings at Wadley to -- what we
13  do during due diligence is kind of a cursory review of
14  the safety files and the driver files.
15          Back to your question is that to move to a
16  letter of intent, yes, we have to satisfy ourselves that
17  the information, whether it's whole or partial, is enough
18  for us to enter negotiations from a letter of intent
19  point of view.
20  Q    So what you're saying is U.S. Xpress was
21  satisfied enough with the documentation that G.F. Kelly
22  Trucking had provided such that it could enter into a
23  letter of intent, correct?
24  A    Yes.
25  Q    So you're saying after the confidentiality

COOK & WILEY, INC.

58

1   agreement and before the letter of intent, there were
2   others with U.S. Xpress that met with Guy Kelly and other
3   officials at G.F. Kelly Trucking, correct?
4   A    Correct.
5   Q    You mentioned safety, so I'm guessing Russ
6   Moore was involved?
7   A    Yes.
8   Q    What did he do to your knowledge before the
9   letter of intent?
10  A    To my knowledge, before the letter of intent,
11  he spent one day there reviewing driver files that were
12  available there on the location.
13  Q    Okay. So it's your testimony that before the
14  letter of intent was entered into, that Russ Moore on
15  behalf of U.S. Xpress was given access to and did review
16  the driver files for G.F. Kelly Trucking, correct?
17  A    That is my recollection.
18  Q    Did you speak to Russ Moore after he reviewed
19  these driver files?
20  A    Yes, I did.
21  Q    What did he say to you?
22  A    Russ Moore said that the driver files were
23  somewhat incomplete. When Frank Childers was asked
24  where are the files, he said that they were destroyed in
25  a tornado that occurred in 2004, and you could

COOK & WILEY, INC.

59

1   physically see a building that had been destroyed. Had
2   no verification whether that was true or not.
3           But that, you know, there was issues in the
4   driver files due to missing data that would have to be
5   either completed to, you know, his satisfaction or an
6   explanation of whatever that had to support what that
7   driver was about before we could really do any type of a
8   due diligence.
9   Q    So before the letter of intent, Russ Moore went
10  to Wadley to physically review the driver files, correct?
11  A    That's my recollection.
12  Q    And I think what I hear you saying is that some
13  driver files were available and some were not, correct?
14  A    Correct.
15  Q    And it's your understanding from Russ Moore
16  that some driver files were not available because they
17  were destroyed in a tornado, correct?
18  A    Per Frank Childers and Guy Kelly.
19  Q    Did you ever discuss with Frank Childers this
20  problem with driver files being destroyed in a tornado?
21  A    Yes.
22  Q    Was that before the letter of intent or after?
23  A    I'm not certain.
24  Q    Tell me what you what are you certain of. What
25  do you remember about that conversation?

COOK & WILEY, INC.

60

1   A    I just remember having conversation with Frank
2   Childers about his driver files were missing and that --
3   you know, where were the files and what was going on
4   with the files. It was his response that they were
5   destroyed by the tornado, that those files were not
6   available.
7   Q    Do you feel like U.S. Xpress understood that
8   for whatever reason there were a certain number of driver
9   files that were not going to be available? Did U.S.
10  Xpress understand that before the letter of intent was
11  entered into?
12  A    I really don't -- I really don't know.
13  Q    So the question is --
14  A    I can only speculate, you know, and -- like I
15  say, I really don't know the timing.
16  Q    Right. And I'm just getting there because you
17  said you think this meeting with Russ Moore --
18  A    I believe it was before the letter of intent.
19  Q    And certainly Russ --
20  A    Based on my recall, but I'm not certain.
21  Q    All I want to know is what you remember.
22  A    Right. That's all I -- I remember there was a
23  meeting, I remember -- and I'm not certain whether it
24  was before or after the letter of intent.
25  Q    But it was at that meeting that Russ Moore

COOK & WILEY, INC.

1  learned that there were some driver files that could not
2  be accessed, correct?
3      A   Yes.  Yes.
4      Q   Do you remember other U.S. Xpress employees
5  going to Wadley to meet with G.F. Kelly Trucking
6  officials before the letter of intent was entered into?
7      A   There was a meeting -- I don't know whether it
8  was before the letter of intent or after.  I don't
9  recall.  There was a meeting right around that time
10 frame when -- that was when Russ Moore came.  It was
11 Russ Moore, myself, Jeff Wardeberg, I think Bill Farris
12 came to that meeting, I think Mike Murphy -- might have
13 been Mike Murphy or Jerry Elkins.  I don't know which
14 one.
15     Q   Who is Mike Murphy?
16     A   He works for Jerry Elkins in the equipment
17 side.  That's what I recall.  I don't know specifically
18 all the people there.  We had a plane full we took down
19 there, a company plane.
20     Q   And you all were down there for one day?
21     A   One day.
22     Q   Didn't want to spend the night in Wadley?
23     A   No.
24     Q   And, again, you think this was before the
25 letter of intent, correct?

COOK & WILEY, INC.

1      A   It was right around that time frame.  It could
2  have been just before or just after, but I really don't
3  recall.  I just know it was right around that time
4  frame.
5      Q   But regardless, we know that a letter of intent
6  was entered into between U.S. Xpress and G.F. Kelly
7  Trucking, correct?
8      A   Correct.
9      Q   And if it proceeded like you told me these
10 other conversions did, after the letter of intent was
11 executed, you began your due diligence, correct?
12     A   Correct.
13     Q   How many times did you visit Wadley in the
14 process of your due diligence?
15     A   What I recall is I think three times.
16     Q   Tell me what you recall about the first time.
17     A   First time, I spent -- the first time, I
18 believe I spent an entire week there primarily looking
19 at financials and receivables, but really this is
20 different.  Since it's an asset purchase, I really
21 didn't focus on financials in general because I'm buying
22 the assets.  You know, the financials are his.
23         I focused primarily on trying to look at the
24 debt instruments associated with the equipment, since
25 there would be a payout associated with that to pay off

COOK & WILEY, INC.

63

1  the liens.  So I worked with Randall Fant I believe
2  during that time frame, looked at that, and I also
3  focused on looking at their accounts receivable to get a
4  handle on the type of customer, since we were also
5  looking at purchasing the accounts receivable as part of
6  the asset purchase.
7      Q   This week that you spent as part of your due
8  diligence, do you remember what month that was?
9      A   I believe it was toward the end of July.
10     Q   What was your understanding of Randall Fant's
11 title?
12     A   Randall Fant was -- was new on board and was a
13 financial person for the company.  He really didn't have
14 a title that was really presented to me, but he was
15 responsible for the financial reports, accounts payable,
16 accounts receivable activities.
17     Q   You did this review on-site?
18     A   Yes.
19     Q   Like in a conference room?
20     A   No.  They didn't have a conference room.  They
21 were an old department store.  I did it in one -- I
22 think their salesman's office I think is what I used.
23 He was out of town.
24     Q   Was Guy Kelly there this week?
25     A   50 percent of the time.

COOK & WILEY, INC.

64

1      Q   Would he come check in on you and say Hey and
2  all that stuff?
3      A   No.
4      Q   Would you all talk to each other while you were
5  doing your review?
6      A   Usually if I needed -- had a question or
7  something, I would go chat with him or Nelson.  Those
8  were my two individuals that I discussed to clarify.
9      Q   Would Guy ask you things like, How's your
10 review coming, how is everything looking during this
11 process?
12     A   No, not -- no.
13     Q   What about Nelson?
14     A   No.
15     Q   After you finished this -- during your first
16 visit for your due diligence, after you completed this
17 week, did you talk to Guy or Nelson and say, I'm finished
18 and this is what I've found or --
19     A   Yes.
20     Q   -- or give them any conclusion?
21     A   Yes.
22     Q   Tell me what you remember saying to them after
23 you concluded your week-long due diligence there in
24 Wadley.
25     A   What I recall is I was having significant

COOK & WILEY, INC.

65

```
1   trouble getting the leases and the debt instruments on
2   the assets, and I conveyed that. I recall conveying
3   that to Nelson Chastain, who told me that he's sorry for
4   that but that the previous controller was basically a
5   dud and they had to terminate him.
6       Q    Who was that, do you know?
7       A    Dennis Hamlet. And that the records were out
8   of -- well, the records were in poor shape and Randall
9   had been hired to get everything back into shape. And I
10  recall telling Guy that, you know, we couldn't even
11  consider moving forward at all unless he gets me all of
12  the loan documentation, because each loan documentation
13  has different covenants or issues that deal with what
14  you can or cannot do as far as early payoff goes.
15      Q    And when you told Guy that, what did he say?
16      A    He said pretty much the same thing Nelson did,
17  that it was a mess, said he had every title in his
18  drawer to every piece of equipment, he could tell me
19  about that piece of equipment and, you know, who was on
20  the loan; but as far as a loan documents go, I would
21  have to work with Randall, and Randall -- he said he
22  would tell Randall to give it his all to try to gather
23  all that information.
24      Q    What did you say to Guy after he told you that?
25      A    I said, Fine, you need to pull together all
```

COOK & WILEY, INC.

```
1   that information. Before we can consider going further
2   on any other steps, you need to gather that information.
3       Q    Anything else you remember saying to Guy or
4   Nelson before you left?
5       A    No.
6       Q    What's the next thing you did -- well, let me
7   ask you this: After you completed this week review of
8   documents and whatnot in Wadley as part of your due
9   diligence, did you make a recommendation to anyone at
10  U.S. Xpress?
11      A    Yes.
12      Q    What did you do?
13      A    Basically recapped the -- reviewed the
14  structure again and how the deal might work and put
15  together a -- you know, I put together a summary that
16  said here are, you know, the facts as I know them and
17  based on the facts, we should continue on with the
18  process.
19      Q    Was that a written summary?
20      A    Yes.
21      Q    When you would write stuff, would you type it
22  or e-mail it or how did it work?
23      A    I usually would type it in Word and attach it
24  via e-mail and send it. I was not in Chattanooga that
25  often, so I would deliver things typically by e-mail.
```

COOK & WILEY, INC.

67

```
1       Q    So after your week-long review in Wadley, you
2   did a summary of G.F. Kelly for U.S. Xpress and
3   recommended that they move forward with the conversion
4   process, correct?
5       A    Move forward with the continued negotiation
6   process and the steps leading up to the definitive
7   agreement.
8       Q    Well, all that's part of the conversion
9   process, isn't it?
10      A    Right. But it's not -- I did not make any
11  recommendation to say, you know, based on these facts,
12  we have enough information to say close. All I have is
13  enough facts to say based on these facts, it still looks
14  like a worthy transaction and let's proceed with further
15  due diligence and negotiations on the terms and
16  conditions.
17      Q    And you did that in a written document,
18  correct?
19      A    Yes.
20      Q    And you think that was towards the end of July?
21      A    I believe so.
22      Q    What happened next in the conversion process?
23      A    I'd like to request a restroom break.
24      Q    Granted.
25
```

COOK & WILEY, INC.

68

```
1       (Recess taken.)
2
3       Q    What happened next in the conversion process?
4       A    I'm trying to remember. I would like to back
5   up just a little bit. You keep using the term
6   conversion process. Conversion process -- you know, in
7   defining how that works, you don't have a conversion
8   process until you have a closing, as explained in the
9   other three contracts that we did.
10          You asked what I did after the closing as far
11  as the conversion goes to continue on. There is no
12  conversion happening at this point in time. I'd like to
13  make that on the record as far as Guy Kelly and G.F.
14  Kelly Trucking goes.
15      Q    So in your nomenclature, the conversion process
16  starts after the closing?
17      A    Correct.
18      Q    All right. And what name or phrase do you use
19  to describe the process that we're going through right
20  now?
21      A    Due diligence, defining due diligence as you
22  have a letter of intent, which is a document that
23  outlines the understanding of the parties but is not a
24  contractual agreement that is binding upon those
25  parties.
```

COOK & WILEY, INC.

1   Q.    Okay.

2   A.    Okay? And then you have a contract that will

3   set out terms and conditions of a contract to go to

4   actual closing. Just like if you bought a home, to

5   where you sit down and sign the closing documents and

6   then you have conversion at the time you sign the

7   closing documents, then you physically move your

8   household goods into the house.

9         So I would like to put that definition in

10  there, because that term was used many times during this

11  process. Okay?

12  Q.    Gotcha. I appreciate that.

13        We've talked about the week you spent in Wadley

14  for your due diligence, and we've talked about your

15  conversation with Guy and Nelson.

16  A.    Right.

17  Q.    At the completion of that, we've talked about

18  the written summary that you gave to say go forward, and

19  then I think I asked you what happened next --

20  A.    Right. Right.

21  Q.    -- in your due diligence process.

22  A.    Correct. During -- after that recommendation,

23  then there was negotiation between Guy Kelly and U.S.

24  Xpress -- U.S. Xpress being myself -- as far as to

25  potential terms and conditions of an agreement. So that

---

1   was going on at the same time as other due diligence

2   activities which would have concentrated around

3   equipment review and driver file review.

4   Q.    Who's doing the due diligence on the equipment

5   review and the driver file review?

6   A.    The driver file review was performed by our

7   safety department, which was headed up by Russ Moore.

8   At that time, as part of the due diligence, Guy Kelly

9   had provided all the driver files with all the

10  information that he had available, had been provided to

11  U.S. Xpress, and was in U.S. Xpress's possession in

12  Chattanooga.

13  Q.    Okay.

14  A.    Okay?

15  Q.    What about with respect to the due diligence on

16  the equipment, who handled that?

17  A.    Jerry Elkins, Mike Murphy. And part of that

18  due diligence, they reviewed equipment on-site as well

19  as at several locations where Guy Kelly had equipment.

20  Q.    And is the purpose of that just to check out

21  the condition of the equipment to help you all determine

22  what it's worth?

23  A.    Yes, what it's worth or whether the equipment

24  could actually be used based on our specs.

25  Q.    And while that due diligence is going on,

---

1   you're negotiating with Guy on behalf of U.S. Xpress,

2   correct?

3   A.    Negotiating potential terms and conditions on

4   behalf of U.S. Xpress.

5   Q.    Give me some examples of potential terms and

6   conditions that you and Guy were negotiating during that

7   time frame.

8   A.    During that time frame, we negotiated the

9   initial number of drivers. The way we approached the

10  contract was an asset purchase, and Guy Kelly wanted --

11  additionally wanted goodwill in his terms, what he

12  defined as goodwill; goodwill being moneys that are

13  associated with the general valuation of the company or

14  what it's all about. There's really no specific assets

15  you can put the value on.

16        So we looked at -- I looked at and talked with

17  Guy Kelly about the concept of how many drivers that he

18  would get signed on, in addition to a continuing

19  relationship to maintain that driver base. In that

20  concept, I explained to him that really the drivers and

21  the continuing relationship to continue to keep drivers

22  or grow drivers is what I would term goodwill. The

23  physical asset purchase had to do with the physical

24  pieces of equipment, the tractors and the trailers and

25  the accounts receivable.

---

1   So we had discussions along those lines of how

2   many drivers could he potentially -- out of his 175 to

3   200 drivers, how many could he believe based on

4   discussion that he had had with safety people at U.S.

5   Xpress on how many drivers he thought he could really

6   qualify within U.S. Xpress's guidelines.

7   Q.    In the context of the stock purchase, earlier I

8   think you told me that the drivers would remain employed

9   by whoever they were with before the stock purchase,

10  correct?

11  A.    Correct.

12  Q.    But what I hear you saying is with an asset

13  purchase, it's different?

14  A.    It's different.

15  Q.    How is it different?

16  A.    It's different in that the drivers have to

17  become employed by U.S. Xpress or independent -- sign on

18  as independent contractors under U.S. Xpress operating

19  authority. So they have to meet standards of U.S.

20  Xpress.

21  Q.    Is that always the situation with an asset

22  purchase?

23  A.    Yes.

24  Q.    Did you understand early on in the due

25  diligence process that if there was a conversion, the

73

1  drivers would go to work for U.S. Xpress?
2      A    They would go to work for -- if U.S. Xpress
3  would own the assets, they would have become employed
4  within the U.S. Xpress umbrella, yes.
5      Q    Did you explain that to Guy Kelly?
6      A    Yes.
7      Q    Did you and Guy Kelly negotiate a figure with
8  respect to how many drivers would be at issue?
9      A    Based on the initial conversations that we had
10 and discussions based on his overall total and what he
11 thought, we -- on the initial asset purchase agreement,
12 I believe we -- somewhere between 145, 150.  I don't
13 remember the number exactly, but it was somewhere --
14 because typically if they had 200 drivers, we would look
15 at having around 75 -- we would need at least
16 75 percent, so that's where we get to the number of
17 about 150 drivers.
18     Q    So it was your belief based on your
19 investigation during due diligence that G.F. Kelly
20 Trucking had about 200 drivers?
21     A    He represented that he had approximately 200
22 drivers, counting spotting drivers, independent
23 contractor drivers.  Guy Kelly seemed to come up with
24 drivers where we didn't know there was 200.
25     Q    And initially it was your belief that you all

---

1  were going to need 140 to 150 of those drivers?
2      A    145 to 150 range.
3      Q    Initially, did you do anything to verify this
4  number of 200 drivers?
5      A    Just through the driver list that he would
6  provide, just a listing of driver names.  Part of the
7  initial gathering of the information he would provide,
8  you know, kind of how many drivers he had that were
9  three years, four years, two years, one.  Just kind of a
10 global in the initial information request I always
11 looked for.
12          It just give me kind of a summary of the number
13 of drivers that you represent, and he had provided that.
14 So based on initial conversations, just initial raw data,
15 he was saying he had somewhere in the neighborhood of
16 190, 200 drivers under his control.
17     Q    And at this stage, did you undertake to
18 determine whether or not any of those 200 drivers would
19 be able to work for U.S. Xpress or contract --
20     A    I did not, but U.S. Xpress did through the
21 safety department.
22     Q    Russ Moore?
23     A    Yes, through the initial general review of the
24 driver file.
25          MR. HALL:  Let him finish his question before

---

75

1      you --
2          THE WITNESS:  What was that?
3          MR. HALL:  I said, let him finish his question
4  before you answer.
5          THE WITNESS:  Okay.
6      Q    Okay.  So you've finished your week-long due
7  diligence in Wadley, you've made a recommendation to go
8  forward, and Russ Moore and his crowd are undertaking to
9  determine how many of these 200 drivers could get
10 qualified to drive for U.S. Xpress if there was a
11 conversion, correct?
12     A    The recommendation was to move forward with
13 the due diligence process.
14     Q    I gotcha.
15     A    Okay.  Russ Moore's review is an initial
16 review to determine on paper approximately how many
17 are -- would be absolute yes, how many were absolute
18 noes based on the documentation in the file, and what
19 the population of undetermined amount was to see if you
20 were in the ballpark of having the opportunity to
21 qualify that many drivers.
22     Q    And during the due diligence process, did Russ
23 Moore on behalf of U.S. Xpress determine that G.F. Kelly
24 was in the ballpark such that the due diligence could go
25 forward?

---

76

1      A    The -- between -- after the first draft of the
2  asset agreement which was provided to Guy Kelly based on
3  negotiations and based on Russ Moore's review, there was
4  a carved down number of drivers due to the fact that
5  there were some issues with his driver base.  So by the
6  second asset agreement, we had lowered that requirement.
7      Q    At what point during the due diligence for G.F.
8  Kelly was the asset purchase agreement entered into?  Had
9  you completed your due diligence before that agreement
10 was entered into?
11     A    No.
12     Q    That agreement was entered into while the due
13 diligence process was still ongoing.  Is that correct?
14     A    Yes.
15     Q    When did you finish the due diligence process?
16     A    I finished the due diligence process on the
17 day that we terminated the agreement.
18     Q    Is that standard operation for the due
19 diligence process?
20     A    Yes.
21     Q    Once your due diligence has determined that the
22 conversion cannot go forward, U.S. Xpress terminates the
23 process, correct?
24     A    Yes.
25     Q    Okay.  So during the due diligence process, an

1  asset purchase agreement is entered into, correct?
2      A    Yes.
3      Q    Among other things, that asset purchase
4  agreement contemplates that G.F. Kelly Trucking will have
5  145 to 150 drivers who are qualified to drive for U.S.
6  Xpress if the conversion takes place, correct?
7      A    The conditions of the contract were twofold:
8  That that many drivers could qualify and -- and that
9  they had accepted to come to work within the contract
10  provisions that you had to meet the 145 drivers. And
11  the decision to bring a driver on under the terms and
12  conditions of the contract were at the sole discretion
13  of U.S. Xpress.
14      Q    Subsequent to the original asset purchase
15  agreement based on Russ Moore's due diligence with
16  respect to the drivers, the number of 145 is reduced,
17  correct?
18      A    Correct.
19      Q    And that's because -- well, let me ask you.
20  Why was the number reduced?
21      A    Well, the number was reduced because the
22  number of driver files and issues involved, it appeared
23  that 145 was not an attainable number. And through
24  negotiations and discussions with Guy Kelly, we were
25  willing to move forward with a lower number and Guy

---

78

1  Kelly was willing to move forward with a lower number,
2  as Guy Kelly's earnout or his goodwill was determined by
3  the number of drivers. So it was a joint decision to
4  move forward with a lower number.
5      Q    How specifically was his earnout or his
6  goodwill determined by the number of drivers?
7      A    The agreement was written with two -- two
8  sections on it. One section dealt with the initial
9  number of drivers, so if 135 or the number that would
10  meet the criteria signed on, he got an up-front payment.
11  I don't recall exactly how much, but he would get an
12  up-front payment.
13          Then there was -- it was important that those
14  drivers stay for at least six months, so there was a
15  detriment against that initial payout and an earnout
16  against that initial payout. So there was some number --
17  $2,500 or $2,000 or something -- up front.
18          Then if that driver left in the first month,
19  that money was to be recovered out of the entire pot, so
20  he would have to refund that $2,000. If it went another
21  month past there, then he would have to refund less. And
22  then the final -- there was a final payout if it went the
23  entire six months, he would get an additional $500 or
24  $1,000. I don't know what the number was.
25          So that was the front -- I said there was two

---

79

1  pieces. That was the front piece, how he would get paid.
2  Then there was a back piece that we agreed to, because
3  typically on an asset purchase you would do something
4  based on the revenue or an earnout. You'd say as an
5  owner you would receive X percent of the revenue.
6          Guy Kelly's position was, I really want someone
7  to do the transaction, I don't have that much control
8  over the revenue. Therefore I agreed that he probably
9  doesn't have that much control over the revenue, but what
10  he does have control over is helping to build the driver
11  base.
12          So therefore we set up a matrix that would
13  just -- the number of drivers at the end of each month
14  that were in the pot that was associated with Guy Kelly,
15  he would receive an earnout for the next two years and
16  that would be his earnout of his goodwill and he received
17  no salary.
18      Q    What's the importance to U.S. Xpress of
19  retaining the G.F. Kelly drivers?
20      A    The importance of whether it's G.F. Kelly or
21  any potential company that we would do a transaction
22  with is that drivers are very expensive to replace. I
23  think it costs in the neighborhood of 2,000 upwards to
24  $5,000 to replace a driver. So we were not going to
25  enter into a contract to where -- again, you can't

---

80

1  physically own a human being like you can a tractor.
2  These are individuals who can resign at any point in
3  time.
4          So if we're going to make the investment for
5  those drivers, it's very important that you get some
6  earnings or some earnout out of that driver if I'm going
7  to pay you for a driver. So there's an incentive for
8  there for -- I get some money up front but you have to
9  help retain that driver for us to get our earnout out of
10  that driver.
11      Q    Okay. So we have our initial purchase -- asset
12  purchase agreement with 145 drivers, and the amended
13  asset purchase agreement requires how many?
14      A    When we say the initial purchase agreement,
15  there was no executed initial purchase agreement. It
16  was only a purchase agreement for consideration.
17      Q    Okay.
18      A    The final purchase agreement was somewhere
19  around, you know, 135, 140. I don't know the number,
20  but it was a lower amount of drivers from the initial
21  draft we discussed.
22      Q    But only slightly lower?
23      A    Only slightly lower.
24      Q    All right. Tell me about your -- and we may
25  have already talked about this a little bit, but tell me

1  about your second visit to Wadley during the due
2  diligence process.
3       A    My second visit to Wadley during the due
4  diligence process was -- and I believe Guy wasn't even
5  there present when I went.  I went to continue to follow
6  up on the supporting documentation for the loans, to see
7  where we were at, and also to have discussions with
8  Nelson Chastain as far as the potential role of Nelson
9  going forward as being a part of the organization.
10      Q    What did those discussions with Nelson entail?
11      A    Basically entailed, you know, where Nelson
12 thought he might fit in going forward, how he felt about
13 the transaction, what he thought of it.  Also, I asked
14 him questions about what he thought of some of the
15 individuals in the company like Frank Childers, Randall
16 Fant.
17          So -- and also we discussed some of the
18 customer base and, you know, whether he had any concerns
19 or not as far as, you know, keeping customers going
20 forward, they had to get a better handle on -- really
21 what Nelson thought about everything.
22      Q    What did he tell you?
23      A    He told me he was excited about, you know, the
24 potential opportunity of working directly with U.S.
25 Xpress and, you know, he saw it as an opportunity for

1  their business to grow in the future and that he would
2  be willing to stay on board.
3       Q    Would Nelson ask you to comment on whether or
4  not this is going to happen?  I mean, would he say, Do
5  you think that this is really going to go down, am I
6  really going to get a job with you at U.S. Xpress?  Would
7  he ask you questions like that?
8       A    He asked me questions like that.  My response
9  to him is that each step of the due diligence process,
10 we have to make it through every step.  They've got to
11 qualify the drivers and we have to meet all the
12 requirements in order for us to close.
13      Q    During your second trip to Wadley, based on
14 everything you knew at the time of the second trip after
15 talking to Nelson, did you form an opinion as to whether
16 or not you thought the conversion was going to go
17 through?
18      A    My job as facilitator is to execute all the
19 steps.  We were going through that process, so as a
20 second visit, you know, the steps were still moving
21 forward and we had to accomplish each individual task to
22 move to a closing date.
23      Q    Your goal was to get to a closing date,
24 correct?
25      A    That's my goal as facilitator.

83

1       Q    You were there talking to Nelson in part to get
2  to a closing date, correct?
3       A    Correct.
4       Q    You're doing your due diligence in your
5  week-long review to try to get to a closing date,
6  correct?
7       A    Correct.
8       Q    Certainly you never indicated during that
9  second meeting to anyone that there would not be a
10 closing date, correct?
11      A    During the due diligence process, you're not
12 at a point where you can say whether there's going to be
13 or not going to be a closing date.  My job as
14 facilitator it is to do the due diligence and make all
15 the steps happen.  That's what I do -- did.
16      Q    You explained the due diligence process to Guy
17 Kelly, correct?
18      A    Yes, I did.
19      Q    And you explained the due diligence process to
20 Nelson Chastain, correct?
21      A    Yes, I did.
22      Q    You were the representative on behalf of U.S.
23 Xpress who explained the due diligence process to G.F.
24 Kelly Trucking, correct?
25      A    Yes.

84

1       Q    And you wanted them to listen to what you said
2  about the due diligence process and rely on what you said
3  about the due diligence process, correct?
4       A    The answer to that is yes.  I -- very clear --
5  I am extremely clear -- as a part of my job as VP of
6  business development, I'm extremely clear under the
7  steps and the risks of the things that have to happen
8  that must take place in order for me to close.
9       Q    Based on your representations to Guy and
10 Nelson, they understood that the culmination of this
11 process was the closing, correct?
12          MR. HALL:  Object to the form.
13      Q    You can still answer unless he tells you not
14 to.
15          MR. HALL:  You can answer.
16      A    The objective of the process as I described is
17 that there are conditions within the contract that have
18 to take place that are presented to the seller that
19 specifically outline the events that have to occur.  If
20 those events occur, there will be a closing because that
21 is the conditions of the contract.  That is made
22 extremely clear each and every step of the way.
23      Q    You made that extremely clear --
24      A    Yes, I did.
25      Q    -- to Guy and Nelson.  That's your testimony?

1    A.   Yes.
2    Q.   Anything else you remember about this second
3 visit to Wadley?
4    A.   No.
5    Q.   What do you recall about your next visit to
6 Wadley?
7    A.   My third visit to Wadley was just prior to the
8 driver process, the direct review of the driver and
9 paperwork. It was just before that. The purpose of
10 that was again to lay down in front of Guy and Nelson
11 the things that must take place. Also, we had general
12 discussions on how we were going to try to accomplish
13 that as far as where the driver was going to have to be
14 in order for the driver to be reviewed by our safety
15 department.
16    Q.   And at the occurrence of your third trip to
17 Wadley, is it fair to say that the other aspects but for
18 this driver issue -- that the other aspects of the due
19 diligence were complete?
20    A.   No.
21    Q.   What else was still hanging out there besides
22 the drivers on this third meeting?
23    A.   We still did not have all the documentation to
24 support the loan agreements on the assets. We still did
25 not have payoff letters -- all the final payoff letters

COOK & WILEY, INC.

1 from those companies. We had not received anything from
2 the factoring company that would have provided a payoff
3 and a release of the factoring agreement.
4    Q.   What's -- I didn't mean to interrupt you, but
5 what's a factoring agreement?
6    A.   A factoring agreement is an agreement between
7 a company and a factoring company that basically says
8 that they will loan money against those receivables or
9 those billings as they occur so that they take
10 possession -- you know, the factoring company can be
11 with recourse or without recourse depending on how
12 they're written, and I can't remember how that one was
13 written, but they're very specific for a period of time.
14 Every one year, two years, three years they sign a
15 contract that says this is the term.
16    And as the invoices are created, they are
17 funded -- either 85 percent or 90 percent or some
18 number -- by the factoring company. Then those
19 collections are still handled by the original party, and
20 it may or may not be that way, but they handle it. The
21 moneys then flow through an account which pay off that
22 note, and the only way the company gets future funds is
23 from future billings.
24    And they have penalties in there for early
25 payout, you know, and releases and things that have to

COOK & WILEY, INC.

87

1 occur in order before they close out that agreement.
2    Q.   Was there just one factoring agreement at
3 issue?
4    A.   Yes.
5    Q.   Who was it with?
6    A.   I think it was International something. I
7 don't recall.
8    Q.   So is it your testimony that during this third
9 meeting, you were still asking Guy to provide more
10 information about the factoring agreement?
11    A.   Yes.
12    Q.   Did you deal with International at all in
13 obtaining the information?
14    A.   No.
15    Q.   Why?
16    A.   Because that's their company. I have no
17 relationship with that company.
18    Q.   Is it your testimony that you told Guy and
19 Nelson you still needed this information during this
20 third meeting?
21    A.   Yes.
22    Q.   What did they say in response?
23    A.   They said that they were working on getting
24 that information to me. I made it very clear to them
25 that we cannot close on that -- on the asset purchase

COOK & WILEY, INC.

88

1 without having that information.
2    Q.   During this third meeting, were you all
3 actually kicking around dates for the closing?
4    A.   We were kicking around potential dates based
5 on the amount of time it would take to complete the
6 condition -- the items of the condition.
7    Q.   Was there a discussion of some August closing
8 dates?
9    A.   I don't remember exactly how the contract was
10 written, but it was -- the discussion was centered
11 around the contractual arrangements.
12    Q.   I think you told me earlier that the closing
13 was scheduled mutually by both parties, correct?
14    A.   That's correct.
15    Q.   In other words, to have a closing, U.S. Xpress
16 has got to agree on a date and G.F. Kelly Trucking's got
17 to agree on a date, correct?
18    A.   That's correct.
19    Q.   And what you're saying is during this third
20 meeting during the due diligence process, you all are
21 kicking around potential closing dates, correct?
22    A.   That would be correct.
23    Q.   Anything else that you remember that happened
24 during this -- your third meeting to Wadley -- your third
25 trip to Wadley?

COOK & WILEY, INC.

89

```
1      A    No.
2      Q    All right.  You said it was right before
3  something.
4      A    It was right before -- the third meeting at
5  Wadley was to jointly agree on a process on how to
6  basically qualify -- the final qualification and sign-up
7  of the drivers.
8      Q    All right.  I want to talk about that, but I
9  want to ask you about something first.  We talked about
10 three conversions that you did during this '04 to '06
11 time frame with U.S. Xpress, correct?
12     A    Correct.
13     Q    All of those were stock purchases, correct?
14     A    Correct.
15     Q    Now, we've been talking about an asset purchase
16 with G.F. Kelly Trucking, correct?
17     A    Correct.
18     Q    So this is the first process that we've talked
19 about where you actually had to qualify drivers, correct?
20     A    Correct.
21     Q    My question is, during this '04 to '06 time
22 frame, was there any other company that got as far along
23 as G.F. Kelly did in the process to where you were
24 dealing with the qualification of drivers?
25     A    No, not in an acquisition of assets, not in an
```

90

```
1  asset purchase.
2      Q    Well, if I'm hearing you right, that's the only
3  time you qualify drivers is in an asset purchase.
4      A    The other time is when you do an agent
5  agreement.
6      Q    Between '04 and '06, did you facilitate an
7  agent agreement on behalf of U.S. Xpress that involved
8  the qualification of drivers?
9      A    Yes.
10     Q    How many companies?
11     A    I was personally -- I was personally involved
12 with one, and there was three other agents that had been
13 acquired -- negotiated contracts with during that time
14 frame that I was not involved in.
15     Q    Who were you personally involved with?
16     A    Bryant Transportation.
17     Q    Where is that?
18     A    In -- trying to think of the town in Georgia.
19 It's near Dalton.
20     Q    Did you conduct the due diligence process for
21 Bryant?
22     A    Yes.
23     Q    Is it similar to the due diligence processes
24 that you've described for me already today?
25     A    Yes.
```

91

```
1      Q    Did the Bryant deal go to a closing?
2      A    Yes.
3      Q    It was converted?
4      A    Yes.
5      Q    Was the Bryant driver qualification before or
6  after the G.F. Kelly driver qualification?
7      A    I don't recall.
8      Q    Now, I'm trying to find out --
9      A    I don't recall.
10     Q    I'm trying to find out if you had actually gone
11 through the process of conducting a driver qualification
12 on behalf of U.S. Xpress before you did this one at G.F.
13 Kelly.
14     A    I don't recall.  They were right around the
15 same time frame, so I can't say one finished before the
16 other.
17     Q    You only did two, correct?
18     A    Correct.
19     Q    And they were right around the same time frame?
20     A    Correct.
21     Q    Did you set them up the same way?
22     A    No.  An agency's different.
23     Q    Tell me how.
24     A    An agency is the company's ownership remains
25 totally intact.  All the employees are the employees of
```

92

```
1  the agent.  The drivers are employees of the agent.  The
2  agent leases their trucks to U.S. Xpress.  The agent has
3  total 100 percent control of their business.
4          In an asset purchase, the control of those
5  assets and those drivers become -- the buyer has total
6  control over those assets and drivers.
7      Q    And the first -- the one and only driver
8  qualification you did for an asset purchase with U.S.
9  Xpress was the one for G.F. Kelly, correct?
10     A    That I was involved in.
11     Q    That you were involved in?
12     A    Right.
13     Q    All right.  Well, tell me how the driver
14 qualification process worked at G.F. Kelly.
15     A    In my role as due diligence as primarily the
16 finance side, I was not in charge or directly
17 participating in that process, so I can't really tell
18 you how that went.
19     Q    Who was in charge of that process on behalf of
20 U.S. Xpress?
21     A    It would be Russ Moore and Al Hingst.
22     Q    What's the purpose of the driver qualification
23 process?
24     A    From my perspective -- and, again, it's my
25 perspective -- the purpose of the driver qualification
```

93

```
1   process is to qualify the driver under U.S. Xpress
2   standards and to get the driver to accept those
3   standards and become either an independent contractor or
4   an employed driver of U.S. Xpress.
5        Q    So physically all these drivers are brought in,
6   right?
7        A    They're brought in or coordinated in other
8   locations.
9        Q    I guess what you're telling me is if I want to
10  find out the details of that, I've got to go talk to Russ
11  Moore?
12       A    Russ Moore or Al Hingst. I don't know the
13  details. I can't help you.
14       Q    Okay. How long did the process last, if you
15  know?
16       A    I recollect that it was approximately two to
17  three weeks.
18       Q    Were you doing anything during this two to
19  three weeks?
20       A    The only thing I was involved in, again, as
21  facilitator was to try to drive the process forward.
22       Q    Were the other due diligence -- were the other
23  aspects of the due diligence pretty much finished at that
24  point?
25       A    Well, the other aspects would be -- there was
```

94

```
1   only, you know, asset purchase and driver qualification.
2   The asset purchase still had no payoff -- no final
3   payoff statements and no factoring agreement, so that
4   still was incomplete. That was still being gathered.
5        Q    Were you doing anything proactively to deal
6   with the asset purchase end of things or were you just
7   waiting on G.F. Kelly?
8        A    No. I was proactive, and every day I would
9   beat up basically Nelson Chastain and Guy Kelly on
10  where's the information. I use the term beat up, but
11  basically it was my role to aggressively pursue those
12  individuals to try to stay on target.
13       Q    You said it took two or three weeks?
14       A    Well, I recollect it was two to three weeks.
15       Q    What happened at the end of the driver
16  qualification process?
17       A    The driver qualification process had not been
18  completed, and the determination was made by the
19  group -- the senior management group that has to make
20  these decisions -- that there would not be enough
21  drivers qualified to meet the requirements and that the
22  assets were in such poor condition that there would be
23  no value -- as part of the conditions of the contract,
24  the assets had to be conveyed free and clear and that
25  the order liquidation value was -- by the time it met
```

95

```
1   the spec requirements, it was before -- would have been
2   below the debt and repair requirements of that
3   equipment.
4        Q    All right. You mentioned a senior management
5   group.
6        A    Yes, which is Ray Harlin Jeff Wardeberg.
7        Q    It's your testimony that Ray Harlin and Jeff
8   Wardeberg were the people on behalf of U.S. Xpress that
9   made the determination that there were not enough drivers
10  to qualify?
11       A    Yes.
12       Q    It's your belief that they needed 135 drivers
13  to qualify?
14       A    I don't know the exact number. I don't have
15  the contract in front of me.
16       Q    Do you know how many drivers did qualify?
17       A    No, I don't.
18       Q    How did you learn that the senior management
19  group had decided that G.F. Kelly Trucking couldn't put
20  together enough drivers to qualify?
21       A    We had a meeting the day of termination. We
22  had a meeting with Al Hingst, Dennis Farnsworth, Lisa
23  Pate, Ray Harlin, and Jeff Wardeberg to discuss whether
24  we move forward with the transaction or not.
25       Q    Where was that meeting?
```

96

```
1        A    It was a conference call.
2        Q    Did anyone reveal on that conference call the
3   number of drivers that did qualify?
4        A    Not that I recall.
5        Q    Who made the decision to terminate the process?
6        A    The authoritative decision is Ray Harlin and
7   Jeff Wardeberg.
8        Q    Was that decision made on this conference call?
9        A    Yes.
10       Q    What was your understanding of the reasons as
11  to why the potential conversion of G.F. Kelly was
12  terminated?
13       A    The reasons that were determined in the
14  conference call were the number of drivers that could
15  qualify, the quality of the equipment and the valuation
16  of the equipment, and the missing documentation required
17  for closing, which was payoffs and factoring
18  information. Combination of all those events.
19       Q    The missing documents, that was -- that kind of
20  fell under your umbrella, correct?
21       A    That's correct.
22       Q    You were the guy that was in charge of getting
23  those documents for U.S. Xpress, correct?
24       A    Correct.
25       Q    Did you opine or say that it was your opinion
```

98

1 they could never get the documents? I mean, I thought
2 the last time we talked about this, you said, Hey, I've
3 been beating up on them trying to get the documents.
4     Did they tell you they could not provide them?
5    A  Guy Kelly continued to say that he could
6 provide those.
7    Q  So you're saying despite Guy telling you that
8 he was going to get the documentation you need, you
9 decided that he couldn't get it?
10    A  We decided based on all the conditions that
11 were required per the contract, that they couldn't be
12 met and therefore it decided to terminate.
13    Q  Well, what evidence do you have that this third
14 condition couldn't be met, that they couldn't provide the
15 documentation you were asking for?
16    A  Even if the third condition could be met, the
17 closing still couldn't take place because we didn't have
18 the proper number of drivers to close the deal.
19    Q  Is that really what killed it?
20    A  Yes.
21    Q  The asset valuation, wouldn't that just affect
22 the final price?
23    A  No, because there was no final price when you
24 take that into consideration. The only price there was
25 was the number of dollars associated with the drivers.

COOK & WILEY, INC.

1 Okay? So at 135 drivers, $2,000 or whatever the number
2 of drivers you got there -- let's say you have $27,000.
3 The valuation of the assets and the quality of the
4 assets at that point was -- it would have cost more.
5 There would be no value on the table.
6    Q  Well, doesn't U.S. Xpress gain the value of --
7 after the conversion goes through of gaining profits from
8 continuing that business on?
9    MR. HALL: Object to the form.
10    Q  You can answer unless he tells you not to.
11    MR. HALL: I'll tell you when you don't need to
12 answer.
13    THE WITNESS: Okay.
14    A  U.S. Xpress and Guy Kelly and every trucking
15 company out there is in the business to generate margin
16 and income. Having drivers generates margin and income.
17 Having revenue does not necessarily generate margin and
18 income. There would be a benefit of having drivers to
19 go forward with. There would be -- not be a benefit if
20 as part of the conditions of taking those drivers, the
21 price for those drivers became more than the benefit
22 that you would gain from those drivers.
23    So I would not buy a tractor that is valued at
24 $50,000 and pay -- and take on a loan of $80,000 if I got
25 the driver with that tractor, because there would be no

COOK & WILEY, INC.

99

1 profit margin generated by that driver within that
2 tractor into the future.
3    Q  So are you saying that the senior management
4 folks at U.S. Xpress decided that the price of buying the
5 drivers was too high in comparison to the assets or
6 whatever would be received from the ultimate purchase of
7 G.F. Kelly?
8    A  Yes.
9    Q  Is there a certain acceptable ratio or margin
10 or percentage that has to be in place before the decision
11 is made that the cost of the drivers is worth purchasing
12 the business?
13    A  There's not a solid formula number. Every
14 situation has to be thought through. If you have a
15 piece of equipment that doesn't cost you anything to
16 deal with, the debt is equal to what the value is, and
17 if you don't have to do any repairs to that piece of
18 equipment and you're going to pay X. for a driver, then
19 in that particular one instance, I would perhaps buy
20 that tractor and that driver.
21    Q  Every asset that was contemplated in the
22 purchase was reviewed by U.S. Xpress, correct?
23    A  No.
24    Q  Who was the person that would know the most
25 about the review and valuation of G.F. Kelly's assets for

COOK & WILEY, INC.

100

1 potential purchase by U.S. Xpress?
2    A  Jerry Elkins, Mike Murphy.
3    Q  Did you hear -- well, were Jerry Elkins or Mike
4 Murphy on this conference call we've been talking about
5 with the senior management group?
6    A  Not that I recall.
7    Q  Who is the person on the conference call that
8 said the assets aren't worth what they need to be worth?
9    A  I don't recall exactly who would have made
10 that statement, but it would either have been Jeff
11 Wardeberg, Ray Harlin, or myself.
12    Q  Well, what was your feeling about the assets at
13 that time?
14    A  My feeling about the assets at that time,
15 which had been conveyed to Guy Kelly, was that based on
16 the information provided to me by Jerry Elkins and Mike
17 Murphy was that his tractors and trailers were in
18 serious disarray.
19    Q  Did you ever hear anyone at U.S. Xpress give a
20 value to those assets?
21    A  The value to those assets were determined by
22 an outside company, Taylor & Martin, which U.S. Xpress
23 uses in a regular basis. Taylor & Martin works auctions
24 of equipment across the country and creates valuations
25 based on those auctions.

COOK & WILEY, INC.

101

1   Q   So Taylor & Martin is the entity that looked at
2   all the assets or valuated all the assets for U.S.
3   Xpress?
4   A   Based on book valuation, not physical
5   valuation. The process is we do a book valuation --
6   U.S. Xpress does a book valuation, then does a physical
7   sampling review of those assets to determine whether or
8   not they will meet the conditions of the contract, which
9   is basically trade spec. I believe 50 percent brakes,
10  50 percent tires.
11              MR. CARTER:   All right. Let's take a break.
12
13              (Recess taken.)
14
15  Q   Before we gave your lawyer a break, we were
16  talking about assets, right?
17  A   Correct.
18  Q   You said there were two types of asset
19  valuation, one you refer to as a book valuation?
20  A   Yes.
21  Q   That was conducted by third party, correct?
22  A   Yes.
23  Q   And you also mentioned a physical asset
24  valuation, correct?
25  A   Yes.

COOK & WILEY, INC.

102

1   Q   And the physical asset valuation of G.F.
2   Kelly's assets was conducted by U.S. Xpress, correct?
3   A   Yes.
4   Q   Who conducted it?
5   A   Jerry Elkins, Mike Murphy.
6   Q   The book valuation comes up with a number,
7   correct?
8   A   Yes.
9   Q   Do you remember what that number was?
10  A   The book valuation was that Mr. Kelly was
11  significantly what we -- quote, upside down on the
12  tractors, which means he owed more than the value of the
13  tractors; and on the trailers, he was favorable on his
14  trailers by just about an equal amount. So as a whole,
15  all trailers and all tractors put together would have
16  resulted in most likely a break-even valuation.
17  Q   And that was acceptable to U.S. Xpress?
18  A   That determination by itself alone was not
19  made. Under the initial valuation before everything was
20  done from a due diligence point of view, Mr. Kelly had
21  represented to U.S. Xpress that he had approximately a
22  million dollars of equity in his total assets.
23  Q   Well, how does that relate to the -- are you
24  saying that U.S. Xpress or this third party valuated his
25  assets and said there were less than a million dollars?

COOK & WILEY, INC.

103

1   A   A third party valuation of the assets in
2   comparison to the liabilities that were determined based
3   on the due diligence review resulted in approximately a
4   break-even scenario between the total value of his
5   equipment versus what was verbally represented
6   throughout the process.
7   Q   Well, the fact that the assets were in a
8   break-even situation, was that a deal killer?
9   A   By itself, no, based on the book valuation.
10  Q   Okay. So we talked about three things:  Number
11  of drivers, the assets, and the missing documents,
12  correct?
13  A   Correct.
14  Q   You said that even if Guy Kelly would have
15  provided you with the missing documents, it wouldn't have
16  mattered, correct?
17  A   Correct.
18  Q   You said that the book valuation of the assets
19  showed that everything was a break-even and that was not
20  a deal killer by itself, correct?
21  A   Correct.
22  Q   But the qualification of the drivers was a deal
23  killer by itself, correct?
24  A   Yes.
25  Q   And you've already testified that's the real

COOK & WILEY, INC.

104

1   reason for killing the deal, correct?
2   A   Correct.
3   Q   When did anyone from U.S. Xpress first
4   communicate to Guy Kelly that the deal was off and the
5   deal was off because of the driver qualification?
6   A   The day the contract was terminated.
7   Q   How was that communicated to Guy Kelly?
8   A   That was communicated to Guy Kelly by the --
9   in the physical presence of Al Hingst and myself being
10  on a telephone.
11  Q   Al was in Wadley?
12  A   Al was in Wadley.
13  Q   You were up here?
14  A   I was in Richmond.
15  Q   On a speaker phone?
16  A   On a regular telephone.
17  Q   Could you hear everybody talk?
18  A   Yes.
19  Q   Tell me what you remember about this meeting
20  from your aspect of the call.
21  A   What I remember from the conversation, the
22  aspect of the call was that Al Hingst and Guy Kelly
23  called me, Al went in and told Guy to call me on the
24  phone, we are on the phone all together, and it was
25  communicated at that time.

COOK & WILEY, INC.

105

```
 1     Q    What did you hear -- strike that.
 2          What did you hear Al say to Guy?
 3     A    I did not hear Al -- any Al conversation to
 4  Guy.
 5     Q    So you could not hear Al talk, correct?
 6     A    When I was on the phone, I believed we were
 7  all on speaker phone together.
 8     Q    Okay.  So I don't understand how come you
 9  couldn't hear Al.
10     A    What I'm saying is Al didn't make any specific
11  statements when I was on the phone talking to Guy Kelly.
12     Q    All right.  Well, who is the person that told
13  Guy Kelly the deal was off?
14     A    I told Guy Kelly the deal was off.
15     Q    And why were you the person to tell him?
16     A    Because I was the one who facilitated the
17  process.
18     Q    Because somebody instructed you to do so,
19  right?
20     A    Yes.
21     Q    Who is that?
22     A    Ray Harlin and Jeff Wardeberg.
23     Q    So you're the person who communicated to Guy
24  Kelly that the deal was off, correct?
25     A    Yes.
```

                    COOK & WILEY, INC.

106

```
 1     Q    What did you tell him?
 2     A    I told Guy Kelly that due to the driver -- not
 3  being -- the number of drivers not being able to meet
 4  the condition of the agreement, that there was no reason
 5  to pursue the contract any further and that U.S. Xpress
 6  was ceasing to be active in the contract immediately.
 7     Q    What did Guy say?
 8     A    Guy said, Thanks, bye, and disconnected.
 9  There was no conversation, no discussion.
10     Q    What did you do next?
11     A    Next thing I did was communicate that back to
12  Ray Harlin and also suggested to Ray Harlin that we --
13  you know, I said, Per the agreement, we have to put it
14  in writing.
15          So I suggested that Lisa Pate draft up the
16  termination notice and move forward with the termination
17  of the contract.
18     Q    Who is Lisa Pate?
19     A    In-house counsel for U.S. Xpress.
20     Q    Did you ever have another conversation with
21  Guy?
22     A    I tried to communicate with Guy throughout the
23  day to tell him that we were sending the termination
24  notice, and he did not return my phone calls or answer.
25  I believe I may have even e-mailed him saying call me,
```

                    COOK & WILEY, INC.

107

```
 1  and he did not respond.
 2     Q    Have you ever talked to him since the deal was
 3  terminated?
 4     A    No.
 5     Q    I know you've e-mailed him.  Has he ever
 6  e-mailed back to you since the deal was terminated?
 7     A    No.
 8     Q    Are you aware that there was an issue with the
 9  drivers and their belief as to whether or not they would
10  have weekends off if Kelly Trucking got converted?
11     A    I'm not aware of any belief or any
12  conversation.  The discussions and the structure of the
13  transaction was that we were going to continue to
14  operate out of Wadley with Nelson Chastain in charge
15  with the drivers that were there and the operations that
16  they had in place.
17     Q    Is it your testimony then that U.S. Xpress was
18  not going to change any of the standards or policies that
19  G.F. Kelly Trucking had in place for the drivers?
20     A    No.
21     Q    In fact, you were going to change some of the
22  policies and standards?
23     A    I don't know that.  I'm saying the drivers
24  must fit the policies and standards of U.S. Xpress in
25  order to operate within U.S. Xpress.  The operation was
```

                    COOK & WILEY, INC.

108

```
 1  going to continue to operate in Wadley under Nelson
 2  Chastain.  As far as the drivers and how they're
 3  impacted about that would totally depend upon the
 4  revenue streams that were generated and were kept there,
 5  whether or not those drivers would continue to operate
 6  under their existing time schedules.
 7     Q    During your due diligence process and before we
 8  went through this driver qualification deal, did you ever
 9  sit down and compare U.S. Xpress's standards and policies
10  for drivers to those for G.F. Kelly Trucking?
11     A    I did not compare that, but that would have
12  been done by Russ Moore in conjunction with Frank
13  Childers.
14     Q    Do you recall there being an issue about
15  whether or not Guy or G.F. Kelly was going to be
16  compensated for drivers being off the road during this
17  qualification process?
18     A    No.
19     Q    It's your testimony that nobody ever brought
20  that up to your attention?
21     A    I don't recall that coming up to my attention.
22     Q    Is it feasible to you that G.F. Kelly would
23  lose revenue during this process where all their drivers
24  have to come off the road and go through your
25  qualification process?
```

                    COOK & WILEY, INC.

1    A    The answer to that is yes, he would, because
2    those drivers would have to qualify and be off the road
3    to do that. But as a part of the qualifying process,
4    that was discussed with Guy Kelly, Nelson Chastain, as
5    far as the timing and how to get those drivers the least
6    amount of interference to get the qualification done.
7    Q    Did you ever remember Guy Kelly calling or
8    e-mailing you and asking that the closing date be moved
9    up?
10   A    Guy Kelly sent me an e-mail threatening to
11   pull the deal if the closing could not be moved up. He
12   made statements to the fact in -- not in his e-mail but
13   verbally to me that he had another buyer and if we
14   weren't going to move forward with the deal, he would
15   pull the deal and run somewhere else.
16   Q    So does that assume that at some point there
17   was a closing date that was mutually agreed upon between
18   the parties and set?
19   A    The first asset agreement that was not signed
20   or agreed to I believe was more specific as to the date
21   of closing. The second asset agreement was more -- had
22   a more general -- I don't remember the terminology, but
23   it was because we had to go through the qualifying
24   process, we didn't know exactly how long it would take.
25   So what we were willing to agree to was that we would

1    try to get, you know, the drivers processed as soon as
2    possible and that it was within some range of dates, but
3    I don't remember the dates.
4    Q    Isn't it true that both Guy Kelly and Nelson
5    Chastain reiterated to you during this process that G.F.
6    Kelly Trucking Company was losing money and they needed
7    to hurry up and get a closing date and get the deal done?
8    Didn't they tell you that?
9    A    I would say yes.
10   Q    You understood that G.F. Kelly Trucking was
11   losing money during your due diligence process as a
12   result of your due diligence process, correct?
13   A    I understood that G.F. Kelly was losing
14   revenues. If the driver wasn't pulling on a revenue
15   load and he was being qualified, he's not generating
16   revenue.
17   Q    Did you understand that G.F. Kelly Trucking was
18   losing revenue as a result of their obeyance [sic] and
19   reliance on your requests during the due diligence
20   process?
21       MR. HALL:    Object to the form. Kind of
22   ambiguous.
23       THE WITNESS:    Let me answer this one.
24   A    Number one, Guy Kelly and Nelson Chastain knew
25   exactly the process that was going on and agreed to that

1    process and the implications associated with that
2    process to try to move forward to a closing date.
3    Q    So are you saying that Guy Kelly made a willing
4    choice to run his business into the ground during the due
5    diligence process?
6        MR. HALL:    Object to the form, argumentative.
7    A    Guy Kelly made a business choice to agree to
8    the contract and the terms and conditions thereof and
9    the steps that were required to qualify the drivers. He
10   was fully aware of all steps and processes.
11   Q    You think that was a mistake?
12   A    I'm not here to voice an opinion.
13   Q    Well, I mean, you're here to answer my
14   questions. My question is, do you think it was a mistake
15   for Guy Kelly to enter into that agreement on behalf of
16   G.F. Kelly Trucking?
17   A    I can't answer that question. It's not my
18   position to answer that question.
19   Q    Well, I mean --
20   A    There's a lot of parties involved in making a
21   decision whether to move forward with a contract. I
22   don't have an opinion on whether or not that was a smart
23   move on Guy Kelly's part or not.
24   Q    When's the first time you knew that this deal
25   wasn't going to move forward to closing?

1    A    On the day that we terminated the contract.
2    Q    Were you surprised that the contract got
3    terminated?
4    A    Any time, you know, that you would reach a
5    contract termination point prior to that, that would be
6    a surprise at that point.
7    Q    At any point during the call, did you try to
8    dissuade the termination? Did you try to argue for Kelly
9    Trucking and ask that the deal not be terminated?
10   A    No.
11   Q    All right. I want to show you some documents.
12   These are documents that have already been marked, so I'm
13   not going to mark them. I just want to -- I'm going to
14   tell you what the document is and ask if you can identify
15   it for me.
16   A    Sure.
17   Q    All right. This has been previously marked as
18   Defendant's Exhibit 37. It's dated June 25. It's a
19   letter to Guy Kelly. Do you recognize that?
20   A    Yes.
21   Q    What is it?
22   A    A letter of intent.
23   Q    Defendant's Exhibit 37 is the letter of intent,
24   correct?
25   A    Correct.

1    Q    All right. Let me show you what's been
2 previously marked as Defendant's Exhibit 40. You
3 recognize that, sir?
4    A    Yes.
5    Q    What is it?
6    A    This is the initial asset purchase agreement
7 that was discussed between all parties, not the signed
8 or agreed to asset agreement.
9    Q    All right. It's your testimony that you
10 discussed this exhibit with Guy Kelly?
11   A    Yes.
12   Q    Do you know why this one did not get executed?
13   A    Guy Kelly responded to that asset agreement
14 after he reviewed it and said it was not satisfactory of
15 his requirements.
16   Q    He asked that some changes be made?
17   A    He basically made many demands on pricing and
18 that changes be made to that agreement before he would
19 consider going forward.
20   Q    Were changes made?
21   A    Yes.
22   Q    All right. Let me show you what's been marked
23 as Exhibit 45. You recognize that, sir?
24   A    This is the agreed to asset agreement.
25   Q    That was executed by the parties?

---

1    A    As far as I know. I was not physically there
2 when they were signed.
3    Q    But it is signed by the parties?
4    A    There seems to be some concern on whether they
5 were signed or not, due to a response that I received
6 from Guy Kelly stating that in his opinion we had no
7 contract because Ray Harlin didn't sign the contract
8 page.
9    Q    Are you here to testify on behalf of U.S.
10 Xpress, Inc., to say whether or not you all believe this
11 is an executed asset purchase agreement?
12   A    Yes, I am.
13   Q    What's your answer?
14   A    I believe that is an executed asset purchase
15 agreement.
16   Q    And that U.S. Xpress is obligated and duty
17 bound to perform under this agreement, correct?
18   A    Yes. It was the intent for that to have been
19 signed by Ray Harlin.
20   Q    What about Defendant's Exhibit 43, do you
21 recognize that?
22   A    Yes. I recognize this. This would be a
23 summary that I would have put together and sent to Guy
24 Kelly of a general outline before the first agreement
25 was drafted or the letter. I'm not sure whether this is

---

1 before the letter of intent or after the letter of
2 intent.
3    Q    Does it have a date on it?
4    A    It says since the letter of intent here. No
5 date.
6    Q    So you think there was a letter of intent and
7 then after some discussions between you and Guy, you
8 drafted this document?
9    A    Yes. And this would have been attached to an
10 e-mail which would have further described the nature of
11 this document.
12   Q    Okay. You said that the first time Guy Kelly
13 would have learned of the termination was on the day of
14 the termination, correct?
15   A    Correct.
16   Q    And the way he learned of the termination was
17 from you, correct?
18   A    He would have learned of the termination from
19 me via phone call.
20   Q    And after the phone call, you called Ray
21 Harlin, correct?
22   A    Correct.
23   Q    And then are you aware that Mr. Harlin wrote a
24 letter to Guy Kelly on that same day?
25   A    Yes, I am.

---

1    Q    And is that letter what's reflected on
2 Defendant's Exhibit 55?
3    A    Yes, it is.
4    Q    Have you seen that letter before?
5    A    Yes, I have.
6    Q    Is that the letter from Ray Harlin to G.F.
7 Kelly Trucking informing G.F. Kelly Trucking that the
8 deal is off?
9    A    Yes.
10   Q    There's also some discussion of $20,000
11 compensation. Do you know anything about that?
12   A    Yes.
13   Q    What is that?
14   A    That was a compensation that was offered as a
15 part of the due diligence issues and the cooperation
16 that Guy Kelly had provided.
17   Q    Doesn't that offer of $20,000 recognize the
18 fact that Guy Kelly on behalf of G.F. Kelly Trucking
19 cooperated with you and attempted to work with you during
20 the due diligence process?
21   A    The $20,000 was a offer from U.S. Xpress as a
22 result of basically terminating the contract and
23 recognizing his cooperation.
24   Q    Are you here on behalf of U.S. Xpress to talk
25 about exactly why that $20,000 was offered and how that

1 number was arrived at?
2    A    No.
3    Q    You understood after the termination of this
4 process that G.F. Kelly Trucking was worse financially
5 before you first dealt with Guy -- well, let me strike
6 that.
7         MR. HALL:  Yeah, that's good.
8         MR. CARTER:  You like that?
9         MR. HALL:  Yeah.
10   Q    When you first heard about G.F. Kelly Trucking,
11 you made an appraisal of G.F. Kelly Trucking for the
12 purpose of ultimately converting that business, correct?
13        MR. HALL:  Object to the form.
14   A    We evaluated G.F. Kelly Trucking just the way
15 we evaluated the hundred carriers I looked at.  We
16 looked at the business, the driver numbers.
17   Q    To determine --
18   A    Conversations.
19   Q    To determine whether you wanted to go forward
20 with looking into it, correct?
21   A    Spending money to go forward looking into it,
22 yes.
23   Q    Between that time and the termination of the
24 process as set forth in Exhibit 55, you understand that
25 G.F. Kelly Trucking was worse off financially, correct?

1    A    Based on the due diligence reviews,
2 discussions with parties that worked at Kelly Trucking,
3 I would say my determination is that Guy Kelly was in no
4 worse position at closing than he was the day I walked
5 in the door.
6    Q    And that's your testimony under oath?
7    A    Yes.
8    Q    Have you made a comparison?  I mean, you did
9 this due diligence, but do you know for sure if there's a
10 difference in what the financials say for April when you
11 first started dealing with them and what they said in
12 August when you were done?
13   A    I can't say for certain, because the
14 financials -- I did no due diligence from a standpoint
15 of recurring liability based upon the financials.  So
16 going back to what I said, that would be an opinion
17 statement.
18   Q    All right.  Let's take a break.  I'm close.
19
20        (Recess taken.)
21
22        (Exhibits 3-6 are marked.)
23
24   Q    Okay.  I've got a few more exhibits I want to
25 ask you about.

1    A    Sure.
2    Q    And a couple more questions.  Then we're going
3 to be done.  First is a new exhibit.  I'm going to mark
4 it as Exhibit 3 to your deposition.  It was produced by
5 U.S. Xpress.  It's Bates 208 through 221.  It's an e-mail
6 that has your name on it.
7         Take a second and review it and tell me if you
8 can identify it please, sir.
9    A    This would be an e-mail sent by me internally
10 to Al Hingst and John Martin basically identifying the
11 pieces of equipment and the order liquidation value and
12 the best payoff information I had at the time.
13        And it basically shows that if all is true on
14 here and everything fit exactly right, the order
15 liquidation value of all equipment versus the known
16 payoff information I had at the time would have resulted
17 in about a slight negative position for Guy Kelly.
18   Q    Okay.  The first page is an e-mail from you to
19 Al and John Martin?
20   A    Right.
21   Q    Correct?
22   A    Correct.
23   Q    And it discusses this attachment that we're
24 looking at, correct?
25   A    Correct.

1    Q    Could you just read the e-mail into the record
2 for us?
3    A    Sure.
4         Attached is the OLV and payoff.  He is way
5 under on the tractors and over on the trailers.  Guy is
6 fully aware of his problem.  We agreed verbally to help
7 him the best we can to get out the tractors that are
8 under water -- parentheses, via sales advice,
9 parentheses -- but we will not pay him more than OLV.
10 This is probably the most critical part of making this
11 deal work.  We need our sales rep to get involved
12 immediately.
13   Q    Do you know whether or not after you sent this
14 e-mail to Al or John whether or not the sales rep got
15 immediately involved?
16   A    No, I don't.
17   Q    Who is the sales rep?  What's his name?
18   A    That would have been Jerry Elkins or Mike
19 Murphy.
20   Q    And you don't know one way or the other whether
21 or not --
22   A    I don't recall.
23        MR. HALL:  Again, let him finish.
24        THE WITNESS:  Oh, excuse me.
25   Q    You don't recall whether Al or John honored

---

**Page 121**

1  your request to get him involved?

2     A   Correct. I don't recall.

3     Q   All right. Let me show you Exhibit 4. This

4  was also produced to us by U.S. Xpress. It's Bates

5  No. 303. Can you identify that, sir?

6     A   I have not seen this document.

7     Q   Do you know what it is?

8     A   It appears to be an action plan with

9  assignments set up around the steps that are required to

10  complete a conversion.

11     Q   Do you know who generated it?

12     A   No, I do not.

13     Q   Okay. And you never used it in your assessment

14  of your due diligence?

15     A   No.

16     Q   All right. Let me show you what I've marked as

17  Exhibit 5, also a document produced by U.S. Xpress, Bates

18  285. Again, it's an e-mail with your name on it. Take a

19  second and tell me if you can identify that.

20     A   Okay. This is an e-mail, again, from Dennis

21  Farnsworth to John Martin and Al Hingst, copying Ray Harlin

22  and Jeff Wardeberg, basically an update on August 9.

23     I'm telling John Martin and Al Hingst that all

24  the driver files have been gathered and are now in

25  Chattanooga and that Andy Glover from the information

COOK & WILEY, INC.

---

**Page 122**

1  services department of U.S. Xpress is currently at Kelly

2  reviewing their computer system and communication

3  situation, which would be phones, fax.

4     We've received authorization from Wabash to

5  visit their steel Alabama plant concerning the aluminum

6  contract. I will contact Russ or Wally -- and I didn't

7  mention Wally White is like a director of safety who

8  works for Russ Moore -- to set up a time to visit the

9  plant.

10     I do recognize this.

11     Q   Okay. It says that all the driver files are

12  now in Chattanooga, correct?

13     A   All the driver files -- it says specifically

14  all driver files have been gathered and are now in

15  Chattanooga.

16     Q   Every driver file that G.F. Kelly had was given

17  to U.S. Xpress and physically taken to Chattanooga as of

18  August 9, correct?

19     A   Correct.

20     Q   And that is -- well, back up. Were those --

21  the purpose of physically bringing the file to

22  Chattanooga was so the files could be reviewed before the

23  on-site driver qualification process that we discussed

24  earlier, correct?

25     A   Correct.

COOK & WILEY, INC.

---

**Page 123**

1     Q   Were any drivers disqualified as a result of

2  that review?

3     A   Yes.

4     Q   Why?

5     A   You need to discuss that with the VP of

6  safety, but the answer is yes. There were drivers that

7  were disqualified based on the book review.

8     Q   Certainly then it wouldn't have made sense for

9  those drivers to have been requested by U.S. Xpress to

10  come physically to the actual driver qualification,

11  correct?

12     A   That would be correct.

13     Q   All right. Exhibit 6 is an e-mail from you

14  produced by U.S. Xpress, Bates 035. You recognize that,

15  sir?

16     A   Yes. I recognize this e-mail.

17     Q   That's an e-mail from you to Guy in response to

18  his e-mail to you?

19     A   No.

20     Q   I'm sorry.

21     A   This is an e-mail from Dennis Farnsworth to

22  Jeff Wardeberg, Ray Harlin, Al Hingst, and Lisa Pate,

23  basically attaching Guy Kelly's e-mail to myself dated

24  August 19 in which Guy Kelly expresses his -- his upset

25  with the closing process, basically saying that he's not

COOK & WILEY, INC.

---

**Page 124**

1  paid his bills and he's in jeopardy of some foreclosure

2  action and he's got to pay $100,000 insurance and

3  $100,000 in trade payables, all of which he incurred --

4  he didn't say that in here, but my response -- all of

5  which he incurred as normal course of business.

6     And it's my letter to Jeff Wardeberg saying we

7  need to have a meeting to discuss, you know, whether we

8  move forward or not.

9     Q   Okay. And that's dated August 19?

10     A   Correct.

11     Q   Okay. Let me show you what's previously been

12  marked as Defendant's Exhibit 48. Do you recognize that?

13     A   Yes. This is a letter from myself to Randall

14  Fant emphasizing that to meet an August 29 close, we

15  need to pay off letters and wiring instructions for the

16  receivable factor.

17     Q   Was that the date that was set for the closing,

18  August 29?

19     A   That was the anticipated date that all parties

20  were shooting for.

21     Q   All right. Let me show you what's previously

22  been marked as Defendant's Exhibit 42. You recognize

23  that, sir?

24     A   Yes. That was Guy Kelly basically sending me

25  a note saying that the terms of the contract -- this is

COOK & WILEY, INC.

125

1 right around the time that the letter of intent or the
2 contract -- and we had seen those earlier, but I don't
3 remember the dates on them, but it was right around that
4 time frame.
5 Q   Let's do this. I don't mean to interrupt you.
6 I know you're trying to get out of here. Rather than you
7 summarize if it for me, let me ask you a couple
8 questions.
9 A   Okay.
10 Q   Is Guy telling you in this e-mail that the
11 closing date has changed three times?
12 A   That's his letter -- it's his e-mail to me
13 stating that fact.
14 Q   Do you agree or disagree with that?
15 A   I don't recall, and I don't know whether it
16 changed three times or not.
17 Q   Okay. Okay. Let me look at it right quick.
18 A   Okay.
19 Q   Is Guy telling you that, quote, I was told
20 goodwill money paid, $740,000?
21 A   He's stating that in his e-mail.
22 Q   Do you dispute that someone from U.S. Xpress
23 represented to Guy that his goodwill money would be
24 $740,000?
25 A   I dispute that the exact words goodwill money

COOK & WILEY, INC.

1 would be paid was $741,000. The discussion always
2 around the goodwill money was how many drivers qualified
3 and the number of drivers that he would be able to
4 maintain over the two-year period would determine in
5 effect what the goodwill was for the transaction. There
6 was no agreement that there was a specific terminology
7 used in the contract or the letter of intent that
8 referenced goodwill.
9 Q   Then you see at the bottom of the e-mail, Guy
10 says, This is basically what I want?
11 A   Correct.
12 Q   And he sets forth eight requests that he would
13 like?
14 A   Right. And after looking at what he requested
15 on here, this was -- this letter would have been drafted
16 between the letter of intent and the first draft of the
17 asset agreement, since it references $161,912 for tax
18 and permits, which I believe was included as a
19 payment -- agreed to and included as a payment in the
20 initial agreement.
21 Q   Okay. Let me show you what's been marked as
22 Defendant's Exhibit 51 and ask you if you recognize that.
23 A   I do not recognize it, but it's obviously an
24 e-mail from Guy Kelly to Dennis Farnsworth dated
25 August 23 saying, Dennis, have you discussed with your

COOK & WILEY, INC.

127

1 guys about out-of-pocket expenses a week, insurance,
2 prepay; my revenue will be half driver pay fuel; please
3 understand I cannot eat this.
4 Q   That's Guy telling U.S. Xpress, that he's
5 losing money as a result of the due diligence process,
6 correct?
7 A   That's Guy sending an e-mail saying this is
8 occurring, in his words.
9 Q   Let me ask you this: The goal of the
10 conversion is to ultimately produce margin revenue for
11 U.S. Xpress, correct?
12 A   The goal of the conversion was to ultimately
13 obtain over 135 drivers, a regional operation, and
14 develop margin revenue from that transaction.
15 Q   And the margin revenue was going to be
16 developed in part from obtaining G.F. Kelly's drivers and
17 obtaining their customers, correct?
18 A   Obtaining the opportunity to their customers,
19 yes.
20 Q   The goal -- if the conversion was completed,
21 U.S. Xpress's goal would have been to try and keep every
22 customer that G.F. Kelly Trucking had, correct?
23 A   Not necessarily.
24 Q   Well, you weren't going to automatically do
25 away with the customers, were you?

COOK & WILEY, INC.

128

1 A   Day one, no.
2 Q   If you could make a profit from keeping G.F.
3 Kelly's customers, then you would have kept them,
4 correct?
5 A   Correct.
6 Q   Would it have been appropriate for U.S. Xpress
7 to contact G.F. Kelly's customers during the due
8 diligence process?
9 A   Without the permission of Guy Kelly, it would
10 be inappropriate. Any discussions with any customers
11 were preapproved in advance by Guy Kelly or Nelson
12 Chastain.
13 Q   Did you have any discussions with G.F. Kelly
14 customers during the due diligence process?
15 A   Yes, I did, with one customer.
16 Q   Who was that?
17 A   Wabash.
18 Q   And is it your contention that you had G.F.
19 Kelly's express permission to do that?
20 A   100 percent.
21 Q   And do you recall an e-mail or a conversation
22 or something that would evidence your assertion that you
23 had 100 percent permission?
24 A   I don't recall.
25 Q   What's the basis for you saying you had

COOK & WILEY, INC.

1 100 percent permission?
2    A   Because every contact that I would have done,
3 I would never contact anyone without prior approval of
4 the owner.
5    Q   Right. But I'm --
6    A   That is how I operate.
7    Q   But what evidence do you have that we could
8 show a judge or a jury --
9    A   I don't have evidence other than -- the
10 evidence would be a deposition or a discussion with the
11 two individuals from Wabash.
12    Q   All right. Let me finish my question.
13    A   Okay.
14    Q   What evidence do you have with you here today
15 that you can show me or a judge or a jury that would
16 prove that you had 100 percent express permission to
17 contact G.F. Kelly, Inc.'s customers?
18    A   I have no evidence with me in this room.
19    Q   Do you know of any evidence that your lawyer
20 has in his possession?
21    A   Not that I'm aware of.
22    Q   Is it your testimony that Wabash was the only
23 customer of G.F. Kelly Trucking, Inc., that you contacted
24 during the due diligence process?
25    A   That Dennis Farnsworth contacted during the

COOK & WILEY, INC.

1 due diligence process. Wabash was the only one I had
2 discussions with.
3    Q   Did you speak with any of G.F. Kelly Trucking's
4 customers after the due diligence was terminated?
5    A   I did not. Dennis Farnsworth did not have any
6 discussions with any customers.
7    Q   Do you know whether or not after the due
8 diligence was terminated, that U.S. Xpress contracted
9 with any of G.F. Kelly Trucking, Inc.'s customers?
10    A   I have no knowledge of that.
11    Q   But you do admit that one of the reasons that
12 you entered into this process was because U.S. Xpress
13 would have liked to have obtained Guy Kelly's customers
14 that could have made it a profit?
15    A   We proceeded with our discussions with Guy
16 Kelly from the beginning with the opportunity to create
17 a transaction with Guy Kelly Trucking without knowledge
18 of his customers. We did not enter into the process
19 based on knowledge or -- nor a plan or anything
20 associated around the customer base.
21    All the acquisition work that I did for U.S.
22 Xpress began with a concept -- a discussion around the
23 business as a truckload carrier and a driver base
24 associated with that, and then evolved through the due
25 diligence process of course into understanding the

COOK & WILEY, INC.

1 customer base and the lanes that are associated with
2 that.
3    Q   Did you ask G.F. Kelly Trucking to give you or
4 tell you its customer base during your due diligence
5 process?
6    A   Yes.
7    Q   And did you at some point make or keep a record
8 of G.F. Kelly Trucking's customer base during that
9 process?
10    A   Yes.
11    Q   And isn't it true that at the time that you
12 terminated the deal, that you were aware and had a copy
13 of G.F. Kelly Trucking's customer list?
14    A   Yes.
15    MR. CARTER: That's all the questions I have,
16 pending any questions from your lawyer.
17    MR. HALL: We're done.
18    MR. CARTER: You're so easy.
19
20 AND FURTHER THIS DEPONENT SAITH NOT
21
22    (The deposition concluded at 6:25 p.m.)
23
24
25

COOK & WILEY, INC.

1 COMMONWEALTH OF VIRGINIA,
2 COUNTY OF HENRICO, to wit:
3
4    I, Kimberly A. Heiser, a Notary Public for the
5 State of Virginia at Large, do hereby certify that the
6 foregoing deposition of Dennis Farnsworth was duly sworn
7 to before me at the time and place set out in the caption
8 hereto.
9    Further, that the transcript of the deposition
10 is true and correct, and that there were six exhibits
11 filed with me during the taking hereof.
12    Given under my hand this 12th day of February,
13 2007.
14
15                    *Kimberly A Heiser*
16
17    Kimberly A. Heiser, RPR
18    Notary Public for the
19    State of Virginia at Large
20 My commission expires:
21 June 30, 2007
22
23
24
25

COOK & WILEY, INC.

1  COMMONWEALTH OF VIRGINIA,

2  CITY/COUNTY OF _____, to wit:

3

4          I, Dennis Farnsworth, do hereby certify that I

5  have read the foregoing pages of typewritten matter

6  numbered 1 through 131, and that the same contains a true

7  and correct transcription of the deposition given by me

8  on the 5th day of February, 2007, with the exception of

9  the noted corrections, to the best of my knowledge and

10  belief.

11

12

13  Date                    Dennis Farnsworth

14

15

16

17          Subscribed and sworn to before me this _____

18  day of _____, 200___.

19          My commission expires _____

20

21

22          _____   Notary Public

23

24

25

COOK & WILEY, INC.

**$**

$1,000 [1] 78/24
$100,000 [2] 124/2 124/3
$161,912 [1] 126/17
$161,912 for [1] 126/17
$2,000 [3] 78/17 78/20 98/1
$2,500 [1] 78/17
$20,000 [4] 116/10 116/17 116/21 116/25
$24 [1] 43/23
$24 million [1] 43/23
$27,000 [1] 98/2
$35 [1] 43/5
$35 million a [1] 43/5
$5,000 [1] 79/24
$50,000 [1] 98/24
$500 [1] 78/23
$740,000 [2] 125/20 125/24
$741,000 [1] 126/1
$80,000 [1] 98/24

**'**

'04 [8] 14/17 14/20 15/8 17/18 26/1 89/10 89/21 90/6
'04-'06 [1] 14/20
'05 [2] 30/4 44/20
'06 [9] 14/17 14/20 15/8 19/23 19/24 26/1 89/10 89/21 90/6
'96 [1] 6/25
'99 [1] 7/6

**0**

035 [2] 2/22 123/14

**1**

100 percent [7] 28/22 28/22 92/3 128/20 128/23 129/1 129/16
1021 [1] 1/17
118 [4] 2/19 2/20 2/21 2/22
12th [1] 132/12
131 [1] 133/6
135 [5] 78/9 80/19 95/12 98/1 127/13
140 [2] 74/1 80/19
145 [7] 73/12 74/2 77/5 77/10 77/16 77/23 80/12
15 million [1] 45/17
150 [5] 73/12 73/17 74/1 74/2 77/5
175 [2] 43/22 72/2
19 [2] 123/24 124/9
190 [1] 74/16
1970 [1] 4/25
1974 [1] 5/11
1984 [1] 1/22
1990 [1] 5/21
1991 [1] 6/10
1995 [2] 6/10 6/24
1996 [3] 6/24 7/1 7/6
1999 [3] 7/6 7/7 7/8

**2**

2,000 [1] 79/23
20 [1] 52/2
200 [9] 72/3 73/14 73/20 73/21 74/4 74/16 74/18 75/9 133/18
2000 [4] 7/15 14/5 14/13 14/14
2004 [7] 9/23 9/25 10/9 10/22 11/8 37/18 58/25
2006 [6] 10/9 10/9 10/10 10/22 11/8 37/18
2007 [4] 1/10 132/13 132/20 133/8
205 [1] 2/8
208 [1] 119/5
208-221 [1] 2/19
20th [1] 2/7
221 [2] 2/19 119/5

**2** (second column)

23 [1] 126/25
2342 [1] 2/4
2343 [1] 2/4
244-3831 [2] 2/8
25 [1] 112/18
25 percent [1] 27/16
250 [10] 20/3 23/5 23/6 23/7 23/10 23/11 23/12 24/1 24/1 24/5
269-2343 [1] 2/8
272 [1] 2/3
285 [2] 2/21 121/18
29 [2] 124/14 124/18
2:30 [1] 1/16

**3**

3-6 [1] 118/22
30 [6] 41/22 44/1 44/15 48/24 52/2 132/20
30 million [2] 43/5 44/12
303 [2] 2/20 121/5
334 [1] 2/4
35 million [2] 44/1 44/16
35203 [1] 2/8
359-1984 [1] 1/22
36103 [1] 2/4
37 [2] 112/18 112/23
3751 [1] 1/21
3831 [1] 2/8
3PL [1] 10/12

**4**

40 [3] 2/17 2/18 113/2
40 percent [1] 18/2
42 [1] 124/22
420 [1] 2/7
43 [1] 114/20
45 [3] 36/15 36/17 113/23
450 [1] 36/9
48 [1] 124/12
49 percent [8] 24/8 26/18 30/6 31/21 35/3 35/6 43/18 52/21

**5**

50 [1] 101/10
50 percent [2] 63/25 101/9
51 [1] 126/22
51 percent [1] 31/20
55 [2] 116/2 117/24
5th [1] 133/8

**6**

6 million [1] 9/8
60 [5] 17/22 17/24 36/15 36/17 56/13
6:25 [1] 131/22

**7**

75 [1] 73/15
75 percent [1] 73/16

**8**

804 [1] 1/22
85 percent [1] 86/17

**9**

90 [9] 17/23 17/24 39/7 39/9 39/12 39/18 40/8 40/9 40/16
90 percent [3] 39/4 39/18 86/17
90-day [1] 40/13
95 percent [1] 27/3

**A**

Abilene [34] 12/2 19/19 20/2 20/3 20/4 20/10 20/14 20/21 20/23 21/9 22/1 23/4 23/17 24/8 24/10 24/21 25/9 25/11 26/9 26/14 26/15 26/18 27/9 27/14 27/19 28/7 28/10 29/3 29/10

**A** (third column)

Abilene's [4] 19/20 21/20 24/11 26/25
ability [1] 55/6
able [3] 74/19 106/3 126/3
about [109]
absolute [2] 75/17 75/17
Absolutely [1] 34/9
accept [1] 93/2
acceptable [3] 25/9 99/9 102/17
accepted [2] 9/21 77/9
access [3] 31/1 31/2 58/15
accommodate [1] 4/12
accomplish [3] 19/1 82/21 85/12
accord [1] 40/1
account [2] 16/25 86/21
accounts [10] 7/20 7/21 8/9 17/11 17/12 63/3 63/5 63/15 63/16 71/25
accuracy [1] 18/21
acknowledging [1] 55/5
acquire [1] 13/14
acquired [2] 13/18 90/13
acquiring [1] 26/17
acquisition [4] 11/2 17/6 89/25 130/21
across [2] 6/21 100/24
action [3] 1/5 121/8 124/2
active [1] 106/6
activities [4] 18/24 54/16 63/6 70/2
actual [2] 69/4 123/10
actually [9] 11/9 25/20 39/17 44/11 51/14 70/24 88/3 89/19 91/10
addition [2] 26/25 71/18
additional [2] 38/2 78/23
additionally [1] 71/11
admit [1] 130/11
advance [1] 36/9
advice [1] 120/8
affect [1] 97/21
affiliate [1] 9/13
after [49]
afternoon [1] 21/7
afterwards [1] 47/18
again [16] 7/2 21/14 21/23 35/3 38/25 52/9 52/11 61/24 66/14 79/25 85/10 92/4 93/20 120/23 121/18 121/20
against [4] 3/13 78/15 78/16 86/8
agency [3] 52/16 53/12 91/24
agency's [1] 91/22
agent [8] 9/12 11/2 90/4 90/7 92/1 92/1 92/2 92/2
agents [1] 90/12
aggressively [1] 94/11
ago [1] 16/1
agree [7] 55/11 88/16 88/17 89/5 109/25 111/7 125/14
agreed [9] 79/2 79/8 109/17 109/20 110/25 113/8 113/24 120/6 126/19
agreement [79]
agreements [2] 54/7 85/24
ahead [2] 11/22 19/18
Ahern [24] 12/2 12/8 12/9 12/12 12/15 12/16 12/17 12/19 13/3 13/3 13/11 13/13 13/16 13/21 30/8 44/21 44/22 45/2 45/7 45/11 45/13 45/15 46/3 46/7
al [24] 1/7 2/11 41/24 92/21 93/12 95/22 104/9 104/11 104/12 104/22 104/23 105/2 105/3 105/3 105/5 105/9 105/10 119/10 119/19 120/14 120/25 121/21 121/23 123/22
Al and [1] 119/19
Al conversation [1] 105/3
Al didn't [1] 105/10
Al or [2] 120/14 120/25
Al say [1] 105/2

## A

AI talk [1] 105/5
ALABAMA [5] 1/1 2/4 2/8 3/12 122/5
all [115]
ALLEN [2] 2/3 3/11
alone [2] 34/1 102/18
along [5] 3/10 48/24 50/10 72/1 89/22
already [4] 4/5 80/25 90/24 103/25 112/12
also [13] 2/11 12/19 63/2 63/4 81/7 81/13
  81/17 85/11 101/23 106/12 116/10 121/4
  121/17
aluminum [1] 122/5
always [4] 43/15 72/21 74/10 126/1
am [6] 3/15 23/10 82/5 84/5 114/12 115/25
ambiguous [1] 110/22
amended [1] 80/12
Among [1] 77/3
amount [5] 72/19 80/20 88/5 102/14 109/6
analysis [2] 8/7 30/25
Andy [3] 12/16 46/7 121/25
announced [1] 53/21
annually [1] 9/8
another [5] 4/6 21/13 78/20 106/20 109/13
answer [17] 3/22 4/3 4/6 75/4 84/4 84/13
  84/15 98/10 98/12 106/24 109/1 110/23
  111/13 111/17 111/18 114/13 123/6
answered [1] 51/16
anticipated [1] 124/19
any [41] 4/9 19/16 21/6 27/18 34/12 37/20
  38/6 39/3 40/12 41/7 41/11 44/3 54/18 59/7
  64/20 66/2 67/10 74/18 79/21 80/2 81/18
  89/22 99/17 105/3 105/10 106/5 107/11
  107/11 107/18 112/4 112/7 123/1 128/10
  128/10 128/13 129/19 130/3 130/5 130/6
  130/9 131/16
anyone [7] 13/10 66/9 83/9 96/2 100/19
  104/3 129/3
anything [17] 23/16 24/14 29/24 30/20 33/13
  54/8 55/5 66/3 74/3 85/2 86/1 88/23 93/18
  94/5 99/15 116/11 130/19
anywhere [1] 38/5
apartment [2] 14/14 14/15
apologize [1] 32/4
appealed [1] 10/14
APPEARANCES [1] 2/1
appeared [2] 44/19 77/22
appears [1] 121/8
appraisal [1] 117/11
appreciate [1] 69/12
approach [2] 11/2 38/19
approached [7] 7/8 7/24 10/11 16/14 16/16
  16/17 71/9
appropriate [1] 128/6
approval [1] 129/3
approximately [7] 23/5 56/14 73/21 75/16
  93/16 102/21 103/3
April [1] 118/10
are [63]
area [1] 57/11
areas [1] 36/3
aren't [1] 100/8
argue [1] 112/8
argumentative [1] 111/6
Arizona [1] 12/9
Arnold [20] 11/17 11/17 11/19 11/20 16/11
  16/12 16/21 17/7 17/17 17/25 18/4 18/9 18/19
  19/15 20/15 26/11 26/16 31/24 37/7 37/8
around [22] 20/3 20/13 39/4 56/13 61/9 62/1
  62/3 70/2 73/15 80/19 88/3 88/4 88/11 88/21
  91/14 91/19 121/9 125/1 125/3 126/2 130/20
  130/22
arrangements [1] 88/11
arranging [1] 37/12
arranged [1] ...
as [130]
ask [18] 4/6 22/15 45/10 48/23 57/1 64/9
  66/7 77/19 82/3 82/7 89/9 112/9 112/14
  118/25 125/7 126/22 127/9 131/3
asked [10] 7/2 31/23 36/7 39/6 58/23 68/10
  69/19 81/13 82/8 113/16
asking [6] 3/21 49/7 49/10 87/9 97/15 109/8
aspect [2] 104/20 104/22
aspects [4] 85/17 85/18 93/23 93/25
assertion [1] 128/22
assessment [1] 121/13
asset [47]
assets [34] 8/10 17/14 42/16 43/10 62/22
  65/2 71/14 73/3 85/24 89/25 92/5 92/6 94/2
  94/24 98/3 98/4 99/5 99/25 100/8 100/12
  100/14 100/20 100/21 101/2 101/2 101/7
  101/16 102/2 102/22 102/25 103/1 103/7
  103/11 103/18
assignments [1] 121/9
assistant [1] 5/18
associated [11] 41/14 57/5 62/24 62/25 71/13
  79/14 97/25 111/1 130/20 130/24 131/1
Associates [14] 12/2 12/8 12/12 12/15 12/17
  12/19 13/3 13/3 13/11 13/14 13/17 13/21 30/8
  44/21
Associates on [1] 12/15
assume [2] 23/11 109/16
assuming [1] 17/9
assured [1] 18/20
attach [1] 66/23
attached [2] 115/9 120/4
attaching [1] 123/23
attachment [1] 119/23
attainable [1] 77/23
attempt [2] 33/19 37/19
attempted [1] 116/19
attend [1] 33/12
attention [2] 108/20 108/21
auctions [2] 100/23 100/25
auditor [2] 17/11 17/12
August [9] 88/7 118/12 121/22 122/18
  123/24 124/9 124/14 124/18 126/25
August 19 [2] 123/24 124/9
August 23 [1] 126/25
August 29 [2] 124/14 124/18
August 9 [2] 121/22 122/18
authoritative [1] 96/6
authority [4] 40/5 54/19 54/21 72/19
authorization [1] 124/7
Auto [3] 6/1 6/2 6/4
automatically [1] 127/24
availability [1] 26/7
available [7] 33/12 58/12 59/13 59/16 60/6
  60/9 70/10
average [1] 36/16
aware [9] 3/13 46/24 107/8 107/11 111/10
  115/23 120/6 129/21 131/12
away [1] 127/25

## B

Bachelor's [1] 5/9
back [20] 6/6 9/4 13/24 14/4 14/12 25/6
  31/22 33/6 34/6 49/19 56/2 56/5 57/15 65/9
  68/4 79/2 106/11 107/6 118/16 122/20
background [3] 4/17 33/10 45/5
backwards [1] 56/25
BAKER [1] 2/7
balance [4] 17/9 27/11 35/6 35/7
ballpark [2] 75/20 75/24
banker [1] 6/18
base [13] 22/22 23/1 23/22 45/17 71/19 76/5
179/11 81/18 130/20 130/23 131/... 131/4 131/8
based [45]
basically [26] 9/5 13/2 17/9 18/10 18/20
  21/14 31/19 47/7 52/17 65/4 66/13 81/11 86/7
  89/6 94/9 94/11 101/9 113/7 116/22 119/10
  119/13 121/22 123/23 123/25 124/24 126/10
basis [5] 15/4 28/3 43/13 100/23 128/25
Bass [3] 6/18 6/19 6/20
Bates [8] 2/19 2/20 2/21 2/22 119/5 121/4
  121/17 123/14
be [91]
BEARMAN [1] 2/7
BEASLEY [2] 2/3 3/11
beat [2] 94/9 94/10
beating [1] 97/3
became [1] 98/21
because [30] 9/10 20/16 29/1 31/22 35/5
  43/25 52/3 59/16 60/16 62/21 65/19 69/10
  73/14 77/19 77/21 79/2 84/20 87/16 97/17
  97/23 98/25 104/5 105/16 105/18 109/1
  109/23 114/7 118/13 129/2 130/12
become [7] 7/3 7/25 24/12 72/17 73/3 92/5
  93/3
been [39] 11/12 13/17 21/11 23/15 24/18
  34/1 40/7 45/6 46/22 59/1 61/13 62/2 65/9
  70/10 89/15 90/12 94/17 95/1 97/3 100/4
  100/10 100/15 108/12 112/12 112/17 113/1
  113/22 114/18 115/9 120/18 121/24 122/14
  123/9 124/11 124/22 126/15 126/21 127/21
  128/6
before [60]
began [2] 17/16 62/11 130/22
begin [1] 48/11
beginning [3] 1/16 34/2 130/16
behalf [22] 26/1 37/21 42/2 42/5 54/12 54/14
  54/25 55/6 55/11 58/15 71/1 71/4 75/23 83/22
  90/7 91/12 92/19 95/8 111/15 114/9 116/18
  116/24
behind [1] 42/25
being [14] 3/3 52/23 59/20 69/24 71/12 80/1
  81/9 94/4 104/9 106/3 106/3 108/14 108/16
  110/15
belief [6] 73/18 73/25 95/12 107/9 107/11
  133/10
believe [28] 15/15 17/22 21/11 21/19 22/18
  30/4 39/17 41/10 43/22 48/2 48/5 50/9 56/13
  57/12 60/18 63/1 63/9 67/21 72/3 73/12
  81/4 101/9 106/25 109/20 114/10 114/14
  126/18
believed [1] 105/6
below [1] 95/2
benefit [3] 98/18 98/19 98/21
BERKOWITZ [1] 2/7
besides [1] 85/21
best [5] 3/22 20/21 119/12 120/7 133/9
better [2] 45/10 81/20
between [24] 10/22 11/8 17/19 34/19 36/10
  36/22 37/18 48/14 49/8 49/13 50/18 56/11
  62/6 69/23 73/12 76/1 86/6 90/6 103/4 109/17
  113/7 115/7 117/23 126/16
beyond [1] 21/7
bid [2] 24/21 24/22 24/24 25/3 25/3 25/5
big [3] 9/6 12/17 15/1
Bill [5] 32/22 32/23 32/24 33/10 61/11
billing [2] 7/21 8/10
billings [2] 86/9 86/23
bills [1] 124/1
binding [1] 68/24
Birmingham [1] 4/3
bit [7] 4/16 12/25 13/24 19/19 45/5 68/5
  80/25
board [2] 63/12 82/2
Boneau [1] 16/4

**B**

book [9] 101/4 101/5 101/6 101/19 102/6 102/10 103/9 103/18 123/7
books [1] 18/11
born [1] 4/17
both [7] 14/13 34/3 34/18 36/21 53/25 88/13 110/4
bottom [1] 126/9
bought [2] 11/13 69/4
bound [1] 114/17
brakes [1] 101/9
break [11] 4/11 40/20 52/8 67/23 101/11 101/15 102/16 103/4 103/8 103/19 118/18
break-even [4] 102/16 103/4 103/8 103/19
briefly [1] 52/21
bring [2] 38/9 77/11
bringing [1] 122/21
broker [6] 11/25 12/19 12/24 20/24 34/5 38/11
brokerage [1] 38/8
brokers [5] 11/3 11/16 12/22 38/17 38/18
brought [7] 11/16 11/18 11/25 12/3 93/5 93/7 108/19
Bryant [4] 90/16 90/21 91/1 91/5
bubble [1] 52/23
build [1] 79/10
building [1] 59/1
business [33] 5/9 5/24 5/25 6/5 6/14 9/2 10/6 10/7 11/1 12/17 14/24 21/4 21/5 21/6 21/23 33/2 39/12 47/8 47/9 54/6 55/14 82/1 84/6 92/3 98/8 98/15 99/12 111/4 111/7 117/12 117/16 124/5 130/23
businesses [1] 12/7
buy [5] 12/23 13/12 31/20 98/23 99/19
buyer [4] 12/10 12/13 92/5 109/13
buying [5] 37/8 37/9 43/10 62/21 99/4
bye [1] 106/8

**C**

C-P-O-R [1] 8/20
C-P-O-R-E [1] 8/19
C:06cv00351 [1] 1/6
C:06cv00351-MEF [1] 1/6
CALDWELL [1] 2/7
call [20] 29/20 30/8 30/11 30/12 30/13 45/6 53/12 96/1 96/2 96/8 96/14 100/4 100/7 104/20 104/22 104/23 106/25 112/7 115/19 115/20
called [5] 3/2 8/19 41/22 104/23 115/20
calling [1] 109/7
calls [1] 106/24
came [7] 19/4 21/12 21/17 25/6 52/15 61/10 61/12
can [28] 3/23 13/24 17/19 20/21 29/24 30/25 36/23 37/24 39/7 40/1 49/2 60/14 65/14 66/1 71/15 80/1 80/2 83/12 84/13 84/15 86/10 98/10 112/14 119/8 120/7 121/5 121/19 129/15
can't [10] 16/5 47/1 49/4 79/25 86/12 91/15 92/17 93/13 111/17 118/13
candidate [1] 45/3
cannot [6] 31/5 54/25 65/14 76/22 87/25 127/3
capacity [2] 11/1 47/11
caption [1] 132/7
car [2] 5/24 52/1
carrier [8] 11/23 15/3 30/9 45/23 45/24 45/24 45/25 130/23
carriers [13] 9/14 9/18 12/24 13/4 15/7 24/21 24/22 24/23 38/19 46/14 51/2 53/4 117/15
carries [1] 43/7
Carter [3] 2/2 3/5 3/9

carried [1] 76/4
Carpenter [1] 3/9
case [3] 4/16 17/7 50/10
cash [1] 27/11
CCR [1] 1/15
ceasing [1] 106/6
centered [1] 88/10
certain [8] 21/19 59/23 59/24 60/8 60/20 60/23 99/9 118/13
certainly [3] 60/19 83/8 123/8
certainly Russ [1] 60/19
certify [2] 132/5 133/4
CFO [1] 5/24
Champlin [1] 5/13
change [3] 37/14 107/18 107/21
changed [2] 125/11 125/16
changes [4] 39/9 113/16 113/18 113/20
charge [4] 92/16 92/19 96/22 107/14
Chastain [11] 51/25 65/3 81/8 83/20 94/9 107/14 108/2 109/4 110/5 110/24 128/12
chat [1] 64/7
Chattanooga [11] 7/11 14/6 14/8 14/15 66/24 70/12 121/25 122/12 122/15 122/17 122/22
chatted [2] 52/8 52/21
check [2] 64/1 70/20
chemical [1] 45/24
chief [6] 7/25 8/6 8/24 10/3 10/13 38/20
child [1] 8/16
Childers [6] 58/23 59/18 59/19 60/2 81/15 108/13
choice [1] 111/4 111/7
CITY [1] 133/2
CITY/COUNTY [1] 133/2
Civil [1] 1/5
clarify [1] 64/8
clear [10] 30/24 54/6 54/20 84/4 84/5 84/6 84/22 84/23 87/24 94/24
client [2] 12/24 20/5
Clint [1] 3/9
Clinton [1] 2/2
close [8] 61/2 82/12 84/8 87/1 87/25 97/18 118/18 124/14
closed [1] 30/4
closing [42] 27/22 29/23 29/25 36/11 36/19 36/21 36/23 37/3 37/13 68/8 68/10 68/16 69/4 69/5 69/7 82/22 82/23 83/2 83/5 83/10 83/13 84/11 84/20 88/3 88/7 88/12 88/15 88/21 91/1 96/17 97/17 109/8 109/11 109/17 109/21 110/7 111/2 111/25 118/4 123/25 124/17 125/11
Cochairman [2] 15/15 15/21
Colin [1] 32/2
collections [1] 86/19
college [2] 5/2 5/4
combination [2] 47/25 96/18
come [11] 7/2 8/11 12/25 29/9 38/17 64/1 73/23 77/9 105/8 108/24 123/10
comes [1] 102/6
coming [2] 64/10 108/21
comment [1] 82/3
Commerce [1] 2/3
commission [3] 52/18 132/20 133/19
commitment [1] 54/18
committing [1] 54/17
COMMONWEALTH [2] 132/1 133/1
communicate [4] 47/24 104/4 106/11 106/22
communicated [4] 104/7 104/8 104/25 105/23
communication [1] 122/2
companies [27] 11/3 11/4 11/4 11/12 13/12 13/15 13/16 17/18 37/20 37/23 38/2 38/5 38/21 38/23 38/24 39/1 39/10 39/18 39/19

40/11 40/14 44/14 45/16 51/7 51/12 86/1 96/10
company [56]
company's [2] 43/11 91/24
compare [2] 108/9 108/11
comparison [3] 99/5 103/2 118/8
compensated [2] 108/16
compensation [2] 116/11 116/14
complaint [1] 42/12
complete [4] 26/16 85/19 88/5 121/10
completed [14] 17/21 19/21 19/22 19/23 25/8 27/17 28/15 28/18 59/5 64/16 66/7 76/9 94/18 127/20
completion [4] 27/4 36/10 36/22 69/17
computer [1] 122/2
concentrated [1] 70/2
concept [4] 20/25 71/17 71/20 130/22
concern [1] 114/4
concerning [1] 122/5
concerns [1] 81/18
concluded [2] 64/23 131/22
conclusion [1] 64/20
conclusions [2] 19/5 19/15
condition [9] 27/11 35/25 70/21 88/6 88/6 94/22 97/14 97/16 106/4
conditions [19] 25/4 36/5 36/24 37/11 50/5 67/16 69/3 69/25 71/3 71/6 77/7 77/12 84/17 84/21 94/23 97/10 98/20 101/8 111/8
conduct [2] 27/15 90/20
conducted [4] 36/23 101/21 102/2 102/4
conducting [1] 91/11
conference [9] 18/11 63/19 63/20 96/1 96/2 96/8 96/14 100/4 100/7
confidentiality [26] 30/20 30/21 30/23 31/12 32/15 34/7 34/11 34/13 39/5 39/17 39/22 40/4 40/5 40/6 47/13 47/14 48/2 48/14 48/20 49/9 49/14 51/12 54/24 55/2 56/12 57/25
conjunction [1] 108/12
consider [5] 43/6 43/12 65/11 66/1 113/19
consideration [2] 80/16 97/24
considered [1] 14/25
consummated [1] 11/7
contact [11] 6/6 13/9 38/9 38/16 44/24 45/2 122/6 128/7 129/2 129/3 129/17
contacted [6] 7/1 14/4 44/21 44/22 129/23 129/25
contacts [1] 29/18
contains [1] 133/6
contemplate [1] 24/4
contemplated [1] 99/21
contemplates [1] 77/4
contemplating [1] 24/8
contention [1] 128/18
context [1] 72/7
continue [9] 24/10 53/3 66/17 68/11 71/21 81/5 107/13 108/1 108/5
continued [3] 36/4 67/5 97/5
continuing [3] 71/18 71/21 98/8
contract [37] 29/8 33/3 33/7 36/25 37/12 69/2 69/3 71/10 74/19 77/7 77/9 77/12 79/25 84/17 84/21 86/15 88/9 94/23 95/15 97/11 101/8 104/6 106/5 106/6 106/17 111/8 111/21 112/1 112/2 112/5 114/7 114/7 116/22 122/6 124/25 125/2 126/7
contracted [1] 130/8
contractor [6] 9/16 9/20 29/7 29/12 73/23 93/3
contractors [4] 23/3 23/8 23/14 72/18
contracts [3] 33/3 68/9 90/13
contractual [4] 24/10 42/15 68/24 88/11
control [8] 23/12 74/16 79/7 79/9 79/10 92/3 92/4 92/6
controller [14] 5/19 5/23 6/8 7/3 7/10 7/19

controller... [8] 8/8 27/23 28/6 28/7 28/10 28/11 29/1 65/4
controls [2] 18/22 35/24
convenient [2] 20/18 20/19
conversation [23] 34/6 39/2 39/23 46/12 46/23 47/1 47/4 47/5 47/6 47/10 47/17 48/1 50/18 54/5 59/25 60/1 69/15 104/21 105/3 106/9 106/20 107/12 128/21
conversations [13] 21/25 23/15 30/19 46/3 49/22 49/23 49/24 56/3 56/4 56/6 73/9 74/14 117/18
Conversations were [1] 56/6
conversion [54]
conversion's [1] 31/5
conversions [6] 15/25 16/2 37/25 42/18 62/10 89/10
convert [5] 11/9 22/1 37/19 53/9 53/16
converted [5] 23/17 24/6 37/18 91/3 107/10
converting [3] 22/3 43/12 117/12
converts [1] 29/2
conveyed [3] 65/2 94/24 100/15
conveying [1] 65/2
COOK [1] 1/20
cooperated [1] 116/19
cooperation [2] 116/15 116/23
coordinated [1] 93/7
copy [1] 131/12
copying [1] 121/21
corporate [2] 7/10 7/19
Corporation [3] 5/14 6/7 7/2
correct [164]
corrections [1] 133/9
correspond [1] 23/6
cost [3] 98/4 99/11 99/15
costs [1] 79/23
could [36] 8/15 14/20 17/22 38/14 38/15 50/20 51/5 53/9 53/16 53/24 57/22 58/25 59/7 61/1 62/1 65/18 70/24 72/2 72/5 75/9 75/24 77/8 96/14 97/1 97/4 97/5 97/16 104/17 105/5 109/11 120/1 122/22 128/2 129/7 130/14
couldn't [9] 52/7 65/10 95/19 97/9 97/11 97/14 97/14 97/17 105/9
counsel [4] 2/5 2/9 25/21 106/19
counteroffers [1] 25/7
counterparts [2] 28/2 29/5
counting [1] 73/22
country [1] 100/24
COUNTY [2] 132/2 133/2
couple [5] 41/1 56/1 57/12 119/2 125/7
course [2] 124/5 130/25
court [2] 1/1 4/1
covenants [1] 65/13
CPOR [5] 8/19 8/21 8/22 9/2 9/3
create [1] 130/16
created [1] 86/16
creates [1] 100/24
criteria [3] 43/2 46/4 78/10
critical [1] 120/10
CROW [1] 2/3
crowd [1] 75/8
culmination [1] 84/10
currently [1] 122/1
cursory [1] 57/13
custody [1] 8/16
customer [11] 33/5 63/4 81/18 127/22 128/15 129/23 130/20 131/1 131/4 131/8 131/13
customers [15] 45/18 81/19 127/17 127/18 127/25 128/3 128/7 128/10 128/14 129/17 130/4 130/6 130/9 130/13 130/18

D-1 [1] 1/21
daily [1] 28/3
Dallas [1] 10/13
Dalton [1] 90/19
data [2] 59/4 74/14
date [21] 36/19 36/21 82/22 82/23 83/2 83/5 83/10 83/13 88/16 88/17 109/8 109/17 109/20 110/7 111/2 115/3 115/5 124/17 124/19 125/11 133/12
dated [4] 112/18 123/23 124/9 126/24
dates [7] 88/3 88/4 88/8 88/21 110/2 110/3 125/3
Davenport [2] 12/4 12/5 20/5 20/8 21/8 24/20 24/20
David [1] 2/6
day [20] 17/25 26/22 35/8 40/13 58/11 61/20 61/21 76/17 94/8 95/21 104/6 106/23 112/1 115/13 115/24 118/4 128/1 132/12 133/8 133/18
days [11] 17/23 17/24 36/15 36/18 39/7 39/10 39/12 40/8 40/9 40/16 56/13
deal [31] 11/7 12/20 13/5 65/13 66/14 87/12 91/1 94/5 97/18 99/16 103/8 103/20 103/22 104/1 104/4 104/5 105/13 105/14 105/24 107/2 107/6 108/8 109/11 109/14 109/15 110/7 111/24 112/9 116/8 120/11 131/12
dealing [4] 28/2 43/3 89/24 118/11
dealings [1] 42/8
deals [4] 11/5 11/8 19/13 20/25
dealt [6] 13/22 31/15 31/17 31/23 78/8 117/5
debt [4] 62/24 65/1 95/2 99/16
decent [1] 18/22
decide [2] 38/24 40/18
decided [7] 9/12 36/21 95/19 97/9 97/10 97/12 99/4
decides [1] 36/19
decision [11] 11/6 19/12 43/2 54/19 77/11 78/3 96/5 96/6 96/8 99/10 111/21
decision-makers [1] 11/6 19/12
decisions [4] 39/9 54/25 55/6 94/20
dedicated [3] 32/25 33/3 33/3
Defendant's [8] 112/18 112/23 113/2 114/20 116/2 124/12 124/22 126/22
Defendants [2] 1/8 2/9
defined [1] 71/12
defining [2] 68/7 68/21
definition [1] 69/9
definitive [3] 25/17 36/5 67/6
degree [2] 5/6 5/9
deliver [1] 66/25
demands [1] 113/17
DENNIS [15] 1/13 3/2 3/8 33/17 65/7 95/22 121/20 123/21 126/24 126/25 129/25 130/5 132/6 133/4 133/4 133/12
department [5] 63/21 70/7 74/21 85/15 122/1
depend [1] 108/3
depending [3] 43/5 52/14 86/11
depends [1] 17/6
DEPONENT [1] 131/20
deposition [13] 1/13 2/17 2/18 3/16 41/3 41/22 50/14 119/4 129/10 131/22 132/6 132/9 133/7
describe [4] 21/3 21/5 21/5 68/19
described [5] 19/15 35/16 84/16 90/24 115/10
describing [6] 11/13 22/6 23/16 45/3 45/4 50/6
description [2] 2/16 22/22
despite [1] 97/7
destroyed [5] 58/24 59/1 59/17 59/20 60/5

detail [1] 32/16
details [4] 33/23 82/2 93/10 93/13
determination [6] 44/6 44/9 94/18 95/9 102/18 118/3
determine [12] 34/17 40/16 41/6 70/21 74/18 75/9 75/16 75/23 101/7 117/11 117/19 126/4
determined [7] 26/6 76/21 78/2 78/6 96/13 100/21 103/2
determines [1] 26/5
determining [1] 49/19
detriment [1] 78/15
develop [1] 127/14
developed [1] 127/16
development [4] 10/6 10/8 54/6 84/6
dictate [1] 36/25
did [184]
didn't [19] 9/19 11/22 30/18 41/19 43/25 55/5 61/22 62/21 63/13 63/20 73/24 86/4 97/17 105/10 109/24 110/8 114/7 122/6 124/4
difference [1] 118/10
different [8] 42/21 62/20 65/13 72/13 72/14 72/15 72/16 91/22
diligence [106]
direct [3] 32/16 47/25 85/8
directly [10] 12/16 14/2 15/22 38/15 38/17 38/19 45/3 81/24 92/16
director [1] 122/7
disagree [1] 125/14
disarray [1] 100/18
disclose [1] 31/5
disconnected [1] 106/8
discretion [1] 77/12
discuss [9] 20/24 22/22 51/3 53/22 53/24 59/19 95/23 123/5 124/7
discussed [11] 37/25 53/8 53/15 64/8 80/21 81/17 109/4 113/7 113/10 122/23 126/25
discusses [1] 119/23
discussing [2] 21/25 54/4
discussion [17] 21/7 30/14 30/17 32/16 45/14 45/20 46/8 52/24 54/18 72/4 88/7 88/10 106/9 116/10 126/1 129/10 130/22
discussions [30] 21/22 22/10 30/24 34/14 34/16 34/22 38/10 39/14 40/10 43/15 43/17 45/13 45/15 50/4 53/3 54/7 72/1 73/10 77/24 81/7 81/10 85/12 107/12 115/7 118/2 128/10 128/13 130/2 130/6 130/15
dispose [1] 6/11
disposing [1] 12/7
dispute [2] 125/22 125/25
disqualified [2] 123/1 123/7
dissuade [1] 112/8
Distribution [2] 8/1 8/2
DISTRICT [2] 1/1 1/1
DIVISION [1] 1/2
divulge [1] 24/25
do [119]
document [9] 50/9 55/7 67/17 68/22 112/14 115/8 115/11 121/6 121/17
documentation [13] 56/7 56/23 57/2 57/5 57/21 65/12 65/12 75/18 81/6 85/23 96/16 97/8 97/15
documents [32] 27/23 34/12 34/14 34/17 34/22 41/7 41/11 41/15 41/16 41/18 49/4 49/16 49/17 49/18 49/19 49/20 49/22 49/24 56/16 56/18 65/20 66/8 69/5 69/7 96/19 96/23 97/1 97/3 103/11 103/15 112/11 112/12
does [22] 12/22 12/24 23/6 26/5 29/11 31/8 31/8 34/7 37/24 38/7 39/3 52/11 52/12 52/12 54/24 79/10 98/17 101/6 101/6 102/23 109/16 115/3
doesn't [4] 79/9 98/6 99/15 116/17
doing [15] 6/5 9/1 9/19 17/3 17/25 28/25 29/24 48/17 49/13 50/1 64/5 70/4 83/4 93/18

**D**

doing... [1] 94/5
dollars [3] 97/25 102/22 102/25
don't [57]
done [11] 29/21 29/23 44/11 102/20 108/12
109/6 110/7 118/12 119/3 129/2 131/17
DONELSON [1] 2/7
door [1] 118/5
down [14] 3/12 3/24 19/8 21/2 21/13 24/19
61/18 61/20 69/5 76/4 82/5 85/10 102/11
108/9
downtown [2] 20/24 21/14
draft [5] 33/21 76/1 80/21 106/15 126/16
drafted [4] 25/21 114/25 115/8 126/15
drafts [1] 25/20
drawer [1] 65/18
drive [3] 75/10 77/5 93/21
driver [73]
drivers [106]
drove [1] 51/15
dud [1] 65/5
due [114]
duly [2] 3/3 132/6
during [66]
duties [5] 7/17 8/4 8/8 8/25 10/24
duty [1] 114/16

**E**

e-mail [30] 45/3 47/21 47/24 47/25 66/22
66/24 66/25 109/10 109/12 115/10 115/9
119/9 119/18 120/1 120/14 121/18 121/20
123/13 123/16 123/17 123/18 123/21 123/23
125/10 125/12 125/21 126/9 126/24 127/7
128/21
e-mailed [4] 48/10 106/25 107/5 107/6
e-mailing [1] 109/8
each [5] 20/20 28/13 29/17 64/4 65/12 79/13
82/9 82/21 84/22
earlier [7] 30/18 42/18 48/14 72/7 88/12
122/24 125/2
early [4] 43/16 65/14 72/24 86/24
earnings [1] 80/6
earnout [8] 78/2 78/5 78/15 79/4 79/15 79/16
80/6 80/9
easily [1] 39/7
East [1] 1/17
EASTERN [1] 1/2
easy [1] 131/18
eat [1] 127/3
effect [1] 126/5
effectuate [1] 16/2
eight [5] 38/5 38/21 40/11 40/13 126/12
either [8] 11/1 12/10 21/2 38/8 59/5 86/17
93/3 100/10
elected [1] 6/11
Elkins [11] 16/5 21/20 22/17 61/13 61/16
70/17 100/2 100/3 100/16 102/5 120/18
else [16] 13/10 16/4 24/14 29/24 30/20 33/13
35/8 40/3 46/15 46/19 46/24 66/3 85/2 85/21
88/23 109/15
emphasizing [1] 124/14
employed [8] 5/15 7/12 8/17 8/18 72/8 72/17
73/3 93/4
employee [3] 9/21 11/18 55/13
employees [10] 14/21 14/23 16/7 23/13 24/11
24/12 61/4 91/25 91/25 92/1
encounter [1] 22/24
end [10] 7/6 9/4 13/5 28/13 35/19 63/9 67/20
79/13 94/6 94/15
engineering [1] 9/5
enough [8] 56/23 57/17 57/21 67/12 67/13
94/20 95/9 95/20

ensure [1] 29/2
entangilement [?] [?]
entailed [1] 81/11
enter [6] 56/24 57/18 57/22 79/25 111/15
130/18
entered [12] 11/12 36/13 39/17 58/14 60/11
61/6 62/6 76/8 76/10 76/12 77/1 130/12
entering [2] 34/15 39/21
ENTERPRISES [3] 1/7 3/13 7/10
entertain [1] 51/4
entire [4] 18/10 62/18 78/19 78/23
entity [2] 43/3 101/1
equal [2] 99/16 102/14
equipment [24] 9/4 22/18 53/1 61/16 62/24
65/18 65/19 70/3 70/4 70/16 70/18 70/19
70/21 70/23 71/24 95/3 96/15 96/16 99/15
99/18 100/24 103/5 119/11 119/15
equity [1] 102/22
Eric [1] 31/25
especially [1] 57/4
Esquire [3] 2/2 2/2 2/6
essentially [1] 13/22
estate [1] 6/21
estimate [3] 14/21 17/19 17/22
et [1] 1/7
evaluated [2] 117/14 117/15
even [10] 52/23 65/10 81/4 97/16 102/16
103/4 103/8 103/14 103/19 106/25
events [3] 84/19 84/20 96/18
eventually [1] 11/13
ever [12] 3/16 14/3 43/12 44/10 59/19 100/19
106/20 107/2 107/5 108/8 108/19 109/7
every [16] 17/25 26/22 43/14 54/4 65/17
65/18 82/10 84/22 86/14 94/8 98/14 99/13
99/21 122/16 127/21 129/2
everybody [1] 104/17
everything [14] 3/24 35/8 48/17 51/22 52/4
56/8 57/2 64/10 65/9 81/21 82/14 102/19
103/19 119/14
Everything's [1] 33/6
evidence [8] 97/3 128/22 129/7 129/9
129/10 129/14 129/18 129/19
evolved [1] 130/24
exact [5] 21/14 22/19 95/14 125/25
exactly [8] 73/13 78/11 88/9 100/9 109/24
110/25 116/25 119/14
EXAMINATION [1] 3/5
example [1] 29/7
examples [1] 71/5
excellent [2] 27/9 27/11
except [1] 11/16
exception [1] 133/8
excess [1] 44/15
excited [1] 81/23
excuse [2] 8/20 120/24
execute [3] 25/25 30/19 82/18
executed [11] 25/23 26/8 34/3 34/11 34/14
62/11 80/15 113/12 113/25 114/11 114/14
execution [2] 25/10 48/19 49/13
Executive [1] 10/3
executives [1] 54/8
exhibit [18] 41/2 41/21 112/18 112/23 113/2
113/10 113/23 114/20 116/2 117/24 119/3
119/4 121/3 121/17 123/13 124/12 124/22
126/22
Exhibit 37 [2] 112/18 112/23
Exhibit 4 [1] 121/3
Exhibit 40 [1] 113/2
Exhibit 42 [1] 124/22
Exhibit 45 [1] 113/23
Exhibit 48 [1] 124/12
Exhibit 51 [1] 126/22
Exhibit 55 [1] 116/2

Exhibit 6 [1] 123/13
exhibits [5] 40/25 48/24 59/24 132/10
exist [1] 43/8
existed [1] 38/16
existing [1] 108/6
expected [1] 27/25
expenses [1] 127/1
expensive [1] 79/22
experience [2] 14/25 33/11
expires [2] 132/20 133/19
explain [5] 10/23 12/25 15/2 26/13 73/5
explained [7] 27/5 52/22 68/8 71/20 83/16
83/19 83/23
explanation [1] 59/6
express [2] 12/3 128/19 129/16
expresses [1] 123/24
extremely [4] 84/5 84/6 84/22 84/23
eye [1] 29/21

**F**

F-u-l-l-e-r [1] 15/13
face [2] 21/2 21/2
facilitate [5] 10/25 11/6 37/4 54/7 90/6
facilitated [1] 105/16
facilitator [4] 82/18 82/25 83/14 93/21
facility [3] 21/21 26/25 32/18
fact [9] 22/1 37/8 56/24 76/4 103/7 107/21
109/12 116/18 125/13
factor [1] 124/16
factoring [6] 86/2 86/3 86/5 86/6 86/7 86/10
86/18 87/2 87/10 94/3 96/17
facts [7] 4/15 19/10 66/16 66/17 67/11 67/13
67/13
fair [4] 4/13 28/15 56/21 85/17
fall [1] 17/18
family [3] 6/18 6/20 6/22
Fant [4] 63/1 63/12 81/16 124/14
Fant's [1] 63/10
far [20] 13/25 18/21 19/11 22/24 52/10 52/23
54/14 54/17 65/14 65/20 68/10 68/13 69/24
81/8 81/19 85/13 89/22 108/2 109/5 114/1
FARNSWORTH [14] 1/13 3/2 3/8 3/9 33/18
95/22 121/21 123/21 126/24 129/25 130/5
132/6 133/4 133/12
Farris [5] 32/22 32/23 32/24 33/10 61/11
favorable [1] 102/13
fax [1] 122/3
feasible [1] 108/22
February [3] 1/10 132/12 133/8
feedback [1] 51/4
feel [4] 49/3 49/5 50/17 60/7
feeling [2] 100/12 100/14
fell [1] 96/20
felt [1] 81/12
few [1] 118/24
fifteen [4] 38/5 38/21 40/11 40/13
figure [2] 49/1 73/7
file [7] 70/3 70/5 70/6 74/24 75/18 122/16
122/21
filed [1] 132/11
files [25] 57/14 57/14 58/11 58/16 58/19
58/22 58/24 59/4 59/10 59/13 59/16 59/20
60/2 60/3 60/4 60/5 60/9 61/1 70/9 77/22
121/24 122/11 122/13 122/14 122/22
final [10] 5/5 27/16 78/22 78/22 80/18 85/25
89/6 94/2 97/22 97/23
finance [1] 92/16
financial [25] 5/18 7/25 8/6 8/8 8/24 8/25
10/3 10/14 16/24 17/1 17/3 17/12 17/14 18/20
26/16 26/19 27/9 27/10 28/12 35/4 35/11
35/23 38/20 63/13 63/15
financially [2] 117/4 117/25
financials [13] 7/20 27/25 29/2 31/6 31/9

**F**

financials... [8]  31/10 35/24 62/19 62/21 62/22 118/10 118/14 118/15
financing [1]  37/12
find [8]  4/16 18/18 19/11 23/21 30/15 91/8 91/10 93/10
findings [3]  27/6 27/8 27/18
Fine [1]  65/25
finish [7]  4/3 4/6 74/25 75/3 76/15 120/23 129/12
finished [9]  19/4 19/14 47/10 64/15 64/17 75/6 76/16 91/15 93/23
firm [4]  3/11 9/5 10/13 12/6
firms [1]  12/13
first [41]  3/3 11/16 14/3 17/16 20/23 21/8 21/15 22/12 30/7 32/14 34/10 38/11 41/2 43/2 44/18 51/15 52/3 53/5 54/10 55/4 55/24 62/16 62/17 62/17 64/15 76/1 78/18 89/9 89/18 92/7 104/3 109/19 111/24 114/24 115/12 117/5 117/10 118/11 119/3 119/18 126/16
fit [6]  13/8 30/10 32/17 81/12 107/24 119/14
five [2]  32/11 51/1
fixed [1]  8/10
Florida [4]  8/1 8/15 11/21 11/24
flow [2]  27/12 86/21
focus [5]  10/21 18/1 18/3 28/24 62/21
focused [2]  62/23 63/3
focuses [1]  33/3
folks [1]  99/4
follow [3]  32/14 32/15 81/5
follow-up [2]  32/14 32/15
followed [1]  45/6
following [2]  25/10 36/25
follows [1]  3/3
foreclosure [1]  124/1
foregoing [2]  132/6 133/5
forgotten [1]  32/5
form [6]  82/15 84/12 98/9 110/21 111/6 117/13
formula [1]  99/13
Fort [1]  6/15
forth [2]  117/24 126/12
forward [29]  19/9 36/2 65/11 67/3 67/5 69/18 75/8 75/12 75/25 76/22 77/25 78/1 78/4 81/9 81/12 81/20 82/21 93/21 95/24 98/19 106/16 109/14 111/2 111/21 111/23 117/19 117/21 117/21 124/8
found [2]  11/1 64/18
founded [1]  14/1
four [4]  26/3 32/11 54/22 74/9
fourth [2]  25/1 25/2
frame [20]  13/12 14/15 14/20 26/2 36/16 37/21 49/21 56/15 61/10 62/1 62/4 63/2 71/7 71/8 89/11 89/22 90/14 91/15 91/19 125/4
framework [1]  25/18
Frank [6]  58/23 59/18 59/19 60/1 81/15 108/12
free [1]  94/24
front [10]  3/19 54/15 78/10 78/12 78/17 78/25 79/1 80/8 85/10 95/15
fuel [1]  127/2
full [2]  3/7 61/18
Fuller [6]  15/11 15/22 21/17 21/18 26/4 54/23
fully [2]  111/10 120/6
functions [1]  8/7
funded [1]  86/17
funding [1]  37/12
funds [1]  86/22
further [10]  22/10 24/18 30/17 30/24 66/1 67/14 106/5 115/10 131/20 132/9
future [4]  82/1 86/22 86/23 99/2

**G**

G.F [80]
gain [2]  98/6 98/22
gaining [1]  98/7
gas [1]  6/20
gather [2]  65/22 66/2
gathered [4]  45/24 121/24 122/14
gathering [3]  39/8 40/9 74/7
gave [5]  4/15 41/12 41/12 69/18 101/15
general [3]  8/8 20/25 21/22 30/14 39/8 46/13 47/9 62/21 71/13 74/23 85/11 109/22 114/24
generally [3]  47/3 47/5 49/8
generate [4]  40/4 40/5 98/15 98/17
generated [4]  40/7 99/1 108/4 121/11
generates [1]  98/16
generating [1]  110/15
Georgia [1]  90/18
gesture [1]  3/23
get [49]
get-to-know-you [1]  22/9
gets [3]  28/18 65/11 86/22
getting [6]  4/5 13/6 60/16 65/1 87/23 96/22
give [7]  3/22 64/20 65/22 71/5 74/12 100/19 131/3
given [9]  3/16 10/5 10/23 38/22 40/12 58/15 122/16 132/12 133/7
giving [1]  19/7
glad [1]  4/11
global [1]  74/10
Glover [1]  121/25
go [39]  4/20 4/22 5/3 6/13 7/25 9/12 11/22 19/8 19/18 20/10 20/14 20/20 21/6 21/14 28/11 32/7 38/14 38/15 39/4 48/22 56/25 64/7 65/20 69/3 69/18 73/1 73/2 75/7 75/24 76/22 82/5 82/16 91/1 93/10 98/19 108/24 109/23 117/19 117/21
goal [12]  17/4 28/17 34/15 34/16 53/21 53/22 82/23 82/25 127/9 127/12 127/20 127/21
goals [2]  18/25 23/21
goes [9]  18/2 20/8 20/8 35/9 38/11 65/14 68/11 68/14 98/7
going [53]
gone [1]  91/10
good [4]  19/8 30/10 32/4 117/7
goods [1]  69/8
goodwill [13]  71/11 71/12 71/12 71/22 78/2 78/6 79/16 125/20 125/23 125/25 126/2 126/5 126/8
got [21]  13/20 13/21 16/18 16/20 20/4 30/9 39/15 49/4 78/10 82/10 88/16 88/16 89/22 90/10 98/2 98/24 107/10 112/2 118/24 120/14 124/2
gotcha [2]  69/12 75/14
graduate [1]  4/24
graduated [2]  5/1 5/12
Granted [1]  67/24
ground [1]  111/4
group [5]  94/19 94/19 95/5 95/19 100/5
grow [2]  71/22 82/1
growth [1]  11/1
guess [1]  93/9
guessing [1]  58/5
guidelines [1]  72/6
guy [126]
guys [1]  127/1

**H**

habit [1]  47/24
had [104]
half [5]  8/22 38/4 38/23 39/16 127/2
Hall [1]  2/6

Hamlet [1]  65/7
hand [7]  132/4 132/6 132/9
handle [3]  63/4 81/20 86/20
handled [6]  54/8 70/16 86/19
hanging [1]  85/21
happen [5]  23/17 24/5 82/4 83/15 84/7
happened [11]  7/7 25/1 36/1 47/18 48/7 50/21 67/22 68/3 69/19 88/23 94/15
happening [2]  55/23 68/12
Harlin [34]  10/1 15/9 15/10 16/3 16/16 19/6 19/10 19/11 20/7 21/12 21/18 26/4 26/10 26/12 27/6 33/17 44/9 50/2 54/22 95/6 95/7 95/23 96/6 100/11 105/22 106/12 106/12 114/7 114/19 115/21 115/23 116/6 121/21 123/22
Harrisburg [1]  18/7
has [24]  13/17 20/3 22/3 36/9 36/22 36/25 40/6 44/10 52/3 54/8 54/21 65/13 76/21 88/16 92/2 92/5 94/19 99/10 99/14 107/5 112/17 119/6 125/11 129/20
haul [1]  33/6
have [170]
haven't [2]  10/19 29/25
having [16]  15/4 21/7 22/9 22/20 33/8 34/22 39/8 40/9 60/1 64/25 73/15 75/20 88/1 98/16 98/17 98/18
he [112]
he's [9]  23/20 30/8 65/3 110/15 123/25 124/1 124/2 125/21 127/4
head [1]  3/23
headed [1]  70/7
headhunter [7]  7/8 7/24 10/11 10/18 10/19 10/20 14/4
hear [10]  59/12 72/12 100/3 100/19 104/17 105/1 105/2 105/3 105/5 105/9
heard [2]  14/3 117/10
hearing [1]  90/2
Heiser [3]  1/15 132/4 132/17
held [1]  32/18
help [6]  29/1 52/7 70/21 80/9 93/13 120/6
helping [1]  79/10
HENRICO [1]  132/2
her [3]  4/5 8/15 23/25
here [23]  4/9 8/12 8/18 14/19 20/16 20/17 21/13 42/1 42/5 48/25 49/2 66/16 104/13 111/12 111/13 114/9 115/4 116/24 119/14 124/1 124/6 126/15 129/14
hereby [2]  132/5 133/4
hereof [1]  132/11
hereto [1]  132/8
Hey [3]  13/12 64/1 97/2
high [5]  4/20 4/22 4/23 5/1 99/5
him [39]  4/10 28/11 29/1 29/10 31/20 33/9 41/12 46/24 47/13 47/14 47/19 47/21 48/2 48/9 48/10 48/11 49/16 52/22 53/6 53/21 53/22 55/9 64/7 65/5 71/20 74/25 75/3 81/14 82/9 105/15 106/1 106/23 106/25 107/2 107/5 120/7 120/9 120/23 121/1
Hingst [11]  2/11 41/24 92/1 93/12 95/22 104/9 104/12 119/1 121/21 121/23 123/22
hire [2]  9/20 9/21
hired [2]  9/24 65/9
his [61]
historic [1]  16/24
history [2]  35/8 45/5
hmm [1]  23/23
hold [2]  6/9 7/5
holding [2]  54/1 54/3
holds [1]  6/20
home [2]  41/19 69/4
honored [1]  120/25
house [3]  21/21 69/8 106/19
household [1]  69/8

how [82]
How's [1] 64/9
Hugh [4] 31/18 31/19 32/21 33/18
human [1] 80/1
hundred [7] 37/22 38/2 38/22 39/1 39/4 39/18 117/15
hurry [1] 110/7

**I**

I'd [6] 9/17 20/20 49/3 56/7 67/23 68/12
I'll [3] 4/5 4/11 98/11
I'm [40] 3/21 7/13 10/17 21/19 28/19 28/22 28/24 41/21 49/1 49/5 49/7 49/10 51/11 54/3 58/5 59/23 60/16 60/20 60/23 62/21 64/17 68/4 80/6 84/6 90/2 91/8 91/10 105/10 107/11 107/23 111/12 112/12 112/13 114/25 118/18 119/3 121/23 123/20 129/5 129/21
I've [8] 4/1 32/4 39/15 64/18 93/10 97/2 118/24 121/16
ice [1] 52/8
idea [1] 9/14
identify [4] 112/14 119/8 121/5 121/19
identifying [1] 119/10
immediately [3] 106/6 120/12 120/15
impacted [1] 108/3
implications [1] 111/1
importance [2] 79/18 79/20
important [2] 78/13 80/5
In-house [1] 106/19
inappropriate [1] 128/10
inbound [1] 33/6
INC [8] 1/3 1/7 1/20 3/12 3/13 49/12 114/10 129/23
Inc.'s [2] 129/17 130/9
incentive [1] 80/7
included [2] 126/18 126/19
income [3] 98/16 98/16 98/18
incomplete [5] 57/3 57/5 57/7 58/23 94/4
incorrect [1] 23/10
incurred [2] 124/3 124/5
independent [12] 9/15 9/20 23/3 23/8 23/13 29/7 29/8 29/12 72/17 72/18 73/22 93/3
indicated [1] 83/8
individual [1] 82/21
individually [1] 1/4
individuals [11] 26/3 28/1 29/16 39/9 54/22 57/9 64/8 80/2 81/15 94/12 129/11
industry [1] 9/14
information [32] 16/25 31/11 31/11 39/6 39/8 40/9 45/21 47/19 47/21 48/11 52/15 56/22 57/4 57/17 65/23 66/1 66/2 67/12 70/10 74/7 74/10 87/10 87/13 87/19 87/24 88/1 94/10 96/18 100/16 119/12 119/16 121/25
informing [1] 116/7
initial [27] 21/1 22/8 34/6 39/13 45/2 46/8 46/11 50/18 71/9 73/9 73/11 74/7 74/10 74/14 74/14 74/23 75/15 78/8 78/15 78/16 80/11 80/14 80/15 80/20 102/19 113/6 126/20
initially [3] 43/14 73/25 74/3
inquiry [4] 47/19
instance [1] 1/14 99/19
instead [1] 3/23
instructed [1] 105/18
instructions [1] 124/15
instruments [1] 62/24 65/1
insurance [2] 124/2 127/1
intact [1] 91/25
integrated [1] 9/4
intent [51]
interest [4] 22/3 31/21 34/18 42/17
interested [6] 9/19 45/7 45/11 45/15 45/23

interference [1] 109/6
interim [1] 9/11
internal [2] 18/22 35/24
internally [1] 119/9
International [2] 87/6 87/12
interrupt [3] 11/22 86/4 125/5
introduce [1] 28/11
introduced [2] 28/1 29/5
introduction [1] 38/20
investigate [1] 37/19
investigating [1] 40/13
investigation [1] 73/19
investment [4] 6/17 6/18 8/9 80/4
investor [1] 8/25
invite [1] 29/9
invoices [1] 86/16
involved [21] 12/20 13/6 13/17 16/18 16/20 16/24 20/4 38/1 58/6 77/22 90/7 90/11 90/14 90/15 92/10 92/11 93/20 111/20 120/11 120/15 121/1
involvement [4] 19/16 27/19 28/17 30/7
is [216]
isn't [3] 67/9 110/4 131/11
issue [6] 8/16 73/8 85/18 87/3 107/8 108/14
issues [7] 22/23 43/7 59/3 65/13 76/5 77/22 116/15
it [198]
it's [44] 9/5 10/19 17/8 20/18 22/9 34/21 35/4 36/17 36/17 37/11 37/14 39/11 40/8 44/14 46/2 57/17 58/13 59/15 62/20 67/10 70/22 70/23 71/14 72/13 72/14 72/16 79/20 80/5 90/19 92/24 95/7 95/12 108/19 111/17 112/18 112/18 113/9 119/5 119/5 121/4 121/18 124/6 125/12 126/23
items [2] 48/9 88/6
its [2] 31/9 131/4
itself [4] 102/18 103/9 103/20 103/23

**J**

Jackson [2] 32/19 35/13
Jacksonville [2] 11/21 11/24
Jeff [18] 16/3 16/16 19/11 21/12 26/4 33/11 50/2 54/22 61/11 95/6 95/7 95/23 96/7 100/10 105/22 121/22 123/22 124/6
jeopardy [1] 124/1
Jerry [11] 16/5 21/20 22/17 61/13 61/16 70/17 100/2 100/3 100/10 102/5 120/18
job [15] 7/5 8/11 8/12 9/11 10/16 10/23 10/25 11/2 14/12 16/21 54/6 82/6 82/18 83/13 84/5
jobs [1] 9/1
John [14] 2/2 3/10 16/4 29/8 29/9 31/17 32/21 33/18 119/10 119/19 120/14 120/25 121/21 121/23
join [1] 10/12
joining [1] 12/12
joint [1] 78/3
jointly [1] 89/5
Jones [2] 32/2 32/2
judge [2] 129/8 129/15
July [2] 63/9 67/20
June [2] 112/18 132/20
June 25 [1] 112/18
jury [3] 3/19 129/8 129/15
just [48]

**K**

Kale [3] 31/17 32/22 33/18
Kansas [1] 4/19
keep [5] 52/17 68/5 71/21 127/21 131/7
keeping [2] 81/19 128/2
Keith [1] 32/2

Kaloo [13] 5/7 8/9 22/23 78/9 79/9 99/25 102/2 111/23 123/23 127/16 128/3 128/7 128/19 130/13
kept [2] 108/4 128/3
kicked [1] 56/2
kicking [4] 56/5 88/3 88/4 88/21
killed [1] 97/19
killer [3] 103/8 103/20 103/23
killing [1] 104/1
Kimberly [5] 1/14 3/23 4/1 132/4 132/17
kind [13] 9/2 13/6 25/18 34/4 34/10 52/9 52/13 57/13 74/8 74/9 74/12 96/19 110/21
knew [5] 38/15 38/17 82/14 110/24 111/24
know [97]
knowledge [7] 13/10 58/8 58/10 130/10 130/17 130/19 133/9
known [1] 119/15

**L**

lanes [1] 131/1
lapse [1] 36/10
large [5] 1/16 15/3 38/19 132/5 132/18
larger [1] 45/17
largest [2] 15/7 16/10
last [3] 15/12 93/14 97/2
late [1] 19/23
latter [1] 10/9
law [1] 3/11
lawsuit [1] 3/12
lawyer [4] 4/9 41/10 41/25 101/15 129/19 131/16
lay [1] 85/10
leading [1] 67/6
learn [1] 95/18
learned [4] 61/1 115/13 115/16 115/18
lease [1] 52/17
leases [2] 65/1 92/2
least [5] 39/1 59/3 73/15 78/14 109/5
leave [6] 5/20 5/22 6/4 7/23 9/9 10/12
left [22] 5/23 6/12 8/11 8/12 9/10 29/14 41/15 41/17 53/2 55/24 66/4 78/18
legal [1] 43/11
less [4] 44/12 45/24 78/21 102/25
let [29] 4/2 4/5 8/14 22/15 28/4 29/10 31/22 34/6 39/15 45/10 53/7 66/6 74/25 75/3 77/19 110/23 113/1 113/22 117/5 120/23 121/3 121/16 124/11 124/21 125/7 125/17 126/21 127/9 129/12
let's [10] 13/24 14/12 19/18 40/20 49/19 67/14 98/2 101/11 118/18 125/5
letter [61]
letters [3] 85/25 85/25 124/15
level [2] 15/1 39/5
liabilities [1] 103/2
liability [1] 118/15
liens [1] 63/1
like [33] 3/19 6/19 13/8 17/11 19/7 20/20 25/18 30/9 39/22 40/12 45/22 46/13 48/9 49/4 51/13 60/7 60/14 62/9 63/19 64/9 67/14 67/23 68/4 68/12 69/4 69/9 69/9 80/1 81/15 82/7 82/8 117/8 122/7 126/13
liked [1] 130/13
likely [1] 102/16
line [1] 9/5
lines [2] 50/11 72/1
liquidation [3] 94/25 119/11 119/25
Lisa [4] 95/22 106/15 106/18 123/22
list [4] 48/9 48/10 74/5 131/13
listed [1] 18/25
listen [1] 84/1
listing [1] 74/6
little [13] 4/16 12/25 13/24 19/18 21/21 27/20

## L

little... [7] 29/18 37/7 45/5 52/8 56/25 68/5 80/25
live [3] 14/8 14/11 20/17
load [2] 45/22 110/15
loan [7] 65/12 65/12 65/20 65/20 85/24 86/8 98/24
loans [2] 57/6 81/6
local [1] 12/6
locally [1] 20/16
located [2] 14/6 20/16
location [1] 58/12
locations [2] 70/19 93/8
locked [1] 18/10
logistics [1] 10/13
long [25] 4/12 5/15 6/2 6/9 6/23 7/5 7/14 8/2 8/21 10/7 10/16 18/13 18/19 19/14 26/20 35/10 48/21 50/17 56/11 64/23 67/1 75/6 83/5 93/14 109/24
look [8] 13/14 17/12 21/1 38/2 43/16 62/23 73/14 125/17
looked [9] 37/22 38/22 63/2 71/16 71/16 74/11 101/1 117/15 117/16
looking [19] 9/11 12/23 13/4 13/5 13/12 17/11 17/13 38/18 43/4 52/14 52/15 62/18 63/3 63/5 64/10 117/20 117/21 119/24 126/14
looks [4] 13/8 19/8 30/9 67/13
Lori [1] 16/4
lose [1] 108/23
losing [5] 110/6 110/11 110/13 110/18 127/5
lot [6] 23/9 24/18 39/9 39/13 57/3 111/20
love [1] 49/3
lower [6] 77/25 78/1 78/4 80/20 80/22 80/23
lowered [1] 76/6

## M

mad [3] 4/2 4/5 23/25
made [37] 6/6 19/15 28/16 38/9 43/2 44/5 44/8 44/9 45/11 50/19 50/21 50/25 51/2 53/25 54/19 75/7 84/21 84/23 87/24 94/18 95/9 96/5 96/8 99/11 100/9 102/19 109/12 111/3 111/7 113/16 113/17 113/18 113/20 117/11 118/8 123/8 130/14
mail [30] 45/3 47/21 47/24 47/25 66/22 66/24 66/25 109/10 109/12 115/10 115/9 119/9 119/18 120/1 120/14 121/18 121/20 123/13 123/16 123/17 123/18 123/21 123/23 125/10 125/12 125/21 126/9 126/24 127/7 128/21
mailed [4] 48/10 106/25 107/5 107/6
mailing [1] 109/8
main [1] 18/1
mainly [2] 9/10 43/20
maintain [2] 71/19 126/4
majority [1] 39/13
make [20] 21/24 23/24 28/18 35/19 39/3 39/15 53/6 54/5 54/25 55/6 66/9 67/10 68/13 80/4 82/10 83/14 94/19 105/10 128/2 131/7
makers [2] 11/6 19/12
makes [1] 55/2
making [2] 111/20 120/10
man [2] 15/18 15/19
management [6] 7/21 94/19 95/4 95/18 99/3 100/5
manager [1] 6/15
many [28] 11/8 14/21 16/12 18/6 20/2 20/12 23/4 24/22 32/10 36/7 62/13 69/10 71/17 72/2 72/3 72/5 73/8 74/8 75/9 75/16 75/17 75/21 77/8 80/13 90/10 95/16 95/23 102/7 128/2 131/7
margin [8] 98/15 98/16 98/17 99/1 99/9 127/10 127/14 127/15
mark [2] 112/13 119/3
marked [1] 40/24 41/2 112/12 112/17 113/2

113/22 118/22 121/16 124/12 124/22 126/21
married [1] 8/12
Mart [3] 6/1 6/2 6/4
Martin [10] 16/4 29/9 29/9 100/22 100/23 101/1 119/10 119/19 121/21 121/23
Martino [1] 31/25
matrix [1] 79/12
matter [1] 133/5
mattered [1] 103/16
Max [7] 15/11 19/11 19/12 21/17 21/18 26/4 54/23
Max's [1] 15/11
may [19] 21/19 21/23 21/23 31/22 32/17 32/17 36/7 39/10 39/10 40/13 43/8 45/4 54/15 54/16 54/16 80/24 86/20 86/20 106/25
McPherson [3] 4/19 4/23 5/4
me [120]
mean [17] 11/22 14/24 16/22 23/9 28/25 29/6 40/12 49/4 49/7 53/18 82/4 84/6 97/1 111/13 111/19 118/8 125/5
means [5] 11/11 23/11 31/4 33/4 102/12
meet [15] 29/10 29/10 29/16 44/1 51/17 53/4 61/5 72/19 77/10 78/10 82/11 94/21 101/8 106/3 124/14
meeting [48]
meetings [5] 22/6 22/13 32/13 54/11 57/12
MEF [1] 1/6
mention [2] 30/18 122/7
mentioned [8] 15/25 16/9 19/19 29/5 30/2 58/5 95/4 101/23
merge [1] 12/23
merged [1] 11/14
mess [1] 65/17
met [10] 21/20 21/22 45/22 46/3 57/10 58/2 94/25 97/12 97/14 97/16
METHVIN [1] 2/3
mid [1] 11/5
mid-level [1] 15/1
middle [2] 1/1 18/17
might [10] 12/23 21/23 22/23 26/7 30/15 51/4 51/6 61/12 66/14 81/12
Mike [13] 11/19 16/5 16/14 21/20 61/12 61/13 61/15 70/17 100/2 100/3 100/16 102/5 120/18
MILES [1] 2/3
million [10] 9/8 43/5 43/5 43/23 44/1 44/12 44/16 45/17 102/22 102/25
minimal [1] 18/23
minutes [2] 48/24 52/2
missed [1] 51/14
missing [6] 59/4 60/2 96/16 96/19 103/11 103/15
Mississippi [7] 11/25 30/3 30/9 31/16 32/5 32/19 35/13
mistake [2] 111/11 111/14
Mm [1] 23/23
Mm-hmm [1] 23/23
money [12] 10/18 78/19 80/8 86/8 110/6 110/11 117/21 125/20 125/23 125/25 126/2 127/5
moneys [2] 71/12 86/21
Montgomery [1] 2/4
month [5] 28/13 63/8 78/18 78/21 79/13
monthly [1] 28/3
months [2] 78/14 78/23
Moore [24] 16/4 21/19 22/15 22/20 23/20 58/6 58/14 58/18 58/22 59/9 59/15 60/17 60/25 61/10 61/12 61/12 70/7 74/22 75/8 75/23 92/21 93/11 93/12 108/12 122/8
Moore's [5] 75/15 76/3 77/15
more [16] 20/18 20/19 29/18 30/15 32/16 37/14 87/9 98/4 98/21 102/12 109/20 109/21

109/22 118/24 119/2 120/9
moon [4] 19/26 119/24 109/24 102/16
120/10
Motor [1] 12/2
move [21] 8/15 34/19 34/20 50/3 57/15 67/3 67/5 69/7 75/12 77/25 78/1 78/4 82/22 95/24 106/16 109/14 111/2 111/21 111/23 111/25 124/8
moved [3] 36/2 109/8 109/11
moving [2] 65/11 82/20
MR [4] 3/5 29/14 36/13 102/10
Mr. [6] 3/9 15/10 15/22 15/23 102/20 115/23
Mr. Farnsworth [1] 3/9
Mr. Fuller [1] 15/22
Mr. Harlin [2] 15/10 115/23
Mr. Kelly [1] 102/20
Mr. Quinn [1] 15/23
much [10] 9/1 10/18 17/19 19/10 36/10 65/16 78/11 79/7 79/9 93/23
Mullen [1] 1/17
Murphy [11] 16/5 21/20 61/12 61/13 61/15 70/17 100/2 100/4 100/17 102/5 120/19
must [3] 84/8 85/11 107/24
mutually [2] 88/13 109/17
my [56]
myself [14] 21/9 21/18 27/3 30/25 32/22 34/1 46/22 54/3 61/11 69/24 100/11 104/9 123/23 124/13

## N

name [10] 3/7 3/9 5/25 15/12 15/16 32/5 68/18 119/16 120/17 121/18
names [1] 74/6
nation [1] 6/21
nature [1] 47/8 55/8 115/10
near [1] 90/19
necessarily [3] 38/13 98/17 127/23
necessary [1] 29/1
need [19] 4/10 19/8 29/18 31/12 43/4 54/16 54/16 56/25 65/25 66/2 73/15 74/1 97/8 98/11 100/8 120/11 123/5 124/7 124/15
needed [5] 26/8 64/6 87/19 95/12 110/6
negative [1] 119/17
negotiate [2] 11/4 36/5 73/7
negotiated [2] 71/8 90/13
negotiating [3] 71/1 71/3 71/6
negotiation [3] 25/8 67/5 69/19
negotiations [4] 57/18 67/15 76/3 77/24
neighborhood [3] 56/14 74/15 79/23
Nelson [28] 51/24 64/7 64/13 64/17 65/3 65/16 66/4 69/15 81/8 81/8 81/10 81/11 81/21 82/3 82/15 83/1 83/20 84/10 84/25 85/10 87/19 94/9 107/14 108/1 109/4 110/4 110/24 128/11
never [4] 83/8 97/1 121/13 129/3
new [2] 63/12 119/3
next [25] 4/9 8/17 8/18 21/10 21/11 24/17 24/18 33/16 33/17 33/25 34/1 34/20 46/6 48/7 48/8 50/3 55/23 66/6 67/22 68/3 69/19 79/15 85/5 106/10 106/11
night [1] 61/22
no [89]
No. [1] 121/5
No. 303 [1] 121/5
nobody [1] 108/19
noes [1] 75/18
nomenclature [1] 68/15
nonbinding [1] 25/15
nondisclosure [2] 31/2 31/4
none [1] 41/19
normal [1] 124/5
normally [2] 31/1 38/4
North [1] 2/7

**N**

Nos [1]  2/19
not [130]
Notary [4]  1/15 132/4 132/17 133/21
note [2]  86/22 124/25
noted [1]  133/9
nothing [1]  37/14
notice [6]  2/17 2/18 41/3 41/23 106/16
   106/24
notification [1]  34/5
now [7]  49/2 68/20 89/15 91/8 121/24 122/12
   122/14
number [42]  2/16 11/15 14/23 45/4 60/8 71/9
   73/13 73/16 74/4 74/12 76/4 77/16 77/20
   77/21 77/22 77/23 77/25 78/1 78/3 78/4 78/6
   78/9 78/9 78/16 78/24 79/13 80/19 86/18
   95/14 96/3 96/14 97/18 97/25 98/1 99/13
   102/6 102/9 103/10 106/3 110/24 117/1 126/3
number one [1]  11/15
numbered [1]  133/6
numbers [1]  117/16

**O**

oath [2]  3/18 118/6
obeyance [1]  110/18
Object [5]  84/12 98/9 110/21 111/6 117/13
objective [1]  84/16
obligated [1]  114/16
obtain [1]  127/13
obtained [1]  130/13
obtaining [4]  87/13 127/16 127/17 127/18
obviously [3]  10/21 37/16 116/25
occur [4]  84/19 84/20 86/9 87/1
occurred [1]  58/25
occurrence [1]  85/16
occurring [2]  17/7 127/8
ocean [1]  45/24
off [17]  13/11 21/21 21/21 62/25 86/21 104/4
   104/5 105/13 105/14 105/24 107/10 108/16
   108/24 109/2 116/8 117/25 124/15
off-site [1]  21/21
offer [2]  116/17 116/21
offered [3]  6/7 116/14 116/25
office [8]  18/8 21/13 26/7 27/1 35/14 51/18
   51/23 63/22
officer [6]  7/25 8/6 8/24 10/4 10/14 38/20
officials [2]  58/3 61/6
often [1]  66/25
Oh [1]  120/24
oil [1]  6/20
Okay [51]
old [1]  63/21
OLV [2]  120/4 120/9
on-site [1]  63/17 70/18 122/23
Once [1]  76/21
one [54]
ones [1]  19/19
ongoing [1]  76/13
only [18]  14/22 17/22 46/22 50/20 53/18
   60/14 80/16 80/22 80/23 86/22 90/2 91/17
   92/7 93/20 94/1 97/24 129/22 130/1
open [1]  13/2
operate [5]  107/14 107/25 108/1 108/5 129/6
operating [1]  72/18
operation [3]  76/18 107/25 127/13
operations [1]  107/15
opine [1]  96/25
opinion [5]  15/4 42/15 96/25 111/12 111/22
   114/6 118/18
opportunity [9]  4/10 7/25 10/12 52/23 75/20
   81/24 81/25 127/18 130/16
option [4]  43/15 43/17 52/19 53/1

options [4]  43/16 51/3 54/4 54/15
or [108]  37/8 37/24 78/8 85/14 89/1 94/22
   107/25 119/11 119/14
organization [1]  43/20 81/9
organizations [1]  15/6
oriented [1]  17/2
original [2]  77/14 86/19
other [46]
others [1]  58/2
our [14]  18/23 22/24 25/5 29/8 45/20 48/10
   57/10 70/6 70/24 80/9 80/11 85/14 120/11
   130/15
ourselves [2]  18/20 57/16
out [47]
out-of-pocket [1]  127/1
outbound [1]  33/5
outfit [4]  15/1 15/1 15/1 32/5
outline [4]  25/3 33/24 84/19 114/24
outlines [2]  22/10 68/23
outside [2]  31/6 100/22
over [19]  16/13 21/14 28/11 30/14 37/22 38/4
   38/16 38/22 49/17 52/9 52/10 53/7 79/8 79/9
   79/10 92/6 120/5 126/4 127/13
overall [1]  73/10
overnight [1]  7/3
overview [1]  47/9
owed [1]  102/12
own [5]  12/25 21/21 40/1 73/3 80/1
owned [1]  31/19
owner [2]  79/5 129/4
owners [8]  30/13 30/15 31/18 31/21 32/3
   32/21 47/6 54/5
ownership [2]  22/4 37/15 42/17 43/7 43/11
   91/24
owning [2]  24/8 35/6

**P**

p.m [2]  1/16 131/22
Pacific [8]  5/14 6/1 6/2 6/4 6/6 6/11 7/1 7/9
packaging [1]  9/3 9/4
page [3]  2/16 114/8 119/18
pages [1]  133/5
paid [7]  10/18 10/19 14/16 79/1 124/1 125/20
   126/1
paper [1]  75/16
paperwork [1]  85/9
parentheses [2]  120/8 120/9
Parkway [1]  1/21
part [22]  10/9 22/7 22/8 51/1 57/8 63/5 63/7
   66/8 67/8 70/8 70/17 74/6 81/9 83/1 84/5
   94/23 98/20 109/3 111/23 116/15 120/10
   127/16
partial [1]  57/17
participating [1]  92/17
particular [4]  24/19 45/7 45/14 99/19
parties [18]  25/23 34/3 34/18 34/19 36/21
   46/23 51/6 53/25 68/23 68/25 88/13 109/18
   111/20 113/7 113/25 114/3 118/2 124/19
party [5]  10/12 86/19 101/21 102/24 103/1
past [1]  78/21
Pat [5]  15/11 15/17 19/12 26/4 54/21
Pate [4]  95/23 106/15 106/18 123/22
path [1]  30/24
pay [9]  62/25 80/7 86/21 98/24 99/18 120/9
   124/2 124/15 127/2
payable [3]  7/20 8/9 63/15
payables [2]  17/13 124/3
payment [4]  78/10 78/12 126/19 126/19
payoff [9]  65/14 85/25 85/25 86/2 94/2 94/3
   119/12 119/16 120/4
payoffs [1]  96/17
payout [5]  62/25 78/15 78/16 78/22 86/25
PC [2]  2/3 2/7

penalties [1]  86/24
pending [3]  37/17 131/16
Pennsylvania [1]  18/8
people [5]  29/10 29/17 61/18 72/4 95/8
per [3]  59/18 97/11 106/13
percent [28]  18/2 24/8 26/18 27/3 27/16
   28/22 28/22 30/6 31/20 31/21 35/3 35/6 39/4
   39/18 43/18 52/21 63/25 73/16 79/5 86/17
   86/17 92/3 101/9 101/10 128/20 128/23 129/1
   129/16
percentage [1]  99/10
perform [2]  25/11 114/17
performed [2]  35/5 70/6
perhaps [1]  99/19
period [7]  37/1 40/13 48/22 49/17 57/8 86/13
   126/4
permission [9]  40/2 54/12 55/15 55/17 128/9
   128/19 128/23 129/1 129/16
permits [1]  126/18
person [9]  9/24 12/14 31/15 31/23 42/1 42/5
   44/5 44/22 63/13 99/24 100/7 105/12 105/15
   105/23
personal [1]  6/14
personally [3]  90/11 90/11 90/15
persons [1]  12/14
perspective [3]  33/24 92/24 92/25
Petroleum [1]  5/13
phase [4]  18/15 18/17 21/1 27/14
phone [22]  21/2 30/8 30/11 30/12 30/13
   30/14 45/6 46/8 46/11 46/17 52/10 104/15
   104/24 104/24 105/6 105/7 105/11 106/24
   115/19 115/20
phones [1]  122/3
phrase [1]  68/18
physical [9]  17/14 43/10 71/23 71/23 101/4
   101/6 101/23 102/1 104/9
physically [9]  59/1 59/10 69/7 80/1 93/5
   114/1 122/17 122/21 123/10
pictures [1]  52/6
piece [6]  65/18 65/19 79/1 79/2 99/15 99/17
pieces [5]  28/23 49/22 71/24 79/1 119/11
pipeline [4]  38/5 38/7 38/22 40/12
place [20]  18/16 26/24 26/25 34/7 34/23
   35/12 36/22 36/25 37/10 46/9 54/17 77/6 84/8
   84/18 85/11 97/17 106/19 107/19 132/7
Plaintiffs [4]  1/5 1/14 2/5 3/3
plan [2]  121/8 130/19
plane [1]  61/18 61/19
planning [1]  8/7
plant [2]  122/5 122/9
players [1]  28/19
please [3]  3/7 119/8 127/2
PNL [1]  27/11
pocket [1]  127/1
point [25]  16/6 18/23 25/12 26/7 34/21 38/6
   45/18 46/1 47/11 47/15 49/15 52/22 57/19
   68/12 76/7 80/2 83/12 93/24 98/4 102/20
   109/16 112/5 112/6 112/7 131/7
policies [4]  107/18 107/22 107/24 108/9
poor [2]  65/8 94/22
population [1]  75/19
portion [1]  37/15
PORTIS [1]  2/3
position [11]  5/23 6/7 6/9 6/23 10/15 41/16
   51/11 79/6 111/18 118/4 119/17
positive [2]  27/13 28/16
possession [6]  41/7 41/16 41/17 70/11 86/10
   129/20
possibility [1]  16/15
possible [1]  110/2
pot [2]  78/19 79/14
potential [27]  17/4 22/10 22/11 25/4 30/16
   37/20 38/3 40/7 43/15 45/3 48/18 50/4 51/3

**P**

potential... [14]  52/16 53/25 54/15 55/15
  69/25 71/3 71/5 79/21 81/8 81/24 88/4 88/21
  96/11 100/1
potentially [2]  22/3 25/16 53/9 72/2
poultry [1]  9/3
practical [1]  40/17
preapproved [1]  128/11
premises [1]  21/22
preparation [1]  50/14
prepay [1]  127/2
presence [1]  104/9
present [5]  2/11 11/5 19/10 45/19 81/5
presented [1]  33/21 63/14 84/18
president [7]  10/3 10/6 10/7 22/16 22/18
  23/21 32/24
pretty [5]  9/1 19/10 48/21 65/16 93/23
previous [2]  11/18 65/4
previously [5]  44/15 112/17 113/2 124/11
  124/21
price [5]  97/22 97/23 97/24 98/21 99/4
pricing [1]  113/17
primarily [6]  16/21 17/1 30/25 62/18 62/23
  92/15
prior [5]  12/11 43/7 85/7 112/5 129/3
Pro [1]  6/19
proactive [1]  94/8
proactively [1]  94/5
probably [14]  17/23 18/2 18/17 20/3 20/13
  27/3 27/16 37/22 39/4 43/5 52/2 56/13 79/8
  120/10
problem [3]  29/19 59/20 120/6
proceed [2]  39/12 67/14
proceeded [2]  62/9 130/15
proceeding [1]  18/24
process [103]
processed [1]  110/1
processes [2]  90/23 111/10
produce [1]  127/10
produced [4]  119/4 121/4 121/17 123/14
Professional [1]  1/20
profit [3]  99/1 128/2 130/14
profits [1]  98/7
program [5]  9/12 9/16 22/23 22/24 22/25
proper [1]  97/18
protection [1]  31/2
prove [1]  129/16
provide [13]  27/25 28/14 39/6 48/9 48/12
  56/8 57/1 74/6 74/7 87/9 97/4 97/6 97/14
provided [11]  56/22 57/3 57/22 70/9 70/10
  74/13 76/2 86/2 100/16 103/15 116/16
providing [2]  56/6 56/18
provisions [1]  77/10
public [7]  1/15 15/5 31/10 31/11 132/4
  132/17 133/21
pull [3]  65/25 109/11 109/15
pulling [1]  110/14
purchase [60]
purchased [1]  31/20
purchases [3]  42/19 42/21 89/13
purchasing [6]  31/19 42/16 43/9 52/25 63/5
  99/11
purpose [12]  22/20 25/13 30/21 30/23 33/8
  33/19 70/20 85/9 92/22 92/25 117/12 122/21
pursue [2]  94/11 106/5
put [18]  9/16 24/21 25/8 25/16 28/13 34/18
  37/24 48/8 49/25 51/5 66/14 66/15 69/9 71/15
  95/19 102/15 106/13 114/23
putting [2]  27/24 48/11

**Q**

Q-u-i-n-n [1]  15/17

qualification [21]  89/6 89/24 90/8 91/5 91/6
  90/23 91/12 92/16 92/25 93/14 94/1 94/22
  94/17 103/22 104/5 108/8 108/17 108/25
  109/6 122/23 123/10
qualified [5]  75/10 77/5 94/21 110/15 126/2
qualify [16]  72/6 75/21 77/8 82/11 89/6
  89/19 90/3 93/1 95/10 95/13 95/16 95/20 96/3
  96/15 109/2 111/9
qualifying [2]  109/3 109/23
quality [4]  8/1 8/2 96/15 98/3
quarter [1]  28/13
question [20]  4/3 4/6 4/12 23/18 24/4 31/23
  32/1 37/19 51/16 57/1 57/15 60/13 64/6 74/25
  75/3 89/21 111/14 111/17 111/18 129/12
questions [11]  3/22 29/19 48/23 81/14 82/7
  82/8 111/14 119/2 125/8 131/15 131/16
quick [1]  125/17
Quinn [5]  15/11 15/17 15/23 26/4 54/23
quote [2]  102/11 125/19

**R**

racing [1]  52/3
radar [1]  44/19
raised [1]  4/18
Randall [9]  63/1 63/10 63/12 65/8 65/21
  65/21 65/22 81/15 124/13
range [2]  74/2 110/2
rather [2]  9/21 125/6
ratio [1]  99/9
raw [1]  74/14
Ray [39]  3/8 10/1 15/9 16/3 16/16 19/6 19/7
  19/10 19/11 19/12 20/6 20/8 20/8 21/12 21/18
  21/20 26/3 26/10 26/12 27/6 33/17 38/11 44/9
  50/2 54/22 95/6 95/7 95/23 96/6 100/11
  105/22 106/12 106/12 114/7 114/19 115/20
  116/6 121/21 123/22
reach [1]  112/4
read [2]  120/1 133/5
real [4]  6/21 34/21 34/23 103/25
really [28]  4/2 26/6 28/17 28/24 34/8 34/20
  37/11 39/11 49/1 50/3 59/7 60/12 60/2 60/15
  62/2 62/19 62/20 63/13 63/14 71/14 71/20
  72/5 79/6 81/20 82/5 82/6 92/17 97/19
reason [6]  16/5 21/6 44/3 60/8 104/1 106/4
reasonable [1]  18/21
reasons [3]  96/10 96/13 130/11
recall [35]  17/16 49/16 49/17 49/18 50/13
  51/7 51/9 51/10 51/22 60/20 61/9 61/17 62/3
  62/15 62/16 64/25 65/2 65/10 78/11 85/5 87/7
  91/7 91/9 91/14 96/4 100/6 100/9 108/14
  108/21 120/22 120/25 121/2 125/15 128/21
  128/24
recapped [1]  66/13
receivable [6]  7/21 63/3 63/5 63/16 71/25
  124/16
receivables [4]  7/22 17/13 62/19 86/8
receive [3]  52/18 79/5 79/15
received [5]  79/16 86/1 99/6 114/5 122/4
receiving [1]  49/17
recent [1]  19/20
Recess [4]  40/22 68/1 101/13 118/20
recognize [13]  112/19 113/3 113/23 114/21
  114/22 116/17 122/10 123/14 123/16 124/12
  124/22 126/22 126/23
recognizing [1]  116/23
recollect [4]  44/20 49/7 93/16 94/14
recollection [4]  44/24 46/2 46/11 46/13 47/17
  51/19 58/17 59/11
recommendation [20]  28/16 35/19 35/23
  50/1 50/2 50/3 50/6 50/7 50/10 50/14 50/19
  50/22 50/24 50/25 53/6 66/9 67/11 69/22 75/7
  75/12
recommended [2]  40/2 67/3

reconciliation [1]  27/10
reconciliations [1]  98/25
record [3]  68/13 120/1 131/7
records [6]  18/12 18/19 18/21 27/10 65/7
  65/8
recourse [2]  86/11 86/11
recovered [1]  78/19
recurring [1]  118/15
reduced [3]  77/16 77/20 77/21
refer [1]  101/19
reference [1]  55/23
referenced [1]  126/8
references [1]  126/17
referencing [1]  41/24
reflected [1]  116/1
refund [2]  78/20 78/21
regarding [1]  50/11
regardless [1]  62/5
regional [1]  11/23 127/13
Registered [1]  1/20
regular [2]  100/23 104/16
rehashed [1]  52/9
reiterated [1]  110/5
relate [1]  102/23
related [1]  42/16
relating [1]  41/16
relations [2]  8/9 8/25
relationship [9]  12/11 13/2 13/13 13/21
  24/10 52/16 71/19 71/21 87/17
relationships [2]  9/13 11/2
release [1]  86/3
releases [1]  86/25
relevance [1]  33/8
reliance [1]  110/19
rely [1]  84/2
remain [1]  72/8
remains [1]  91/24
remember [41]  20/21 24/14 29/24 32/12
  33/13 45/1 45/14 46/17 47/1 48/17 49/6 49/13
  49/23 50/1 52/14 55/23 56/1 56/4 56/11 59/25
  60/1 60/21 60/22 60/23 61/4 63/8 64/22 66/3
  68/4 73/13 85/2 86/12 88/9 88/23 102/9
  104/19 104/21 109/7 109/22 110/3 125/3
rep [3]  120/11 120/14 120/17
repair [1]  95/2
repairs [1]  99/17
rephrase [1]  23/18
replace [2]  79/22 79/24
report [3]  15/8 15/10 19/5
reported [1]  27/6
reporters [1]  1/20 4/2
reporting [4]  7/20 8/8 8/9 28/12
reports [1]  63/15
represent [4]  3/11 12/12 13/4 74/13
representations [1]  84/9
representative [5]  25/24 29/8 54/2 54/3
  83/22
represented [8]  20/5 20/6 24/20 27/12 73/21
  102/21 103/5 125/23
representing [2]  55/18 55/21
represents [1]  12/6
request [4]  49/16 67/23 74/10 121/1
requested [4]  46/7 56/7 56/9 57/2 123/9
  126/14
requesting [1]  56/15
requests [3]  41/12 110/19 126/12
required [4]  96/16 97/11 111/9 121/9
requirement [1]  76/6
requirements [5]  82/12 94/21 95/1 95/2
  113/15
requires [1]  80/13
research [1]  11/4
reside [1]  14/18

**R**

resided [2] 14/14 14/19
resign [1] 80/2
respect [5] 48/18 55/24 70/15 73/8 77/16
respond [1] 107/1
responded [1] 113/13
response [9] 30/11 30/12 47/12 60/4 82/8
87/22 114/5 123/17 124/4
responsibilities [3] 7/17 8/4 10/24
responsibility [1] 10/25
responsible [5] 7/19 8/6 8/24 28/23 63/15
responsive [2] 41/8 41/11
restroom [2] 4/11 67/23
result [6] 18/18 110/12 110/18 116/22 123/1
127/5
resulted [3] 102/16 103/3 119/16
retain [1] 80/9
retained [2] 25/22
retaining [1] 79/19
return [1] 106/24
reveal [1] 96/2
revenue [18] 43/5 43/23 44/1 45/17 79/4 79/5
79/8 79/9 98/17 108/4 108/23 110/14 110/16
110/18 127/2 127/10 127/14 127/15
revenues [4] 9/7 44/12 44/15 110/14
review [39] 16/23 18/19 19/2 19/4 19/14 25/6
26/17 26/19 34/16 35/5 36/3 36/4 48/10 49/24
57/13 58/15 59/10 63/17 64/5 64/10 66/7 67/1
70/3 70/3 70/5 70/5 70/6 74/23 75/15 75/16
76/3 83/5 88/8 99/25 101/7 103/3 119/7 123/2
123/7
reviewed [10] 25/22 49/20 50/13 58/18 66/13
70/18 85/14 99/22 113/14 122/22
reviewing [5] 16/24 34/22 49/18 58/11 122/2
reviews [1] 118/1
Richmond [13] 1/11 1/17 1/21 7/2 8/13 8/18
12/3 14/19 20/17 20/24 21/12 35/14 104/14
Rick [3] 31/17 32/22 33/18
right [65]
rise [1] 4/15
risk [2] 18/23 43/7
risks [1] 84/7
road [9] 24/19 50/25 51/1 51/2 51/8 53/4
108/16 108/24 109/2
role [4] 55/3 81/8 92/15 94/11
roles [1] 5/18
rolled [1] 33/6
room [7] 18/11 18/11 29/14 36/13 63/19
63/20 129/18
routes [1] 33/5
RPR [2] 1/15 132/17
ruled [3] 43/17 43/25 45/25
run [2] 109/15 111/4
Russ [29] 16/3 21/19 22/15 22/20 23/20 58/5
58/14 58/18 58/22 59/9 59/15 60/17 60/19
60/25 61/10 61/11 70/7 74/22 75/8 75/15
75/22 76/3 77/15 92/21 93/10 93/12 108/12
122/6 122/8

**S**

safety [17] 22/16 22/23 22/24 22/25 23/21
29/16 29/17 36/3 57/11 57/14 58/5 70/7 72/4
74/21 85/14 122/7 123/6
said [39] 23/16 23/24 23/24 24/1 27/12 41/14
45/11 47/1 47/3 47/12 47/15 47/15 47/18 58/22
58/24 60/17 65/16 65/17 65/21 65/25 66/16
75/3 78/25 84/1 84/2 87/23 89/2 94/13 97/2
100/8 101/18 102/25 103/14 103/18 106/8
106/13 113/14 115/12 118/11 118/16
SAITH [1] 131/20
salary [1] 79/17
sales [4] 120/8 120/11 120/14 120/17

salesman's [1] 63/22
sampled [4] 32/14 32/16 43/3 65/9 65/15
65/16 70/1 91/15 91/19 91/21 115/24 133/6
sampling [1] 101/7
San [1] 31/25
sat [1] 27/22
satisfaction [1] 59/5
satisfactory [1] 113/14
satisfied [1] 57/21
satisfy [1] 57/16
saw [3] 6/5 51/2 81/25
say [38] 13/12 16/22 22/1 21/3 23/1 28/15 32/11
40/8 40/11 41/14 56/21 58/21 60/15 64/1
64/17 65/15 65/24 67/1 67/12 67/13 69/18
79/4 80/14 82/4 83/12 85/17 87/22 91/15
96/25 97/5 98/2 105/2 106/7 110/9 114/10
118/3 118/10 118/13 124/4
saying [29] 19/8 23/19 25/4 30/8 39/16 41/10
42/1 55/9 57/20 57/25 59/12 64/22 66/3 72/12
74/15 88/19 97/7 99/3 102/24 105/10 106/25
107/23 111/3 123/25 124/6 124/25 126/25
says [6] 86/7 86/15 115/4 122/11 122/13
126/10
SCC [7] 7/20 8/9
scenario [1] 103/4
scheduled [1] 88/13
schedules [1] 108/6
school [4] 4/20 4/22 4/23 5/1
Scottsdale [1] 12/9
screen [1] 44/19
search [3] 11/3 11/3 12/13
second [30] 16/1 41/21 76/6 81/1 81/3 82/13
82/14 82/20 83/9 85/2 109/21 119/7 121/19
section [1] 78/8
sections [1] 78/8
see [11] 13/7 21/6 22/9 30/16 51/4 53/21
53/22 59/1 75/19 81/6 126/9
seemed [1] 73/23
seems [1] 114/4
seen [7] 4/1 41/3 41/23 42/3 116/4 121/6
125/2
selected [1] 43/10
sell [2] 9/12 13/5
seller [5] 12/10 20/6 24/20 47/11 84/18
sellers [2] 12/6 21/3
selling [1] 20/24
send [2] 39/24 66/24
sending [4] 49/16 106/23 124/24 127/7
senior [5] 94/19 95/4 95/18 99/3 100/5
sense [6] 21/24 39/3 49/5 50/17 53/25 123/8
sent [9] 40/7 47/13 47/14 47/19 48/2 109/10
114/23 119/9 120/13
series [1] 3/21
serious [1] 100/18
seriously [1] 57/7
service [1] 23/7
services [2] 33/4 122/1
set [11] 30/13 46/7 69/3 79/12 91/21 109/18
117/24 121/9 122/8 124/17 132/7
sets [2] 25/15 126/12
setting [1] 27/24
seven [2] 20/13 20/14
Seventeen [1] 5/16
several [2] 56/2 70/19
shake [1] 3/23
shape [3] 18/22 65/8 65/9
share [2] 31/9 45/21
shared [2] 34/12 34/14
she [3] 8/14 8/15 8/16
sheet [4] 17/9 27/11 35/6 35/7
shooting [1] 124/20
Shops [1] 6/19

should [1] 66/17
show [12] 41/7 41/22 42/19 89/7 113/22
121/3 121/16 124/11 124/21 126/21 129/8
129/15
showed [2] 52/5 103/19
shows [1] 119/13
sic [1] 110/18
side [5] 29/8 29/12 57/11 61/7 92/16
sign [7] 55/5 69/5 69/6 72/17 86/14 89/6
114/7
sign-up [1] 89/6
signed [11] 27/23 48/5 51/12 71/18 78/10
109/19 113/7 114/2 114/3 114/5 114/19
significant [1] 64/25
significantly [1] 102/11
signs [1] 27/13
similar [4] 18/11 20/25 26/15 90/23
simply [1] 46/25
since [10] 17/8 26/17 51/11 62/20 62/24 63/4
77/2 88/19 105/4 126/17
sir [12] 3/7 4/17 41/1 41/4 41/23 44/18 113/3
113/23 119/8 121/5 123/15 124/23
sit [6] 21/2 21/13 48/24 49/2 69/5 108/9
sit-down [1] 21/13
site [4] 21/21 63/17 70/18 122/23
situation [7] 24/20 37/17 38/1 72/21 99/14
103/8 122/3
six [5] 20/13 20/14 78/14 78/23 132/10
size [4] 15/6 43/3 43/20 43/21
slash [1] 5/24 9/13
slight [1] 119/17
slightly [2] 80/22 80/23
small [2] 97/7 15/1
smaller [1] 11/11
smart [1] 111/22
so [95]
So the [1] 60/13
sole [1] 77/12
solid [4] 27/13 35/25 45/17 99/13
solution [1] 9/3
some [42] 11/4 16/5 23/7 23/8 23/12 23/13
24/23 25/8 28/4 29/10 36/2 37/6 38/17 39/10
47/11 47/19 51/4 51/5 59/12 59/13 59/16 61/1
71/5 76/5 78/16 80/5 80/6 80/8 81/14 81/17
86/17 88/7 107/21 109/15 110/2 112/11
113/16 114/4 115/7 116/10 124/1 131/7
somebody [2] 40/3 105/18
someone [4] 39/24 46/24 79/6 125/22
something [10] 13/7 17/25 45/22 64/7 78/17
79/3 87/6 89/3 89/9 128/22
somewhat [1] 58/23
somewhere [6] 50/9 73/12 73/13 74/15 80/18
109/15
soon [1] 110/1
sorry [2] 65/3 123/20
sounded [1] 45/21
span [1] 38/23
speak [6] 42/1 42/5 54/12 54/14 58/18 130/3
speaker [2] 104/15 105/7
spec [2] 95/1 101/9
specific [8] 47/17 49/15 51/19 71/14 86/13
105/10 109/20 126/6
specifically [10] 33/4 48/23 49/10 49/11
49/12 49/23 61/17 78/5 84/19 122/13
specifics [2] 46/16 47/2
specs [1] 70/24
speculate [2] 50/20 60/14
speculation [1] 14/22
spell [1] 15/12
spend [1] 61/22
Spending [1] 117/21
spent [8] 18/10 52/2 57/12 58/11 62/17 62/18
63/7 69/13

**S**

spotting [1] 73/22
spring [1] 44/20
springtime [1] 30/4
staff [1] 57/10
stage [1] 74/17
standard [2] 39/22 76/18
standards [7] 72/19 93/2 93/3 107/18 107/22 107/24 108/9
standpoint [3] 17/10 37/14 118/14
start [6] 4/3 5/24 10/12 34/8 48/25 53/7
start-up [2] 5/24 10/12
started [3] 12/11 17/20 118/11
starts [1] 63/6
state [7] 1/15 3/7 5/5 5/6 54/24 132/5 132/18
statement [5] 40/4 40/5 40/6 100/10 118/17
statements [3] 94/3 105/11 109/12
STATES [1] 1/1
stating [3] 114/6 125/13 125/21
Statum [4] 31/18 31/19 32/21 33/18
stay [3] 78/14 82/2 94/12
steel [1] 122/5
step [8] 34/20 34/21 48/8 48/13 50/3 82/9 82/10 84/22
steps [11] 48/23 48/24 66/2 67/6 82/19 82/20 83/15 84/7 111/9 111/10 121/9
still [18] 7/12 10/17 38/2 53/12 67/13 76/13 82/20 84/13 85/21 85/23 85/24 86/19 87/9 87/19 94/2 94/4 94/4 97/17
stock [28] 17/7 19/25 22/24 24/7 26/18 30/5 30/6 30/6 35/4 35/7 37/8 37/9 37/13 42/17 42/19 42/25 43/1 43/4 43/6 43/6 43/11 43/13 43/25 44/11 72/7 72/9 89/13
Stomps [3] 31/17 32/21 33/18
stop [1] 4/10
stopped [1] 51/2
store [1] 63/21
straight [1] 52/25
strategy [1] 42/24
streams [1] 108/4
Street [3] 1/17 2/3 2/7
strike [2] 105/1 117/5
structure [4] 26/15 43/11 66/14 107/12
stuff [3] 49/5 64/2 66/21
subject [1] 42/12
submit [1] 25/3
submitted [2] 25/5 27/18
Subscribed [1] 133/17
subsequent [3] 28/17 54/11 77/14
subsidiary [2] 5/14 6/12
successful [1] 29/22
such [4] 56/23 57/22 75/24 94/22
sufficient [1] 56/22
suggested [2] 106/12 106/15
Suite [1] 1/21
summarize [1] 125/7
summary [6] 66/15 66/19 67/2 69/18 74/12 114/23
summer [1] 19/23 19/24
supply [1] 33/4
support [3] 17/14 59/6 85/24
supporting [2] 57/5 81/6
sure [8] 28/5 28/18 39/15 112/16 114/25 118/9 119/1 120/3
surprise [1] 112/6
surprised [1] 112/2
sworn [3] 3/3 132/6 133/17
system [2] 27/10 122/2

**T**

table [2] 52/20 98/5
take [28] 4/11 5/23 18/16 26/20 26/24 34/7

5/7 35/10 35/12 36/22 36/25 39/7 40/20 41/20 44/24 45/11 86/9 86/15 93/7 97/24 97/24 98/24 101/11 109/24 118/18 119/7 121/18
taken [6] 1/14 40/22 68/1 101/13 118/20 122/17
takes [4] 34/23 37/10 39/7 77/6
taking [5] 22/4 35/8 54/17 98/20 132/11
talk [19] 9/18 19/18 29/20 46/14 50/4 52/1 52/7 52/20 64/4 64/17 89/8 93/10 104/17 105/5 116/24
talked [19] 9/18 42/18 44/15 48/13 52/9 52/10 52/13 52/24 53/2 69/13 69/14 69/17 71/16 80/25 89/9 89/18 97/2 103/10 107/2
talking [15] 23/1 28/7 33/22 34/8 39/2 39/2 52/3 53/19 55/14 82/15 83/1 89/15 100/4 101/16 105/11
Tampa [1] 8/1
target [4] 31/5 31/9 38/24 94/12
task [1] 82/21
tax [3] 8/7 16/6 126/17
Taylor [6] 6/15 6/16 6/17 100/22 100/23 101/1
telephone [5] 39/1 46/23 50/18 104/10 104/16
tell [40] 3/19 4/17 12/8 13/25 20/21 23/10 24/17 28/6 29/6 32/12 33/16 35/1 45/1 48/17 49/2 51/10 51/22 52/11 59/24 62/16 64/22 65/18 65/22 80/24 80/25 81/22 91/23 92/13 92/17 97/4 98/11 104/19 105/15 106/1 106/23 110/8 112/14 119/7 121/9 131/4
telling [8] 47/16 65/10 93/9 97/7 121/23 125/10 125/19 127/4
tells [2] 84/13 98/10
term [5] 68/5 69/10 71/22 86/15 94/10
terminate [3] 65/5 96/5 97/12
terminated [11] 76/17 96/12 104/6 107/3 107/6 112/1 112/3 112/9 130/4 130/8 131/12
terminates [1] 76/22
terminating [1] 116/22
termination [12] 95/21 106/16 106/16 106/23 112/5 112/8 115/13 115/14 115/16 115/18 117/3 117/23
terminology [2] 109/22 126/6
terms [15] 11/5 25/4 36/5 36/24 37/11 50/4 67/15 69/3 69/25 71/3 71/5 71/11 77/11 111/8 124/25
testified [2] 3/3 103/25
testify [1] 114/9
testimony [13] 43/24 44/14 46/25 58/13 84/25 87/8 87/18 95/7 107/17 108/19 113/9 118/6 129/22
Texas [3] 6/15 6/18 10/13
than [12] 37/14 42/21 44/12 45/17 45/24 98/21 102/12 102/25 118/4 120/9 125/6 129/9
Thanks [1] 106/8
that [713]
that's [42] 13/22 14/6 22/12 23/7 23/7 23/8 24/13 37/17 34/10 42/1 42/5 46/20 48/21 48/21 51/15 53/18 53/20 55/9 55/20 59/11 60/22 61/17 67/8 73/16 77/19 82/25 83/15 84/25 87/16 88/14 88/18 90/2 96/21 103/25 117/7 118/6 123/17 124/9 125/12 127/4 127/7 131/15
their [39] 7/3 7/10 12/7 16/6 16/24 16/25 18/7 18/21 18/22 20/5 20/24 21/5 22/23 22/24 24/9 25/6 25/7 28/1 30/15 32/16 32/23 35/24 39/2 47/12 63/3 63/22 82/1 87/16 92/2 92/3 107/9 108/6 108/23 110/18 122/2 122/5 127/17 127/18
them [31] 5/17 9/15 9/16 9/17 11/13 11/14 13/22 14/13 21/8 21/13 22/4 22/4 29/11 29/11 33/21 39/24 41/12 41/13 52/15 64/20 64/22

66/16 84/1 87/24 91/21 97/3 97/4 112/13 125/1 125/22 126/1 126/2 127/5 127/5
then [39] 5/5 11/6 11/24 12/2 12/24 14/17 25/11 25/11 25/22 36/1 36/2 37/25 45/5 47/13 52/9 52/24 53/3 69/2 69/6 69/7 69/19 69/23 78/13 78/18 78/21 78/22 79/2 86/18 86/21 99/18 101/6 107/17 115/7 115/23 119/2 123/8 126/9 128/3 130/24
there [114]
there's [9] 21/1 21/6 71/14 80/7 83/12 99/13 111/20 116/10 118/9
therefore [6] 24/9 26/16 47/14 79/8 79/12 97/12
thereof [1] 111/8
these [21] 16/7 17/24 19/5 21/25 22/6 22/8 22/12 23/15 25/4 37/17 41/15 54/4 58/19 62/9 67/11 67/13 75/9 80/2 93/5 94/20 112/12
they; [85]
They'd [1] 9/20
they'll [1] 38/19
they're [14] 11/21 11/23 12/6 13/5 15/3 15/5 15/7 20/16 31/11 38/18 86/12 86/13 93/7 108/2
They've [1] 82/10
thing [10] 9/1 21/14 34/10 35/15 39/3 53/18 65/16 66/6 93/20 106/11
things [16] 9/11 14/1 18/25 37/6 45/25 49/8 52/9 54/16 64/9 66/25 77/3 84/7 85/11 86/25 94/6 103/10
think [31] 3/10 16/4 16/6 16/13 19/8 19/23 41/25 47/3 47/16 51/16 56/1 56/25 59/2 60/17 61/11 61/12 61/24 62/15 63/22 63/22 67/20 69/19 72/8 79/23 82/5 87/6 88/12 90/18 111/11 111/14 115/6
thinking [1] 30/16
third [21] 10/12 21/17 23/19 24/14 30/2 53/1 85/7 85/16 85/22 87/8 87/20 88/2 88/19 88/24 88/24 89/4 97/13 97/16 101/21 102/24 103/1
third-party [1] 10/12
this [123]
thorough [4] 17/8 17/10 26/18 35/4
those [72]
thought [10] 42/24 72/5 73/11 81/12 81/13 81/14 81/21 82/16 97/1 99/14
thousand [1] 16/13
threatening [1] 109/10
three [32] 8/3 11/10 11/11 11/15 15/25 16/9 22/12 31/18 31/21 32/21 37/17 37/25 42/18 44/14 51/9 52/13 53/6 53/8 53/15 62/15 68/9 74/9 86/14 89/10 90/12 93/17 93/19 94/13 94/14 103/10 125/11 125/16
threshold [1] 44/1
threw [1] 52/19
through [38] 6/10 11/1 18/11 20/6 20/20 22/1 22/4 25/6 26/14 33/23 38/8 38/8 38/9 47/7 47/8 47/24 48/22 48/25 49/3 51/15 68/19 74/5 74/20 74/23 77/23 82/10 82/17 82/19 86/21 91/11 98/7 99/14 108/8 108/24 109/23 119/5 130/24 133/6
throughout [2] 103/6 106/22
thumbs [1] 19/7
thumbs-up [1] 19/7
time [77]
times [10] 18/6 20/12 20/13 20/14 32/10 62/13 62/15 69/10 125/11 125/16
timing [2] 60/15 109/5
tip [1] 13/11
tires [1] 101/10
title [19] 10/5 10/23 15/14 15/20 22/19 63/11 63/14 65/17
today [6] 3/22 7/12 10/17 50/15 90/24 129/14
together [18] 9/16 25/8 25/16 27/24 28/13 34/19 48/8 48/11 50/1 51/5 65/25 66/15 66/15

**T**

together... [5] 95/20 102/15 104/24 105/7 114/23
told [16] 13/20 29/25 55/9 62/9 65/3 65/15 65/24 72/8 81/23 87/18 88/12 104/23 105/12 105/14 106/2 125/19
Tomlinson [4] 2/2 3/10 29/14 36/13
Tommy [3] 6/15 6/16 6/17
too [1] 99/5
took [5] 3/18 10/14 26/25 61/18 94/13
Topic [2] 42/8 42/11
Topics [2] 42/2 42/6
tornado [4] 58/25 59/17 59/20 60/5
total [20] 9/7 11/24 30/3 32/6 32/7 32/7 35/2 35/3 35/10 35/15 36/4 36/8 36/9 36/15 37/8 73/10 92/3 92/5 102/22 103/4
totally [2] 91/25 108/3
toward [1] 63/9
towards [2] 29/21 67/20
town [2] 63/23 90/18
tractor [5] 80/1 98/23 98/25 99/2 99/20
tractors [8] 57/6 71/24 100/17 102/12 102/13 102/15 120/5 120/7
trade [2] 101/9 124/3
trailers [7] 57/6 71/24 100/17 102/13 102/14 102/15 120/5
transaction [15] 22/11 24/7 25/5 31/19 32/18 51/6 67/14 79/7 79/21 81/13 95/24 107/13 126/5 127/14 130/17
transcript [1] 132/9
transcription [1] 133/7
transparent [1] 37/13
transportation [20] 7/4 9/13 11/17 11/17 11/20 11/24 16/11 30/3 32/6 32/7 32/8 35/2 35/3 36/4 36/8 36/9 36/15 37/9 45/16 90/16
Transportation's [1] 35/16
treasury [1] 8/7
tried [1] 106/22
trip [5] 1/1 51/1 51/2 51/8 53/4 82/13 82/14 85/16 88/25
trophies [1] 52/5
trouble [1] 65/1
truck [1] 45/22
trucking [55]
Trucking's [4] 88/16 130/3 131/8 131/13
truckload [4] 15/3 15/7 45/25 130/23
trucks [12] 16/12 20/2 23/4 23/7 23/10 24/1 24/5 36/7 36/9 43/22 45/4 92/2
true [6] 59/2 110/4 119/13 131/11 132/10 133/6
truth [2] 3/19 51/15
try [13] 28/13 37/3 48/22 65/22 83/5 85/12 93/21 94/12 110/1 111/2 112/7 112/8 127/21
trying [17] 17/5 19/1 28/24 40/16 49/1 49/5 62/23 68/4 90/18 91/8 91/10 97/3 125/6
two [26] 5/4 5/5 11/15 26/21 27/5 32/3 35/11 35/17 38/4 38/23 39/14 64/8 74/9 78/7 78/7 78/25 79/15 86/14 91/17 93/18 94/13 94/14 101/18 126/4 129/11
two-week [1] 27/5
two-year [1] 126/4
twofold [1] 77/7
type [8] 8/8 17/6 17/15 27/24 39/3 39/11 51/5 54/18 59/7 63/4 66/21 66/23
types [2] 45/25 101/18
typewritten [1] 133/5
typical [1] 45/2
typically [9] 25/25 34/4 36/17 36/19 38/11 38/18 66/25 73/14 79/13

**U**

U.S [167]

ultimate [2] 54/25 99/6
ultimately [4] 47/10 117/6
umbrella [2] 73/4 96/20
under [15] 31/2 72/18 74/16 77/11 84/6 93/1 96/20 102/19 108/1 108/6 114/17 118/6 120/5 120/8 132/12
understand [9] 3/18 13/7 28/24 60/10 72/24 105/8 110/17 117/24 127/3
understanding [7] 25/16 42/4 59/15 63/10 68/23 96/10 130/25
understood [5] 60/7 84/10 110/10 110/13 117/3
undertake [2] 41/6 74/17
undertaking [1] 75/8
undetermined [1] 75/19
Union [5] 5/14 6/6 6/11 7/1 7/9
unit [1] 33/2
UNITED [1] 1/1
University [1] 5/5
unless [3] 65/11 84/13 98/10
until [3] 10/9 48/20 68/8
up [44] 5/18 5/24 10/12 13/24 14/12 19/7 27/24 30/13 31/22 32/14 32/15 34/6 34/21 45/6 46/7 49/19 56/2 56/5 67/6 68/5 70/7 73/23 78/10 78/17 79/12 80/8 81/6 89/6 91/21 94/9 94/10 97/3 102/6 104/13 106/15 108/20 108/21 109/9 109/11 110/7 121/9 122/8 122/20
up-front [2] 78/10 78/12
update [1] 121/22
upon [5] 43/3 68/24 108/3 109/17 118/15
upset [1] 123/24
upside [1] 102/11
upwards [1] 79/23
us [12] 11/16 11/18 11/25 12/4 25/6 45/15 54/15 57/18 80/9 82/12 120/2 121/4
use [3] 39/23 68/18 94/10
used [6] 5/24 63/22 69/10 70/24 121/13 126/7
uses [1] 100/23
using [1] 68/5
USPCI [2] 6/8 6/10
usually [2] 64/6 66/23

**V**

valuated [2] 101/2 102/24
valuation [20] 71/13 96/15 97/21 98/3 99/25 101/4 101/5 101/5 101/6 101/19 101/19 101/24 102/1 102/6 102/10 102/16 102/19 103/1 103/9 103/18
valuations [1] 100/24
value [12] 71/15 94/23 94/25 98/5 98/6 99/16 100/20 100/21 102/12 103/4 119/11 119/15
valued [1] 98/23
various [7] 5/18 6/20 9/14 25/23 49/17 49/21 51/3
verbal [1] 3/22
verbally [3] 103/5 109/13 120/6
verification [1] 59/2
verify [1] 74/3
verifying [3] 17/13 17/13 17/14
versus [3] 22/24 103/5 119/15
very [19] 6/21 9/7 9/19 17/8 17/10 26/18 27/12 27/13 32/4 35/4 35/24 37/7 54/5 54/20 79/22 80/5 84/4 86/13 87/24
via [3] 66/24 115/19 120/8
vice [7] 10/3 10/6 10/7 22/16 22/18 23/20 32/24
view [5] 18/23 45/18 49/16 57/19 102/20
Virginia [13] 1/11 1/16 1/17 1/21 7/3 8/13 8/19 12/3 14/19 132/1 132/5 132/18 133/1
visit [12] 18/4 50/23 62/13 64/16 81/1 81/3 82/20 85/3 85/5 85/7 122/5 122/8

visited [3] 18/9 51/1 51/8
void [1] 111/2
VP [3] 54/6 84/5 123/5

**W**

Wabash [5] 122/4 128/17 129/11 129/22 130/1
Wadley [25] 51/13 57/12 59/10 61/5 61/22 62/13 64/24 66/8 67/1 69/13 75/7 81/1 81/3 82/13 85/3 85/6 85/7 85/17 88/24 88/25 89/5 104/11 104/12 107/14 108/1
waiting [1] 94/7
walk [2] 47/7 49/2
walked [2] 47/8 118/4
walking [1] 48/25
wall [1] 52/4
Wally [2] 122/6 122/7
Walters [2] 11/19 16/14
want [16] 4/16 9/20 10/21 29/1 39/12 41/1 60/21 61/22 79/6 89/8 89/9 93/9 112/11 112/13 118/24 126/10
wanted [4] 71/10 71/11 84/1 117/19
wants [2] 22/1 42/25
Wardeberg [18] 16/3 16/17 19/11 21/12 26/4 33/11 50/2 54/22 61/11 95/6 95/8 95/23 96/7 100/11 105/22 121/22 123/22 124/6
was [394]
wasn't [5] 6/5 8/14 81/4 110/14 111/25
water [2] 28/4 120/8
way [10] 31/8 71/9 84/22 86/20 86/22 91/21 115/16 117/14 120/4 120/20
ways [5] 52/13 53/7 53/8 53/15 56/25
we [133]
we'd [2] 45/20 52/10
we're [7] 3/19 13/12 68/19 80/4 119/2 119/23 131/17
we've [9] 13/20 49/4 69/13 69/14 69/17 89/15 89/18 100/4 122/4
wealthy [1] 6/22
weeds [1] 39/12
week [15] 18/14 18/19 19/14 27/5 62/18 63/7 63/24 64/17 64/23 66/7 67/1 69/13 75/6 83/5 127/1
week-long [6] 18/19 19/14 64/23 67/1 75/6 83/5
weekends [1] 107/10
weekly [1] 28/3
weeks [8] 26/21 35/11 56/1 56/2 93/17 93/19 94/13 94/14
well [43] 6/6 10/21 15/5 19/25 23/19 24/19 25/2 32/14 34/18 35/13 37/7 39/11 41/14 41/25 49/1 49/20 51/14 51/25 52/2 53/7 55/18 65/8 66/6 67/8 70/18 77/10 77/19 77/21 90/2 92/13 93/25 94/14 97/13 98/6 100/3 100/12 102/23 103/7 105/12 111/13 111/19 117/5 122/20 127/24
went [20] 5/2 5/4 5/13 6/14 7/9 9/14 9/17 20/15 25/5 26/13 55/3 56/2 59/9 78/20 78/22 81/5 81/5 92/18 104/23 108/8
were [146]
weren't [2] 109/14 127/24
Westerre [1] 1/21
what [183]
what's [22] 5/25 15/4 22/20 25/13 30/21 39/21 41/22 42/24 66/6 79/18 86/4 86/5 92/22 113/1 113/22 114/13 116/1 120/17 124/11 124/21 126/21 128/25
whatever [10] 4/11 29/11 35/7 36/24 38/9 45/20 59/6 60/8 98/1 99/6
whatnot [1] 66/8
when [48]
When's [1] 111/24
where [29] 4/17 4/22 5/3 6/13 11/20 14/11

# W

where... [23]  14/17 21/1 26/24 35/12 39/8
51/17 52/16 58/24 60/3 69/5 70/19 73/16
73/24 79/25 81/7 81/11 83/12 85/13 89/19
89/23 90/17 95/25 108/23
where's [1]  94/10
whereas [1]  20/15
whether [40]  32/17 34/17 40/17 40/18 41/6
42/25 44/10 50/13 50/24 51/5 53/24 57/17
59/2 60/23 61/7 70/23 74/18 79/20 81/18 82/3
82/15 83/12 95/23 101/7 107/9 108/5 108/15
111/21 111/22 114/4 114/10 114/25 117/19
120/13 120/14 120/20 120/25 124/7 125/15
130/7
which [30]  13/5 14/12 16/10 17/7 25/3 34/20
38/24 39/5 42/12 50/1 50/4 53/6 61/13 68/22
70/2 70/7 76/2 86/21 95/6 96/17 100/15
100/22 101/8 102/12 115/10 122/3 123/24
124/3 124/5 126/18
which is [1]  95/6
while [5]  19/1 52/8 64/4 70/25 76/12
White [1]  122/7
who [57]
Who's [2]  31/15 70/4
whoever [1]  72/9
whole [2]  57/17 102/14
whom [1]  19/5
why [17]  5/22 6/4 7/23 9/9 10/10 20/14 21/23
23/18 43/19 45/10 77/20 87/15 96/11 105/15
113/12 116/25 123/4
Wichita [2]  5/5 5/6
WILEY [1]  1/20
will [12]  12/10 17/9 29/2 38/18 69/2 77/4
84/20 86/8 101/8 120/9 122/6 127/2
Williams [1]  1/16
willing [5]  77/25 78/1 82/2 109/25 111/3
wiring [1]  124/15
wit [2]  132/2 133/2
withdraw [2]  39/10 39/11
within [7]  72/6 73/4 77/9 84/17 99/1 107/25
110/2
without [5]  86/11 88/1 128/9 129/3 130/17
Witness [2]  1/13 3/2
woman [2]  8/12 15/18
Word [1]  66/23
words [5]  13/1 45/23 88/15 125/25 127/8
work [32]  5/13 6/2 6/14 7/9 7/14 8/14 8/21
9/15 11/3 12/10 12/22 15/22 16/1 17/15 29/21
31/8 33/19 34/23 37/2 37/24 51/6 53/9 65/21
66/14 66/22 73/1 73/2 74/19 77/9 116/19
120/11 130/21
worked [13]  7/15 7/18 8/22 9/17 12/14 12/16
14/8 16/3 27/23 28/10 63/1 92/14 118/2
working [15]  9/15 11/19 13/13 13/21 17/16
17/20 17/25 22/10 27/1 28/1 28/6 28/25 38/6
81/24 87/23
works [5]  13/1 61/16 68/7 100/23 122/8
world [1]  31/6
worse [3]  117/4 117/25 118/4
worth [7]  6/15 22/9 70/22 70/23 99/11 100/8
100/8
worthy [1]  67/14
would [167]
wouldn't [3]  97/21 103/15 123/8
write [1]  66/21
writing [1]  106/14
written [14]  50/7 50/10 50/14 50/19 50/21
50/24 50/25 66/19 67/17 69/18 78/7 86/12
86/13 88/10
wrote [1]  115/23

# X

XPRESS [157]

Xpress's [10]  21/6 31/10 42/8 47/9 54/12
55/6 71/6 71/8 127/2 127/2

# Y

Yeah [3]  30/3 117/7 117/9
year [10]  4/24 5/10 5/20 6/3 7/15 7/16 8/22
43/5 86/14 126/4
years [13]  5/4 5/5 5/16 8/3 38/4 38/23 39/16
74/9 74/9 74/9 79/15 86/14 86/14
yes [130]
yeses [1]  75/17
you [625]
you'd [2]  35/6 79/4
you're [39]  4/5 17/3 17/25 21/1 22/6 23/19
28/21 28/25 28/25 35/8 37/8 37/9 39/8 39/16
40/16 42/1 43/9 43/10 47/16 50/6 55/9 55/11
55/14 55/18 55/21 56/15 57/20 57/25 71/1
83/4 83/11 88/19 93/9 97/7 99/18 105/23
111/13 125/6 131/18
you've [12]  10/23 11/12 23/15 24/1 27/5
28/15 35/16 75/6 75/7 90/24 103/25 107/5
your [132]
yourself [2]  27/2 54/1