# EXHIBIT 7

**American Court Reporting**
**toll-free (877) 320-1050**

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

CIVIL ACTION NUMBER: 3:06-CV-351-MEF

G.F. KELLY TRUCKING, INC.; and GUY
KELLY, individually,
         Plaintiffs,
vs.
U.S. XPRESS ENTERPRISES, INC., et al.,
         Defendants.

DEPOSITION TESTIMONY OF
WILLIS FRANKLIN CHILDERS

January 25, 2007
10:00 a.m.

COURT REPORTER:
MELANIE L. PETIX, CSR, CLR

Page 2

1    S T I P U L A T I O N S
2        It is hereby stipulated and
3    agreed, by and between the parties
4    through their counsel, that the
5    deposition of WILLIS FRANKLIN CHILDERS
6    may be taken before Melanie L. Petix,
7    Certified Shorthand Reporter, Certified
8    LiveNote Reporter and Notary Public for
9    the State of Alabama at Large, at the
10   offices of Baker, Donelson, Bearman,
11   Caldwell & Berkowitz, Wachovia Tower,
12   420 20th Street North, Suite 1600,
13   Birmingham, Alabama 35203 on January
14   25, 2007, commencing at 10:00 a.m.
15       It is further stipulated and
16   agreed that the signature to and the
17   reading of the deposition by the
18   witness are waived, the deposition to
19   have the same force and effect as if
20   full compliance had been had with all
21   laws and rules of Court relating to the
22   taking of depositions.
23       It is further stipulated and

Page 3

1    agreed that it shall not be necessary
2    for any objections to be made by
3    counsel as to any questions except as
4    to form or leading questions, and that
5    counsel for the parties may make
6    objections and assign grounds at the
7    time of trial, or at the time said
8    deposition is offered in evidence, or
9    prior thereto.
10       In accordance with Rule 5(d)
11   of The Alabama Rules of Civil
12   Procedure, as amended, effective
13   May 15, 1988, I, Melanie L. Petix,
14   Certified Shorthand Reporter and
15   Certified LiveNote Reporter, am hereby
16   delivering to David B. Hall the
17   original transcript of the oral
18   testimony taken on January 25, 2007.
19       Please be advised that this is
20   the same and not retained by the Court
21   Reporter, nor filed with the Court.
22       --oOo--
23

Page 4

1    A P P E A R A N C E S
2
3    FOR THE PLAINTIFF:
4        JOHN EVERETT TOMLINSON, Esq.
5        BEASLEY, ALLEN, CROW, METHVIN,
6        PORTIS & MILES, P.C.
7        P.O. BOX 4160
8        MONTGOMERY, ALABAMA 36103-4160
9
10   FOR THE DEFENDANTS:
11       DAVID B. HALL, Esq.
12       BAKER, DONELSON, BEARMAN,
13       CALDWELL & BERKOWITZ, P.C.
14       Wachovia Tower
15       420 20th Street North, Suite 1600
16       Birmingham, Alabama 35203
17
18   ALSO PRESENT (via teleconference):
19       Lisa Pate
20       Melissa Kell
21
22
23

1 (Pages 1 to 4)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 5

INDEX

EXAMINATION BY:          PAGE
MR. HALL            7

EXHIBITS

DEFENDANT'S          PAGE
No. 88          117

--oOo--

Page 7

1    COURT REPORTER: Usual
2    stipulations?
3        MR. HALL: Sure.
4        MR. TOMLINSON: Yes.
5
6    EXAMINATION BY MR. HALL:
7        Q. Mr. Childers, if you could,
8    please state your full name.
9        A. Willis Franklin Childers.
10       Q. Could you spell your last
11   name, please?
12       A. C-h-i-l-d-e-r-s.
13       Q. Mr. Childers, I represent U.S.
14   Xpress in a case that was filed by G.F.
15   Kelly Trucking, Inc. and Guy Kelly.
16   I'm going to be asking you some
17   questions today. If I ask you any
18   questions that you don't understand, I
19   don't speak loud enough or I ask a
20   confusing question, please let me know,
21   ask me to restate it or speak up and I
22   will try to do it so that you
23   understand what I'm trying to ask you.

Page 6

1        I, Melanie L. Petix, a
2    Certified Shorthand Reporter, Certified
3    LiveNote Reporter and Notary Public for
4    the State of Alabama at Large, acting
5    as Commissioner, certify that on this
6    date, pursuant to the Alabama Rules of
7    Civil Procedure, and the foregoing
8    stipulations of counsel, there came
9    before me at the offices of Baker,
10   Donelson, Bearman, Caldwell &
11   Berkowitz, Wachovia Tower, 420 20th
12   Street North, Suite 1600, Birmingham,
13   Alabama 35203, on January 25, 2007,
14   commencing at or about 10:00 a.m.,
15   WILLIS FRANKLIN CHILDERS, witness in
16   the above cause, for oral examination,
17   whereupon, the following proceedings
18   were had:
19
20       WILLIS FRANKLIN CHILDERS,
21   having been first duly sworn
22   (affirmed), was examined and testified
23   as follows:

Page 8

1    If I do ask you a question and you
2    answer it, I will presume that you
3    understand the question. Is that fair?
4        A. Yes, sir.
5        Q. And also, for purposes of the
6    court reporter taking down what you
7    say, she can't write down nods or
8    uh-huhs or uh-uhs. So you need to
9    answer audibly. Okay?
10       A. Okay.
11       Q. Mr. Childers, where do you
12   reside?
13       A. Dadeville, Alabama.
14       Q. What is your address there?
15       A. 168 Greensview, one word,
16   Lane.
17       Q. How long have you lived at
18   that location?
19       A. Four years in June.
20       Q. I'm going to ask you about
21   your educational background starting
22   with high school.
23       Where did you graduate from

**www.AmericanCourtReporting.com**
**January 25, 2007**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 9

1  high school?
2      A.  Auburn High School.
3      Q.  What year was that?
4      A.  1960.
5      Q.  Did you go to college after
6  that?
7      A.  Went in the military.
8      Q.  Military.  Okay.  Have you had
9  any education --
10     A.  I'm sorry.  I'm sorry.  One
11  quarter at Auburn and then in the
12  military.
13     Q.  Have you attended any -- other
14  than that quarter at Auburn, have you
15  attended any other universities or
16  colleges?
17     A.  One more quarter after that in
18  '62, I believe it was, 1962.
19     Q.  Okay.  What branch of the
20  service were you in?
21     A.  Air Force.
22     Q.  When did you get out?
23     A.  Same year I went in, '61.

Page 10

1      Q.  '61?  When you got back, is
2  that when you went to the second
3  quarter at Auburn?
4      A.  No, sir.  I got back in '61.
5  I didn't go the second quarter until
6  '62.
7      Q.  Okay.  Have you had any other
8  education, formal education, since that
9  second quarter at Auburn?
10     A.  No, sir.
11     Q.  I'm going to ask you about
12  your job history up to the present.
13  Simplest way to do it is start at the
14  beginning and work our way forward.
15         What was the first job you had
16  after high school besides the military?
17     A.  Working for my father.  He had
18  a grocery business.
19     Q.  All right.  Where was that?
20     A.  Auburn, Alabama.
21     Q.  Auburn.  How long did you work
22  there?
23     A.  Worked there really from the

Page 11

1  time I was about 12 years old up until
2  about 25 or 26.
3      Q.  What did you do after that?
4      A.  I worked with Colonial Baking
5  Company for four years out of
6  Montgomery, Alabama.
7      Q.  How many years?  I'm sorry.
8      A.  About four.
9      Q.  Four years?
10     A.  Yes.
11     Q.  What years were they?
12     A.  Let's see.  Had to be
13  somewhere around '65 to about '69.
14     Q.  What did you do for Colonial
15  Baking?
16     A.  I was a salesperson.
17     Q.  Were you on call 24 hours a
18  day?
19     A.  Yes, sir.
20     Q.  You lasted a long time.  What
21  did you do after Colonial Baking?
22     A.  Uniroyal, at the time that was
23  the name of it, Uniroyal, and you

Page 12

1  know, Uniroyal and Goodrich, Michelin
2  bought them out.  But it was -- I went
3  there in -- I believe it was December
4  of '69 is when I went to work there and
5  I worked there until 1993, September of
6  '93.
7      Q.  I imagine you held more than
8  one position there?
9      A.  Yes, sir.
10     Q.  If you could, just run me
11  through it, as best you can recall?
12     A.  Well, I went in just to work
13  in the factory to start with.  I was a
14  steward, which is just a departmental
15  job in the union.  I was a supervisor
16  in the plant.
17     Q.  Okay.
18     A.  Then I was chairman of the
19  union, which is over a division of the
20  plant, and then I was president of the
21  union.  And I was with the corporate
22  office for a very short period of time
23  in Detroit, Michigan.  And then I came

**www.AmericanCourtReporting.com**
**January 25, 2007**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 13

1  back and worked in the plant for a
2  while and then I was president of the
3  union until I retired.
4      Q.  And you did that up until '93?
5      A.  Yes, sir.
6      Q.  After you left, I'm going to
7  call it Uniroyal, Goodrich, after you
8  left there in '93, where did you go?
9      A.  I didn't do anything, really.
10  I bought a place on Lake Martin and
11  remodelled it for several months.  And
12  I went to a truck driving school.  And I
13  got my license.  I wanted to drive a
14  truck and I did that.  And I bought
15  several trucks, leased them all to Guy
16  Kelly.  And that's how I met him.
17      Q.  What truck driving school did
18  you go to?
19      A.  It's the same one they have at
20  Southern Union in Opelika now.  It's
21  changed names, but it's --
22      Q.  It's in Opelika?
23      A.  Yes, sir.  It was in Cusseta

Page 14

1  at the time just up the interstate from
2  Opelika, Exit 70.  Opelika is exit
3  what, 64.  So it's six miles from the
4  last exit in Opelika.
5      Q.  Did you drive for anybody?
6      A.  Yes.
7      Q.  Who?
8      A.  Kelly.
9      Q.  Oh, okay.
10      A.  And I drove for Salem
11  Carriers.  I believe it was three trips
12  for them, from Alexander City southeast
13  of here to Eagle Pass, Texas.  And I
14  did that on weekends while I was
15  working for the State.
16      Q.  Did you work for Salem
17  Carriers before you went to work for
18  Kelly?
19      A.  No, sir.  I think it was two
20  or three trips, I think that's all I
21  made out there for them.
22      Q.  For Salem?
23      A.  Yes, sir.

Page 15

1      Q.  Were you an owner/operator?
2      A.  No.  I was driving one of
3  their trucks.  They were just behind on
4  what they had to pull out of Russell
5  Mills in Alex City.
6      Q.  After you got your CDL, you
7  indicated you bought several or bought
8  some trucks; is that right?
9      A.  Yeah.
10      Q.  Is that what you did right
11  after you got your CDL; did you
12  immediately buy a truck?
13      A.  Yes.  Uh-huh.  Yes.
14      Q.  That won't be the last time.
15          And you became a contractor
16  for Mr. Kelly?
17      A.  Yes.  Yes.
18      Q.  What year was that?
19      A.  '94.
20      Q.  Did you start out with just
21  one truck?
22      A.  Yes, sir.
23      Q.  You indicated you were working

Page 16

1  for the State during the week?
2      A.  I was with Kelly, I drove for
3  him '94 up until late spring of '95,
4  and I still had trucks leased on up
5  there, other trucks.  I worked at the
6  lake house for about three months that
7  year, working on, you know -- in the
8  yard, outside.  And Guy called me and
9  asked me to come drive one of his
10  trucks until he could find somebody to
11  drive it, to help him out.  And that
12  was sometime in August of '95, and I
13  did that until about the first of 1996.
14  That's when I went with the State.
15      Q.  Did you have drivers that
16  worked for you?
17      A.  Yes, sir.
18      Q.  How many -- I will call them
19  employees.  How many employees did you
20  have '94 to '95?
21      A.  Four.  At one time, four.
22      Q.  And four tractors?
23      A.  Yes, sir.  Well, really I had

4 (Pages 13 to 16)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 17

1 five tractors, but four drivers.
2    Q. And you leased all of them to
3 Mr. Kelly?
4    A. Most of the time. A couple of
5 times, I had one leased to a company in
6 Tuscaloosa, one leased to a company
7 here in Birmingham. But then I pulled
8 them back in and put them back with
9 Kelly.
10    Q. What did you do for the State
11 in '96?
12    A. I was a truck driving
13 instructor.
14    Q. Was that at Southern Union?
15    A. No, not at that time. It's
16 where it is now. At that time, it was
17 at Cusseta, Alabama.
18    Q. How do you spell Cusseta?
19    A. C-u-s-s-e-t-a.
20    Q. I wouldn't even come close.
21    A. It was there in the office
22 until '98 and we moved to Opelika. But
23 not at Southern Union.

Page 18

1    Q. But it's the same school?
2    A. No. Not at that time, no.
3 It's the same group that's at Southern
4 Union today, but it was Central Alabama
5 Skills Center when I was there.
6    Q. What aspect of -- I assume
7 this is commercial driver's training?
8    A. Yes.
9    Q. What aspect did you teach?
10    A. All of it.
11    Q. That's a simple answer.
12    How long did you work for the
13 State?
14    A. From the first of 1996 to July
15 of 2000.
16    Q. During this time period, were
17 you leasing tractors to Kelly Trucking?
18    A. Yes.
19    Q. And you had one occasion or a
20 few times you leased to Salem Carriers?
21    A. No. No. I said I drove a
22 company truck for Salem Carriers.
23    Q. I'm sorry. I misunderstood

Page 19

1 you.
2    A. To help a friend out.
3    Q. All right. '96 to July of
4 2000, you maintained the same number of
5 trucks, roughly, the same number of
6 employees?
7    A. Not until 2000, no. '99 is
8 when I sold all my trucks. Latter part
9 of '99 is when I sold the last one.
10    Q. At that point in time, were
11 you out of the trucking business, other
12 than teaching?
13    A. Yes.
14    Q. Why did you get out?
15    A. Why did I sell my trucks?
16    Q. Yes, sir.
17    A. Phone calls at 2:00 or 3:00 in
18 the morning and just keeping drivers.
19 Sometimes, hard to keep drivers.
20    Q. In July of 2000, what did you
21 do then?
22    A. Went to work with Guy Kelly.
23    Q. What did you go to work with

Page 20

1 Mr. Kelly as? What was your title?
2    A. I was the safety director.
3    Q. Did you work continuously
4 with -- was that with Kelly Trucking?
5    A. Yes.
6    Q. Did you work continuously with
7 Kelly Trucking from that point to, I
8 guess, August of 2005?
9    A. No.
10    Q. How long did you work with
11 Kelly Trucking?
12    A. I left in October of that same
13 year.
14    Q. Okay.
15    A. I believe it was -- yeah, that
16 was in 2000.
17    Q. Somewhere in the fall?
18    A. Yeah. October. I think it
19 was October. About ten weeks.
20    Q. Why did you leave?
21    A. I guess I didn't have the
22 control that I thought I needed to run
23 my job.

5 (Pages 17 to 20)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 21

1    Q.  What did you do after you
2  left?
3    A.  Went back with the State.
4    Q.  Same position?
5    A.  Yes.
6    Q.  What was your title?
7  Instructor?
8    A.  Truck driving instructor.
9    Q.  Okay.  I assume this is fall
10  of 2000 that you went back?
11    A.  Yes.
12    Q.  How long did you stay with the
13  State the second time?
14    A.  July of 2001.
15    Q.  You know what the next
16  question is.
17      Where did you go next?
18    A.  Kelly.
19    Q.  How long did you stay at Kelly
20  Trucking the second time?
21    A.  Until -- with the group -- you
22  know, it's one of these now.  He's
23  changed the name.  But I was there

Page 22

1  until the latter part of -- until
2  December of last year.  I started to
3  work where I am now January the 1st.
4  Well, January the 2nd.
5    Q.  I'm not sure I understand.
6    A.  You are saying Kelly on one
7  hand, but it's Eagle.  When I left, the
8  name of the company was Eagle.
9    Q.  When did it switch from Kelly
10  Trucking to Eagle?
11    A.  In '05.  No.  No.  What's
12  this?
13    Q.  '06.
14    A.  '06.
15    Q.  So you worked with Kelly
16  Trucking from roughly July '01 until it
17  changed its name to Eagle?
18    A.  I was still with them then.
19  Yeah.  I just left Wadley, Alabama.  I
20  just left G.F. Kelly or Guy.
21    Q.  In December of '06?
22    A.  '06.  My last day was the 31st
23  of December.

Page 23

1    Q.  But from July 2001 up until
2  the end of '05, you were an employee of
3  Kelly Trucking?
4    A.  Yes.
5    Q.  Were you safety director that
6  entire time?
7    A.  Yes.  Safety and personnel,
8  HR.
9    Q.  At Kelly Trucking, what did
10  you do?  Describe your job.  She has
11  got plenty of pages, if it takes a long
12  time.
13    A.  Well, I guess the long story
14  short would be, applications,
15  applications that came through were
16  approved in my department.  MVRs were
17  run in my department.  Any advertising
18  for it came out of my department.  Any
19  discipline that took place came out of
20  my department.  I guess that would be,
21  basically, the hiring and firing came
22  through my department.
23      I dealt with all the claims

Page 24

1  that came in from the, you know,
2  different customers that we had.  I
3  dealt with that on a daily basis.
4  Tickets, citations, things of that
5  nature had to be recorded and kept up
6  with.  Kept up with all drug and
7  alcohol preemployment, random,
8  suspicion, postaccident, things of that
9  nature.
10    Q.  Logbooks?
11    A.  Yes, sir.  Logbooks, yes.  I
12  handled all the Lease Agreements.
13    Q.  With the drivers?
14    A.  Yes, sir.
15    Q.  I just wanted to make sure, as
16  opposed to finance companies that would
17  lease tractors to Kelly, did you deal
18  with those as well?
19    A.  I dealt with them after Guy.
20  You know, Guy would have to sign off
21  and sign the lease and then the
22  paperwork came to me, yes.  Because I
23  had to plate the trucks and register

6  (Pages 21 to 24)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 25

```
 1   the trucks.  If they just sent an MSO
 2   and a bill, I would have to take that
 3   paperwork to the county courthouse to
 4   get them titled in the State.  I
 5   handled insurance, physical damage
 6   cargo, liability, general liability.
 7      Q.  No sales?
 8      A.  I made a couple of calls, but
 9   nothing -- no, sir, not in the respect
10   that you would think of sales, no.  No.
11      Q.  Okay.
12      A.  And this is the end of '05,
13   right?
14      Q.  Yes, sir.  Or '05.
15      A.  Right.
16      Q.  Let me go back a second.  You
17   mentioned that you did not have the
18   control that you thought you would have
19   when you worked with Kelly Trucking in
20   2000.
21         What kind of control did you
22   expect to have that you didn't have?
23      A.  His brother worked for me.
```

Page 26

```
 1   Family.  If I need to go further, I
 2   will, but I don't think I should.
 3      Q.  Did his brother previously
 4   hold that position?
 5      A.  Yes.
 6      Q.  Did his brother eventually go
 7   into his own trucking business?
 8      A.  His brother always had one or
 9   two trucks that he owned himself.  And
10   he drove.  When I first went up there,
11   he drove, the brother did.  And he went
12   into the office, but he still had a few
13   trucks that, you know, he would get
14   drivers for.
15      Q.  Was he leasing them to Kelly
16   Trucking?
17      A.  Yes.  He still -- I think one
18   truck is all he had when I went to work
19   there in 2000.  I believe it was just
20   one truck that he had at that time.
21      Q.  When you went to work for
22   Kelly Trucking in 2000, did it have any
23   hiring criteria?
```

Page 27

```
 1      A.  Talking about as far as --
 2      Q.  Drivers.
 3      A.  -- moving violations and --
 4      Q.  Correct.  I mean, what --
 5      A.  Your basic, no more than three
 6   moving violations and accidents or a
 7   combination thereof for a three-year
 8   period.  Which it has changed now.  And
 9   as far as me sitting here spitting it
10   out word for word, I can't.  And I say
11   it's changed from the standpoint, the
12   insurance company, one time per year
13   they will shoot you a sheet and say,
14   this is the requirements for you to be
15   able to hire somebody.
16      Q.  Did you have any -- when I say
17   you, I'm talking about Kelly Trucking
18   -- have any written hiring instructions
19   or standards?
20      A.  Were there --
21      Q.  Yes, sir.
22      A.  -- at the time that I went to
23   work there?
```

Page 28

```
 1      Q.  Yes, sir.
 2      A.  Yes.
 3      Q.  Did those still exist when you
 4   left or had they changed by then?
 5      A.  And you are speaking of when,
 6   now, what year?
 7      Q.  2005.
 8      A.  If they changed any at all,
 9   the three moving violations, which was
10   the main part of it, it was still there
11   and the accident or the combination
12   thereof.  That was mainly the meat of
13   what the insurance company wanted to
14   get to.
15      Q.  While you were there, was
16   there a policy -- and I'm talking about
17   2000 to 2005 -- was there a policy on
18   -- I'm talking about for hiring now --
19   prior positive drug testing or prior
20   positive drug tests?
21      A.  What we used -- you know, if
22   they told you, that's the key to it.
23      Q.  Right.
```

7 (Pages 25 to 28)

**www.AmericanCourtReporting.com**
**January 25, 2007**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 29

1    A.   You had two years, if we tried
2  to hire one and he tested positive, he
3  had to wait six months and he would
4  have to go to an approved --
5    Q.   SAP?
6    A.   Yes.  And get his certificate
7  and then we would we test him basically
8  like we wanted to for the next 12
9  months.  Or if he came there and
10 applied for a job, tested positive and
11 would not go to rehab, then we couldn't
12 hire him back for two years.  That's
13 basically what the federal guidelines
14 are.  That's what they are.
15   Q.   Okay.  Did he have any
16 criteria for experience?
17   A.   I wouldn't say solid because
18 there had been some student drivers
19 that had been hired there in the past,
20 exceptional students.  They were
21 approved through the insurance agent,
22 though, before they were hired and they
23 had to do more training than somebody,

Page 30

1  say, like you that had been driving ten
2  years.
3    Q.   Who was the insurance company
4  or which insurance company set the
5  standards that you have referred to?
6    A.   Lincoln General.  Liberty
7  Mutual at one time.  When I went there,
8  they had -- they were just coming off a
9  -- a yearly contract is what they had
10 with Liberty Mutual.  I think it's out
11 of Birmingham.  I never did deal with
12 them that much, but we went with
13 Lincoln General.
14   Q.   Is that who you were with from
15 the second time you came back?
16   A.   The entire time, yes.
17   Q.   Was there any particular agent
18 that you dealt with at Lincoln General?
19   A.   Bill Hamrick.  He's not with
20 Lincoln General.  He is just an agency
21 that sells.  You know, he's an
22 insurance --
23   Q.   He is like a broker or --

Page 31

1    A.   Out of Troy.
2    Q.   -- a private agent?
3    A.   Yes.
4    Q.   Was there a written standard
5  regarding prior accidents?  I guess the
6  MVR?
7    A.   Yes.  It's like the three and
8  one or two and two.  You had to have a
9  combination thereof.  You couldn't have
10 four speeding tickets.
11   Q.   Okay.
12   A.   You couldn't have two speeding
13 tickets and two accidents or something
14 of that nature.  It could vary.  They
15 might let one go that had three
16 speeding tickets and had two fender
17 benders that would show up on an MVR
18 that wasn't their fault.  Or one could
19 be at fault, could not be at fault
20 and they would still approve those
21 people.
22   Q.   If you got an application from
23 a driver and you had done a background

Page 32

1  check on him, would you send that
2  information to Mr. Hamrick and get his
3  approval to hire each driver?
4    A.   When we added a driver, any
5  driver, whether it be an owner/operator
6  or a company driver, we would send that
7  driver's name in with his license
8  number and the State.  And we would
9  send it in to them and they would --
10 they would run it.  They would let us
11 know whether or not they would accept
12 that person.
13   Q.   And if they accepted them, was
14 that sufficient for Kelly Trucking
15 hiring practices?  In other words, if
16 the insurance company or the insurance
17 agent says, he's approved by the
18 insurance company, did that mean that
19 Kelly could then hire him?
20   A.   Yes.
21   Q.   Did that make sense?
22   A.   I understood what you are
23 saying.

8  (Pages 29 to 32)

**www.AmericanCourtReporting.com**
**January 25, 2007**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 33

1    Q. Okay. You indicated that you
2 handled advertising; is that right?
3    A. Yes.
4    Q. That's for recruitment of
5 drivers --
6    A. Yes.
7    Q. -- that type of advertising?
8    A. Yes.
9    Q. Did Kelly Trucking have
10 anything written down anywhere, either
11 in advertising or in any of its manuals
12 or anywhere else setting out the
13 specific criteria to hire a driver?
14    A. In advertising?
15    Q. Yes, sir.
16    A. No.
17    Q. What about anywhere else?
18    A. The only thing we would put in
19 our advertising would be a clean MVR.
20 Like most trucking companies, they put
21 that, but they don't live by it.
22    Q. Okay. Did Kelly live by it?
23    A. We lived by what the insurance

Page 34

1 company told us we had to live by.
2    Q. Okay. Once a driver is hired,
3 were there any written policies
4 regarding what it took to be retained?
5 In other words -- let me ask it another
6 way.
7        What would a driver have to do
8 to be terminated as a driver?
9    A. What would a driver have to do
10 to be terminated as a driver?
11    Q. Right. In other words, he can
12 no longer drive for Kelly Trucking.
13    A. Well, he could come into my
14 office and cuss me out and I would fire
15 him.
16    Q. I'm talking about with regard
17 to driving.
18    A. One serious at fault accident,
19 a very good possibility of being
20 terminated. Points. You get three
21 serious violations, which they will
22 take care of themselves, because State
23 will pull their license anyway for 60

Page 35

1 days on points.
2    Q. That's three serious
3 violations in a 36-month period?
4    A. Well, if you get two serious
5 back to back, and that's 15 over or
6 more, following too close, improper
7 lane change or using the wrong lane,
8 those are serious, and if you get two
9 of those in a short period of time,
10 they will pull it for 60 days.
11    Q. What about, you said one
12 serious at fault accident?
13    A. As I said, it's a very good
14 possibility, I believe, is the wording
15 I used.
16    Q. You are right. How do you
17 define serious?
18    A. Rollover, at fault, you know,
19 the driver being at fault.
20    Q. In 2005, did Kelly Trucking
21 have a printed driver's manual?
22    A. Like a policy and procedure
23 manual?

Page 36

1    Q. Yes.
2    A. Yes.
3    Q. When it changed names from
4 Kelly Trucking to, did you say Eagle?
5    A. Yes.
6    Q. Did a policy manual still
7 exist?
8    A. Yes.
9    Q. Do you know where -- was a
10 copy of the Kelly Trucking -- I'm going
11 to call it a driver's manual, policy
12 and procedure manual.
13        Do you know if a copy of that
14 still exists today?
15    A. I haven't been there to look.
16 As far as me sitting here saying that I
17 know one is there, I can't sit here and
18 say that. I couldn't do it. I don't
19 know what they have done since I left
20 there.
21    Q. When you left, do you know if
22 there was one?
23    A. There was one in my desk

9 (Pages 33 to 36)

**www.AmericanCourtReporting.com**
**January 25, 2007**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 37

1  drawer when I left.
2      Q.  Did Eagle have a separate
3  driver's policy and procedure manual?
4      A.  It was basically the same one
5  that Kelly had.
6      Q.  Was there a separate safety
7  manual?
8      A.  No, sir.
9      Q.  Was there a separate employee
10  manual?
11      A.  No, sir.
12      Q.  Did Kelly Trucking maintain --
13  I'm talking about 2004-2005 time
14  period.  Did it maintain an accident
15  log?
16      A.  Yes, sir.
17      Q.  I'm talking about the kind
18  where you put down preventable or not
19  preventable.
20      A.  Yes.
21      Q.  Did Kelly Trucking have any
22  kind of standard for determining what
23  was preventable, what was defined as

Page 38

1  preventable and what was defined as not
2  preventable?
3      A.  Any type standard?
4      Q.  Yes, sir.  This is our
5  definition of preventable and this is
6  our definition of not preventable.
7      A.  No.  We just took a look at
8  the facts that were there at the time
9  the accident took place and made the
10  determination from that as to whether
11  we thought it was preventable or
12  nonpreventable.
13      Q.  Who was involved in those
14  decisions?
15      A.  My son part of the time.
16      Q.  Your son?
17      A.  My son.  David Battle
18  (phonetic).  Tucker McKinney, I think
19  he's sort of -- well, no.  No.  No.
20  Let me back up.  We are talking about
21  2005.  Back it up.
22      Q.  Yeah.  2004 and 2005.
23      A.  I'm running together on that.

Page 39

1  David Battle would be.  Tucker McKinney
2  would not be.  But Eddie Adams, I don't
3  think he ever worked a wreck, so.
4      Q.  What is your son's name?
5      A.  Marcus Childers.
6      Q.  Did he work at Kelly Trucking?
7      A.  Yes.
8      Q.  What did he do for Kelly?
9      A.  He was safety, over safety.  I
10  brought him in as safety director, and
11  I was just over the department, as far
12  as human resources, personnel and
13  safety.
14      Q.  What did David Battle do?
15      A.  When my son left, David came
16  to work for me.
17      Q.  I see.  Was David Battle there
18  in 2005?
19      A.  Yes.  Now, the dates on David
20  are going to be a little bit iffy for
21  me, I mean, as far as coming and going.
22  I mean, I can find out, but I cannot
23  sit here and tell you the exact dates.

Page 40

1      Q.  I wasn't going to ask you.
2          What year did Marcus leave?
3      A.  If I'm not badly mistaken,
4  it's going to be sometimes in late
5  spring of '05.
6      Q.  Do you know why he left?
7      A.  He went in business for
8  himself.
9      Q.  Trucking?
10      A.  Yes, sir.
11      Q.  What was the name of his
12  company?
13      A.  Eagle Landscaping and
14  Materials, I think is the name of it.
15  He hauls pine straw by the trailer load
16  and sells it by the trailer load.
17  That's it.
18      Q.  He is not working with any of
19  Mr. Kelly's companies?
20      A.  No, sir.  No, sir.
21      Q.  What was Kelly Trucking's
22  policy regarding drugs or alcohol for a
23  driver, not hiring, but somebody who

10  (Pages 37 to 40)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 41

1 has already been hired that tested
2 positive for drugs or alcohol?
3     A.  Terminated.  We would
4 terminate them.
5     Q.  Did it matter whether it was a
6 random test or related to an accident?
7     A.  It didn't matter.
8     Q.  By the way, if you need to
9 take a break, let me know.
10     A.  Okay.
11     Q.  When you went to work for
12 Kelly Trucking the second time, in your
13 opinion, what was the condition of the
14 drivers' files that Kelly Trucking
15 maintained on its drivers?
16     A.  Second time, so it would be
17 2001; is that what you are saying?
18     Q.  Yes, sir.
19     A.  What was the condition of the
20 files?
21     Q.  Yes, sir.  Was there a file
22 for every driver?
23     A.  Yes.

Page 42

1     Q.  Were they up to date?
2     A.  To the best of my knowledge,
3 yes.
4     Q.  Did Kelly Trucking have a file
5 on every driver working for it in 2005
6 when the negotiations with U.S. Xpress
7 began?
8     A.  I cannot say that there was
9 one on every driver, because we were in
10 the hiring process at that time and we
11 were still continuing to run it like a
12 business.  So to say that somebody that
13 had been brought in in the last week or
14 two, that their file would be in there
15 that was completed, I will say no, they
16 wouldn't be in there, you know.  So
17 every file, I would have to say, no,
18 not every file.
19     Q.  In the summer of 2005, do you
20 recall how many drivers, either
21 owner/operator or employee, were
22 working for Kelly Trucking?
23     A.  I want to say approximately

Page 43

1 155.  That will be close.
2     Q.  Did any of those drivers also
3 work for any of Mr. Kelly's other
4 companies?
5     A.  What other companies did he
6 have?
7     Q.  I understand that there were
8 some spotting companies; there was a
9 company called K-Diesel and then there
10 was an Eagle, which I understood is a
11 logging operation.
12     A.  You are going to have to clear
13 up which drivers.  Were any of the
14 drivers -- you are talking about out of
15 the 155 now; is that's what you are
16 saying.
17     Q.  Yes, sir.  I'm talking about
18 the ones that were driving under Kelly
19 Trucking's authority.  Did any of those
20 also work for any of Mr. Kelly's other
21 companies?
22     A.  Have you got that list?
23     Q.  I do.

Page 44

1     MR. HALL:  I tell you what,
2 why don't we take a break and grab
3 something to drink and I will find that
4 list.
5
6     (Short recess.)
7
8     Q.  (BY MR. HALL:)  I'm showing
9 you what has been marked as Defendant's
10 Exhibits 32, 33 and 65.  And those are
11 all lists, appear to be drivers' lists.
12     Do you recognize those?
13     A.  This one, I do.  And this one,
14 I -- do you want me to say what exhibit
15 it is?
16     Q.  Yes.
17     A.  Sixty-five, I recognize it;
18 Exhibit 33, I recognize it; 32, I do
19 not.
20     Q.  Thirty-two, you do not?
21     A.  No, sir.
22     Q.  Because it's easier for me to
23 read, and life is all about me, what is

**www.AmericanCourtReporting.com**
**January 25, 2007**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 45

1  Defendant's Exhibit 33?
2     A.  U.S. Xpress sent this to me,
3  me being Frank Childers, to look at.
4     Q.  All right.
5     A.  And then they called me, the
6  gentleman that is the vice-president of
7  safety -- I cannot remember his name.
8  I'm sorry, but I cannot remember.  It's
9  in my office, though.  I have his card
10  in my office, but I don't have it with
11  me.  He called me and wanted to talk
12  about some of the drivers on this list.
13     Q.  Okay.
14     A.  But this was generated at U.S.
15  Xpress.
16     Q.  Does that contain all of Kelly
17  Trucking's drivers at that time?
18     A.  I would say probably not.
19  Like I told you earlier, there were
20  some still being processed and their
21  files would not have been in the two
22  filing cabinets that we sent to U.S.
23  Xpress for them to look at, no, sir.

Page 46

1     Q.  Defendant's Exhibit 65, what
2  is it?
3     A.  It's a printout of drivers,
4  date of birth, license number, State,
5  hire date.
6     Q.  Is this a Kelly Trucking
7  document?
8     A.  Yes, it is.  Yes, sir.
9     Q.  Does this contain -- it looks
10  like at the top it says -- well, it
11  says, run 8/9/05 at 13:34, which is
12  military time.
13     Does this contain all of Kelly
14  Trucking's drivers?
15     A.  Again, probably not.  From
16  this standpoint, some that were in the
17  process, we hired say five or six
18  people, their names and their files
19  would not go in the cabinets that we
20  had that we sent up there.  They would
21  not be in that filing cabinet nor would
22  they be entered here until everything
23  was complete on the file.  So, yeah, we

Page 47

1  might have had -- there might have been
2  a handful, just a few that might not be
3  entered here or that might not have
4  been in those filing cabinets.
5     Q.  Looking at Defendant's Exhibit
6  33, can you tell from this list whether
7  or not any of these drivers drove for
8  companies other than Kelly Trucking or
9  in addition to Kelly Trucking?
10     MR. HALL:  While you are
11  looking at that, go off the record just
12  a second.
13
14     (Discussion off the record.)
15
16     THE WITNESS:  I see about five
17  that might have pulled --
18     Q.  (BY MR. HALL:)  You see about
19  five?
20     A.  I see about five that probably
21  pulled wood and it's listed out here as
22  timber.
23     Q.  A handwritten note?

Page 48

1     A.  Yes.
2     Q.  Do you remember the drivers
3  that worked for Kelly Trucking by name?
4     A.  Not the total list, no, sir.
5  No, sir.
6     Q.  Okay.  If they pulled timber,
7  would they have been working for Eagle?
8     A.  Yes, sir.  More than likely,
9  they would have worked for Eagle.  But
10  if they pulled some of the product that
11  we had in the van division, then they
12  would have been on this list also.
13     Q.  When you say the van division,
14  is that Kelly Trucking?
15     A.  Yes, sir.
16     Q.  On this list in the biggest
17  column, there are some typewritten
18  notations, no file, next to a lot of
19  the names or several of the names.
20     Do you know what that is
21  regarding?
22     A.  What?  The no file?
23     Q.  Yes, sir.

12  (Pages 45 to 48)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 49

1    A. U.S. Xpress did that. This
2   document, other than the handwritten
3   part that's in here, was generated by
4   U.S. Xpress, not by Kelly Trucking.
5    Q. Okay. Were there ever
6   occasions where a driver would take a
7   load for Kelly Trucking and then not
8   have a load for his trip back, and
9   consequently he would pull a load for
10   one of Mr. Kelly's other companies?
11    A. I can't think of anything. I
12   can't think of it, you know, because if
13   he was up in Virginia, Kelly didn't do
14   anything -- I mean, one of his other
15   companies didn't do anything in
16   Virginia, North Carolina, South
17   Carolina, anything like that.
18    Q. Okay.
19    A. Can I say something about this
20   document?
21    Q. Sure.
22    A. I didn't generate this
23   document. When I got it, it came --

Page 50

1    Q. It came from U.S. Xpress?
2    A. Yeah. You know, I don't know
3   if anybody in Kelly generated it and
4   then it came back to me. But I did not
5   -- this I generated, but this one I
6   didn't.
7    Q. This one being Defendant's
8   Exhibit 65, the one marked 65 is the
9   one you created?
10    A. Yes, sir. My fax cover sheet
11   is on it.
12    Q. Okay. Can you tell from your
13   list, Defendant's Exhibit 65, whether
14   these are all drivers that worked for
15   Kelly Trucking or whether any of them
16   worked for any spotting companies or
17   Eagle or K-Diesel?
18    A. Now, Patrick Ackles -- I don't
19   know what page this is.
20    Q. In the right-hand corner,
21   there's a D and a couple of numbers
22   after it.
23    A. Okay. 1128, top of the page,

Page 51

1   now he pulled both. He would pull
2   logs, he would pull chips, and
3   sometimes he would pull van freight.
4   Again, the van freight being G.F. Kelly
5   freight. You know, there might be one
6   before that. But that's the first one
7   that jumped out and hit me.
8       1129, Marvin Catrett.
9    Q. I got it.
10    A. Okay.
11    Q. He did the same thing?
12    A. He did the same thing, yes,
13   sir. Now, these there at the bottom --
14    Q. You are on 1139, the
15   handwritten?
16    A. Yes. Yeah. These were South
17   Carolina drivers as you so have up
18   there. Now, the Christopher Bell, I
19   just do not remember that name. I
20   remember Lewis Boisey, James Griffin,
21   Sorrells and Walter Voorhees, now those
22   I do remember that they ran that
23   shuttle up there, which was about --

Page 52

1   the furthest point from point A to
2   point B was about 16 miles one way. It
3   was pulling -- it was van freight. The
4   rest of -- the remainder of it, to my
5   knowledge, was about a mile and a half
6   to two miles from A to B and then go
7   back to A and then back to B, just back
8   and forth. Now, that's what this -- I
9   know the ones, the names that I called
10   out, that's what they did. But they
11   were part of the van division of G.F.
12   Kelly Trucking.
13    Q. On that same page, 1139, just
14   above the handwriting, drivers on this
15   report 104, do you see that?
16    A. Okay. Uh-huh.
17    Q. I assume that doesn't include
18   the handwritten names?
19    A. It doesn't include the 54
20   that's back over here either, I don't
21   think. I don't think it does. I saw
22   it somewhere in here when I was going
23   through it, 54 on this other page, 127.

13 (Pages 49 to 52)

**www.AmericanCourtReporting.com**
**January 25, 2007**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 53

1    Q.  Page 127.
2    A.  It's like 158 and then this,
3  what, ten, eight, whatever it is, 160
4  something.
5    Q.  I think there's nine listed
6  there, so it will be --
7    A.  Yeah, 167.
8    Q.  -- 167?
9    A.  Well, let's see, 58 and nine.
10  Yeah, 167.
11    Q.  Where are you getting 58 from?
12    A.  Fifty-four from over here and
13  104 here.
14    Q.  Oh, 158 plus nine?
15    A.  Yes.  I mean, that's the way I
16  ran it up in my head.
17    Q.  Okay.  Do you remember why you
18  ran this report on August 9th, 2005?
19    A.  They called me and asked me
20  for it, some lady did.
21    Q.  At U.S. Xpress?
22    A.  Yes.
23    Q.  Mary?

Page 54

1    A.  You can check that number and
2  find out who it is.  I don't remember
3  the lady's name.  But that's where it
4  was faxed to.
5    Q.  Okay.  All the names listed on
6  here, were they all active employees or
7  drivers for Kelly Trucking?
8    A.  For me to sit here and tell
9  you that everybody that's between 1122
10  and 1139, that everybody was there that
11  day, I don't think I could sit here and
12  tell you that.  What I can tell you is
13  this is what the computer showed as an
14  active list at that time.
15    Q.  I just noticed on 1128 that
16  there is a Richard Bowie, and below it
17  there's a message, working a week
18  notice, last day will be the 19th of
19  August.
20    A.  Okay.
21    Q.  I think there was another one
22  I saw in here.
23    A.  So then answering your

Page 55

1  question, yes, he would have been there
2  at the time that this was faxed to
3  them.  But, I mean, the computer --
4  until this man is actually gone, our
5  computer system has an A and it will
6  pull up.  If you put an I on it, it
7  won't pull it up because that puts them
8  inactive.  Gut if you go in there and
9  just plug the A in on the drivers A to
10  Z, that's what it will pull up.  And
11  until he left, this would not actually
12  kick him out.
13    Q.  The way the program was set
14  up, you could pull up active and
15  inactive drivers?
16    A.  Not on the same listing, no,
17  sir.  No, sir.
18    Q.  You had to pull up two
19  different listings?
20    A.  Yes, sir.  You would have to
21  go to a different list.
22    Q.  On 1134 --
23    A.  Okay.

Page 56

1    Q.  And I don't know if this is
2  Niki Peters.  Do you see where I'm
3  referring to?
4    A.  The termination.
5    Q.  Yeah.  Termination date '03.
6  Do you know what that means?
7    A.  No, sir, I don't.  Not the way
8  -- not with it sitting in there like
9  that, because that's normally just a
10  message system for the people in
11  operations.  That's the reason those
12  messages are put at the bottom, like
13  the Tommy Norad at the top, death in
14  the family, that's letting operations
15  know that this man has got a death in
16  the family and he will be gone for a
17  few days; he won't -- you know, will
18  not be at work.  But the termination,
19  no, sir, I have no earthly idea.
20    Q.  Yeah.  I noticed there is one
21  on 1135 for Reginald Stone also.
22    A.  1135, you said?
23    Q.  Yes, sir.

14  (Pages 53 to 56)

**www.AmericanCourtReporting.com**
**January 25, 2007**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 57

1    A.  Okay.  No, sir.  I can't sit
2  here and say.  I mean, as far as me
3  telling you that I know why that's
4  there, I cannot do it.  No, sir.
5    Q.  On 1128 with Richard Bowie and
6  1137 for James Watts, it indicates that
7  they are both working.
8    A.  Richard Bowie.
9    Q.  That's on 1128.
10    A.  What's the other one?
11    Q.  The other one is on 1137.
12  It's James Watts.  Do you see the two
13  I'm talking about?
14    A.  Yes, sir.
15    Q.  Both of them indicate they
16  have given notice.
17      Do you know why they had given
18  notice, do you remember?
19    A.  We had -- we had a few
20  drivers, I cannot sit here and tell you
21  how many -- I would possibly have to
22  try to take another day off or go at
23  night back to the office and see if the

Page 58

1  paperwork is still there.
2      We had a few drivers that left
3  because they didn't want to work with
4  U.S. Xpress.  Can I sit here and tell
5  you, without looking at other
6  paperwork, that these were two of the
7  people, no, sir, I cannot.
8    Q.  Sure.
9    A.  James Watts is still with the
10  company to this day, the company that's
11  there now.
12    Q.  He's driving for Eagle?
13    A.  Yes, sir.  I'm 99 percent sure
14  he's there, 99.
15    Q.  Can you look at this list in
16  Defendant's Exhibit 65 and tell which
17  of these drivers are still driving for
18  Eagle or that were when you left?
19    A.  I don't know if I will have it
20  100 percent right.  I can try.
21    Q.  Sure.
22    A.  I can try.  On page 11 or
23  document number 1122.

Page 59

1    Q.  Yes, sir.
2    A.  V.J. -- well, Victory Jack
3  Adams is still there.  Baker is gone,
4  Jerry Baker.
5    Q.  Do you know when he left?
6    A.  At the time that most of this
7  took place.
8    Q.  Do you know if it was before
9  or after the negotiations with U.S.
10  Xpress broke down?
11    A.  No, sir.  I wouldn't sit here
12  and tell you that I knew if it was
13  before the 25th or after the 25th.
14  Honestly, I can't sit here and do that.
15  I can't.
16    Q.  Okay.
17    A.  Melvin Cleveland is gone.
18  This is still on document 1122.  Monroe
19  Cooper is not there anymore.
20    Q.  Let me stop you.  The ones in
21  between Jerry Baker and Melvin
22  Cleveland --
23    A.  I think Vence Eddie Bell.

Page 60

1  Faite Brantley, I know Faite is still
2  there.  Eugene Burwell -- I'm 99
3  percent Eugene is still there and Keith
4  Byrd.  I'm sure that -- if you want me
5  to tell the ones that are still there
6  and the ones that are gone or just the
7  ones that are gone that I think --
8    Q.  I tell you what, just to make
9  it clear, why don't we go through which
10  ones that are still there and just say
11  they are still there, and those that
12  are not, are not.  And if you don't
13  know --
14    A.  Okay.  Randall Curby, then, to
15  my knowledge, he's still there.
16    Q.  When we talk about still
17  there, I'm talking about they were with
18  Eagle when you left.
19    A.  Yes, sir.  Yes, sir.  Yes,
20  sir.
21    Q.  Did you say with regard to
22  Mr. Corbett?
23    A.  Corbett gone.

**www.AmericanCourtReporting.com**
**January 25, 2007**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 61

1    Q.  All right.  On page 1123?
2    A.  Charles Dean is there, but he
3  is not driving.  He is still with the
4  company.  Ronald Dewberry, still there.
5  Greg Dudley, gone.  I'm going to have
6  to say gone on John English.  I'm not
7  100 percent sure, but I believe he is
8  gone.
9    Q.  Okay.
10    A.  Fred Gordon is gone.  Pretty
11  sure Cedric is still there.  Jimmy
12  Griffin is gone.  John C. Hall is
13  there.  Tommy Allen Hall is there.
14  Hamby, he is gone, I'm pretty sure.
15  David Hester.
16    Q.  Yes, sir.
17    A.  On 1124, David Hester is gone.
18  Homer Hudson is gone.  Charles Kerry
19  Jackson is gone.  Dale Johnson is still
20  there.  Kenneth Johnson, I will say
21  gone.  Carl Jones, gone.  Roger Keener,
22  still there, I believe.  Joe Kelly,
23  he's there but not driving.  McClung,

Page 62

1  Douglas McClung, I'm pretty sure he is
2  gone.  Ronald Tory Mezick is gone.
3    1125.  Doris Mosley is still
4  there.  Jerry Mosley is still there.
5  These next two, they are brothers, I
6  think both Luther Norwood and
7  Roosevelt, I think both of them are
8  gone.  Kenneth Payne is gone.  He left
9  because of what happened.  Raymond Paul
10  Phillips is gone, and he is part of
11  that same problem.  Jeffrey Quick, to
12  my knowledge, is still there.  John
13  Richardson is still there.  Charles
14  Robinson is gone.  Wayne Slaton is
15  gone.
16    1126, Meven Stringer, Meven is
17  still there.  Keith Taft was there when
18  I left.  I cannot speak, you know.
19  Cameron Tharpe.  George Cameron, is
20  that Tharpe?  I will say he's gone.  I
21  haven't heard the name in a good while.
22  James Todd, gone.  Jason Walker is
23  gone.  Darrell Waldon is there.

Page 63

1  Anthony Walker, I will be honest with
2  you, I am not 100 percent sure.  I
3  honestly cannot sit here and say either
4  way.
5    Q.  Okay.
6    A.  James Watkins is gone.  Teresa
7  Watkins is gone.  Roderick Williams is
8  gone.
9    1127, Walter Williams, I'm
10  pretty sure he is gone.  Ronnie Woods,
11  gone.  George Wright, I'm not 100
12  percent sure on him either way, so I
13  would rather not say.  John Wyatt, I'm
14  pretty sure he's gone.
15    1128, Patrick Ackles is there.
16  Ronnie Allen is gone.  Iteago Banks is
17  gone.  Mack Battle is still there.
18  Drew Bernard is gone.  Richard Bowie,
19  Richard Bowie, I'm pretty sure he is
20  gone.
21    Q.  He is the one that indicates
22  he was working his week notice?
23    A.  Yeah.  The week prior.  And I

Page 64

1  can't speak to him, whether it was -- I
2  don't know about the rest of it on that
3  one.
4    Q.  Okay.
5    A.  Walter Bryant, I'm sure is
6  gone.  Lynn Bryant, I'm sure he is
7  gone.  Edward Buchanan, I'm sure -- I
8  believe he is gone.  Gerald Huff, Buff,
9  Buff, gone.
10    1129, Larry Burns, gone.
11  Melvin Buster, gone.  Wesley Byrd,
12  Wesley Byrd, I'm not 100 percent sure
13  on Wesley Byrd.  I think he's gone, but
14  I'm not 100 percent sure.
15    Marvin Catrett is still there.
16  Monroe Cooper is gone.  Johnny Wayne
17  Cox, I don't think he is there.  I'm
18  pretty sure he is gone.  Everett
19  Crowder, I think Everett is still
20  there.  He is.  Everett is still there.
21  Taylor Crowe, I think he's gone.  Jerry
22  Cunningham, I think, is gone.  Bobby
23  Ray Daniel, I'm pretty sure he is gone.

16 (Pages 61 to 64)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 65

1  Todd Daugherty, gone, Thomas Davis is
2  still there. Gordon Denney, gone, Andy
3  Devine, gone. Jimmy Dobbs, Jimmy
4  Dobbs, I don't know. I don't know. I
5  can't guess either way.
6       Ronald Durden, Ronald Durden,
7  I think Ronald is gone. Roger Eaton is
8  gone. Joe Ebiling, Anniston, is gone.
9  Jason Ellis, gone. Dennis Fowler,
10 gone.
11      1131, Demetrius Fuller, gone.
12 James Fuller, I'm pretty sure he is
13 gone. I'm pretty sure. Pedro Garcia
14 is gone. Keith Gentry is gone.
15 Kenneth Gibson is gone. Randall
16 Gleaton, gone. Ricky Gleaton, gone.
17 Philip Goodwin, gone. Jack Gorham,
18 gone. Willard Gregory, I'm pretty sure
19 Willard is still there. Suwadu Harris,
20 gone. Darrel Hart. Darrel Hart.
21 Gosh, it was brothers. One of them is
22 still there and one of them is gone on,
23 the Hart brothers. And I don't know

Page 66

1  where the other one is. Let me see. I
2  cannot remember. But there were two
3  brothers, Darryl and something else. I
4  do not know, but one of the Hart
5  brothers is still working there.
6       Q. Okay.
7       A. Toby Hilyer, gone. Douglas
8  Holston, gone. Charles W. Jackson,
9  gone. Charles Jackson, gone. Thomas
10 Johnson, gone. Sam Jones, gone. James
11 Jones, gone. Avora Kelly, I'm going to
12 say he is gone. Patrick Kite, I'm not
13 a -- I don't know. I just don't know.
14 Alan Knight is gone. Walter Lancaster,
15 gosh. I'm not 100 percent sure on
16 Walter either way. I just cannot
17 remember. Eddie Lawrence, gone. James
18 Maness, gone. Jeff Mastin. I don't
19 know on Jeff. Jeffrey Mastin, I do not
20 know.
21      Q. Okay.
22      A. Macon Mauldin, gone. Mark
23 McDaniel, gone. Rodney McClain, still

Page 67

1  working. Philip Stanley Miranda, I'm
2  going to say gone. The name has not
3  jumped up.
4       1134, Johnny Newell, gone.
5  Tommy Norred, I don't know on Tommy.
6  Tommy, I don't know. George Norton,
7  gone. Steven Nunn, I would say gone.
8  Ronnie Owens, gone. Tommy Peters is
9  still working. Niki Peters is gone.
10 Tony Poole is gone. Les Rogers is
11 gone. William Roth, I don't know about
12 William Roth, I don't remember.
13      Q. Okay.
14      A. Louie, Louie, Louie. Let's
15 see. I'm going to say gone.
16      Q. All right.
17      A. Jimmy Screws is gone. Gone on
18 Nathan Simons. Billy Sims, gone.
19 Curtis Sims, gone. Charles Smith,
20 gone. Curtis Smith, gone. Joel Mack
21 Stewart, gone. Steven Stephenson,
22 gone. Reginald Stone, gone.
23      Reginald Stone again -- 1136,

Page 68

1  Reginald Stone again is gone. M.C.
2  Talton, gone. Yeah. I'm going to say
3  gone. Jesse Taylor, gone. Harold
4  Thomas, gone. Andrew Thorpe is still
5  there. Willie Thompson, gone. James
6  Vann, I'm 99 percent sure he's gone.
7  Barbara Vickers, gone. Dennis Wadley,
8  gone. Jimmy Walters, gone. David
9  Washburn, I'm pretty sure he is gone.
10 This is on 1137. I'm sorry. David
11 Washburn, gone. James Watts, I think
12 James is still there, I think. Arthur
13 Wearing, I'm going to say gone. Robert
14 Weaver, still working. Chris Welcher,
15 gone. Michael Welles, gone. Milton
16 David Whatley, I think he's gone.
17 Steven Wilkins, I'm not sure. I cannot
18 say on that one. I don't know.
19      Q. Okay.
20      A. Arthur Wimberly is still
21 there. He was when I left. William
22 Woods, I'm 99 percent sure he's gone.
23 Ronnie Woods, I think Ronnie is gone.

17 (Pages 65 to 68)

**www.AmericanCourtReporting.com**
**January 25, 2007**

## American Court Reporting
## toll-free (877) 320-1050

Page 69

1  Anthony Wright, I'm not sure. Robert
2  Wright is gone. Yamashito Yowe is
3  gone. Ronnie Woods, gone. Anthony
4  Wright, that's a reprint.
5      Q.  Yeah. I guess we are down to
6  the --
7      A.  Yeah, that's the same sheet.
8      Q.  -- down to the written names.
9      A.  Yes. I'm going to have to say
10  all of this group is gone. A couple of
11  them, I don't know. But the ones that
12  I do know on here, if they were working
13  in there, they are all gone. That's on
14  1139, the handwritten.
15      Q.  How many drivers did Kelly
16  Trucking have in January of 2006 or the
17  beginning of 2006, roughly?
18      A.  It will have to be rough.
19  Sixty-five, 70. It could be off five
20  to ten. But I believe it would be
21  below 70.
22      Q.  When Kelly Trucking, as you
23  indicated, switched over to Eagle, was

Page 70

1  it called -- is it Eagle Logistics?
2      A.  Yes, sir.
3      Q.  How many drivers did Eagle
4  Logistics wind up with?
5      A.  Probably around 65 or 70, give
6  or take one or two.
7      Q.  You indicated that -- let me
8  see if I can find it -- Kenneth Payne
9  and Raymond Phillips left because of
10  what happened.
11      What do you mean? What was it
12  that happened that caused them to
13  leave?
14      A.  The company that they were
15  pulling freight for, which -- and I'm
16  saying a company. One of our
17  customers.
18      Q.  Okay.
19      A.  They were working out of
20  Rainbow Logistics' drop yard in
21  Gadsden, Alabama or Rainbow City,
22  whichever one you want to call it. But
23  the name of the company was Rainbow

Page 71

1  Logistics. They were leased on to us,
2  pulling freight for Rainbow Logistics,
3  which they acquired the freight and
4  they were pulling Overnite freight.
5  And when all this came about, the
6  gentleman that owned Rainbow Logistics
7  was not 100 percent sure -- well, as a
8  matter of fact, U.S. Xpress never would
9  even talk with him. So we lost those
10  accounts. And when we lost them, we
11  lost five trucks that went with them
12  and we lost the business. We have been
13  able to get two trucks back in there,
14  but we lost several trucks and some
15  good revenue when we lost that account.
16      Q.  You said Mr. Payne and
17  Mr. Phillips were owner/operators?
18      A.  Yes, sir.
19      Q.  And they were working for
20  Rainbow Logistics?
21      A.  No, sir. No, sir. They were
22  leased on to Kelly Trucking. Rainbow
23  Logistics is like a brokerage company.

Page 72

1  They used to be a trucking company, but
2  now he brokers freight. And he let us
3  pull the freight. He had the account
4  with Overnite. He was not in the
5  trucking business. So the men leased
6  on to us, but they went up and pulled
7  the Overnite freight, which came
8  through him. Well, him sitting in the
9  middle not knowing what was going to
10  happen and nobody from U.S. Xpress
11  would ever talk to him, and at that
12  point he said, to heck with you, I'm
13  pulling it. So he did. He snatched
14  them from under us, you know, and the
15  operators went with him. We lost the
16  trucks, we lost the account.
17      Q.  I see. He moved it to another
18  client?
19      A.  Yes.
20      Q.  And then the drivers went --
21      A.  Yes, sir.
22      Q.  -- with the account?
23      A.  And Baker, Jerry Baker is

18  (Pages 69 to 72)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 73

1 another one that went with them.
2     Q.  Of those on this list that you
3 indicated they left, do you know how
4 many of them quit voluntarily and how
5 many were terminated?
6     A.  I can't sit here and tell you,
7 no, sir.
8     Q.  Okay.
9     A.  Terminated in what fashion?
10 What are you speaking of, terminated?
11     Q.  Either there was a reduction
12 in force or something happened and you
13 made the decision to let them go.
14     A.  Okay.  As far as sitting here
15 and telling you specific names, no,
16 sir, I cannot do that today.  I can't.
17     Q.  Prior to August 25th, 2005, we
18 are talking about the U.S. Xpress
19 negotiations, prior to that time, do
20 you know how many Kelly Trucking
21 drivers quit?  And I'm talking about
22 the June, July, August time period.
23     A.  Because of the buyout that was

Page 74

1 going on?
2     Q.  Yes.
3     A.  I would have to have a halfway
4 educated guess.  Below 20.
5     Q.  I know you are guessing at the
6 number, approximate number below 20.
7         Do you know why those drivers
8 chose to quit?
9     A.  Some of them didn't want to
10 work for U.S. Xpress.
11     Q.  Okay.
12     A.  Some of them.
13     Q.  Right.
14     A.  I can't sit here and call out
15 individual names.  Some, we could pick
16 up and going back possibly in the
17 archives on the computer system, let's
18 say, and possibly pulling it out of
19 that.  But as far as me -- which the
20 man is still there, V.J. Adams, he was
21 not going with U.S. Xpress.  But
22 everything worked out like it did.  A
23 lot of them wanted to leave.  But when

Page 75

1 they found out I was going to work for
2 U.S. Xpress -- I started to wear my
3 shirt today -- some of them decided to
4 stay.
5     Q.  So there were a number that
6 were going to quit until they found out
7 that you were going to be part of the
8 USX operation; is that what you are
9 saying?
10     A.  Yeah.  In the trucking
11 business, you have people quitting
12 every day.  You have people coming on
13 every day.  As far as me sitting here
14 and telling you an actual number that
15 quit because of U.S. Xpress --
16     Q.  Right.
17     A.  -- I cannot give you a dead
18 number.  I cannot do it.  I can't pull
19 it out.
20     Q.  Sure.  I think Mr. Kelly
21 estimated that there were 35 drivers
22 that quit the week of August 21st,
23 22nd, 2005.

Page 76

1         Does that number -- do you
2 have an opinion about the number that
3 quit that week?
4     A.  I really don't want to give an
5 opinion on that number.  If it's any
6 way to pull it out of the system,
7 because it's normally -- normally, I
8 won't say always, normally notated in
9 the system why that person left,
10 normally.
11     Q.  Was that information
12 maintained in the system when you left
13 Eagle?
14     A.  I cannot -- I cannot sit here
15 and say that it was or wasn't, because
16 I didn't go into the archives.  If that
17 had to be done, somebody else in the
18 company would do that.  I didn't want
19 to fool with it.
20     Q.  I understand.  Was the Eagle
21 system the same system that was
22 operated by Kelly Trucking?
23     A.  Yes, sir.  You are speaking of

19  (Pages 73 to 76)

**www.AmericanCourtReporting.com**
**January 25, 2007**

Page 77

1 computers?
2     Q.  Yes, sir.
3     A.  Okay.
4     Q.  How do you measure turnover
5 rates in -- or how did you measure
6 turnover rates in drivers?
7     A.  On a percentage basis of what
8 we hired in a year.  Basically, we do
9 it on the year, 12-month period,
10 beginning of year with what we had at
11 the end of the year and what we hired
12 in between and get your percentage of
13 it.
14     Q.  What was the turnover rate in
15 drivers for Kelly Trucking 2003, 2004,
16 2005?
17     A.  I honestly couldn't sit here
18 and tell you exactly what it was.  I
19 cannot do it.  Not -- and you come back
20 and say, well, this is what you said.
21 Because I honestly don't know what the
22 percentage was.
23     Q.  Sure.  Is that maintained?

Page 78

1 Are there records that would reflect
2 that?
3     A.  The only way you could pull it
4 up now is see how many people were
5 hired in that year off the system that
6 they have, if it's still working.  And
7 pull that up as to how many drivers
8 they had, active drivers they had for
9 the entire year is the only way I would
10 know to do it.
11     Q.  What was the -- and I'm not
12 sure when Kelly and Eagle switched.
13         What was the turnover rate for
14 2006 for Kelly Trucking?
15     A.  It was very low; I remember
16 that.  We didn't hire many people last
17 year.  And I'm speaking of company
18 trucks now.  Owner/operators, we lost a
19 few and we gained a few.  I would say
20 that was pretty close to an even break
21 on owner/operators.  Company trucks,
22 very, very few trucks we had to fill.
23 The people that were there just really

Page 79

1 aren't leaving; they are staying.
2         MR. HALL:  Let's take a real
3 break.
4
5         (Short recess.)
6
7     Q.  (BY MR. HALL:)  Mr. Childers,
8 why did you leave Kelly Trucking or
9 Eagle?
10     A.  Which time?
11     Q.  This last time.
12     A.  This last time?  I guess
13 probably two or three reasons combined.
14 I had taken a pay cut, and the job that
15 came available in Dadeville -- I guess,
16 bottom line, you take the gross and you
17 don't care too much about the gross;
18 it's what you have left at the bottom.
19 And I make more money now than I did
20 with Kelly, as far as actual money in
21 my hand, and it's 15 minutes from my
22 house, where the other one was 45
23 minutes from my house.

Page 80

1     Q.  Where do you currently work?
2     A.  Tallapoosa County Board of
3 Education, transportation supervisor.
4     Q.  Did the drivers say what it
5 was about USX or the reasons why they
6 did not want to work for USX?
7     A.  I didn't have anyone -- I
8 can't remember personally.  V.J. Adams,
9 like I said, he's still there.  But
10 V.J., I don't know if he had worked for
11 them in the past or knew people that
12 had worked for them.  Normally, that's
13 was what you were getting from the
14 people.  Somebody else told them what
15 kind of company it was, and that's the
16 reason they said they just didn't want
17 to go.  But again, I guess V.J. is the
18 only one that came up and said -- I
19 think it was V.J., that he -- I think
20 he had been there.  I don't know.  But
21 he just said he couldn't go.
22     Q.  After August 25th, 2005, did
23 the -- let me back up a second.

20  (Pages 77 to 80)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 81

```
1        Did Kelly Trucking -- this is
2    a new question. Did Kelly Trucking get
3    unsolicited applications from drivers,
4    just as part of the business?
5        A.  Unsolicited?
6        Q.  Yeah. Somebody would show up
7    and say, I'm here to apply.
8        A.  Yes. We have had a few
9    walk-ins, yes. Yes.
10       Q.  How did you recruit drivers
11   normally?
12       A.  Word of mouth from our current
13   drivers, the drivers we had on the
14   road, plus we advertised, you know, had
15   an 800 number on the back of -- not all
16   the trailers, but the majority of our
17   trailers, we had an 800 number on the
18   back of it. We had two billboards, one
19   on 95, one on Interstate 20 and one in
20   South Carolina, one in North Carolina.
21   Magazines.
22       Q.  Was there an average number of
23   applicants that you would get per year
```

Page 82

```
1    or per month?
2        A.  I wouldn't say an average. I
3    mean, you are going to get so many per
4    month just by word of mouth from the
5    drivers.
6        Q.  Right. Do you have an
7    estimate of what an average month would
8    be like?
9        A.  Applications or phone calls?
10       Q.  Applications.
11       A.  Maybe 20, 25 a month, maybe.
12   I mean, that might be an average.
13       Q.  During your time at Kelly
14   Trucking, did that ever change up or
15   down?
16       A.  I would say probably -- we cut
17   back on our advertising. So before we
18   switched over, yeah, the calls we had
19   dropped off and the applications, we
20   didn't get the applications that we had
21   been getting, because we had to cut all
22   advertising.
23       Q.  When did you cut back on
```

Page 83

```
1    advertising?
2        A.  I started cutting back on that
3    in about June.
4        Q.  2005?
5        A.  2005.
6        Q.  Was the need for drivers less
7    or was that just a cash flow?
8        A.  It wasn't that. We were
9    selling the company and I was not going
10   to get hung out there and continue to
11   run that because that came out of my
12   budget and continue to run it. And, I
13   guess, Kelly would have had to have
14   paid it a month or so down the road.
15   So it was a consensus, that we felt
16   like we needed to cut back. And that's
17   what I did. We cut back to one
18   magazine.
19       Q.  So in roughly June 2005, you
20   cut back on the recruiting?
21       A.  No. Started cutting back on
22   just the magazines. Just because you
23   are in a magazine doesn't necessarily
```

Page 84

```
1    mean you are going to get an
2    application out of it. The majority of
3    our applications came from our drivers
4    referring somebody to us.
5        Q.  So the applicants, you know,
6    the average applicants didn't change
7    much even though you cut back on the
8    advertising?
9        A.  It changed some. It cut it
10   down some, yes. But, you know, it
11   didn't cut it down 100 percent, no,
12   sir.
13       Q.  After August 25th, 2005, did
14   you start advertising again? When I
15   say you, I'm talking about Kelly
16   Trucking.
17       A.  Yeah, I understand. I
18   understand. No, sir. We cut the last
19   -- I think we got it down to one
20   magazine and then we cut that magazine
21   out and we didn't do anything for
22   several months just trying to have
23   money to operate on. And it was
```

21 (Pages 81 to 84)

**www.AmericanCourtReporting.com**
**January 25, 2007**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 85

1  sometime in '06, three or four months
2  maybe that I advertised, maybe five
3  months, with one magazine to try to
4  pick up a couple of drivers. Or mainly
5  owner/operators is what I was trying to
6  pick up at the time.
7  Q. Did Kelly Trucking's need for
8  drivers change between 2004 and 2005?
9  I'm talking about quantity.
10 A. You mean did we have a lot
11 more empty trucks sitting than we
12 needed to hire somebody to put in
13 them --
14 Q. Yes, sir.
15 A. -- from '04 through 05?
16 Q. Yes, sir.
17 A. I probably -- I would have to
18 say the empty trucks ran about the
19 same. We were very fortunate on being
20 able to keep our trucks filled.
21 Q. When did you first learn that
22 Kelly Trucking was -- excuse me --
23 yeah, Kelly Trucking and U.S. Xpress

Page 86

1  were in discussions?
2  A. May or June, maybe. I don't
3  remember the exact month, but I'm going
4  to say it's somewhere in there. Maybe
5  sometime in June. I've got a calendar
6  of events once I got involved with it
7  that's at my old office. When I say
8  events, I guess, when I first became
9  aware of it.
10 Q. Is this like an appointment
11 book or something?
12 A. Well, I did everything the old
13 fashion way. I just copied a calendar
14 sheet, a small one, and then I would
15 just write in there. I didn't have an
16 appointment book. It was just sheets
17 out of a calendar that I copied and
18 used.
19 Q. This wasn't something you kept
20 specifically for U.S. Xpress; it's what
21 you did regularly?
22 A. Yeah. I always keep dates on
23 everything. Tried to, anyway.

Page 87

1  Q. And that was at your old
2  office --
3  A. Yes, sir.
4  Q. -- at Kelly Trucking --
5  A. Yes, sir.
6  Q. -- when you left in December
7  of '06?
8  A. '06, that's when I left.
9  Q. That calendar of events was
10 still there when you left?
11 A. To my knowledge, it was, yes,
12 sir.
13 Q. Were you aware of Kelly
14 Trucking having entered into any
15 discussions with any other companies
16 about the sale of Kelly Trucking to
17 some other entity?
18 A. It was just mentioned to me
19 about a company, Floyd & Beasley, had
20 talked with Guy and Nelson, and I
21 believe Dennis was there at the time.
22 Q. Dennis?
23 A. Hamlet.

Page 88

1  Q. Hamlet. Okay. How did you
2  first hear about U.S. Xpress?
3  A. Guy called me in his office
4  and informed me as to what he was
5  doing.
6  Q. What did he tell you?
7  A. He told me he had entered into
8  an agreement with U.S. Xpress for them
9  to buy the company. And he said,
10 Frank, I don't think you are going to
11 have to worry about your job. I said,
12 okay.
13 Q. At any point in time, did you
14 ever see any agreements between Kelly
15 Trucking and U.S. Xpress?
16 A. At any point during any time
17 period?
18 Q. Yes, sir.
19 A. Yes.
20 Q. When?
21 A. Probably the latter part of
22 August after the deal went sour.
23 Q. So after August 25th, 2005?

22  (Pages 85 to 88)

**www.AmericanCourtReporting.com**
**January 25, 2007**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 89

1    A.  I'm going to say that's
2   probably the first time that I sat down
3   and really went through the agreement,
4   yes, sir.  I don't remember going
5   through it before.  I'm trying to
6   remember.
7        Q.  Did you ever have any contact
8   with anybody from U.S. Xpress?
9        A.  Yes, sir.
10       Q.  When was that and if more than
11  one occasion?
12       A.  Many occasions.  And every one
13  of them's name I can't -- Dennis
14  Farnsworth, I talked to him a number of
15  times.  Al, I think he was the man from
16  Nebraska --
17       Q.  Al Hingst.
18       A.  -- that had sold his company
19  to U.S. Xpress.  He had a small
20  company.  And John, a man from Utah, I
21  believe that was his name, John.  Yeah.
22  Was it John?
23       The lady that came in with a

Page 90

1   crew that came to the office building
2   that I was in at the time, because I
3   was the only one down there, I cannot
4   remember that lady's name.  I've got it
5   in some of my paperwork at the office,
6   but again I don't have it with me.
7   Vice-president of -- over safety, he
8   came to my office.  I met the CFO, the
9   vice -- I believe it was the
10  vice-president of the company when they
11  flew in.  Six of them flew in on their
12  little jet.
13       Q.  Did you say six of them?
14       A.  I believe it was six.  I
15  believe it was five or six.  I had
16  lunch with them.  The exact number, I
17  don't know.  But it was several of them
18  that flew in to Alexander City, to the
19  airport there and then they came over.
20  You know, I met that group, and they
21  all gave me their card, but it's stuck
22  at the office.
23       Q.  When you say the office, are

Page 91

1   you referring to Eagle?
2        A.  Yes.  Yes.  Not where I work
3   now.  There was a lady and a gentleman,
4   and I'm going to have to -- my days are
5   close and I'm going to be under more so
6   than over as far as a date, I believe.
7        Between a two- and three-week
8   period prior to the disaster date,
9   there was a gentleman I got a call
10  from, I think it was Tunnel Hill in
11  Georgia, asking me if I would let them
12  have my files on our drivers.  I said,
13  let me talk with Guy Kelly.
14       I talked with Guy and he said,
15  go ahead and let them have them.  And
16  the reason that I remember the -- I do
17  not remember their names, but I know
18  both of them were single; they were
19  single.  I think both had been
20  divorced.  It just stands out in my
21  head.  One lived in Georgia, one lived
22  in Alabama, but they both worked there.
23  They came down together and we chatted

Page 92

1   a little bit.  They told me they were
2   going together.  We, you know, just
3   carried on generally.  They picked up
4   our filing cabinets, two complete top
5   to bottom stuffed with drivers.  They
6   took those back with them and kept them
7   for a long period of time.  I'm going
8   to say a good two weeks.  Again, I
9   could be off a day or two, but I'm sure
10  it was a good two weeks.  And those two
11  people I met.  Their names, I do not
12  remember.  They did not give me a card.
13       There were about five or six
14  ladies that came down the 22nd, I
15  believe it was, the week of the 25th.
16  Was Monday the 22nd?  Yeah, Monday
17  would be the 22nd is when they came
18  down.  A lot of the ladies that came
19  down then, I had conversation with
20  them.  But names, I don't remember.
21  They were at the office.  I'm just
22  trying to think of anybody else.  I'm
23  probably the world's worst with names

23  (Pages 89 to 92)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 93

1  than anybody you ever met. But I think
2  that's all that I met with the company.
3      Q.  You said they kept the filing
4  cabinets with the drivers' stuff in it
5  for a while?
6      A.  It was everything. Had
7  everything in it. Had their personnel
8  file and their DQ files.
9      Q.  Okay.
10     A.  They had both files. They
11 went to Tunnel Hill. After the deal
12 went sour, they did not bring them back
13 personally. They wanted us to send
14 somebody. They didn't give them back
15 till after the deal went bad. And we
16 had one of our trucks to pick it up,
17 had an empty trailer, truck and trailer
18 coming. I've got a receipt at the
19 office again where our driver had to
20 sign for the filing cabinets. The
21 exact date on it, I cannot tell you.
22 But the best I remember, the date is on
23 there. He signed for them. They put

Page 94

1  them up in the back of the trailer and
2  he brought them back to the office and
3  we unloaded them and put them in the
4  office.
5      Q.  Were you involved at all in
6  the negotiations regarding what went in
7  the Purchase Agreement?
8      A.  As to what went in the
9  Purchase Agreement?
10     Q.  Yes.
11     A.  No, sir.
12     Q.  What, if any, involvement did
13 you have in, I guess, the due diligence
14 or the negotiations?
15     A.  Well, one part, to get it out
16 of the way, is when Dennis came down --
17 and this will not be in any order.
18 Dennis came down to my office and asked
19 me about working for U.S. Xpress. I
20 told him yeah. They even brought me
21 some nice shirts to wear. We had a
22 number of small meetings. And I say
23 small. Quick, 15, 20 minutes,

Page 95

1  sometimes less, that Guy and Nelson
2  would be in one of the two offices with
3  Dennis where they might be on a
4  conference call with somebody out of
5  Tunnel Hill, I'm assuming that's where
6  they were from, talking about what was
7  coming up or when they were going to
8  try to get this thing together, I guess
9  you would say, and get it completed.
10         But also, Dennis got me to
11 come up one day because of a phone call
12 from -- and I'm still -- I'm going to
13 use Tunnel Hill, and if some of them
14 were in corporate or somewhere else,
15 that's what I'm speaking of when I say
16 Tunnel Hill.
17     Q.  Okay.
18     A.  They needed a number of items
19 from me. They needed like a sample of
20 our drivers. That was what they
21 wanted. And this was several weeks
22 prior to August 25th. I didn't pull
23 them. I had -- I believe Dennis came

Page 96

1  to my office, when they were asked for,
2  and I told him just to go in there and
3  pull whatever he wanted. And that way,
4  it would be a true sampling. But
5  somebody else pulled them, and I'm
6  thinking it was Dennis that pulled them
7  and we sent them to Tunnel Hill, and
8  they sent those back. And then that's
9  when they asked me if it was a true
10 sampling of our drivers and I said,
11 yes, it was. I could not sit here and
12 tell you the eight or ten that were
13 pulled, the names.
14         And then that was when they
15 asked me -- Dennis called me again and
16 asked me if I could -- or Nelson did
17 and asked me to come up to his office.
18 Dennis was there and Guy was there. I
19 believe it was Dennis and Guy. I know
20 Dennis was there and Nelson was there.
21 I don't know if Guy was there this
22 particular time or not. But that was
23 when we got on the squawk box and that

24  (Pages 93 to 96)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 97

1  was when they wanted to send the lady
2  and the gentleman down to pick up the
3  files. And I told them, you know, at
4  that point, I had already talked to Guy
5  and, yes, they sent them down.
6       One conversation, and again I
7  can't remember if it was Guy's office
8  or Nelson's, because we had a few in
9  there, and Guy, which you would just
10  have to know Guy. We are sitting here
11  talking, well, you got to do something,
12  I can't lose money. And basically when
13  he said that, it was during the
14  conversation as to when they wanted to
15  start to pull these drivers in on the
16  22nd. And he said, I can't lose money.
17  And they said, well, we will take care
18  of your expenses for that week
19  basically on getting the drivers in.
20       My understanding from talking
21  to the vice-president, which is over
22  safety, was that we were going to have
23  the people come in to hit a short form

Page 98

1  application, is what we call it, and
2  especially these large companies, like
3  U.S. Xpress, they have what they call a
4  short or express application.
5  Basically, you are just giving the
6  company the right to check everything.
7  That's what they did at Tunnel Hill
8  with a handful of drivers that went
9  through there. But the ones that they
10  brought into my office, they kept them
11  and they kept them and they kept them.
12  They had no earnings for the week, to
13  my knowledge. They were so hacked,
14  when they got through on Thursday, that
15  I think most of them went home. They
16  were there Monday and Tuesday, and they
17  told them not to come back Wednesday
18  because they had some more people
19  coming in. They told them to come back
20  Thursday. So they did. And then
21  early, before lunchtime is when Al and
22  John and the lady that was over the
23  group that came in from Tunnel Hill, I

Page 99

1  called them into my office that morning
2  and had a good chitchat with them, then
3  after that is when everything broke
4  loose.
5       Q. Let me go back. Is that all
6  you could remember?
7       A. No. What I remember -- what I
8  don't understand in remembering, I
9  don't know if you want this or not, you
10  might not, but they had every file that
11  we had, maybe one or two or three,
12  something, you know, like I told you
13  earlier, I wouldn't bet my life that
14  every file was sent on every driver we
15  had. I wouldn't bet my life on it.
16  But the ones that we could find, we
17  sent. But they had those files for so
18  long, they could have -- they knew
19  exactly what kind of drivers they were
20  before they sent all these people in
21  there on the 22nd to my office to start
22  the recruiting process or whatever you
23  want to call it, signing them up for

Page 100

1  hire. But they had everything. They
2  had it for a couple of weeks, a good
3  couple of weeks that they had it.
4       Q. Did U.S. Xpress ever ask or
5  ever send down any applications for the
6  drivers to fill out and send back to
7  U.S. Xpress before that August 22nd
8  week?
9       A. You know, I honestly don't
10  remember. I know we had a bunch of --
11  I say a bunch. We had a stack of
12  applications in the office. They could
13  have. They could have. I honestly
14  can't -- I think at one point in time,
15  I don't know if it was before the 22nd
16  or after, I know there were several
17  applications there in our building down
18  there, yes. So it had to be somewhere
19  around that time. It could have been
20  -- it could have been a day or two
21  before.
22       Q. I take it, you weren't
23  involved in handing those out or

25 (Pages 97 to 100)

**www.AmericanCourtReporting.com**
**January 25, 2007**

# American Court Reporting
## toll-free (877) 320-1050

Page 101

1 sending those back to U.S. Xpress after
2 they were filled out?
3     A.  That would have been Eddie
4 Adams or either David Battle that would
5 have handled that.
6     Q.  What did Mr. Farnsworth say to
7 you about coming to work for U.S.
8 Xpress?
9     A.  He asked me -- their intent
10 was -- their intent was to leave a
11 satellite office in Wadley. I think it
12 was to make the transition. He didn't
13 say that. But in my mind, I felt like
14 that's what it was. He asked me what I
15 was making and I told him. He asked me
16 what benefits I had and I told him.
17 And he told me that I would have the
18 same thing with them when this took
19 place.
20     Q.  Do you remember when this
21 conversation took place?
22     A.  June, July, maybe. When I'm
23 speaking of July, it would be around

Page 102

1 the very first part of July, and I'm
2 thinking probably closer to the latter
3 part of June is when we discussed it.
4     Q.  Did you have any conversations
5 with anyone from U.S. Xpress about the
6 closing date?
7     A.  It was discussed in one or two
8 of the meetings that we had. And the
9 reason I'm saying one or two, because
10 it changed. Again, I cannot sit here
11 -- more than likely, it was in Nelson's
12 office. Dennis was there. I don't
13 know if Randall Fant was in there or
14 not, I cannot say. It was three people
15 in that room or four people in that
16 room that day. It was either Randall
17 or Guy in the room with Dennis when it
18 was discussed on one occasion. Another
19 occasion, I think it was just me and
20 Guy and Dennis in Guy's office. But to
21 my knowledge, I think that's the only
22 two times I heard of closing dates for
23 the exception now -- excuse me -- for

Page 103

1 the exception of when they were coming
2 down.
3     Q.  That week in August?
4     A.  Yes, sir. That it was
5 supposed to close that following
6 Monday, I believe it was, the 29th is
7 what they -- is the reason they had to
8 get everything done that week.
9     Q.  All right. The first meeting
10 that you mentioned, not necessarily the
11 first in order, but the first meeting
12 that you mentioned where there were
13 several people, four or five people in
14 the conference, do you remember what
15 was said about the closing date?
16     A.  No. The only thing I can
17 remember basically out of it is just
18 Dennis would say that we've got to do
19 this, that's the reason we are going to
20 move the closing date to this date.
21 But as far as any particulars, I
22 honestly don't know of any.
23     Q.  Is that the same thing with

Page 104

1 the second meeting or second
2 conference?
3     A.  Pretty much. I think the last
4 one was the one -- the middle one --
5 the last one was right before they came
6 in there. So that was not really --
7 that was just an FYI, I believe, for me
8 being up there. But the one prior to
9 that was when they were letting me know
10 that the people were coming in.
11     And I was getting a little
12 disgusted, I believe, because of the
13 calls I was getting from the drivers,
14 you know, and the date getting put off.
15 But they did call me. As far as
16 covering anything else in that meeting,
17 I cannot sit here and tell you we went
18 through a great deal of anything other
19 than maybe just close to an FYI again.
20     Q.  Okay. You mentioned that
21 there was a conference where Mr. Kelly
22 was worried about his expenses of
23 bringing the drivers in.

26 (Pages 101 to 104)

## www.AmericanCourtReporting.com
## January 25, 2007

Page 105

1    A. Yes, sir.
2    Q. Do you remember when that
3  conference was?
4    A. Golly. Golly. I'm going to
5  say maybe sometime maybe the first
6  week, second week in August, I'm
7  thinking. You know, it was one of the
8  deals where -- when we were told to
9  call -- I say we. From Guy and
10 Nelson's standpoint, they had a code
11 that they had to call this number and
12 enter it and it would be four, five,
13 six people on the phone at one time.
14 You know, I didn't know everybody that
15 was on the phone calls; I didn't know
16 everybody.
17   Q. This was a conference call?
18   A. Yes. One of them, yes.
19   Q. You said one of them?
20   A. Dennis Farnsworth was in the
21 room with us.
22   Q. Was there a second conference
23 call regarding this?

Page 106

1    A. Not that specifically, no, not
2  the money, if that's what you are
3  talking about.
4    Q. Right.
5    A. No, sir. No, sir. There was
6  another one about the drivers' DQ files
7  and personnel files, one about that.
8    Q. So Dennis was in the room with
9  yourself, Mr. Chastain and Mr. Kelly
10 when the discussion came up about Kelly
11 Trucking's expense to bring the
12 driver's in the week of --
13   A. I'm just about 100 percent
14 sure on that one, yes. Yes.
15   Q. You indicated that they said,
16 we will take care of the expenses; is
17 that right?
18   A. Yes.
19   Q. Who said that?
20   A. I don't know. It was four or
21 five on the phone. I know one person
22 -- and again, I hate that I don't
23 remember his name, but you know who I'm

Page 107

1  talking about, the vice-president over
2  safety. You will know him. Should.
3  Because I got several -- had several
4  calls with him. I've got his card at
5  the office again. You know, they are
6  card people. I don't know if it was
7  the CFO. I don't know if it was him.
8  I don't know. I can go through the
9  cards and maybe tell you who it was.
10 But as far as --
11   Q. There is a Mr. Wardeberg.
12   A. Who?
13   Q. Wardeberg.
14   A. Yeah. Now, I remember him.
15   Q. Russ Moore?
16   A. When I say remember him, I
17 remember the name.
18   Q. Mr. Moore, Russ Moore?
19   A. Russ Moore was over safety.
20 He was vice-president of safety, wasn't
21 he?
22   Q. Is that who --
23   A. No, he is not the one that

Page 108

1  said that. No, not Russ. It wasn't
2  Russ.
3    Q. Did you know what kind of a
4  purchase this was, whether it was an
5  asset purchase or a stock purchase?
6    A. I did know that, yes, sir.
7    Q. What was your understanding?
8    A. It was an asset purchase.
9    Q. And were you aware that the
10 drivers were no longer going to work
11 for Kelly Trucking, they were going to
12 have to apply with a new employer, U.S.
13 Xpress?
14   A. Well, going to work, you had
15 -- the law says they have to do that if
16 they changed over and go for U.S.
17 Xpress.
18   Q. Right.
19   A. I mean, they couldn't just
20 roll them over.
21   Q. Right. You understand that's
22 why they had to come in and have them
23 fill out applications and go through

27  (Pages 105 to 108)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 109

1  the driver's qualification process?
2      A.  Well, yeah, I understand what
3  you are saying, but -- yeah, I
4  understand what you are saying.
5      Q.  But what?  There is something
6  that you were thinking there.
7      A.  Well, that's something I know.
8  They had their files, they knew what
9  their driving record was.  They had the
10 files for a couple of weeks.  They knew
11 it -- before they came into my office
12 on the 22nd, they knew what every
13 driver that they've got on that piece
14 of paper had on their record up until
15 the last annual review.  You have to do
16 an annual review on every driver.  And
17 it varies.  So the worst, the latest
18 one it could have been was 11 months
19 and 29 days or 11 months and 30 days.
20 And then it would drop down to ten,
21 nine, eight, seven, six, five, four,
22 three current is the way you have to do
23 them.  So they knew what their record

Page 110

1  was before they ever walked through the
2  doors to sign them up.
3      Q.  Were there ever any
4  conversations between yourself and
5  anyone from U.S. Xpress about the Kelly
6  driver files, what was contained in the
7  Kelly driver files?
8      A.  Did I have a conversation?
9      Q.  Yes, sir.
10     A.  The only conversation I had is
11 the one I told you a few minutes ago
12 when we pulled some at random, when
13 some were pulled at random and sent,
14 are these representative of the files,
15 and, you know, my answer to them was
16 yes, because I just reached in there
17 like you pulling them out blind.  I
18 didn't want to pull them.  I wanted
19 somebody else to do it.
20     Q.  Right.
21     A.  And they were sent, so they
22 should have known what was in those
23 files.

Page 111

1      Q.  Do you know if anyone from
2  U.S. Xpress had any conversations with
3  anyone else at Kelly Trucking about
4  specific drivers and things in their
5  driver's file prior to the week of
6  August 21st, 2005?
7      A.  I had a conversation -- can I
8  see this?
9      Q.  Yes.  They are there for your
10 reference.
11     A.  I'm looking at Defendant's
12 Exhibit 33.  There are a couple of
13 notations on here that I put on here
14 myself when I got a call from Russ
15 Moore.
16     Q.  Which ones are your notations?
17     A.  The real ugly ones.
18     Q.  The which ones?
19     A.  This one.
20     Q.  The heavy ones?
21     A.  Yes.  Like this rollover.
22     Q.  On page 97?
23     A.  Yes, 97.

Page 112

1      Q.  There is a 12 dash --
2      A.  12.
3      Q.  -- R period over?
4      A.  Yes.  Yes.  Now, these are the
5  reasons that U.S. gave that they
6  wouldn't hire these people and I
7  scribbled it in and that's what it's in
8  there for.
9      Q.  On that same page, there's a
10 couple of heavy notations.  The word
11 no?
12     A.  Yes.
13     Q.  What does that mean?
14     A.  No, they would not be hired.
15 They are numbered.
16     Q.  I see.
17     A.  The number, it should start
18 with one, wherever one is.
19     Q.  And this is what U.S. Xpress
20 told you?
21     A.  Yes.  Over the phone.
22     Q.  Do you remember when this
23 conversation was?

28 (Pages 109 to 112)

**www.AmericanCourtReporting.com**
**January 25, 2007**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 113

1   A.  I had two.  The second one --
2  the first one, it's going to be hard.
3  I'm drawing a blank on it.  But the
4  second one I know was on August 25th,
5  the morning of August the 25th.
6   Q.  Do you remember when the first
7  one was?
8   A.  It had to be the week prior to
9  the 25th.  It had to be in this mix.
10  Well, it could have been before that,
11  because when they sent me this, they
12  said, we didn't have these files, we
13  don't have these files, where are they.
14  And that's when we went down and looked
15  at the files.  And you can see on some
16  of them here, here, here, we sent those
17  in.  Some of them they said they didn't
18  have.  When we got the files back, they
19  were in there.
20   So I'm going to say on the
21  nine -- I mean, I believe it was ten, I
22  think it was the week prior to on the
23  first ten that's on here.  Either nine

Page 114

1  or ten, he called me the week prior to.
2   Now, the ones after that, you
3  know, like either ten, 11, 12, 13, 14,
4  15, 16, that was the morning of the
5  25th.  That was when John and Al and
6  the lady that was handling the office
7  people that came down, that's when they
8  came into the office and told me that
9  Russ wanted me to call him.  And, boom.
10  He wanted to talk.  And I asked them
11  what it was about, and they said, Russ
12  wants to discuss these drivers that he
13  had said that he couldn't use.  I think
14  it's the first -- anyway, nine or ten
15  that's on here.  He said, you could
16  take it to somebody else, personnel, to
17  see if they can get some of them
18  changed.  I said, okay.  So when I
19  called him that morning with these
20  people present in the office --
21   Q.  This is the morning of the
22  25th?
23   A.  The 25th.  He decides or

Page 115

1  either they knew it and didn't tell me
2  the truth, one or the two, they give me
3  other names to add to the list instead
4  of me being able to discuss him pulling
5  some of these people off the list that
6  they wouldn't accept.  And that's when
7  I sort of got upset.
8   Q.  So you had a conversation
9  around the 9th or 10th of August?
10   A.  I won't say the 9th or 10th.
11   Q.  What was the nine or ten in
12  reference to?
13   A.  These numbers here.
14   Q.  Oh, okay.
15   A.  These numbers like -- see
16  nine, when he -- to get it clear, when
17  he called me the first time about
18  these --
19   Q.  Right.
20   A.  -- when he would call one out,
21  I would just stick a number down there.
22  And it was either nine or ten drivers
23  the first time he called that he could

Page 116

1  not accept.  He said, we can't take
2  these drivers.  So when they told me
3  about it on that Thursday morning that
4  he wanted to discuss the drivers again
5  and possibly send them through
6  personnel again to see if we could
7  change over to get some of them
8  approved, when I called him, it was
9  just reverse, he wanted to add some
10  more to the list.
11   Q.  I see.
12   A.  We had two conversations about
13  the handwritten part here, on my part,
14  we had two different conversations
15  about that.
16
17   (Discussion off the record.)
18
19   (Whereupon, Defendant's Exhibit
20   Number 88 was marked for
21   identification and is attached to
22   the original transcript.)
23   Q.  (BY MR. HALL:) I will show

29 (Pages 113 to 116)

**www.AmericanCourtReporting.com**
**January 25, 2007**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 117

1  you what has been marked as Defendant's
2  Exhibit 88 and ask if you had a copy,
3  a color copy like that.
4      A.  Do I have a color copy?
5      Q.  Did you get a color copy like
6  that?
7      A.  No.
8      Q.  You were working from a copy
9  like --
10     A.  I worked from this right here.
11     Q.  Defendant's 33?
12     A.  Yes, sir, 33.
13     Q.  On the last page of
14  Defendant's Exhibit 33, there is a
15  notation at the top, 50 orange.
16        Do you know whose handwriting
17  that is?
18     A.  That is definitely not mine.
19  You can see my scribbling over here and
20  how fat I write with my pen.  What does
21  that mean to you?  Oh, you are talking
22  about on this?
23     Q.  I was just wondering if that

Page 118

1  was your handwriting.
2      A.  No, sir.
3      Q.  The -- I lost my train of
4  thought.
5      A.  The E looks like mine.  I make
6  E's like that.  But I haven't had
7  anything in color.  There's nothing in
8  my office in color.  I worked off this
9  copy since I have had it.
10     Q.  For the next two, these that
11  have no file, I'm on Defendant's
12  Exhibit 33, those that have no file
13  typed in in the right-hand column, next
14  to it when it says here, that means
15  that you actually still had the file at
16  Kelly Trucking?
17     A.  Yes.
18     Q.  Were there any drivers'
19  qualification files missing because of
20  a weather related mishap in Wadley?
21     A.  Weather related?
22     Q.  Either a tornado or something
23  destroyed a building and drivers' files

Page 119

1  were lost.
2      A.  We had a tornado that hit our
3  safety building.  That's the reason I
4  was down in the other building.
5      Q.  This is before --
6      A.  It happened April the 31st,
7  April the 30th.  Let's see.  April the
8  30th, last day of April.  That's the
9  reason, 30 days.
10     Q.  Were there any drivers' files
11  lost in that?
12     A.  Yes, there were some in that.
13  As far as sitting here telling you
14  there was 30 or 40 or 50, I wouldn't
15  tell you that.
16     Q.  The drivers' files you had to
17  give to U.S. Xpress, were they
18  complete?
19     A.  Yes, to my knowledge, they
20  were, now.
21     Q.  Was there anything that
22  existed before the tornado that wasn't
23  in the drivers' files after the tornado

Page 120

1  that you sent to U.S. Xpress?
2      A.  Shoot that one to me again.
3      Q.  What I'm trying to get at is,
4  if some of the drivers' files were lost
5  because of this tornado, were these
6  drivers files completely reconstructed
7  afterwards?
8      A.  Yeah.  What was sent, what was
9  in those filing cabinets?
10     Q.  Right.
11     A.  Yes, they were correct.  They
12  were correct.
13     Q.  And complete?
14     A.  Yes.
15     Q.  They had everything that
16  existed before the tornado?
17     A.  Yes.  Yes.  It might have been
18  four or five that might not have been
19  sent that weren't even on the list,
20  period, that wouldn't have anything to
21  do with U.S. Xpress that would have to
22  be in there that we had.  You know,
23  everything -- everything that they

30  (Pages 117 to 120)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 121

1 received was a complete DQ file and
2 personnel file.
3    Q.  Who was it you called the
4 morning of the 25th?
5    A.  I didn't call anybody.  They
6 came in and -- well, they came in and
7 told me to call him.  I didn't call him
8 up and say, hey, let's talk about this.
9 Al and John and the lady that was over
10 the group of the ladies that came in
11 there said that Russ Moore wanted me to
12 talk to him that morning about the nine
13 or ten drivers he had said he couldn't
14 accept.  And he said, if I would call
15 him, that he would try to go through
16 personnel with it again and see if he
17 could get some of them corrected.  I
18 said, okay.  So I talked to him and he
19 added some more to it.
20    Q.  This was the morning of the
21 25th?
22    A.  Of the 25th.
23    Q.  What did he say about the

Page 122

1 additional drivers?
2    A.  The ones he added to the list?
3    Q.  Yes, sir.
4    A.  He gave me -- starting at
5 either ten or 11 and going up to the
6 end.  See on these numbered ones,
7 that's the ones that he added to it,
8 saying he could not take those.  All of
9 these were not done on the same date.
10 And that's what I couldn't understand,
11 why with the files that he couldn't
12 say, I can't take the 20, but he has to
13 do it in two different sessions.  But I
14 wrote out there what he said.
15    Q.  What does it mean when it has
16 timber written next to it on
17 Defendant's Exhibit 33?
18    A.  That was one that I told you
19 pulled timber mainly, but they would
20 pull road freight also.
21    Q.  Both.  Okay.  Next to Malcomb
22 Maulden --
23    A.  Which --

Page 123

1    Q.  On page 98, Defendant's
2 Exhibit 33, it's got four accidents --
3    A.  Okay.  Macon Maulden.
4    Q.  Correct.
5    A.  Yes.
6    Q.  What does no; accidents, four
7 accidents mean?
8    A.  No, they won't accept him
9 because of accidents.
10    Q.  Okay.  I got you.  All right.
11 The one below that, Rodney McClain.
12    A.  Rodney McClain.  Okay.
13    Q.  Is it rear end, R period end?
14    A.  Yes.  Yes.
15    Q.  So three tickets plus three
16 tickets?
17    A.  Yeah.  That, I don't know what
18 that stuff got there for.  But he had
19 three tickets and I think one of them
20 was an accident and had a rear end.
21 And that's the reason.  We can go back.
22 That won't be hard to find out what he
23 had on there anyway.

Page 124

1    Q.  Page 99, Harold Thomas.
2    A.  Page 99, Harold Thomas.
3    Q.  It says homicide?
4    A.  That's what it says, which we
5 don't run a -- we don't do a criminal
6 background.  Undoubtedly USX does.
7    Q.  Willy Thompson?
8    A.  He was SAP.
9    Q.  He had tested positive and had
10 not been --
11    A.  Not for us.  With another
12 company.
13    Q.  All right.
14    A.  But he came in and brought his
15 forms like he was supposed to do, and
16 we followed up on it from there.
17    Q.  He had tested positive for
18 another company and then was hired by
19 Kelly Trucking?
20    A.  Yes.  Which that's legal.
21    Q.  You can test positive at
22 another employer and then go to work
23 for another employer?

31 (Pages 121 to 124)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 125

1   A.  After you have gone through
2   your rehab in the SAP program.
3     Q.  Okay.  It's not no SAP, but
4   no --
5     A.  No.  They will not hire him
6   because they won't hire anybody that's
7   in a SAP.
8     Q.  He went to a SAP?
9     A.  Yeah.
10    Q.  I got you.  I thought it
11  meant, no, he had not been to a SAP.
12    A.  No.  He had.  He brought his
13  paperwork with him.
14    Q.  All right.  I'm with you.
15  Jimmy Walters, do you know what that
16  note says?
17    A.  Stop sign, it looks like.
18  S-t-o-p s-i-g-n.
19    Q.  Were you aware of U.S. Xpress'
20  hiring requirements?
21    A.  No.  No, sir, I was not, not
22  until they came in there with their
23  applications, notebooks and everything

Page 126

1   that they brought in on the 22nd.  I
2   think I still have some of it at the
3   office.
4     Q.  Do you know how many drivers
5   USX set as a minimum number of drivers
6   that they had to qualify and hire, be
7   able to hire on the closing date for
8   the Purchase Agreement to go through?
9     A.  I didn't know until after the
10  fact.
11    Q.  So before the fact, you
12  weren't involved in deciding how many
13  drivers they needed?
14    A.  No, sir.  No, sir.  No, sir.
15    Q.  Were you aware that they
16  reduced it from 145 to 130 at one
17  point?
18    A.  I was aware that it was 130.
19  That's what I was aware of.
20    Q.  And you learned that
21  afterwards?
22    A.  After the 25th, yes, sir,
23  because the conversation that I had

Page 127

1   about it with the gentleman from
2   Nebraska, he didn't say anything about
3   it when I was in the room with him,
4   with Guy and Al, Nebraska.
5     Q.  Mr. Hingst, Al?
6     A.  Yeah, he is the one that's
7   over that department that sort of gets
8   small companies and throws them in, you
9   know, hooks them up and tries to help
10  get in the fold for USX.
11    Q.  So you call Mr. Moore and he
12  adds names to the list that they can't
13  hire?
14    A.  Yes, sir.
15    Q.  What, if anything, happens
16  then?
17    A.  I sort of threw my pen up in
18  the air at my desk with Al and John and
19  the lady.  Again, you will have to find
20  out who she is or I can look it up at
21  the old office.  And I told them, I
22  said, you know, you group of people are
23  the most unprofessional people I have

Page 128

1   ever dealt with in my life, to be a
2   company of your size and to have the
3   people that you have in here.
4       I went on -- like I said, I
5   was upset at that point.  I said, I
6   think your main point in coming in here
7   was to shut this company down and break
8   us.  That's what I said to these people
9   that were in my office.
10      Al, he said, Frank, is Guy
11  here today; and I said, yes, sir, he
12  is.  I said, let me call.  So I called
13  up on the hill.  We were down at the
14  office down at the bottom of the hill.
15  I called up on the hill, Guy was there.
16  I said, Guy, Al wants to come up and
17  talk to you; he said, fine.  Al goes up
18  there.
19      In the meantime, three of the
20  people that were on this list that USX
21  would not hire but they were making
22  them fill out paperwork anyway, they
23  had already given me their names, that

32 (Pages 125 to 128)

**www.AmericanCourtReporting.com**
**January 25, 2007**