IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | |
|---|---|
| G.F. KELLY TRUCKING, INC.; and GUY KELLY, individually, <br><br> Plaintiff, <br><br> v. <br><br> U.S. XPRESS ENTERPRISES, INC., et al., <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) CIVIL ACTION NO: 3:06-CV-351-MEF |

### DEFENDANT'S REPLY TO PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

COMES NOW Defendant U.S. Xpress Enterprises, Inc. ("USX") and submits this reply to Plaintiffs' Response in Opposition to Defendant's Motion for Summary Judgment.

### Summary of Undisputed Material Facts

As best as can be discerned from Plaintiffs' thirty-five page Response, Plaintiffs have disputed only one fact asserted in USX's Narrative Summary of Undisputed Pertinent Facts -- the number of drivers who attended the driver qualification process in Wadley during the week of August 22, 2005 ("Driver Qualification Process").[1] The actual number of drivers who attended the Driver Qualification Process is, however, immaterial to the issues before this Court. Regardless of the actual number, the bottom line is that USX was not satisfied, in its sole

---

[1] Plaintiffs contend that ninety-five drivers participated in the Driver Qualification Process, and they base that contention on Exhibits 15 through 117 of their Evidentiary Submission. [Plaintiffs' Response at p. 11, last para.]. Because Plaintiffs do not cite any particular page or line in those exhibits, it is impossible to confirm that their contention is accurate. Under Section 2 of the Uniform Scheduling Order, each citation "must be accompanied by a specific reference, by page and line, to where the evidence can be found in a supporting deposition or document. Failure to make such specific reference will result in the evidence not being considered by the court." [Uniform Scheduling Order at pp. 1-2, Section 2]. As far as the undersigned counsel can tell from reviewing these exhibits, there were approximately 77 drivers who were present in Wadley during the week of August 22.

discretion that there would be 130 Closing Date Drivers that would meet USX's qualifications for hiring. That fact is undisputed and resolves all issues before this Court as a matter of law.

The nuts and bolts of the material, undisputed facts are as follows: On August 8, 2005, USX, GFK, Kelly and Chastain entered into the Asset Purchase Agreement. The APA includes several Conditions to Closing, which, Plaintiffs admit, were conditions precedent to USX's obligations under the APA. [Plaintiffs' Response at p. 22, lines 11-17]. Most relevant among the Conditions to Closing was that USX "shall be satisfied, in its sole discretion, that there will be at least one hundred thirty (130) Closing Date Drivers that will meet [USX]'s qualifications for hiring." [Def. Exh. 45 at p. 6, Sec. 3.6; Kelly Depo. at p. 227, line 19 to p. 228, line 6].

It is undisputed that, at all times relevant hereto, Kelly sought and received the advice of counsel, his company's accountants and his business partner. It is also undisputed that Kelly is an experienced businessman.

Plaintiffs do not dispute that they sent USX a list of 158 GFK drivers on August 9, 2005. Nor do they dispute that on August 12, 2005, GFK added more names to the list for a final total of 167 drivers ("GFK Drivers"). Between August 9 and August 12, GFK sent USX its driver files. While Plaintiffs contend that GFK sent USX "all the information available," it is undisputed that GFK either did not have or did not send a complete driver file for every GFK Driver. [Plaintiffs' Response at p. 3, line 7 from top]. It is further undisputed that Russ Moore and Frank Childers discussed the missing files and discussed the drivers that USX had determined were not qualified based upon the information in GFK's driver files. It is undisputed that Moore told Childers the names of the drivers who were found disqualified. According to Plaintiffs, only 27 of the 167 GFK Drivers were determined to be unqualified based upon the GFK driver files. [Plaintiffs' Response at p. 10, lines 7-10 from top]. Consequently, it is

2

undisputed that there were still 140 drivers who remained eligible to be qualified to work for USX as of August 21, 2005.

On August 22, GFK routed its drivers to Wadley for the Driver Qualification Process. Plaintiffs' Response mentions that 17 GFK Drivers were routed into Wadley who had previously been disqualified, and they imply that USX was responsible. [Plaintiffs' Response at p. 11, line 18 from top to p. 12, line 6 from top]. However, Plaintiffs cite no evidence to dispute that Plaintiffs selected which drivers were routed into Wadley for the Driver Qualification Process. The drivers worked for GFK and were dispatched by GFK, not USX. Thus, USX could not and did not route any drivers to Wadley. Though Plaintiffs complain that USX processed drivers who had already been disqualified, Plaintiffs chose which drivers participated in the Driver Qualification Process.

The Driver Qualification Process involved, among other things, road testing, drug testing, and meeting with USX safety department employees to orient them with USX's safety policies and procedures. It is undisputed that when USX's team arrived in Wadley on August 22 for the Driver Qualification Process, USX met the GFK Drivers for the first time and encountered, for the first time, the drivers' hostility toward working for USX and toward complying with USX's policies and procedures. Plaintiffs do not dispute that GFK Drivers did not want to work for USX and that GFK Drivers announced their intention to quit. Plaintiffs do not dispute that there was a clash of cultures feeding the driver discontent and that the GFK Drivers stated their intention not to adhere to USX's policy and procedures. Although it is true that USX did not know specific names or a specific number of the hostile and discontent drivers, it is undisputed that the drivers present on August 25 "cheered" when they learned that the purchase would not be consummated. [Childers Depo. at p. 141, line 12 to p. 142, line 15]. It is further undisputed

that prior to the week of August 22, USX was wholly unaware of the drivers' hostility towards USX.

Plaintiffs admitted in Guy Kelly's deposition that 50 drivers quit prior to or during the week of August 22. [Kelly Depo. at p. 72, line 14 to p. 75, line 14 and p. 233, line 14 to p. 234, line 15]. Though USX may not now be able to document which drivers actually quit, Plaintiffs' admission that they did quit only confirms and reinforces USX's determination that there would not be enough Closing Date Drivers. These 50 drivers obviously were not willing to conform to USX's policy and procedures inasmuch as, according to Guy Kelly, they quit because they did not want to work for USX. USX was appropriately not satisfied that the drivers would be part of the 130 Closing Date Drivers. Despite not having the names of the drivers who quit, at the very least, it is undisputed that, qualified or not, 167 less 50 results in 117 -- a number less than the requisite 130 Closing Date Drivers.

It is further undisputed that, on August 25, 2005, USX determined that "at most" only about 100 drivers would be qualified for hiring by USX at closing and, "at best," only about 70 drivers would go to work for USX. [Moore Decl. at ¶ 9]. Even putting aside the 50 drivers who quit, based on Plaintiffs own calculations, no less than 39 drivers were disqualified by August 25.[2] [Plaintiffs' Response at p. 11, line 13 from top to p. 12, line 1 from top]. USX decided to

---

[2] It is undisputed that there were 27 drivers disqualified based upon USX's review of GFK's drivers files before the Driver Qualification Process began. It is undisputed that there were 29 drivers disqualified during the week of August 22 based on the Driver Qualification Process. Plaintiffs contend that of the 27 drivers disqualified based upon the driver files, 17 showed up in Wadley the week of August 22 to proceed through the Driver Qualification Process. Plaintiffs do not identify which 17 drivers they are referring to. But assuming Plaintiffs are right, there were still 10 drivers of the 27 drivers who were disqualified based on the GFK driver files and who did not come to Wadley for the Driver Qualification Process. Since these 10 drivers were not in Wadley, they could not be part of the 29 drivers disqualified during the Driver Qualification Process. Adding these 10 previously disqualified drivers to the 29 drivers disqualified by the Driver Qualification Process in Wadley leads to a total of 39 disqualified drivers.

Citing only to their Exhibit 9, Plaintiffs write that "out of the twenty-nine (29) drivers that USX claims were disqualified as of August 25, 2007, [sic] twenty-seven (27) of them were the same drivers that were disqualified before USX even came for the on-site visit August 22, 2005." [Plaintiffs' Response at p. 12, lines 12-15 from top]. However, Exhibit 9 does not demonstrate this point. It is only the color-coded chart listing the 167 GFK

4

terminate the due diligence efforts and informed Plaintiffs of its decision on August 25 because it was impossible to qualify 130 drivers. There were not, and could not be, 130 Closing Date Drivers qualified for hiring by USX. As of August 25, 2005, it was impossible for this Condition to Closing to be met.

## Argument

Plaintiffs' arguments in opposition to summary judgment present a perfect demonstration of the saying, "Darned if you do; darned if you don't." For purposes of their breach of contract claim, Plaintiffs complain that USX was wrong to stop the due diligence process on August 25 and that USX should have continued evaluating drivers until August 31. For purposes of their fraud claims, however, Plaintiffs complain that USX was wrong to even begin the Due Diligence Process. On the one hand, they contend USX should have put every driver through the Driver Qualification Process. On the other hand, they contend that USX should not have put the first driver through the Driver Qualification Process. The internally inconsistent arguments presented in Plaintiffs' Response are wrong on both accounts.

**I.   Plaintiffs have failed to present substantial evidence that USX breached any provision of the Asset Purchase Agreement.**

   **A.   The undisputed evidence shows that USX performed in accordance with Section 7.12 of the APA.**

Though no such specific allegation is pleaded in the Complaint, Plaintiffs now contend that USX breached Section 7.12 of the Asset Purchase Agreement ("APA").[3] Section 7.12 of the

---

Drivers and showing that 27 drivers were not qualified. The chart does not provide a comparison of any two lists of disqualified drivers. At best, Plaintiffs' argument is impermissible speculation.

[3]   Plaintiffs also argue that USX did not act in good faith. However, under both Alabama and Tennessee law the duty to act with good faith and fair dealing cannot serve as an independent basis for a cause of action against USX. *See Shah v. Racetrac Petroleum Co.*, 338 F.3d 557, 572 (6th Cir. 2003) ("Breach of the implied covenant of good faith and fair dealing is not an independent basis of relief."); *Metmor Financial, Inc. v. Commonwealth Land Title Ins. Co.*, 645 So. 2d 295, 297 (Ala. 1993) (bad faith claims limited to insurance contracts).

5

APA requires all parties -- USX, GFK, Kelly and Chastain -- to "cooperate and use their reasonable best efforts to evaluate as promptly as practicable all of Seller's employee drivers and owner-operators for purposes of the condition specified in Section 3.6 above." [Def. Exh. 45, p. 12, Sec. 7.12; Kelly Depo. at p. 227, line 19 to p. 228, line 6].

The Plaintiffs challenge USX's compliance with Section 7.12 on two accounts. One, Plaintiffs challenge the manner by which USX performed the driver qualification process by asserting that USX did not notify Plaintiffs that there were an insufficient number of qualified GFK drivers until during the Driver Qualification Process in Wadley. This challenge presumes, however, that USX <u>could and did</u> reach that conclusion prior to the Driver Qualification Process in Wadley. Plaintiffs fail to offer any evidence in support of that presumption. In fact, the evidence demonstrates the contrary.

USX <u>could not</u> make a determination that there were an insufficient number of drivers until the Driver Qualification Process. USX may have had GFK's driver files, but reviewing driver files alone is insufficient for driver qualification. While drivers can be definitively disqualified based, for example, on a record of their accident history or positive drug test as reported in their GFK files, Department of Transportation ("DOT") regulations and USX's hiring criteria prevent USX from relying only on a prior employee's file for purposes of qualifying a driver. If not disqualified by his prior documented record, the DOT regulations and USX's policy requires applicants to fully complete an application, submit to a physical examination, road test, drug test, criminal background check and an orientation of USX's policies and procedures before they can be determined to be qualified. *See* 49 C.F.R. Part 391. [Moore Decl. at ¶ 10, Def. Exh. 89]. The Driver Qualification Process was necessary to meet these

requirements and to determine whether there were 130 Closing Date Drivers who would meet USX's qualifications for hiring.

The undisputed evidence also shows that USX <u>did not</u> make the determination that there were an insufficient number of drivers until the Driver Qualification Process began. Plaintiffs admit that USX found only 27 drivers that appeared to be disqualified prior to the Driver Qualification Process based on its review of GFK's driver files. That left 140 GFK Drivers for possible qualification during the week of August 22. It is undisputed that, during the week of August 22 and while the Driver Qualification Process was ongoing, USX encountered an outright hostility toward working for USX, and a general refusal to comply with its policies and procedures. Moreover, Plaintiffs do not challenge the reasons for the disqualifications nor do they dispute that there was a general hostility toward USX by the GFK Drivers (a fact they expressly admit). Dennis Farnsworth's, Al Hingst's and Russ Moore's undisputed testimony is that USX determined that there were an insufficient number of drivers on August 25 and terminated the due diligence efforts on that date.

While Plaintiffs do not dispute the foregoing evidence, they attempt to persuade the Court by citing to a color-coded chart of drivers, which they contend was prepared on August 17, as proof that USX knew there were less than 130 qualified drivers prior to the Driver Qualification Process. [Plaintiffs' Response at p. 10, line 7 from the top; Plaintiffs' Evidentiary Submission Exhibit 9]. The color-coded chart, however, actually reflects USX's uncertainty as to the qualification of a substantial number of drivers. [Id.]. The chart lists the names of the GFK Drivers. There are 48 drivers designated as "????." There are 18 drivers designated as "MAYBE." There are 12 drivers designated as "NO FILE." Finally, there are 27 drivers designated as "NO." [Id. at bates label D002556]. Therefore, based on this color-coded chart

and contrary to Plaintiffs' argument, on August 17, 140 out of the 167 GFK drivers remained eligible to be qualified for hiring by USX.

Plaintiffs cannot honestly contend that USX somehow blind-sided them about the disqualification of drivers on August 25. As Frank Childers testified, Russ Moore made him aware of drivers who were disqualified the week prior to August 22. In fact, Childers' testimony confirms Russ Moore's declaration in that respect. [Childers Depo. at p. 110, line 3 to p. 116, line 15; Moore Decl. at ¶ 5]. The bottom line is that USX did not determine that less than 130 drivers could be qualified for hiring until August 25. [Farnsworth Depo. at p. 94, line 15 to p. 97, line 12; Moore Decl. at ¶ 9; Hingst Depo. at p. 28, line 9 to p. 29, line 15]. USX informed Plaintiffs of its determination the very same day it reached its conclusion. [Kelly Depo. at p. 260, lines 6-19 and Def. Exh. 55; Chastain Depo. at p. 78, line 21 to p. 80, line 5; Hingst Depo. at p. 41, line 5 to p. 42, line 19; Farnsworth Depo. at p. 94, line 15 to p. 97, line 12]. There is no evidence that USX knew prior to the week of August 22 that it was not satisfied that there would be 130 qualified Closing Date Drivers.

Second, Plaintiffs contend that USX acted unreasonably because it did not continue the Driver Qualification Process past August 25 and attempt to qualify all of the GFK Drivers. In other words, Plaintiffs argue here that USX should have done what they argued in the first challenge USX should not have done. However, USX determined on August 25 that, at best, it was looking at a pool of 100 drivers who could be qualified. To proceed with the Driver Qualification Process after it made this determination would have been futile. With less than 130 drivers in the pool of those who could potentially be qualified, it was impossible to qualify at least 130 drivers. The law does not require one to perform a vain or useless act. *See Cary v. Curtis*, 44 U.S. 236, 246 (1845) ("Here then the right and the duty of retainer are sanctioned in

the officer; without them the notice spoken of would be nugatory -- a vain act, which the law never requires."); *Mutual Assurance, Inc. v. Wilson*, 716 So. 2d 1160, 1165 (Ala. 1998) ("Alabama law does not require the performance of a vain or useless act."); *Richardson v. Tennessee Board of Dentistry*, 913 S.W.2d 446, 456 (Tenn. 1995) ("The law should not require one to perform useless or futile acts."); *State v. Graham*, 30 S.W.2d 274, 278 (Tenn. 1930) ("The law does not require useless acts."); *Keith v. Howerton*, No. E2000-0273-COA-R3-CV, 2001 Tenn. App. LEXIS 646 at *21 (Aug. 28, 2001) (quoting *Richardson v. Tennessee Board of Dentistry*, 913 S.W.2d 446, 456 (Tenn. 1995)).

Plaintiffs do not dispute that under the APA, USX retained the right to be satisfied, "in its sole discretion," that there will be at least 130 Closing Date Drivers who will meet its qualifications for hiring. [Def. Exh. 45 at p. 6, Sec. 3.6; Kelly Depo. at p. 227, line 19 to p. 228, line 6]. On August 25, USX was not satisfied that there would be 130 Closing Date Drivers who would meet its qualifications for hiring. Indeed, it is undisputed that, on August 25, USX found that there would be only 100 drivers who would meet its qualifications for hiring. Again, Plaintiffs do not dispute that, at most, there were 167 GFK Drivers and that, by August 25, regardless of qualification, 50 drivers had quit. Consequently, Plaintiffs concede that USX's determination that there were less than 130 Closing Date Drivers was, in fact, accurate.

USX's determination that the driver qualification Condition to Closing, as well as other Conditions to Closing, could not be met is what resulted in the termination of the due diligence efforts and the APA. Though Plaintiffs attempt to minimize the issues with the equipment and payoff letters, the undisputed testimony of Dennis Farnsworth and Al Hingst shows that these other Conditions to Closing played a role in USX's decision to terminate the APA. It was the culmination of each of these issues -- driver qualification, equipment and payoff letters -- that led

USX to determine on August 25 that no matter what additional efforts were made over the succeeding days, there was no way the Conditions to Closing would ever be met.[4]

**B.    USX has proven that conditions precedent to its obligations under the APA were not met.**

Plaintiffs contend that USX has failed to present sufficient evidence that the driver qualification Condition to Closing of Section 3.6 was not met. Section 3.6 requires that USX "shall be satisfied, in its sole discretion, that there will be at least one hundred thirty (130) Closing Date Drivers that will meet [USX]'s qualifications for hiring." [Def. Exh. 45 at p. 6, Sec. 3.6; Kelly Depo. at p. 227, line 19 to p. 228, line 6]. Without rehashing the undisputed facts set forth above, suffice it to say that USX determined on August 25 that "at most [it] would be able to qualify 100 drivers." [Moore Decl. at ¶ 9].

**II.   Plaintiffs' fraud and suppression claims lack legal merit and have no basis in the factual record.**

In Plaintiffs' interrogatory answers and in Guy Kelly's deposition testimony, Plaintiffs repeatedly assert that USX "guaranteed" that it would "buy the business" and that Kelly need not worry about GFK's drivers and equipment. [Def. Exh. 13 at p. 4, Int'g 8; Kelly Depo. at p. 101, line 8 to p. 102, line 3; p. 135, line 6 to p. 136, line 22; p. 137, line 21 to p. 139, line 7; p. 145, line 7 to p. 148, line 8; p. 170, line 13 to p. 179, line 5, Def. Exh. 37; p. 181, line 7 to p. 182, line 8; p. 254, line 13 to p. 257, line 22]. Kelly goes so far as to testify that he and Dennis Farnsworth had a separate "verbal agreement" to this effect. [Kelly Depo. at p. 266, line 18 to p. 267, line 4]. Kelly contends that this verbal agreement was in place as far back as June before

---

[4] In terminating the APA, USX was proceeding under Section 11.1(a)(iii)(**B**): "if the Closing shall not have occurred on or before August 31, 2005." The Closing did not occur on or before August 31 because the Conditions to Closing could not be met, as discussed herein. [Def. Exh. 45 at p. 18, Sec. 11.1(a)(iii)(B)]. Despite Plaintiffs' complaint that USX did not give them five days notice, as shown herein, section 11.1(a)(iii)(**A**) did not apply.

the Letter of Intent was signed and before the APA. [Kelly Depo. at p. 170, line 21 to p. 179, line 5]. Kelly's testimony is unequivocal--he contends that Farnsworth led him to believe that the Conditions to Closing were not conditions at all. At no time does he testify that he was led to believe that the conditions to closing were being met. In short, Kelly's testimony is expressly that he relied on Farnsworth's alleged statements to the exclusion of the written contract. As Kelly put it, "I didn't need a guaranteed contract. I had Dennis Farnsworth's word." [Kelly Depo. at p. 177, lines 5-7].

However, in their Response to USX's Motion for Summary Judgment, Plaintiffs attempt to run from Kelly's testimony in an effort to avoid the inevitable consequences of the *Foremost* decision.[5] The Response argues that the only promises Plaintiffs relied on were, strangely enough, promises that were consistent with the APA. That is, Plaintiffs now contend that they were relying on representations that the Conditions to Closing were being met. Regardless of their changed theories, and despite the fact that they are not borne out by Kelly's testimony, Plaintiffs' fraud and suppression claims fail as a matter of law.

    A.    **There is no evidence that USX knew at any time prior to August 25 that it would not close on the APA.**

Accepting Plaintiffs' current argument that Farnsworth's promises that the Conditions to Closing would be met prior to completion of the due diligence, including the Driver Qualification Process and the actual physical inspection of GFK's equipment, Plaintiffs have failed to present evidence that Farnsworth or anyone from USX intended not to consummate the

---

[5] As shown in USX's Brief in Support of Summary Judgment, Kelly's contended reliance on Farnsworth's alleged statements is unreasonable as a matter of law. Following each alleged representation, Kelly was confronted with a writing or action that demonstrated that the Terms and Conditions of the APA were not mere formalities, but, in fact, pre-conditions that had to be met before there could be a closing. Kelly even knew that Farnsworth did not have the authority to agree to a closing. The Letter of Intent stated that only the USX Board of Directors could authorize a closing. [Kelly Depo. at p. 170, lines 13-22; p. 177, line 2 to p.178, line 15; Def. Exh. 37 at pp. 3-4, para. 3].

APA when those promises were made, let alone believed these representations to be false. Plaintiffs contend that Farnsworth represented on July 22 and August 20 that the Conditions to Closing were being met or would be met. On July 22, however, there were no Conditions to Closing to even be met. The APA had not been executed at that point; the final version did not even exist. In fact, USX had not yet sent the first draft of the agreement to Plaintiffs, nor had Plaintiffs rejected it yet. Thus, even assuming representations were made on July 22 that Plaintiffs need not worry about the Conditions to Closing pertaining to GFK's drivers and equipment, the alleged representations were followed by the APA that provided unequivocally that GFK's drivers and equipment had to meet USX's standards in its sole discretion.

As for an alleged representation on August 20, as shown above, the undisputed evidence is that USX at that time knew of only 27 disqualified drivers. Moreover, until USX's team actually met with the GFK Drivers, USX did not, and could not, know that the drivers would either quit rather than work for USX or refuse to accept its policies and procedures. Certainly, Kelly did not disclose this prior to USX's arrival in Wadley for the Driver Qualification Process. Thus, assuming for the sake of argument that Farnsworth made the alleged statements, there is no evidence that Farnsworth or anyone at USX knew on August 20 (or on July 22 for that matter) that the Conditions to Closing could not be met. Once USX learned that the driver qualification Condition to Closing could not be met (on August 25), USX communicated that fact to Plaintiffs.

Plaintiffs make three unsupported arguments in an effort to establish that USX "put on an elaborate ruse under the guise of consummating a buyout in order to suspend Plaintiffs' operations." [Plaintiffs' Response at p. 27, line 6 from the top]. First, Plaintiffs again assert their unsupported argument that USX continued with the Driver Qualification Process despite knowing that there were an insufficient number of drivers for qualification. However, as shown

B ERF 742099 v1
2016317-000055 3/28/2007

above, USX did not know that there were an insufficient number of drivers until the Driver Qualification Process began in Wadley. Moreover, USX did not select which drivers should be routed to Wadley for the Driver Qualification Process. On the contrary, Plaintiffs did. USX told Plaintiffs the names of the drivers who were disqualified as of August 17 based on their driver files. If Plaintiffs routed these drivers to Wadley for the Driver Qualification Process, they have only themselves to blame. Furthermore, Nelson Chastain, who is an officer and shareholder of G. F. Kelly Trucking, Inc., testified that he did not believe USX never intended to close. He did not "see what they could gain by not" closing the deal. [Chastain Depo. at p. 94, lines 1-8].

Second, Plaintiffs contend that USX tried to steal GFK drivers. In support of this contention, they offer a form letter that was sent to 2 drivers of the 167 GFK Drivers disclosed to USX. The two drivers who allegedly received these letters are drivers that USX had determined during the due diligence period did not meet its qualifications. There is no evidence that either of these drivers was hired. There is no evidence that the department within USX that actually sent the letters had any connection with, let alone knowledge of, the APA or the GFK negotiations. There is no evidence that anyone at USX involved in the negotiations with GFK or the Driver Qualification Process had any knowledge that these letters were sent to these two drivers. There is no evidence of any connection whatsoever between these two form letters and the APA, let alone GFK. Moreover, there is no evidence that any of the other 165 GFK Drivers have had any contact from USX in the roughly 2 years after the APA was terminated. Plaintiffs have failed to present any evidence linking the form letter to any greater scheme to "steal" Plaintiffs' drivers. To arrive at such a conclusion would require inference to be stacked on top of other inferences. In other words, Plaintiffs offer nothing but impermissible speculation.

B ERF 742099 v1
2016317-000055 3/28/2007

Third, Plaintiffs contend that USX tried to steal GFK's customers through improper contact. Plaintiffs have, however, presented no evidence to support their contention. Plaintiffs identify three customers, Bowater Paper, Delphi and Wabash Alloys, and claim that these "Customers told us ... That U. S. Xpress had been in to talk to them." [Chastain Depo. at p. 67, 68]. Plaintiffs offer these unverified, out-of-court statements to prove the truth of matter asserted. Thus, the statements are inadmissible hearsay, and USX moves to strike them. USX has filed a Motion to Strike contemporaneously with this Reply.

Moreover, Chastain testified that it was his responsibility to notify GFK customers of the potential purchase of GFK's assets by USX and to obtain contracts with the customers for USX:

> Q. How did they know about -- not Mr. Hopper, but how did the customers: Kanoff, Bowater, Mead, Nabisco and the others that you mentioned, how did they know about the negotiations?
>
> A. Some I had mentioned to, and I think some might have picked it up just maybe through a dispatcher. I had to have a contract in place with each one of them at time of sale that wasn't presently doing business with U.S.
>
> Q. Okay. As part of the agreement U. S. Xpress, you, Mr. Chastain, were supposed to approach the customers and get a contract that U.S. Xpress would provide transportation services for them?
>
> A. They were taking over Kelly.
>
> Q. And basically you had to get the agreement from the customers?
>
> A. Yeah. We had a contract that we provided and they had to sign it.

[Chastain Depo. at p. 64, line 8 to p. 65, line 6]. Under Section 7.3(b) of the APA, Chastain was obligated to work with USX and the customers to transition the business with that customer to USX. [Def. Exh. 45 at p. 11, Sec. 7.3(b); Kelly Depo. at p. 227, line 19 to p. 228, line 6]. In fact, Chastain admitted that it was he who contacted Bowater Paper (and other GFK customers)

to determine whether it would do business with USX in accordance with the APA. [Id. at p. 65, lines 7-21].

Furthermore, and especially in light of Chastain's testimony, the out-of-court statements allegedly made by GFK's customers do not demonstrate any sort of secretive solicitation. The alleged statements are simply that during the negotiation process and due diligence period, USX "had been in contact" with three of GFK's customers. Again, Plaintiffs' Response speculates that the nature of the dubiously alleged contact was an act of improper solicitation. No such evidence exists that would lead to this inference. In short, there is no evidence that USX improperly contacted, let alone attempted to steal, GFK's customers. There is simply no evidence to support a claim of fraud or suppression.

**B.    Plaintiffs have presented no evidence of a false promise on which they reasonably relied.**

Despite their change in legal theories, Plaintiffs have still failed to offer any evidence of reasonable reliance. At the time of the alleged promises, USX had not yet begun the Driver Qualification Process. Pursuant to federal transportation law, of which Plaintiffs must necessarily be familiar, USX was required to put new hires through the Driver Qualification Process. Plaintiffs knew this when the alleged representations were made. Therefore, there was no reason for a sophisticated, college-educated businessman of Kelly's experience to believe that USX could possibly know on July 22 or August 20 that the driver qualification Condition to Closing was or would be met.

Moreover, it would have been unreasonable as a matter of law for Plaintiffs to change their position in reliance on Farnsworth's alleged representations in the face of the APA's language forbidding Plaintiffs from changing the way they did business. The APA provides: "Prior to the Effective Time [the time of closing], Seller [GFK] shall operate the Business only in

15

the ordinary course of business consistent with past practice and will not introduce any new method of management, operation or accounting." [Kelly Depo. at p. 227, line 19 to p. 228, line 6, Def. Exh. 45, p. 7, Sec. 4.1 and p. 10, Sec. 7.1].

### Conclusion

Plaintiffs admit that the APA is a valid and binding contract. Plaintiffs do not offer any evidence to dispute the number of GFK Drivers; the number that were disqualified; the number who quit; the number who refused to adhere to USX's policies and procedures or the lack of 130 drivers available to be qualified on August 25; USX's ignorance of the GFK Drivers' hostility toward USX and the APA or the efforts USX took as part of the due diligence to see that the APA would be consummated. There is no dispute that all the Conditions to Closing could not be met on August 25. There is simply no evidence that USX breached the APA, nor is any evidence to support Plaintiffs' fraud or suppression claims. Whether couched as breach of contract or fraud, Plaintiffs claims fail as a matter of law. There are no genuine issues of material fact, and USX is entitled to judgment as a matter of law.

Respectfully submitted this 28th day of March, 2007.

/s/ Elizabeth R. Floyd
Lawrence B. Clark (CLA012)
David B. Hall (HAL052)
Elizabeth R. Floyd (FLO032)
Attorneys for Defendant
U.S. Xpress Enterprises, Inc.

Of Counsel:
BAKER DONELSON BEARMAN CALDWELL & BERKOWITZ, P.C.
420 20th Street North, Suite 1600
Birmingham, Alabama 35203
(205) 328-0480

## Certificate of Service

I hereby certify that I have filed this document through the Court's CM/ECF electronic filing system and that the following persons will be served with notice of the filing on this the 28th day of March, 2007.

Jere L. Beasley
W. Daniel Miles
Clinton C. Carter
John Everett Tomlinson
BEASLEY, ALLEN, CROW, METHVIN, PORTIS & MILES, P.C.
P. O. Box 4160
Montgomery, Alabama 36103-4160

/s/ Elizabeth R. Floyd
Of Counsel