IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| G. F. KELLY TRUCKING, INC., *et al.,* | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | CASE NO. 3:06-cv-351-MEF |
| | ) | |
| U.S. XPRESS ENTERPRISES, INC., | ) | (WO) |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

G.F. Kelly Trucking, Inc. and Guy Kelly (collectively "Plaintiffs") bring this action against U.S. Xpress Enterprises, Inc. ("USX"), alleging breach of contract, fraud, and suppression. Plaintiffs claim that USX failed to pay them the purchase price for certain of Plaintiffs' assets, falsely told them that it would pay them the money owed, failed to disclose that it would not pay the money, and made misrepresentations and/or concealed material facts. This cause is before the Court on USX's Motion to Strike (Doc. # 37) and Motion for Summary Judgment (Doc. # 21). The Court has carefully considered all submissions in support of and in opposition to the motions and surveyed the relevant case law. For the reasons set forth below, the Court finds that Defendant's Motion to Strike is due to be DENIED as moot, and Defendant's Motion for Summary Judgment is due to be GRANTED.

**I. JURISDICTION AND VENUE**

The Court exercises subject matter jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1332 (diversity). The parties contest neither personal jurisdiction nor venue, and the Court finds an adequate factual basis for each.

## II. SUMMARY JUDGMENT STANDARD

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "An issue of fact is 'genuine' if the record as a whole could lead a reasonable trier of fact to find for the nonmoving party. An issue is 'material' if it might affect the outcome of the case under the governing law." *Redwing Carriers, Inc. v. Saraland Apartments,* 94 F.3d 1489, 1496 (11th Cir. 1996) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)). "A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor." *Chapman v. AI Transp.,* 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc) (quoting *Haves v. City of Miami,* 52 F.3d 918, 921 (11th Cir. 1995) (internal quotation marks and citations omitted)).

The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing the nonmoving party has failed to present evidence in support of some element of its case on

which it bears the ultimate burden of proof. *Id.* at 322-23.

Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324. To avoid summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). On the other hand, a court ruling on a motion for summary judgment must believe the evidence of the nonmovant and must draw all justifiable inferences from the evidence in the nonmoving party's favor. *See, e.g., Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *McCormick v. City of Fort Lauderdale,* 333 F.3d 1234, 1243 (11th Cir. 2003) (the evidence and all reasonable inferences from the evidence must be viewed in the light most favorable to the nonmovant). After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c).

### III.  FACTS AND PROCEDURAL HISTORY

The Court has carefully considered all deposition excerpts and documents submitted in support of and in opposition to the motion. The submissions of the parties, viewed in the light most favorable to the non-moving parties, establish the following relevant facts:

USX is a publicly traded company, and has a principal place of business in Chattanooga, Tennessee. USX is also one of the largest truckload carriers in the country. At the time relevant to this suit, Ray Harlin ("Harlin") was USX's Executive Vice President and Chief Financial Officer. Dennis Farnsworth ("Farnsworth") was USX's Vice President of Business Development. Farnsworth reported to Harlin, and Harlin reported to Max Fuller and Pat Quinn, the co-chairmen of USX. At USX, only four individuals had authority to make commitments on behalf of USX: Ray Harlin, Pat Quinn, Max Fuller, and Jeff Wardeberg.

Guy F. Kelly ("Kelly") founded G.F. Kelly Trucking, Inc. ("Kelly Trucking") in 1990. Kelly Trucking had its principal place of business in Wadley, Alabama, and it was a regional, short haul trucking company, and operated approximately 200 trucks prior to the events leading to this suit. Kelly was the President of Kelly Trucking, and Nelson Chastain ("Chastain") was the Vice-President. This case arises out of USX's failed attempt to purchase the drivers and assets of Kelly Trucking.

Farnsworth's job at USX was to facilitate the growth of USX by searching for trucking companies that would make profitable acquisitions for USX and then conducting the necessary research and negotiations to complete the transactions. From 2004 to 2006, USX investigated the possible acquisition of over one hundred different trucking companies. At any given time, USX could be looking at eight to fifteen different companies to acquire at once. Out of the one hundred companies USX investigated during that time, Farnsworth

was personally involved in the successful acquisition of three separate companies on behalf of USX. As a result of these three transactions, USX acquired more than 1,500 trucks in this two and a half year span.

In April of 2005, Kelly was first contacted regarding a potential sale of Kelly Trucking to USX. Kelly was interested in a deal, and the parties began to negotiate. Farnsworth was Kelly's point of contact at USX during the negotiation process, and at all times relevant to this suit, Kelly was represented by counsel. In July of 2005, USX began to conduct a "due diligence" review of Kelly Trucking. This process was conducted by Farnsworth, and it involved reviewing Kelly Trucking financial statements, meeting with Kelly Trucking's officers to negotiate and plan the conversion process, and planning the driver qualification process. Farnsworth visited the Kelly Trucking offices in Wadley three times during the course of the due diligence process.

On July 26, 2005, USX provided Kelly a first draft of the Asset Purchase Agreement ("APA" or "the Agreement"). On July 29, 2005, Kelly emailed Farnsworth to tell him that he could not accept the APA as drafted, and he requested several changes to the Agreement. Kelly signed the final version of the Agreement on August 8, 2005. The APA established the following "Conditions to Closing" that are relevant to this case:

> Section 3.2. <u>Inspections</u>. Buyer shall have completed its inspection of the Transferred Equipment and Leased Equipment and shall be satisfied with the results of such inspection *in its sole discretion*.
> . . . .
> Section 3.6. <u>Closing Date Drivers</u>. Buyer shall be

> satisfied, *in its sole discretion*, that there will be at least one hundred thirty (130) Closing Date Drivers that will meet Buyer's qualifications for hiring.
>
> Section 3.7. <u>Lien Payoff Letters</u>. If any Transferred Equipment is subject to a Lien, prior to Closing, Seller shall present to Buyer one or more payoff letters, with all prepayment penalties, late fees, administrative fees, and other amounts due included . . . .
>
> Section 3.8. <u>Factoring Payoff Letter</u>. Seller shall present to Buyer a payoff letter, with all prepayment penalties, late fees, administrative fees, and other amounts due under the Factoring Agreement included . . . .

(Def. Ex. 45, Doc # 20) (emphasis added).[1]

In his deposition, Kelly testified that prior to the execution of the APA, Farnsworth made several oral representations to him that USX was going to close the deal. The first representation occurred in May 2005 when Farnsworth allegedly told Kelly that he had "seen all he needed to see, that he wanted the company, and he would make it happen." Kelly testified that after Farnsworth made this statement, Kelly reduced certain insurance and creditor payments in anticipation of the buyout by USX. Kelly also testified that on June 30, 2005, Farnsworth guaranteed that USX would buy Kelly Trucking and told Kelly "not to worry about the driver situation." Kelly also testified that on July 22, 2005, during one of

---

[1] One of the changes from the first draft of the APA was that the number of required "Closing Date Drivers" in Section 3.6 was reduced from 145 to 130. Farnsworth testified in his deposition that the reason that the number of drivers was reduced from 145 to 130 in the final draft of the Agreement was out of a concern that 145 would not be attainable.

Farnsworth's visits to Wadley, he guaranteed that USX would complete the deal and acquire Kelly Trucking.

On August 19, 2005, Kelly sent an email telling Farnsworth to complete the deal or leave him alone because his customers and drivers were getting nervous about the deal. Kelly also indicated in the email that he had already lost 15 drivers due to the uncertain state of the negotiations. On August 20, Farnsworth called Kelly at home and apologized for the delay. Kelly testified that during this conversation, Farnsworth guaranteed that USX would buy Kelly Trucking, and that they would close on August 29, 2005. Farnsworth also said that a team of representatives would be coming to Kelly Trucking on August 22.

On August 22, 2005, representatives from USX arrived in Wadley to qualify drivers. The process was planned to last one day, but actually lasted three days before USX decided to terminate the contract.[2] Under the terms of the APA, USX needed to find in its sole discretion that 130 drivers met USX's "qualifications for hiring." USX used a three step approach to make this determination. The first step was the a review of Kelly Trucking's driver files which involved reviewing each file for immediate disqualifying facts such as traffic accidents. The second step was the "driver qualification process," which required the driver to be physically present in Wadley, and involved, among other things: road tests, drug

---

[2] Kelly Trucking had to compensate these drivers for their time despite the fact that they were not pulling in any revenue. Kelly testified that he had a verbal agreement with Farnsworth that USX would reimburse Kelly Trucking for its out-of-pocket expenses. Farnsworth disputes that there was any such discussion.

7

tests, and an orientation meeting with USX safety department employees on USX's safety policies and procedures. Based upon the number of drivers that were preliminarily "qualified" by the driver qualification process, USX would then move to the third step, which was to determine how many of these qualified drivers were willing to work for USX. Only drivers who successfully passed all three steps would be considered a "Closing Date Driver" by USX for the purposes of meeting the 130 driver requirement of the APA.

By the end of August 24, 2005, 95 of Kelly Trucking's drivers had gone through the driver qualification process,[3] and USX had disqualified 29 of them. Hingst testified that many of the drivers who did qualify through the driver qualification process did not want to work at USX because it had stricter policies and procedures for drivers than Kelly Trucking.[4] Approximately 70 drivers never went through the driver qualification process because USX elected to end the due diligence process and terminate the APA.

On August 25, 2005, USX notified Plaintiffs that it was terminating the APA. Kelly Trucking lost 35 drivers the week of August 22, 2005, as a result of the negotiations between Kelly Trucking and USX. Therefore, by August 25, 2005, Kelly Trucking had lost 50

---

[3] Hingst testified that the week of August 22, 2005, only 60 Kelly Trucking drivers went through the qualification process in Wadley. The Plaintiffs dispute this fact and allege that 95 drivers went through this process. Because of the procedural posture of this case, the Court assumes for the purposes of this opinion that 95 drivers went through this process.

[4] Although Plaintiffs contend that Kelly Trucking had at least 130 qualified drivers who would have been willing to work for USX, Plaintiffs do not dispute that there were drivers who were dissatisfied with USX's policies and procedures, and Kelly admitted this fact in his deposition.

drivers. According to Kelly, these drivers left because they had felt misled when they found out during the USX qualification process that USX had many policies and procedures that were different from Kelly Trucking. Kelly Trucking had a policy that its drivers would be routed to their home city for every weekend, and, according to Kelly's testimony, USX had indicated that situation would not change. However, during the driver qualification process, the drivers became aware that USX's policy was different and they would not be home every weekend. When the drivers were later informed that the sale to USX had been terminated, the drivers cheered.

Kelly Trucking also lost several clients during, and subsequent to, the negotiations with USX. Some clients left because they didn't want to do business with USX, and after USX terminated the deal, they did not return. Others left because Kelly Trucking was unable to provide adequate service due to the loss of its drivers.

During the due diligence process, USX employees made certain contacts with Kelly Trucking clients. Kelly testified that he never gave USX authorization to contact any of Kelly Trucking's clients. As soon as Kelly found out about the client contacts, he told Farnsworth not to contact any more of his clients until after the deal was closed.[5] In addition, more than two months after cancelling the APA, USX sent two invitation to hire letters dated November 16, 2005 to two of Kelly Trucking's drivers. Both of these drivers had been

---

[5] While there is evidence that USX made certain client contacts, there is no evidence in the record that the purpose of these contacts was to attempt to solicit these clients away from Kelly Trucking.

rejected by USX during the qualification process.

Kelly Trucking ceased operations during the first quarter of 2006. Plaintiffs then filed this action on March 14, 2006 in the Circuit Court of Randolph County, Alabama. USX removed the case to this Court on April 18, 2006, pursuant to 28 U.S.C. § 1332.

## IV. DISCUSSION

### A. Motion for Summary Judgment

#### 1. Breach of Contract

Plaintiffs contend that USX breached its contract with them by terminating the APA. USX has moved for summary judgment, asserting that Plaintiffs' breach of contract claim fails because Plaintiffs failed to meet one or more conditions precedent required by the APA.

Tennessee law[6] provides that failure to meet a condition precedent is an affirmative defense to a breach of contract claim. *Safeco Ins. Co. of Am. v. City of White House*, 191 F.3d 675, 682 (6th Cir. 1999). The defendant bears the burden of proof to show that the plaintiff failed to meet the condition precedent. *Id.* USX argues that the APA imposed

---

[6] When a federal court decides a state law claim it applies the choice of law rules of the jurisdiction in which it sits. *Benchmark Med. Holdings, Inc. v. Rehab Solutions, LLC*, 307 F. Supp. 2d 1249, 1258-59 (M.D. Ala. 2004) (Albritton, C.J.) (citing *Boardman Petroleum, Inc. v. Federated Mut. Ins. Co.*, 135 F.3d 750, 752 (11th Cir. 1998). In contractual disputes where the contract contains a choice of law provision, Alabama law requires the court to apply the law of the sovereign that the parties have chosen. *Stovall v. Universal Constr. Co.*, 893 So. 2d 1090, 1102 (Ala. 2004). Here, the APA contains a choice of law provision that specifies that the agreement should be construed and enforced in accordance with the laws of the State of Tennessee. Furthermore, the parties do not dispute that Tennessee law applies to the breach of contract claim. Therefore, this Court will apply Tennessee law to this claim.

several conditions precedent that were never fulfilled. Specifically, USX argues that Plaintiffs failed to provide the required number of qualified drivers, failed to provide the required Lien Payoff Letters and Factoring Payoff Letters, and its equipment failed to satisfy USX's inspections. Plaintiffs contend, based on statements made by USX employees, that USX did not consider the equipment inspections and payoff letters obstacles to closing, and that the only purported justification for USX's termination of the contract was the issue of qualified drivers.

With respect to the issue of drivers, the APA provides:

> Section 3.6. <u>Closing Date Drivers</u>. Buyer shall be satisfied, *in its sole discretion*, that there will be at least one hundred thirty (130) Closing Date Drivers that will meet Buyer's qualifications for hiring.

(Def. Ex. 45, Doc # 20) (emphasis added). Plaintiffs argue that there were still several days left before the proposed August 29, 2005, closing date, and many drivers had yet to undergo the driver qualification process. Therefore, Plaintiffs assert that there is a genuine issue of material fact as to whether Plaintiffs would have failed to meet the Closing Date Drivers condition. Plaintiffs further assert that USX breached Section 7.12 of the APA, which required them to "cooperate and use their reasonable best efforts to evaluate as promptly as practicable all of Seller's employee drivers and owner-operators for purposes of the condition specified in Section 3.6 above." Plaintiffs also allege that USX breached its duty of good faith and fair dealing.

The APA gave USX the right to exercise its "sole discretion" as to whether Plaintiffs

had provided 130 drivers that met USX's qualifications for hiring. When a contract gives a party the right to exercise its "sole discretion," that discretion must still be exercised in accordance with the duty of good faith and fair dealing. *See Wallace v. Nat'l Bank of Commerce*, 938 S.W.2d 684, 686-87 (Tenn. 1996) (analyzing whether one party's unilateral exercise of discretion as provided by contract violated duty of good faith and fair dealing). However, the duty of good faith does not extend beyond the agreed upon terms of the contract and the reasonable expectations of the parties. *Id.* Furthermore, where a contract provides a party with the right to exercise unilateral discretion, it is reasonable for the other party to expect that discretion to be exercised. *Id.*

Here, the parties do not dispute that by August 25, 2005, approximately 50 of Kelly Trucking's drivers had quit. The parties do not dispute the fact that USX disqualified 29 drivers between August 22, 2005 and August 25, 2005. There is some dispute over how many total drivers USX reviewed the week of August 22, but this Court presumes for the purpose of summary judgment that 95 drivers were reviewed that week. The parties do not dispute that as of August 25, 2005, USX had been given the names of 167 Kelly Trucking drivers, which represented the universe of drivers USX could potentially hire.[7] Therefore, under the best case scenario for the Plaintiffs, 66 drivers had been qualified through the driver qualification process with 72 drivers yet to be reviewed. This means that as of August 24, 2005, the maximum number of drivers that could have qualified as Closing Date Drivers

---

[7] Plaintiffs do not allege that there were more than 167 potential drivers.

was 138.

Moreover, this 138 maximum does not account for whether these drivers were willing to work for USX. Because the entire purpose of the APA was for USX to acquire Kelly Trucking's drivers, USX considered a driver's willingness to work for USX a critical factor in whether a driver met USX's "qualifications for hiring" under the APA. Of the drivers USX qualified during the driver qualification process, there was concern on the part of USX that a substantial percentage of these drivers would refuse to work for USX. These concerns were based on comments drivers made during the qualification process. Therefore, even though it was conceivable that as many as 138 drivers could have been qualified through the driver qualification process, USX determined that it would not be possible to hire at least 130 drivers, as required by the APA.[8] USX's concerns find ample support in the record: Hingst testified that a number of drivers expressed concerns about working for USX; approximately 50 of Kelly's drivers quit after the potential sale to USX was announced but before the APA was terminated; very few drivers quit immediately after the APA was terminated; and when Plaintiffs' drivers were told that the APA had been terminated, they cheered.

---

[8] Plaintiffs have argued that this Court should not interpret Section 3.6 to include a requirement that the 130 Closing Date Drivers actually be willing to work for USX. In other words, the Plaintiffs argue that Section 3.6 is met if 130 drivers met the accident record, road test, and drug test requirements that were a part of the driver qualification process in Wadley, without regard to whether these drivers were willing to work for USX. However, given the facts that a driver unwilling to work for USX would be worthless to USX, and that Section 3.6 left it to USX's "sole discretion" whether a driver met its "qualifications for hiring," this Court will not utilize the narrow construction of the APA proposed by Plaintiffs.

For the foregoing reasons, no reasonable jury could find in favor of Plaintiffs on this issue. Specifically, no reasonable jury could find that USX failed to use its "reasonable best efforts" to find at least 130 drivers that met its qualifications for hiring, or that USX breached its duty of good faith and fair dealing. Moreover, no reasonable jury could find that Plaintiffs had met the requirements of Section 3.6, which was a condition precedent to the APA. Consequently, this Court grants USX's motion for summary judgment as to the breach of contract claim.

2.   **Tort Claims**[9]

   a.   **Promissory Fraud**

Plaintiffs' claim for promissory fraud is based on a theory that the entire process of negotiating the APA, reviewing Plaintiffs' financial documents, inspecting Plaintiffs' equipment, and conducting the driver qualification was an "elaborate ruse" designed to suspend Plaintiffs' operations, so that USX could later poach its drivers and clients after breaching the agreement. Because this fraud claim is based on a promise to act in the future

---

[9] With regard to tort claims, Alabama choice of law rules follow the doctrine of *lex loci delicti*, which provides that such claims are governed by the law of the place where the harm occurred. *Twin City Fire Ins. Co. v. Colonial Life & Acc. Ins. Co.*, 124 F. Supp. 2d 1243, 1248 (M.D. Ala. 2000) (DeMent, J.) (citing *Fitts v. Minn. Mining & Mfg. Co.*, 581 So. 2d 819, 820 (Ala. 1991). In applying the *lex loci delicti* rule to fraud claims, courts have consistently held that the state where the injury occurred is the state in which the plaintiff suffered the economic impact. *See Glass v. S. Wrecker Sales*, 990 F. Supp. 1344, 1348 (M.D. Ala. 1998) (Albritton, J.). Here, Plaintiffs' principal place of business was in Alabama and there is no evidence to suggest that it felt any economic impact in any other state. Moreover, the parties do not dispute that Alabama law applies to the tort claims in this case. This Court agrees and will apply Alabama law to the Plaintiffs' tort claims.

(USX's promise to close the deal), Plaintiffs have the burden to prove the following elements by a preponderance of the evidence: (1) a false representation (2) of a material existing fact (3) reasonably relied upon by the plaintiff (4) who suffered damage as a proximate consequence of the misrepresentation; (5) proof that at the time of the misrepresentation, the defendant had the intention not to perform the act promised, and (6) proof that the defendant had an intent to deceive. *Waddell & Reed, Inc. v. United Investors Life Ins. Co.*, 875 So. 2d 1143, 1160 (Ala. 2003). USX contends that it is entitled to summary judgment because Plaintiffs have failed to make a prima facie case due to insufficient evidence regarding the necessary elements of reasonable reliance and intent to deceive. Where the plaintiff fails to present sufficient evidence on an element that is essential to their claim, the defendant is entitled to summary judgment. *See Kee v. Nat'l Reserve Life Ins. Co.*, 918 F.2d 1538, 1542-43 (11th Cir. 1990).

Kelly testified in his deposition that Farnsworth promised on numerous occasions that USX would close the deal. Because this Court must draw all reasonable inferences in the nonmovant's favor for the purposes of summary judgment, these allegations must be presumed true. However, even operating under the assumption that these promises were made, Plaintiffs' reliance on these promises must still be reasonable. *Waddell*, 875 So. 2d at 1160. Under Alabama law, it is unreasonable as a matter of law to rely on representations that contradict a written document in the plaintiff's possession. In *Foremost Ins. Co. v. Parham*, 693 So. 2d 409, 421 (Ala. 1997), the Alabama Supreme Court held:

15

> [T]he trial court can enter a judgment as a matter of law in a fraud case where the undisputed evidence indicates that the party or parties claiming fraud in a particular transaction were fully capable of reading and understanding their documents, but nonetheless made a deliberate decision to ignore written contract terms.

*Id.*; *see also Tyler v. Equitable Life Assur. Soc. of U.S.*, 512 So. 2d 55, 57 (Ala. 1987) ("[F]raud or misrepresentation cannot be predicated upon a verbal statement made before execution of a written contract when a provision in that contract contradicts the verbal statement."); *Taylor v. Moorman Mfg. Co.*, 475 So. 2d 1187, 1189 (Ala. 1985) (holding that it was not reasonable to rely on oral representation that was contradicted by written contract); *Holton v. Blue Cross & Blue Shield of S. Carolina*, 56 F. Supp. 2d 1338, 1345 (M.D. Ala. 1999) (Albritton, C.J.) (reliance on representations that contradicted handbook in plaintiff's possession was not reasonable).

Here, Kelly had in his possession the APA, which clearly spelled out the conditions to closing that Kelly Trucking had to meet in order for USX to close the deal. Therefore, as a matter of law, it was unreasonable for him to rely on alleged promises and guarantees made by Farnsworth that USX would definitely close the deal under any circumstances. For this reason alone, summary judgment in favor of USX is proper.

With respect to the other requisite element of intent to deceive, Plaintiffs allege that USX was engaged in an elaborate ruse to steal its drivers and clients without paying for them. In support of this argument, Plaintiffs provide two letters of recruitment, each dated November 16, 2005, that were sent by USX to two of its 167 drivers. Plaintiffs also

16

presented evidence that USX made communications to Plaintiffs' clients during the due diligence process without Plaintiffs' permission. This evidence is simply insufficient for a reasonable jury to find an intent to deceive. Two form letters sent to two drivers *out of 167*—with no evidence that any drivers were actually hired by USX—months after the APA was cancelled is not sufficient for a reasonable jury to find that during the due diligence process, USX had an intent to deceive. Neither are isolated communications with clients when there is no evidence that USX was attempting to solicit any clients away from the Plaintiffs. This insufficiency is particularly apparent when the record indicates that this transaction was but one of many routine acquisitions USX was attempting to complete.

### b. Fraudulent Suppression

Plaintiffs' fraudulent suppression claim resembles its promissory fraud claim. Plaintiffs allege that USX failed to disclose that the negotiation process, Agreement, and closing period were part of a strategy to freeze Plaintiffs' operations, paralyze its business functions, and put it out of business.

The elements of a fraudulent suppression claim are: (1) a duty on the part of the defendant to disclose facts; (2) concealment or nondisclosure of material facts by the defendant; (3) inducement of the plaintiff to act; (4) action by the plaintiff to his or her injury. *Freightliner, L.L.C. v. Whatley Contract Carriers, L.L.C.*, 932 So. 2d 883, 891 (Ala. 2005). Moreover, the suppression of the existing material fact must have led the plaintiff to act to his detriment in reasonable reliance thereon. *Davis v. Sterne, Agee & Leach, Inc.*, No.

1050478, --- So. 2d ----, 2007 WL 80810, at *13 (Ala. Jan. 12, 2007) (citing *Crowder v. Memory Hill Gardens, Inc.*, 516 So. 2d 602, 605 (Ala. 1987)). The terms of the APA require a finding as a matter of law that Plaintiffs could not have reasonably relied on any misrepresentations or omissions by USX. *See supra* Part IV.B.2.a. Furthermore, there is insufficient evidence for a reasonable jury to find that USX intended to suspend Plaintiffs' operations in an effort to drive it out of business. *See id.* For these reasons, USX is entitled to summary judgment on Plaintiffs' fraudulent suppression claim.

**B.    Motion to Strike**

USX has moved to strike portions of the deposition testimony of Kelly and Chastain, submitted by Plaintiffs in opposition to USX's Motion for Summary Judgment. USX requests that the court strike the portions of Chastain and Kelly's testimony in which they testify that customers told them that they had been contacted by USX. USX contends that these statements are being offered for the truth of the matter asserted and that they are therefore inadmissible hearsay. Plaintiffs respond that the testimony is admissible because it is not offered for the truth of the matter.

Plaintiffs offered the testimony as evidence of USX's fraudulent intent. However, whether the evidence is admissible is irrelevant because it does not affect this Court's decision. Regardless of whether the evidence was considered, there is no evidence that USX made any attempt to solicit any of Plaintiffs' clients. Therefore, this Court need not address the Motion to Strike.

## V. CONCLUSION

For the reasons set forth above, it is hereby ORDERED that

(1) Defendant's Motion for Summary Judgment (Doc # 21) is GRANTED.

(2) Defendant's Motion to Strike (Doc # 37) is DENIED as moot.

(3) Defendant's Motion to Limit Expert Testimony (Doc # 31) is DENIED as moot.

(4) All claims and this case are DISMISSED WITH PREJUDICE.

(5) The pretrial and the trial scheduled in this matter are CANCELLED.

This Court will enter a separate final judgment taxing costs.

DONE this 30th day of October, 2007.

                                            /s/ Mark E. Fuller
                                    CHIEF UNITED STATES DISTRICT JUDGE